**KESSLER TOPAZ MELTZER & CHECK, LLP**
JENNIFER L. JOOST (Bar No. 296164)
(jjoost@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel: (415) 400-3000
Fax: (415) 400-3001

*Counsel for Plaintiff Anthony Joseph Peters*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ANTHONY JOSEPH PETERS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TWIST BIOSCIENCE CORPORATION, EMILY M. LEPROUST, and JAMES M. THORBURN,<br><br>Defendants. | Case No. 3:22-cv-8168<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Anthony Joseph Peters ("Plaintiff"), by and through his counsel, alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, including the investigation of Plaintiff's counsel, which included, among other things, a review of Defendants' (defined below) United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by Twist Bioscience Corporation ("Twist" or the "Company"), analyst reports and advisories about the Company, media reports concerning the Company, judicial filings and opinions, and other publicly available information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a federal securities class action on behalf of a class of all persons and entities who purchased or otherwise acquired Twist common stock between December 13, 2019, and November 14, 2022, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

2. Twist, a Delaware corporation with its principal executive offices in South San Francisco, California, is a biotechnology company that manufactures synthetic DNA and DNA products. Synthetic DNA products allow users to design and modify DNA for the purposes of academic research, enhancing specialty chemical production, and developing healthcare treatments, among other uses. Twist's common stock trades in the United States on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "TWST."

3. Throughout the Class Period, Defendants repeatedly assured investors that the Company possessed innovative proprietary technology relating to its synthetic DNA products that positioned Twist for significant future growth. Indeed, Defendants claimed that the Company had already achieved substantial growth during the Class Period, growing from a customer base of approximately 1,300 diagnostic companies, hospitals, research institutions, and others at the end of fiscal year 2019, to approximately 2,900 customers at the end of fiscal year 2021.

4. Similarly, Defendants reported skyrocketing gross margins, which purportedly grew from 12.8% in fiscal year 2019, to 39.1% in fiscal year 2021, with margins projected to reach 40% for fiscal year 2022.

5. During the Class Period, Defendants also announced plans to build a "Factory of the Future" in Wilsonville, Oregon (the "Oregon Facility"), which would purportedly provide hundreds of jobs and occupy 110,000 square feet. By August 2022, when Twist reported its financial results for the third quarter of fiscal year 2022, Defendants projected annual capital expenditures between $95 million and $100 million, largely attributable to "building out" this new manufacturing facility.

6. Plaintiff and other members of the class learned the truth about the Company's actual financial health on November 15, 2022, when Scorpion Capital ("Scorpion") published a lengthy report (the "Scorpion Report") alleging that Twist is "a cash-burning inferno that is not a going concern."[1] Specifically, Scorpion alleged that, among other things, Twist's purported DNA chip technology is a "farce" comparable to Theranos Inc.'s now infamous non-existent blood-testing technology, and that the Company's growth and revenues are unsustainable, among other issues.

7. According to the Scorpion Report, Twist is perpetuating its fraud through false reporting of capital expenditures and gross margins—which Scorpion claims are actually negative. Indeed, Scorpion's investigation of the forthcoming Oregon Facility revealed no evidence that the Company is preparing to begin manufacturing there, suggesting that the Company is using the facility to hide large operating expenses as fraudulent capital expenditures.

8. Scorpion further alleged that the Company's growth is dependent upon unsustainable pricing strategies, such as using below-cost prices to undercut competitors by as much as 70% to 85%. Ultimately, the Scorpion Report concluded that Twist is "operating a Ponzi-like scheme that will end in bankruptcy."

---

[1] All emphasis is removed from the Scorpion Report quotations.

9. In response to the revelations in the Scorpion Report, the price of Twist common stock fell $7.57 per share, or nearly 20%, from a close of $38.00 per share on November 14, 2022, to close at $30.43 per share on November 15, 2022.

10. This Complaint alleges that, throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts, about the Company's business and operations. Specifically, as alleged in the Scorpion Report, Defendants overstated the commercial viability of Twist's synthetic DNA manufacturing technology while engaging in accounting fraud and using unsustainable pricing to inflate the Company's true financial condition and prospects. As a result of Defendants' wrongful acts and omissions, and the significant decline in the market value of the Company's common stock, Plaintiff and other members of the Class have suffered significant damages.

## II. JURISDICTION AND VENUE

11. Plaintiff's claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

12. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Twist's principal executive offices are in South San Francisco, California, and because many of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of materially false and misleading information, occurred in this District.

14. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

15. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Twist common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

16. Defendant Twist is a Delaware corporation, with principal executive offices in South San Francisco, California.

17. Defendant Emily M. Leproust ("Leproust") has served as the Company's Chief Executive Officer throughout the Class Period.

18. Defendant James M. Thorburn ("Thorburn") has served as the Company's Chief Financial Officer throughout the Class Period.

19. Defendants Leproust and Thorburn are collectively referred to herein as the "Individual Defendants."

20. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Twist's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Each Individual Defendant was provided with copies of the Company's reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.

21. Twist and the Individual Defendants are collectively referred to herein as "Defendants."

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background

22. Twist manufactures synthetic DNA and DNA products for use by customers including diagnostic companies, hospitals, and research institutions.

**B. Defendants' False and Misleading Statements**

23. The Class Period begins on December 13, 2019, to coincide with the filing of the Company's annual report for the fiscal year ending September 30, 2019, on Form 10-K with the SEC (the "2019 Annual Report").

24. In the 2019 Annual Report, which was signed by Defendants Leproust and Thorburn, Defendants touted the Company's synthetic DNA technology, claiming:

> We have combined our silicon-based DNA writing technology with proprietary software, scalable commercial infrastructure and an e-commerce platform to create an integrated technology platform that enables us to achieve high levels of quality, precision, automation, and manufacturing throughput at a significantly lower cost than our competitors.
>
> We have applied our unique technology to manufacture a broad range of synthetic DNA-based products, including synthetic genes, tools for next generation sample preparation, and antibody libraries for drug discovery and development, all designed to enable our customers to conduct research more efficiently and effectively.

25. Defendants further claimed in the 2019 Annual Report that the Company was selling its synthetic DNA products to "a global customer base of 1,305 customers across a broad range of industries."

26. In the 2019 Annual Report, assured investors that the Company had significant growth potential and DNA synthesis methods that were vastly superior to its competitors, explaining that Twist's "silicon-based chip technology can increase DNA production by a factor of 9,600 on a footprint like that of traditional DNA synthesis methods" and "significantly lowers the volume of required reagents."

27. As required by the Sarbanes-Oxley Act of 2002, Defendants Leproust and Thorburn certified that they had reviewed the 2019 Annual Report, that it "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and that they were "responsible for establishing and maintaining disclosure controls and procedures."

28. Throughout the Class Period, Defendants continued to tout Twist's purportedly revolutionary technology. In the Company's annual report for fiscal year 2020 filed on Form 10-K with the SEC on November 27, 2020 (the "2020 Annual Report"), which was signed by Defendants Leproust and Thorburn, Defendants again represented that Twist's "proprietary technology" is enabling a wide range of customers "to conduct research more efficiently and effectively," and stated that the Company's customer base had grown to approximately 2,200 customers.

29. Defendants also reported skyrocketing gross margins of 31.8% for fiscal year 2020 in the 2020 Annual Report, up from 12.8% in the prior fiscal year.

30. As required by the Sarbanes-Oxley Act of 2002, Defendants Leproust and Thorburn certified that they had reviewed the 2020 Annual Report, that it "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and that they were "responsible for establishing and maintaining disclosure controls and procedures."

31. On December 22, 2020, Twist issued a press release announcing that the Company planned to build a "Factory of the Future" in Wilsonville, Oregon. In the press release, Defendants claimed that the Oregon Facility would cover 110,000 square feet, provide up to 400 jobs, and become operational in calendar year 2022.

32. Throughout the remainder of the Class Period, Twist reported substantial expected capital expenditures, and largely attributed these expenditures to building the Oregon Facility. For example, in the Company's press release announcing its earnings for the first quarter of fiscal year 2021 on February 4, 2021, Defendants projected that capital expenditures for fiscal year 2021 would be $30 million, "including expansion into 'Factory of the Future.'"

33. Defendants also reiterated the purported superiority of its proprietary technology and increasing margins. For example, when the Company filed its annual report for fiscal year 2021 on Form 10-K with the SEC on November 23, 2021 (the "2021 Annual Report"), which was signed by Defendants Leproust and Thorburn, Defendants again claimed that Twist's "proprietary technology"

would enable customers "to conduct research more efficiently and effectively," and reported that the Company had approximately 2,900 global customers.

34. In the 2021 Annual Report, Defendants also reported a substantial increase in gross margins, reporting 39.1% gross margins for fiscal year 2021, up from 31.8% in the prior fiscal year.

35. As required by the Sarbanes-Oxley Act of 2002, Defendants Leproust and Thorburn certified that they had reviewed the 2021 Annual Report, that it "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and that they were "responsible for establishing and maintaining disclosure controls and procedures."

36. On August 5, 2022, in the Company's press release announcing its financial results for the third fiscal quarter of 2022, Defendants increased their guidance for annual capital expenditures to a range between $95 million and $100 million, which Defendants attributed to "building out" the Oregon Facility. Additionally, Defendants assured investors that the Company's annual gross margins would reach 40% in fiscal year 2022.

37. During the Company's quarterly earnings call with investors held that same day, Defendant Leproust assured investors that the Oregon Facility would begin generating revenue in January 2023.

38. Then, on August 16, 2022, Defendant Leproust told the *Portland Business Journal* that the Oregon Facility would be fully operational by January 2023 and stated that the Company was "in a very aggressive hiring spree in Wilsonville," where the Oregon Facility is located.

39. In the same interview, Defendant Leproust further represented that renovations at the Oregon Facility were complete, the facility's manufacturing equipment was in place, and "[o]nce we have [completed quality checks], we'll be able to start taking orders and ship product."

40. The above statements identified in paragraphs 24-39 were materially false and misleading, and failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants overstated the commercial viability of Twist's synthetic DNA

manufacturing technology while engaging in accounting fraud and using unsustainable pricing to inflate the Company's true financial condition and prospects.

**C. The Truth Emerges**

41. Investors learned the truth about the Company's scheme on November 15, 2022, when Scorpion issued a lengthy report warning that Twist is "a cash-burning inferno that is not a going concern" and is "operating a Ponzi-like scheme that will end in bankruptcy."

42. According to the Scorpion Report, "Twist's 'DNA chip' is simply a cut-and-paste of an old technology" that Defendant Leproust's former employer, Agilent Technologies, developed in the early 2000s and had proven an "epic flop." The Scorpion Report further alleged that Twist's DNA chip is "nothing more than a DNA micro-array, a legacy 40-year old technology" that is a commodity already offered by competitors rather than an actual, innovative microchip with transistors.

43. Given the alleged deceptive repackaging of existing technology, Scorpion compared Twist to the now-defunct Theranos Inc., which infamously claimed that it had developed a revolutionary blood-testing technology, but in reality was still using traditional technology.

44. The Scorpion Report also revealed that, according to certain former Twist employees, Defendants' representations about the Company's competitive advantages—specifically, the purported ability of its DNA chip technology to manufacture DNA at dramatically higher volumes and with less raw materials—are patently false. Scorpion quoted former Twist employees who explained that the Company's manufacturing workflow uses "pretty standard molecular biology technique[s]" and is "at the same point that all of the other vendors are at"—contradicting Defendants' claims that Twist possesses revolutionary technology.

45. Moreover, the Scorpion Report characterized Twist as a "ticking time bomb" that is "operating an unsustainable Ponzi-like scheme based on price dumping and customer subsidies to buy revenue and create the illusion of 'growth,'" and explained that Twist's strategy was to "radically underprice the competition in an effort to purchase market share and 'growth,'" reporting that Twist undercut competitors' pricing by as much as 85%.

46. According to Scorpion, Twist depends on "extreme discounting to hold on to [customer] accounts," and several customers told Scorpion that they would not continue to purchase from Twist if not for the massive discounts they are receiving. In fact, Scorpion reported that certain of Twist's competitors internally label the Company's strategy a "Ponzi scheme," given that Twist is only displaying growth by raising money from investors to sell products at a loss to its customers.

47. Because Twist's price dumping dramatically reduced prices throughout the industry, certain former Twist employees told Scorpion that they do not expect Twist to ever recover from the unsustainably low prices they caused, stating that "once you displace pricing and that badly, it's almost impossible to lift it again."

48. Explaining Twist's concealment of its unremarkable technology and unsustainable pricing strategies by, *inter alia*, reporting fraudulent gross margins and improperly classifying certain costs as operating expenses and capital expenses, the Scorpion Report alleged that Twist's reported gross margins—nearly 40% as of fiscal year 2021—are "unusually high" for a commodity manufacturer, and that Twist's gross margins are actually negative. As explained in the Scorpion Report, Twist is concealing this problem in two ways: (1) "improperly expensing direct manufacturing costs like labor as [research and development], an operating expense"; and (2) "capitalizing manufacturing costs as capital expenditures."

49. Further, Scorpion highlighted the fact that Twist has largely attributed its skyrocketing capital expenditures to development of the Oregon Facility, which it characterized as an "epic hoax . . . that . . . is little more than a ruse to conceal an additional $100MM of losses by misclassifying [cost of goods sold] as capital expenditures." To this end, Scorpion reported that its own private investigator had visited the location of the Oregon Facility, where he found "a deserted parking lot, a quiet loading dock," no reception area, a handful of office employees working at computers, and—contrary to Defendant Leproust's claims in August 2022—no evidence of manufacturing equipment or activity.

50. The Scorpion Report also identified several additional "red flags" that Twist is concealing fraudulent behavior, including a "cesspool of bad actors" comprising the Company's

largest holders at the time of the Company's Initial Public Offering in October 2018, potential undisclosed related-party transactions by Defendant Thorburn, and suspicious transactions between Twist and offshore Chinese entities raising concerns that the Company is violating the Foreign Corrupt Practices Act.

51. In response to the revelations in the Scorpion Report, the price of Twist common stock declined $7.57 per share, or nearly 20%, from a close of $38.00 per share on November 14, 2022, to close at $30.43 per share on November 15, 2022.

## V. PLAINTIFF'S CLASS ACTION ALLEGATIONS

52. Plaintiff brings this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased or otherwise acquired Twist common stock during the Class Period (the "Class"). Excluded from the Class are Defendants, their agents, directors and officers of Twist, and their families and affiliates.

53. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

54. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a. Whether Defendants violated the Exchange Act;

b. Whether Defendants omitted and/or misrepresented material facts;

c. Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d. Whether Defendants knew or recklessly disregarded that their statements were false and/or misleading;

e. Whether the price of Twist common stock was artificially inflated; and

f. The extent of damage sustained by members of the Class and the appropriate measure of damages.

55. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

56. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

57. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable.

## VI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE MARKET DOCTRINE

58. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. The omissions and misrepresentations were material;

c. The Company's common stock traded in an efficient market;

d. The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e. Plaintiff and the Class purchased Twist common stock between the time the Company and the Individual Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

59. At all relevant times, the market for the Company's common stock was efficient because: (1) as a regulated issuer, the Company filed periodic public reports with the SEC; and (2) the Company regularly communicated with public investors using established market communication mechanisms, including through regular disseminations of press releases on the major news wire

services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## VII. NO SAFE HARBOR

60. Defendants' "Safe Harbor" warnings accompanying any forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

61. Defendants are liable for any false and/or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that the forward-looking statement was false. None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## VIII. LOSS CAUSATION/ECONOMIC LOSS

62. Defendants' wrongful conduct directly and proximately caused the economic loss suffered by Plaintiff and the Class. The price of Twist common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses. As a result of their purchases of Twist common stock during the Class Period, Plaintiff and the Class suffered economic loss, i.e., damages, under the federal securities laws.

## IX. ADDITIONAL SCIENTER ALLEGATIONS

63. During the Class Period, Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of

business that operated as a fraud or deceit on purchasers of Twist common stock during the Class Period.

## X. CLAIMS AGAINST DEFENDANTS

### COUNT I

**Violations of Section 10(b) of the Exchange Act and**
**SEC Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

64. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

65. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and the Class; and (2) cause Plaintiff and the Class to purchase Company common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

66. Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices thereof in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

67. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

### COUNT II

**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

68. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

69. The Individual Defendants acted as controlling persons of Twist within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, and their ownership

and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the Company, including the content and dissemination of the various false and/or misleading statements. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

70. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular accounting practices giving rise to the securities violations as alleged herein, and exercised the same.

71. As described above, the Company and the Individual Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Company common stock during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b. Awarding compensatory damages and equitable relief in favor of Plaintiff and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d. Such other and further relief as the Court may deem just and proper.

## XI. DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

DATED: December 12, 2022

Respectfully submitted,

**KESSLER TOPAZ MELTZER & CHECK, LLP**

*/s/ Jennifer L. Joost*
JENNIFER L. JOOST (Bar No. 296164)
(jjoost@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel: (415) 400-3000
Fax: (415) 400-3001

*Counsel for Plaintiff Anthony Joseph Peters*