# WEAVER DECLARATION EXHIBIT 13

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN UTESCH, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff(s), | Civil Action No. 2:16-cv-005932-WB |
| v. | **CLASS ACTION** |
| LANNETT COMPANY, INC., ARTHUR P. BEDROSIAN, and MARTIN P. GALVAN, | Judge Wendy Beetlestone |
| Defendants. | |

## MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTION OF THE UNIVERSITY OF PUERTO RICO RETIREMENT SYSTEM FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF SELECTION OF LEAD COUNSEL AND IN <u>OPPOSITION TO THE COMPETING MOTIONS</u>

**Table of Contents**

**Page(s)**

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT ...................................................................................................................... 4

I.  The Institutional Investor Group Selected Counsel With a Potential Conflict of Interest
    Rendering Them Inadequate to be Appointed as Lead Plaintiff............................................. 4

    A.    The Institutional Investor Group is an Inappropriate Group ....................................... 9

    B.    The LCI Investor Group is an Inappropriate Group .................................................. 15

    C.    UPR Should Be Appointed as Lead Plaintiff ........................................................... 17

II. Limited Discovery is Warranted Concerning the Institutional Investor Group and the LCI
    Investor Group ............................................................................................................ 19

    A.    Discovery of the Institutional Investor Group's Counsels' Conflict Is Sought.......... 19

    B.    Discovery of the LCI Investor Group's Formation Is Sought ................................... 20

CONCLUSION.................................................................................................................. 23

## **Table of Authorities**

**Page(s)**

**Cases**

*Boston Retirement System v. Volkswagen AG, et al.*,
No. 3:16-cv-03435-CRB (N.D. Ca. 2016)................................................................................18

*Buettgen v. Harless*,
263 F.R.D. 378 (N.D. Tex. 2009) ................................................................................. 9, 12

*Fischler v. Amsouth Bancorporation*,
1997 U.S. Dist. LEXIS 2875 (M.D. Fla. Feb. 6, 1997) ............................................... 19

*Fraternal Order of Police, Miami Lodge 20, Insurance Trust Fund v. Lannett Company, Inc., et al.*,
No. 2:16-cv-02031-CMR (E.D. Pa.) ............................................................................. 5

*Greenfield v. Villager Industries, Inc.*,
483 F.2d 824 (3d Cir. 1973)........................................................................................... 7

*Howard Gunty Profit Sharing Plan v. CareMatrix Corp.*,
354 F. Supp. 2d 18, 24 (D Mass. 2000) ...................................................................... 13

*In re Bally Total Fitness Litigation*,
2005 U.S. Dist. LEXIS 6243 (N.D. Ill. Mar. 15, 2005)............................................... 22

*In re Cendant Corp. Litig.*,
264 F.3d 201 (3d Cir. 2001)............................................................... 1, 10, 11, 17

*In re Eichenholtz,*
2008 U.S. Dist. LEXIS 64633 (N.D. Cal. Aug. 22, 2008)......................................... 12

*In re eSpeed, Inc. Sec. Litig.*,
232 F.R.D. 95 (S.D.N.Y. 2005) ..................................................................................... 2

*In re Level 3 Communs., Inc. Secs. Litig.*,
2009 U.S. Dist. LEXIS 44706 (D. Colo. 2009) ..................................................... 11, 14

*In re Network Associates, Inc. Sec. Litig.*,
76 F. Supp. 2d 1017 (N.D. Cal. 1999) .................................................................. 21, 22

*In re Organogensis Sec. Litig.*,
241 F.R.D. 397 (D. Mass. 2007)................................................................................. 23

*In re Razorfish, Inc. Sec. Litig.*,
143 F. Supp. 2d 304 (S.D.N.Y. 2001)......................................................................... 11

*In re Spectrum Pharms., Inc.*,

2014 U.S. Dist. LEXIS 38322 (D. Nev. Mar. 20, 2014)............................................................ 16

*In re UBS Auction Rate Sec. Litig.*,
   2008 U.S. Dist. LEXIS 56016, (S.D.N.Y. July 16, 2008) ......................................................... 18

*In re Vonage Initial Public Offering Sec. Litig.*,
   2007 U.S. Dist. LEXIS 66258 (D.N.J. Sept. 7, 2007) ......................................................... 19, 22

*In re: Generic Digoxin and Doxycycline Antitrust Litigation*,
   No. 2:16-md-02724-CMR, Dkt. No. 111(E.D. Pa.)................................................................. 5, 6, 8

*Kuper v. Quantum Chem. Corp.*,
   145 F.R.D. 80 (S.D. Ohio 1992) ................................................................................................. 5, 6

*Lifestyle Invs., LLC v. Amicus Therapeutics, Inc.*,
   2016 U.S. Dist. LEXIS 68952 (D.N.J. May 26, 2016) ................................................................. 13

*Lifestyle Invs., LLC v. Amicus Therapeutics, Inc.*,
   2016 U.S. Dist. LEXIS 68952 (D.N.J. May 26, 2016) ........................................................... 10, 16

*Niederklein v. PCS Edventures!.com, Inc.*,
   2011 WL 759553 (D. Idaho Feb. 24, 2011)................................................................................... 9

*Pipefitters Local No. 636 Defined Benefit Plan v. Bank of Am. Corp.*,
   275 F.R.D. 187 (S.D.N.Y. 2011) .................................................................................................. 9

*Pirelli Armstrong Tire Corp. v. LaBranche & Co., Inc.*,
   229 F.R.D. 395 (S.D.N.Y. 2004) ................................................................................................ 18

*Ross v. Abercrombie & Fitch Co.*,
   2007 U.S. Dist. LEXIS 24903 (S.D. Ohio Mar. 22, 2007)................................................... 10, 14

*Sakhrani v. Brightpoint, Inc.*,
   78 F. Supp. 2d 845 (S.D. Ind. 1999).......................................................................................... 22

*Sallustro v. Cannavest*,
   93 F. Supp. 3d 265  (S.D.N.Y. 2015).......................................................................................... 2

*Shi v. Sina Corp.*,
   2005 U.S. Dist. LEXIS 13176 (S.D.N.Y. July 1, 2005) ............................................................ 18

*Sullivan v. Chase Investment Services of Boston, Inc.*,
   79 F.R.D. 246 (N.D. Cal. 1978).................................................................................................... 5

*Teran v. Subaye, Inc.*,
   2011 WL 4357362 (S.D.N.Y. Sept. 16, 2011)............................................................................. 9

*Topaz Realty v. Northfield Labs., Inc.*,
   2006 U.S. Dist. LEXIS 77613 (N.D. Ill. June 19, 2006) ........................................................... 22

*Tsirekidze v. Syntax-Brillian Corp.*,

2008 WL 942273 (D. Ariz. Apr. 7, 2008) ....................................................................... 14

*UFCW Local 1500 Welfare Fund v. Allergan PLC, et al.*,
No. 2:16-cv-02169-CMR (E.D. Pa.) ............................................................................ 6

**Statutes**

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) ................................................................................. 2

15 U.S.C. §78u-4(a)(3)(B)(iv) .................................................................................... 18

15 U.S.C. 78u-4(a)(2)(A)(i)-(vi) .................................................................................. 22

**Other Authorities**

H.R. Conf. Rep. No. 104-369, at 34 (1995).................................................................. 21

*Legal Ethics and Class Actions: Problems, Tactics and Judicial Responses*, 71 Ky. L.J. 787, 796
(1983) ........................................................................................................................... 5

Lead Plaintiff movant University of Puerto Rico Retirement System ("UPR") respectfully submits this memorandum of law in further support of its motion for: (i) appointment as Lead Plaintiff; and (ii) approval of its selection of Lead Counsel and in opposition to the competing motions for appointment as Lead Plaintiff.  In that regard, UPR also moves for limited discovery concerning the Institutional Investor Group's and the LCI Investor Group's ability to fairly and adequately represent the class.[1]

## PRELIMINARY STATEMENT

Seven motions for appointment as lead plaintiff pursuant to the PSLRA were filed in this Action.  The movants are:  (i) UPR; (ii) the so-called LCI Investor Group; (iii) the so-called Institutional Investor Group; (iv) Iron Workers District Counsel (Philadelphia & Vicinity) Retirement and Pension Plan; (v) the so-called Lannett Investor Group; (vi) Operating Engineers Construction Industry and Miscellaneous Pension Fund; and (vii) John Allen.[2]  For the reasons set forth below, UPR is the movant with the largest financial interest in the relief sought in this litigation, that also satisfies the requirements of Rule 23.  As such, UPR is the presumptive lead plaintiff and should be appointed as lead plaintiff in this Action.

"In appointing a lead plaintiff, the court's first duty is to identify the movant that is presumptively entitled to that status."  *In re Cendant Corp. Litig.*, 264 F.3d 201, 262 (3d Cir. 2001).  That movant is the one with the largest financial interest in the relief sought by the class that also meets the typicality and adequacy requirements of Rule 23.  *Id.* at 264; *see also* 15

---

[1] Capitalized terms having the same meaning as in UPR's Memorandum in Support of Motion For Appointment As Lead Plaintiff and Approval of Selection of Lead Counsel ("Memo in Support").

[2] On January 23, 2016, the Lannett Investor Group filed a Notice of Withdrawal of its motion to be appointed lead plaintiff.  Docket Number ("Dkt. No.") 12.  On January 24, 2017, John Allen filed a Notice of Withdrawal of his motion to be appointed lead plaintiff.  Dkt. No. 13.

U.S.C. § 78u-4(a)(3)(B)(iii)(I). UPR's losses of $237,943.00 make it a movant with a substantial

financial interest. *See* Declaration of David M. Promisloff in Further Support of the University of

Puerto Rico Retirement System's Motion for Appointment as Lead Plaintiff and Approval of

Selection of Counsel and in Opposition to Competing Motions ("Promisloff Decl.") Exhibit A.

Of the competing movants, only the LCI Investor Group and the Institutional Investor Group

claim to have a larger loss than UPR from their Class Period investments, and thus a greater

financial interest in the relief sought in the Action.[3]  Promisloff Decl. Exhibit E. Neither of those

movants satisfy the typicality and adequacy requirements necessary to be approved Lead

Plaintiff.

The Institutional Investor Group is inadequate to represent the proposed Class as it

apparently failed to uncover or ignored a debilitating conflict of interest by its chosen counsel,

Labaton Sucharow LLP ("Labaton") and Pomerantz LLP ("Pomerantz").  Instead, it selected two

law firms to serve as co-lead counsel for the putative class, but those two firms are engaged in

litigation against the same corporate defendant, Lannett, (and others), alleging price-fixing and

violations of the anti-trust and consumer laws.  Seeking recoveries in two different complex

litigations for two competing groups against the same corporate defendant imposes a potential

conflict on those two law firms as they may need to determine litigation strategy or settlement

---

[3] The stated losses for the lead plaintiff movants who have not withdrawn their motions, using the *Dura* LIFO method, are as follows:  the Institutional Investor Group's four members' losses are approximately $1.427 million; the LCI Investor Group's 5 members' losses are approximately $573,519 (with the largest individual group member's losses at approximately $234,309); UPR's losses are approximately $237,943; Iron Workers District Counsel (Philadelphia & Vicinity) Retirement and Pension Plan's losses are approximately $128,390; and Operating Engineers Construction Industry and Miscellaneous Pension Fund's losses are approximately $93,275.  Courts generally prefer calculating losses under the *Dura*  and last-in, first-out ("Dura LIFO) method of calculating losses in securities fraud actions.  *See, e.g., Sallustro v. Cannavest*, 93 F. Supp. 3d 265, 272 n.10  (S.D.N.Y. 2015) (*Dura* LIFO is the preferred accounting method in the Second Circuit).

options that favor one action to the detriment of the other.  Moreover, given the finite resources of Lannett, including the possibility of a bankruptcy filing, competition for those resources will pit its selected counsel in this case against its clients in the price-fixing case.  That potential conflict is sufficient to deny them a role in this litigation.

If the Institutional Investor Group did uncover this potential conflict, it should not have proffered its selected counsel as lead counsel for the Class, to which it would owe fiduciary duties.  If it did not uncover the conflict, its ability to represent the Class adequately must be questioned.  In either case, it cannot satisfy Rule 23 and cannot be appointed lead plaintiff.

In addition, the Institutional Investor Group, as well as the LCI Investor Group, are improper groups, which cobble-together unrelated investors for the sole purpose of aggregating losses in an attempt to obtain lead plaintiff appointment.  The Institutional Investor Group, composed of four entities with no pre-existing relationship, submitted an inadequate joint declaration because they provide no details as to how they would function or how disputes would be resolved.  Such deficiencies are indicative of a group sown together by counsel in an attempt to claim the largest losses and the lead plaintiff appointment; such attempts have been repeatedly denied by courts.  The LCI Investor Group provides no information at all about how it came to apply as a group, much less how it would function or how disputes would be resolved.  None of the five individual members of the LCI Investor Group have as large a loss as UPR, and its only purpose of jointly filing for lead plaintiff appears to be to claim the largest loss as a group.  Moreover, its selected counsel has solicited investors to sign up with their firm without disclosing that they can obtain a recovery as a member of the Class without taking such action.  The Institutional Investor Group and the LCI Investor Group applications are, therefore, deficient and should be rejected.

By contrast, UPR is precisely the type of plaintiff identified by Congress as an ideal lead plaintiff candidate when it enacted the PSLRA.  UPR is a sophisticated institutional investor with a significant financial interest in the outcome of the litigation and it is not subject to any unique defenses or conflicts.  Accordingly, UPR should be appointed as lead plaintiff and its choice of lead counsel should be approved.

Alternatively, if the Court does not reject the Institutional Investor Group's application, then UPR respectfully requests limited discovery of the Institutional Investor Group to determine what its members know about their selected law firms' potential conflict, and how that may determine its ability to fairly and adequately represent the Class.  Given that there are four members of the Institutional Investor Group, it may be that one or two of them knew of the potential conflict of counsel and did not share that information with the other members of the group.  Such information would be significant in determining how that group would function, particularly given the failure of the group to provide that information.  Accordingly, limited discovery is warranted into what the members of the Institutional Investor Group knew about its counsels' potential conflict of interest.

In addition, limited discovery is requested as to how the Institutional Investor Group and the LCI Investor Group each came together as groups, how they would each function and how they would resolve conflicts.  Given that they each appear to be groups that were driven by counsel and provided no information on their functioning or conflict resolution, limited discovery on these issues is warranted to the extent the Court does not reject their motions.

## **ARGUMENT**

### I.    **The Institutional Investor Group Selected Counsel With a Potential Conflict of Interest Rendering Them Inadequate to be Appointed as Lead Plaintiff**

The Institutional Investor Group selected Labaton and Pomerantz to serve as co-lead

counsel for the proposed Class in this Action.  Labaton and Pomerantz have an undisclosed conflict because they were each appointed as members of Plaintiffs' Steering Committee ("PSC") in *In re: Generic Digoxin and Doxycycline Antitrust Litigation*, No. 2:16-md-02724-CMR, Dkt. No. 111(E.D. Pa.), a consolidated litigation against Lannett and others alleging price-fixing.  Thus, the same counsel selected by the Institutional Investor Group to serve as co-lead counsel in this Action against Lannett and others are also among the counsel in charge of an anti-trust case against Lannett, which may result in a need to apportion Lannett's available finite resources between the two litigations.  In any event, it creates an intractable potential conflict to which the Class would be subjected by the Institutional Investor Group because of their actions. *See* Richard H. Underwood, *Legal Ethics and Class Actions:  Problems, Tactics and Judicial Responses*, 71 Ky. L.J. 787, 796 (1983) (class counsel pursuing another securities fraud action against same corporate defendant in another federal district court had a disabling conflict) (citing *Sullivan v. Chase Investment Services of Boston, Inc.*, 79 F.R.D. 246, 258 (N.D. Cal. 1978)).  The Institutional Investor Group's selection of counsel with such a debilitating conflict demonstrates their inadequacy and precludes their appointment as lead plaintiff.  *See, e.g., Kuper v. Quantum Chem. Corp.*, 145 F.R.D. 80, 83 (S.D. Ohio 1992) (because of counsel's potential conflict, plaintiffs cannot demonstrate they will vigorously prosecute the interests of the class adequacy could not be found).

On or about April 27, 2016, Pomerantz filed a complaint against Lannett and others, alleging a conspiracy to fix prices regarding certain drugs and alleging violations, *inter alia*, of the anti-trust and consumer protection laws.  *See Fraternal Order of Police, Miami Lodge 20, Insurance Trust Fund v. Lannett Company, Inc., et al.*, No. 2:16-cv-02031-CMR (E.D. Pa.).  That action seeks, among other things, damages on behalf of all those in 28 states and the District of

Columbia who purchased, paid and/or provided reimbursement for some or all of the purchase price of certain generic drugs.  On or about May 5, 2016, Labaton filed a similar complaint against Lannett and others, making similar allegations. *UFCW Local 1500 Welfare Fund v. Allergan PLC, et al.*, No. 2:16-cv-02169-CMR (E.D. Pa.). Those actions filed against Lannett by Pomerantz and Labaton (collectively, the "Anti-Trust Action") were subject to a multi-district litigation ("MDL") proceeding and, with other transferred actions, have since become part of the MDL pending in the Eastern District of Pennsylvania before the Honorable Cynthia M. Rufe.  *In re: Generic Digoxin and Doxycycline Antitrust Litigation*, No. 2:16-md-02724-CMR (E.D. Pa.). On or about November 28, 2016, Labaton and Pomerantz were appointed as members of the PSC in the MDL.  Promisloff Decl., Exhibit B.

The Anti-Trust Action is a complex litigation seeking trebled damages from the same corporate defendant named in this Action.  As such, the Anti-Trust Action and this Action will likely be competing for the same pool of limited resources available to resolve the litigations or to obtain a recovery after trial.  Lannett is rated as being below average in revenue among related companies and is rated as second overall in the probability of filing for bankruptcy among related companies. *See* Promisloff Decl., Exhibit C.  Given Lannett's precarious financial situation, it may not have the resources to resolve two complex litigations.  Those attorneys litigating both actions may then have to choose one action over the other to obtain a benefit for one of the actions that may then be unavailable to the other.  Such choices could determine litigation strategy and/or settlement strategy and the course of either of the actions could be determined because of counsel's decisions in the other action.  *Kuper v. Quantum Chem. Corp.*, 145 F.R.D. at 83 ("competing claims may impair counsel's ability to vigorously pursue the interests of both classes").  In any event, the situation is fraught with potential conflicts, and is a

situation which the Class in this Action should never have to face. "The responsibility of class counsel to absent class members whose control over their attorneys is limited ***does not permit even the appearance of divided loyalties of counsel***." *Sullivan v. Chase Investment Services*, 79 F.R.D. at 246, 258 (emphasis added) (court required proposed class counsel to withdraw from one of the two actions against same corporate defendant) (citing *Greenfield v. Villager Industries, Inc.*, 483 F.2d 824, 832 & n.9 (3d Cir. 1973)).

In the Institutional Investor Group's motion for lead plaintiff, no mention is made of the Anti-Trust Action or the involvement of Labaton and Pomerantz in a potentially conflicting litigation. Whether or not the members of the Institutional Investor Group knew about the Anti-Trust Action and its counsels' conflict is irrelevant to this issue. In either case, the Institutional Investor Group is inadequate to protect the other members of the Class and cannot serve as lead plaintiff. If they knew about the conflict and still sought to have Labaton and Pomerantz appointed as lead counsel, their judgment must be questioned and their willingness to potentially compromise the rights of the Class because of their relationship with their counsel must disqualify them from serving as lead plaintiff. If they did not know about the conflict, then their lack of ability to inquire about relevant issues and to be informed about material facts precludes them from the lead plaintiff appointment. Indeed, information about Labaton's involvement in the Anti-Trust Action as a member of PSC is readily available on its web site, where it refers to itself as "lead[ing] the prosecution." *See* Promisloff Decl., Exhibit D.

While the current role of Pomerantz in the Anti-Trust Action is not clear, that does not change the determination that the Institutional Investor Group is not adequate to represent the Class. On January 4, 2017, Jayne A. Goldstein, the attorney from Pomerantz who was appointed as a member of PSC in the Anti-Trust Action, filed a Notice of Change of Firm Affiliation and

Address, and no longer is a partner at Pomerantz. *In re: Generic Digoxin and Doxycycline Antitrust Litigation*, No. 2:16-md-02724-CMR, ECF No. 111 (E.D. Pa.). Judge Rufe's order, however, explicitly appointed Ms. Goldstein **and** Pomerantz to the PSC. *See* Promisloff Decl. Exhibit B. Thus, Pomerantz should still be a member of the PSC.  Even if not, however, that still does not absolve the Institutional Investor Group from being found to be inadequate.

First, the Institutional Investor Group selected Pomerantz and Labaton to be co-lead counsel in this Action.  As such, Labaton is still potentially conflicted and the proposed co-lead counsel remains potentially conflicted as their decisions will still be tainted by the involvement of Labaton in a competing litigation.  Second, even if the Institutional Investor Group belatedly and improperly attempts to remove Labaton as a co-lead counsel, their adequacy is still imputed because they either knew about the potential conflict and selected those firms as co-lead anyway or they did not know about the potential conflict, demonstrating a complete lack of attentiveness to this Action.  Third, because they have not presented any information on this issue, it is not known if Pomerantz still has a role in the Anti-Trust Action or, even if not a formal position, has an arrangement with Labaton regarding its involvement in the Anti-Trust Action.  Fourth, lead plaintiff motions are governed by the PSLRA, which has strict deadlines.  The motion the Institutional Investor Group filed cannot now be altered by changing their selection of counsel. If they filed an unsupportable motion for appointment as lead plaintiff, they do not get an opportunity for a do-over. Fifth, the Institutional Investor Group provided no explanation as to why it needed two law firms to litigate this Action, it did not explain how it was determined among its members that those two law firms should be jointly appointed as co-lead counsel and it did not explain how each member of their group became associated with any particular law firm. Thus, for example, it is not known whether three of the four members of the Institutional

Investor Group consider Labaton to be its attorney and how their application might change if Labaton was dropped as co-lead counsel.

The Institutional Investor Group's knowledge of the Anti-Trust Action and the potential conflict of its counsel are also relevant to the issue of whether it is an appropriate group and is discussed further below.  In any event, the existence of the potential conflict is sufficient for the Court to deny the Institutional Investor Group's lead plaintiff motion.

### A.  The Institutional Investor Group is an Inappropriate Group

In addition to selecting counsel with a potential conflict, which renders it inadequate under Rule 23, the Institutional Investor Group suffers from another deficiency in its lead plaintiff application – it is an inappropriate group.  The group is composed of four unrelated entities with no known pre-existing relationship.  "[W]hen unrelated investors are cobbled together, the clear implication is that counsel, rather than the parties, are steering the litigation." *Buettgen v. Harless*, 263 F.R.D. 378, 381 (N.D. Tex. 2009) (citation omitted).  While the fact that the Institutional Investor Group was formed by counsel, may not alone be fatal to its application, here, the information presented is indicative of a lawyer-driven group that was put together merely to accumulate the largest loss and to be appointed lead plaintiff.  Courts have repeatedly rejected such attempts.  *See, e.g.*, *Pipefitters Local No. 636 Defined Benefit Plan v. Bank of Am. Corp.*, 275 F.R.D. 187, 191 (S.D.N.Y. 2011) (rejecting lead plaintiff group even after submission of joint declaration about working together because of no showing of pre-existing relationship); *Teran v. Subaye, Inc.*, No. 11 Civ. 2614(NRB), 2011 WL 4357362, at *4 (S.D.N.Y. Sept. 16, 2011) (rejecting lead plaintiff group even after the submission of declarations, because it "was cobbled together by counsel for purposes of making this motion and becoming the lead plaintiff"); *Niederklein v. PCS Edventures!.com, Inc.*, No. 1:10-cv-00479-EJL-CWD, 2011 WL

759553, at *6 (D. Idaho Feb. 24, 2011) (rejecting lead plaintiff group and stating that there was "nothing in the record contravening the appearance that [the group's attorneys were] not the driving force behind the grouping").

While the Third Circuit does not explicitly bar unrelated groups from serving as lead plaintiff, it has held that a court must determine whether "the way in which a group seeking to become lead plaintiff was formed or the manner in which it is constituted would preclude it from fulfilling the tasks assigned to a lead plaintiff." *In re Cendant*, 264 F.3d at 266.  The Third Circuit thus disapproves of groups created by counsel in order to attempt to claim they have the largest financial loss and should be appointed lead plaintiff.  The Third Circuit explicitly stated that if "a court were to determine that the movant 'group' with the largest losses had been created by the efforts of lawyers hoping to ensure their eventual appointment as lead counsel, it could well conclude, based on this history, that the members of that 'group' could not be counted on to monitor counsel in a sufficient manner." *Cendant*, 264 F.3d at 267 (citation omitted); *see also Lifestyle Invs., LLC v. Amicus Therapeutics, Inc.*, No. 3:15-cv-7350 (FLW) (DEA), 2016 U.S. Dist. LEXIS 68952, at *16 (D.N.J. May 26, 2016) (group cobbled together by counsel to ensure lead counsel position may result in finding that group cannot be relied on to monitor counsel).

Here, although the Institutional Investor Group submitted a joint declaration claiming they each wanted to litigate this Action as lead plaintiff with other institutional investors and that they discussed strategy and wanted to achieve the best results for the Class, they provided no details about how they will function collectively and how they will resolve disputes.  *See* Institutional Investor Group Joint Declaration, Dkt. No. 8.  It is this lack of information that is indicative of a lawyer-driven application for lead plaintiff.  *See, e.g., Ross v. Abercrombie & Fitch Co.*, No. 2:05-CV-819, 2007 U.S. Dist. LEXIS 24903, at *9 (S.D. Ohio Mar. 22, 2007)

(court disallowed lead plaintiff group where, among other things, no mechanism for decision making was provided).

Its own Joint Declaration supports the finding that it was just a lawyer driven group put together to be appointed lead plaintiff. In its Joint Declaration, the Institutional Investor Group stated that it was through counsel that the members "learned of the potential to file this joint lead plaintiff application." Joint Declaration Dkt. No. 8 at ¶ 7. Thus, it was counsel who put the group together, with its members having no connection whatsoever except through their contacts with counsel and their losses investing in Lannett. This type of situation was exactly the type that the PSLRA sought to prevent. *See Cendant*, 264 F.3d at 267 (citing *In re Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d 304, 308 (S.D.N.Y. 2001) (court refused to appoint a lead plaintiff group that was created by counsel to have investors large enough to be named lead plaintiff, "which can then select the equally artificial grouping of counsel as 'lead counsel'")).

Moreover, the submission of a joint declaration by a group does not lead to an automatic determination that the group is not lawyer-driven. As one court stated about a joint declaration, it did not "articulate any actual mechanisms for cooperation, dispute resolution, or communication among the group members and counsel. In short, the joint declaration [did not] inform the Court as to why it was a group aside from the obvious motive to aggregate the greatest financial interest among any movant." *In re Level 3 Communs., Inc. Secs. Litig.*, 2009 U.S. Dist. LEXIS 44706, at *15 (D. Colo. 2009) (court had little understanding of "***how its members would function collectively; how potential disputes among the members or counsel would be resolved***; and the mechanism by which the group members and counsel would communicate with one another about the litigation.") (emphasis added) (citing Baan). Based on the record submitted to it, including that joint declaration, the *Level 3* court determined it was

11

insufficient to justify appointing the group as lead plaintiff. *Id.* at \*16; *see also In re Eichenholtz,* 2008 U.S. Dist. LEXIS 64633, at \*28, 2008 WL 3925289, \*9 (N.D. Cal. Aug. 22, 2008) (holding that statements by group that it was comprised of "sophisticated investors" with "significant interest in the outcome" who were "committed to working closely with class counsel," but which failed to describe actual mechanisms for cooperation, decision-making or the nature of any preexisting relationship were insufficient to warrant appointment of group as lead plaintiff). As one court stated, its function is to determine whether unrelated groups have a sufficient governance structure in place so that they will manage the litigation, not counsel. *Buettgen v. Harless*, 263 F.R.D. 378 at 381 (citation omitted).

Here, there is no mechanism in place to govern. In their Joint Declaration, the Institutional Investor Group stated that they will confer to make timely decisions, but failed to state how decisions will be made. Given that there are four members, if they govern their group equally, it is likely that some decisions will be equally divided. They do not explain whether unanimity must exist among the group before a decision can be rendered or if a majority can decide, and they do not provide for what will occur if they are equally divided. They provided no information at all as to how disputes will be resolved or how they will make decisions if one or more members are adamantly opposed to a particular decision. Without a mechanism for resolution, the litigation may reach a standstill or decisions may be made without a consensus.[4]

---

[4] Among other issues, there may be a dispute about how to allocate any recovery. The Institutional Investor Group's disparity in stated losses from their Lannett Class Period investments may lead to disagreements. The range of losses are from $90,866 to $624,056 among its members, and given the trading patterns of the four members, with some selling some shares early during the Class Period, before and after partial disclosures, and others not selling any shares, disputes are likely to arise regarding allocation of any recovery or whether it is even worthwhile to settle depending on whether a recovery can be obtained for certain sold shares. With four members, two members may support competing proposals, and without a mechanism to resolve disputes, inaction may result.

*See Buettgen v. Harless*, 263 F.R.D. at 381-82 (N.D. Tex. 2009) (no mechanism for decision

making and functioning provided and groups' lead plaintiff motions denied) (citations omitted);

*see also Howard Gunty Profit Sharing Plan v. CareMatrix Corp.*, 354 F. Supp. 2d 18, 24 (D

Mass. 2000) (unrelated group needs to explain how they would work together, among other.

things; court rejected proposed lead plaintiff group because no information provided).

Their Joint Declaration also stated that representatives of the group members had a joint

conference call.  Joint Declaration, ECF No. 8-7 at ¶ 9.  However, it provides no information

about the role or authority of those representatives on the conference call or whether those

participants could make decisions on behalf of the entity they represented or how decisions are

made within each entity, specifically relating to this litigation.  Thus, it is not just the group

members of the Institutional Investor Group who must agree on decisions, but also within each

entity, their individual governing bodies must agree on decisions.  Such additional layers of

decisions may result in an "untenable decision making process" that will not adequately protect

the Class.  *See, e.g., Lifestyle Invs., LLC v. Amicus Therapeutics, Inc.*, 2016 U.S. Dist. LEXIS

68952, at \*18-19 (D.N.J. May 26, 2016).

In addition to not providing a governing mechanism, the Joint Declaration does not

explain why the group needs two law firms to litigate this Action or even explain how each

member of their group became associated with one of the particular law firms and how it was

determined that those two law firms should be jointly appointed as lead counsel.  Whether more

than one lead counsel is needed is debatable, but it is not known whether the Institutional

Investor Group even discussed the issue.  *See e.g., Howard Gunty Profit Sharing Plan*, 354 F.

Supp. 2d at 25 (only one lead counsel, not two was needed).

Their selection of two law firms with a conflict is indicative of their inability to

13

adequately represent the Class as that conflict may lead to a lower recovery for the Class, such selection should disqualify the Institutional Investor Group from representing the Class. In addition, it demonstrates how an inadequate decision making process exists for the Institutional Investor Group, if one exists at all. If any of the members of the Institutional Investor Group knew about the potential conflict, it is not clear whether they informed the other members of the group and discussed the issue. If the issue was known and not discussed, it represents an incurable flaw in the decision-making structure. If not all members of the group knew of the potential conflict, the failure to share information about it evidences an ineffective governing structure. If none of the members knew of the potential conflict, it demonstrates that they cannot be trusted with representing the other members of the Class. In any situation, it shows how this is a lawyer-driven group.

Any attempt by the Institutional Investor Group to re-configure their lead plaintiff application and request that only one member of its group be appointed as lead plaintiff and/or that they be allowed to replace one or both of their selected counsel should be rejected. Pursuant to the PSLRA, lead plaintiff applications were due on January 17, 2017. Nothing in that statute provides for amending the application after the fact. Courts addressing those types of requests, have declined to do so. *See*, *e.g.*, *In re Level 3 Communs.*, 2009 U.S. Dist. LEXIS 44706, at \*15 (denying request to appoint one individual from a lead plaintiff group); *Tsirekidze v. Syntax-Brillian Corp.,* No. CV-07-2204, 2008 WL 942273, \*4 (D. Ariz. Apr. 7, 2008) (declining to consider individual constituent of group as lead plaintiff candidate because the group "moved for lead plaintiff as a group and will be evaluated as such"); *Ross v. Abercrombie & Fitch Co.,* No. 2:05-CV-819, 2007 U.S. Dist. LEXIS 24903, at \*13 (S.D. Ohio Mar. 22, 2007) (same). This Court should similarly decline to alter the lead plaintiff applications that were submitted, if such

14

a request is made.

**B. The LCI Investor Group is an Inappropriate Group**

Similar to the Institutional Investor Group, the LCI Investor Group is also an inappropriate group. As with the Institutional Investor Group, the LCI Investor Group has the indicia of being a lawyer-driven group and its lead plaintiff application should be denied on that basis alone. Additionally, UPR's loss is greater than each member of the LCI Investor Group's losses examined individually. *See* Promisloff Decl. Exhibit E. A group should not be allowed to aggregate losses just to claim it, collectively, has the largest loss. The LCI Investor Group is also comprised of five (or six) unrelated investors. As such, it should not be selected as lead plaintiff over UPR, a sophisticated institutional investor, which suffered a large loss, and is just the type of investor that Congress sought to be a lead plaintiff when it enacted the PSLRA. Finally, the issues, discussed in greater detail below, surrounding the certifications submitted by the LCI Investor Group, including whether the members of that group knew they were going to be part of a group applying for lead plaintiff and whether there are actually six, instead of five, members of the group, preclude the granting of its motion. If the Court is going to consider appointing the LCI Investor Group as lead plaintiff, then UPR respectfully requests limited discovery on these issues, as detailed below.

For many of the same reasons as stated above regarding the Institutional Investor Group, the LCI Investor Group is also an inappropriate group. The LCI Investor Group did not even submit a joint declaration. Thus, it has provided no information as to how it was formed, why it was formed, how the members of that group will function, how they will govern themselves, how they will communicate and how they will resolve conflicts. Courts have found such a lack of information leads them to conclude that the group was just put together by counsel to claim

15

the largest loss and to be appointed lead plaintiff.  *See* Argument II, A, *supra*.  This court should reach a similar conclusion here and deny the LCI Investor Group's lead plaintiff application.

The members of the LCI Investor Group are also all individuals.  As such, they are not the preferred type of lead plaintiff.  Congress made it plain when enacting the PSLRA that it sought to encourage institutions to apply to be appointed lead plaintiff.  UPR is just the type of lead plaintiff that Congress intended.  Here, where none of the individuals of the LCI Investor Group has a larger loss than UPR, it is UPR that should be selected as lead plaintiff in accordance with congressional intent.  *See, e.g.*, *In re Spectrum Pharms., Inc.*, 2014 U.S. Dist. LEXIS 38322 at *11 (D. Nev. Mar. 20, 2014) (appointing a single institutional investor with larger losses than any member of an individual investor group lead plaintiff); *Randall v. Fifth St. Fin. Corp.*, 2016 U.S. Dist. LEXIS 15719 at *9 (S.D.N.Y. Feb. 1, 2016) (appointing an institutional investor lead plaintiff where the institutional investor's losses were greater than either member of the individual investor group).

Moreover, while the Third Circuit will allow proper groups to be considered on a lead plaintiff motion, courts generally disapprove of groups that only have the largest loss if the members' losses are combined.  *See Lifestyle Invs., LLC v. Amicus Therapeutics, Inc.*, 2016 U.S. Dist. LEXIS 68952, at *15, *20 (none of four members of lead plaintiff group had a loss larger than the individual lead plaintiff movant although they had a larger loss when aggregated; individual appointed as lead plaintiff).  Here, no one member of the LCI Investor Group has a loss as large as UPR.  Thus, without the group artifice, none of the members of the LCI Investor Group would be the presumptive lead plaintiff, which is yet another reason to deny its application.

Finally, the submissions by the LCI Investor Group raise questions about the propriety of

16

its application.  None of the certifications submitted indicate that the individuals are seeking to be appointed as lead plaintiff, much less stating that they agreed to be part of any lead plaintiff group.  While those facts by themselves are troubling, they are more so because it seems that at least two of the five certifications were forms taken from their counsel's web site, which provide no information about applying for lead plaintiff, but instead suggest that you need to complete the form to be included as part of the Class.  *See* Promisloff Decl., Exhibit F.  Thus, it is not known whether the LCI Investor Group members ever agreed to apply to be lead plaintiff.

Moreover, while the LCI Investor Group is said to be composed of five members, it appears that Rick Denton's investment in Lannett was made jointly with Jane L. Denton, who is not included in the LCI Investor Group.  Because Rick Denton's certification attaches transactions in Lannett stock made with Jane L. Denton, it is not known if it was intended that they both be part of the LCI Investor Group.  Given that five members of a group is generally regarded as the maximum, *In re Cendant* 264 F.3d at 267, including another member would exceed that limit.

### C.  UPR Should Be Appointed as Lead Plaintiff

Among the lead plaintiff movants, other than the inadequate groups, UPR possesses the largest financial interest in the relief sought in this Action.  Promisloff Decl. Exhibit E.  As demonstrated in its Memo in Support, UPR also unquestionably satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.  *See* Memo in Support at 6-8.

In addition, the appointment of UPR as lead plaintiff also fulfills a critical legislative goal behind enacting the PSLRA - to encourage sophisticated institutions to serve as lead plaintiff in securities class actions.  Indeed, the framers of the PSLRA clearly intended that institutional investors serve as lead plaintiffs in class action lawsuits arising under the federal securities laws.

17

*See, e.g.*, *In re Cendant Corp. Litig.*, 264 F.3d at 243-44 ("[T]he PSLRA's legislative history expressly states that Congress anticipated and intended that [institutional] investors would serve as lead plaintiffs.") (citation omitted); *see also In re UBS Auction Rate Sec. Litig.*, No. 08-2967, 2008 U.S. Dist. LEXIS 56016, at *11 (S.D.N.Y. July 16, 2008) ("[T]he PSLRA reflects a preference on the part of the Congress that passed it that institutional investors are the most desirable lead plaintiffs"); *Shi v. Sina Corp.*, No. 05-2154, 2005 U.S. Dist. LEXIS 13176, at *15 (S.D.N.Y. July 1, 2005) ("In enacting the PSLRA, Congress expressed an intention to encourage institutional investors to step forward and assume the role of lead plaintiff") (quoting *Pirelli Armstrong Tire Corp. v. LaBranche & Co., Inc.*, 229 F.R.D. 395, 402 (S.D.N.Y. 2004)). As recognized by the court in *Shi*, "[b]ecause the size and experience of institutional investors can be of significant assistance to the prosecution of the action, a number of courts 'have understood [the PSLRA] to favor large institutional investors' as lead plaintiff." *Shi*, 2005 U.S. Dist. LEXIS 13176, at *15 (citing *Pirelli Armstrong Tire Corp.*, 229 F.R.D. at 402).

Here, UPR is just such an institutional investor. It has the size and experience to serve as lead plaintiff. *See* Promisloff Decl. Ex. G.[5] It is precisely the type of lead plaintiff Congress envisioned when it passed the PSLRA and sought to encourage institutions to seek to become lead plaintiffs. *See* H.R. Conf. Rep. No. 104-369, at 34 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 733 ("The Conference Committee believes that increasing the role of institutional investors in class actions will ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions.").

---

[5] In the past, one of the law firms representing the Institutional Investor Group, Labaton & Sucharow, LLP, has made specious arguments against Puerto Rican pension funds based on the passage of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"). This argument has been rightfully rejected by Judge Breyer in the *Boston Retirement System v. Volkswagen AG, et al.*, No. 3:16-cv-03435-CRB Dkt. No. 18, (N.D. Ca. 2016) for the reasons set forth in that decision and applicable here as demonstrated by the Declaration of Maria Del Carmen, attached to the Promisloff Declaration as Exhibit G. If such arguments are raised here by the competing movants UPR will address them and show why they must fail in its reply memorandum.

**II.**     **Limited Discovery is Warranted Concerning the Institutional Investor Group and the LCI Investor Group**

Consistent with the Court's discretion to appoint the most adequate plaintiff to represent the class, the PSLRA permits the Court to grant discovery upon a "reasonable basis" that the proposed lead plaintiff is incapable of representing the class.  15 U.S.C. §78u-4(a)(3)(B)(iv); *see also In re Vonage Initial Public Offering Sec. Litig.*, No. 07 Civ. 177 (FLW), 2007 U.S. Dist. LEXIS 66258, at \*11 (D.N.J. Sept. 7, 2007) (permitting discovery where concerns were raised as to the plaintiff's adequacy and selection of counsel); *Fischler v. Amsouth Bancorporation*, No. 96 Civ. 1567 (EAK), 1997 U.S. Dist. LEXIS 2875, at \*11 (M.D. Fla. Feb. 6, 1997) ("uncertainty" or "unanswered questions" are enough to trigger the PSLRA's discovery provision).  For the reasons discussed below, UPR's request to conduct discovery is founded on a reasonable basis that the Institutional Investor Group and the LCI Investor Group are incapable of adequately representing the class.

**A.  Discovery of the Institutional Investor Group's Counsels' Conflict Is Sought**

As stated above, the counsel selected by Institutional Investor Group to be co-lead counsel for the Class have a potential conflict because they are involved in, and also appointed to the PSC, in the Anti-Trust Action.  As such, the strategy they might employ here and any potential recovery may be compromised by events that occur in the Anti-Trust Action.

The Institutional Investor Group's lead plaintiff application makes no mention of this potential conflict.  What the members of that group knew about the potential conflict and discussions about that potential conflict are relevant to the adequacy of the Institutional Investor Group.  If they knew about the potential conflict, but decided to select Labaton and Pomerantz as co-lead counsel despite that knowledge, that issue is ripe for discovery.  The discussions among members of the Institutional Investor Group on that topic is an issue on which information is

sought.

Similarly, if only some, but not all, members of the Institutional Investor Group knew about the potential conflict, and if that information was not shared among all group members, that is also an issue for discovery as it goes to the functioning and the governing of the group. Moreover, if none of the members of the group knew of the potential conflict, that is also a relevant issue in determining its motion as it goes to the ability of the group to keep itself informed and the investigation it undertook in selecting counsel.

Limited discovery should be granted on these topics if the Court does not reject the Institutional Investor Group's lead plaintiff motion.

**B.  Discovery of the LCI Investor Group's Formation Is Sought**

While UPR believes the LCI Investor Group is inadequate, as stated above, if its application is not rejected, UPR requests limited discovery as to its formation, functioning and decision making.  The LCI Investor Group submitted no information on these topics.  It appears that the group was just put together by counsel in an attempt to achieve the largest loss and be appointed lead plaintiff.  UPR should be given the opportunity to take discovery of the LCI Investor Group to determine how it was formed, how it intends to function and whether it has mechanisms in place to govern itself, resolve disputes and interact with counsel.

**1.  The LCI Investor Group's Counsel May Have Misled Investors**

The LCI Investor Group selected The Rosen Law Firm, P.A. (the "Rosen Firm") and Levi & Korsinsky, LLP ("Levi") to be co-lead counsel.  Besides not stating why the group needs two law firms, none of the certifications submitted by the members of the group mentions representation by two law firms.  Two of those certifications mention an agreement with the Rosen Firm, but make no mention of Levi.  The other three do not mention any counsel.  None of

20

the certifications mention applying to be lead plaintiff.

The Rosen Firm website may be misleading investors into believing that they must complete the form available on that website, which closely resembles a claims form, in order to be included in the class action recovery. Indeed, the Rosen Firm's website urges investors to "Join this Class Action." *See* Promisloff Decl., Exhibit F. In seeking to direct investors to complete its online form regarding Lannett, the Rosen Firm states: "Lannett shareholders have an opportunity to recover their investment losses." It then instructs investors to: "Click 'Join this Class Action' above." *Id.* The Rosen Firm seeks to take advantage of unwitting investors who do not know they can simply remain absent class members. Rather, the Rosen Firm's website makes it appear as though an investor needs to sign up in order to share in any recovery. This is a misleading tactic used to improperly trick investors into serving as class representatives where they very likely would not if it were explained that their inclusion as a class member is not dependent on serving as a class representative.

Judge William Alsup of the Northern District of California harshly criticized such a practice in the oft cited case *In re Network Associates, Inc. Sec. Litig.*, 76 F. Supp. 2d 1017 (N.D. Cal. 1999), stating:

> This form-submitting process bears a resemblance to the claim-submitting process that traditionally has occurred at the end of class litigation. The only information required to be written in by the investor in the form mentioned was the name of the investor and the number of shares purchased or sold, the price, and the date. The rest is boilerplate. In this connection, one class counsel candidate herein accuses another of disguising its notices so as to cause investors to believe that returning the form is a prerequisite to participation in any ultimate recovery--when it plainly is not under the law. No doubt, many send in the forms thinking they need to in order to participate in any recovery.

*Network Associates*, 76 F. Supp. 2d at 1022. Accordingly, numerous courts have denied lead

plaintiff positions to avoid creating an "incentive for lawyers competing to represent the class to solicit clients and to create misleading forms of notice under the PSLRA that prompt plaintiff 'to volunteer' as lead plaintiff when they think they are merely providing notice to preserve their claims." *Accord Topaz Realty v. Northfield Labs., Inc.*, No. 06 Civ. 1493 (GMM), 2006 U.S. Dist. LEXIS 77613, at *10-11 (N.D. Ill. June 19, 2006) (quoting *In re Bally Total Fitness Litigation*, No. 04 Civ. 3530 (JFG), 2005 U.S. Dist. LEXIS 6243, at *8 (N.D. Ill. Mar. 15, 2005) (quoting *Sakhrani v. Brightpoint, Inc.*, 78 F. Supp. 2d 845 (S.D. Ind. 1999)).

Indeed, it is this faceless process that creates a reasonable basis to grant discovery with respect to the LCI Investor Group and its members' actual intentions in completing the form found on the Rosen Firm's website. *Accord Network Associates*, 76 F. Supp. 2d at 1022 ("with no discovery conducted as to the *bona fides* of any, the truth is that there is no way to check the accuracy of the forms . . . ."); *In re Vonage*, 2007 U.S. Dist. LEXIS 66258, *11 and 26 (granting discovery where it was doubtful that plaintiff had spoken to his attorneys until after returning his certification as demonstrated by the numerous errors found in his initial certification).

The PSLRA also requires that a plaintiff should provide a "sworn certification" setting forth the enumerated statements concerning, *inter alia*, their willingness to act as a class representative. *See* 15 U.S.C. 78u-4(a)(2)(A)(i)-(vi). Movants John Jafolla and Charlotte Rutsch's certifications, however, do not swear as to the truth of any of the statements required by the PSLRA. Rather, their certifications merely swear that the information entered on the Rosen Firm's website was accurate. *See* Promisloff Decl. Ex. F ("I declare under the penalty of perjury, under the laws of the United States, ***that the information <u>entered</u> is accurate</u>*.") (emphasis added). The information entered however, does not include a statement the movants are willing to serve as a class representative which, instead, appears automatically as part of the form. That

22

is not enough to satisfy the PSLRA's mandate that a "sworn certification" be provided concerning a person's willingness to serve as a representative party.

The failure of the Rosen Firm to guard against such inaccuracies also indicates the LCI Investor Group's inadequacy as lead plaintiff. *Accord In re Organogensis Sec. Litig.*, 241 F.R.D. 397, 409 (D. Mass. 2007) (denying class certification where lead counsel failed to properly oversee the certification process).

Accordingly, UPR has provided a reasonable basis to define that the LCI Investor Group is incapable of adequately representing the Class and that at a minimum discovery is warranted in order to aid the Court in making its determination as to lead plaintiff.

## CONCLUSION

For the reasons stated above, as well in its moving papers, UPR's motion to: (i) appoint UPR as lead plaintiff in this Action; and (ii) approve the selection of Abraham, Fruchter & Twersky, LLP as lead counsel should be granted and the competing motions should be denied. Alternatively, if the motions by the Institutional Investor Group and the LCI Investor Group are not denied, UPR requests that it be granted limited discovery of those groups concerning their ability to fairly and adequately represent the Class.

23

Dated: January 26, 2017

Respectfully submitted,

By: /s/David M. Promisloff_____
David M. Promisloff (ID# 200971)
**PROFY PROMISLOFF & CIARLANTO, P.C.**
Joseph M. Profy (ID# 77141)
Jeffrey J. Ciarlanto (ID#205838)
100 N. 22nd Street, Unit 105
Philadelphia, PA 19103
Phone: (215) 259-5156
Fax: (215) 600-2642
david@prolawpa.com
profy@prolawpa.com
ciarlanto@prolawpa.com

*Proposed Liaison Counsel*

**ABRAHAM, FRUCHTER AND TWERSKY, LLP**

Mitchell M.Z. Twersky (*Pro Hac Vice* forthcoming)
Atara Hirsch (*Pro Hac Vice* forthcoming)
Lawrence D. Levit (*Pro Hac Vice* forthcoming)
Matthew E. Guarnero (*Pro Hac Vice* forthcoming)
One Penn Plaza, Suite 2805
New York, New York 10119
(212) 279-5050
(212) 279-3655 (fax)
MTwersky@aftlaw.com
AHirsch@aftlaw.com
LLevit@aftlaw.com
MGuarnero@aftlaw.com

*Counsel for University of Puerto Rico Retirement
System and Proposed Lead Counsel for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on January 26, 2017.

/s/David M. Promisloff
David M. Promisloff