UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ANTHONY JOSEPH PETERS,<br><br>    Plaintiff,<br><br>    v.<br><br>TWIST BIOSCIENCE CORPORATION, et al.,<br><br>    Defendants. | Case No. 5:22-cv-08168-EJD<br><br>**ORDER APPOINTING LEAD PLAINTIFF AND SELECTING LEAD COUNSEL**<br><br>Re: ECF Nos. 16, 22, 26, 36, 40, 43 |

The Court has received several motions to appoint lead plaintiff and select lead counsel in this securities class action governed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). After all the opening motions seeking appointment had been submitted, all but two movants withdrew or expressed non-opposition to the remaining plaintiffs seeking appointment. The two remaining movants are the University of Puerto Rico ("UPR") Retirement System, ECF No. 26, and the Policemen's Annuity and Benefit Fund of Chicago ("PABF"), ECF No. 43.

Having reviewed the parties' submissions, the Court GRANTS PABF's Motion for Appointment as Lead Plaintiff and Approval of its Selection of Lead Counsel. All other competing motions for appointment of lead plaintiff are DENIED.

## I.  BACKGROUND

### A.  Factual Background

Defendant Twist Bioscience Corporation ("Twist" or the "Company") is a biotechnology company that manufactures synthetic DNA and DNA products. Synthetic DNA products allow users to design and modify DNA for the purposes of academic research, enhancing specialty

Case No.: 5:22-cv-08168-EJD
ORDER APPOINTING LEAD PLAINTIFF AND SELECTING LEAD COUNSEL
1

1  chemical production, and developing healthcare treatments, among other uses.  Class Action

2  Compl. ("Compl.") ¶ 2, ECF No. 1.

3        During the period between December 13, 2019 and November 14, 2022 (the "Class

4  Period"), Twist and Co-Defendants Emily Leproust and James Thorburn (collectively,

5  "Defendants") assured investors that the Company had achieved substantial growth and was

6  positioned for future growth.  *Id.* ¶ 3.  Defendants also reported "skyrocketing gross margins" and

7  announced plans to build a "Factory of the Future" in Wilsonville, Oregon.  *Id.* ¶¶ 4–5.

8        On November 15, 2022, Scorpion Capital published a lengthy report ("Scorpion Report")

9  that described Twist as a "cash-burning inferno that is not a going concern," drawing parallels

10  between Twist's DNA chip technology to "Theranos Inc.'s now infamous non-existent blood-

11  testing technology."  *Id.* ¶ 6.  The Scorpion Report indicated that the Company's growth is

12  dependent on unsustainable pricing strategies to undercut competitors, that the Company was

13  perpetuating its fraud through false reporting of capital expenditures and gross margins.  *Id.* ¶¶ 7–

14  8.  Moreover, Scorpion's investigation revealed that there was no evidence that the Company

15  intended to begin manufacturing in Wilsonville and suggested that the Company was using the

16  facility to hide large operating expenses as fraudulent capital expenditures.  *Id.* ¶ 7.

17        In response to the Scorpion Report, the price of Twist's common stock fell nearly 20%

18  from $38 per share on November 14, 2022, to $30.43 per share on November 15, 2022.  *Id.* ¶ 9.

19      **B.**    **Procedural History**

20        On December 12, 2022, Plaintiff Anthony Joseph Peters filed the instant Complaint,

21  asserting claims for relief under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934,

22  15 U.S.C. §§ 78j(b) and 78t(a).  Compl. ¶¶ 64–71.  On the same day, Plaintiff's counsel published

23  notice on *Business Wire*, providing information on the claims asserted, the purported class period,

24  and a lead plaintiff motion deadline of February 10, 2023.  ECF No. 8, Ex. A.

25        On February 10, 2023, the Court received eight (8) motions to appoint lead plaintiff and

26  select lead counsel.  ECF Nos. 16, 19, 22, 26, 32, 36, 40, 43.  Since then, six (6) of the movants

27  have either withdrawn their motions or filed non-opposition to competing motions for lead

28  Case No.: 5:22-cv-08168-EJD
ORDER APPOINTING LEAD PLAINTIFF AND SELECTING LEAD COUNSEL
2

United States District Court
Northern District of California

1    plaintiff. The remaining candidates for lead counsel are the University of Puerto Rico Retirement

2    System ("UPR") and the Policemen's Annuity and Benefit Fund of Chicago ("PABF"), each of

3    whom have filed subsequent briefs in opposition and reply.

### 1. PABF Motion

4

5    In its motion, PABF stated that it had purchased 19,112 shares and sold 7,267 shares over

6    the Class Period. Weaver Decl., Ex. C ("PABF Loss Chart"), ECF No. 43-4, at 2. At the time of

7    the Scorpion Report's corrective disclosure, PABF had 11,845 shares with an average value of

8    $25.9752 (calculated as the average close price between Nov. 15, 2022 and Feb. 10, 2023). *Id.*

9    Accordingly, PABF estimated its loss to be **$814,517.36**, based on the actual price it purchased

10   each tranche of stock and disregarding any losses it sustained from selling shares before the

11   Scorpion Report's disclosure. *Id.*; PABF Mot. 6, ECF No. 43.

### 2. UPR Motion

12

13   In its opening motion, UPR stated that it purchased and retained a total of 10,630 Twist

14   common stock during the Class Period at an average price of $40.94 per share and a total cost of

15   $435,229. UPR Mot. 7, ECF No. 26. Accordingly, UPR estimated its total loss to be **$158,704**,

16   which it calculated by taking the total cost of its shares ($435,229) and subtracting the average

17   value of those retained shares ($26.01 per share) during the PSLRA's 90-day lookback period

18   (Nov. 15, 2022 to Feb. 9, 2023). *Id.* at 7–8 n.2.

19   After all competing motions for appointment had been received, however, UPR adopted a

20   different calculation method that resulted in a reduced loss amount of **$113,859**. UPR Opp. 2,

21   ECF No. 62. UPR's new methodology calculates the value of its pre-corrective disclosure shares

22   by adopting the actual purchase price but capping the price at $38 per share (the closing price on

23   the day before the corrective disclosure), instead using the average price ($40.94) it had previously

24   calculated in its opening motion. *Compare* UPR Opp. 2, 7–8 (capping cost calculation at $38.00

25   per share) *with* UPR Mot. 7 (calculating total cost "at an average price of $40.94 per share"). In

26   other words, all shares purchased at a price above $38 per share were reduced to $38 for the

27   purposes of UPR's calculations. Additionally, UPR proposes using the first-in, first-out ("FIFO")

28   Case No.: 5:22-cv-08168-EJD
ORDER APPOINTING LEAD PLAINTIFF AND SELECTING LEAD COUNSEL
3

1  accounting method—which assumes that the first stocks to be sold were the ones bought first—
2  instead of the last-in, first out ("LIFO") method—which assumes that the first stocks to be sold are
3  those purchased most recently.[1]  UPR Opp. 9–10.  Although UPR's new calculation reduces their
4  own loss amount, it would reduce the estimated loss even further for PABF, changing PABF's
5  estimated loss from over $800,000 to somewhere between $87,000 to $124,000.  *Id.*

6  As an alternative, UPR posits that both FIFO and LIFO methodologies are flawed and
7  proposes a novel method that involves "comparing the total amount of alleged inflation in []
8  retained shares by matching shares with the same levels of inflation."  UPR Opp. 9–10.

## II. LEGAL STANDARD

Pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B)(ii), the Court "shall appoint the most adequate plaintiff as lead plaintiff" in a consolidated action.  There is a rebuttable presumption that the most adequate plaintiff is a person or group of persons who:

> aa. has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);
>
> bb. in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
> cc. otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

Accordingly, there is a "simple three-step process" to identify a lead plaintiff.  *In re Cavanaugh*, 306 F.3d 726, 729 (9th Cir. 2002).  "The first step consists of publicizing the pendency of the action, the claims made and the purported class period."  *Id.*  Next, the Court considers which plaintiff has the highest financial stake.  *Id.* at 729–30.  Finally, "[t]he third step of the process is to give other plaintiffs an opportunity to rebut the presumptive lead plaintiff's

---

[1] Whether the Court uses a LIFO or FIFO calculation would not change UPR's loss amount, because UPR did not sell any shares and, therefore, does not have any "first out" shares.  The decision to use LIFO or FIFO only impacts the loss calculation for investors who had sold shares during the Class Period, such as PABF.

Case No.: 5:22-cv-08168-EJD
ORDER APPOINTING LEAD PLAINTIFF AND SELECTING LEAD COUNSEL
4

1  showing that it satisfies Rule 23's typicality and adequacy requirements." *Id.* at 730. The
2  presumption may be rebutted only upon proof that the most adequate plaintiff "will not fairly and
3  adequately protect the interests of the class" or "is subject to unique defenses that render such
4  plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

## III. DISCUSSION

Given that only two competing movants remain for lead plaintiff appointment, the Court will focus its analysis on the UPR and PABF motions.

### A. Lead Plaintiff

As an initial matter, the Court finds that both UPR and PABF plainly satisfy the first statutory requirement in that they have filed timely motions in response to the Plaintiff's notice. ECF Nos. 26, 43. The dispositive questions, therefore, will be which movant has the "largest financial interest in the relief" and satisfies the Rule 23 requirements.

#### 1. Largest Financial Interest

In calculating a movant's financial interest, courts typically consider four factors, often referred to as the *Lax-Olsten* factors: "(1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered during the class period." *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998) (citing *Lax v. First Merchants Acceptance Corp.*, 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997)).

With respect to the first *Lax-Olsten* factor regarding total shares purchased during the Class Period, this factor favors PABF (19,112 shares) over UPR (10,630 shares). *Compare* Ruthizer Decl., Ex. C ("UPR Loss Chart"), ECF No. 26-4, *with* PABF Loss Chart 2. The second factor considers net shares purchased also favors PABF (11,845 net shares) over UPR (10,630 (net shares), albeit by a lesser margin given that PABF sold some shares during the Class Period while UPR did not. *See id.* The third factor on total net expenditures again favors PABF, who had net expenditures of $1,142,436.58 compared to UPR's $435,229 net expenditures. *See id.*; *see also* PABF Opp. 5, ECF No. 63.

United States District Court
Northern District of California

The final *Lax-Olsten* factor considers the approximate losses suffered during the Class Period and is widely regarded as the factor commanding the most weight. *See, e.g.*, *Weston v. DocuSign, Inc.*, 2022 WL 1301770, at *2 (N.D. Cal. Apr. 18, 2022) ("The weight of authority puts the most emphasis on the competing movants' estimated losses. . . .") (quoting *Bodri v. Gopro, Inc.*, 2016 WL 1718217, at *3 (N.D. Cal. Apr. 28, 2016)). The Ninth Circuit has not required a specific methodology to calculate financial interest, only calling on courts to apply "accounting methods that are both rational and consistently applied." *Cavanaugh*, 306 F.3d at 730. That said, most courts in this district use the "last in, first out" ("LIFO") accounting method to calculate estimated losses. *See, e.g.*, *Scheller v. Nutanix, Inc.*, 2021 WL 2410832, at *4 (N.D. Cal. June 10, 2021) (collecting cases); *Weston*, 2022 WL 1301770, at *2 ("The weight of authority puts the most emphasis on the competing movants' estimated losses, using a 'last in, first out' ('LIFO') methodology."). District courts also will give effect to the Supreme Court's guidance in *Dura Pharmaceuticals v. Broudo*, that losses must have been proximately caused by defendants' misrepresentations. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). In lead plaintiff motions, this typically has resulted in courts excluding losses incurred from pre-disclosure stock sales. *See, e.g.*, *Xu v. FibroGen, Inc.*, 2021 WL 3861454, at *5 (N.D. Cal. Aug. 30, 2021) ("In response to *Dura*, many district courts—including this one—have chosen 'not to consider losses resulting from stock trades that occurred prior to any disclosure of the defendant's fraud' when evaluating potential plaintiffs' financial interests in the litigation.").

### a. PABF's Loss Calculation

PABF proposes calculating financial loss using the LIFO accounting method and class members' actual purchase price. PABF Opp. 3–4. Using LIFO and excluding pre-disclosure losses per *Dura*, PABF's estimate of $814,517 is the highest loss amount by far, exceeding the losses of the next highest movant (UPR) by over $650,000. *Id.* at 4. Furthermore, even under a calculation under FIFO with *Dura* analysis, PABF's loss exceeds UPR's by over $180,000. PABF Reply 5, ECF No. 67.

### b. UPR's Loss Calculation

As mentioned *supra* at Section I(B), UPR's loss estimate has evolved over the course of its briefing. Although it initially estimated its loss based on an average price of $40.94 per share, UPR Mot. 7–8, UPR subsequently changed calculations in its Opposition brief and argued that share prices should be capped at the "price immediately before the corrective disclosure," which was $38.00 per share. UPR Opp. 7. In other words, regardless of whether a class member purchased Company stock at $120 or $38.01 per share, UPR's proposed methodology would treat those purchases identically for the purposes of calculating financial interest, *i.e.*, $38 per share. In the alternative, UPR contended that loss should be estimated by "comparing the total amount of alleged inflation . . . by matching shares with the same levels of inflation." *Id.* at 9.

To begin, the Court views UPR's revised calculations with considerable skepticism. UPR changed its loss calculation only after all lead plaintiff motions had been submitted and only after it was apprised of PABF's losses and calculations. Nowhere in its Opposition or Reply briefs does UPR explain why it changed its calculation methodology or why it reached a different loss estimate from the estimate advanced in its opening motion. District courts across the country have uniformly disapproved of such gamesmanship in PSLRA lead plaintiff motions, whereby movants revise their loss analysis after seeing what other competing movants have submitted. *See, e.g.*, *Bodri v. Gopro, Inc.*, 2016 WL 1718217, at *3 (N.D. Cal. Apr. 28, 2016) ("Only after the parties filed their opening briefs, and the parties were made aware of how their respective motions would fare under this methodology, did the Majesty Palms Group argue that the more appropriate measure of greatest financial stake was the 'retained shares' methodology. *This fact alone counsels in favor of adopting the LIFO methodology*, as opposed to the retained shares methodology.") (internal citations omitted) (emphasis added); *Nicolow v. Hewlett Packard Co.*, 2013 WL 792642, at *4 (N.D. Cal. Mar. 4, 2013) ("Tellingly, VRS itself made no reference to net shares purchased or a retained shares calculation in its opening motion seeking appointment as lead plaintiff, *shifting its argument only after PGGM came forward with larger LIFO losses*.") (emphasis added); *City of Sunrise Firefighter's Pension Fund v. Citigroup Inc.*, 2021 WL 396343,

Case No.: 5:22-cv-08168-EJD
ORDER APPOINTING LEAD PLAINTIFF AND SELECTING LEAD COUNSEL
7

at *4 (S.D.N.Y. Feb. 4, 2021) ("Presenting new methodologies, loss calculations, or substantive allegations only in opposition, after the PSLRA deadline for moving to be appointed lead Plaintiff has closed, is the type of opportunism that is generally unfavored in appointing lead plaintiffs."). UPR's revised methodologies advanced only in Opposition, therefore, warrant increased scrutiny.

Notwithstanding the skepticism invited by UPR's tactics and turning to the merits of its proposed calculations, the Court will first address UPR's alternative "total alleged aggregate inflation" method, a method that has never been adopted by any district court in this circuit. The only case that UPR cites in support is *Gruber v. Gilbertson* from the Southern District of New York, where the parties *agreed* to aggregate class members' inflation-related losses after "six years, one pandemic, two judges, two proposed class settlements, and one jury trial." *Gruber v. Gilbertson*, 2022 WL 17828609, at *1 (S.D.N.Y. Dec. 21, 2022). A methodology supported only by an out-of-circuit opinion in a completely different phase of litigation where the methodology was undisputed can hardly be said to satisfy *Cavanaugh*'s standard that "accounting methods [be] both rational and *consistently applied*." 306 F.3d at 730 (emphasis added). The Court accordingly declines to adopt UPR's "total alleged aggregate inflation" method for calculating loss.

With respect to its primary proposed methodology that caps share prices at $38 per share, UPR fails to demonstrate how this methodology—which largely disregards the amounts of putative class members' purchase prices—is supported by *Dura* or warranted under the PSLRA. UPR's proposed calculation purports to cap the effective purchase price at the "price immediately before the corrective disclosure," UPR Opp. 7, which is $38.00 per share. Although *Dura* stands for the proposition that "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss," *Dura*, 544 U.S. at 342, it does not support the proposition at the other extreme, *i.e.*, that an inflated purchase price is *never* relevant to loss calculation and therefore should be capped in loss calculations. Indeed, *Dura* suggested that an elevated purchase price *could* be the result of misrepresentation and "may prove to be a necessary condition of any such loss." *Id.* at 343; *see also Sallustro v. CannaVest Corp.*, 93 F. Supp. 3d 265, 277 (S.D.N.Y. 2015) ("*Dura* does not state that purchase price plays no role in loss analysis, nor does its logic require

Case No.: 5:22-cv-08168-EJD
ORDER APPOINTING LEAD PLAINTIFF AND SELECTING LEAD COUNSEL
8

1   such an approach."). If nothing else, *Dura* teaches that the reasons a share price may be inflated
2   could be one (or more) of several factors, including "misrepresentation, changed economic
3   circumstances, changed investor expectations, new industry-specific or firm-specific facts,
4   conditions, or other events." *Dura*, 544 U.S. at 343.

5   Here, as in *Dura*, UPR's methodology reflects an unwarranted and premature assumption
6   about loss causation in this case. Specifically, by capping the class's potential recovery at the
7   "price immediately before the corrective disclosure" ($38 per share) and excluding any additional
8   amounts that a class member may have paid above that price, UPR effectively assumes that *none*
9   of the depreciation between the actual purchase prices and the $38 pre-disclosure price could be
10  attributable to fraud. This assumption very well may be true upon further factual development and
11  with expert analyses. However, "[g]iven the tangle of factors affecting price," *Dura*, 544 U.S. at
12  343, the Court will decline to draw this inference at the lead plaintiff appointment stage, where it
13  need only compare and approximate losses between competing movants.

14  Moreover, UPR's proposed cap on PSLRA loss calculation would need to be reconciled
15  with the PSLRA's statutory language in setting an actual statutory damages cap, which is
16  determined in part by a plaintiff's actual purchase price. 15 U.S.C. § 78u-4(e)(1) ("[T]he award of
17  damages to the plaintiff shall not exceed the difference between *the purchase or sale price paid or*
18  *received*, as appropriate, by the plaintiff for the subject security and the mean trading price of that
19  security.") (emphasis added). Although this language does not outright preclude UPR's proposed
20  loss methodology, it does suggest that Congress intended the upper bounds of PSLRA recovery to
21  account for a plaintiff's actual purchase price. *See In re Wrap Techs., Inc. Sec. Exch. Act Litig.*,
22  2021 WL 71433, at *2 (C.D. Cal. Jan. 7, 2021) (rejecting loss calculation that ignored purchase
23  price); *accord Sallustro*, 93 F. Supp. 3d at 276 ("Given the [PSLRA's] statutory scheme, it would
24  be odd to apply a loss model that precludes any reference to purchase price.").

25  In any event, even adopting UPR's methodology and capping purchase prices at $38,
26  UPR's purported losses do not necessarily exceed PABF's for the purposes of lead plaintiff
27  motions. Per UPR's own calculations, PABF would have the highest loss amount if calculated

using LIFO, which is the accounting method that "[m]ost courts in this district use . . . to calculate a movant's estimated losses." *Scheller*, 2021 WL 2410832, at *4; *see also* Ruthizer Decl., Ex. A ("UPR Modified Loss Chart"), ECF No. 63-2, at 3–4 (calculating PABF's loss as $124,276 and UPR's loss as $113,859). Only if UPR applies FIFO in addition to its $38 share price cap do UPR's losses surpass PABF's by about $26,000. *See* UPR Modified Loss Chart 1–2. In other words, UPR's loss exceeds PABF's loss if and only if the Court were to accept that share prices should be capped at $38 per share and that the FIFO accounting method should be used, both of which are, at best, minority methodologies applied in this district and have never been adopted in unison as UPR proposes here. Especially given the suspect circumstances under which UPR is advancing this proposed methodology, the Court is not persuaded by UPR's elaborate arithmetic and will not adopt either of its proposed methodologies.

* * *

In sum, the Court finds that PABF's LIFO calculation is "rational and consistently applied," *Cavanaugh*, 306 F.3d at 730, both by this Court and other courts in this district. *See, e.g.*, *Leventhal v. Chegg*, 2022 WL 4099454, at *2 (N.D. Cal. Sept. 7, 2022); *Scheller*, 2021 WL 2410832, at *4. Moreover, even if the Court were to adopt UPR's proposals, the resultant losses are close enough that the Court would not be able to find that the fourth *Lax-Olsten* factor favors UPR, much less to such a degree as to outweigh all other *Lax-Olsten* factors that favor PABF. Because PABF purchased the most net shares, expended the most net funds, and sustained the most loss during the Class Period, the Court finds that PABF has the largest financial interest.

### 2. Typicality and Adequacy

The Rule 23(a)(3) typicality requirement is satisfied when a proposed class representative "has suffered the same injuries as other class members as a result of the same conduct by defendants and has claims based on the same legal issues." *Westley v. Oclaro, Inc.*, 2011 WL 4079178, at *3 (N.D. Cal. Sept. 12, 2011). Movants need only make a "prima facia showing of typicality and adequacy" at the lead plaintiff selection stage. *Deinnocentis v. Dropbox, Inc.*, 2020 WL 264408, at *4 (N.D. Cal. Jan. 16, 2020).

Case No.: 5:22-cv-08168-EJD
ORDER APPOINTING LEAD PLAINTIFF AND SELECTING LEAD COUNSEL
10

1    The Court finds that PABF satisfies the typicality requirement because, like all other putative class members, PABF purchased Twist stock during the Class Period at artificially inflated prices due to Defendants' alleged misrepresentations. PABF Mot. 7–8. Furthermore, PABF satisfies the adequacy requirement, given that it does not appear to have any conflicts of interests with other class members and its substantial stake in the litigation will be a strong incentive to litigate vigorously on behalf of the class. *See generally* Weaver Decl., Ex. A. Furthermore, PABF is an institutional investor that has also served as lead plaintiff in two previous securities class actions. PABF Mot. 8. Accordingly, the Court finds that PABF satisfies the typicality and adequacy requirements set forth in Rule 23.

\* \* \*

Based on the foregoing, PABF is presumed to be the most adequate plaintiff under the PSLRA. No other competing movant, including UPR, has made any effort to rebut the presumption. Accordingly, the Court GRANTS PABF's Motion for Appointment as Lead Plaintiff.

### B.    Lead Counsel

Pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(v), the "most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." A court generally will accept the lead plaintiff's choice of counsel unless it appears necessary to appoint different counsel to "protect the interests of the class." *Kim v. Advanced Micro Devices, Inc.*, 2018 WL 2866666, at *2 (N.D. Cal. June 11, 2018).

No parties have objected to PABF's selection of Bleichmar Fonti & Auld LLP ("BFA") as lead counsel for the putative class, nor is the Court aware of any need to appoint different counsel to protect the interests of the class. The Court has reviewed the firm's and attorneys' resumes, ECF No. 43-5, and is satisfied with PABF's selection of counsel. Accordingly, the Court APPROVES PABF's selection of Bleichmar Fonti & Auld as Lead Counsel.

### IV.   CONCLUSION

Based on the foregoing reasons, the Court GRANTS PABF's Motion as follows:

Case No.: 5:22-cv-08168-EJD
ORDER APPOINTING LEAD PLAINTIFF AND SELECTING LEAD COUNSEL
11

1. The Policemen's Annuity and Benefit Fund of Chicago is APPOINTED as Lead Plaintiff;
2. Bleichmar Fonti & Auld is APPOINTED as Lead Counsel; and
3. All other Motions to Appoint Lead Plaintiff and Select Lead Counsel are DENIED.

**IT IS SO ORDERED.**

Dated: July 28, 2023

EDWARD J. DAVILA
United States District Judge

Case No.: 5:22-cv-08168-EJD
ORDER APPOINTING LEAD PLAINTIFF AND SELECTING LEAD COUNSEL
12