**BLEICHMAR FONTI & AULD LLP**
Lesley E. Weaver (Bar No. 191305)
555 12th Street, Suite 1600
Oakland, California 94607
Telephone: (415) 445-4003
Facsimile: (415) 445-4020

*Counsel for Lead Plaintiff Policemen's
Annuity and Benefit Fund of Chicago and
Lead Counsel for the Putative Class*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| ANTHONY JOSEPH PETERS, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> TWIST BIOSCIENCE CORPORATION, EMILY M. LEPROUST, and JAMES M. THORBURN, <br><br> Defendants. | Case No. 5:22-cv-08168-EJD <br><br> <u>CLASS ACTION</u> <br><br> **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I.     SUMMARY OF THE ACTION ................................................................. 1

II.    JURISDICTION AND VENUE ................................................................. 5

III.   PARTIES ................................................................................................... 5

    A.    Lead Plaintiff ............................................................................... 5

    B.    Defendants ................................................................................... 6

IV.   BACKGROUND ALLEGATIONS............................................................ 6

    A.    The Apparent Success of Twist's Business Revolved Around the Purportedly Efficient and Effective Production of Synthetic DNA and DNA Products ................ 6

    B.    Twist Raised Over $1 Billion in an IPO and Five Secondary Offerings .................... 9

        1.    October 31, 2018 IPO ....................................................... 9

        2.    January 27, 2020 Offering ............................................... 10

        3.    February 19, 2020 Offering ............................................. 10

        4.    June 3, 2020 Offering ...................................................... 10

        5.    December 2, 2020 Offering .............................................. 10

        6.    February 10, 2022 Offering ............................................. 11

    C.    Relevant Accounting Principles................................................ 11

V.    FORMER EMPLOYEE ALLEGATIONS ............................................... 16

    A.    FE-1............................................................................................ 16

    B.    FE-2............................................................................................ 25

    C.    FE-3............................................................................................ 30

    D.    FE-4............................................................................................ 35

    E.    FE-5............................................................................................ 38

    F.    FE-6............................................................................................ 39

VI.   THE OFFICER DEFENDANTS ARE SUBJECT TO CONTROL PERSON LIABILITY ...................................................... 43

VII.  SECURITIES ACT ALLEGATIONS ..................................................... 43

    A.    2020 Registration Statement ..................................................... 44

        1.    The December 2020 Offering .......................................... 44

        2.    The February 2022 Offering ............................................ 45

    B.    False and Misleading Statements Regarding Gross Margins and Related Financial Metrics ....................................... 46

    C.    False and Misleading Statements Regarding Twist's Products ................. 48

VIII. CLASS ACTION ALLEGATIONS .......................................................... 51

IX.   INNAPLICABILITY OF STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE ................................................. 53

X.    EXCHANGE ACT ALLEGATIONS......................................................... 54

A.     Exchange Act False and Misleading Statements ................................ 54

    1.    False and Misleading Statements Regarding Gross Margins and Related Financial Metrics ................................................ 54

    2.    False and Misleading Statements Regarding Twist's Products .................... 59

B.     Summary Of Scienter Allegations ................................................ 64

    1.    Leproust Intentionally Sacrificed Automation and Product Quality to Prioritize Introducing New but Underdeveloped Products in an Effort to Generate Misleading Short-Lived Revenue ................................ 64

    2.    Leproust and Thorburn Had Continuous Access to Information Showing Their Statements Were False ................................ 65

    3.    Officer Defendants Leproust and Thorburn Were Motivated to Inflate Twist's Share Price to Generate Over $85 Million in Insider Sales .............. 68

    4.    Leproust Admitted That She Withheld Material Information from Investors ................................................ 69

    5.    The Officer Defendants Were Motivated to Conceal Twist's Product Issues and Declining Revenues to Raise Funds in Public Offerings and Complete Twist's Acquisition of Abveris ................................ 69

    6.    Defendants' False and Misleading Statements Concerned Core Operations Central to Twist's Business ................................ 70

    7.    Corporate Scienter ................................................ 71

C.     Loss Causation ................................................ 71

    1.    The Scorpion Report Revealed Defendants' Misstatements ................ 71

    2.    Response to the Scorpion Report ................................ 72

D.     Presumption of Reliance and Fraud-on-the-Market Doctrine .................... 73

XI.    CLAIMS FOR RELIEF ................................................ 74

    COUNT I ................................................ 74

    COUNT II ................................................ 75

    COUNT III ................................................ 77

    COUNT IV ................................................ 77

XII.    JURY DEMAND ................................................ 78

XIII.   PRAYER FOR RELIEF ................................................ 78

ii

# GLOSSARY OF TERMS

| Term | Definition |
|------|------------|
| Accounting Standards Codification ("ASC") | The current single source of United States Generally Accepted Accounting Principles ("GAAP"). It is maintained by the Financial Accounting Standards Board. |
| Antibody Discovery | Antibody drug discovery and development is the process of identifying new therapeutic antibodies to combat different diseases. Therapeutic antibodies are drugs that utilize proteins produced by the immune system to protect against unwanted substances (cancer cells, viruses, etc.) that enter the body. |
| Chief Executive Officer Emily M. Leproust ("Leproust") | Twist's co-founder, Chief Executive Officer ("CEO"), and a member of Twist Board of Directors since April 2013. Leproust served as Twist's President from April 2013 to October 2022, and as Chair of Twist's Board of Directors since October 2018. Defendant Leproust signed all relevant SEC filings and Registration Statements. |
| Chief Financial Officer James M. Thorburn ("Thorburn") | Twist's Chief Financial Officer ("CFO") and a Director of the Company since April 2018. Defendant Thorburn signed all relevant SEC filings and Registration Statements. |
| Chief Operating Officer Patrick Weiss ("Weiss") | Twist's Chief Operating Officer ("COO") from January 2020 to September 2022. Previously, Weiss served as Senior Vice President of Global Operations from January 2014 to September 2018, and Senior Vice Present of Operations, Research and Development, and Data Storage from October 2018 to December 2019. |
| Chief Operating Officer Bill Banyai ("Banyai") | One of Twist co-founders and Twist's Senior Vice President of Advanced Development and General Manager of Data Storage since January 2020. Previously, Banyai served as Twist's Chief Operating Officer from April 2013 to December 2019. He has been a member of Twist's Board of Directors since April 2013. |
| Chief Technology Officer Siyuan Chen ("Chen") | Twist's Chief Technology Officer ("CTO") since December 2020. Chen previously served as Director of Chemistry and Molecular Biology, and Senior Director of Research and Development from joining Twist in 2013 through December 2020. |
| Class Period | December 20, 2018 to November 15, 2022. |

AMENDED CLASS ACTION COMPLAINT                                    5:22-cv-08168-EJD

| Term | Definition |
|------|-----------|
| Cost of Goods Sold ("COGS"), Cost of Revenues, Cost of Sales | Interchangeable terms describing the total cost of manufacturing and delivering a product or service to consumers.  Under U.S. GAAP, this figure does not include research and development (R&D) costs as those expenses are not attributable to the actual manufacturing and delivery of a product to a customer. |
| Defendants | Twist, Leproust, and Thorburn. |
| Fixed Cost | Costs that are independent of sales volume.  Fixed costs tend to be costs that are based on time rather than the quantity produced or sold by your business.  Examples of fixed costs are rent and lease costs, salaries, utility bills, insurance, and loan repayments. |
| Former Employee (FE) | Former Employees of Twist who are referenced herein and identified as FE-#. |
| Gene | A section on a strand of DNA that encodes for a protein or an RNA molecule.  These molecules are the basis for inheritance.  For example, a gene could encode for eye color while other regions of DNA do not produce a trait. |
| Gross Margin | A company's net sales (revenue) minus its cost of goods sold.  The gross margin is the amount that a business earns from the sale of its products and services.  R&D expenses do not reduce gross margins.  Gross margins can be reported as a dollar figure or as a percentage of revenue (*i.e.*, (revenue minus cost of revenue) / revenue). |
| Next Generation Sequencing ("NGS") | A technology for determining the sequence of DNA or RNA to study genetic variation associated with diseases or other biological phenomena.  Introduced for commercial use in 2005, this method was initially called "massively-parallel sequencing," because it enabled the sequencing of many DNA strands at the same time, instead of one at a time as with traditional Sanger sequencing. |
| Officer Defendants | Defendants Emily Leproust and James Thorburn. |
| Oligo Pool | A diverse collection of oligonucleotides that allow for the precise design and synthesis of thousands of user-defined sequences in parallel.  They can be utilized in high-throughput screening experiments for identification of novel gene mutations, optimization of protein structure and function, or for drug discovery. |

| Term | Definition |
|---|---|
| Oligonucleotides ("Oligos") | Short single strands of synthetic DNA or RNA that serve as the starting point for many molecular biology and synthetic biology applications.  Oligos are most commonly known for their role in PCR or polymerase chain reaction.  PCR is the technique of making many copies of a fragment or strand of DNA to then generate thousands or millions more copies for use in other downstream applications like cloning or sequencing. |
| Panels | An NGS tool sold by Twist.  Panels are useful tools for analyzing specific mutations in a given sample.  Focused panels contain a select set of genes or gene regions that have known or suspected associations with the disease or phenotype under study.  Gene panels can be purchased with preselected content or custom designed to include genomic regions of interest. |
| Lead Plaintiff | Policemen's Annuity and Benefit Fund of Chicago ("PABF") is a public fund established in 1887 to provide retirement, survivors, and disability benefits to sworn members of the Chicago Police Department, their spouses, and children.  PABF manages more than $3.8 billion on behalf of nearly 27,300 active and retired members. |
| Probes | An NGS tool sold by Twist.  Twist's probes for target enrichment are double-stranded DNA that target both strands for improved sensitivity.  They can also be used to enrich targets from cDNA libraries made from RNA. |
| Research and Development ("R&D") | According to GAAP's master glossary, R&D is a planned search or critical investigation aimed at discovery of new knowledge with the hope that such knowledge will be useful in developing a new product or service (referred to as product) or a new process or technique (referred to as process) or in bringing about a significant improvement to an existing product or process.  This does not include the cost of manufacturing and delivering an existing product or service to consumers. |
| Revenue | The total amount of income generated by the sale of goods and services related to the primary operations of the business. |
| Synthetic DNA | Genes made by Twist utilizing artificial gene synthesis.  Unlike DNA synthesis in living cells, artificial gene synthesis does not require template DNA, allowing virtually any DNA sequence to be synthesized in the laboratory. |

| Term | Definition |
|---|---|
| Twist or the Company | Twist Bioscience Corporation.  A Delaware corporation with principal executive offices located at 681 Gateway Blvd, South San Francisco, CA 94080. The Company's common stock trades on NASDAQ under the ticker symbol "TWST." |
| United States Generally Accepted Accounting Principles ("GAAP") | The standards that encompass the details, complexities, and legalities of business and corporate accounting.  GAAP compliance is required under the securities laws to ensure that public companies like Twist issue reliable, accurate financial statements and public disclosures that investors can rely on and trust. |
| Variable Cost | Expenses that change based on how much a company produces and sells.  This means that variable costs increase as production rises and decrease as production falls.  Some of the most common types of variable costs include labor, utility expenses, commissions, and raw materials. |

1    Court-appointed Lead Plaintiff Policemen's Annuity and Benefit Fund of Chicago
2    ("Lead Plaintiff") alleges: (i) strict liability and negligence claims under Sections 11 and 15 of the
3    Securities Act of 1933 (the "Securities Act"); and (ii) fraud-based claims under Sections 10(b) and
4    20(a) of the Exchange Act of 1934 (the "Exchange Act") for a class period of December 20, 2018 to
5    November 15, 2022 (both inclusive), against Twist Bioscience Corporation ("Twist" or the
6    "Company"), Twist's CEO Emily M. Leproust ("Leproust"), and Twist's CFO James M. Thorburn
7    ("Thorburn").

8    Lead Plaintiff, by and through its counsel, alleges the following upon personal knowledge as
9    to itself and its own acts, and upon information and belief as to all other matters based on, among
10   other things, the independent investigation conducted by and through Lead Counsel.
11   This investigation includes, but is not limited to, a review and analysis of public filings by Twist
12   with the Securities and Exchange Commission ("SEC"), transcripts of Twist and industry
13   conferences with investors and analysts, press releases and media reports concerning the Company,
14   analyst reports concerning Twist, other public information and data regarding the Company, and
15   interviews with former employees of Twist conducted in Lead Counsel's investigation.[1]

16   **I.    SUMMARY OF THE ACTION**

17       1.    This Securities Act and Exchange Act class action arises from Defendants' material
18   misstatements and omissions about (i) the Company's cost of revenues and gross margins, and
19   (ii) the Company's lack of automated production, high error rates, delayed turnaround times, and
20   rampant customer dissatisfaction with Twist's products.  When these misstatements and omissions
21   were revealed, Twist's stock dropped 20% in one day, from a closing price of $38.00 per share on
22   November 14, 2022, to a closing price of $30.43 per share on November 15, 2022, wiping out
23   hundreds of millions of dollars in shareholder value in a single day.

24       2.    Founded in 2013, Twist is a biotechnology company built around DNA synthesis
25   technology that founder Emily Leproust stole from her former company.  Internally at Twist,

---

[1] Emphasis is added and citations are omitted unless otherwise noted.

Leproust readily admitted that, when she founded Twist, she "took all the ideas" that her prior company, Agilent, had been working on for years. Leproust frequently described Agilent's lawsuit against her for this theft, and the settlement she was forced to pay to resolve it, as simply "the cost of doing business."

3.    Although the original technology that Leproust stole allowed the Company to produce diverse DNA, this market was inherently "niche" because buyers needed just "a couple of pieces for experiments." To create the impression that Twist could serve a larger and more diverse market, and to support Twist's high valuation, Defendants announced a new suite of DNA products. In particular, Twist focused on two product types, synthetic DNA and NGS tools, that together accounted for between 80 and 100 percent of the Company's revenues during the Class Period.

4.    Defendants impressed investors by claiming that Twist earned significant gross margins on the sale of these products. They claimed to have accomplished this through, among other things, highly mechanized and automated production processes and "scalable commercial infrastructure," that resulted in the "lowest industry error rate[s]" and faster delivery times, as well as generating high customer satisfaction. Indeed, Leproust boasted, "We have actually perfect quality, we ship perfect DNA."

5.    Concealed from investors, however, was Leproust's true business strategy: to attempt to sell early version products (which Leproust called "V1" or "beta") to quickly generate revenue, even though these low-quality products were unprofitable. Internally, Leproust told her staff that the goal was to "get [the product] out, even if it was just one time revenue, it was still revenue." Rather than having "automated [Twist's] entire workflow" or achieved the "the lowest industry error rate," as Defendants told investors, Leproust's internal slogan was "good enough is good enough," and she told employees that, "[i]f you have to do it manually, it is okay. We just want [the product] out." Leproust repeated her slogan so often that Twist employees made T-shirts featuring her tag line as a "bad joke." The shirts said: "Good enough is good enough."

6.    In reality, Twist did not, and could not, produce its products profitably. This was because Twist relied heavily on its technical staff to constantly intervene manually in the manufacturing process. These expensive manual processes generated inconsistent, error-prone

1  products with slow delivery times.  As a result, customer complaints flooded in.

2      7.      Defendants concealed these true facts from investors in two key ways:  *First*,

3  Defendants artificially inflated Twist's gross margins as a percentage of revenue ("Gross

4  Margins")—which they told investors was a "key metric" for the Company—by improperly

5  classifying the costs incurred to produce its existing commercial products (*i.e.*, cost of revenues) as

6  research and development ("R&D") expenses.  Gross Margins are calculated by deducting cost of

7  revenue from total revenue and can be presented as a percentage of total revenue (*i.e.*, (revenue –

8  cost of revenue) / revenue).  Through Twist's standing policy on production costs, Twist's senior

9  management improperly instructed employees to categorize production costs for its existing products

10  as R&D.  This improper classification violated GAAP and allowed Twist to inflate its Gross Margins

11  by reducing the cost of revenue that would be deducted from total revenue.  In other words,

12  Defendants' improper classification of expenses that were truly part of the cost of revenue as R&D

13  expenses, artificially <u>decreased</u> the cost of revenue, and thus artificially <u>increased</u> the "key metric"

14  of Gross Margins.

15      8.      *Second*, Defendants misrepresented the efficiency and effectiveness of Twist's

16  production process.  Where they told investors that they had error rates of 1:3000 or 1:2000, in truth

17  they had error rates closer to 1:10, but cherry-picked data from manipulated and artificial parameters

18  to generate false error rates.  Where they told investors that "[t]he customer experience is excellent,"

19  they failed to disclose rampant customer complaints about, among other things, empty "containers

20  that did not have the product," genes where the "DNA was the wrong sequence," and products

21  infected with cross-contamination.  Where they told investors that they had "automated [Twist's]

22  entire workflow using proprietary and over-the-counter laboratory equipment," in truth there were

23  many human touchpoints in the production processes, which resulted in errors, delayed turnaround

24  times, and other production problems, such as contaminations that periodically shut down Twist

25  production labs.  In short, Twist did not have an automated efficient production process

26  (as represented to investors), but had to employ laborious, expensive, time-consuming manual

27  processes to make its products.  And the few automated processes that Twist did have consistently

28  failed.  As a result, the Company had high error rates and turnaround times.  But Defendants told

1    investors a different story, touting non-existent highly efficient automated systems using

2    cherry-picked data.

3        9.    Leproust and Thorburn were intimately aware of these problems. They received

4    reports outlining the extent of the problems and were present in meetings when the issues were

5    discussed. In monthly internal meetings, Leproust presented an "internal only set of slides" with

6    information that either contradicted or was omitted from Twist's public statements about production

7    issues and "other types of breakdowns." Leproust also admitted in these monthly meetings that the

8    Company's high error rate was 10%, not the 0.013-0.033% error rate Defendants touted publicly.

9    As to customer complaints, Leproust instructed Twist's Senior Application Scientist to never admit

10   that Twist's products had failed because Twist was "the top dog," "doing great," and employees

11   "shouldn't talk about these problems," which contradicted the image of Twist that Leproust had

12   presented to the public. Former employees of Twist speak to "hundreds" of conversations with

13   Leproust about these issues. Aware as they were of them, it is not surprising that Leproust and

14   Thorburn capitalized on Twist's inflated share price, by cashing in on over $85 million in insider

15   sales during the Class Period.

16       10.   What is more, based on their false and misleading statements and omissions,

17   Defendants launched Twist's initial public offering ("IPO") and five subsequent offerings during the

18   Class Period, which raised more than $1 billion from investors, with Twist's share price exceeding

19   over $207 at its height during the Class Period.

20       11.   The pressure on Leproust to keep up appearances became overwhelming. In one

21   candid moment shortly before these significant issues were exposed, Leproust admitted at a

22   conference that she concealed Twist's significant issues from the Class: "If you are CEO, one thing

23   I didn't know is that is the loneliest job in the world because things don't go well most of the time.

24   You can't tell your team. *You can't tell your investors*. And so you really have the weight of the

25   world on you and you're sitting laying in bed at four in the morning saying 'what did I do; how can I

26   get myself out of this.'"

27       12.   These false and misleading statements and omissions came to light on November 15,

28   2022, in a report released by Scorpion Capital, which disclosed, among other things, that: (i) Twist's

Gross Margins were inflated; (ii) Twist was covering up a flawed manufacturing process; (iii) Twist's products suffered quality control problems and high error rates; (iv) Twist suffered poor turnaround times; and (v) Twist suffered significant customer complaints.  As a result of these revelations, Twist's stock dropped 20% in one day, wiping out hundreds of millions of dollars in market capitalization.

## II.    JURISDICTION AND VENUE

13.    This Court has jurisdiction over the subject matter of this action pursuant to: (i) Section 22 of the Securities Act of 1933 (15 U.S.C. § 77v); and, separately, (ii) Section 27 of the Exchange Act of 1934 (15 U.S.C. § 78aa).  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

14.    Venue is proper in this District pursuant to:  (i) Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)); and, separately, (ii) Section 27 of the Exchange Act (15 U.S.C. § 78aa).  In addition, venue is proper pursuant to 28 U.S.C. § 1391(b) because the acts and transactions giving rise to the violations of law complained of occurred in part in this District, including the dissemination of false and misleading statements into this District.  Further, Twist is headquartered within this District at 681 Gateway Blvd, South San Francisco, CA 94080.

15.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Lead Plaintiff

16.    Lead Plaintiff Policemen's Annuity and Benefit Fund of Chicago ("PABF") is a public fund established in 1887 to provide retirement, survivors, and disability benefits to sworn members of the Chicago Police Department, their spouses, and children.  PABF manages more than $3.8 billion on behalf of nearly 27,300 active and retired members.  As set forth in the certification attached hereto as Exhibit A, PABF purchased or otherwise acquired Twist common stock in the open market and in the December 2020 Offering pursuant and/or traceable to the 2020 Registration Statement, specifically from JP Morgan Chase & Co. as underwriter.  Lead Plaintiff suffered

damages as a result of the violations of the federal securities laws alleged herein.

**B.     Defendants**

17.     Defendant Twist Bioscience Corporation is a Delaware corporation with principal executive offices located at 681 Gateway Blvd, South San Francisco, CA 94080.  The Company's common stock trades on NASDAQ under the ticker symbol "TWST."  Twist issued common stock pursuant to multiple offerings throughout the Class Period, including the December 2020 and February 2022 Offerings pursuant and/or traceable to the 2020 Registration Statement, which are the subject of Counts I and II of this Amended Complaint.

18.     Defendant Leprout is one of Twist's co-founders and has served as Twist's CEO and a member of Twist's Board of Directors since April 2013, as Twist's President from April 2013 to October 2022, and as Chair of Twist's Board of Directors since October 2018.  Defendant Leprout signed all relevant SEC filings, including the 2020 Registration Statement and the documents incorporated therein by reference.  During her tenure at Twist, Defendant Leprout had the power and authority to, and in fact did, approve and control the contents of the 2020 Registration Statement and the documents incorporated therein by reference.

19.     Defendant Thorburn has served as Twist's CFI and a Director of the Company since April 2018.  Defendant Thorburn signed all relevant SEC filings, including the 2020 Registration Statement and the documents incorporated therein by reference.  During his tenure at Twist, Defendant Thorburn had the power and authority to, and in fact did, approve and control the contents of the 2020 Registration Statement and the documents incorporated therein by reference.

**IV.     BACKGROUND ALLEGATIONS**

**A.     The Apparent Success of Twist's Business Revolved Around the Purportedly Efficient and Effective Production of Synthetic DNA and DNA Products**

20.     Founded in 2013, Twist is a biotechnology company that manufactures synthetic DNA and DNA products.  During the Class Period, Twist reported revenue from five types of products:  (1) synthetic DNA (sometimes referred to by the company as "genes" or "oligos"); (2) NGS tools, or next generation sequencing tools (mainly "custom panels," "probes," and "oligo pools"); (3) DNA and biopharma libraries; (4) antibody discovery services; and (5) DNA

data storage.

21.     Twist's two key products, synthetic DNA and NGS tools, accounted for between 80 and 100 percent of the Company's revenues during the Class Period.  Synthetic DNA enables scientists to create DNA molecules of DNA sequences without a template.  Construction begins with the base-by-base synthesis of oligonucleotides, followed by assembly into double-stranded DNA fragments.  These custom DNA fragments can be used directly, cloned into vectors, or assembled into larger constructs to serve a variety of research uses.

22.     Twist's synthetic DNA products are sold as clonal genes and non-clonal genes. Clonal genes are verified sequences of genetic material produced according to customers' specifications.  Non-clonal genes are gene fragments that are not sequence-verified and can be used by customers to build the genes they need for research or other purposes.

23.     NGS is a technology for determining the sequence of DNA or RNA to study genetic variation associated with diseases or other biological phenomena.  Specifically, this technology enabled the sequencing of many DNA strands at the same time, instead of one at a time as with traditional or "legacy" methods.  Twist began offering NGS tools to customers in February of 2018. Throughout the Class Period, Twist sold a variety of NGS tools including DNA panels, probes, and NGS kits.

24.     Underlying these product lines is Twist's DNA synthesis technology.  Twist described this technology in each of its Forms 10-K for 2018, 2019, 2020, 2021, and 2022 as the "core" of its business model and claimed to have "proprietary technology that pioneer[ed] a new method of manufacturing synthetic DNA by 'writing' DNA on a silicon chip."  According to Defendants, Twist's breakthrough proprietary "chip" allowed the Company to produce synthetic DNA at "high levels of quality, precision, automation, and manufacturing throughput at a significantly lower cost than their competitors."  Defendants told investors that this "chip" allowed Twist to "miniaturize the chemistry" necessary for DNA synthesis.  Defendants claimed it was this revolutionary technology that allowed Twist to sell its synthetic DNA products at high gross margins despite offering prices well below its competitors.

25.     Twist sought to differentiate itself from its competitors by touting its gross margins

AMENDED CLASS ACTION COMPLAINT                                            5:22-cv-08168-EJD

and profit-generating product lines. Twist told investors and analysts that although it had yet to see profits, it earned a comfortable gross margin on every sale and that Twist did not sell products below cost. When questioned about the discounts that Twist offered, Leprost stated in Twist's 2Q 2022 Earnings Call on May 5, 2022 that "there's definitely a red line where any deal has to pay for our cost, right? So the bare minimum. We're not going to do a deal that's not a gross margin positive."

26.    Defendants further emphasized the Company's focus on gross margins and the metric's importance to Twist's financial well-being. For example, on February 7, 2019, Leprost told investors during the 1Q 2019 Earnings Call that "[n]ow [the Company] will focus on improving overall operations efficiency to improve our gross margin"; during the December 5, 2019, Evercore ISI Healthcare Conference, Thorburn told investors that "the other key metric we look at is gross margin"; during the 4Q 2019 Earnings Call on December 11, 2019, Leprost told investors "operationally, we will continue to focus on increasing our gross margin, reducing turnaround time"; during the January 15, 2020, JPMorgan Healthcare Conference, Leprost said, "[L]ast year was a key year for us because the first time that we broke gross margin breakeven"; and on June 2, 2020, at the Jefferies Virtual Global Healthcare Conference, Leprost said that "very important for us is the focus on gross margin."

27.    In light of the Company's emphasis on gross margins, it was a key metric for investors. This was reflected in analyst reports throughout the Class Period, which, for example, noted that gross margins were listed first in the Company's goals for 2020 (Cowen, October 18, 2019); included gross margins in "key financial modeling" (Evercore, May 31, 2019); and proclaimed that "the future for TWST remains bright" due in part to "scaling gross margins" (Cowen, February 6, 2020).

28.    Defendants also touted the effectiveness and efficiency of Twist's manufacturing capabilities. They told investors that Twist made synthetic DNA with the "lowest industry error rate of 1:3000 base pairs . . . and customizable set of oligo pools . . . with an error rate of 1:2000 nucleotides." Later in the Class Period, Defendants claimed to have improved their error rate further to just 1:7500 base pairs. Moreover, these error rates supposedly represented the errors that occurred during production but that were ultimately caught by Twist's quality control ("QC") process. For

the products that were shipped to customers, Leproust claimed the Company only shipped "perfect quality" or errorless DNA, and repeatedly boasted, "We have actually perfect quality, we ship perfect DNA."

29.     Defendants further distinguished Twist by emphasizing its turnaround times, that is, the time it takes to deliver the Company's product after receiving an order from a customer.  The Company claimed in early post-IPO SEC filings, and throughout the Class Period, that it "offer[ed] turnaround times of approximately 11 to 17 business days for clonal genes," and "six to nine business days for non-clonal genes."  This was an important metric because it meant that Twist could quickly produce and deliver products to customers, which would further increase revenues.

30.     For the same reason, Twist repeatedly highlighted its supposed capacity for automated production and scalability.  For example, in its 2019 Form 10-K, Twist told investors that "[f]or synthetic genes, we have built a highly scalable gene production process with what we believe is industry-leading capacity of approximately 45,000 genes per month to address the growing demand of scalable, high-quality, affordable synthetic genes."  They claimed the same for their other products:  "The manufacturing process for our NGS tools is highly flexible and scalable and requires minimal fixed costs and direct labor given the efficiency of our production capability."

31.     These initiatives and their ability to grow Twist's gross margins were also important to investors.  As analysts at William Blair noted on August 8, 2022, "we see the potential for gross margins between 55% and 60% long term and view the significant gross margin beat in the quarter as evidence of how dramatically Twist will be able to benefit from scale over time."

**B.     Twist Raised Over $1 Billion in an IPO and Five Secondary Offerings**

32.     Notwithstanding its labor-intensive production process, poor product quality, high error rates and turnaround times, and customer dissatisfaction, as described below, Twist initiated numerous public offerings to raise funds.  All told, Twist raised over $1 billion through its offerings.

**1.   October 31, 2018 IPO**

33.     Twist completed the IPO on November 2, 2018.  In the IPO, Twist offered 5,750,000 shares of Twist common stock (including 750,000 shares sold pursuant to the exercise in full by the

1   underwriters of their option to purchase additional shares) priced at $14.00 per share.  The IPO

2   raised $80.5 million for Twist (before deducting underwriting discounts and commissions and

3   offering expenses).

4        34.    Twist's registration statement was declared effective by the SEC and its common

5   stock began trading on the NASDAQ on October 31, 2018.  In the first day of trading, the share

6   price popped to $14.25 per share.

7                        **2.  January 27, 2020 Offering**

8        35.    Pursuant to the 2019 Registration Statement, Twist completed an offering on

9   January 27, 2020 (the "January 2020 Offering").  In the January 2020 Offering, Twist offered 2.24

10  million shares of Twist common stock priced at $22.32 per share.  The offering raised $49.98

11  million in gross proceeds for Twist.

12                       **3.  February 19, 2020 Offering**

13       36.    Pursuant to the 2019 Registration Statement, Twist completed an offering on

14  February 19, 2020 in which it offered 5,339,295 shares of Twist common stock (including 696,428

15  shares sold pursuant to the exercise in full by the underwriters of their option to purchase additional

16  shares) at $28.00 per share (the "February 2020 Offering").  The offering raised nearly $150 million

17  for Twist (before deducting underwriting discounts and commissions and offering expenses).

18                          **4.  June 3, 2020 Offering**

19       37.    Pursuant to 2020 Registration Statement, Twist completed an offering on June 3,

20  2020, in which it offered 3,484,848 shares of Twist common stock (including 454,545 shares sold

21  pursuant to the exercise in full by the underwriters of their option to purchase additional shares) at

22  $33.00 per share (the "June 2020 Offering").  The offering raised nearly $115 million for Twist

23  (before deducting underwriting discounts and commissions and offering expenses).

24                       **5.  December 2, 2020 Offering**

25       38.    Pursuant to the 2020 Registration Statement, Twist completed an offering on

26  December 2, 2020, in which it offered 3,136,362 shares of Twist common stock (including 409,090

27  shares sold pursuant to the exercise in full by the underwriters of their option to purchase additional

28  shares) at $110.00 per share (the "December 2020 Offering").  The offering raised nearly

AMENDED CLASS ACTION COMPLAINT                                5:22-cv-08168-EJD

$350 million for Twist (before deducting underwriting discounts and commissions and offering expenses).

### 6. February 10, 2022 Offering

39.    Pursuant to the 2020 Registration Statement, Twist completed an offering on February 10, 2022, in which it offered 5,227,272 shares of Twist common stock (including 681,818 shares sold pursuant to the exercise in full by the underwriters of their option to purchase additional shares) at $55.00 per share (the "February 2022 Offering").   The offering raised nearly $287.5 million for Twist (before deducting underwriting discounts and commissions and offering expenses).

*        *        *

40.    The following table summarizes the funds raised in Twist's offerings:

| Offering | Shares | Offering Price | Approx. Funds Raised |
|---|---|---|---|
| 2018 IPO | 5,750,000 | $14.00 | $80.5 million |
| January 2020 | 2,240,000 | $22.32 | $50 million |
| February 2020 | 5,339,295 | $28.00 | $150 million |
| June 2020 | 3,484,848 | $33.00 | $115 million |
| December 2020 | 3,136,362 | $110.00 | $345 million |
| February 2022 | 5,227,272 | $55.00 | $287.5 million |
| Totals | 25,177,777 | | $1.028 billion |

### C.    Relevant Accounting Principles

41.    As discussed below, Twist's reported cost of revenues, R&D expenses, and gross margins were false.  The following is a description of the relevant accounting principles that govern cost of revenues, R&D expenses, and gross margins.

42.    GAAP compliance is required under the U.S. securities laws to ensure that public companies like Twist issue reliable, accurate financial statements as well as public disclosures that investors can rely on and trust.  Indeed, federal law requires Twist's CEO and CFO to personally

certify the accuracy of the Company's financial statements every quarter. Without GAAP compliance, investors are exposed to the risk of material misstatements that exaggerate and distort the company's true financial performance and business, as was the case with Twist.

43.     Authoritative GAAP is promulgated by the Financial Accounting Standards Board ("FASB") and contained within the FASB's Accounting Standards Codification ("ASC"). GAAP requires Twist to account for the manufacturing costs incurred to produce the Company's products as a component of cost of revenue, not as R&D expense. ASC Topic 330, *Inventory* ("ASC 330") and ASC Topic 730, *Research and Development* ("ASC 730") contain the relevant GAAP pertaining to the proper classification of manufacturing costs and R&D expenses.

44.     Gross Margin, an important profitability ratio evaluated by investors, is the amount of revenue after subtracting the cost of revenues. While manufacturing and production costs, as well as any other costs directly or indirectly related to making the products that generate revenue, must be included in cost of revenues, R&D expenses are not. Accordingly, assuming all else being equal, increased manufacturing costs would lead to a lower gross margin, whereas increased R&D expenses would not impact Gross Margin. Therefore, improperly classifying manufacturing costs as R&D expenses necessarily inflates a company's gross margins.

45.     ASC 330 states that a major objective of accounting for inventories is the proper determination of income through the process of matching appropriate costs against revenues. Cost includes both direct and indirect production costs that are incurred to bring the inventory to its present condition and location. For goods manufactured, assembled, processed, or otherwise changed in form, content, or utility, wages of employees directly engaged in the production process and an allocation of indirect production expenses (overhead) should be included in inventory costs.

46.     Cost of revenues consist of the costs that are directly or indirectly incurred to make the products that a reporting entity sells or incurred in the process of rendering services that generate revenue. When properly accounting for cost of revenues, a litmus test frequently employed to determine if an expense should be included is whether the expense would exist but for the manufacturing of a current product or service.

47.     As defined by Twist in its 2022 Form 10-K, its cost of revenues "reflects the

12

aggregate cost incurred in the ***production and delivery of our products*** and consists of production materials, personnel costs, cost of expensed equipment and consumables, laboratory supplies, consulting costs, depreciation, production overhead costs, information technology ('IT'), and maintenance and facility costs.  Personnel costs consist of salaries, employee benefit costs, bonuses, and stock-based compensation expenses."

48.    Twist included similar definitions of cost of revenues in all its Forms 10-K filed during the Class Period:

a.    2021 Form 10-K:  "Cost of revenues reflect the aggregate cost incurred in the production of and delivery of our products and consists of production materials, personnel costs, cost of expensed equipment and consumables, laboratory supplies, depreciation of capitalized equipment, production overhead costs and allocations of information technology ('IT') and facility costs.  Personnel costs consist of salaries, employee benefit costs, bonuses, and stock-based compensation expenses."

b.    2020 Form 10-K:  "Cost of revenues reflect the aggregate cost incurred in the production and delivery of our products and consists of production materials, personnel costs, cost of expensed equipment and consumables, laboratory supplies, depreciation of capitalized equipment, production overhead costs and allocations of IT and facility costs.  Personnel costs consist of salaries, employee benefit costs, bonuses, and stock-based compensation expenses. We expect that our cost of revenues will vary with changes in our revenues and our revenue mix."

c.    2019 Form 10-K:  "Cost of revenues reflect the aggregate cost incurred in the production and delivery of our products and consists of production materials, personnel costs (salaries, benefits, bonuses and stock-based compensation), cost of expensed equipment and consumables, laboratory supplies, depreciation of capitalized equipment, production overhead costs and

13

1    allocations of IT and facility costs.  We expect that our cost of revenues will

2    increase as we increase our revenues with new product developments."

3    d.    2018 Form 10-K:  "Cost of revenues reflect the aggregate cost incurred in the

4          production and delivery of our products and consists of: production materials,

5          personnel costs (salaries, benefits, bonuses and stock-based compensation),

6          cost of expensed equipment and consumables, laboratory supplies,

7          depreciation of capitalized equipment, production overhead costs and

8          allocations of IT and facility costs.  We expect that our cost of revenues will

9          increase as we increase our revenues with new product developments."

10   49.    Twist's definition of "cost of revenues" also aligns with the definition of "costs of

goods sold" as used by Twist's current auditor, EY:  "Cost of goods sold (COGS) are those costs

that undoubtedly need to be made in order for a company to deliver a service or produce a good.

Without these costs, the product or service would simply not exist."  It also aligns with the definition

of "cost of sales" as used by Twist's former auditor, PwC:  "Cost of sales are costs that are directly

related to creating the product that a reporting entity sells.  Costs may include direct costs, such as

labor and raw materials, or indirect costs, such as machinery depreciation, warehouse utilities, stock-

based compensation, and amortization of intellectual property intangible assets."  Accordingly, the

terms cost of revenue, COGS, and cost of sales are often used interchangeably.

19   50.    Gross Margins are calculated by deducting cost of revenue from total revenue.  Gross

margin can be presented either as a dollar figure (*i.e.*, revenue – cost of revenue), or as a percentage

of total revenue (*i.e.*, (revenue – cost of revenue) / revenue).

22   51.    As noted previously, FASB's ASC 730 is the relevant GAAP pertaining to R&D.

FASB defines research as a "planned search or critical investigation aimed at discovery of new

knowledge with the hope that such knowledge will be useful in developing a new product or service

(referred to as product) or a new process or technique (referred to as process) or in bringing about a

significant improvement to an existing product or process" and development as the "translation of

research findings or other knowledge into a plan or design for a new product or process or for a

significant improvement to an existing product or process whether intended for sale or use."

52.     Twist's accounting of research and development was purportedly consistent with FASB's definition of R&D.   As defined by Twist in its 2022 Form 10-K, its research and development expenses "consist primarily of costs incurred for the development of our products, which include personnel costs, laboratory equipment and supplies, consulting costs, depreciation, rent, IT, and maintenance and facility costs.  Personnel costs consist of salaries, employee benefit costs, bonuses, and stock-based compensation expenses.  We expense our research and development expenses in the period in which they are incurred.  We expect to increase our research and development expenses as we continue to invest in new product development."

53.     Twist included similar definitions of cost of revenues in all its Forms 10-K filed during the Class Period:

a.     2021 Form 10-K:  "Research and development expenses consist primarily of costs incurred for the development of our products, which include personnel costs, laboratory supplies, consulting costs and allocated overhead, including IT and facility costs.  We expense our research and development expenses in the period in which they are incurred.  We expect to increase our research and development expenses as we continue to invest in new product development."

b.     2020 Form 10-K:  "Research and development expenses consist primarily of costs incurred for the development of our products, which include personnel costs, laboratory supplies, consulting costs and allocated overhead, including IT and facility costs.  We expense our research and development expenses in the period in which they are incurred.  We expect to increase our research and development expenses as we continue to invest in new product development."

c.     2019 Form 10-K:  "Research and development expenses consist primarily of costs incurred for the development of our products, which include personnel costs, laboratory supplies, consulting costs and allocated overhead, including IT and facility costs.  We expense our research and development expenses in the period in which they are incurred.  We expect to increase our research and development expenses as we continue to invest in new product development."

15

d.    2018 Form 10-K:  "Research and development expenses consist primarily of costs incurred for the development of our products, which include personnel costs, laboratory supplies, consulting costs and allocated overhead, including IT and facility costs.  We expense our research and development expenses in the period in which they are incurred.  We expect to increase our research and development expenses as we continue to develop new products."

54.    ASC 730 states that research and development "does not include routine or periodic alterations to existing products, production lines, manufacturing processes, and other ongoing operations, and it does not include market research or market-testing activities."  Further, ASC 730 states that the following activities are not considered to be within the scope or research and development:

> (a) Engineering follow-through in an early phase of commercial production; (b) Quality control during commercial production including routine testing of products; (c) Trouble-shooting in connection with break-downs during commercial production; (d) Routine, ongoing efforts to refine, enrich, or otherwise improve upon the qualities of an existing product (e) Adaptation of an existing capability to a particular requirement or customer's need as part of a continuing commercial activity; [and] (f) Seasonal or other periodic design changes to existing products.

55.    Consistent with ASC 330 and ASC 730, Twist's current and past auditors confirm that labor expenses incurred when manufacturing products should be included as cost of revenues rather than R&D.  Twist's current auditor, EY, leaves no room for interpretation on this point.  EY states that compensation expenses for "[p]ersonnel involved in delivering services or producing goods ends up in cost of goods sold."  Twist's former auditor, PwC, has similarly written that "labor . . . related to production should be included in inventory costs for both financial reporting and tax purposes."

## V.    FORMER EMPLOYEE ALLEGATIONS

56.    Together with the allegations attributed to the FEs herein, this section provides an overview of the basis for the FEs' personal knowledge and the basis for the allegations herein.

### A.    FE-1

57.    FE-1 worked at Twist from July 2019 through April 2022, serving as Senior

16

Bioinformatics Engineer from July 2019 through December 2020, before being promoted and then serving as Bioinformatics Engineering Manager from December 2020 through April 2022. FE-1 worked in both of the labs in Twist's South San Francisco facility—one lab manufactured genes and the second manufactured NGS tools. FE-1 was responsible for QC of Twist's products in both labs. In this role, FE-1 was tasked with knowing and understanding each of the QC processes, as well as executing and managing them. FE-1 also led the team responsible for building the pipelines for production of Twist's products and handled software engineering, including the codes that supported data processing in manufacturing. FE-1 reported to several executives during this time, including then-Director of NGS Applications Esteban Toro and Senior Vice President of Business Technologies Martin Kunz.

58. <u>Twist Artificially Inflated Gross Margins</u>: According to FE-1, Twist inflated its Gross Margins by improperly categorizing costs incurred to produce and sell its existing commercial products as R&D rather than cost of revenue. Internally at Twist, when the company incurred costs or an employee submitted a purchase order for approval, personnel had to select to which department to bill that cost. Twist had a standing policy to expense production costs to R&D: if a cost or expense *could* be used for R&D or was a shared resource that could at least, in part, be used by R&D personnel, then the entire amount was to be billed to R&D. FE-1 emphasized that this was a "known, understood policy" in place during the COO tenures of Twist co-founder William Banyai and then Patrick Weiss. Indeed, Weiss instructed employees to expense costs to R&D "as much as possible." In addition, if a cost was "common infrastructure" or the cost could be used by R&D in any way, the cost was "not counted as production." Instead, "[i]t would all go to R&D" and the Company recorded the cost as R&D. In adhering to this policy, Twist billed many direct product costs, as well as those incurred in connection with the production process, to R&D. FE-1 provided additional details about several types of expenses that Twist improperly recorded as R&D under Twist's standing policy on production costs, when they should have been included in the cost of revenue:

      a.    <u>Computation Costs Related to Production</u>: Twist incurred computation costs to run its production pipeline. These costs were necessary to analyze samples

in production, perform QC and apply Twist's pass/fail process, complete the NGS verification, and determine which samples to ship to customers. Twist incurred these computation costs for every product that it produced. Although these costs were related to production, pursuant to Twist's standing policy on production costs, FE-1 and other Twist employees improperly billed these costs to R&D.

    i.    The computation costs were essential to production. For example, for production of genes, Twist collected DNA fragments and performed cloning into a bacterial cell or a vector to generate clones. These computation costs were needed to sequence all clones of the genes, to perform the QC process, and to determine which of those clones "passed" QC and met the specifications the customer ordered.

    ii.    In addition, Twist's pipeline ran different third-party platforms that formed the basis of the computation resources. These included Amazon Web Services ("AWS"), Illumina BaseSpace, and Seven Bridges Genomics. Each of these contracts alone cost Twist "six figures or more" at a minimum per year, and the cost Twist owed under these contracts scaled with production, so that Twist had to pay more under each of these contracts as it produced more products. FE-1 confirmed that when these contracts were entered into the expense and purchase order approval system, the contracts were "recorded under the R&D side of it."

    iii.    When FE-1 had to approve the annual AWS services needed to perform QC for Twist's production pipeline, FE-1 asked Weiss where to bill the cost of the contract. Weiss told FE-1: "Bill it to R&D. If it is a shared resource that R&D could use in addition to production then bill it to R&D." FE-1 knew that the cost was

1                                   billed to R&D, as Weiss directed, because FE-1 designated the

2                                   R&D department as the appropriate department to bill the cost to

3                                   in Twist's system that tracked such information.

4               iv.     Similarly, with respect to the BaseSpace contract, FE-1 shared the

5                                   details of the contract with Weiss and Kunz, including Twist's

6                                   estimated usage for production.  Weiss and Kunz then said to

7                                   FE-1: " Put it through the expense system and tag it as R&D

8                                   expense," and FE-1 saw that the contract was then processed in the

9                                   manner instructed.

10      b.    <u>Production Software</u>:  Twist also treated the expense of the software needed to

11            complete orders of its products as R&D rather than cost of revenue.  All the

12            software engineering work FE-1 did at Twist was billed to R&D, pursuant to

13            Twist's standing policy on production costs.  In addition, the processing and

14            intake of customer orders—which required significant resources and were part

15            of commercial production and fulfilment of customer orders for Twist's

16            existing products—were not being billed into cost of revenue, but instead

17            into R&D.

18      c.    <u>Quality Control Costs Were Improperly Billed to R&D rather than Cost of</u>

19            <u>Revenue</u>:  Every Twist product had multiple levels of QC and Twist's

20            production tools and processes required QC as well.  For each product Twist

21            sold to customers, Twist used R&D personnel for troubleshooting and

22            re-making or re-running products on the production line that did not pass QC.

23            Rather than allocate these costs to cost of revenue, they were recorded as

24            R&D.  In that regard, FE-1 noted that "none of the salaried employees in

25            R&D were asked to track how much they were working on production."  The

26            same was true of FE-1 and FE-1's team.

27      d.    <u>Contamination Remediation Costs Were Improperly Recorded as R&D</u>:

28            During FE-1's tenure at Twist there were contamination problems that

19

periodically shut down production at Twist's South San Francisco facility. These were "Company-wide events" and Leproust and Thorburn were "all aware" and personally involved when contamination events occurred.  Each time, Twist had to devote substantial resources to clean up the contamination and get production running again.  R&D personnel were pulled into these scenarios to troubleshoot the contamination events related to existing products.  FE-1 confirmed that the costs associated with R&D personnel's work in this regard were billed to R&D.

 e. Production Costs of Orders From "Important" Customers Were Improperly Recorded as R&D:  When an "important" Twist customer, like Pfizer or AstraZeneca, placed an order—for example, for "10,000 non-standard clonal genes"—Twist would have the R&D staff produce and facilitate delivery of the order.

 59. Twist Misrepresented its Production Processes as Automated:  As FE-1 explained, the Company rushed to introduce new products without building the necessary automation around them or knowing how to make them in regular commercial production.

 a. FE-1 stated that Twist represented its production to be automatic, precise, and mechanized when it was not.  There were many human touchpoints in the production processes, which resulted in errors, delayed turnaround times, and other production problems, such as contaminations that periodically shut down Twist production labs.

 b. In Monthly Performance Meetings (discussed further below), Leproust advanced a business strategy to try to sell "V1" or "beta" products to quickly generate revenue without having to invest the time and resources in developing an automated process that could produce quality products profitably.  Internally Leproust advised Twist staff that her strategy was to get a "V1 out"—a first delivery of a commercialized product—to "make sure there is enough interest and then do work to automate it and get more software

AMENDED CLASS ACTION COMPLAINT   5:22-cv-08168-EJD

support for it."  Leproust also said in Monthly Performance Meetings that she did not want to invest in the software development needed for automated production, until "we know it is going to sell."  For example, with respect to NGS products, the goal was to "get [the product] out, even if it was just one time revenue, it was still revenue."

60.     Leproust's Business Strategy Contributed to Ballooning Costs and Poor Product Quality:  By the time Twist was able to ensure there was enough interest in a newly released product to create automation around it, one or two years had typically lapsed.  Throughout this period, Twist was "just throwing more bodies at the problem," and making products utilizing expensive manual labor rather "than doing the automation work."  FE-1 emphasized that Twist could not "hit the cost" it wanted to achieve because it was "remaking the product over and over."  Due to serious complaints about quality, Twist had to re-make products for customers multiple times because of the errors.  This reproduction affected all Twist products.  If the product does not work, Twist had to "go back and resynthesize—that is extra cost."  Twist based its stated cost figures on "one time through" production, but in reality had to make products multiple times.  Because of this, the Company could not meet its desired costs.

a.     For example, FE-1 noted that Twist made custom panels, which the Company had to "print right, QC right, and ship correctly to the customer."  Because it lacked the automation and quality processes necessary to produce the custom panels to specification on the first try, Twist faced delays in turnaround times and increased costs when the panels had to be remade.

b.     In addition, Twist made "off the shelf, catalogue products."  The Company produced these catalogue products in lots—large quantities to be stored and delivered upon order.  FE-1 explained that "even lot to lot, the variability was high," meaning that Twist could not ensure the same specifications for a particular product.  This generated customer complaints and Twist having to "remake large batches of things" as a result of the variability.  This was specifically an issue with Twist's exome product.  FE-1 confirmed that it was

21

1     expensive to remake the large lots of exomes, with the entire cost absorbed by

2     Twist.  As with so many other aspects of the production process for existing

3     products, R&D staff were involved "to figure out why there was variability

4     from lot to lot."

5          61.    Twist Misrepresented Its Error Rates and Turnaround Times to the Public:

6  FE-1 knew what the true turnaround times and error rates were because FE-1 was responsible for QC

7  and "saw the raw numbers."  FE-1 and FE-1's team wrote the software by which Twist derived error

8  rates and determined how Twist classified product as pass or fail from the sequencing data.  Twist's

9  turnaround times and error rates were "definitely underreported."  Twist accomplished this by

10  reporting numbers that were "very cherry-picked" to misrepresent the true error rates and

11  turnaround times.

12          a.     For instance, Twist only counted certain types of errors as counting towards

13                 its "error rate," while excluding other errors detected in the QC process

14                 overseen by FE-1.  So when Twist told the public that, for example, its genes

15                 had an "error rate of 1:3000 base pairs," (meaning 1 error in 3,000 base pairs)

16                 it concealed that the other 2,999 included base pairs that also had errors but

17                 were not reported because they did not fit Twist's narrow definition of errors.

18                 FE-1 made clear that Defendants omitted additional errors from their publicly

19                 disclosed "error rates" that required reproduction.  In reality, according to FE-

20                 1, Twist's error rate was about 1 in 10 base pairs, or 1 in 10 nucleotides for

21                 oligo pools, and certainly never better than 1 in 100.

22          b.     Additionally, Twist presented artificial error rates and turnaround times to the

23                 public by filtering its data to exclude batches or types of products from the

24                 calculation that Twist knew suffered higher error rates or slower

25                 turnaround times.

26          c.     The reported figures that Twist cherry-picked from manipulated and artificial

27                 parameters did not match its actual error rates and turnaround times.  For

28                 example, Twist batched larger orders, and reported the turnaround time on the

1    first batch as the delivery time for the whole order.  This reporting concealed

2    that these orders were still incomplete, and it took Twist much longer to

3    complete production and shipment of the full customer orders.

4    d.    This manipulation of Twist's data was "easy to do" by playing with data and

5    joining tables.  One simply had to "start selecting IDs that fall into a general

6    bucket."  Twist's data science and software, coupled with the fact that "every

7    piece of data was in a table in a database," allowed Twist to simply write the

8    appropriate "joins and queries" to "show the data how [the Company]

9    want[ed] it."  This manipulation was done by Twist's data science and

10   business intelligence personnel, and the instructions to do so "came from

11   the top."

12   62.    Executive Meetings:  As a senior engineer and manager responsible for overseeing

13   the QC of Twist's products, FE-1 participated in meetings with Twist's C-Suite and VP-level

14   executives, including Leproust, Thorburn, Weiss, and Kunz.  These meetings included the Monthly

15   Performance Meetings led by Leproust from the South San Francisco facility that were

16   simultaneously broadcast by Zoom.  During these meetings, Leproust frequently excused Twist's

17   improper or objectionable behavior as "the cost of doing business."  For example, Leproust admitted

18   that she "took all the ideas" that her prior company, Agilent, had been working on for years, and

19   took Chief Technology Officer Siyaun Chen with her from Agilent to found Twist.  Leproust

20   frequently described Agilent's lawsuit against her for this, and the settlement paid to resolve it, as

21   simply "the cost of doing business."

22   a.    In these meetings, Leproust reported information that had been conveyed to

23   shareholders and other outside stakeholders, and then presented a separate,

24   "internal only set of slides" with information about technology or production

25   problems or "other types of breakdowns."  These internal slides contradicted

26   the information Twist was publicly conveying.

27   b.    In addition, Leproust often used the phrase "good enough is good enough" to

28   encourage Twist personnel to prioritize short term sales over product quality

23

and Company reputation.  For example, if customers were purchasing a product, then it was not worth spending resources on quality because "good enough is good enough."  Leproust also used her tag line to distinguish "good enough to ship versus actual quality," encouraging employees to make product merely "good enough to ship," which did not represent actual quality. As such, Leproust urged FE-1 and other personnel working on quality control to sacrifice quality and instead focus on shipping more product, even if it did not meet the high-quality standards Twist represented to the public.

c.  Leproust stated to FE-1 and other Twist personnel in Monthly Performance Meetings that Twist's goal was "getting more revenue and growth," even if Twist sold products that were not profitable.  She made these statements in response to questions posed by staff during the meetings about "profit versus growth."  FE-1 specifically recalled that about a year before FE-1 departed Twist, Leproust responded to a question in an all-hands meeting, in which she "very specifically said" that Twist was "targeting growth rather than bottom line profitability."

d.  During meetings, CFO Thorburn would show charts demonstrating that Twist was not profitable and identifying under what conditions the Company could potentially be profitable in the future.  Throughout FE-1's tenure, senior management pushed out the date Twist could potentially be profitable further out into the future.  A lot of people internally at Twist felt that the Company would never be profitable.  During the meetings, Thorburn excused this by saying that "investors seem to like what we're doing so we're going to keep doing it."

63.  FE-1's Efforts to Raise Concerns at These Meetings Were Shut Down by Leproust and Senior Executives:

a.  The two biggest concerns FE-1 had about Twist were "profitability and quality."  Twist was skimping on quality, and had "a lot of manual processes,

24

1  throwing people with Excel to do the tracking, rather than building software to

2  do the tracking," and "recording things in analysis" to make it appear that

3  quality was better than it actually was.

4      b.  FE-1 raised concerns directly to Leproust in the Monthly Performance

5  Meetings and to Senior Director of R&D Esteban Toro and Chief Technology

6  Officer Siyuan Chen.  But Twist's senior executives rejected FE-1's

7  objections.  Leproust's response was:  "Good enough is good enough.  If a

8  customer thinks it is good enough, we do not have to be holier-than-thou."

9  FE-1 posed such questions to Leproust "more than two or three times,"

10  including after being promoted to manager.  FE-1 recalled that Leproust was

11  called out in front of the whole Company with questions like these in Monthly

12  Performance Meetings.  On behalf of colleagues and FE-1's team, FE-1

13  expressed concerns about decisions that jeopardized the quality of Twist's

14  products and urged Twist to improve its manufacturing quality, but was

15  "shut down."

16  **B.**    **FE-2**

17      64.  FE-2 was employed by Twist for nearly six years from August 2017 through June

18  2023.  During this time, FE-2 held the roles of Manufacturing Associate from August 2017 to March

19  2019, Manufacturing Supervisor from March 2019 to March 2021, and Product Line Specialist from

20  March 2021 to June 2023.  FE-2's job responsibilities included managing Twist's manufacturing

21  process, monitoring production metrics, training manufacturing staff, maintaining detailed record

22  keeping and documentation of manufacturing processes, and investigating failures in production and

23  quality control issues.

24

25

26

27

28

AMENDED CLASS ACTION COMPLAINT                                    5:22-cv-08168-EJD

65.    <u>Twist's MES Database Automatically Tracked Error Rates, Turnaround Times, and Other Production Data</u>:  According to FE-2, Twist tracked its production data using an "Electronic Batch Record System," which employees commonly called "MES"—an acronym for "manufacturing execution system."  The system worked as follows:  at the start of the manufacturing process, Twist employees scanned barcodes for containers and lot numbers into the MES.  Twist's software then automatically generated real-time production data from each stage of the production process, through production completion and shipment to the customer.  MES "kept track" of each product "going through the process," and gave Twist visibility into which orders were in the production process, and how long they had been there.  The information generated and captured in the MES system included metrics on all aspects of Twist's products.  The system produced metrics like turnaround time, the stage in the production process at which a particular product was located, error rates, and other QC-related information.  Most everyone at Twist could access the MES, which provided a general and detailed view of Twist's manufacturing process.

66.    <u>Leproust and Other Executives Accessed and Used the Twist Production Data</u>:  Data from the MES were "linked to a SQL database" that was used for reporting purposes.  Twist executives used its SQL (Structured Query Language) tool to generate reports and query specific types of information from the MES.  FE-2, FE-2's supervisors, and senior management also had access to the SQL tool, which was sometimes called the SQL database.  The SQL tool was used to generate reports and query specific types of information from the MES, such as details about how long production was taking and other metrics regarding the production processes.  The data from the SQL database were used to create and inform presentations that senior executives delivered to staff in meetings at the South San Francisco facility.  FE-2 attended Monthly Performance Meetings, led by Leproust, where Leproust presented production data from the SQL and MES databases.

67.    <u>Leproust Led Monthly Performance Meetings</u>:  Twist executives held biweekly Performance Meetings in the large breakroom area of the Company's South San Francisco facility.  In addition to the in-person attendees, some employees joined by Zoom.  On a monthly basis—*i.e.*, at every other biweekly meeting—Leproust led the Twist Performance Meeting.  At each of her Monthly Performance Meetings, Leproust delivered a PowerPoint presentation on how Twist was

performing in relation to her corporate goals for that month.  Leproust also presented details on the Company's quarterly performance as compared to her quarterly goals.

    a.    During each Monthly Performance Meeting, Leproust utilized PowerPoint to present Twist executives and employees with a detailed analysis of the Company's metrics for the month or the quarter.  Her presentations used data from the SQL database.  Leproust specifically covered production data and production metrics, including the first task yield and error rate, the turnaround time, the number of genes shipped, and the gross margins for Twist products.  At the meetings, Leproust discussed and compared Twist's monthly and quarterly results to her goals.  CFO Thorburn was at the monthly meetings as well and discussed the Company's revenues.  This internal information contradicted Defendants' public statements.

    b.    At these meetings, Leproust also provided updates about the Company and various topics.  In addition, Twist vice presidents presented large scale Company updates.  At times, department vice presidents and directors provided updates about activity in their respective parts of the business.  There was also a portion of the meetings dedicated to employee questions.

68.  <u>Leproust and Thorburn Were Personally on Site at the Gene Production Lab</u>: Since becoming a specialist in March 2021, FE-2 worked "the 9 to 5" day shift.  During this time, FE-2 observed Leproust and Thorburn each on site visiting the South San Francisco gene production lab where FE-2 worked.  Sometimes Leproust or Thorburn would include other senior managers, like Vice President of Manufacturing Jacqueline Fidanza, and investors and important customers in these visits.  FE-2 personally interacted with Leproust and Thorburn on more than one occasion during their visits to the production lab.

69.  <u>Twist's True Error Rate Was 10%</u>:  One metric that Leproust tracked closely and discussed in Monthly Performance Meetings was "first task yield."  First task yield represented how often Twist's production was "right the first time," or "how much of the order was correct the first time without anything having to be redone."  Twist's internal goal was to get around 90 percent first

AMENDED CLASS ACTION COMPLAINT                        5:22-cv-08168-EJD

1  task yield, meaning that 90 percent of the time, the gene production was done correctly and did not

2  require "anything to be redone."  This translated to a ten percent error rate, meaning that one in ten

3  of Twist's products failed quality control.  Accordingly, ten percent of the time manufacturing staff

4  like FE-2 had to send the product back into the production pipeline, or "into the redo process," as

5  FE-2 put it.  Detailed metrics regarding Twist's first task yield and error rate were generated

6  "automatically" in the MES database and queued in SQL.  Leproust reported the Company's 10%

7  error rate at Monthly Performance Meetings.

8          a.    According to FE-2, the error rate mattered because more production work was

9          required with respect to the products that failed.  FE-2 explained that there

10          were a series of steps that were followed in the ten percent of instances where

11          Twist's manufacturing process did not result in an acceptable product.  If the

12          production was re-run, and the product failed the quality control check a

13          second time, there was a "manual quality control review conducted," and the

14          product was then "redone again."  FE-2 explained that the Company used this

15          manual process because there were a variety of reasons for the errors affecting

16          10% of the Company's production requiring different efforts to remediate the

17          errors in the QC and re-run process.

18        70.    <u>Twist's Manufacturing Team Was Forced to Replace Missing, Defective, and</u>

19  <u>Contaminated Products</u>:  After manufacturing was complete, employees conducted QC checks and

20  DNA purification before the product was processed in containers and shipped to the customer.

21  Throughout FE-2's time at Twist, production quality and shipments to customers were never

22  "perfect."  Customers contacted Twist's customer support team to make complaints about the

23  products they received.  There were several different complaints and defects, including Twist

24  shipping:  (i) empty "containers that did not have the product," meaning that the product was entirely

25  missing; (ii) genes where the "DNA was the wrong sequence"; and (iii) products infected with cross-

26  contamination.

27          a.    When customers raised these complaints to Twist about missing, defective, or

28          contaminated shipments, FE-2 and the manufacturing team made the product

1  again and Twist incurred the cost of doing so without receiving additional
2  payment from the customer.

3  b.  Twist established a protocol for responding to customers' complaints about
4  missing, defective, or contaminated products.  These complaints were
5  investigated, documented, and discussed in department-level meetings.  As a
6  product specialist, FE-2 was personally involved in investigating these types
7  of customer complaints.  FE-2 worked with quality control personnel as part
8  of these investigations.  FE-2 "tracked back" the product through the MES to
9  identify the day the product was shipped, what machines were used in
10  production, and who was working on the product with the goal of identifying
11  where the problem occurred.  FE-2 communicated FE-2's findings to the
12  quality control personnel and prepared "incident reports" to memorialize the
13  errors that generated customer complaints.  Twist also held department-level
14  meetings involving product specialists, supervisors, and managers, during
15  which customer complaints were discussed.  FE-2 recalled that there were, for
16  example, instances in which FE-2's investigation determined that the
17  problems that led to customer complaints occurred in the last process of
18  production, "by the time they were doing the shipping process" and after the
19  product had already been "QC-ed and verified."

20  c.  FE-2 used two different types of software—called Confluence and Jira—to
21  prepare the "incident reports" on product errors that led to customer
22  complaints.  FE-2 explained that this software allowed the report writer to
23  document the issue and to "attach SOPs," or standard operating procedures.
24  Once incident reports were completed, they were discussed in department-
25  level meetings.  The director of manufacturing used the incident reports in
26  presentations to the production team as "teaching moments" and to try "to
27  prevent future errors."  Kum Ming Woo was the director of manufacturing for
28  some time until spring 2022, when he was replaced by Brian Scott.

29

Manufacturing Directors Woo and Scott delivered the same presentations regarding the incident reports multiple times to ensure that everyone understood the customer complaint problems at Twist.

71.    <u>Production Lab Contamination in Spring 2022</u>:    In spring 2022, Twist's gene production lab had a major issue in which "a large amount of product was failing QC checks."  For a period of weeks, Twist conducted an extensive investigation which caused "significant delays" in the shipment of Twist products and the first task yield was very low.  FE-2 reported that "a lot of things went into redo and things were on hold during the investigation."

    a.    FE-2 confirmed that Leproust "definitely knew" of the cross-contamination issue that plagued Twist's gene lab in 2022.  FE-2 prepared reports and the manager then met with other managers and multiple directors to discuss FE-2's reports.  These meetings were aimed at trying to discover where in the production process the issue was occurring; whether it was "in gene production or before gene production."  The managers and directors used the information from FE-2's reports to provide updates to Leproust on the status of the issue.

72.    <u>Twist's Production Was Not Fully Automated</u>:    Despite efforts to automate the production process, Twist was not able to achieve automation and consequently was forced to rely on various human touchpoints and manual steps to manufacture the Company's products.  For example, the production process required that humans prepare the machines for manufacturing, but the machines required that the preparation be done to exact specifications.  This could not always be achieved with human preparation, resulting in production errors.  In addition, materials were moved between machines by humans rather than an automated process.  FE-2 explained that in the 10% of products that suffered from production errors, the most common root causes were human error or instrument error.

**C.    FE-3**

73.    FE-3 served as Twist's Director of Bioinformatics and Data Science from August 2020 to August 2022, and was based in the South San Francisco office.  In this capacity,

FE-3 oversaw three different teams.   First, FE-3 oversaw the Data Science team, which had responsibility for QC at Twist's manufacturing lab and worked on the design of Twist's Factory of the Future, among other things.  Second, FE-3 oversaw a team responsible for building the pipelines for production, including the codes that supported data processing in manufacturing.  Third, FE-3 oversaw a team providing bioinformatics and data science support for early research and "computational research."   As director, FE-3 reported to Senior Vice President of Business Technologies Martin Kunz who, in turn, reported to Chief Operating Officer Patrick Weiss.

74.   <u>Customer Complaints</u>:   FE-3 worked on NGS tools and, in particular, on panels sold to customers as a means to detect specific bio markers in research and experiments.   There were smaller panels—for instance, for specific types of cancer—and larger panels that detected phenotypes.  In this work, FE-3 was advised of customer complaints about these NGS tools through numerous channels, including from:   (i) field application scientists;  (ii)Twist's sales team; (iii) Twist's customer relationship staff; and (iv) Twist executives directly for particularly serious issues.   FE-3 suspected that FE-3 would have heard only a small fraction of customer complaints about Twist's products because FE-3 did not receive any direct customer feedback.   The complaints were only routed to FE-3 in instances where the underlying issue was a pipeline problem that "needed to be fixed," or when "people could not figure out what was happening and" the Company "had to use computational methods to track it down."

a.   Examples of production issues that caused complaints about these NGS tools include instances where:  (i) customers would re-order the same panel but receive "big differences" in terms of the product that was shipped; (ii) the target effect of the panel failed to meet the appropriate threshold; (iii) materials were not binding correctly; and (iv) there were "sequences that were not supposed to be there," there was an "extra probe," or "something was missing."

b.   To address these customer complaints, VP-level executives discussed the issues with FE-3's team and other teams as well.  In the reporting hierarchy, VP-level executives reported directly to C-suite executives, and Directors like

AMENDED CLASS ACTION COMPLAINT                                                    5:22-cv-08168-EJD

FE-3 reported directly to VP-level executives.  The customer complaints were "no secret," "everyone knew."  VP-level executives were directly involved in troubleshooting to try to resolve the production problems that were causing customer complaints and would regularly check-in with FE-3's team about the status of remediation efforts.  Twist's R&D team was "usually" involved in responding to customer complaints and trying to resolve the underlying problems in Twist's production of its products.

75.    <u>Contamination Shutdowns</u>:  At least twice during FE-3's two-year tenure, there was "contamination in the lab" in South San Francisco which held up production for a "few weeks at a time—three or four weeks."  One contamination event occurred in the first six months after FE-3 began work in August 2020.  Twist had another contamination in the spring of 2022.

a.    Given how Twist's lab was designed and used, even the smallest mistake with the tiniest amount of trace DNA could amplify and cause a major problem, such as contamination issues.  In other words, as FE-3 explained, contamination issues were inevitable at Twist's lab because of the design of the lab and the purpose of the production system.  For instance, a worker simply putting the wrong plate in the wrong place could result in the system becoming contaminated.

b.    To remediate the contamination issues, Twist had to shut down the whole lab and "really clean the lab."  "The whole production had to stop."  And the delays impacted "anyone who had an order in the pipeline" at the time of the contamination.

c.    It was "really hard" and time-consuming to identify the source of the contamination and remediate the problem.  Twist's production and delivery could not continue until the issue was resolved.  That is, "[n]one of the products would pass quality control" unless the contamination issues were resolved.

d.    CEO Emily Leproust and CFO Jim Thorburn were "definitely aware" of the contamination issues.  As FE-3 put it, "Oh yes, everyone knew.  When we had contamination, it was a big deal and everyone knew."  When contamination events occurred, it became "top priority and there was nothing more important because the lab gets shut down."

76.    <u>Monthly Performance Meetings</u>:  Leproust held Monthly Performance Meetings with Twist executives and employees.  The meetings were on Wednesdays and lasted one hour.  These meetings were hosted via Zoom.  And there was a message at the start of each meeting informing participants that the meetings were being recorded.  Hundreds of personnel attended these meetings.

a.    At each meeting Leproust presented PowerPoint slides to the attendees, covering various topics, including general company updates.  "Emily did a lot of the talking" during the meetings.  At times, department heads also made presentations at the meetings.

b.    FE-3 distinctly recalled Leproust discussing the contamination issues during Company meetings, including the Monthly Performance Meetings and/or separate meetings specifically held to discuss the contamination.  At these meetings, Leproust was displeased, and she discussed "lessons learned" on contamination with the attendees and ways to try to stop the contaminations that were shutting down the Company's production.

c.    These Monthly Performance Meetings were recorded and available for employees to view on Twist's internal network.  On some occasions, FE-3 accessed these recordings and viewed them from the Twist internal network.

77.    <u>Monthly Leadership Meetings</u>:  Leproust also led regular meetings each month among Company leadership.  Through approximately early 2021, these meetings were attended by C-Suite executives, VP-level leadership, and directors.  FE-3 attended as a director.  At these meetings, Leproust presented in-depth discussion and analysis about "what was going on" with each of Twist's products, including problems or delays with respect to each one.  FE-3 provided an update on FE-3's work at these meetings.  In approximately early 2021, however, Twist changed these

1    meetings to restrict them to just C-Suite executives and VP-level leadership, so directors like FE-3

2    no longer attended.

3    78.    <u>Operations Meetings with COO Weiss and SVP Kunz</u>:    FE-3 regularly met with

4    Senior Vice President Martin Kunz, and Chief Operating Officer Patrick Weiss.    During these

5    meetings, Kunz and Weiss frequently sought information, making comments to the tune of:    "Emily

6    wants to know.    Emily this or Emily that."    The discussions at these regular meetings further

7    indicated to FE-3 that Leproust was deeply involved with all matters at the Company.

8    79.    <u>Leproust's Business Strategy of "Good Enough is Good Enough" Jeopardized Quality</u>

9    <u>and Undermined Automated Production</u>:    When Twist first launched, it quickly gained market share

10    among producers of DNA.    However, as time passed and more competitors entered the market, other

11    companies were able to produce DNA "as well" as Twist.    As FE-3 noted, "just selling genes, oligos,

12    plasma, and panels is a saturated market."    As a result, Twist "has been struggling to come up with

13    new products to utilize the DNA they print."    Throughout FE-3's employment, until at least

14    approximately early 2022, "everything was about pushing out new products," FE-3 recalled.    This

15    drive for new products "jeopardized the quality of everything because the priority was push out

16    more."    Further, Leproust told the employees, "If you have to do it manually, it is okay.    We just

17    want [the product] out."    Leproust espoused this advice while conveying her signature tag line:

18    "Good enough is good enough."    FE-3 said that Leproust said this tag line often in meetings.

19    Leproust repeated the tag line so often that some employees made T-shirts that featured the tag line

20    as a "bad joke."    The shirts said:    "Good enough is good enough."

21    a.    <u>Quality Deficiencies</u>:    In FE-3's role overseeing the Data Science team, FE-3

22    dealt with QC at Twist's manufacturing lab.    Twist's QC team and the senior

23    engineer responsible for QC in production voiced concerns that Twist had

24    jeopardized the quality of its products and urged Twist to improve its

25    manufacturing quality.    But these concerns were rejected, FE-3 explained.

26    Twist's senior leadership, including Senior Director of R&D Esteban Toro

27    and Chief Technology Officer Siyuan Chen, advised that quality control

28    would be done quickly and imprecisely and that would be good enough.

i. Specifically, Twist could have improved QC by spending more money on early computational detection software that monitored the manufacturing and having more checks in manufacturing. Twist's QC evaluation was "somewhat arbitrary," and QC failures were measured based on a "tolerance to errors—there was no gold standard."

b. <u>Lack of Automation</u>: Automating Twist's manufacturing process "was not the priority." The priority was "rolling out more product, even if it meant doing things more manually. That was the message all the way from the CEO." Leproust told the employees, "If you have to do it manually, it is okay. We just want it out." FE-3 explained that there were some steps in production that had to be done manually, outside the scope of the software for such production. FE-3 observed that "things definitely could have been faster if there was more automation." Twist knew which products and steps required manual production tasks because the Company internally accounted for the extra time that was necessary due to lack of automation.

**D.      FE-4**

80.     FE-4 served as Twist's Senior Application Scientist, NGS Bioinformatics from November 2017 to December 2020. FE-4 reported to two different directors who, in turn, reported to Senior Director Patrick Finn. During FE-4's tenure, Twist faced major failures in the NGS products it sold to customers. FE-4 was involved in uncovering why Twist's products were failing, particularly its NGS panels. "More than half" of the thousands of customers to whom Twist sold NGS products complained that Twist's NGS tools did not work. Customers were upset and made complaints that "you sold us something that is not working."

81.     <u>Twist Used Falsified Data to Report False Error Rates</u>:  Twist "falsified data and information to project an image that it was the forefront leader" in the market for these DNA products. For example, the error rates Twist reported were not obtained using actual products that it manufactured in its production line for customers. Rather, Twist created "gold data," which were

AMENDED CLASS ACTION COMPLAINT                                                      5:22-cv-08168-EJD

the very best results that Twist had ever achieved in artificial conditions using different, prototype versions of its products. Twist could not replicate its "gold data" results in actual commercial production, and it never achieved the metrics it presented outside the Company. Nonetheless, Twist would use the "gold data" as a basis for "hammering away" and falsely representing to the public and customers that it had these capabilities. This disconnect between the product capabilities Twist presented and the actual capabilities of its products generated constant customer complaints and frustration.

82.    Leproust and Twist Leadership Were Fully Aware of Product Problems and Customer Complaints: FE-4 had "hundreds" of conversations and meetings with Leproust about these product failures, quality control errors, and customer complaints. These included more formal "Development Meetings" with Leproust in the company of other executives. In addition, FE-4 sent emails to Leproust "all along" FE-4's tenure, including in 2018—the year of Twist's IPO—which FE-4 said was a was a messy situation internally for the Company. FE-4 confirmed that discovery will show numerous emails to Leproust as well as calendar notices for meetings with Leproust about these issues that Leproust concealed from the public. At Development Meetings, which included CEO Leproust, CFO Thorburn, CTO Siyuan Chen, Senior Director Quality Assurance Kathleen Perry, Co-Founder Bill Peck, Co-Founder Bill Banyai, and others, Leproust discussed how to "manage" these problems and how to "manage" Twist's customers who were frustrated by the fact that Twist's NGS products did not work. FE-4 was responsible for working directly with Twist customers, creating marketing materials to onboard customers and educate them about Twist products, and traveling around the world to "try to smooth over" customer concerns about faulty products. The instruction handed down by senior management was to never admit when Twist's products failed or did not work. FE-4 was told to try to convince the customers that the issues they experienced could be attributed to the customers' actions, even when the problem was actually that Twist's product did not work. To pacify customers who had received a failed or defective product, Twist employees were instructed to give "serious discounts" on that product or just "comp" the product or send replacement products to customers for free. In many cases, Twist's replacement products did not work either, so Twist would incur substantial expense to continuously send more

1  than one replacement product to the same customer.  FE-4 said, customers "stopped ordering" from

2  Twist "all the time" after experiencing quality issues with NGS panels and kits.

3       83.    Leproust and Twist Leadership Encouraged Employees to Conceal the Truth About

4  Twist's Failures:  Although Leproust was very concerned about the large number of customer

5  complaints, to FE-4's surprise and frustration, Leproust tried to suppress internal discussion about

6  the product failures and production problems.  FE-4 was instead told that, as a customer-facing

7  employee, FE-4 should try to convince customers that the customers did something wrong, rather

8  than admit "what Twist did wrong."  Leproust would insist that Twist was "the top dog," "doing

9  great," and employees "shouldn't talk about these problems," which contradicted the image of Twist

10 that Leproust had presented to the public.  Even though FE-4 was instructed not to discuss problems

11 that contradicted Leproust's public messaging, FE-4 purposely continued to bring them up and let

12 Leproust know about the production failures and customer dissatisfaction that caused FE-4 to work

13 unusually long hours.  Nonetheless, Leproust and Twist management pressured customer-facing

14 employees to make these kinds of misrepresentations to customers.  Even though FE-4 objected that

15 the way Twist treated its customers was "disgusting," FE-4 was told to "just get it done."  FE-4 also

16 raised FE-4's concerns with Vice President of Human Resources Paula Green, but nothing changed.

17      84.    Twist Could Not Solve Its Production Problems:  FE-4 worked with R&D personnel,

18 including Chief Technology Officer Siyuan Chen and Director of NGS Research Ramsey Zeitoun, to

19 try to address the QC issues and deal with customer complaints.  FE-4 described Twist's R&D

20 department as "chaotic, at best."  At the time, then-Senior Director Siyuan Chen led the R&D

21 function.  Chen's "whole MO was it worked once, so it is a product."  However, once the products

22 were put into production, there was "no reproducibility," and this was particularly true with the NGS

23 panels Twist sold to customers.  FE-4 was dismayed and raised multiple times the lack of

24 reproducibility for Twist's NGS Tools, but Chen was "honored for pushing products out" in this

25 fashion and, to Twist senior management like Leproust, Chen was the "golden child."  In the

26 Development Meetings (discussed above), Leproust and Twist's senior leadership "were always in

27 this mode of build the airplane while it is in flight."

28

AMENDED CLASS ACTION COMPLAINT                                      5:22-cv-08168-EJD

a.    Twist R&D staff was involved in trying to remediate and handle these issues but they were unable to resolve the failures or fix production problems.  These included instances where customers ordered the same panels but received different, incompatible versions, making it difficult for customers to use the products effectively for research.

b.    There were also problems with the "wet lab" chemistry for Twist's existing NGS products.  "[S]o many customers were annoyed" that "it simply did not work."  Twist R&D staff was actively involved in the wet lab and there was a "lot of QC they did not get right; they had to reiterate and replace kits so many, so many times" because "something clearly did not work" in the wet lab portion of production.  FE-4 emphasized that "for a long, long time, they just could not get it right and had to reiterate over and over and remake and gave it to customers for free."

85.    <u>Twist Leadership Shut Down FE-4</u>:  Eventually, FE-4 was "frozen out" of the Development Meetings with Leproust and other executives.  FE-4 was specifically asked "not to attend," because FE-4 was "the one to bring up the problems and no one wanted to hear the problems."

**E.    FE-5**

86.    FE-5 served as NGS Sales Specialist from March 2021 to November 2021, covering the New England territory.  During this time, FE-5 sold Twist's NGS tools to Twist customers.

87.    <u>Turnaround Times</u>:  Based on training FE-5 received at Twist, FE-5 told customers that Twist would ship its synthetic probes (an NGS tool) to them in four to six weeks.  But FE-5's manger informed the team that instead of a four-to-six-week turnaround time, they should expect delivery to take "10 to 12 weeks."  FE-5 emphasized that the turnaround time turned out to be "more like 12 or 16 weeks."  This meant that FE-5's customers, like Harvard University, were having to wait "three months" or longer to receive the NGS tools they ordered from Twist.

a.    FE-5's customers were upset about the delays.  "My clients were like: 'Whoa!  What is going on?  I don't want to lay off people from my lab'"

38

because Twist cannot deliver the product.  FE-5 pointed out that at one point, Harvard had ordered $250,000 in probes from Twist, but the delivery was significantly delayed.  Harvard was unhappy because it had to "shut down a lab for four to six weeks" in summer 2021 because it could not get the probes it needed from Twist within the expected turnaround time.  FE-5 reported that this illustrated the type of issue that occurred all too often at Twist.

   b.   Twist's inability to meet its reported turnaround times was discussed during the weekly Northeast region sales calls that FE-5 attended.  FE-5 knew from these calls that the entire Northeast region was experiencing similar issues.  FE-5 and the other sales specialists conveyed their concerns about the delays in turnaround times to the region manager during the calls.  They pleaded, "You got to get this stuff going and get it out."

   c.   But instead of resolving the production problems, the delays at Twist were getting worse.  FE-5 noted that the longer FE-5 worked at Twist, the "harder it was for them" to deliver probes.  FE-5 learned through discussions with a Twist scientist and FE-5's supervisor that the delays occurred because Twist was "behind on production."

88.   <u>Pricing / Discounts</u>:  Twist gave customers "steep" discounts on its products.  Twist gave FE-5 authority to give discounts to every customer, and FE-5 did, even for recurring customers.  All discounts greater than 10-20% were specifically approved by FE-5's boss.  It was not uncommon for FE-5 to give customers a 25% to 50% discount, and in some cases FE-5 was given authority to offer a discount of up to 70%.  Critically, there was no "pricing floor" for the Twist sales team.  And in contrast to other employers that shared manufacturing costs with the sale teams, Twist withheld this information.  At Twist, FE-5 was "always asking" about costs, but never received that information.

## F.   FE-6

89.   FE-6 worked at Twist from November 2019 through July 2023 and held the positions of Shipping Coordinator & Export Compliance (November 2019 to October 2020), Manufacturing

Associate (October 2020 to October 2021), and Team Lead (October 2021 to July 2023). Throughout this time, FE-6 worked on site at Twist's South San Francisco facility. FE-6 reported to a supervisor named Anthony Canoy. Canoy reported to Production Manager Philip Lucero, who reported to Manufacturing Director Brian Scott.

90.     Contamination:  There were at least two instances when the lab was shut down as a result of contamination.  The shutdowns "caused delays" in turnaround times because Twist was "not producing anything" for weeks.  During such shutdowns, no orders were shipped, no product went out, there was no progress on orders that were in production, and no production started on new or existing orders.

    a.     There was a significant amount of manpower dedicated to trying to discern the source of the contamination.  Twist had to test, among other things, "everything from [the Company's] suppliers," product that had already been manufactured, and "all the material that had been touched."  Some of the material had to be placed in incubators "for days or weeks" to assess whether it was part of the contamination.  FE-6 was involved in cleaning the lab following contamination events and recounted having to "clean the lab upside down, cleaning the nooks and crannies and decontaminating the lab from corner to corner, ceiling to floor."  It then took additional time after the shutdown was resolved to get production started again because there was a backlog of customer orders and Twist had to select which customers to prioritize.

    b.     "Of course" CEO Emily Leproust knew about the contamination issues, FE-6 said.  FE-6 noted that "when operations are shut down, all that goes up the ladder really quickly" and large groups of personnel quickly become involved in the effort, which likely would have required executive approval.  Leproust also discussed the contamination issues at meetings.  At least once per month, Leproust held a "business meeting" to provide updates to the Company.  These meetings were available on Zoom, and attendees posted questions to the

AMENDED CLASS ACTION COMPLAINT                                     5:22-cv-08168-EJD

1    "Zoom chat" during the presentations.  Leproust and other executives would

2    respond to the questions during the meeting or provide answers later to

3    employees via the Twist Intranet or at the next meeting.

4    91.    Customer Complaints:  FE-6 became aware of customer complaints due to FE-6's

5    work in manufacturing.  For example, Twist faced delays and shipping-related issues for products

6    made for international customers.  This would lead to situations like the product sitting for five or six

7    days where it thawed and then spoiled before the customer even received it.  In these instances,

8    Twist would have to either find and send a replacement product if it was in stock or remake the

9    spoiled product if none was in stock.

10    92.    Skewed Turnaround Times:  At Twist, FE-6 observed that the "details of the

11    turnaround times were skewed."  For example, FE-6 explained, if a customer ordered 100 products

12    in one order, Twist broke that order up into batches.  Twist may have shipped out the first 10

13    products of the 100-product order in five days and counted the turnaround time for the whole order

14    as five days, even though "the whole order had not been completed."

15    93.    MES software:  Twist used MES software to track production and information about

16    the status of production of customer orders; this information was readily available in the MES

17    system when FE-6 wanted to look it up.  From MES, Twist "planners" evaluated customer orders

18    and would "pick and choose, in batches," what should be produced and when.

19    94.    Production Errors:  FE-6 recounted different types of production errors.

20    a.    For example, because of a lack of automation, Twist had operator errors and

21    operator mishandling problems.  Twist had to hire and train operators for the

22    production process; these types of errors "came in waves," and newer

23    operators usually made more errors.  For instance, the human operators

24    inadvertently "flipped plates" that contained samples onto the table.  At times,

25    these plates, which contained as many as "400 samples and three weeks of

26    product," were then lost because of the "flipping."  Twist had to make those

27    samples again.  Additionally, these operator errors could affect samples not on

28

AMENDED CLASS ACTION COMPLAINT                                    5:22-cv-08168-EJD

the plate, causing contamination of additional samples, along with more reproduction.

b.    Other types of production errors included "oversights," as well as ineffective communication between manufacturing personnel.  For example, as part of production, Twist personnel had to incubate certain components for a certain number of hours, *e.g.*, 10 hours.  However, there were errors in which the materials were incubated for well over 10 hours, even up to 24 hours.

c.    Another production problem was a failure by production staff to report errors due to "not wanting to be at fault."  When these mistakes were not caught in QC checks, defective products would be sent to customers.  And even when the mistakes were caught in QC checks, weeks' worth of production time was lost because Twist had to reproduce the product.

d.    FE-6 emphasized that it was not just the human touchpoints that created errors and contamination in the lab.  For example, Twist machines also flipped plates, causing Twist to have to remake products.  One of the "main machines," the "Hamilton," was an automatic liquid handler robot that moved liquid from one plate to another plate.  The Hamilton robot also lifted the plates.  There were issues at the South San Francisco gene lab in which there was adhesive on the plates, resulting in the robot not being able to fully disengage the plates and ultimately flipping them in the lift process as a result.

e.    Finally, FE-6 explained that, depending on the product, there was a QC check in Twist's production line.  In some cases, products failing QC were sent back into the pipeline "a few steps back."  Some Twist products failed the quality check consistently, and in those instances, everything had to be restarted "all the way back to the beginning of the production process."

## VI.    THE OFFICER DEFENDANTS ARE SUBJECT TO CONTROL PERSON LIABILITY

95.    Lead Plaintiff incorporates and realleges the allegations set forth above.  In addition, the following allegations demonstrate the Officer Defendants' control over Twist at the time of the relevant offerings and throughout the Class Period.

96.    The Officer Defendants had control of Twist due to their executive positions and their roles in management, their preparation and signing of Twist's SEC filings, and their direct involvement in its day-to-day operations.

97.    The Officer Defendants held the top management positions within Twist since before the Class Period and thereby controlled the Company.  Specifically:  (i) Leprout has served as Twist's CEO and a member of its Board since 2013; and (ii) Thorburn has served as Twist's CFO and a member of its Board since April 2018.

98.    The Officer Defendants prepared and signed each of Twist's SEC filings throughout the Class Period.  Further, the Officer Defendants also spoke on behalf of the Company during conference calls with investors during the Class Period.  Both Leprout and Thorburn spoke regularly in earnings call and at the industry conferences described below.

## VII.    SECURITIES ACT ALLEGATIONS

99.    In this section of the Amended Complaint, Lead Plaintiff asserts strict liability and negligence claims based on Sections 11 and 15 of the Securities Act of 1933 on behalf of all persons and entities who purchased or otherwise acquired Twist common stock in the December 2020 and February 2022 Offerings pursuant and/or traceable to the 2020 Registration Statement.

100.    Lead Plaintiff expressly disclaims any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately from Lead Plaintiff's Exchange Act claims.

101.    All of the statements and omissions in the 2020 Registration Statement that Lead Plaintiff alleges to be actionable are included in this section.

102.    The 2020 Registration Statement violated the Securities Act because it contained materially false and misleading statements falling into two categories:  (1) false financial statements

that reported false cost of revenues, R&D expenses, and gross margins; and (2) false and misleading statements about Twist's products.

### A.    2020 Registration Statement

103.    On June 3, 2020, Twist filed a registration statement on Form S-3, including a preliminary prospectus with the same date (the "2020 Registration Statement").

104.    The 2020 Registration Statement specifically incorporated by reference information that it said was "considered to be part of this prospectus."   The information incorporated by reference into the 2020 Registration Statement included "any future filings we make with the SEC under Sections 13(a), 13(c), 14, or 15(d) of the Exchange Act on or after the date of this prospectus (other than, in each case, documents or information deemed to have been furnished and not filed in accordance with SEC rules) until the termination of the registration statement of which this prospectus is a part" and the following specific documents, among others: Form 10-K for the year ended September 30, 2019; Forms 10-Q for the quarters ending December 31, 2019 and March 31, 2020; and the Forms 8-K filed on October 25, 2019, October 29, 2019, December 18, 2019, January 8, 2020, January 13, 2020, January 27, 2020, February 6, 2020, February 7, 2020, and February 20, 2020.

105.    Twist had three offerings linked to the 2020 Registration Statement, including the December 2020 Offering and the February 2022 Offering, which are the subject of Counts I and II of this Amended Complaint.

### 1.    The December 2020 Offering

106.    On December 1 and December 4, 2020, Twist filed successive prospectus supplements to the 2020 Registration Statement for the sale of approximately $300 million in common stock.  The December 1 and 4, 2020 prospectus supplements were specifically made "a part of" the June 3, 2020 Form S-3.

107.    The December 1 and 4, 2020 prospectus supplements incorporated by reference, among other things, the Form 10-K for the year ended September 30, 2020; the information in Part III of Twist's Form 10-K for the year ended September 30, 2019 (other than information furnished rather than filed); and "[a]ll documents filed by Twist Bioscience Corporation under

Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act, that are filed (excluding, however, information we furnish to the SEC) by us after the date of the prospectus and prior to the termination of this offering."

108.    On December 7, 2020, Twist announced the close of the December 2020 Offering. The Company sold 3,136,362 shares of its common stock (including 409,090 shares sold pursuant to the exercise in full by the underwriters of their option to purchase additional shares) at a price of $110.00 per share.  Twist received nearly $350 million in gross proceeds from the December 2020 Offering (before deducting underwriting discounts and commission and offering expenses).

### 2.  The February 2022 Offering

109.    On February 9 and February 14, 2022, Twist filed prospectus supplements to the 2020 Registration Statement for the sale of approximately $250 million of common stock.  The February 9 and 14, 2022 prospective supplements were specifically made "a part of" the June 3, 2020 Form S-3.

110.    The February 9 and 14, 2022 prospective supplements incorporated by reference the Form 10-K for the year ended September 30, 2021; the Forms 10-Q filed with the SEC for the quarter ending December 31, 2021; the information in Part III of Twist's Form 10-K for the year ended September 30, 2021 (other than information furnished rather than filed), as incorporated by reference to the Proxy Statement, filed with the SEC on January 4, 2022; the Forms 8-K and 8-K/A filed with the SEC on November 22, 2021, November 23, 2021, and December 2, 2021; and "[a]ll documents filed by Twist Bioscience Corporation under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act, that are filed (excluding, however, information we furnish to the SEC) by us after the date of the prospectus and prior to the termination of this offering."

111.    On February 15, 2022, Twist announced the close of the February 2022 Offering. The Company sold 5,227,272 shares of its common stock (including 681,818 shares sold pursuant to the exercise in full by the underwriters of their option to purchase additional shares) at a price of $55.00 per share.  Twist received nearly $287.5 million in gross proceeds from the February 2022 Offering (before deducting underwriting discounts and commission and offering expenses).

112.    For the avoidance of the doubt, as relevant here, the 2020 Registration Statement

1    includes the Form S-3 filed on June 3, 2020, the Prospectus Supplements filed on December 1, 2020,

2    December 4, 2020, February 9, 2022, and February 14, 2022, and the documents incorporated by

3    reference therein, all issued in connection with the Company's December 2020 and February 2022

4    offerings (together, the "2020 Registration Statement").

**B.    False and Misleading Statements Regarding Gross Margins and Related Financial Metrics**

7        113.    In the 2020 Registration Statement and/or the 2019, 2020, and 2021 Forms 10-K

8    incorporated therein by reference, Defendants reported Twist's cost of revenues, R&D expenses, and

9    gross margins for the fiscal years 2019, 2020, and 2021.  Those annual figures are reproduced in the

10   following table:

| Filing | Cost of Revenue[2] | R&D Expense | Gross Margin |
|---|---|---|---|
| 2019 Form 10-K | $47,426 | $35,683 | 12.8% |
| 2020 Form 10-K | $61,406.00 | $43,006 | 31.8% |
| 2021 Form 10-K | $80,620.00 | $69,072 | 39.1% |

16       114.    The 2020 Registration Statement incorporated by reference the Company's

17   Form 10-Q for each fiscal quarter beginning with 4Q 2019 and ending with 4Q 2021.  Specifically,

18   the 2020 Registration Statement incorporated by reference "any future filings we make with the SEC

19   under Sections 13(a), 13(c), 14, or 15(d) of the Exchange Act on or after the date of this prospectus

20   (other than, in each case, documents or information deemed to have been furnished and not filed in

21   accordance with SEC rules) until the termination of the registration statement of which this

22   prospectus is a part."  In each of these quarterly reports, Defendants reported Twist's revenues, cost

23   of revenues, and research and development expenses.  In the Forms 10-Q for 1Q 2021 to 3Q 2021,

24   the Company reported gross margins.  Those quarterly figures are reproduced in the following table:

---

[2] All numbers in thousands of USD.

| Filing | Cost of Revenue[3] | R&D Expense | Gross Margin |
|---|---|---|---|
| 4Q 2019 Earnings Press Release Filed on Form 8-K | $12,386 | $10,496 | Not Reported in Filing |
| 1Q 2020 Form 10-Q | $13,792 | $10,297 | Not Reported in Filing |
| 2Q 2020 Form 10-Q | $13,564 | $10,629 | Not Reported in Filing |
| 3Q 2020 Form 10-Q | $16,472 | $10,444 | Not Reported in Filing |
| 4Q 2020 Earnings Press Release Filed on Form 8-K | $17,578 | $11,636 | Not Reported in Filing |
| 1Q 2021 Form 10-Q | $18,162 | $14,000 | 35% |
| 2Q 2021 Form 10-Q | $19,028 | $15,791 | 39% |
| 3Q 2021 Form 10-Q | $20,933 | $19,838 | 40% |
| 4Q 2021 Earnings Press Release Filed on Form 8-K | $22,500 | $19,400 | Not Reported in Filing |

115.    The foregoing statements concerning Twist's cost of revenue, R&D expenses, and gross margins were false and misleading and omitted and concealed the truth that at the time of the statements:

a.    <u>Research and Development</u>:  Under Twist's standing policy on production costs, Twist billed production costs for the Company's existing products as R&D.  This included the following costs:  (i) computation costs to run Twist's production pipeline, including to analyze samples, perform QC, apply Twist's pass/fail process, complete NGS verification, and determine which samples to ship to customers; (ii) production software needed to complete orders of Twist products; (iii) day to day quality control for existing products; (iv) contamination remediation; and (v) production when the orders for Twist products came from "important" customers.    Due to this improper

---

[3] All numbers in thousands of USD.

1  mischaracterization, the R&D numbers that Twist reported in its SEC filings

2  were false.  Accordingly, the amount the Company actually spent on R&D

3  was materially lower than Defendants claimed in SEC filings.

4     b.   <u>Cost of Revenues</u>:  By improperly recharacterizing expenses that Twist

5  actually incurred in manufacturing its products as R&D expense, the

6  Company necessarily reported materially understated cost of revenues.  U.S.

7  GAAP required Twist to account for these expenses as cost of revenue rather

8  than R&D.  Accordingly, the Company's true cost of revenues as stated in

9  each quarterly and annual filing was materially higher than Defendants stated.

10     c.   <u>Gross Margin</u>:  Gross margin percentage is calculated by subtracting cost of

11  revenues from the company's total revenue and dividing by the company's

12  total revenue.  Understating the cost of revenue and overstating the R&D

13  expenses necessarily resulted in the Company reporting artificially inflated

14  gross margins.  As such, the Company's gross margins were materially

15  overstated in the foregoing statements.

16  **C.**    **False and Misleading Statements Regarding Twist's Products**

17  116.   In Twist's 2019, 2020, and 2021 Forms 10-K incorporated by reference into the 2020

18  Registration Statement, Defendants stated:

19  > The core of our platform is a proprietary technology that pioneers a
   > new method of manufacturing synthetic DNA by "writing" DNA on a

20  > silicon chip.  We have combined this technology with proprietary
   > software, scalable commercial infrastructure, and an e-commerce

21  > platform to create an integrated technology platform that enables us to
   > achieve high levels of quality, precision, automation, and

22  > manufacturing throughput at a significantly lower cost than our

23  > competitors.

24  117.   In Twist's 2019 and 2020 Forms 10-K, incorporated by reference into the 2020

25  Registration Statement, Defendants also stated:

26  > We offer turnaround times of approximately 11 to 17 business days for
   > clonal genes.

27

28  > . . .

1

2

> We offer turnaround times of six to nine business days for non-clonal genes with what we believe is the lowest industry error rate of 1:3000 base pairs.

3

> . . .

4

5

6

> We sell a diverse, customizable set of oligo pools, ranging from a few hundred oligos to over one million and offer oligonucleotides of up to 300 nucleotides in length with an error rate of 1:2000 nucleotides and turnaround times beginning at five days.

7        118.    In Twist's 2019 and 2020 Forms 10-Ks, incorporated by reference into the 2020

8   Registration Statement, Defendants stated that Twist had:

9

> automated [its] entire workflow using proprietary and over-the-counter laboratory equipment.

10

11        119.    In Twist's 2019 Form 10-K incorporated by reference into the 2020 Registration

12   Statement, Defendants stated:

13

14

15

16

17

> The ability of the Twist DNA synthesis platform to precisely manufacture target enrichment probes at large scale has dramatically increased the types of projects that can now be addressed using NGS technologies.  Our platform has unlocked new applications, improved data quality, and dramatically expanded the types of scientific questions that can be answered using NGS.  In addition, the speed of our DNA synthesis platform enables customers to quickly deploy NGS technologies to applications where the time to answer is critical.

18        120.    In Twist's 2019 Form 10-K incorporated by reference into the 2020 Registration

19   Statement, Defendants stated:

20

21

22

> For synthetic genes, we have built a highly scalable gene production process with what we believe is industry-leading capacity of approximately 45,000 genes per month to address the growing demand of scalable, high-quality, affordable synthetic genes.

23

> . . .

24

25

26

> The manufacturing process for our NGS tools is highly flexible and scalable and requires minimal fixed costs and direct labor given the efficiency of our production capability.  We have automated the entire workflow using proprietary and over-the-counter laboratory equipment.  We have built dedicated production capabilities for our NGS products.

27        121.    In Twist's 2019 Form 10-K incorporated by reference into the 2020 Registration

28   Statement, Defendants stated:

49

1

2

3

4

5

6

For all of our contracts to date, the customer orders a specified quantity of a synthetic DNA sequence; therefore, the delivery of the ordered quantity per the purchase order is accounted for as one performance obligation.  Some contracts may contain prospective discounts when certain order quantities are exceeded; however, these future discounts are either not significant, not deemed to be incremental to the pricing offered to other customers, or not enforceable options to acquire additional goods.  As a result, these discounts do not constitute a material right and do not meet the definition of a separate performance obligation.  We do not offer retrospective discounts or rebates.

7

. . .

8

9

10

Our customer contracts generally include a standard assurance warranty to guarantee that our products comply with agreed specifications.  We reduce revenue by the amount of expected returns which have been insignificant.

11

12

122.    The foregoing statements were false and misleading and omitted and concealed the truth that at the time the statements were made:

13

14

15

16

17

a.    Lack of Automation:  Twist's production process was not automated, precise, highly accurate, reproducible, or integrated; it did not operate at a large scale, nor was it scalable.  Twist was not able to achieve automation and consequently was forced to rely on human touchpoints and manual steps to make Twist products.

18

19

20

21

22

23

24

b.    Product Quality and Error Rate:  Twist's synthetic DNA and NGS products were produced with a high error rate, poor quality, and with variation or incompatibility that made them unfit for Twist customers.  Twist shipped incomplete, defective, or contaminated products to customers, causing significant customer complaints.  Twist utilized "cherry-picked" numbers to underreport the true error rates of its products, which was actually 1:10 (10%), not 1:3000 to 1:7500 (0.033-0.013%) as Defendants stated.

25

26

27

28

c.    Slow and Unpredictable Turnaround Times:    Twist misrepresented its turnaround times and omitted that the Company consistently failed to meet turnaround times to customers.  Defendants' statements concealed that Twist's shutdowns and production problems exacerbated its slow and unpredictable

turnaround times.  Twist utilized "cherry-picked" numbers to underreport its true turnaround times.  Twist's publicly disclosed turnaround times excluded batches or types of products from the calculation that suffered slower turnaround times.

d.   Contamination Events:  The Company's production labs suffered periodic contamination events, a consequence of the lack of automation, which also exacerbated poor turnaround times.  These contamination events required Twist to shut down its manufacturing operations, causing delays in turnaround times because production was halted for weeks.  During such shutdowns, no orders were shipped, there was no progress on orders that were in production, and no new production was able to start on new or existing orders.

e.   Customer Dissatisfaction:  Twist received significant customer complaints. These complaints included customers receiving:  (i) empty "containers that did not have the product," meaning that the product was entirely missing; (ii) genes where the "DNA was the wrong sequence"; (iii) products infected with cross-contamination; (iv) spoiled products; (v) non-functioning products; and (vi) products that did not match the specifications to the previous versions of the same products.

f.   Retrospective Refunds, Discounts, and Rebates:  When problems occurred in Twist's NGS product line, which happened with approximately 50% of orders, the Company offered retrospective discounts and refunds.  Further, these products were often returned, resulting in significant costs to the Company.

## VIII.   CLASS ACTION ALLEGATIONS

123.   Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following proposed Class:

> As to claims under the Securities Act, all persons that purchased or otherwise acquired Twist's common stock in the December 2020 and February 2022 Offerings pursuant and/or traceable to the 2020

Registration Statement, and were damaged thereby; and

As to claims under the Exchange Act, all persons and entities who purchased or otherwise acquired Twist's common stock between December 20, 2018 and November 15, 2022, both inclusive, and were damaged thereby.

124.    Excluded from the Class are: (i) Defendants and any affiliates or subsidiaries thereof; (ii) present and former officers and directors of Twist and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iii) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any Defendant had or has had a controlling interest; (v) Twist's employee retirement and benefit plan(s); and (vi) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding five categories.

125.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of October 9, 2023, there were over 57 million shares of Twist common stock outstanding, owned by at least thousands of investors.

126.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  The questions of law and fact common to the Class include, but are not limited to, the following:

a.    Whether the federal securities laws were violated by Defendants' conduct as alleged herein;

b.    Whether Defendants made any untrue statements of material fact or omitted to state any material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading;

c.    Whether the Registration Statements contained any untrue statements of material fact or omitted to state any material facts required to be stated therein or necessary to make the statements therein not misleading, in violation of the Securities Act and/or Exchange Act;

d.     Whether Defendants acted with scienter as to Lead Plaintiff's claim for relief under Section 10(b) of the Exchange Act;

e.     Whether Defendants were controlling persons as to Lead Plaintiff's claim for relief under Section 20(a) of the Exchange Act;

f.     Whether Defendants were controlling persons as to Lead Plaintiff's claim for relief under Section 15 of the Securities Act;

g.     Whether any Defendants can sustain their burden of establishing an affirmative defense under applicable provisions of the Securities Act;

h.     Whether and to what extent the prices of Twist common stock were artificially inflated or maintained during the Class Period due to the misstatements and non-disclosures complained of herein;

i.     Whether, with respect to Lead Plaintiff's claims under the Exchange Act, reliance may be presumed under the fraud on the market doctrine; and

j.     Whether and to what extent Class members have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

127.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.

128.     There will be no difficulty in the management of this action as a class action.

129.     Class members may be identified from records maintained by the Company or its transfer agent(s), or by other means, and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

## IX.    INNAPLICABILITY OF STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE

130.     The statutory safe harbor and bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the untrue or misleading statements alleged herein. The statements complained of herein concerned then-present or historical facts or conditions that existed or were purported to exist at the time the statements were made.

131.    To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, (a) they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements, and the generalized risk disclosures made were not sufficient to shield Defendants from liability, and (b) the person who made each such statement knew that the statement was untrue or misleading when made, or each such statement was approved by an executive officer of Twist who knew that the statement was untrue or misleading when made.

## X.    EXCHANGE ACT ALLEGATIONS

### A.    Exchange Act False and Misleading Statements

#### 1.    False and Misleading Statements Regarding Gross Margins and Related Financial Metrics

132.    In Twist's 2018, 2019, 2020, and 2021 Forms 10-Ks, Defendants reported Twist's cost of revenues, gross margins, research and development expenses, or some combination of all three metrics.  Those annual figures are reproduced in the following table:

| Filing | Cost of Revenue[4] | R&D Expense | Gross Margin |
|---|---|---|---|
| 2018 Form 10-K | $32,189 | $20,347 | Not Reported in Filing |
| 2019 Form 10-K | $47,426 | $35,683 | 12.8% |
| 2020 Form 10-K | $61,406 | $43,006 | 31.8% |
| 2021 Form 10-K | $80,620 | $69,072 | 39.1% |

133.    In Twist's quarterly filing for each fiscal quarter beginning with 4Q 2018 and ending with 3Q 2022, Defendants reported Twist's cost of revenues, gross margins, and R&D expenses.  Those quarterly figures are reproduced in the following table:

---

[4] All numbers in thousands of USD.

| Filing | Cost of Revenue[5] | R&D Expense | Gross Margin |
|---|---|---|---|
| 4Q 2018 Earnings Press Release Filed on Form 8-K | $9,093 | $6,065 | Not Reported in Filing |
| 1Q 2019 Form 10-Q | $11,857 | $7,273 | Not Reported in Filing |
| 2Q 2019 Form 10-Q | $11,789 | $8,907 | Not Reported in Filing |
| 3Q 2019 Form 10-Q | $11,394 | $9,007 | Not Reported in Filing |
| 4Q 2019 Earnings Press Release Filed on Form 8-K | $12,386 | $10,496 | Not Reported in Filing |
| 1Q 2020 Form 10-Q | $13,792 | $10,297 | Not Reported in Filing |
| 2Q 2020 Form 10-Q | $13,564 | $10,629 | Not Reported in Filing |
| 3Q 2020 Form 10-Q | $16,472 | $10,444 | Not Reported in Filing |
| 4Q 2020 Earnings Press Release Filed on Form 8-K | $17,578 | $11,636 | Not Reported in Filing |
| 1Q 2021 Form 10-Q | $18,162 | $14,000 | 35.00% |
| 2Q 2021 Form 10-Q | $19,028 | $15,791 | 39.00% |
| 3Q 2021 Form 10-Q | $20,933 | $19,838 | 40.00% |
| 4Q 2021 Earnings Press Release Filed on Form 8-K | $22,500 | $19,400 | Not Reported in Filing |
| 1Q 2022 Form 10-Q | $27,056 | $22,630 | 35% |
| 2Q 2022 Form 10-Q | $29,714 | $31,231 | 38% |
| 3Q 2022 Form 10-Q | $30,974 | $36,840 | 45% |

134.    In Twist's quarterly and year-end earnings calls, Defendant Thorburn reported Twist's gross margin.

135.    During Twist's Earning Call for 2Q 2019, Defendant Thorburn stated:

> Our gross margin was 13% positive for the quarter, and we're now positive gross margin year-to-date.

---

[5] All numbers in thousands of USD.

136.    During Twist's Earnings Call for 3Q 2019 on August 1, 2019, Defendant Thorburn stated:

> Our gross margin for the third quarter is positive 16%.

137.    During Twist's Earnings Call for 4Q and FY 2019 on December 11, 2019, Defendant Thorburn stated:

> As Emily noted, the fourth quarter was another very strong quarter for us in terms of revenue growth and increased gross margins. Our annual revenue for 2019 was $54.4 million, which exceeded our revised upward guidance of $52 million to $53 million. This represents another year of triple-digit growth for Twist. As we continue to grow our revenue and leverage our fixed costs, our gross margins improved, and the margin for the year was $7 million positive compared to a negative gross margin of $6.8 million in the previous fiscal year 2018.

138.    During Twist's Earnings Call for 1Q 2020 on February 6, 2020, Defendant Thorburn stated:

> Our gross margin was positive $3.4 million at 20%, essentially flat sequentially.

139.    During Twist's Earnings Call for 2Q 2020 on May 7, 2020, Defendant Thorburn stated:

> Our gross margin for the quarter was 29.7% as compared to approximately 13% in the same quarter last year, and up from 20% in quarter 1.

140.    During Twist's Earnings Call for 3Q 2020 on August 6, 2020, Defendant Thorburn stated:

> Our gross margin for the third quarter was 22%, which is impacted by our scale-up of our DNA preps for clonal genes.

141.    During Twist's Earnings Call for 4Q and FY 2020 on November 23, 2020, Defendant Thorburn stated:

> Our orders for the fiscal year achieved a record $116.7 million, and revenue was $90.1 million, and our gross margin scaled to 31.8% for the year . . . . Our gross margin is notable in the fourth quarter with positive 46%.

142.    During Twist's Earnings Call for 4Q and FY 2021 on November 22, 2021, Defendant

Thorburn stated:

> Gross margin for the fourth quarter was 40.7%, and our total year gross margin was 39% as compared to 32% in FY '20.

143.    In Twist's 2Q 2019 Earnings Call on April 30, 2019, the first question asked was from a JP Morgan analyst concerning gross margins: "Maybe I'll start with the gross margins. Nice improvement there. Can you maybe just touch on how much of this was just volume leverage versus maybe some manufacturing efficiencies?" Defendant Thorburn responded:

> A lot of it [*i.e.*, Twist's reported high Gross Margins] is a combination of volume and manufacturing efficiencies. As we've scaled our NGS, we've seen our NGS costs come down, which is driving manufacturing efficiencies.

144.    In Twist's 4Q 2020 Earnings Call on November 23, 2020, Defendant Thorburn touted the Company's gross margins in his prepared remarks at the outset of the earnings call:

> As we've noted before, the increase in our margin reflects the impact of scaling our revenues, leveraging our fixed costs and the benefits of a higher mix of NGS products and terrific execution by our organization.

145.    In Twist's 1Q 2021 Earnings Call on February 4, 2021, an analyst from JPMorgan Chase & Co. questioned why Twist did not project further increases in gross margins, asking, "You've left top line guidance unchanged despite the beat this quarter. But you increased the gross margin guide just to account for the higher-margin in the quarter, so essentially leaving the rest of the year the same. Is this just typical conservatism? Or is there something else to call out here?" Defendant Thorburn answered by reassuring the analyst three times that the Company was "conservative" with its gross margins and was "on track" to achieve "55% to 60" gross margins, stating:

> It's conservative. We are in [the] middle of a pandemic. We're off to a really strong start, and we see good strong synbio business. We're seeing -- experiencing good business in Europe. In the U.S., we had a $4.5 million shipment on liquid biopsy. So our NGS business is going strong. Synbio business is going strong. Regionally, we're doing well. And at the same time, we're being conservative.
>
> We saw our gross margins increase to 36%. And we feel good about improving our gross margins as we increase our revenue, our longer-

57

1    term gross margin targets 55% to 60%, and we're on track for that.
2    But just to summarize, we are being conservative and prudent in the middle of the pandemic.

3    146.    In the same call, Defendant Thorburn also stated:

4    Our gross margin for the quarter was $10 million or 35.5% of revenue
5    as compared to 20% in quarter 1 of '20.  This increase in margin
     reflects the impact of scaling our revenue, leveraging our fixed costs
6    and the benefit of higher mix of NGS products earlier in the year than
     anticipated and also reflects great execution by our organization.

7    147.    Discussing the Company's gross margins at JP Morgan's 2021 Healthcare

8    Conference on January 11, 2021, Defendant Leproust sated:

9    [O]ur business model is such that we do have high fixed costs, but we
10   have low variable costs, which means that once we [have absorbed]
     the fixed cost, any dollar above that, big portion of that drops to gross
     margin.  And so that's why as our revenue ramps, we'll be able to
11   show that our gross margin ramps as well.

12   148.    The foregoing statements about Twist's cost of revenue, gross margins, and R&D

13   expenses were false and misleading and omitted and concealed the truth that before and during the

14   Class Period:

15   a.    Research and Development:  Under Twist's standing policy on production
16         costs, Twist routinely billed production costs for Twist's existing products as
17         R&D.  This included the following costs: (i) computation costs to run Twist's
18         production pipeline, including to analyze samples, perform QC, apply Twist's
19         pass/fail process, complete NGS verification, and determine which samples to
20         ship to customers; (ii) day to day quality control for existing products,
21         (iii) contamination remediation, and (iv) production when the orders for Twist
22         products came from "important" customers.    Due to this improper
23         mischaracterization, the R&D numbers that Twist reported in its SEC filings
24         were false.  Accordingly, the amount the Company actually spent on R&D
25         was materially lower than Defendants claimed in SEC filings.

26   b.    Cost of Revenues:  By improperly recharacterizing expenses that Twist
27         actually incurred in manufacturing its products as R&D expense, the
28         Company necessarily reported materially understated cost of revenues.  U.S.

GAAP required Twist to account for these expenses as cost of revenue rather than R&D. Accordingly, the Company's true cost of revenues as stated in each quarterly and annual filing was materially higher than Defendants stated.

c.  <u>Gross Margin</u>:  Gross margin percentage is calculated by subtracting cost of revenues from the company's total revenue and dividing by the company's total revenue. Understating the cost of revenue and overstating the R&D expenses necessarily resulted in the Company reporting artificially inflated gross margins. As such, the Company's gross margins were materially overstated in the foregoing statements.

## 2.  False and Misleading Statements Regarding Twist's Products

149.  In Twist's 2018, 2019, 2020, and 2021 Forms 10-K, Defendants stated:

The core of our platform is a proprietary technology that pioneers a new method of manufacturing synthetic DNA by "writing" DNA on a silicon chip. We have combined this technology with proprietary software, scalable commercial infrastructure, and an e-commerce platform to create an integrated technology platform that enables us to achieve high levels of quality, precision, automation, and manufacturing throughput at a significantly lower cost than our competitors.

150.  In Twist's 2019 and 2020 Forms 10-K, Defendants stated:

We offer turnaround times of approximately 11 to 17 business days for clonal genes.

. . .

We offer turnaround times of six to nine business days for non-clonal genes with what we believe is the lowest industry error rate of 1:3000 base pairs.

. . .

We sell a diverse, customizable set of oligo pools, ranging from a few hundred oligos to over one million and offer oligonucleotides of up to 300 nucleotides in length with an error rate of 1:2000 nucleotides and turnaround times beginning at five days.

151.  In Twist's 2018, 2019, 2020, and 2021 Forms 10-K, Defendants stated that Twist had:

[A]utomated [its] entire workflow using proprietary and over-the-

59

counter laboratory equipment.

152.    In Twist's 2019 Form 10-K, Defendants stated:

The ability of the Twist DNA synthesis platform to precisely manufacture target enrichment probes at large scale has dramatically increased the types of projects that can now be addressed using NGS technologies.  Our platform has unlocked new applications, improved data quality, and dramatically expanded the types of scientific questions that can be answered using NGS.  In addition, the speed of our DNA synthesis platform enables customers to quickly deploy NGS technologies to applications where the time to answer is critical.

153.    In Twist's 2019 Form 10-K, Defendants stated:

For synthetic genes, we have built a highly scalable gene production process with what we believe is industry-leading capacity of approximately 45,000 genes per month to address the growing demand of scalable, high-quality, affordable synthetic genes.

. . .

The manufacturing process for our NGS tools is highly flexible and scalable and requires minimal fixed costs and direct labor given the efficiency of our production capability.  We have automated the entire workflow using proprietary and over-the-counter laboratory equipment.  We have built dedicated production capabilities for our NGS products

154.    Speaking at the JP Morgan Healthcare Conference on January 15, 2020, Leproust stated:

Because we can print any DNA we want, we have accumulated the human repertoire, all the sequences from antibodies that have been sequenced, we know what those are, and we can introduce that genetic content into libraries.  On top of it, we have automated everything.

155.    Speaking at the Cowen Healthcare Conference on March 7, 2022, Leproust stated:

But again because we have built a great engine internally that leverages the whole [next-gen innovate] from Twist; leveraged the explicit synthesis that makes sure that all our mutants are fully human-derived, so high-quality mutant; and then miniaturized and automated . . . [w]e were able to overall have more productivity than anybody else.  So that means that we could do things that others could not.  We literally take more shots on goals than everyone else. So 100% of time it works.

156.    In Twist's 2019 and 2020 Forms 10-K, filed with the SEC on December 12, 2019 and November 25, 2020 respectively, Defendants claimed that the Company produced synthetic DNA:

60

1
>         [W]ith what [Twist] believe[s] is the lowest industry error rate of
2         1:3000 base pairs . . . and customizable set of oligo pools . . . with an
          error rate of 1:2000 nucleotides.

3       157.    In Twist's 2021 Form 10-K, filed with the SEC on November 22, 2021, Defendants

4    claimed that the Company produced:

5         [N]on-clonal genes with an error rate of 1:7500 base pairs.

6       158.    Discussing Twist's synthetic DNA products at the 2019 Cowen Health Care

7    Conference on March 12, 2019, Defendant Leproust stated:

8         We have actually perfect quality, we ship perfect DNA. The customer
9         experience is excellent.

10      159.    Later in that same conference Leproust touted the customer satisfaction with

11   Twist's products:

12        So those were our product launches which is -- were very well
13        received.  In addition, we had four customer presentations to highlight
          the performance of our product.  In the past it used to be me or people
          from Twist saying we are great and we'll lower your sequencing costs.
14        And now we don't have to do that because the Broad Institute and
15        other customers are saying it for us.

16      160.    At the JPM Healthcare Conference on January 11, 2021, Leproust claimed:

17        In NGS, why we win is because of our quality.  On the left, because
18        we are higher uniform -- we have higher uniformity of oligo synthesis.
          And we can reduce the [noise] of sequencing and our customers report
          that they need to sequence half as much with Twist as with the
19        competition to get the same answer.  And so we win there.

20      161.    Discussing its NGS product line in Twist's 4Q 2019 earnings call on December 11,

21   2019, Defendant Leproust stated:

22        [O]ur view so far is that we still have the fastest turnaround time and
23        the best price for custom panel.

24   Discussing Twist's NGS product line at JPMorgan's 2020 Healthcare Conference, Defendant

25   Leproust stated:

26        If you want a new panel, it takes 6 to 8 weeks with the competition to
27        get it, and then you have to test it. With Twist, it's 2 to 3 weeks.  So if
          you have to do 2, 3 rounds of optimization to get your assay
          developed, you can do your R&D twice as fast with Twist.
28

Two years later at SVB Leerink's 2022 Healthcare Conference on February 17, 2022, Leproust stated in regard to NGS product turnaround time that:

> We swiftly [ph] combined a million probe panels for just 100 samples, probably for $20,000 and you get it in two weeks.

162.    In Twist's 2Q 2022 Earnings Call on May 5, 2022, an analyst asked about Twist's flexibility on price.  Defendant Leproust responded:

> So we're definitely not subsidizing anybody else's drug discovery . . . .
> In terms of our ability or our willingness to be flexible on economic terms, we are very flexible.  But there's definitely a red line where any deal has to pay for our cost, right?  So the bare minimum.  We're not going to do a deal that's not a gross margin positive.  We're not in the business of subsidizing our customers' research.

163.    The foregoing statements were false and misleading and omitted and concealed the truth that before and during the Class Period:

a.    <u>Lack of Automation</u>:  Twist's production process was not automated, precise, highly accurate, reproducible, or integrated; it did not operate at a large scale, nor was it scalable.  Defendants' business strategy, which they concealed from investors, was to try to sell early version products (which Defendants called "V1" or "beta") to quickly generate revenue, without an automated production process to produce a product until "we know it is going to sell."  Internally, Leproust advised her staff that the goal was to "get [the product] out, even if it was just one time revenue, it was still revenue" and that, "[i]f you have to do it manually, it is okay.  We just want [the product] out."  Twist was not able to achieve automation and consequently was forced to rely on human touchpoints and manual steps in order to produce Twist products.

b.    <u>Product Quality and Error Rate</u>:  Twist's synthetic DNA and NGS products were produced with a high error rate, poor quality, and variation or incompatibility that made them unfit for use in research or experimentation by Twist customers.  Twist shipped incomplete, defective, or contaminated products to customers, causing significant customer complaints.  Twist

utilized "cherry-picked" numbers to underreport the true error rates in producing its products, which was actually 10%, not 1:3000 to 1:7500 (0.033-0.013%) as Defendants stated. Twist created the error rates it presented to the public by artificially filtering its data to only include prototype versions that were not actually made in the production line used for customers, and excluding batches or types of products from the calculation that Twist knew suffered higher error rates.

c.   Slow and Unpredictable Turnaround Times: Twist misrepresented and failed to meet turnaround times to customers. Defendants' statements concealed that Twist's shutdowns and production problems exacerbated its slow and unpredictable turnaround times. Twist utilized "cherry-picked" numbers to underreport its true turnaround times. Twist's publicly disclosed turnaround times excluded batches or types of products from the calculation that suffered slower turnaround times.

d.   Contamination Events: The Company's production labs suffered periodic contamination events, a consequence of lack of automation, which also exacerbated poor turnaround times. These contamination events required Twist to shut down its manufacturing operations, causing delays in turnaround times because production halted for weeks. During such shutdowns, no orders were shipped, there was no progress on orders that were in production, and no new production started on new or existing orders.

e.   Customer Dissatisfaction: Twist received significant customer complaints. These complaints included customers receiving: (i) empty "containers that did not have the product," meaning that the product was entirely missing; (ii) genes where the "DNA was the wrong sequence"; (iii) products infected with cross-contamination; (iv) spoiled products; (v) non-functioning products; and (vi) products that did not match the specifications of previous versions of the same products. These problems were rampant. For example, "[m]ore than

half" of the thousands of customers to whom Twist sold NGS products complained that Twist's NGS tools did not work.  Following instructions from senior management, when products failed, Twist employees denied the failure and instead tried to convince customers that it was the customer's fault.  Twist employees gave "serious discounts" or sent replacement products to customers for free.  In many cases, Twist's replacement products did not work either, so Twist re-made and re-shipped replacement products multiple times to the same customer.  Customers "stopped ordering" from Twist "all the time" after experiencing quality issues with NGS panels and kits.

**B.    Summary Of Scienter Allegations**

164.    The Officer Defendants and corporate Defendant Twist knew or were reckless in not knowing that the Exchange Act Statements were materially false and misleading when made.  Set forth below is a summary of the allegations that support scienter.

**1.    Leproust Intentionally Sacrificed Automation and Product Quality to Prioritize Introducing New but Underdeveloped Products in an Effort to Generate Misleading Short-Lived Revenue**

165.    As recounted in detail by Twist's Bioinformatics Engineering Manager, Leproust pushed a very deliberate business strategy:  sell "V1" or "beta" products to quickly generate revenue without investing the time and resources necessary to develop an automated production process that profitably produced quality products; subsequently, and only if there was "enough interest," Twist would "do work to automate it and get more software support for it."  (FE-1.)  When employees complained that Twist's process was not automated, Leproust shut them down. (FE-1.)

166.    Leproust also urged employees working on quality control to sacrifice quality and focusing on shipping more product, even if it did not meet the high-quality standards Twist represented to the public.  (FE-1.)

167.    Twist's Director of Bioinformatics and Data Science likewise recalled that, until at least approximately early 2022, "everything was about pushing out new products" which "jeopardized the quality of everything because the priority was push out more."  (FE-3.)  Leproust was well aware of this approach's impact on automation and quality and told the employees, "If you

64

1    have to do it manually, it is okay.  We just want it out." (FE-3.)  Leproust espoused this advice

2    while conveying her signature tag line: "Good enough is good enough." (FE-3.)  According to FE-

3    3, Leproust said this tag line often in meetings.  Indeed, Leproust said it so often that Twist

4    employees made T-shirts that featured her tag line as a bad joke; the shirts said: "Good enough is

5    good enough." (FE-3.)  When FE-1, as the engineer who led QC at both Twist production labs,

6    raised quality concerns directly to Leproust in the Monthly Corporate Meetings, FE-1 was rejected

7    and instead fed Leproust's refrain that "good enough is good enough." (FE-1.)

8
         **2.  Leproust and Thorburn Had Continuous Access to Information
              Showing Their Statements Were False**
9

10        168.    Throughout the Class Period, Defendants Leproust and Thorburn were intimately

11   involved in all aspects of Twist's business and had access to real-time data that was contrary to their

12   false and misleading statements.  This data was used to make presentations and instruct employees

13   that, instead of correcting the growing litany of problems, "good enough was good enough."

14   Evidence of this is set forth below and above at Section IV.

15        169.    The Officer Defendants' Access to Data and Information Contradicting Their Public

16   Statements:  According to FE-2, throughout the Class Period, Leproust and Thorburn had continuous

17   access to, and actively made use of, systems that tracked metrics concerning Twist's production

18   processes that contradicted their public statements.  Specifically, the MES database automatically

19   generated and captured product metrics like turnaround times, error rates, and QC-related

20   information throughout the DNA synthesis production process.  (FE-2.)  The MES data was linked

21   to a SQL database that was used for reporting purposes.  (FE-2.)

22        170.    In addition, Leproust and Thorburn frequently visited the gene production lab and

23   spoke with manufacturing employees, including FE-2.  During these visits, the Officer Defendants

24   learned of production problems and quality control issues.   (FE-2.)

25        171.    The Officer Defendants' Internal Presentations Demonstrating Their Concealment of

26   Data Contradicting Their Public Statements:  Every month during the Class Period, using

27   information gathered from the SQL database and MES, Leproust created PowerPoint presentations

28   that documented her understanding of Twist's performance and presented these to employees,

---

65

including FE-1, FE-2, and FE-3, in the South San Francisco production facility. According to FE-2, Leproust's presentation reported on production data and production metrics, including the first task yield and error rate, the turnaround time, the number of genes shipped, and the gross margins for Twist products. At the meetings, Leproust discussed and compared Twist's monthly and quarterly results to her goals. (FE-2.) Defendant Thorburn was at the monthly meetings as well and discussed the Company's revenues. (FE-2.) This internal information contradicted Defendants' public statements. (FE-2.)

172. In addition, throughout the Class Period, there were regular meetings with Twist's C-Suite and VP-level executives, including, among others, Leproust and Thorburn. (FE-1.) These meetings included the Monthly Company Meetings led by Leproust from the South San Francisco facility that were simultaneously broadcast by Zoom. (FE-1.) In these meetings, Leproust presented a separate, "internal only set of slides" containing information about technology or production problems or "other types of breakdowns." (FE-1.)

173. Separately, in Monthly Leadership Meetings, Leproust presented in-depth discussion and analysis to C-Suite executives and other senior personnel about "what was going on" with each of Twist's products, including problems or hold ups. (FE-3.) And in Development Meetings, which included Leproust, Thorburn, CTO Siyuan, Co-Founder Bill Peck, Co-Founder Bill Banyai, and others, Leproust discussed how to "manage" product failures, quality control errors, and customer complaints, and how to "manage" Twist's customers who were frustrated by the fact that Twist's NGS products did not work. (FE-4.) Specifically, FE-4 was told to never admit it when Twist's products failed or did not work and to instead try to deceive customers by trying to convince them that it was the customers' fault that Twist's products did not work. (FE-4.)

174. FE-1 also reported that Thorburn showed charts demonstrating that Twist was not profitable and identifying under what conditions the Company could potentially be profitable in the future. Thorburn insisted on concealing the truth from investors, stating that "investors seem to like what we're doing so we're going to keep doing it." (FE-1.)

175. These internal presentations and the underlying data contradicted the Company's public statements.

176.    <u>The Officer Defendants' Knowledge of Contamination Shutdowns</u>:  FE-2 stated that Leproust and Thorburn "definitely knew" about the cross-contamination issue that plagued Twist's gene lab in 2022, because FE-2 personally prepared reports for FE-2's supervisors that were used to update Leproust.  Likewise, FE-3 corroborated that Leproust and Thorburn were "definitely aware" of the contamination issues because such issues became "top priority and there was nothing more important because the lab gets shut down."   In fact, FE-3 recalled Leproust discussing the contamination issues during Company meetings.  FE-6 also stated that "when operations are shut down, all that goes up the ladder really quickly" and large groups of personnel quickly became involved in the effort, which likely required executive approval.  Leproust also discussed the contamination issues at meetings.  (FE-2.)

177.    <u>The Officer Defendants' Knowledge of Customer Complaints</u>:  As Twist's Senior Application Scientist, FE-4 had "hundreds" of conversations and meetings with Leproust and sent emails to Leproust "all along" her tenure, about product failures, quality control errors, and customer complaints.  (FE-4.)  At meetings, which included CEO Leproust, CFO Thorburn, CTO Siyuan Chen, Senior Director Quality Assurance Kathleen Perry, Co-Founder Bill Peck, Co-Founder Bill Banyai and others, Leproust discussed how to "manage" these problems and how to "manage" Twist's customers who were frustrated by the fact that Twist's NGS products did not work.  (FE-4.)  In these discussions not only was Leproust aware, but she was also "very concerned" about the large number of customer complaints.  (FE-4.)  Rather than disclose the truth, Leproust tried to suppress internal discussion about the product failures and production problems, insisting to Twist employees that "we're the top dog," and "shouldn't talk about these problems" that undermined the image of Twist that Leproust tried to present to the public.  (FE-4.)  Notably, even though FE-4 was instructed to not discuss problems that contradicted Leproust's public messaging, FE-4 continued to purposely bring them up and let Leproust know about the production failures and customer dissatisfaction that caused FE-4 to work 20 hours per day.  (FE-4.)

178.    Likewise, according to FE-3, C-suite executives, including Defendants Leproust and Thorburn, knew about widespread customer complaints about Twist's NGS tools.  Specifically, FE-3 said that the customer complaints were discussed with throughout the Company, including VP and

67

C-suite level executives.

### 3. Officer Defendants Leproust and Thorburn Were Motivated to Inflate Twist's Share Price to Generate Over $85 Million in Insider Sales

179.    Defendants Leproust and Thorburn were motivated to make false and material misstatements and omissions for personal profit.  Inflating the price of Twist stock allowed them to reap over $85 million in insider proceeds.

180.    During the Class Period, Defendant Leproust sold 638,838 shares of Twist common stock in 161 separate open market transactions for total proceeds of $67,342,339.  During the same period, she acquired only 69,125 shares of Twist common stock in three transactions, for a net reduction of 569,713 shares.

181.    Defendant Leproust's stock sales were unusual in nature.  At the time of Leproust's last open market sale during the Class Period, she retained only 198,010 shares of Twist common stock, meaning her Class Period sales of 638,838 shares of Twist common stock liquidated over 76% of her Twist holdings during the Class Period.  Defendant Leproust did not have any open market sales before or, as of September 28, 2023, after the Class Period.

182.    During the Class Period, Defendant Thorburn sold 237,040 shares of Twist common stock in 62 separate open market transactions for total proceeds of $18,061,424.  During the same period, he acquired only 22,187 shares of Twist common stock in three transactions, for a net reduction of 214,853 shares.

183.    Defendant Thorburn's stock sales were unusual in nature.  At the time of Thorburn's last open market sale during the Class Period, he retained only 38,831 shares of Twist common stock, meaning his Class Period sales of 237,040 shares liquidated over 85% of his Twist holdings during the Class Period.  Defendant Thorburn did not have any open market sales before or, as of September 28, 2023, after the Class Period.

184.    Although certain of Defendant Leproust's and Defendant Thorburn's sales during the Class Period were pursuant to Rule 10b5-1 Trading Plans, such sales were exclusively pursuant to plans adopted and/or amended during the course of Defendants' Class Period fraud.  Specifically, Defendant Leproust's Rule 10b5-1 Trading Plan trades were pursuant to plans adopted or amended

on May 16, 2019, September 16, 2020, and May 28, 2021, and Defendant Thorburn's Rule 10b5-1 Trading Plan trades were pursuant to plans adopted or amended on December 16, 2020, and August 24, 2021.  Defendant Leproust's and Defendant Thorburn's Rule 10b5-1 Trading Plans were not filed publicly with the SEC.

### 4. Leproust Admitted That She Withheld Material Information from Investors

185.    In April 2022, Leproust attended the SynBioBeta's Built with Biology Global Conference where she said the following:  "If you are CEO, one thing I didn't know is that is the loneliest job in the world because things don't go well most of the time.  You can't tell your team.  ***You can't tell your investors***.  And so you really have the weight of the world on you and you're sitting laying in bed at four in the morning saying 'what did I do; how can I get myself out of this.'"

186.    By Leproust's own admission, she was aware of issues that she concealed from investors but that were significant enough to keep her awake until four in the morning.

### 5. The Officer Defendants Were Motivated to Conceal Twist's Product Issues and Declining Revenues to Raise Funds in Public Offerings and Complete Twist's Acquisition of Abveris

187.    The Officer Defendants were motivated to make false statements to inflate the price of Twist's stock to raise funds through multiple public offerings and complete the acquisition of Abveris and, by doing so, add a profitable vertical to hide Twist's unprofitability.

188.    Because of Twist's manufacturing deficiencies and declining revenues, it was dependent on public offerings to raise capital.  Indeed, Twist has "incurred net losses in every period to date" and emphasized that the Company "expect[s] to continue to incur significant losses as [it] develop[s] [its] business."  In the Company's most recent Form 10-K following the end of the Class Period, Defendants stated that the Company has "an accumulated deficit of $828.4 million."

189.    During the Class Period, Twist conducted an IPO and five secondary offerings of stock, as indicated above, raising a total of over $1 billion.  Moreover, according to the November 28, 2022 Form 10-K, "[s]ince its inception, the Company has received an aggregate of $1,333.7 million in net proceeds from the issuance of equity and an aggregate of $13.8 million from debt."

190.    To appeal to potential investors in these offerings, Twist was motivated to buoy its declining revenues and paint a rosy picture of its manufacturing capabilities and internal processes. By concealing the true state of affairs, as discussed above, Twist was able to artificially inflate its value and lure investors into providing it much needed funds.

191.    Similarly, on December 1, 2021, Twist completed the acquisition of Abveris.  With this acquisition, Twist aimed to build out its antibody discovery vertical, which generated just under $5 million in revenue for fiscal year 2021.  Defendants specifically touted the importance of the acquisition as a revenue generator boasting about the "progress that we've made building revenue" and discussing how they were "very excited to evolve biopharma vertical and integrating our current biopharma capabilities with the new capabilities from Abveris."

192.    By maintaining a high stock price with its material misstatements and omissions, Twist was able to acquire Abveris more cheaply than it would have otherwise.  Consideration transferred for Abveris was approximately $102.6 million, $66.1 million of which consisted of 759,601 Twist's common stock, then valued at approximately $137 per share.  Twist's stock was seen as so valuable and risk-free that only $9.5 million in cash, less than 10% of the total deal consideration, transferred hands at that date.  Less than a year later, the corrective disclosure in November 2022 more than halved Twist's stock price to $30.43 per share.  Had this been the value of Twist's stock at the time of the acquisition, the Company would have had to hand over twice as many shares of common stock.  Twist also would have had to give a more considerable amount of cash to negate the riskiness of the deal.

### 6.    Defendants' False and Misleading Statements Concerned Core Operations Central to Twist's Business

193.    Defendants made false and misleading statements and omitted material information concerning the Twist products manufactured using the company's DNA synthesis technology, which Twist described in each of its Class Period Forms 10-K as the "core" of its business model.  Indeed, Twist's two key products, synthetic DNA and NGS tools, accounted for between 80 and 100 percent of the Company's revenues during the Class Period.  Likewise, Defendants repeatedly touted Gross Margins to investors as a key metric for assessing the Company's financial well-being.  It

would be absurd therefore to suggest that Defendants were without knowledge of (i) the manufacturing delays, pricing below cost, quality degradation, and other technical problems concerning its primary revenue generating products that existed at the time of their false and misleading statements and omissions, or (ii) the true costs and revenues associated with these products that impacted the "key metric" of Gross Margins.

### 7. Corporate Scienter

194.    As alleged above, Defendants Leproust and Thorburn, both of whom acted with scienter, had actual and apparent authority over Twist and acted within the scope of their apparent authority in making the misstatements at issue.  Their scienter is imputed to the Company.

### C.    Loss Causation

195.    Defendants' fraudulent conduct directly and proximately caused Lead Plaintiff and the Class to suffer substantial losses as a result of purchasing or otherwise acquiring Twist common stock at artificially inflated prices during the Class Period.

196.    Defendants, through their materially false and misleading statements and omissions set forth above, concealed the truth that Twist's core DNA synthesis technology was severely flawed, labor intensive, and costly, that Twist's key products based on its synthesis technology were similarly defective, and that Twist's gross margins were actually much lower than disclosed which gave the false appearance of financial success to its investors.  By concealing these facts, Defendants also concealed the numerous risks associated with their false and misleading statements and omissions, including that Twist may be incapable of reaching profitability.

### 1. The Scorpion Report Revealed Defendants' Misstatements

197.    Defendants' statements were revealed to be false in an investigative report published by Scorpion Capital on November 15, 2022 (the "Scorpion Report").  The Scorpion Report was the result of twenty research interviews including those with ex-executives and manufacturing employees of Twist, customers, competitors, and industry experts.

198.    The Scorpion Report directly highlighted Defendants' false and misleading statements.  By referencing earnings calls, conference call transcripts, and SEC filings, the Scorpion Report contrasted Defendants' statements with reports from Twist's former employees,

1  customers, and industry experts indicating Defendants had made materially false and misleading

2  statements throughout the class period.

3      199.    Specifically, the Scorpion Report revealed, among other things, that:

4      a.      Twist's gross margins were inflated as a result of improperly expensing direct

5              manufacturing costs like labor as research and development and capital

6              expenditures;

7      b.      Twist was covering up a manual, labor intensive, and fatally flawed

8              manufacturing process that was crippled by errors, bottlenecks, and

9              poor yields;

10     c.      Twist's DNA and NGS tool products suffered QC problems, had high error

11             rates, and deficient or incomplete genes were often shipped to customers;

12     d.      Twist suffered poor turnaround times that exceeded promised delivery times

13             and were worse than industry standards; and

14     e.      Twist suffered significant customer complaints.

15                    **2.  Response to the Scorpion Report**

16     200.    Despite its claims that the Scorpion Report was "highly misleading, with many

17  distortions and inaccuracies," Twist failed to address any of the specific allegations in the

18  Scorpion Report.  Twist's statement, which amounted to a blanket denial with no specificity

19  regarding which allegations were untrue, did not instill confidence in the market as reflected in

20  analyst reports following the Scorpion Report.

21     201.    An analyst report from Evercore ISI published on November 18, 2022, noted that the

22  Scorpion Report negatively impacted the stock price—specifically the accounting allegations.

23  The Evercore report stated:

24             [T]he recent short report noted that TWST dismissed PWC as its
               auditor and had hired E&Y (Co noted it was a competitive process and
25             E&Y had a local audit team).  The general investor feedback has been
               that accounting firm change is not a good sign.
26

27     202.    Similarly, J.P. Morgan noted on the same day that, "[Twist's] management had

28  limited commentary regarding the short report" and that "the short report will continue to be an

AMENDED CLASS ACTION COMPLAINT                                    5:22-cv-08168-EJD

overhang on the story and investor sentiment for a number of quarters."

203.    Also on November 18, SVB Securities noted that "[t]he stock reaction . . . suggests that there is significant doubt on whether TWST can deliver on its now higher FY24 guide and steep gross margin improvements."  Further, SVB noted that Twist's FY24 guidance provided by the Company following the short report "is likely to be perceived as aggressive and reactionary to the short report given an uncertain macro backdrop next year."

204.    The effect of the Scorpion Report's revelations on Twist's stock price was also noted in a December 7, 2022 analyst report published by CrispIdea equity research.  CrispIdea stated:

> The company has been alleged to have high cash burning ratio.  It is experiencing cash burn issues despite a strong balance sheet. Recently, it has also been labelled as 'cash burning inferno' by a short selling company Scorpion Capital.  **The stock of the company reacted soon to this news and it tumbled**.

205.    As a result of Defendants' misstatements exposed in the Scorpion Report as well as their limited response in disputing the allegations, Twist's share price declined catastrophically. Despite closing at $38.00 per share the day prior to the release of the Scorpion Report, the stock lost over 20% of its value in a single day on November 15, 2022.  Over the next three days, Twist's stock continued to plummet, closing at a two-year low of $24.81 per share.  This three-day decline represented a loss in value of almost 35% following the publishing of the Scorpion Report.

D.    **Presumption of Reliance and Fraud-on-the-Market Doctrine**

206.    Lead Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations pursuant to the fraud-on-the-market doctrine.  At all relevant times, the market for Twist common stock was an efficient market for the following reasons, among others:

a.    Twist common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.    The average weekly trading volume of Twist common stock was significant;

c.    As a regulated issuer, Twist filed periodic public reports with the SEC;

d.    Twist regularly and publicly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and

73

1    through other wide-ranging public disclosures, such as communications with

2    the financial press and other similar reporting services; and

3    e.    Twist was followed by many securities analysts employed by major brokerage

4    firms who wrote reports that were published and distributed.

5    207.    As a result of the foregoing, the market for Twist common stock promptly digested

6    current information regarding Twist from all publicly available sources and reflected such

7    information in the price of Twist common stock.  Under these circumstances, all purchasers of Twist

8    common stock during the Class Period suffered similar injury through their purchase of Twist

9    common stock at artificially inflated prices, and the presumption of reliance applies.

10    **XI.    CLAIMS FOR RELIEF**

11    <u>**COUNT I**</u>

12    **Section 11 of the Securities Act**
**In Connection with the 2020 Registration Statement**

13    **(Against All Defendants)**

14    208.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth

15    in Sections I-IX above relating to the Securities Act claims as if fully set forth herein.

16    209.    This Count does not sound in fraud.  Any allegations of fraud or fraudulent conduct

17    and/or motive are specifically excluded, except that any challenged statements of opinion or belief

18    made in the 2020 Registration Statement are alleged to have been materially misstated statements of

19    opinion or belief when made.  For purposes of asserting this and their other claims under the

20    Securities Act, Lead Plaintiff does not allege that Defendants acted with intentional, reckless, or

21    otherwise fraudulent intent.

22    210.    The 2020 Registration Statement, the December 2020 and February 2020 prospectus

23    supplements, and/or the documents incorporated therein by reference contained untrue statements of

24    material fact and omissions of material fact necessary to make the statements therein not misleading.

25    211.    Defendants were responsible for the content and dissemination of the 2020

26    Registration Statement.  Defendants Leproust and Thorburn signed the 2020 Registration Statement.

27    212.    As the issuer and registrant for the December 2020 and February 2022 offerings,

28    Twist    is    strictly    liable    for    the    material    misstatements    and    omissions    in    the

AMENDED CLASS ACTION COMPLAINT                                              5:22-cv-08168-EJD

2020 Registration Statement.

213. Defendants acted negligently in that none of them conducted a reasonable investigation or possessed reasonable grounds to believe that the statements contained in the 2020 Registration Statement were true and not misleading, and that the 2020 Registration Statement did not omit any material facts required to be stated therein or necessary to make the statements made therein not misleading.

214. Lead Plaintiff and the Class acquired Twist common stock in the December 2020 and February 2022 Offerings pursuant and/or traceable to the 2020 Registration Statement.

215. When they acquired Twist common stock pursuant and/or traceable to the 2020 Registration Statement, Lead Plaintiff and others similarly situated did not know, nor in the exercise of reasonable care could they have known, of the material untruths and omissions contained (and/or incorporated by reference) in the Registration Statements.

216. Lead Plaintiff and the Class have sustained damages. The value of Twist's common stock has declined substantially subsequent to and due to the Defendants' violations.

## COUNT II

**Section 15 of the Securities Act**
**In Connection with the 2020 Registration Statement**
**(Against Defendants Leproust and Thorburn)**

217. Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth in Sections I-IX above relating to the Securities Act claims as if fully set forth herein.

218. This Count does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded, except that any challenged statements of opinion or belief made in the Registration Statement are alleged to have been materially misstated statements of opinion or belief when made. For purposes of asserting this and their other claims under the Securities Act, Lead Plaintiff does not allege that Defendants acted with intentional, reckless, or otherwise fraudulent intent.

219. At all relevant times, Defendants Leproust and Thorburn were officers and/or directors of the Company and were controlling persons of Twist within the meaning of Section 15 of the Securities Act.

220.    Defendants Leproust and Thorburn by virtue of their positions of control and authority and their direct participation in and/or awareness of Twist's operations and finances, possessed the power to, and did, direct or cause the direction of the management and policies of Twist, its Board of Directors, and its employees, and cause Twist to issue, offer, and sell Twist common stock pursuant to the defective 2020 Registration Statement.

221.    Defendants Leproust and Thorburn had the power to, and did, control the decision-making of Twist, including the content and issuance of the statements contained (and/or incorporated by reference) in the 2020 Registration Statement and the December 2020 and February 2022 prospectus supplements thereto; they were provided with or had unlimited access to copies of the 2020 Registration Statement and the December 2020 and February 2022 prospectus supplements thereto (and/or documents incorporated by reference) alleged herein to contain actionable statements or omissions prior to and/or shortly after such statements were issued, and had the power to prevent the issuance of the statements or omissions or to cause them to be corrected; and they were directly involved in or responsible for providing false or misleading information contained in the 2020 Registration Statement and the December 2020 and February 2022 prospectus supplements thereto (and/or documents incorporated by reference therein) and/or certifying and approving that information. Defendants Leproust and Thorburn each signed the 2020 Registration Statement, and the December 2020 and February 2022 prospectus supplements thereto.

222.    Defendants Leproust and Thorburn acted negligently in that none of them exercised reasonable care to ensure, or had reasonable grounds to believe, that the 2020 Registration Statement and the December 2020 and February 2022 prospectus supplements thereto were true and not misleading as to all material facts and did not omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading.

223.    Lead Plaintiff and others similarly situated suffered damages in connection with the purchase or acquisition of Twist common stock pursuant and/or traceable to the 2020 Registration Statement.

1

2

3

## COUNT III

### Section 10(b) of the Exchange Act and Rule
### 10b-5 (Against All Defendants)

4

5

224.    Lead Plaintiff repeats, incorporates, and re-alleges each and every allegation contained above as if fully set forth herein.

6

7

8

9

10

225.    During the Class Period, Defendants made, disseminated, or approved the false and misleading statements specified above, which they knew or recklessly disregarded were false and misleading in that the statements contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

11

12

226.    The Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they:

13

a.    Employed devices, schemes, and artifices to defraud;

14

15

16

b.    Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

17

18

19

c.    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Twist common stock during the Class Period.

20

21

22

23

24

227.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Twist common stock.  Lead Plaintiff and the Class would not have purchased Twist common stock at market prices, or at all, if they had been aware that the market prices of Twist common stock were artificially inflated and maintained by Defendants' false and misleading statements.

25

## COUNT IV

26

27

### Section 20(a) of the Exchange Act and Rule 10b-5
### (Against Defendants Leproust and Thorburn)

28

228.    Lead Plaintiff repeats, incorporates, and re-alleges each and every allegation set forth

77

above as if fully set forth herein.

229. Defendants Leproust and Thorburn acted as controlling persons of Twist within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions and their power to control Twist's public statements, Defendants had the power and ability to control the actions of Twist and its employees. By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XII.    JURY DEMAND

230. Lead Plaintiff, on behalf of itself and the Class, demands a trial by jury.

## XIII.    PRAYER FOR RELIEF

231. WHEREFORE, Lead Plaintiff, on behalf of itself and the other members of the Class, pray for relief as follows:

    a.    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

    b.    Awarding Lead Plaintiff and the Class damages, including interest;

    c.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees; and

    d.    Granting such other and further relief as the Court may deem just and proper.

Dated: October 11, 2023        Respectfully submitted,

By: */s/ Joseph A. Fonti*
**BLEICHMAR FONTI & AULD LLP**
Joseph A. Fonti (*pro hac vice*)
jfonti@bfalaw.com
George N. Bauer (*pro hac vice*)
gbauer@bfalaw.com
Nancy A. Kulesa (*pro hac vice*)
gbauer@bfalaw.com
Benjamin Burry (*pro hac vice*)
bburry@bfalaw.com
Joseph W. Baier (*pro hac vice*)
jbaier@bfalaw.com
7 Times Square, 27th Floor

78

New York, New York 10036
Tel: (212) 789-1340
Fax: (212) 205-3960

– and –

Lesley E. Weaver (Bar No. 191305)
lweaver@bfalaw.com
555 12th Street, Suite 1600
Oakland, California 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020

*Counsel for Lead Plaintiff Policemen's Annuity and Benefit Fund of Chicago and Lead Counsel for the Putative Class*

John A. Kehoe (*pro hac vice*)
**KEHOE LAW FIRM, P.C.**
41 Madison Avenue, 31st Floor
New York, NY 10010
Telephone: (215) 792-6676
jkehoe@kehoelawfirm.com

*Additional Counsel for Lead Plaintiff Policemen's Annuity and Benefit Fund of Chicago*

AMENDED CLASS ACTION COMPLAINT                                    5:22-cv-08168-EJD

1

## <u>CERTIFICATE OF SERVICE</u>

2

3        I hereby certify that on October 11, 2023, I electronically filed the foregoing document with

4    the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this

     day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

5

6        I certify under penalty of perjury under the laws of the United States of America that the

7    foregoing is true and correct.  Executed on October 11, 2023.

8                                        */s/ Joseph A. Fonti*
                                         Joseph A. Fonti

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED CLASS ACTION COMPLAINT                                    5:22-cv-08168-EJD

# Exhibit A

CERTIFICATION

I, Kevin Reichart, on behalf of Policemen's Annuity and Benefit Fund of Chicago ("PABF"), as Executive Director of PABF, hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of PABF.

2.      I have reviewed the Amended Class Action Complaint for Violations of the Federal Securities Law against Twist Bioscience Corporation ("Twist") and others and authorized its filing.

3.      PABF did not purchase or sell securities of Twist at the direction of counsel in order to participate in any private action under the federal securities laws.

4.      PABF is willing to serve as lead plaintiff on behalf of the Class in this matter, including providing testimony at deposition and trial, if necessary. PABF fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the benefit of the Class.

5.      PABF's transactions in Twist securities that are the subject of this litigation during the Class Period, including Twist common stock issued pursuant and/or traceable to the 2020 Registration Statement, are reflected in Schedule A, attached hereto.

6.      For securities retained, PABF owns and holds legal title to the securities that are the subject of this litigation. For securities sold, PABF owned and held legal title to the securities that are the subject of this litigation at all relevant times.

7.      PABF has not sought to serve as a representative party in a class action filed under the federal securities laws during the last three years.

8.      Beyond its pro rata share of any recovery, PABF will not accept payment for serving as lead plaintiff on behalf of the Class, except the reimbursement of such reasonable costs

and expenses including lost wages as ordered or approved by the Court.

9.      I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 10th day of October, 2023.


Kevin Reichart
Executive Director
*Policemen's Annuity and Benefit Fund of Chicago*

**SCHEDULE A**
TRANSACTIONS IN
TWIST BIOSCIENCE CORPORATION

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 12/03/2020 | 431.00 | 122.76 | ($52,910.38) |
| Purchase | 12/03/2020 | 4,104.00 | 110.00 | ($451,440.00) |
| Purchase | 07/09/2021 | 2,426.00 | 130.13 | ($315,691.01) |
| Purchase | 09/17/2021 | 1,567.00 | 115.41 | ($180,850.13) |
| Purchase | 11/02/2021 | 59.00 | 128.98 | ($7,609.63) |
| Purchase | 12/15/2021 | 2,960.00 | 89.25 | ($264,181.18) |
| Sale | 01/21/2022 | -2,790.00 | 54.33 | $151,571.77 |
| Sale | 03/22/2022 | -5.00 | 49.36 | $246.82 |
| Purchase | 05/03/2022 | 1,129.00 | 31.63 | ($35,711.40) |
| Purchase | 05/04/2022 | 164.00 | 31.78 | ($5,211.59) |
| Purchase | 05/04/2022 | 500.00 | 31.09 | ($15,547.25) |
| Purchase | 05/05/2022 | 129.00 | 30.75 | ($3,966.11) |
| Purchase | 05/05/2022 | 1,528.00 | 31.36 | ($47,923.73) |
| Purchase | 05/06/2022 | 132.00 | 30.56 | ($4,034.04) |
| Purchase | 05/06/2022 | 1,390.00 | 30.62 | ($42,559.16) |
| Purchase | 05/09/2022 | 492.00 | 28.72 | ($14,129.21) |
| Purchase | 05/09/2022 | 1,688.00 | 28.60 | ($48,272.92) |
| Sale | 08/09/2022 | -1,085.00 | 48.95 | $53,113.68 |
| Sale | 08/09/2022 | -200.00 | 49.19 | $9,837.72 |
| Sale | 08/11/2022 | -1,402.00 | 53.62 | $75,171.03 |
| Sale | 08/23/2022 | -1,785.00 | 40.57 | $72,415.84 |
| Purchase | 09/26/2022 | 278.00 | 35.10 | ($9,757.27) |
| Purchase | 09/28/2022 | 135.00 | 37.03 | ($4,998.44) |