JAMES N. KRAMER (SBN 154709)
jkramer@orrick.com
ALEXANDER K. TALARIDES (SBN 268068)
atalarides@orrick.com
M. TODD SCOTT (SBN 226885)
tscott@orrick.com
ARIEL B. WINAWER (SBN 317821)
awinawer@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:    +1 415 773 5700
Facsimile:     +1 415 773 5759

Attorneys for Defendants
TWIST BIOSCIENCE CORPORATION, EMILY M.
LEPROUST, and JAMES M. THORBURN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ANTHONY JOSEPH PETERS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TWIST BIOSCIENCE CORPORATION, EMILY M. LEPROUST, and JAMES M. THORBURN,<br><br>Defendants. | Case No. 5:22-cv-08168-EJD<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS, AND THEIR MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:         March 21, 2024<br>Time:        9:00 a.m.<br>Judge:       Honorable Edward J. Davila<br>Dept:         4, 5th Floor |

1

## NOTICE OF MOTION AND MOTION TO DISMISS

2          **PLEASE TAKE NOTICE** that on March 21, 2024, at 9:00 a.m., or at such later date and

3   time as the Court may order, Defendants Twist Bioscience Corporation ("Twist" or the

4   "Company"), Emily M. Leproust and James M. Thorburn (the "Individual Defendants," and with

5   Twist, "Defendants"), will and hereby do move to dismiss Lead Plaintiff Policemen's Annuity and

6   Benefit Fund of Chicago's ("Plaintiff") Amended Class Action Complaint for Violations of the

7   Federal Securities Laws (the "AC" or "Amended Complaint").

8          This motion is made pursuant to Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)"), Fed. R. Civ. P.

9   9(b) ("Rule 9(b)"), and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), on

10  the grounds that the AC fails to state a claim. The motion is based on this Notice and the

11  Memorandum of Points and Authorities below; the accompanying Request for Judicial Notice and

12  exhibits attached thereto ("Ex."); the papers on file in the action; argument of counsel at the hearing;

13  and other such matters as may be judicially noticed or come before the Court.

14

## STATEMENT OF ISSUES TO BE DECIDED

15  1.    Whether Plaintiff's claim against Defendants for violation of Section 10(b) ("Section 10(b)"

16  of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange

17  Commission ("SEC") Rule 10b-5 ("Rule 10b-5") promulgated thereunder should be dismissed

18  because:

19          a.      Plaintiff has failed to adequately allege that Plaintiff's claimed losses were caused

20  by any allegedly false or misleading statement made by Defendants, and thus has failed to

21  adequately allege the element of "loss causation."

22          b.      Plaintiff has failed to plead with the requisite particularity facts showing that the

23  challenged statements cited in the AC were false or materially misleading when made, and thus has

24  failed to adequately allege the element of "falsity."

25          c.      Plaintiff has failed to plead with the requisite particularity facts creating a strong

26  inference that Defendants made any allegedly false or materially misleading statement with a

27  fraudulent state of mind, and thus has failed to adequately allege the element of "scienter."

28

DEFENDANTS' MOTION TO DISMISS
                                                     5:22-cv-08168-EJD

2.      Whether Plaintiff's claim against Defendants for violation of Section 11 ("Section 11") of the Securities Act of 1933 ("Securities Act") should be dismissed because Plaintiff has failed to plead with the requisite particularity facts showing that the challenged statements cited in the AC were false or materially misleading when made, and thus has failed to adequately allege the element of "falsity."

3.      Whether Plaintiff lacks statutory standing to assert a Section 11 claim based on Twist's February 2022 follow-on public offering of stock, because Plaintiff fails to allege any facts to plausibly suggest that Plaintiff purchased shares that are traceable, and were issued pursuant to, that follow-on public offering.

4.      Whether Plaintiff's "control person" claims against the Individual Defendants under Section 15 ("Section 15") of the Securities Act and Section 20(a) ("Section 20(a)") of the Exchange Act fail because Plaintiff has failed to adequately plead a primary violation under either Section 11 or Section 10(b).

DEFENDANTS' MOTION TO DISMISS
5:22-CV-08168-EJD

# <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ............................................................................................. 1

II.   FACTUAL BACKGROUND ........................................................................... 2

    A.    Twist And the Individual Defendants ................................................... 2

    B.    The Self-Interested Short-Seller Report That Prompted This Lawsuit ................... 2

    C.    The Amended Complaint's Allegations .................................................. 3

        1.    The Amended Complaint's Distortion Of Defendants' Disclosures ..............4

        2.    The Amended Complaint's Conclusory FE Allegations.................................6

III.  ARGUMENT ................................................................................................... 8

    A.    Plaintiff Fails To State A Claim Under Section 10(b) ........................... 8

        1.    Plaintiff Fails To Plead Loss Causation ....................................8

        2.    Plaintiff Fails To Plead An Actionably False Or Misleading Statement ........9

            a.    The Challenged Statements Regarding Financial Metrics ............ 10

            b.    The Challenged Statements Regarding Twist's Products ............. 13

                (1)    The Statements Are Puzzle-Pled................................. 13

                (2)    Statements of Optimism and Puffery Are Inactionable ..... 14

                (3)    Opinion Statements Are Inactionable ................................ 15

                (4)    None Of The Statements Was False Or Misleading .......... 16

        3.    Plaintiff Fails To Allege A "Strong Inference" Of Scienter .........................20

            a.    The FE Allegations Do Not Create Any Inference of Scienter...... 20

            b.    Dr. Leproust's April 2022 Statement About The Difficulties Of Her Job Does Not Create Any Inference of Scienter................ 25

            c.    Stock Sales And Routine Motive Allegations Do Not Suffice ...... 26

            d.    Plaintiff Cannot Overcome The Facts Negating Any Inference Of Scienter ................................................................ 27

    B.    Plaintiff Fails To State A Claim Under Section 11 ................................ 29

    C.    Plaintiff Lacks Section 11 Standing For Twist's February 2022 Offering ........... 30

    D.    Plaintiff's "Control Person" Claims Fail For Lack Of A Primary Violation ......... 30

II.   CONCLUSION ............................................................................................... 30

DEFENDANTS' MOTION TO DISMISS
5:22-CV-08168-EJD

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                     **Page(s)**

*In re 2007 Novastar Fin., Inc., Sec. Litig.*,
  2008 WL 2354367 (W.D. Mo. June 4, 2008), *aff'd*, 579 F.3d 878 (8th Cir. 2009)............... 28

*In re Apple Comput., Inc. Sec. Litig.*,
  243 F. Supp. 2d 1012 (N.D. Cal. 2002) ......................................................... 15

*In re Aqua Metals, Inc. Sec. Litig.*,
  2019 WL 3817849 (N.D. Cal. Aug. 14, 2019) ................................................. 14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................ 8

*Bao v. SolarCity Corp.*,
  2016 WL 54133 (N.D. Cal. Jan. 5, 2016) ...................................................... 22

*In re Bofl Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020)............................................................................ 9

*Brodsky v. Yahoo! Inc.*,
  630 F. Supp. 2d 1104 (N.D. Cal. 2009) ......................................................... 10

*Brody v. Transitional Hosp. Corp.*,
  280 F.3d 997 (9th Cir. 2002)......................................................................... 16

*Browning v. Amyris, Inc.*,
  2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) ............................................... 20

*In re Century Aluminum Co. Sec. Litig.*,
  729 F.3d 1104 (9th Cir. 2013)....................................................................... 30

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017)............................................................. 10, 12, 16

*City of Roseville Emps. Ret. Sys. v. Sterling Fin. Corp.*,
  963 F. Supp. 2d 1092 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir.
  2017) ................................................................................. 11, 22, 24, 28

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
  2019 WL 6877195 (N.D. Cal. Dec. 17, 2019) ........................................ 12, 25

*In re Cornerstone Propane Partners, L.P. Sec. Litig.*,
  355 F. Supp. 2d 1069 (N.D. Cal. 2005) ......................................................... 14

*Curry v. Yelp Inc.*,
  2015 WL 1849037 (N.D. Cal. Apr. 21, 2015) ............................................... 17

DEFENDANTS' MOTION TO DISMISS
                                                           5:22-CV-08168-EJD

# TABLE OF AUTHORITIES (CONTINUED)

**Cases**                                                                                    **Page(s)**

*Daniels-Hall v. Nat'l Educ. Ass'n*,
   629 F.3d 992 (9th Cir. 2010) ................................................................................. 8

*Deason v. Super Micro Comput., Inc.*,
   2017 WL 4355128 (N.D. Cal. Sept. 29, 2017) ...................................................... 11

*Druskin v. Answerthink*,
   299 F. Supp. 2d 1307 (S.D. Fla. 2004) ................................................................. 28

*In re eHealth, Inc. Sec. Litig.*,
   2023 WL 6390593 (N.D. Cal. Sept. 28, 2023) ........................................................ 9

*Fadia v. FireEye, Inc.*,
   2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) .......................................... 12, 21, 23

*In re Hansen Nat. Corp. Sec. Litig.*,
   527 F. Supp. 2d 1142 (C.D. Cal. 2007) ................................................................. 28

*Hong v. Extreme Networks, Inc.*,
   2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) ....................................................... 23

*Hunt v. Bloom Energy Corp.*,
   2021 WL 4461171 (N.D. Cal. Sept. 29, 2021) ...................................................... 12

*Leacock v. IonQ, Inc.*,
   2023 WL 6308045 (D. Md. Aug. 28, 2023) .................................................... 1, 2, 9

*In re Levi Strauss & Co. Sec. Litig.*,
   527 F. Supp. 2d 965 (N.D. Cal. 2007) .................................................................. 11

*Lipton v. Pathogenesis Corp.*,
   284 F.3d 1027 (9th Cir. 2002) ............................................................................... 27

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) ............................................................................... 27

*Lomingkit v. Apollo Edu. Grp. Inc.*,
   275 F. Supp. 3d 1139 (D. Ariz. 2017) ................................................................... 15

*Lu v. Align Tech., Inc.*,
   417 F.Supp.3d 1266 (N.D. Cal. 2019) ................................................................... 14

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ................................................................................................. 25

DEFENDANTS' MOTION TO DISMISS
5:22-CV-08168-EJD

1

## TABLE OF AUTHORITIES (CONTINUED)

2

**Cases** **Page(s)**

3

*Mehedi v. View, Inc.*,
4
    2023 WL 3592098 (N.D. Cal. May 22, 2023) ........................................................................ 12

5
*In re Mellanox Techs. Ltd. Sec. Litig.*,
    2014 WL 12650991 (N.D. Cal. Mar. 31, 2014) .................................................................... 14
6

*Metzler Inv. GMBH v. Corinthian Coll., Inc.*,
7
    540 F.3d 1049 (9th Cir. 2008) ............................................................ 10, 12, 26, 28

8
*Nathanson v. Polycom, Inc.*,
9
    87 F. Supp. 3d 966 (N.D. Cal. 2015) .................................................................... 21

10
*In re Nektar Therapeutics Sec. Litig.*,
    34 F.4th 828 (9th Cir. 2022) .................................................................................... 9
11

*In re Netflix, Inc. Sec. Litig.*,
12
    2005 WL 1562858 (N.D. Cal. June 28, 2005) .............................................. 17, 18, 19

13
*Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*,
14
    2018 WL 3126393 (N.D. Cal. June 26, 2018) .................................................... 22

15
*O'Sullivan v. Trident Microsystems, Inc.*,
    1994 WL 124453 (N.D. Cal. Jan. 31, 1994) ...................................................... 15
16

*Or. Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*,
17
    774 F.3d 598 (9th Cir. 2014) ............................................................ 8, 15, 20

18
*Pirani v. Slack Tech., Inc.*,
19
    445 F. Supp. 3d 367 (N.D. Cal. 2020) ................................................................ 15

20
*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ........................................................................ 23, 28
21

*Primo v. Pac. Biosciences of Cal., Inc.*,
22
    940 F. Supp. 2d 1105 (N.D. Cal. 2013) ............................................................ 14

23
*In re Rigel Pharms., Inc. Sec. Litig.*,
24
    697 F.3d 869 (9th Cir. 2012) ............................................................ 27, 29, 30

25
*Rodriguez v. Gigamon, Inc.*,
    325 F. Supp. 3d 1041 (N.D. Cal. 2018) ............................................................ 27
26

*Ronconi v. Larkin*,
27
    253 F.3d 423 (9th Cir. 2001) ............................................................ 16, 17

28

DEFENDANTS' MOTION TO DISMISS
5:22-CV-08168-EJD

1

<u>**TABLE OF AUTHORITIES (CONTINUED)**</u>

2

**Cases**                                                                                                    **Page(s)**

3

*Rubke v. Capitol Bancorp Ltd.*,

4
    551 F.3d 1156 (9th Cir. 2009)................................................................................. 29

5

*Scheller v. Nutanix*,
    450 F. Supp. 3d 1024 (N.D. Cal. 2020) ................................................................. 21

6

7

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) ................................................................. 24

8

*In re Silicon Graphics, Inc. Sec. Litig.*,

9
    183 F.3d 970 (9th Cir. 1999)............................................................................. 8, 26

10

*Slack Techs., LLC v. Pirani*,
    598 U.S. 759 (2023) ............................................................................................... 30

11

*In re Software Publ'g Sec. Litig.*,

12
    1994 WL 261365 (N.D. Cal. Feb. 2, 1994)........................................................... 15

13

*In re SolarCity Corp. Sec. Litig.*,

14
    274 F. Supp. 3d 972 (N.D. Cal. 2017) ................................................................... 20

15

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
    160 F. Supp. 2d 1059 (N.D. Cal. 2001) ................................................................. 27

16

*Stearns v. Select Comfort Retail Corp.*,

17
    2009 WL 1635931 (N.D. Cal. June 5, 2009) ......................................................... 15

18

*Summit Tech., Inc. v. High–Line Med. Instruments*,

19
    Co., 933 F. Supp. 918 (C.D. Cal. 1996)................................................................. 15

20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S 308 (2007).............................................................................................. 8, 27

21

*Thor Power Tool Co. v. C.I.R.*,

22
    439 U.S. 522 (1979) ............................................................................................... 12

23

*In re Vantive Corp. Sec. Litig.*,

24
    283 F.3d 1079 (9th Cir. 2002)........................................................................... 23, 26

25

*Veal v. LendingClub Corp.*,
    423 F.Supp.3d 785 (N.D. Cal. 2019) ..........................................................*passim*

26

*In re Verifone Sec. Litig.*,

27
    2016 WL 1213666 (N.D. Cal. Mar. 29, 2016)...................................................... 22

28

DEFENDANTS' MOTION TO DISMISS
5:22-CV-08168-EJD

<u>**TABLE OF AUTHORITIES (CONTINUED)**</u>

**Cases**                                                                                             **Page(s)**

*In re Versant Object Tech. Corp. Sec. Litig.*,
    2001 WL 34065027 (N.D. Cal. Dec. 4, 2001) ....................................................... 24

*Webb v. Solarcity Corp.*,
    884 F.3d 844 (9th Cir. 2018) ............................................................................... 21

*Weston Family P'ship LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022) ........................................................................ 19, 26

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) ................................................................................ 26

*Wozniak v. Align Tech., Inc.*,
    850 F. Supp. 2d 1029 (N.D. Cal. 2012) .............................................................. 15

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ......................................................................... *passim*

**Statutes and Rules**

15 U.S.C.
    § 78j(b), Exchange Act Section 10(b)..............................................................*passim*
    § 78t-1(a), Exchange Act Section 20(a) .................................................................. 3
    § 78u-4, PSLRA .............................................................................................*passim*
    § 78u-4(b)(1), PSLRA ................................................................................... 8, 13
    § 78u-4(b)(2), PSLRA .......................................................................................... 8

17 C.F.R.
    § 240.10b5-1, SEC Rule 10b5-1 .......................................................................... 26

Fed. R. Civ. P.
    Rule 9(b)............................................................................................... 8, 9, 29
    Rule 12(b)(6)......................................................................................................... 8

DEFENDANTS' MOTION TO DISMISS
5:22-cv-08168-EJD

1    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.    <u>INTRODUCTION</u>**

3         This lawsuit was filed in the wake of a "report" published by Scorpion Capital ("Scorpion"),

4    a so-called "short-seller firm" that shorts companies' stock and then publishes scandalous reports

5    designed to drive down the companies' stock prices, to Scorpion's financial benefit. Scorpion's

6    November 2022 report on Twist—which explicitly disclaimed any accuracy and was based on

7    dubious (and plainly incorrect) anonymous sources—alleged that Twist's business was an out-and-

8    out fraud, a "ponzi scheme" that relied on criminally fraudulent accounting to stay afloat. Plaintiff's

9    original complaint, filed less than a month later, copied Scorpion's scurrilous accusations verbatim.

10        In the year since, however, at least one court has dismissed a securities fraud complaint that,

11   like the original complaint here, relied heavily on a report published by Scorpion. *See Leacock v.*

12   *IonQ, Inc.*, 2023 WL 6308045, at *10-15 (D. Md. Aug. 28, 2023) (finding that "the Scorpion

13   Report" is not a "reliable source[] of information"). Moreover, Twist's business has continued to

14   prosper, with record annual revenue, up 20% over the year before, and 98% of revenue coming

15   from repeat customers. Despite Scorpion's report, Twist has not restated any of its financial

16   statements, its outside auditors have maintained their clean audit opinions over those financial

17   statements, and Twist is not the subject of any regulatory enforcement action, whether related to

18   Scorpion's accusations or otherwise. Put simply, the Scorpion report has proved to be nothing more

19   than a self-interested hit-job designed to drive Twist's stock price down to benefit Scorpion.

20        Perhaps not surprisingly, therefore, rather than repeat the allegations of Scorpion's report

21   wholesale like the original complaint did, Plaintiff's AC only references the report as the purported

22   revelation of Defendants' alleged fraud. But the AC's citation to the report as the purported

23   revelation of the alleged fraud is fatal to Plaintiff's Section 10(b) claim since, under controlling

24   Ninth Circuit precedent, a short-seller's report that disclaims any accuracy cannot, as a matter of

25   law, serve as the "corrective disclosure" required to plead the element of loss causation.

26        Further, the AC fails to plead an actionable misstatement. The AC cites the supposed

27   statements of six alleged anonymous former employees of Twist to claim that Twist improperly

28   accounted for its research and development costs and made misstatements about the Company's

DEFENDANTS' MOTION TO DISMISS
5:22-CV-08168-EJD

products and production processes. But none of the former employees worked in Twist's finance group or has any knowledge about Twist's accounting decisions, and Plaintiff misrepresents both Twist's public filings and the relevant accounting rules to fabricate a claim. The alleged misstatements regarding Twist's products and production processes, moreover, are largely inactionable statements of puffery and opinion and, in any event, Plaintiff fails to allege any facts to show that any of those statements were false or misleading when made. Those flaws are fatal to Plaintiff's claims, under both Section 10(b) and Section 11.

Plaintiff's Section 10(b) claim also fails because the AC's allegations do not create a strong inference that Defendants acted with fraudulent intent, or scienter, as required by the PSLRA. And Plaintiff's Section 11 claim also fails, in part, because Plaintiff cannot trace its shares to one of the challenged offerings. For these reasons, as further detailed below, the AC should be dismissed.

## II.    FACTUAL BACKGROUND

### A.    Twist And the Individual Defendants

Twist, founded in 2013, is a San Francisco-based company that uses a DNA synthesis platform to engineer DNA for a wide range of uses, including by "writing" DNA on a silicon chip. Ex. 9 at 3. For its fiscal year ("FY") 2022, the Company served approximately 3,300 customers and reported $203.6 million in revenue, *id.*, with 98% of the revenue from repeat customers, *id.* at 50. Twist raised more than $1 billion from its October 31, 2018 IPO and five subsequent offerings conducted between December 20, 2018 to November 15, 2022 (the "Class Period"). AC ¶¶ 10, 32-40. Defendant Emily Leproust is Twist's co-founder, CEO, and a member of its board of directors, and Defendant James Thorburn is Twist's CFO. *Id.* ¶¶ 18-19.

### B.    The Self-Interested Short-Seller Report That Prompted This Lawsuit

On November 15, 2022, Scorpion, a short-seller that profits when the stock prices of companies it targets decline, published a report disparaging Twist's business in the most scurrilous terms. *See* Ex. 1 (the "Scorpion Report" or "Report"). Scorpion has a history of issuing reports that use anonymous accusations of wrongdoing to drive down a company's stock price to profit Scorpion. *See Leacock*, 2023 WL 6308045, at *3-4. Referencing the purported statements of anonymous so-called "experts," anonymous former employees and competitors, and anonymous

social media posts, the Scorpion Report claimed that Twist was "not a going concern," but was a "ponzi-like" "ticking time-bomb," with "fatally flawed" technology and "financials so phony it may be criminal." Ex. 1 at 1. The Report also claimed that Twist's manufacturing facility in Oregon was "deserted" and a "ruse for improper capitalization." *Id.* At the same time, the Report admitted, among other things undermining its credibility, (i) that Scorpion "cannot and does not provide any representations or warranties with respect to the accuracy" of the Report's accusations, and (ii) that the Report was designed to profit Scorpion, which was "short" Twist's stock "and therefore [stood] to realize significant gains in the event that the price of its stock … decline[s]." *Id.* at 2. Indeed, Scorpion's self-interested hit-job Report achieved its goal, and caused Twist's stock price to decline by 20% on the day the Report was published, *see* AC ¶ 1, to Scorpion's financial gain.

Despite Scorpion's accusations, however, Twist's business continued to grow, and for its FY 2023, Twist reported revenue of $245.1 million (a 20% increase over FY 2022), with 98% of that revenue from repeat customers. Ex. 29 at 49-51. Notably, there has not been any regulatory action against Twist, the Company has not restated any financial statements, and neither PwC nor E&Y (Twist's auditors during the Class Period) have withdrawn or amended the clean audit opinions they gave of Twist's financial statements. *See* Exs. 5 at 76, 6 at 78, 7 at 75-77, 8 at 65-67, 9 at 64-66, 29 at 65-67.[1] And the Oregon facility, which Scorpion called a "ruse," began shipping product in early 2023 and is now Twist's primary manufacturing facility in the U.S. Ex. 29 at 32.

## C. The Amended Complaint's Allegations

The original complaint in this action was filed by a different plaintiff on December 22, 2022, and relied heavily on the Scorpion Report to allege that Defendants committed violations of Sections 10(b) and 20(a) of the Exchange Act. On October 11, 2023, Plaintiff filed the AC, which, in addition to Exchange Act claims, also asserts claims under Sections 11 and 15 of the Securities Act. The Securities Act claims are premised on Twist's December 2020 follow-on offering (the "December 2020 Offering") and its February 2022 follow-on offering (the "February 2022 Offering"), both of which were tied to a registration statement that was declared effective by the

---

[1] Plaintiff speculates that the Scorpion Report caused Twist to change auditors during the Class Period, from PwC to E&Y, *see* AC ¶ 201, but Twist disclosed that it moved to E&Y for "competitive" reasons. *Id.* ¶ 201.

DEFENDANTS' MOTION TO DISMISS
5:22-CV-08168-EJD

SEC on June 3, 2020 (the "June 2020 Registration Statement"). *See* AC ¶¶ 103-112.

The AC's reliance on the Scorpion Report is limited to citing it as the purported "corrective disclosure" that revealed Defendants' alleged fraud. *Id.* ¶¶ 197-199. The AC cites the alleged statements of six purported former employees ("FEs") of Twist to allege that Defendants: (i) "artificially inflated Twist's gross margins … by improperly classifying the costs incurred to produce its existing commercial products … as research and development ('R&D') expenses," and (ii) "misrepresented the efficiency and effectiveness of Twist's production process" by hiding the truth about Twist's production automation, error rates and contamination issues, its product turn-around times, and customer satisfaction levels. *Id.* ¶¶ 7-8.

## 1. The Amended Complaint's Distortion Of Defendants' Disclosures

Plaintiff alleges that Twist's gross margins were overstated during the Class Period because the Company improperly classified certain manufacturing work as an R&D expense. AC ¶¶ 7, 115, 148. But Twist has long disclosed that its "ongoing research and development efforts [are] focused on *enhancements to existing products*," and thus "[r]esearch and development activities are conducted *in collaboration with manufacturing activities*." Ex. 5 at 12 (emphasis added); s*ee also* Ex. 9 at 8 (same).[2] It also long disclosed that the same employees are "primarily engaged in engineering *as well as* research and development activities." *Id.* at 12 (emphasis added), and that "[r]esearch and development expenses consist *primarily* of costs incurred for the development of [its] products," but include other costs as well, *id.* at 52, *id.* (emphasis added).[3] Plaintiff further alleges that Twist secretly charged certain manufacturing and software costs to R&D, *see, e.g.*, AC ¶ 115(a), but Twist's public disclosures make clear that R&D expenses include "allocations from facilities and information technology," *see* Exs. 5 at 64, 6 at 67, 7 at 64, 8 at 55, 9 at 55.

---

[2] Under the relevant GAAP rules, where product development costs "are related to both the modification of existing products as well as the conceptual formulation of new products, the[] product development costs would be within the scope of ASC 730 and classified as research and development costs." *See* Ex. 3 at 4/8.

[3] Plaintiff alleges that Twist failed to disclose that R&D employees sometimes helped with production issues such as contamination problems, *see* AC ¶ 115, but Twist discloses that its "technology and the production process for [its] DNA synthesis equipment and tools are complex, involving specialized parts, and [it] may encounter unexpected difficulties in the manufacture, improvement or increasing the capacity of [its] DNA synthesis equipment and tools, and *addressing these difficulties may cause [it] to divert [its] time and resources from [its] other product offerings*." Ex. 9 at 25 (emphasis added).

DEFENDANTS' MOTION TO DISMISS
5:22-cv-08168-EJD

Plaintiff also ignores Twist's disclosures about its products. As Twist has long disclosed, synthetic biology "is characterized by rapid and significant technological changes, frequent new product introductions and enhancements[,] and evolving industry demands and standards," and so Twist's success "depends on [its] ability to **manufacture these new and improved products to meet customer demand in a timely and cost-effective manner, including [its] ability to resolve manufacturing issues that may arise as [it] commence[s] production of any new products [it] develops**." Ex. 5 at 23 (emphasis added); Ex. 9 at 23. As the Company further disclosed:

> Our technology and the production process for our DNA synthesis equipment and tools are complex, involving specialized parts, and **we may encounter unexpected difficulties in manufacturing our DNA synthesis equipment and tools**. . . . **Manufacturing and product quality issues may arise as we increase the scale of our production.**

Ex. 5 at 25. Indeed, Twist repeatedly disclosed that, while it aims to deliver its product at a "low-cost, with high quality, reliable turn-around times and throughput," it "**cannot guarantee that [its] efforts to provide these key requirements will be consistently acceptable to, and meet the performance expectations of, [its] customers**." *Id.* at 21 (emphasis added); Ex. 9 at 23.

Moreover, contrary to Plaintiff's allegations, *see, e.g.*, AC ¶¶ 8, 59, 75, Defendants **did** disclose instances where Twist experienced contamination-related events that disrupted production. For example, on November 22, 2021, Dr. Leproust disclosed to investors that "[d]uring the quarter, we saw some impact from an extraordinary event where we needed to shutdown production" because "unwanted DNA sequences were included in our genes. None of these genes were shipped to customers, but we did experience a delay in some gene orders." Ex. 26 at 6.

Furthermore, while Plaintiff claims that Twist's statements about production automation were false because the Company was still "forced to rely on human touchpoints and manual steps to make [its] products," AC ¶¶ 8, 122, Twist repeatedly disclosed that its automated manufacturing process still "requires minimal … **direct labor**," *id.* ¶ 120; *see also* Ex. 5 at 13 (same). Likewise, Plaintiff claims that Twist concealed the fact that it offered refunds on product returns, AC ¶ 122, but the Company disclosed that it "reduced revenue by the amount of expected returns," Exs. 6 at 74, 7 at 71 (same). Plaintiff also asserts Twist misrepresented its product turnaround times, but Twist never promised specific turn-around deadlines, and instead "offer[ed] turnaround times of

DEFENDANTS' MOTION TO DISMISS
5:22-cv-08168-EJD

1    approximate[]" date ranges, AC ¶ 117, or turnaround times "beginning at" a minimum number of

2    days, *id.*[4] And while Plaintiff alleges that Twist misrepresented its "error rates," the statements that

3    Plaintiff challenges relate to error rates in the production of "[o]ligo pools," AC ¶ 156, and "[n]on-

4    clonal genes," *id.* ¶ 157, and thus allegations that Twist possessed different error rates for different

5    products or in different contexts cannot be used to show those particular statements were false.

6                    **2.    The Amended Complaint's Conclusory FE Allegations**

7          The AC relies heavily on the alleged statements of six anonymous FEs. AC ¶¶ 56-94. ***FE-***

8    ***1*** is alleged to have been a "Bioinformatics Engineer" and manager who worked in the Company's

9    laboratories for a little over a year, from July 2019 to December 2020. *Id.* ¶ 57. Plaintiff relies

10   ***exclusively*** on FE-1's statements to claim that Twist improperly accounted for production costs as

11   R&D, *id.* ¶ 57, but FE-1 did not play any role in making accounting decisions for Twist.[5] Rather,

12   FE-1 maintains that because laboratory employees allegedly "designated the R&D department as

13   the appropriate department to bill the cost[s]" of software and "computations" that were used in

14   manufacturing, *id.* ¶ 58, Twist must have overstated its gross margins in its financial statements.

15   But FE-1 (i) admits the software and "computations" at issue were "shared resource[s] that R&D

16   could use," *id.*, (ii) does not deny that R&D used them for R&D purposes, and, ultimately, (iii) does

17   not offer any insight into how those expenses were actually apportioned and reported in Twist's

18   financial statements. FE-1 also says nothing about any Individual Defendants' participation in

19   accounting for R&D expenses, or even knowledge of the allegedly misallocated costs.

20         FE-1's gripes about problems related to Twist's products are equally lacking in specifics.

21   FE-1 says that Twist's automated production line suffered "errors, delayed turnaround times, and

22   other production problems," *id.* ¶¶ 59-60, but that is true of every production line, and FE-1 does

23   not offer any specific facts to show the timing or magnitude of the alleged problems at Twist.

24   Likewise, FE-1 insists Twist's "turnaround times and error rates were 'definitely underreported,'"

25   but fails to offer any specifics as to when the error rate was underreported, or corroborating details

26   _____

27   [4] Plaintiff further alleges that Twist experienced customer complaints and periodic "contamination events," AC ¶ 122, but Defendants never claimed otherwise, and as explained below, never made any statement inconsistent with the existence of customer complaints or contamination events.

28   [5] FE-1 claims "Twist had a standing policy to expense production costs to R&D," *id.* ¶ 58 but does not say where that policy was written, who communicated it to FE-1, or when it was communicated.

                                        - 6 -

to support FE-1's claim about what the purportedly "true" error rate should have been. *Id.* ¶ 61.[6] And while FE-1 claims to have participated in meetings where the Individual Defendants reviewed an "'internal only set of slides' with information about technology or production problems ... [that] contradicted the information Twist was publicly conveying," FE-1 does not provide any details to support that conclusory claim. *Id.* ¶ 62.

**FE-2** allegedly worked at Twist from August 2017 to June 2023 as a "Manufacturing Associate" and manager. *Id.* ¶ 64. Like FE-1, FE-2 claims that the Individual Defendants sometimes cited "internal information [that] contradicted Defendants' public statements," *id.* ¶ 67, but identifies no facts to support that accusation. FE-2 also alleges that there were customer complaints "about missing, defective, or contaminated shipments," *id.* ¶ 70, but does not offer any specifics about the timing, nature, or magnitude of those alleged problems. The conclusory statements of **FE-3,** Twist's alleged "Director of Bioinformatics and Data Science from August 2020 to August 2022," mirror that of FE-2 regarding customer complaints, production problems, and automation issues—again without providing any specifics. *Id.* ¶¶ 74, 79.

**FE-4** allegedly "served as Twist's Senior Application Scientist, NGS Bioinformatics from November 2017 to December 2020." *Id.* ¶ 80. FE-4 alleges that Twist used "falsified data" and so-called "gold data" to misrepresent "the error rates Twist reported," but FE-4 does not allege any details to support that conclusory claim or connect it to either of the Individual Defendants. FE-4 further alleges that the Individual Defendants were aware of customer complaints and production problems, and purportedly "encouraged employees to conceal the truth about Twist's failures," including by instructing FE-4 "not to discuss problems that contradicted Leprous's public messaging." *Id.* ¶¶ 81-85. But FE-4 does not name a single specific instance when he or she was purportedly instructed to withhold information, or who purportedly gave that instruction.

**FE-5** allegedly served as an "NGS Sales Specialist from March 2021 to November 2021," and asserts that the turnaround times on Twist's "synthetic probes" took longer than customers were told, *id.* ¶¶ 86-87, but says nothing about any Individual Defendant's awareness of that alleged

---

[6] If FE-1 is to be believed, and Twist's claimed "error rate of 1:3000 base pairs (meaning 1 error in 3,000 base pairs) ... concealed that the other 2,999 included base pairs that also had errors," AC ¶ 61, then Twist would have had an error rate of ***100%***.

DEFENDANTS' MOTION TO DISMISS
5:22-CV-08168-EJD

fact, and provides zero specifics about the allegedly delayed turnaround times. **FE-6** allegedly worked at Twist from November 2019 through July 2023, as a Shipping Coordinator, Manufacturing Associate and Team Leader, and does little more than echo the other FEs' conclusory assertions about lab contamination incidents, production errors, customer complaints and delayed turn-around times. *Id.* ¶¶ 89-94.

## III.     ARGUMENT[7]

### A.     Plaintiff Fails To State A Claim Under Section 10(b)

The PSLRA and Rule 9(b) impose exacting pleading requirements on Plaintiff's Section 10(b) claim. ***First***, Plaintiff must specify with particularity each statement alleged to have been false or misleading and the reasons why it was false or misleading when made, and all facts on which that belief is formed. 15 U.S.C. § 78u-4(b)(1). This means Plaintiff "must provide, in great detail, all the relevant facts forming the basis of [its] belief." *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999). ***Second***, Plaintiff must allege particularized facts giving rise to a "strong inference" that Defendants acted with scienter, 15 U.S.C. § 78u-4(b)(2), *i.e.*, with, "at a minimum, 'deliberate recklessness,'" *Silicon Graphics*, 183 F.3d at 977, "a degree of recklessness that strongly suggests actual intent," *id.* at 979. A strong inference of scienter is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S 308, 314 (2007). The Court must weigh all facts and inferences, including those that weigh against a finding of scienter. *Id.* at 323-24. And ***third***, Plaintiff must plead with particularity facts plausibly showing a causal connection between Defendants' alleged misstatements and Plaintiff's alleged injury— *i.e.*, "loss causation." *Or. Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 605, 608 (9th Cir. 2014). As explained below, Plaintiff does not satisfy any of these pleading requirements.

#### 1.     Plaintiff Fails To Plead Loss Causation

Plaintiff's Section 10(b) claim fails at the threshold because Plaintiff fails to plead the

---

[7] To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court need not accept as true allegations that contradict documents referred to in the complaint or matters subject to judicial notice, or conclusory allegations or unreasonable inferences. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

DEFENDANTS' MOTION TO DISMISS
5:22-CV-08168-EJD

1    element of loss causation in accordance with Rule 9(b). Plaintiff was required to plead specific facts

2    plausibly showing that after purchasing its shares (1) the truth became known, and (2) the revelation

3    caused the fraud-induced inflation in the stock's price to be reduced or eliminated. *In re Bofl*

4    *Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020). Plaintiff has not done so.

5         Plaintiff's attempt to allege loss causation is based **solely** on the Scorpion Report. *See* AC

6    ¶¶ 197-199. According to the AC, "Defendants' statements were revealed to be false" by the

7    Scorpion Report. *Id.* ¶ 197; *see also id.* ¶ 205. But under controlling precedent, a report published

8    by a self-interested short-seller that disclaims the accuracy of its contents is insufficient to plead

9    loss causation. *See In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 840 (9th Cir. 2022).

10        The Scorpion Report is precisely the type of alleged "corrective disclosure" that the Ninth

11    Circuit has held cannot establish loss causation. *Id.* The Report warns that Scorpion "is short" Twist

12    and "therefore stands to realize significant gains in the event that the price of [Twist's] stock …

13    decline[s.]" Ex. 1 at 2. It further warns, among other things, that Scorpion "cannot and does not

14    provide any representations or warranties with respect to the accuracy of" any of the allegations

15    contained in the Report. *Id.* Moreover, the Report has no identified individual author, and relies on

16    anonymous sources, many of which were admittedly paid for their "opinions" and have conflicts

17    of interests and biases against Twist. *Id.*; *see also Leacock*, 2023 WL 6308045, at *10-13 (rejecting

18    allegations based on similar report by Scorpion). Thus, as a matter of law, the Scorpion Report

19    cannot serve as a corrective disclosure, and Plaintiff's Section 10(b) claim fails for failure to plead

20    loss causation. *See, e.g.*, *In re eHealth, Inc. Sec. Litig.*, 2023 WL 6390593, at *7-8 (N.D. Cal. Sept.

21    28, 2023) (finding loss causation inadequately pled because "Muddy Waters is a short-seller," and

22    "[its] report warns that…Muddy Waters 'makes no representation, express or implied, as to the

23    accuracy … of any such information'… [and] has no identified author").

24        **2.**    <u>**Plaintiff Fails To Plead An Actionably False Or Misleading Statement**</u>

25        Plaintiff's Section 10(b) claim separately fails because the AC fails to plead a false or

26    misleading statement. Plaintiff challenges two categories of statements: (i) statements regarding

27    Twist's historical "gross margins and related financial metrics," *see* AC ¶¶ 132-47; and (ii)

28    statements about Twist's products, including about product quality, error rates, turn-around times,

1    production automation, and customer satisfaction, *id.* ¶¶ 149-82. Plaintiff's allegations do not

2    satisfy the PSLRA's "exacting requirements for pleading falsity," *Metzler Inv. GMBH v.*

3    *Corinthian Coll., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008), as to either category of statements.

4                    a.    **The Challenged Statements Regarding Financial Metrics**

5            Plaintiff disputes the accuracy of Twist's historical gross margins, "costs of revenues" and

6    R&D expenses reported in the Company's 2018 to 2021 annual financial statements, AC ¶ 132, its

7    FYQ4 2018 to FYQ3 2022 quarterly financial statements, *id.* ¶ 133, and on certain quarterly and

8    year-end earnings calls, *id.* ¶¶ 134-142, 145-146. Referencing the alleged statements of FE-1,

9    Plaintiff claims that these financial metrics were misstated because Twist "billed production costs

10   for the [Company]'s existing products as R&D," including "computation costs," software costs,

11   contamination remediation costs, and production costs for "important" customers. *Id.* ¶ 148.

12   According to Plaintiff, Twist's purportedly "improper classification [of R&D expenses] violated

13   GAAP and allowed Twist to inflate its Gross Margins" in its financial statements. *Id.* ¶ 7.

14           Plaintiff's allegations fail to establish the falsity of any GAAP violation, and hence falsity,

15   for four independent reasons. ***First***, Plaintiff's claim that Twist improperly accounted for R&D

16   expenses is premised exclusively on the alleged statements of FE-1, but FE-1 allegedly worked in

17   Twist's laboratories, ***not*** in Twist's accounting department. *Id.* ¶ 57. FE-1 is not alleged to have

18   had any involvement in Twist's accounting decisions, and therefore lacks personal knowledge of

19   how Twist in fact accounted for the expenses at issue. Accordingly, under the PSLRA, FE-1's

20   alleged statements are insufficient to plead (i) the falsity of Twist's gross margins and related

21   metrics, or (ii) the Individual Defendants' alleged role in accounting for them. *See City of Dearborn*

22   *Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 617 (9th Cir. 2017)

23   ("[N]one of these [confidential] witnesses … participated in Align's accounting or goodwill

24   analysis … [and] therefore cannot link Cadent's channel stuffing to Defendants."); *Brodsky v.*

25   *Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1114 (N.D. Cal. 2009) ("For the complaint to survive the

26   pleadings stage, Plaintiffs must describe with particularity these CWs' roles in Yahoo!'s revenue

27   recognition process and that they had personal knowledge of Defendants' accounting decisions.").

28           ***Second***, even if FE-1 had personal knowledge of Twist's accounting for R&D expenses,

DEFENDANTS' MOTION TO DISMISS
5:22-CV-08168-EJD

1    FE-1's uncorroborated statements do not give rise to a plausible inference that any financial metric

2    was false. While FE-1, an engineer and not an accountant, maintains it was improper to allocate

3    costs associated with manufacturing and testing to R&D, *see* AC ¶ 58, the applicable accounting

4    rule—ASC 730— provides that R&D expenses can include "improvement[s] to an ***existing product***

5    ***or [manufacturing] process***," "*[t]esting* in search for or ***evaluation of product or process***

6    ***alternatives***," "*[m]odification* of the formulation or design ***of a product or process***," and

7    ***"[e]ngineering activity required to advance the design of a product*** to the point that it meets

8    specific functional and economic requirements." Ex. 2 at 8, 10 (emphases added). Likewise, while

9    FE-1 allegedly believes that it was improper to allocate the cost of "shared resources" or "common

10   infrastructure" like software, "computations" and "third party platforms," to R&D, *see* AC ¶ 58,

11   PwC advises that where costs "are related to both the modification of existing products as well as

12   the conceptual formulation of new products, these product development costs ***would be within the***

13   ***scope of ASC 730 and classified as research and development costs***." Ex. 3 at 3-4 (emphasis

14   added); *see also* Ex. 5 at 64 (disclosing that "information technology" costs are apportioned to

15   R&D). Thus, FE-1 and Plaintiff are simply wrong about the rules for accounting of R&D expenses.

16          In any event, Twist repeatedly disclosed that its "[r]esearch and development activities are

17   conducted ***in collaboration with manufacturing activities***," *see supra* at 4, and Plaintiff

18   acknowledges that PwC and E&Y, Twist's outside auditors during the Class Period, recognize

19   R&D expenses "[c]onsistent with ASC 330 and ASC 730," *id.* ¶ 55. Moreover, Twist has never

20   restated its financial statements, and its auditors have maintained their clean audit opinions of

21   Twist's financial statements. *See supra* at 3. As this Court has recognized, although a "lack of

22   restatement or an unqualified independent auditor's opinion does not absolve or shield a defendant

23   from liability," the failure "to plead facts suggesting improper accounting other than the views

24   expressed by [one] former employee[] … fails to raise a plausible inference that the financial

25   statements were misstated." *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 987-88 (N.D.

26   Cal. 2007); *see also Deason v. Super Micro Comput., Inc.*, 2017 WL 4355128, at *2 (N.D. Cal.

27   Sept. 29, 2017) (similar); *City of Roseville Emps. Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d

28   1092, 1113-14 (E.D. Wash. 2013) (similar), *aff'd*, 691 F. App'x 393 (9th Cir. 2017).

***Third***, as the Supreme Court has recognized, generally accepted accounting principles "tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management." *Thor Power Tool Co. v. C.I.R.*, 439 U.S. 522, 544 (1979). Because Twist's management had to exercise judgment in accounting for R&D expenses, those disclosures constitute ***opinions***. *See Align*, 856 F.3d at 621 (accounting statements were opinion statements); *Hunt v. Bloom Energy Corp.*, 2021 WL 4461171, at *7 (N.D. Cal. Sept. 29, 2021) (if "accounting guidance call[s] for the exercise of judgment" or "involve[s] a subjective evaluation, then any data resulting from that application of GAAP" is "a statement of opinion"). Thus, to plead the falsity of Twist's accounting of R&D expenses, Plaintiff was required to allege specific facts showing both that (1) Defendants "did not [subjectively] hold the belief" that Twist's R&D expenses were properly accounted for, and (2) Defendants' belief was "objectively untrue." *See Align*, 856 F.3d at 615-16. Plaintiff has failed to do so. None of the FEs had any role in Twist's accounting decisions, and none of them provides any insight as to the sincerity of Defendants' beliefs about Twist's accounting decisions. *See Mehedi v. View, Inc.*, 2023 WL 3592098, *10 (N.D. Cal. May 22, 2023).

***Fourth***, FE-1's statements lack specific facts, including concrete and verifiable figures, to show that any historical financial metric was false when made. *See Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *13 (N.D. Cal. Nov. 14, 2016) (finding FE allegations insufficient where FEs "fail to support their allegations with concrete and readily verifiable figures or explanations"). FE-1 was at Twist for only one year of the four-year Class Period and does not identify specifically when or how Twist allegedly improperly classified R&D expenses, or which public disclosure was purportedly false as a result. That flaw is also fatal. *See Metzler*, 540 F.3d at 1070; *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *14 (N.D. Cal. Dec. 17, 2019) ("Generally alleging wrongdoing during the CW's employment at the Company does not provide the particularity required under PSLRA. In short, CW reports must be specific in their time references to support that each alleged misstatement was false when made.").[8]

---

[8] Again relying on FE-1, the AC also challenges the following earnings call statements: (i) "lot of it [i.e., Twist's reported high Gross Margins] is a combination of volume and manufacturing efficiencies," AC ¶ 143, (ii) "the increase in our margin reflects the impact of scaling our revenues, leveraging our fixed costs and the benefits of a higher mix of NGS products and terrific execution by our organization," *id.* ¶ 144, (iii) "we feel good about improving our gross margins as we

DEFENDANTS' MOTION TO DISMISS
5:22-cv-08168-EJD

### b.    The Challenged Statements Regarding Twist's Products

Plaintiff also challenges certain statements about Twist's products and production processes. *See* AC ¶¶ 149-62. As best as Defendants can discern—see the discussion below regarding Plaintiff's improper puzzle pleading—Plaintiff alleges that Defendants misrepresented:

- **that Twist's manufacturing processed were automated**. *Id.* ¶ 149 (Twist has "high levels of quality, precision, automation, and manufacturing throughput"); *id.* ¶ 151 (Twist "automated [its] entire workflow"); *id.* ¶ 153 ("We have automated the entire workflow"), ¶ 154 ("W[e] have automated everything"); *id.* ¶ 155 ("we have built a great engine internally that" is "miniaturized and automated").
- **the quality of Twist's products and error rates**. *Id.* ¶ 150 ("We sell a diverse, customizable set of oligo pools" and "oligonucleotides . . . with an error rate of 1:2000 nucleotides"); *id.* ¶ 156 ("with what [Twist] believe[s] is the lowest industry error rate of 1:3000 base pairs" and "customizable set of oligo pools . . . with an error rate of 1:2000 nucleotides"); *id.* ¶ 157 ("non-clonal genes with an error rate of 1:7500 base pairs"); *id.* ¶ 158 ("We have actually perfect quality, we ship perfect DNA."), ¶ 160 ("why we win is because of our quality").
- **product turn-around times**. *Id.* ¶ 150 ("We offer turnaround times of approximately 11 to 17 business days for clonal genes," "six to nine business days for non-clonal genes," and "beginning at five days" for oligo pools); *id.* ¶ 161 ("our view so far is that we still have the fastest turnaround time," "[w]ith Twist, it's 2 to 3 weeks," "you get it in two weeks").
- **customer satisfaction**. *Id.* ¶ 152 ("our DNA synthesis platform enables customers to quickly deploy NGS technologies to applications"); *id.* ¶ 158 ("The customer experience is excellent."), ¶ 159 ("we don't have to [say we are great] because . . . customers are saying it for us"); *id.* ¶ 160 ("our customers report that they need to sequence half as much with Twist as with the competition"); *id.* ¶ 162 ("We're not going to do a deal that's not a gross margin positive.").

Plaintiff further alleges that Defendants misrepresented that Twist's laboratories had experienced "contamination events," *id.* ¶ 163, but none of the challenged statements references or relates to laboratory contamination. As detailed below, Plaintiff's allegations do not adequately plead the falsity of any of these challenged statements for several independent reasons.

### (1)    The Statements Are Puzzle-Pled

Under the PSLRA, Plaintiff must specify each statement alleged to have been materially misleading and the reason why the statement was misleading when made. 15 U.S.C. § 78u-4(b)(1). But Plaintiff instead cites a list of block-quoted statements, *see* AC ¶¶ 149-62, followed by a conclusory laundry list of generic reasons why ***all*** of the challenged statements are purportedly misleading, *id.* ¶ 163, without identifying which specific alleged "true fact" from the laundry list renders a particular statement false or misleading when made, *id.* Because Plaintiff has "place[d]

---

increase our revenue, our longer term gross margin targets 55% to 60%, and we're on track for that," *id.* ¶ 145, and (iv) "as our revenue ramps, we'll be able to show that our gross margin ramps as well," *id.* ¶ 147. But FE-1 was not even employed at Twist when three of those four statements were made (statements (i), (iii) and (iv)), and, in any event, Plaintiff does not allege ***any*** specific facts to show why any of those statements were false or misleading when made.

DEFENDANTS' MOTION TO DISMISS
5:22-cv-08168-EJD

1    'the burden on the reader to sort out the statements and match them with the corresponding adverse

2    facts to solve the "puzzle" of interpreting [its] claims,'" *Primo v. Pac. Biosciences of Cal., Inc.*,

3    940 F. Supp. 2d 1105, 1111-12 (N.D. Cal. 2013), its claims premised on product-related statements

4    should be dismissed on that basis alone, *see, e.g., In re Aqua Metals, Inc. Sec. Litig.*, 2019 WL

5    3817849, at *8 (N.D. Cal. Aug. 14, 2019). Dismissal is also warranted because Plaintiff does not

6    identify which portions of the block-quoted statements are being challenged, and so Defendants

7    and the Court "cannot discern [with any certainty] which specific statements Plaintiff contends to

8    be false or misleading." *Lu v. Align Tech., Inc.*, 417 F.Supp.3d 1266, 1274 (N.D. Cal. 2019).[9]

9                        **(2)     Statements of Optimism and Puffery Are Inactionable**

10           Many of the challenged product statements are not actionable as a matter of law because

11   they are generalized statements of corporate optimism or puffery. Such vague, generalized, and

12   unspecific assertions of corporate optimism or statements of mere puffing cannot state actionable

13   material misstatements of fact under federal securities laws. *In re Cornerstone Propane Partners,*

14   *L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005). "Such statements employ terms that

15   are 'not measurable'" or "'capable of objective verification' and 'lack a standard against which a

16   reasonable investor could expect them to be pegged.'" *In re Mellanox Techs. Ltd. Sec. Litig.*, 2014

17   WL 12650991, at *7 (N.D. Cal. Mar. 31, 2014). The emphasized language below show that the

18   alleged misstatements below are textbook examples of such inactionable statements:

19   • Twist has an "integrated technology platform that enables us to achieve ***high levels*** of quality,
       precision, automation, and manufacturing," AC ¶ 149.
20   • "The ability of the Twist DNA synthesis platform to *precisely manufacture* target enrichment
       probes at large scale has ***dramatically increased*** the types of projects that can now be addressed
21     using NGS" and "***dramatically expanded*** the types of scientific questions that can be
       answered," *id.* ¶152.
22   • "[W]e have built a ***highly scalable*** gene production process," *id.* ¶ 153.
     • "The manufacturing process for our NGS tools is ***highly flexible and scalable***," *id.* ¶ 153.
23   • "On top of it, we have automated ***everything***," *id.* ¶ 154.
     • "So ***100% of time*** it works," *id.* ¶ 155.
24   • "The customer experience is ***excellent***," *id.* ¶ 158.
     • "[O]ur product launches . . . were ***very well received***," ¶ 159.

25   _____

26   [9] Paragraph 162 is a prime example of both flaws. Citing a ***six-sentence*** statement about product
     ***pricing***, *see* AC ¶ 162, Plaintiff alleges that the statement was misleading because it misrepresented
27   that Twist's production process was automated, that Twist's products suffered a "high error rate,"
     that Twist had high turn-around times, that Twist's laboratories suffered "contamination events,"
     and that Twist's customers were dissatisfied, *id.* ¶ 163. These various alleged reasons for purported
28   falsity of the six-sentence pricing-related statement "bear no connection to the substance of the
     statement[.]" *Veal v. LendingClub Corp.*, 423 F.Supp.3d 785, 806-07 (N.D. Cal. 2019).

DEFENDANTS' MOTION TO DISMISS
                                            5:22-CV-08168-EJD

- "[*W]hy we win* is because of our quality," ¶ 160.
- "In terms of our ability or our willingness to be flexible on economic terms, *we are very flexible*," ¶ 162.[10]

Plaintiff also challenges Dr. Leproust's March 12, 2019 statement at a conference about "perfect DNA." Dr. Leproust was discussing Twist's system for writing DNA on a silicon chip and said that "the silicon platform brings a much higher throughput ... it's a very competitive product. We have actually perfect. We see perfect DNA." Ex. 4 at 2. But Plaintiff misrepresents that quote and alleges that Dr. Leproust said, "We have actually perfect quality, we *ship* perfect DNA." AC ¶ 158 (emphasis added). The Court need not accept allegations that contradict matters subject to judicial notice, though in either case the statement is inactionable puffery.[11]

### (3)    Opinion Statements Are Inactionable

Several of the product-related statements Plaintiff challenges are also clear statements of opinion, as the emphasized portions below demonstrate:

- "[W]e have built a highly scalable gene production process with what *we believe* is industry-leading capacity of approximately 45,000 genes per month," AC ¶ 153.
- "[W]ith what *we believe* is the lowest industry error rate," *id.* ¶ 150.
- "*[O]ur view so far* is that we still have the fastest turnaround time and the best price for custom panel," *id.* ¶ 161.

These opinion statements, which are "subjective and preceded by qualifiers, such as 'We believe'" are inactionable. *See Apollo*, 774 F.3d at 607; *O'Sullivan v. Trident Microsystems, Inc.*, 1994 WL 124453, at *16 (N.D. Cal. Jan. 31, 1994) (statement "we believe that Trident's operating model ... is sustainable" was inactionable); *In re Software Publ'g Sec. Litig.*, 1994 WL 261365, at *5, *8 (N.D. Cal. Feb. 2, 1994) (statement "[w]e believe we have the combination of people and products in place to be successful" was inactionable). As noted above, to plead an actionable opinion, Plaintiff must plead specific facts showing, among other things, that the opinion was not honestly

---

[10] *See, e.g.*, *Pirani v. Slack Tech., Inc.*, 445 F. Supp. 3d 367, 388 (N.D. Cal. 2020) ("people love using Slack and that leads to high levels of engagement" is puffery); *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012) ("statements projecting 'excellent results,' a 'blowout winner' product, 'significant sales gains,'" and the like are puffery); *Lomingkit v. Apollo Edu. Grp. Inc.*, 275 F. Supp. 3d 1139, 1158 n.10 (D. Ariz. 2017) ("we've also made some significant enhancements" and "[w]e're 100% committed to fixing all the issues" are puffery).

[11] *See, e.g.*, *Stearns v. Select Comfort Retail Corp.*, 2009 WL 1635931, at *10 (N.D. Cal. June 5, 2009) (claim mattress delivers "perfect night's sleep" is puffery); *In re Apple Comput., Inc. Sec. Litig.*, 243 F. Supp. 2d 1012, 1017-18 (N.D. Cal. 2002) (statements "incredibly functional" and the "whole thing is perfect" puffery); *Summit Tech., Inc. v. High–Line Med. Instruments*, Co., 933 F. Supp. 918, 931 (C.D. Cal. 1996) (statement products "are 'perfectly reliable' is mere puffery").

DEFENDANTS' MOTION TO DISMISS
5:22-cv-08168-EJD

held—a requirement that Plaintiff makes no attempt to satisfy. *See Align*, 856 F.3d at 615.

(4)    <u>None Of The Statements Was False Or Misleading</u>

Even ignoring the defects identified above, the challenged product-related statements are not false or misleading in any event. To be false or misleading, a statement "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). None of the challenged product-related statements satisfy this standard.

**Statements Regarding Production Automation**. Plaintiff alleges that Defendants' statements about Twist's "high levels of … automation," AC ¶ 149, and how it had "automated [its] entire workflow," *id.* ¶ 151-55, were misleading because "Twist was not able to achieve automation and consequently was forced to rely on human touchpoints and manual steps in order to produce Twist products," *id.* ¶ 163. But none of the challenged statements asserted or insinuated that employee labor was no longer required. To the contrary, Twist repeatedly disclosed that while its technology platform allows it to achieve high levels of automation, it still "requires minimal … *direct labor*." *Id.* ¶ 120 (emphasis added); *see also* Ex. 5 at 13 (same).

Plaintiff also alleges that statements about production automation were misleading because Defendants would "sell early version products … to quickly generate revenue, without an automated production process to produce a product until '[they] kn[e]w it is going to sell.'" AC ¶ 163. But even if we credit Plaintiff's allegation as true, general statements about automation are not inconsistent with initial manual production of early version products. *See Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) (statements not misleading where allegedly true "circumstances are not inconsistent with the statements"). Plaintiff also asserts that statements about automation were misleading because production was not "precise, highly accurate, reproducible, or integrated; it did not operate at a large scale, nor was it scalable." AC ¶ 163. But putting aside the fact that the AC contains no factual support for that assertion, whether Twist's production was "precise, highly accurate, reproducible, or integrated" or operated at a "large scale" or was "scalable" is unrelated to production ***automation***, and thus the reason Plaintiff offers for the statements' alleged falsity bears no connection to the statements. *See Veal*, 423 F. Supp. 3d at 806-07.

Lastly, Plaintiff does not allege any particularized facts to show when or how Twist's production was purportedly "not automated." AC ¶ 163. FE-1 alleges that Twist sometimes created early version products manually, *id.* ¶ 59, FE-2 alleges that "humans [had to] prepare the machines for manufacturing," and "materials were moved between machines by humans rather than an automated process," *id.* ¶ 72, and FE-3 alleges "that there were some steps in production that had to be done manually," *id.* ¶ 79—but none of those allegations establishes that Twist did not have "high levels" of automation, as its SEC filings represented. *See Ronconi,* 253 F.3d at 434.

**Statements about error rates and quality.** Plaintiff alleges that Defendants' statements about certain products' error rates, *see* AC ¶¶ 150, 156-57, and about the "quality" of Twist's products, *see, e.g., id.* ¶ 149 ("high levels of quality [and] precision"); *id.* ¶ 155 ("high-quality mutant[s]"),[12] were misleading because Twist's products were "produced with a high error rate, poor quality, and with variation or incompatibility" that caused "significant customer complaints," *id.* ¶ 163. Putting aside the AC's lack of factual allegations to support Plaintiff's premise regarding Twist's products, none of the challenged statements represented that Twist did not experience any errors or "variations" with its products, or that it did not have any customer complaints. Simply put, Defendants' general statements about product quality and error rates are not at all inconsistent with the existence of some product errors and customer complaints. And, in any event, "customer complaints generally do not, on their own, establish the veracity of the allegations contained therein and the falsity of a defendant's representations to the contrary." *Curry v. Yelp Inc.*, 2015 WL 1849037, at *8 (N.D. Cal. Apr. 21, 2015). "[E]very [] company can expect to have some customer complaints, and the existence of such complaints fails to render [Twist's] statements about its [products] false." *In re Netflix, Inc. Sec. Litig.*, 2005 WL 1562858, at *7 (N.D. Cal. June 28, 2005).

Moreover, as noted above, Twist repeatedly disclosed throughout the Class Period that its "technology and the production process for [its] DNA synthesis equipment and tools are complex," that it "may encounter unexpected difficulties in manufacturing [its] DNA synthesis equipment and tools," and that it therefore "***cannot guarantee that [its] efforts . . . will be consistently acceptable***

---

[12] Given that "quality" is an amorphous subject, it is not clear which of the challenged statements Plaintiff is challenging for misrepresenting quality.

1    ***to, and meet the performance expectations of, [its] customers***." *See supra* at 5 .

2    Plaintiff further alleges that Twist's error rate disclosures were misleading because Twist

3    "'cherry-picked' numbers to underreport the true error rates in producing its products, which was

4    actually 10%," and "artificially filter[ed] its data to only include prototype versions" and

5    "exclude[e] batches or types of products from the calculation that Twist knew suffered higher error

6    rates." AC. ¶ 163. But the AC does not allege any particularized facts to support those conclusory

7    accusations. FE-1, for example, claims that Twist "cherry-picked" data and only "counted certain

8    types of errors as counting towards its error rate," which FE-1 says was "about 1 in 10 base pairs,

9    or 1 in 10 nucleotides for oligo pools," *id.* ¶ 61, but FE-1 does not allege who was allegedly mis-

10   counting error rates, when they were purportedly miscounted, or how any purported miscounting

11   rendered any specific statement false when made. FE-2's testimony about error rates is likewise

12   conclusory, lacking in specific details, *id.* ¶ 69, and is also simply inapposite, because while FE-2

13   supposedly says that the Company's "first-task yield" error rate was 10%, *id.*, the challenged

14   statements do not concern "first-task yield"—they instead concern the error rates associated with a

15   "customizable set of oligo pools," *id.* ¶¶ 150, 156, and "non-clonal genes," *id.* ¶ 157. In other words,

16   the reasons FE-2 offers for the falsity of the error rate statements "bear no connection to the

17   substance of the statements." *Veal,* 423 F. Supp. 3d at 807. And FE-4 generally claims that Twist

18   used artificial "gold data" in compiling error rates, AC ¶ 81, but alleges no facts to show which

19   specific product's error-rates were supposedly skewed as a result, to what extent, or when.

20   **Statements about turn-around times.** A similar analysis applies to the challenged

21   statements regarding product turnaround times, *see* AC ¶¶ 150, 161, which Plaintiff claims were

22   misleading because they "omitted that the Company consistently failed to meet turnaround times

23   to customers," *id.* ¶ 122. The challenged statements are not promises or **guarantees** of turnaround

24   times. To the contrary, several of them explicitly state that they are "approximate" and "beginning"

25   date ranges. *Id.* ¶ 150. Furthermore, while the FEs offer conclusory statements that Twist's product

26   deliveries were sometimes delayed—with FE-1 claiming "turnaround times and error rates were

27   'definitely underreported,'" *id.* ¶ 61—there are no particularized facts alleged to show that any of

28   the turnaround time disclosures were false when made. FE-5 says that "based on training [they]

DEFENDANTS' MOTION TO DISMISS
5:22-CV-08168-EJD

1    received," FE-5 misrepresented turnaround times regarding "synthetic probes," *id.* ¶ 87, but none

2    of the challenged statements concerns synthetic probes, *see, e.g.*, *id.* ¶ 92 (turnaround times of

3    "clonal genes" and "non-clonal genes"). And FE-5's statement, like that of FE-6 (who allegedly

4    "observed that the 'details of the turnaround times were skewed,'" *id.* ¶ 92), is not supported by

5    any specific facts showing that any challenged statement was false when made.

6         **Statements about customer satisfaction and contamination events.** Plaintiff also

7    challenges Defendants' statements about customer satisfaction—*see* AC ¶ 152 (our "platform

8    enables customers to quickly deploy NGS technologies"); *id.* ¶ 158 ("[t]he customer experience is

9    excellent"); *id.* ¶ 159 ("we don't have to [say we are great] because . . . customers are saying it for

10   us"); *id.* ¶ 160 ("customers report that they need to sequence half as much with Twist"); *id.* ¶ 162

11   ("[w]e're not going to do a deal that's not a gross margin positive")—on grounds that "Twist

12   received significant customer complaints" about production problems that were "rampant," *id.*

13   ¶ 163. But as noted above, Twist repeatedly disclosed that it "cannot guarantee that [its]

14   efforts…will be consistently acceptable to, and meet the performance expectations of, [its]

15   customers." *See supra* at 5. Further, none of the challenged statements represented that Twist does

16   ***not*** receive customer complaints or experience production problems; none of the statements was

17   inconsistent with the existence of customer complaints or production problems; none of the FEs

18   allege any specific facts to show that any of the statements were false when made; and in any event,

19   as noted above, "the existence of [customer] complaints fails to render [Twist's] statements about

20   its [products] false," *Netflix*, 2005 WL 1562858, at *7. Moreover, Plaintiff's claims of "rampant"

21   problems and customer complaints are belied by the fact that ***98% of Twist's revenues came from***

22   ***repeat customers*** in both in FY 2022 ***and*** FY 2023. *See supra* at 2-3.

23        Plaintiff's allegation that the statements were misleading for failure to disclose that Twist's

24   "labs suffered periodic contamination events," AC ¶ 163, fares no better. As discussed, ***none*** of the

25   challenged statements refers to contamination events, and thus "the reason[] Plaintiff[] offer[s] as

26   to why many of the statements are false or misleading bear[s] no connection to the substance of the

27   statements." *Veal*, 423 F. Supp. 3d at 807. Nor did Twist have an independent duty to disclose those

28   alleged events, *see Weston Family P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 620 (9th Cir. 2022)—

1    although, as noted above, contrary to Plaintiff's assertions, Twist **did** disclose contamination events,

2    *see supra* at 5. In short, the existence of occasional lab contaminations does not render any

3    statements false or misleading.

### 3.    Plaintiff Fails To Allege A "Strong Inference" Of Scienter

5    Plaintiff also fails to plead specific facts creating a "strong inference" of scienter. "Where,

6    as here, the Plaintiff[] seek[s] to hold individuals and a company liable on a securities fraud theory,

7    [the Ninth Circuit] require[s] that the Plaintiff[] allege scienter with respect to each of the individual

8    defendants." *Apollo*, 774 F.3d at 607. Plaintiff fails to meet this requirement.

### a.    The FE Allegations Do Not Create Any Inference of Scienter

10    To plead scienter, Plaintiff mainly relies on six anonymous alleged FEs of Twist. *See* AC

11    ¶¶ 56-94. Under the PSLRA, "a complaint relying on statements from [anonymous FEs] must pass

12    two hurdles." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). "First,

13    the [FEs] … must be described with sufficient particularity to establish their reliability and personal

14    knowledge." *Id.* "Second, those statements which are reported by [FEs] with sufficient reliability

15    and personal knowledge must themselves be indicative of scienter." *Id.* "[T]he Court may disregard

16    [FE] statements that are speculative, lack specificity, or are not based on personal knowledge."

17    *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *18 (N.D. Cal. Mar. 24, 2014).

18    The FE allegations here do not pass muster because none of the six FEs offers any facts to

19    establish their personal knowledge of any Individual Defendant's state of mind at the time any

20    alleged misstatement was made. "[T]he Ninth Circuit has held that [FE] statements cannot create a

21    strong inference of scienter unless the reporting witness 'has reliable personal knowledge of the

22    defendants' mental state.'" *In re SolarCity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 1009 (N.D. Cal.

23    2017). FE-5 is not alleged to have had any connection to the Individual Defendants and does not

24    mention either of them. *See* AC ¶¶ 86-88. FE-6 only vaguely mentions that "[a]t least once per

25    month, Leproust held a 'business meeting' to provide updates to the Company." *Id.* ¶ 90. FE-2[13]

26    and FE-3 are alleged to have attended Monthly Performance Meetings, led by Dr. Leproust, *id.*

27

28    ---
[13] FE-2 is also vaguely alleged to have "personally interacted with Dr. Leproust and Mr. Thorburn on more than one occasion during their [unspecified] visits to the production lab." AC ¶ 68. No further details are alleged about FE-2's purported interactions with the Individual Defendants.

DEFENDANTS' MOTION TO DISMISS
5:22-cv-08168-EJD

1    ¶¶ 66-67, 76, and FE-3 is alleged to have attended monthly meetings with "Company leadership,"

2    *id.* ¶ 77. But "[m]erely being present at [Company] meetings does not demonstrate the requisite

3    personal knowledge to establish scienter with respect to the individual defendants." *Scheller v.*

4    *Nutanix*, 450 F. Supp. 3d 1024, 1042 (N.D. Cal. 2020); *see Fadia*, 2016 WL 6679806, at *13, *16.

5    Only two FEs are alleged to have had any direct conversations with either of the Individual

6    Defendants—FE-1, who allegedly "raised [unspecified] concerns directly to Leproust in the

7    Monthly Performance Meetings," AC ¶ 63, and FE-4, who allegedly had "'hundreds' of

8    conversations and meetings with Leproust about [] product failures, quality control errors, and

9    customer complaints,'" *id.* ¶ 82. But neither FE-1 nor FE-4 is alleged to have "personal knowledge

10    with respect to falsity of the specific statements at issue." *Scheller*, 450 F. Supp. 3d at 1042.

11    Critically, none of the FEs is alleged to have worked in accounting or finance or had any

12    involvement with the Company's accounting decisions. *Cf. Webb v. Solarcity Corp.*, 884 F.3d 844,

13    851-58 (9th Cir. 2018) (affirming dismissal where FE allegations were much more extensive than

14    those here, including from FEs who worked in accounting, and where the company, unlike here,

15    restated its financial statements). In other words, none of the FEs has any basis to speak to Plaintiff's

16    core claim regarding Twist's alleged GAAP violations. *See Zucco*, 552 F.3d at 996. FE-1, an

17    ***engineer***, is the only FE who addresses this allegation, and the best they can offer is that Twist had

18    a "'known, understood policy' … to expense production costs to R&D," AC ¶ 58, and that Twist

19    COO Patrick Weiss—who is ***not*** a defendant—"instructed employees to expense costs to R&D 'as

20    much as possible[,]'" *id.* But FE-1 lacks personal knowledge of Twist's actual accounting practices

21    and fails to allege any specific costs that were purportedly misallocated on any specific dates. *See*

22    *Zucco*, 552 F.3d at 997 (finding unreliable scienter allegations referencing "some expenses" being

23    "charged to [a] program" but "fail[ing] to provide specifics or dates" for these activities). Further,

24    offering conclusory allegations concerning a "known, understood [Company] policy," as FE-1

25    does, is not indicative of any Individual Defendant's scienter. *See Nathanson v. Polycom, Inc.*, 87

26    F. Supp. 3d 966, 980 (N.D. Cal. 2015) ("'generalized claims about corporate knowledge that offer

27    no reliable personal knowledge concerning the individual defendants' mental state' are insufficient

28    to satisfy the scienter requirement."); *Zucco*, 552 F.3d at 998 ("generalized claims about corporate

DEFENDANTS' MOTION TO DISMISS
5:22-CV-08168-EJD

1    knowledge" such as "[defendant] had to have known" or "project managers knew" fail "to establish

2    that the witness reporting them has reliable personal knowledge of" defendants "mental state").

3        Nor do any of the FEs' allegations regarding Twist's production processes create a strong

4    inference of scienter. For example, FE-1 contends that Dr. Leproust internally advised Twist "staff"

5    that her strategy was "to get a 'V1 out' . . . to 'make sure there is enough interest and then do work

6    to automate it and get more software support for it.'" AC ¶ 59. Without more detail, this statement

7    is entirely speculative and unhelpful. Which staff did Dr. Leproust advise of this strategy? To what

8    product or products was she referring? When did she allegedly say this? The AC does not say.

9    Likewise, FE-3 claims Leproust "told the employees, '[i]f you have to do it manually, it is okay.

10   We just want the product out." *Id.* ¶ 79. But again, specific details concerning this alleged

11   statement, its context, import, or timing are not provided. *See In re Verifone Sec. Litig.*, 2016 WL

12   1213666, at *9 (N.D. Cal. Mar. 29, 2016) (FE allegations that defendants told them that "they

13   needed 'to find another $5 million or another $8 million to book as revenue,'" were "inadequate

14   because Plaintiffs fail to specifically plead the time, place, and manner" of the statement); *Norfolk*

15   *Cnty. Ret. Sys. v. Solazyme, Inc.*, 2018 WL 3126393, at *8 (N.D. Cal. June 26, 2018) ("General

16   allegations ... [of] unspecified hearsay … are not sufficient without further factual detail").

17       FE-3 contends that the Individual Defendants were "definitely aware" of contamination

18   issues because "everyone knew," AC ¶ 75, while FE-6 contends "'[o]f course'" Dr. Leproust knew

19   about contamination issues and "discussed [] contamination issues at meetings," *id.* ¶ 90. FE-2

20   similarly asserts that Dr. Leproust "definitely knew" of a contamination issue that allegedly affected

21   Twist's gene lab in 2022. *Id.* ¶ 71. Such conclusory assertions also fail to support an inference of

22   scienter, especially since, as discussed above, ***none*** of the alleged misstatements refers to or even

23   broaches the topic of contamination. *See, e.g.*, *Sterling*, 963 F. Supp. 2d at 1136 ("generic

24   allegations that 'everyone knew' are insufficient"); *Zucco*, 552 F.3d at 998 ("generalized claims

25   about corporate knowledge are not sufficient"); *Veal*, 423 F. Supp. 3d at 814 ("scienter cannot be

26   established based on 'general awareness'"); *Bao v. SolarCity Corp.*, 2016 WL 54133, at *5 (N.D.

27   Cal. Jan. 5, 2016) (FEs' statements that defendants were "definitely" "involved in financial and

28   accounting policy decisions" were "too conclusory, speculative, and/or vague to hold weight").

DEFENDANTS' MOTION TO DISMISS
5:22-CV-08168-EJD

While certain FEs allege that the Individual Defendants had access to data that allegedly contradicted their public statements, *see* AC ¶¶ 62, 66-67, none of these FEs identifies or explains what specific information was conveyed to the Individual Defendants, or when, or how such information contradicted any public statement, as required by the PSLRA, *see In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087-88 (9th Cir. 2002); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014); *see also Zucco*, 552 F.3d at 1000-01.

Regarding allegations about Twist's turnaround times and error rates, FE-1 asserts that both were "'definitely underreported'" without offering any corroborating details or any link to the Individual Defendants, AC ¶ 61, while FE-4 similarly alleges, without providing any link to the Individual Defendants, that Twist "'falsified data'" and created "'gold data,'" *id.* ¶ 81. These vague statements do not offer any specific facts bearing on the Individual Defendants' mental state. While FE-2 claims that Dr. "Leproust reported the Company's 10% error rate at Monthly Performance Meetings," *id.* ¶ 69, this unsubstantiated vague claim—which does not even establish the falsity of any public statement—fails to provide any "specifics or dates" for these alleged meetings and is thus "not reliable enough to support the [AC's] allegations of scienter." *Zucco*, 552 F.3d at 997.

The AC also alleges that (i) FE-3 "was advised" of customer complaints about Twist's NGS tools, that "customer complaints were discussed [] throughout the Company, including VP and C-suite level executives," and that the complaints were "no secret," "everyone knew"; (ii) FE-4 had "'hundreds' of conversations and meetings with Leproust about [] product failures, quality control errors, and customer complaints"; and (iii) FE-6 was "aware of customer complaints." AC ¶¶ 74, 82, 91, 177. But the fact that these FEs purportedly recounted the existence and general awareness of customer complaints is not indicative of any Individual Defendant's scienter. *See, e.g., Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *20 (N.D. Cal. Apr. 27, 2017) ("[T]hat CW1 purportedly recounted the negative impact on customers is insufficient to establish scienter"); *Fadia*, 2016 WL 6679806, at *14 (FE allegation "that there were integration issues with the [] product, which required the product team to 'babysit' customers" was "insufficient to satisfy the scienter requirement"). Nor does the fact that FE-4 allegedly spoke with Dr. Leproust about an unspecified number of complaints at unspecified dates add much to the scienter analysis:

DEFENDANTS' MOTION TO DISMISS
5:22-cv-08168-EJD

"[C]ustomer complaints, … which are received by every company, do not give rise to a strong inference of deliberate recklessness." *In re Versant Object Tech. Corp. Sec. Litig.*, 2001 WL 34065027, at *6 (N.D. Cal. Dec. 4, 2001); *see also Veal*, 423 F. Supp. 3d at 815 (same).

The FEs also purport to convey what "senior management" supposedly knew or did. *See, e.g.*, AC ¶ 62 (FE-1 claiming "senior management" pushed out Twist's profitability date); *id.* ¶ 66 (FE-2 alleging "senior management" had access to SQL tool); *id.* ¶ 82 (FE-4 claiming "[t]he instruction handed down by senior management was to never admit when Twist's products failed or did not work"). None of these vague references to what unnamed "senior management" supposedly knew or did passes muster under the PSLRA. *See, e.g.*, *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1148 (N.D. Cal. 2017) ("Vague references to 'management' or 'the Company' are not sufficient to raise a strong inference of scienter"); *Veal*, 423 F. Supp. 3d at 814 ("scienter cannot be established based on 'general awareness' and 'hands-on management style' or by lumping 'management' and 'executives' together"). And most, if not all, of the FEs' statements "consist of . . . subjective assessments of [Twist's] practices, and not specific, quantifiable facts demonstrating the falsity of Defendants' representations." *Sterling*, 963 F. Supp. 2d at 1136.

Finally, a few FEs recount that the Individual Defendants made use of various refrains or "tag lines" at unspecified times. *See, e.g.*, AC ¶¶ 62, 79 (FE-1 and FE-3 allege that Leproust "often used the phrase 'good enough is good enough,'" and FE-1 recalls Leproust describing unspecified behavior as "'the cost of doing business'"); *id.* ¶ 62 (FE-1 reports that Thorburn allegedly said "[d]uring meetings" that "'investors seem to like what we're doing so we're going to keep doing it.'"). But these unremarkable statements, which are untethered to any alleged misstatement, are again too vague and generalized to be indicative of any Individual Defendant's alleged scienter.

In sum, the AC's FE allegations do not create an inference of scienter. The FEs who are alleged to have had some form of contact (often indirect) with the Individual Defendants, mostly through large Company-wide meetings, make only vague, generalized assertions—untethered to specific time periods or any particular alleged misstatement—about the Individual Defendants' "business strategy," *see, e.g.*, AC ¶¶ 59-60, 79, "access to information," *id.* ¶¶ 168-174, "knowledge of contamination shutdowns," *id.* ¶ 176, or the existence of "customer complaints," *id.* ¶¶ 177-78.

DEFENDANTS' MOTION TO DISMISS
5:22-CV-08168-EJD

1   But none of the FEs "identify any specific information that was either received or communicated

2   by any Individual Defendant [on a specific date] that would contradict any public statement at the

3   time it was made." *Veal*, 423 F. Supp. 3d at 814; *see also Oracle Corp.*, 2019 WL 6877195, at *14.

4          **b.      Dr. Leproust's April 2022 Statement About The Difficulties Of**
           **Her Job Does Not Create Any Inference of Scienter**

5

6          Plaintiff also attempts to allege scienter by asserting that Dr. Leproust "admitted" to

7   "with[olding] material information" from investors when she said at an industry conference in April

8   2022: "If you are CEO, one thing I didn't know is that is the loneliest job in the world because

9   things don't go well most of the time. You can't tell your team. You can't tell your investors. And

10  so you really have the weight of the world on you and you're sitting laying in bed at four in the

11  morning saying 'what did I do; how can I get myself out of this.'" *See* AC ¶¶ 185-186.

12         This anodyne statement does not create any inference of scienter. For one thing, Plaintiff

13  takes Dr. Leproust's statement out of context. After noting that "now [that] we're 1,000 people at

14  Twist, I don't know what's going on in most of the part of the company," Dr. Leproust made a

15  generalized, off-the-cuff statement to describe the difficulty of being the CEO of a relatively large

16  public company, a sentiment which many other CEOs would undoubtedly share.[14] She did not

17  admit to withholding any specific material information from investors, let alone any material

18  information relevant to the challenged statements here. If anything, her statement regarding her

19  lack of awareness of everything going on within the Company ***negates*** any inference of scienter.

20         Moreover, Section "10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose

21  any and all material information. Disclosure is required under these provisions only when necessary

22  'to make … [other] statements made … not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*,

23  563 U.S. 27, 44-45 (2011) ("Even with respect to information that a reasonable investor might

24  consider material, companies can control what they have to disclose under these provisions by

25  controlling what they say to the market."). "Put another way, companies do not have an obligation

26  to offer an instantaneous update of every internal development, especially when it involves the oft-

27  tortuous path of product development…. Indeed, to do so would inject instability into the securities

28
_____

[14] https://www.youtube.com/watch?v=IS4gTWdIUHs (relevant discussion begins at 7:45 mark).

DEFENDANTS' MOTION TO DISMISS
5:22-cv-08168-EJD

1    market, as stocks may wildly gyrate based on even fleeting developments. A company must

2    disclose a negative internal development only if its omission would make other statements

3    materially misleading." *Twitter*, 29 F.4th at 620. Thus, Dr. Leprous't statement, even if construed

4    as Plaintiff says it should be, is entirely consistent with the federal securities laws and offers no

5    admission of wrongdoing, much less create any inference of scienter.

6                    **c.      Stock Sales And Routine Motive Allegations Do Not Suffice**

7                    Plaintiff's allegations regarding the Individual Defendants' sales of Twist stock during the

8    Class Period, *see* AC ¶¶ 179-84, are also insufficient to plead scienter under the PSLRA. The sale

9    of stock is indicative of scienter "only when it is 'dramatically out of line with prior trading

10   practices at times calculated to maximize the personal benefit from undisclosed inside

11   information.'" *Zucco*, 552 F.3d at 1005. Here, "no inference of scienter can be gleaned from

12   [Plaintiff's] stock sale assertions," *id.* at 1006, because Plaintiff has failed to "provide a 'meaningful

13   trading history' for purposes of comparison to the stock sales within the class period," *id.* at 1005.

14   Plaintiff's failure to do so is unsurprising given that Twist only became a publicly traded company

15   less than two months before the start of the almost four-year Class Period. For this reason, the

16   Individual Defendants' alleged stock sales cannot support an inference of scienter. *See, e.g.*, *id.* at

17   1006 ("Even if the defendant's trading history is simply not available, for reasons beyond a

18   plaintiff's control, the plaintiff is not excused"); *Vantive*, 283 F.3d at 1095 (noting that "[b]ecause

19   [defendant] joined Vantive four months into the class period, he has no relevant trading history,"

20   and thus finding that "[b]ecause [defendant] had no trading history, we cannot conclude that his

21   trades were out of line with his past practice"); *Silicon Graphics*, 183 F.3d at 987-88 (rejecting

22   scienter inference where defendant sold over 75% of stock during class period because defendant

23   was "legally forbidden to trade" before the class period and thus had no meaningful trading history).

24                   In any event, the fact that the Individual Defendants both retained substantial shares of

25   Twist stock after their alleged trades undermines any inference of scienter. *See* Ex. 28; *In re Worlds*

26   *of Wonder Sec. Litig.*, 35 F.3d 1407, 1427 (9th Cir. 1994). Moreover, the fact that most of the

27   Individual Defendants' stock sales during the Class Period were executed pursuant to Rule 10b5-1

28   trading plans, *see* AC ¶ 184, further rebuts any inference of scienter, *see, e.g.*, *Metzler*, 540 F.3d at

1   1067 n.11; *Rodriguez v. Gigamon, Inc.*, 325 F. Supp. 3d 1041, 1056 (N.D. Cal. 2018). The fact that

2   such plans were adopted or amended during the Class Period is of little consequence where, as here,

3   the Class Period begins only a mere seven weeks after Twist's initial public offering. And

4   regardless, insider "stock sales alone cannot create a strong inference of scienter." *In re Splash*

5   *Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1081 (N.D. Cal. 2001) (citation omitted).

6         Plaintiff also asserts that Defendants were motivated to artificially inflate Twist's stock

7   price to raise funds in public offerings and complete Twist's acquisition of Abveris in 2021. *See*

8   AC ¶¶ 187-192. But such "allegations of routine corporate objectives such as the desire to obtain

9   good financing and expand are not, without more, sufficient to allege scienter." *In re Rigel Pharms.,*

10  *Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012). Raising funds and expanding Twist "are in

11  themselves ordinary and appropriate corporate objectives," *Lipton v. Pathogenesis Corp.*, 284 F.3d

12  1027, 1038 (9th Cir. 2002), that add nothing substantial to the scienter analysis.

13
14          **d.**     <u>**Plaintiff Cannot Overcome The Facts Negating Any Inference Of**</u>
             <u>**Scienter**</u>

15        Plaintiff's failure to plead scienter is most glaring when its allegations are examined

16  "holistically," alongside the facts that undermine any inference of scienter, as required by the

17  PSLRA. *See Tellabs*, 551 U.S. at 323-24, 326. The AC's core claim is that Defendants committed

18  GAAP violations, but to create a strong inference of scienter based on alleged GAAP violations,

19  "the [AC] must allege facts demonstrating that defendants 'knowingly and recklessly engaged in

20  an improper accounting practice,' for example, that a company's external auditors counseled

21  against a practice or that a company's CFO was aware the practice was improper." *Lloyd v. CVB*

22  *Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016). The AC contains no such allegations, and

23  Plaintiff's conclusory and vague FE allegations—none of which provides any specific facts

24  showing when and how either Individual Defendant became aware of any facts contradicting any

25  public statement—cannot overcome the facts that undermine any inference of fraud here.

26        For example, the fact that Twist's financial statements were audited by prominent

27  accounting firms and that these outside auditors gave clean audit opinions and did not identify any

28  misallocation of costs of revenue or R&D expenses, or inflated gross margins, *see supra* at 3, refutes

1    any inference that (1) Twist falsely reported these figures in the first instance, or that (2) even if

2    such figures were incorrectly reported (which they were not), Defendants made the errors

3    knowingly or with an intent to defraud investors. Indeed, the fact that the Scorpion Report—the

4    purported "corrective disclosure" that revealed Defendants' alleged fraud—has been out for over a

5    year, yet Twist's auditors have not required Twist to restate its financial statements, nor have they

6    withdrawn their clean audit opinions, is "'highly probative' of an absence of scienter." *In re Hansen*

7    *Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007); *see also Sterling*, 963 F. Supp.

8    2d at 1142. The fact that there has been no government investigation or other action related to the

9    allegations in the Scorpion Report or otherwise further weighs against any inference of scienter.

10   *See, e.g.*, *In re 2007 Novastar Fin., Inc., Sec. Litig.*, 2008 WL 2354367, at *3 (W.D. Mo. June 4,

11   2008), *aff'd*, 579 F.3d 878 (8th Cir. 2009); *Druskin v. Answerthink*, 299 F. Supp. 2d 1307, 1324

12   (S.D. Fla. 2004). And while Plaintiff's case is premised on the notion that Twist's business is in

13   shambles with "low quality products" and "customer complaints flood[ing] in," AC ¶¶ 5-6, Twist's

14   revenues last year, in FY 2023, grew by 20% year-over-year, and 98% of those revenues were from

15   repeat customers, just like the year before, *see supra* at 2-3, which demolishes Plaintiff's premise.

16   Against this backdrop, the inference of nonfraudulent intent here is ***far*** more compelling than any

17   inference of fraudulent intent.[15]

---

18   [15] Plaintiff's invocation of the "core operations" doctrine, *see* AC ¶ 193, is unavailing. "Corporate
19   management's general awareness of the day-to-day workings of the company's business does not
     establish scienter—at least absent some additional allegation of specific information conveyed to
20   management and related to the fraud." *Metzler*, 540 F.3d at 1068. Plaintiff argues "it would be
     absurd [] to suggest that Defendants were without knowledge of (i) the manufacturing delays,
21   pricing below cost, quality degradation, and other technical problems" alleged to be associated with
     Twist's "primary revenue generating products" as well as "(ii) the true costs and revenues
22   associated with these products that impacted the 'key metric' of Gross Margins." AC ¶ 193. But
     while Twist's DNA synthesis technology may be one of its primary revenue sources, "that fact does
23   not make every piece of [unsubstantiated] information within the Company that relates to the
     technology critical to the business's core operations." *Veal*, 423 F. Supp. 3d at 817. Further,
24   nowhere does Plaintiff allege that the Individual Defendants were involved in accounting decisions
     with respect to any particular classification of expense, or that either of them received any reports
25   regarding any purportedly improper classification of R&D expenses or calculation of gross
     margins. *See Intuitive Surgical*, 759 F.3d at 1062 (holding that proof under the core operations
26   doctrine "is not easy," and requires "either specific admissions by one or more corporate executives
     of detailed involvement in the minutia of a company's operations ... or witness accounts
27   demonstrating that executives had actual involvement in creating false reports"); *Zucco*, 552 F.3d
     at 1000 (finding "allegations that senior management ... closely reviewed the accounting numbers
28   ... and that top executives had several meetings in which they discussed quarterly inventory
     numbers" insufficient). Thus, Plaintiff's invocation of the core operations doctrine fails.

DEFENDANTS' MOTION TO DISMISS
5:22-cv-08168-EJD

1

### B.     **Plaintiff Fails To State A Claim Under Section 11**

2

Plaintiff's Section 11 claim fares no better than its Section 10(b) claim. This claim is

3

governed by Rule 9(b)'s particularized pleading requirement because it "sounds in fraud." *See*

4

*Rubke v. Capitol Bancorp Ltd*., 551 F.3d 1156, 1161 (9th Cir. 2009). When a "complaint employs

5

the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent

6

conduct under section 10(b) of the Exchange Act, we can assume that it sounds in fraud." *Id.*

7

Plaintiff's Section 11 and Section 10(b) claims are premised on the same allegations.

8

*Compare* AC ¶ 208, *with id.* ¶ 224. Indeed, Plaintiff's Section 11 claim is largely founded on a

9

subset of the same alleged misstatements underlying Plaintiff's Section 10(b) claim, *compare* AC

10

¶¶ 113-14, 116-20, *with id.* ¶¶ 132-33, 149-53, which are allegedly false and misleading for the

11

same reasons, *compare id.* ¶¶ 115, 122, *with id.* ¶¶ 148, 163. Moreover, the allegations incorporated

12

into Plaintiff's Section 11 claim aver that Defendants "concealed" information, *id.* ¶ 5, "artificially

13

inflated" revenues, *id.* ¶ 7, and "misrepresented" data, *id.* ¶ 8. Plaintiff's attempt to avoid Rule 9(b)

14

with the conclusory disclaimer that its Section 11 claim "does not sound in fraud," *id.* ¶ 209, is

15

unavailing. "[A] plaintiff's nominal efforts to disclaim allegations of fraud with respect to its

16

section 11 claims are unconvincing where [as here] the gravamen of the complaint is fraud and no

17

effort is made to show any other basis for the claims." *Rigel*, 697 F.3d at 885.

18

Accordingly, because Plaintiff's Section 11 claim is almost entirely based on a subset of the

19

alleged misstatements on which its Section 10(b) claim is based, and because "the inquiry into

20

whether plaintiffs have pled falsity with the requisite particularity under the PSLRA is nearly

21

identical to that under [Rule] 9(b)," *Rubke*, 551 F.3d at 1165, Plaintiff has failed to plead a false or

22

misleading statement under Section 11 for the same reasons discussed above in connection with

23

Plaintiff's Section 10(b) claim, *see Rigel,* 697 F.3d at 886.[16]

24

---

[16] Plaintiff's Section 11 claim challenges one statement that is not challenged under Plaintiff's

25

Section 10(b) claim. Specifically, in its FY 2019 annual report, Twist stated that it does "not offer retrospective discounts or rebates," AC ¶ 120, which Plaintiff claims was false because "[w]hen

26

problems occurred in Twist's NGS product line…the Company offered retrospective discounts and refunds," and "products were often returned," *id.* ¶ 122. But Twist's FY 2019 annual report also

27

plainly states that Twist "reduce[s] revenue by the amount of expected returns, which have been insignificant." *Id.* ¶ 120. And there are no factual allegations to support Plaintiff's claim that Twist

28

gave "retrospective discounts," let alone at a time that would have rendered the challenged statement false when made. To the extent Plaintiff is challenging Twist's statement that the number

1

## C.    Plaintiff Lacks Section 11 Standing For Twist's February 2022 Offering

Plaintiff also lacks statutory standing to assert Section 11 claims based on Twist's follow-on February 2022 Offering. A Section 11 plaintiff must "plead and prove that he purchased shares traceable to the allegedly defective registration statement." *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 770 (2023). In a follow-on offering case like this one, the plaintiff must either: (1) plead and prove that they purchased its shares directly in the follow-on offering itself; or (2) plead and prove that its shares, although purchased in the aftermarket, can be traced back to the follow-on offering. *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013).

Plaintiff did not purchase shares directly in the February 2022 Offering; the AC confirms that Plaintiff never purchased shares at the $55 per share price of that Offering. *See* AC ¶ 39 & Schedule A. Nor does Plaintiff adequately plead that it purchased shares that can be traced to the February 2022 Offering; that is, Plaintiff alleges no facts to plausibly show that any of the shares it purchased on or after the date of the February 2022 Offering were part of the 5.2 million shares sold in that Offering, which represented only approximately 11% of Twist's outstanding shares.[17] Instead, Plaintiff asserts generically that it purchased shares in the February 2022 Offering "pursuant and/or traceable" to the June 2020 Registration Statement. *Id.* ¶¶ 16, 99, 214. The Ninth Circuit has held that such conclusory allegations are insufficient to plead tracing and Section 11 standing where, as here, millions of other shares were previously sold and already outstanding pursuant to prior offerings and registration statements. *See Century Aluminum*, 729 F.3d at 1107-10. Plaintiff thus lacks standing to assert a Section 11 claim based on the February 2022 Offering.

## D.    Plaintiff's "Control Person" Claims Fail For Lack Of A Primary Violation

Because Plaintiff has failed to plead a primary violation of either Section 10(b) or Section 11, its Sections 15 and 20(a) claims must likewise be dismissed. *See Rigel,* 697 F.3d at 886.

## II.    CONCLUSION

For these reasons, the AC should be dismissed.

of returns were "insignificant," *id.*, there are no allegations that would show otherwise.
[17] Prior to the June 2020 Registration Statement becoming effective, Twist already had nearly 41 million shares outstanding. *See* Ex. 14 at S-16. By the time of the February 2022 Offering, that number had increased to nearly 51 million shares, *see* Ex. 16 at S-16, and the February 2022 Offering further increased that number by an additional 5.2 million shares, *see* AC ¶ 40.

DEFENDANTS' MOTION TO DISMISS
5:22-CV-08168-EJD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  December 6, 2023

JAMES N. KRAMER
ALEXANDER K. TALARIDES
M. TODD SCOTT
ARIEL B. WINAWER
Orrick, Herrington & Sutcliffe LLP


By:  _____ */s/ James N. Kramer*
JAMES N. KRAMER
Attorneys for Defendants
TWIST BIOSCIENCE CORPORATION,
EMILY M. LEPROUST, and JAMES M.
THORBURN

- 31 -

DEFENDANTS' MOTION TO DISMISS
5:22-CV-08168-EJD