**BLEICHMAR FONTI & AULD LLP**
Lesley E. Weaver (Bar No. 191305)
1330 Broadway, Suite 630
Oakland, California 94612
Telephone: (415) 445-4003
Facsimile: (415) 445-4020

*Counsel for Lead Plaintiff Policemen's*
*Annuity and Benefit Fund of Chicago and*
*Lead Counsel for the Putative Class*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| ANTHONY JOSEPH PETERS, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> TWIST BIOSCIENCE CORPORATION, EMILY M. LEPROUST, and JAMES M. THORBURN, <br><br> Defendants. | Case No. 5:22-cv-08168-EJD <br><br> <u>CLASS ACTION</u> <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** <br><br> Date:   April 18, 2024 <br> Time:   9:00 A.M. <br> Judge:  Honorable Edward J. Davila <br> Dept:   4, 5th Floor |

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION ....................................................................................................1

II. DEFENDANTS VIOLATE THIS COURT'S ORDERS AND LOCAL RULES...............4

III. PLAINTIFF'S EXCHANGE ACT ALLEGATIONS STATE A CLAIM .......................5

A.  Plaintiff Adequately Pleaded Loss Causation...........................................5

   1.  It is Undisputed That the Report Caused the Stock Price Decline ..............5

   2.  The Ninth Circuit Rejects Any "Bright-Line" Rules For Loss Causation..................................................................................................6

B.  Defendants' Misstatements and Omissions Were False and Misleading ................8

   1.  Defendants' Gross Margins Statements Were False and Misleading..........8

   2.  Defendants' Statements Concerning Twist's Products Were False and Misleading...................................................................................................13

     a.  The Statements Are Not "Puzzle-Pleaded"..................................13

     b.  The Identified Statements Are Not Corporate Optimism ..............14

     c.  The Identified Opinion Statements Omit Key Facts and Are Actionable ..................................................................................16

     d.  The Product Statements Are False and Misleading ......................17

C.  Plaintiff Alleges Scienter ........................................................................21

   1.  Plaintiff Alleges a Strong Inference of Scienter .......................................21

     a.  Twist's Scienter .........................................................................21

     b.  Leproust's and Thorburn's Scienter as to Production Costs and R&D ...............................................................................................22

     c.  Leproust's and Thorburn's Scienter as to Twist's Products ..........23

   2.  Core Operations Create a Strong Inference of Scienter.............................26

   3.  Defendants' Stock Sales Create a Strong Inference of Scienter ................27

   4.  Holistically, Lead Plaintiff's Allegations Create a Strong Inference of Scienter ......................................................................................................28

IV. PLAINTIFF STATES SECURITIES ACT CLAIMS .......................................................29

V.  PLAINTIFF STATES 20(a) CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS ..................................................................................................................30

VI. CONCLUSION..................................................................................................................30

**TABLE OF AUTHORITIES**

**Page(s)**

<u>Cases</u>

*In re 2007 Novastar Fin. Inc., Sec. Litig.*,
  2008 WL 2354367 (W.D. Mo. June 4, 2008), *aff'd*, 579 F.3d 878 (8th Cir. 2009) ..................29

*Alaska Elec. Pension Fund v. Adecco S.A.*,
  371 F. Supp. 2d 1203 (S.D. Cal. 2005)......................................................................................28

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) ........................................................................................................20

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020) .............................................................................................. *passim*

*In re CBT Grp. PLC Sec. Grp. Litig.*,
  2001 WL 1822729 (N.D. Cal. Dec. 28, 2001)...........................................................................12

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) .....................................................................................................11

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
  2019 WL 6877195 (N.D. Cal. Dec. 17, 2019)...........................................................................13

*Curry v. Yelp Inc.*,
  2015 WL 1849037 (N.D. Cal. Apr. 21, 2015) ...........................................................................19

*Druskin v. Answerthink, Inc.*,
  299 F. Supp. 2d 1307 (S.D. Fla. 2004) ......................................................................................29

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005).....................................................................................................................5

*In re eHealth, Inc. Sec. Litig.*,
  2023 WL 6390593 (N.D. Cal. Sept. 28, 2023) ............................................................................8

*In re Facebook, Inc. Sec. Litig.*,
  477 F. Supp. 3d 980 (N.D. Cal. 2020) .........................................................................................6

*Fadia v. FireEye, Inc.*,
  2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) ..........................................................................12

*Fonder AB v. NVIDIA Corp.*,
  81 F.4th 918 (9th Cir. 2023) ..........................................................................................12, 22, 23

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023) .............................................................................................8, 22, 23

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION          5:22-cv-08168-EJD
TO DEFENDANTS' MOTION TO DISMISS

*Hunt v. Bloom Energy Corp.*,
2021 WL 4461171 (N.D. Cal. Sept. 29, 2021) ..........................................................................11

*In re Intuitive Surgical Sec. Litig.*,
65 F. Supp. 3d 821 (N.D. Cal. 2014) .......................................................................................13

*In re Intuitive Surgical Sec. Litig.*,
2017 WL 4355072 (N.D. Cal. Sept. 29, 2017) ....................................................................27, 28

*Kyung Cho v. UCBH Holdings, Inc.*,
890 F. Supp. 2d 1190 (N.D. Cal. 2012) ...................................................................................22

*Lamartina v. VMware, Inc.*,
2021 WL 4133851 (N.D. Cal. Sept. 10, 2021) .........................................................................27

*Lamartina v. VMware, Inc.*,
2023 WL 2763541 (N.D. Cal. Mar. 31, 2023).............................................................................5

*Leacock v. IonQ, Inc.*,
2023 WL 6308045 (D. Md. Aug. 28, 2023) ................................................................................8

*In re Levi Strauss & Co. Sec. Litig.*,
527 F. Supp. 2d 965 (N.D. Cal. 2007) .....................................................................................10

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ..................................................................................................23

*Lozada v. TaskUs Inc.*,
2024 WL 68571 (S.D.N.Y. Jan. 5, 2024) ...................................................................................7

*Magana-Munoz v. W. Coast Berry Farms, LLC*,
2022 WL 4112363 (N.D. Cal. Sept. 8, 2022) ..........................................................................15

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)....................................................................................................................20

*Melendres v. Arpaio*,
784 F.3d 1254 (9th Cir. 2015) ...............................................................................................4, 30

*Mendel v. Chao*,
2020 WL 13600294 (N.D. Cal. June 18, 2020).........................................................................4

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) ..................................................................................................13

*Miller v. Gammie*,
335 F.3d 889 (9th Cir. 2003) ......................................................................................................6

*Mulderrig v. Amyris, Inc.*,
492 F. Supp. 3d 999 (N.D. Cal. 2020) ......................................................................................23

iii

*In re Mullen Auto. Sec. Litig.*,
   2023 WL 8125447 (C.D. Cal. Sept. 28, 2023) ..........................................................................7

*Mulquin v. Nektar Therapeutics*,
   510 F. Supp. 3d 854 (N.D. Cal. 2020) ......................................................................................7

*Nathanson v. Polycom, Inc.*,
   87 F. Supp. 3d 966 (N.D. Cal. 2015) ......................................................................................26

*In re Nektar Therapeutics Sec. Litig.*,
   34 F.4th 828 (9th Cir. 2022) .....................................................................................................6

*In re Netflix, Inc. Sec. Litig.*,
   2005 WL 1562858 (N.D. Cal. June 28, 2005) .........................................................................19

*Oh v. Hanmi Fin. Corp.*,
   621 F. Supp. 3d 1075 (C.D. Cal. 2022) ..................................................................................12

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015).............................................................................................10, 11, 16, 17

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*,
   774 F.3d 598 (9th Cir. 2014) ..................................................................................................14

*Orshan v. Apple Inc.*,
   2023 WL 3568079 (N.D. Cal. Mar. 31, 2023).........................................................................4

*In re Plug Power, Inc. Sec. Litig.*,
   2023 WL 5577276 (S.D.N.Y. Aug. 29, 2023).........................................................................11

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*,
   2020 WL 2559939 (N.D. Cal. May 20, 2020).........................................................................11

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ................................................................................................26

*Ponce v. S.E.C.*,
   345 F.3d 722 (9th Cir. 2003) ..................................................................................................10

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ....................................................................................14, 15, 23

*In re QuantumScape Sec. Class Action Litig.*,
   580 F. Supp. 3d 714 (N.D. Cal. 2022) .....................................................................................7

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) .................................................................................................18

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ..................................................................................................26

iv

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION    5:22-cv-08168-EJD
TO DEFENDANTS' MOTION TO DISMISS

*Scheller v. Nutanix*,
    450 F. Supp. 3d 1024 (N.D. Cal. 2020) ................................................................................25

*Software Rsch., Inc. v. Dynatrace LLC*,
    316 F. Supp. 3d 1112 (N.D. Cal. 2018) ................................................................................14

*In re SolarCity Corp. Sec. Litig.*,
    274 F. Supp. 3d 972 (N.D. Cal. 2017) ..................................................................................25

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
    160 F. Supp. 2d 1059 (N.D. Cal. 2001) ................................................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..............................................................................................................21

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) ..................................................................................26

*In re Verifone Sec. Litig.*,
    2016 WL 1213666 (N.D. Cal. Mar. 29, 2016).......................................................................23

*In re Volkswagon "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
    2017 WL 3058563 (N.D. Cal. July 19, 2017)........................................................................30

*Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*,
    2012 WL 3835078 (N.D. Cal. Sept. 4, 2012) ........................................................................26

*Welgus v. TriNet Grp., Inc.*,
    2017 WL 6466264 (N.D. Cal. Dec. 18, 2017), *aff'd*, 765 F. App'x 239 (9th Cir. 2019)..........30

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022) .................................................................................................20

*Wise v. MAXIMUS Fed. Servs., Inc.*,
    445 F. Supp. 3d 170 (N.D. Cal. 2020) ....................................................................................4

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009), *as amended* (Feb. 10, 2009)............................................9, 24, 26

**<u>Statutes</u>**

17 C.F.R. § 240.10b5 .............................................................................................................27

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION                    5:22-cv-08168-EJD
TO DEFENDANTS' MOTION TO DISMISS

## I.     INTRODUCTION

Twist is a biotechnology company that manufactures and sells synthetic DNA and related products.  ¶2.[1]  During the Class Period, Defendants misled investors in two ways: (i) they inflated Twist's gross margins, which Defendants repeatedly told investors was a "key metric" and a "focus" of Twist's leadership, by improperly categorizing production costs as R&D in violation of GAAP and Twist's own accounting disclosures; ¶193, and (ii) they falsely claimed that they had "automated everything" in Twist's production process, offered the "fastest turnaround times" and the "lowest industry error rate" of at worst 1:2000 base pairs (or 0.0005%), and that the "customer experience [was] excellent."  ¶¶154, 156, 158, 161.  None of this was true.

In reality, Defendants had a long-standing internal policy in place throughout the Class Period whereby senior executives instructed employees to categorize production costs as R&D. ¶58.    Further, Defendants did not have a fully automated production process; rather, they deliberately sacrificed automation in favor of generating quick revenues through the sales of early versions of Twist's products, suffered slow and unpredictable turnaround times as a result of the lack of automation, and cherry-picked data in order to paint a rosier picture than actually existed. ¶61.   Indeed, Twist suffered error rates of 1:10 (or 10%), according to Twist's former Senior Bioinformatics Engineering Manager, and experienced a flood of customer complaints from "more than half" of Twist's thousands of customers, ultimately leading the Company's CEO, Emily Leproust, to instruct employees to conceal the widespread failures and blame the customers for the defects. ¶¶61, 82.

Plaintiff's Exchange Act claims should be sustained because Defendants fail to defeat the Complaint's allegations of loss causation, falsity, and scienter.  Defendants first urge the Court to conclude that "as a matter of law" any report by an analyst with a short position cannot qualify as

---

[1] Capitalized terms not defined herein have the meanings in the Complaint.  [ECF No. 83]. Citations to "¶_" are to the Complaint.  Emphasis is added and citations are omitted unless otherwise stated.

1

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION                    5:22-cv-08168-EJD
TO DEFENDANTS' MOTION TO DISMISS

a loss-causation event. But the Ninth Circuit has expressly rejected such a "bright-line rule" and, instead, "endorse[d] a flexible approach to evaluating corrective disclosures," noting that "[a] corrective disclosure can . . . come from any source." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 795 (9th Cir. 2020). It is undisputed that the Scorpion Report (the "Report") "caused Twist's stock price to decline by 20% on the day the Report was published," Mot. at 3, which was also recognized by numerous investment analysts. Further, the Report meets *BofI*'s standards as it is not anonymous, revealed new information, states that its opinions are "held in good faith" and stands behind its sources.

Defendants also challenge the falsity of the misstatements regarding Twist's gross margins, claiming that a former employee's firsthand knowledge of the Company's accounting practices cannot establish falsity because the employee was not in accounting. But Defendants fail to address the allegations that senior executives personally directed that former employee to misclassify production costs, and the employee in fact personally input the improper accounting into Twist's books. ¶58. This direct personal involvement is sufficient to establish the employee's reliability.

Further, Defendants effectively concede that they classified production costs as R&D, but contend that this practice is not fraudulent because: (i) they told investors that R&D costs can include costs to "improve" or "modify" or "advance the design of" existing products; (ii) there was no restatement of Twist's finances; and (iii) how a company accounts for production costs constitutes nonactionable opinion. They are wrong. First, Plaintiff does not allege Defendants improperly booked costs to *improve* products; rather, Plaintiff alleges that Twist categorized costs "incurred to *produce and sell* its existing commercial products" (*i.e.*, costs for the production, marketing, sale, and delivery of existing products) as R&D, ¶58—allegations that Defendants ignore. Second, as Defendants admit, the absence of a restatement does not shield them from liability because failing to admit misconduct does not mean the misconduct did not occur, particularly given that after the Complaint was filed, Defendants reduced their year-over-year gross margins—something they have never done before. *See* Declaration of George N. Bauer, dated January 26, 2024 ("Bauer Decl."), Ex. 1 at 50. And third, production costs reflect actual costs incurred (*i.e.*, facts), and are not subjective opinions based on relevant authority.

2

Defendants also fail to defeat the falsity of the product-related statements. To begin, they raise several flawed procedural and technical arguments, including that the Complaint is puzzle-pleaded, that thirteen of the eighteen alleged misstatements are puffery, and that three of the alleged misstatements are opinions. As discussed below, these arguments fail. *See infra* **III B. 2**.

Defendants' argument that the statements are not false and misleading are similarly flawed. Defendants ignore the particularized allegations that their affirmative misstatements were false and misleading. For instance, Defendants told investors that their error rate was 1:2000, when it was 1:10; and Defendants told investors that they had "automated everything," despite relying on extensive manual touchpoints in the production process. Importantly, Defendants ignore Plaintiff's omissions theory of liability, whereby Defendants' failure to disclose high error rates, high turnaround times, contamination events, and customer dissatisfaction renders their statements false and misleading.

Plaintiff also establishes Defendants' scienter. As an initial matter, Defendants do not challenge, and thus concede, the scienter of Defendant Twist. That is for good reason as the involvement of senior executives in the pressure campaign to inflate gross margins and in the Company's ongoing handling of its product quality issues sufficiently alleges scienter.

Defendant Leproust's and Thorburn's scienter is also well established as: (i) they had access to and regularly used data concerning revenues, costs, gross margins, error rates, turnaround times, and other key metrics that contradicted their public statements; (ii) they reported during monthly meetings that the true error rate was 10%; (iii) they instructed employees to sacrifice automation in favor of pushing out early versions of their products; (iv) they had hundreds of conversations with employees concerning product quality issues and customer complaints, and instructed employees to deceive customers into believing the defects were the customers' fault; (v) their misstatements and omissions concerned products that made up 80 to 100 percent of Twist's revenues and were a "key metric" that Defendants told investors they were "focus[ed]" on; and (vi) during the Class Period, Leproust and Thorburn sold 76% and 85% of their stock holdings, respectively, to generate over $85 million in proceeds, despite having made no open market sales before the Class Period.

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION            5:22-cv-08168-EJD
TO DEFENDANTS' MOTION TO DISMISS

¶¶165–192. Although these allegations are sufficient on their own to establish a strong inference of scienter, when taken together (which Defendants fail to do), the inference is even stronger.

Plaintiff's strict liability Securities Act claim should also be sustained because the relevant statements are false and misleading for the reasons set forth above and below. Defendants' lone remaining argument is that Plaintiff lacks statutory standing to bring claims on behalf of investors who purchased shares pursuant or traceable to the February 2022 offering. But this argument is foreclosed by *Melendres v. Arpaio*, 784 F.3d 1254, 1262 (9th Cir. 2015), which Defendants omit from their Motion. In *Melendres*, the Ninth Circuit unequivocally held that once a plaintiff establishes her individual standing to bring a claim, questions of class standing are deferred until class certification. *Melendres*, 784 F.3d at 1262.

## II.    DEFENDANTS VIOLATE THIS COURT'S ORDERS AND LOCAL RULES

Defendants have circumvented the Court's Order denying their request for 40 pages, *see* ECF No. 85 (setting a 30-page limit), and the Court's Local Rules. Specifically, Defendants reduced their excess pages to 17 single-spaced footnotes, many of which are substantive and lengthy, *see, e.g.*, Mot. at 28, n.15, in direct violation of ¶IV.A.4 of this Court's Standing Order for Civil Cases, which says "[f]ootnotes shall be . . . double-spaced." Defendants also include separate pagination for their Motion, Notice of Motion, and Statement of Issues to Be Decided, despite Local Rule 7-2(b)'s requirement that those elements, together with the body of the brief, be submitted "[i]n one filed document not exceeding 25 pages in length." *See Wise v. MAXIMUS Fed. Servs., Inc.*, 445 F. Supp. 3d 170, 175 n.1 (N.D. Cal. 2020) ("The notice of motion and points and authorities should be contained in one document with a combined page limit.").

Had Defendants complied, their motion would exceed the Court's required page limit by nearly five pages. As such, Plaintiff respectfully requests that this Court refuse to "consider any allegations or materials submitted in excess of the [30-page] limit." *Mendel v. Chao*, 2020 WL 13600294, at *3 (N.D. Cal. June 18, 2020); *see also Orshan v. Apple Inc.*, 2023 WL 3568079, at *1 n.2 (N.D. Cal. Mar. 31, 2023) (Davila, J.) (admonishing a party for using footnotes as "a tool for circumventing page limits.").

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION                    5:22-cv-08168-EJD
TO DEFENDANTS' MOTION TO DISMISS

## III.    PLAINTIFF'S EXCHANGE ACT ALLEGATIONS STATE A CLAIM

### A.    Plaintiff Adequately Pleaded Loss Causation

#### 1.    It is Undisputed That the Report Caused the Stock Price Decline

To establish loss causation, a plaintiff must show "that the defendant's [misconduct] proximately caused the plaintiff's economic loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). That is, a corrective disclosure must "reveal[], in whole or in part, the truth concealed by the defendant's misstatements" and "cause[] the company's stock price to decline." *BofI*, 977 F.3d at 791; *see also Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *16 (N.D. Cal. Mar. 31, 2023) (Davila, J.) ("To prove loss causation, plaintiffs need only show a 'causal connection' between the fraud and the loss."). Further, "[a] corrective disclosure can . . . come from any source." *BofI*, 977 F.3d at 790.

Here, it is undisputed that the November 15, 2022, publication of a detailed, highly researched proprietary report from Scorpion Capital (the "Report") was the proximate cause of the decline in share price. The Report was the result of twenty research interviews including those with ex-executives and employees of Twist, customers, competitors, and industry experts. ¶197. The Report revealed that, contrary to Defendants' public statements: (i) Defendants inflated Twist's gross margins by expensing production costs as R&D; (ii) Twist covered up a manual, labor intensive, and fatally flawed manufacturing process that was crippled by errors, bottlenecks, and poor yields; (iii) Twist's products suffered QC problems, had high error rates, and deficient genes were often shipped to customers; (iv) Twist had poor turnaround times that exceeded promised delivery times and were worse than industry standards; and (v) Twist suffered significant customer complaints. ¶199. When the Report revealed these facts, Twist's stock dropped 20% in one day, wiping out hundreds of millions of dollars in market capitalization. ¶205. As Defendants concede: the "Report achieved its goal, and caused Twist's stock price to decline by 20% on the day the Report was published." Mot. at 3. Over the next three days, the share price fell to a two-year low of $24.81 per share, representing a nearly 35% aggregate loss in value following the publishing of the Report. ¶205.

5

Moreover, at least four analysts recognized that the Report was directly responsible for this decline.  ¶201 (Evercore ISI: "the Scorpion Report negatively impacted [Twist's] stock price."); ¶202 (JP Morgan: the Report "will continue to be an overhang on the story and investor sentiment for a number of quarters.");  ¶203 (SVB Securities: "[t]he stock reaction . . . suggests that there is significant doubt on whether TWST can deliver on its now higher FY24 guide and steep gross margin improvements."); ¶204 (CrispIdea: "[t]he stock of the company reacted soon to [the Report] and it tumbled.").

Defendants point to no "other fact" that could have "foreseeably caused the plaintiff's loss." *In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1034 (N.D. Cal. 2020) (Davila, J.). Accordingly, it is not only "plausible that the market would perceive the [Scorpion] Report as revealing false statements," *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 840 (9th Cir. 2022), the Report is the only possible cause of the decline in share price based on the allegations in the Complaint and Defendants' own admissions.

### 2. The Ninth Circuit Rejects Any "Bright-Line" Rules For Loss Causation

Because it is undisputed that the Report caused the stock to decline, Plaintiff's pleading burden is satisfied.  To avoid this result, Defendants insist that "as a matter of law, the Scorpion Report cannot serve as a corrective disclosure" and a report published by an analyst with a short position is "insufficient to plead loss causation." Mot. at 9.  Defendants' proposed bright-line rule contradicts long-standing Supreme Court and Ninth Circuit precedent. In *BofI* , the case on which Defendants principally rely, the Ninth Circuit rejected that "bright-line rule" and, instead, "endorse[d] a flexible approach to evaluating corrective disclosures," noting that "[a] corrective disclosure can instead come from any source." 977 F.3d at 790, 795.[2]

Indeed, courts applying *BofI* in this Circuit, and courts across the country, have found loss

---

[2] To the extent Defendants argue that *Nektar* overruled *BofI* and established a bright-line rule, this argument is foreclosed by *Miller v. Gammie*, 335 F.3d 889, 892 (9th Cir. 2003) (*en banc*) (holding a decision by a subsequent panel cannot overrule an earlier published decision.)

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS                    5:22-cv-08168-EJD

causation based on reports by analysts holding short positions.  *See, e.g.*, *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 742 (N.D. Cal. 2022) (finding the publication of a report by an analyst with a short interest constituted a loss causation event); *In re Mullen Auto. Sec. Litig.*, 2023 WL 8125447, at *10–11 (C.D. Cal. Sept. 28, 2023) (same after both *BofI* and *Nektar*); *see also Lozada v. TaskUs Inc.*, 2024 WL 68571, at *27–28 (S.D.N.Y. Jan. 5, 2024) (same).  In fact, in a post-*BofI* decision, Judge Orrick explicitly upheld loss causation allegations that another "**Scorpion Capital report** caused the stock price drop." *QuantumScape*, 580 F. Supp. 3d at 742 (emphasis added).  As such, Defendants' absolute rule that a report issued by the same analyst can never serve as a corrective disclosure is wrong.

In any event, the Report is distinguishable from those rejected in *BofI* and *Nektar*.  First, the Report is not anonymous.  In holding that the publishing of eight posts on *Seeking Alpha*—all submitted under pseudonyms—did not constitute a loss causation event, the Ninth Circuit noted that "anonymous short-sellers" authored the blog posts.  *BofI*, 977 F.3d at 797.  Similarly, when the Ninth Circuit rejected the report in *Nektar*, the Court reasoned that the report was published on a blog where the author was identified only as "Planview LLC."  *Mulquin v. Nektar Therapeutics*, 510 F. Supp. 3d 854, 858 (N.D. Cal. 2020) (district court opinion).  In contrast, the firm that published the Report here has a significant history of revealing corporate wrongdoing, and prominently displays the name, title, and biography of its Chief Investment Officer.  Bauer Decl. Ex. 2.  As such, the Report is not "anonymous" under Ninth Circuit precedent and is a corrective disclosure as held by other courts in this district.  *QuantumScape*, 580 F. Supp. 3d at 742.

Second, the disclaimer in the Report does not disclaim the Report's accuracy as Defendants claim.  *See* Mot. at 1.  Rather, the Report states that Scorpion's "opinions are held in good faith, and . . . based . . . on the public information, sources, the interviewed individuals, and any social media posts cited in this report."  *See* Mot. Ex. 1 at 2.  Further, the Report states Scorpion "believe[s] the experts [they] spoke with are reliable sources of information with respect to Twist Bioscience." *Id*. Although the Report does state that it cannot guarantee the accuracy of the "sources of information" or the "information [experts] have provided to" Scorpion, *id*., that is the case for virtually all analyst reports and court filings, and it is well-established that these sources can

7

constitute corrective disclosures. *See BofI*, 977 F.3d at 791–92 (holding that allegations in court filings based on good faith were sufficient to constitute a corrective disclosure); *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1020 (S.D. Cal. 2011) (analyst reports by institutional investors were sufficient loss causation events even where the firms could "not guarantee [the report's] accuracy or completeness"); *see also* Bauer Decl. Ex. 3, (underlying analyst report in *Novatel*).

Finally, Defendants' heavy reliance on *Leacock*, an unpublished, non-precedential, and out of circuit case, is misplaced because that court failed to follow *BofI's* mandate to consider context. *Leacock v. IonQ, Inc.*, 2023 WL 6308045, at *23 (D. Md. Aug. 28, 2023) (incorrectly and summarily describing the Report as "anonymous short-seller report that cannot and does not provide any representations or warranties with respect to its accuracy."). Likewise, *In re eHealth, Inc. Sec. Litig.*, 2023 WL 6390593, at *8 (N.D. Cal. Sept. 28, 2023) is distinguishable because there, unlike here, the report had no author and "contain[ed] only public information."

### B.    Defendants' Misstatements and Omissions Were False and Misleading
#### 1.    Defendants' Gross Margins Statements Were False and Misleading

Defendants inflated Twist's "key metric" of gross margins by improperly categorizing production costs as R&D in violation of GAAP and Twist's own accounting disclosures. Defendants tellingly do not dispute that the gross margin misstatements violated applicable GAAP provisions.  Instead, they contend that the misstatements were not false and misleading for four reasons, all of which fail.

First, Defendants argue that FE-1 is an unreliable witness because FE-1 "worked in Twist's laboratories," not in finance or accounting.  Mot. at 10.  But titles alone are not dispositive; significantly, FE-1 "provides a basis for [FE-1's] knowledge about the specific statements he made," as required by the Ninth Circuit.  *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 771 (9th Cir. 2023).  FE-1 was a Senior Bioinformatics Engineer and later a Bioinformatics Engineer manager, who led the team responsible for the production of Twist's products. ¶57.  In that role, senior executives personally instructed FE-1 to improperly categorize production costs as R&D. ¶58.  And per those instructions, FE-1 personally billed production costs

8

to the R&D department. *Id.* This is more than sufficient to establish FE-1's reliability. *Glazer*, 63 F.4th 747, 771 (FEs were reliable where they "described . . . practices to which they themselves were subjected . . . [and] CWs were pressured to" engage in the challenged activity). And in contrast to *Zucco Partners, LLC v. Digimarc Corp.*, the case on which Defendants rely, FE-1 was employed for most of the class period and had firsthand information of the accounting practices as he personally booked the costs. *Cf.* 552 F.3d 981, 996 (9th Cir. 2009), *as amended* (Feb. 10, 2009) (FEs "were not employed by [the Company] during the time period in question and ha[d] only secondhand information about accounting practices.")

Second, Defendants offer several flawed arguments for why the gross margins statements are not false and misleading, including because R&D costs can include costs to "improve," "modify," or "advance the design of" existing products. Mot. at 11. But the costs at issue were not incurred to "improve," "modify," or "advance the design of" existing products; rather, Plaintiff alleges that Twist categorized costs "incurred to produce and sell its existing commercial products as R&D," which included, among other things, computation costs to run Twist's production pipeline, ¶58(a); production software used to process and complete customer orders, ¶58(b); and quality control for products sold to customers, ¶58(c).

Defendants also claim that their misstatements were not false and misleading because they told investors that "[r]esearch and development activities are conducted in collaboration with manufacturing activities." Mot. at 4, 11. But activities being conducted "in collaboration" is not the same as recording production costs as R&D. In fact, Twist specifically told investors otherwise: that R&D costs included "costs incurred for the ***development*** of [Twist's] products," ¶53, not the production of those products. Defendants' recording of costs incurred for the "production and delivery" as R&D expenses, violated GAAP and explicitly misled investors.

Defendants also maintain that they are somehow shielded from liability because they have not restated their financials or received an adverse opinion from Twist's auditors. Mot. at 11. But the absence of these formal events is not determinative, as they admit in their brief. *Id.* In fact, Twist's financials were audited on a "test basis" only, meaning the auditor looked at the "overall presentation" of the financial statements, not the presentation of each line item. Mot., Ex. 8 at 65–

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS
    5:22-cv-08168-EJD

66.   What's more, Twist's auditor did in fact identify three material weaknesses in its financial reporting, and noted that "there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis." *Id*.  Defendants also fail to grapple with the fact that Twist's 2023 Form 10-K (filed two months after the Complaint) recorded its biggest year-over-year increase in costs of revenue, and, *for the first time ever*, decreased its year-over-year R&D costs (by 11% from $120.3 million in 2022 to $106.9 million in 2023) and year-over-year gross margins (by 15% from 42% in 2022 to 36% in 2023). Bauer Decl. Ex. 1.

Defendants rely on *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965 (N.D. Cal. 2007), but there, unlike here, the Company conducted an audit committee investigation specifically into the alleged fraud and there were no subsequent reductions in the key metrics at issue.

Third, Defendants argue that their misstatements concerning production costs, R&D, and gross margins are opinions.  Not so.  The Ninth Circuit has held that, as is true here, evidence that a Company manipulated R&D costs was "dispositive" in the analysis of whether their conduct "violated Section 10(b) and Rule 10b-5" because doing so "portrayed an overall picture of [the Company] as having greater . . . financial stability than in reality it did." *Ponce v. S.E.C.*, 345 F.3d 722, 734 (9th Cir. 2003).  In fact, the Financial Accounting Standard Board's original guidance on R&D costs was put forth with the specific "objective of reducing the number of alternative accounting and reporting practices" followed for "research and development costs."  Financial Accounting Standard Board, *Financial Accounting Standards No. 2 – Accounting for Research and Development Costs* (FAS 2) (1974).  Further, Defendants' own statements foreclose their argument. As defined in Twist's SEC filings, "[c]ost of revenues reflect the aggregate cost *incurred* in the *production of and delivery* of [Twist's] products" and R&D "expenses consist primarily of costs *incurred* for the *development* of [Twist's] products."  ¶¶48, 53.  Twist's own definition of these metrics provides no allowance for subjectivity.  The existence of production costs was a "thing . . . existing" at the time because the production was already completed; it was not a "belief or view" under controlling precedent. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015).

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION    5:22-cv-08168-EJD
TO DEFENDANTS' MOTION TO DISMISS

Courts in this Circuit and elsewhere have repeatedly held that accounting for revenues and costs like this are not opinions under *Omnicare*. *See, e.g.*, *Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, 2020 WL 2559939, at *5 (N.D. Cal. May 20, 2020) (misstatements about revenue and cost overruns were not opinions because "the statements misrepresented existing, rather than future, overruns"); *In re Plug Power, Inc. Sec. Litig.*, 2023 WL 5577276, at *10 (S.D.N.Y. Aug. 29, 2023) (accepting the audit firm KPMG's finding that a company had engaged in "misclassification of research and development expenses that should have been classified as costs of revenue").

Defendants provide no explanation for how these accounting rules are subjective. Nor do they cite cases holding that accounting for costs under ASC 730 or the treatment of production costs more generally are subjective opinions. Instead, they cite two cases that examine entirely different accounting rules: *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613–14 (9th Cir. 2017), which dealt with goodwill valuations that were inherently dependent on subjective assessments of "fair value," and *Hunt v. Bloom Energy Corp.*, 2021 WL 4461171, at *3–8 (N.D. Cal. Sept. 29, 2021), which dealt with contingent liabilities requiring "reasonable estimates." Neither applies here.[3]

Fourth, Defendants incorrectly argue that the financial misstatements were not pleaded with sufficient temporal particularity. Mot. at 12. Defendants contend that FE-1 was "at Twist for only one year of the four-year Class Period," Mot. at 12; but FE-1 was actually at Twist from July 2019

---

[3] Even assuming that accounting for production costs is subjective (which it is not), the statements would still be false under *Omnicare*. The internal policy whereby employees were directed to book certain production costs to R&D demonstrates that the statements, if opinion, were not honestly held because there was no subjective assessment involved; it was a strict, absolute directive. ¶¶58, 58(a)(iii)-(iv). Likewise, the existence and application of the internal policy contrary to GAAP was not disclosed to investors, and its "omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 1332.

11

through April 2022, ¶57, the vast majority of the December 2018 to November 2022 Class Period.[4] Nonetheless, FE-1 need not have been employed for the entire Class Period to establish falsity. *See Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 937–39 (9th Cir. 2023) (denying motion to dismiss on basis of one FE who was employed for 7 months of an 18-month class period and another FE "quit working at [the Company] at the beginning of the Class Period.").

Defendants also wrongly argue that FE-1 "does not identify specifically when or how Twist allegedly improperly classified R&D expenses, or which public disclosure was purportedly false as a result." Mot. at 12. But Plaintiff alleges that there was an internal Twist policy to record production costs as R&D expenses during the tenures of two different COOs—which subsume the entire Class Period. ¶58. Further, the Complaint details which specific costs were mischaracterized. *See id.* (*i.e.*, computation costs, production software costs, quality control costs, and contamination remediation costs). This is sufficient particularly because a plaintiff need not plead "particular details" when it alleges an accounting fraud, only "enough information so that a court can discern whether the alleged GAAP violations were minor." *Oh v. Hanmi Fin. Corp.*, 621 F. Supp. 3d 1075, 1085 (C.D. Cal. 2022); *see also In re CBT Grp. PLC Sec. Grp. Litig.*, 2001 WL 1822729, at *6 (N.D. Cal. Dec. 28, 2001) ("Although plaintiffs do not allege the names of the customers, the dates of the sales and the amounts, this would be an enormous burden on plaintiffs at the pleading stage, and the court is not persuaded that such detail is required.").

*Fadia v. FireEye, Inc.*, does not support Defendants' position. 2016 WL 6679806 (N.D. Cal. Nov. 14, 2016). There, the former employees alleged that relevant transactions caused

---

[4] In a footnote, Defendants also wrongly contend that FE-1 was not employed by Twist when the misstatements at Paragraphs 143, 144, 145, and 147 were made (Mot. at 12 n.8): FE-1 was employed at the time of the misstatements in Paragraphs 144 (November 23, 2020), 145 (February 4, 2021), and 147 (January 11, 2021). As for the statement in Paragraph 143, which was made on April 30, 2019, FE-1 identifies the standing policy that was in place both during FE-1's employment and at least in the several months before FE-1 started in July 2019.

12

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION                          5:22-cv-08168-EJD
TO DEFENDANTS' MOTION TO DISMISS

"confusion," were "a very big deal," and that the companies "lacked synergy." *Id*. at \*13. Those generic observations are very different from the specific allegations here that executives intentionally mispresented cost of revenues and increased R&D spending. Likewise, *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195 (N.D. Cal. Dec. 17, 2019) and *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008) are not on point. In *Oracle*, the Court found that the FE allegations lacked temporal proximity to the false and misleading statements. *Id*. at \*14. But as described above, the accounting allegations here align with Defendants' statements. Similarly, in *Metzler*, the court held that plaintiffs failed to plead that specific information regarding the fraud was conveyed to management. 540 F.3d at 1068. But here, Plaintiff alleges that executives were aware of details that would have necessarily revealed the fraud and presented those details themselves at various meeting. ¶62.

### 2. Defendants' Statements Concerning Twist's Products Were False and Misleading

#### a. The Statements Are Not "Puzzle-Pleaded"

The Court should reject Defendants' "puzzle-pleading" argument as it has done previously. *See In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014) (Davila, J.). A "puzzle pleading" is a complaint that requires "the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting Plaintiffs' claims." *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1075 (N.D. Cal. 2001). Here, Plaintiff identifies nineteen false and misleading statements Defendants made related to Twist's products, followed by six reasons for falsity. ¶149–163. In fact, Defendants themselves identified the categories of false statements alleged in the Complaint, the statements which correspond to those categories, and the reasons for the statements' falsity. Mot. at 13 (listing the categories of false and misleading statements identified in the Complaint). As in *Intuitive,* Defendants show that they "can parse out with relative ease the statements at issue and the reasons as to why they are alleged to be false and misleading." 65 F. Supp. 3d at 831.

13

**b.      The Identified Statements Are Not Corporate Optimism**

Defendants also argue that eleven cherry-picked portions of their actionable misstatements regarding Twist's products are corporate optimism or puffery.  Mot. at 14–15 (emphasis omitted).[5] This argument fails because the statements "are capable of objective verification." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).  And even if they are not, "general statements of optimism, when taken in context, may form a basis for a securities fraud claim, when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017).

Here, Defendants painted a picture that the Company had "achieve[d] high levels of quality, precision, automation," ¶149, that the Company "ha[d] automated [its] entire workflow," ¶153, and that the Company had "automated everything" related to the Company's production process.  ¶154. In fact, Defendants had objectively not "automated everything" or "achieved high levels" of automation; rather, they deliberately sacrificed automation in favor of quick revenues.  ¶163(a).

In addition, Defendants concealed from investors that Twist's products had "a high error rate, poor quality, and variation or incompatibility that made them unfit for use in research or experimentation by Twist customers," that Twist suffered periodic contamination events, and that the Company received rampant customer complaints, ¶¶163(b), (d), (e).  The statements in ¶¶149, 155, 159, and 160 are therefore actionable because they "address specific aspects of a company's operation that the speaker knows to be performing poorly." *Quality Sys.*, 865 F.3d at 1143.

Defendants also stated that "100% of the time it works," ¶155, that the company "ha[d] actually perfect quality," and "ship[ped] perfect DNA," ¶158, and that the Company had "higher

---

[5] Defendants do not challenge Paragraphs 150, 151, 156, 157, or 161 as puffery and, therefore, Plaintiff need not address them here.  *See Software Rsch., Inc. v. Dynatrace LLC*, 316 F. Supp. 3d 1112, 1116 (N.D. Cal. 2018) (Defendant "has the burden of proving that no claim has been stated.")

14

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION                    5:22-cv-08168-EJD
TO DEFENDANTS' MOTION TO DISMISS

uniformity" than its competitors, ¶160.[6] Whether the Company indeed shipped perfect DNA, had higher uniformity than competitors, and whether its production process worked 100% of the time is objectively verifiable: that is, the Company either shipped perfect DNA, had higher uniformity, and had a production process that worked 100% of the time or it did not.  Here, it did not, thus; these statements were false and misleading.  ¶163(b).

Defendants also claimed that "the speed of [Twist's DNA synthesis platform enable[d] customers to quickly deploy NGS technologies to applications where the time to answer is critical," ¶152.  As Plaintiff alleges that Twist suffered from severe product delays and failed to meet stated turnaround times, ¶163(c), and Defendants knew this fact, ¶169, the statement is actionable as it "address[es] specific aspects of a company's operation that the speaker knows to be performing poorly." *Quality Sys.*, 865 F.3d at 1143.

Regarding Paragraph 162, Defendants challenge the statement that, "In terms of [the Company's] ability or [its] willingness to be flexible on economic terms, [Defendants] are very flexible."  Mot. at 15.  But Defendants ignore the objectively verifiable statements directly preceding this quote that the Company was "definitely not subsidizing anybody else's drug discovery" and "not going to do a deal that's not a gross margin positive." ¶162.  Once again, whether the Company entered into deals that were "not a gross margin positive" is objectively verifiable. That is, all of Twist's deals were either "gross margin positive" or not.

---

[6] Defendants cite a different transcript than the one on which Plaintiff relies and claim that Leproust said the Company "*see[s]* perfect DNA" rather than "*ship[s]* perfect DNA" as the Complaint claims. Mot. at 15 (citing Ex. 4 at 2).  Putting aside that the difference between "sees" and "ships" in this context is irrelevant, it is an impermissible factual dispute at this stage.  *See Magana-Munoz v. W. Coast Berry Farms, LLC*, 2022 WL 4112363, at *2 (N.D. Cal. Sept. 8, 2022) ("[F]actual disputes cannot be resolved at the pleading stage.") (Davila, J.).

15

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION                    5:22-cv-08168-EJD
TO DEFENDANTS' MOTION TO DISMISS

### c.    The Identified Opinion Statements Omit Key Facts and Are Actionable

Defendants challenge three statements as nonactionable opinions. Mot. at 15.[7] Although these statements use the words "we believe" and "our view," such statements are nevertheless actionable where, as here, (i) "the speaker did not hold the belief she professed" and that belief is objectively untrue; (ii) "the supporting fact [the speaker] supplied [is] untrue,"; or (iii), there are "facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 1327, 1332.  That is the case here.

The statement "our view so far is that we still have the fastest turnaround time and the best price for custom panel," is actionable because Defendants were misleading investors about the true turnaround times, ¶163(c), and thus either did not hold the opinion conveyed or failed to disclose information rendering the opinion false and misleading. *Omnicare*, 575 U.S. at 1327.  Either way, the statement is actionable.

The second statement fully reads "with what we believe is the lowest industry error rate" and ***defines*** "lowest industry error rate" to mean "1:3000 base pairs."  ¶150.  That supporting fact is false because the error rate was actually 1:10.  ¶69.  Therefore, the supposed opinion concerning lowest industry error rate is false and misleading either because of the falsity of the embedded fact (which Defendants omitted from their Motion), or because Defendants omitted a fact going to the basis of the opinion (*i.e.*, the true error rate) that makes the statement misleading.

The same is true of the last statement which fully reads: "We have built a highly scalable gene production process with what we believe is industry-leading capacity of approximately 45,000 genes per month ***to address the growing demand of scalable, high-quality, affordable synthetic genes.***"  ¶153.  In other words, Defendants are touting their ability to produce 45,000 "high-quality" genes per month.  But by omitting the issues concerning product quality, high error rates, and

---

[7] Defendants do not contend that the statements in Paragraphs 149, 151, 152, 154, 155, 156, 157, 158, 159, 160, and 162 are opinions.

16

customer complaints, Defendants undermine the accuracy of this statement by omitting "facts going to the basis for the issuer's opinion ... whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 1332.

### d.     The Product Statements Are False and Misleading

Relegated to the last of Defendants' arguments concerning the falsity of the product-related statements is the contention that they are not actually false or misleading. This fails as well. As a threshold matter, Defendants' analysis is backwards. Plaintiff alleges nineteen misstatements and omissions regarding Twist's products, ¶¶149–162, and alleges that they are all false and misleading for six independent reasons. ¶163. But Defendants break the nineteen statements into categories and for each category defend against only one reason for falsity (*e.g.*, designating them "Statements Regarding Production Automation"); they fail to address the other reasons for falsity for each challenged statement. Further, Defendants do not contend at all with the allegation that these statements are actionable because they "omitted and concealed the truth." ¶163. Defendants' falsity argument thus fails for these reasons alone.

Moreover, for the portions of the allegations they do address, Defendants are wrong:

**Lack of Automation**. Ignoring the Complaint, Defendants make four improper arguments. First, Defendants did ***not*** admit their lack of automation. The statement they rely on that Twist "still 'requires minimal . . . direct labor,'" Mot. at 5, 16, makes no such admission. To the contrary, that statement emphasizes Twist was using "minimal … direct labor" because "[w]e have automated the entire workflow." *See* Ex. 5 at 13. ("The manufacturing process for our NGS tools is highly flexible and scalable and requires minimal fixed costs and direct labor given the efficiency of our production capability. ***We have automated the entire workflow*** using proprietary and over-the-counter laboratory equipment.").

Second, again ignoring the Complaint, Defendants argue that their automation statements "are not inconsistent with" the fact that "early version" products required "initial manual production." Mot. at 16. But the Complaint details that Twist's production of existing products was ***never automated*** because Defendants' deliberate but undisclosed business strategy was to

17

sacrifice automation in favor of selling early version products to quickly generate revenue. As a result, Twist used manual production, which led to significant quality control problems, customer complaints, contamination shutdowns, and bloated costs. ¶¶59, 60, 72, 74, 79, 94, 163. The sole authority Defendants cite does not require anything more. *See Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) (allegation that the company had "serious operational problems" is "not inconsistent" with statements that revenues were increasing).

Third, Defendants claim that "whether Twist's production … was 'scalable' is unrelated to production automation." Mot. at 16. But this is non-responsive. Defendants represented to investors that they had built a highly scalable production process for existing products.[8] That statement was false and materially misleading. Even after introducing a product and selling it to customers, Twist never scaled production for existing products, and instead continued to rely on an inefficient and error-prone manual process suitable only for early versions. ¶¶59, 60, 70, 72, 79, 94, 163.

Fourth, Defendants again ignore the Complaint, arguing that it fails to allege "when or how Twist's production was purportedly 'not automated.'" Mot. at 17. However, Plaintiff alleges the process was *never* automated because Defendants *never* developed an automated production process and instead relied on extensive direct manual labor. ¶¶59, 60, 72, 79, 94, 163.

**Product Quality and Error Rates**. Defendants' contention that every company has "some product errors and customer complaints," Mot. at 17, is irrelevant and non-responsive. Plaintiff alleges that Twist used "very cherry-picked data from manipulated and artificial parameters to generate false error rates" and created "falsified data" for the purpose of "falsely representing" its

---

[8] *See, e.g.*, ¶149 ("[w]e have combined [our proprietary manufacturing of synthetic DNA] with … scalable commercial infrastructure"); ¶153 ("[f]or synthetic genes, we have built a highly scalable gene production process"); ¶153 ("The manufacturing process for our NGS tools is highly flexible and scalable and requires minimal fixed costs and direct labor given the efficiency of our production capability.").

18

product capabilities "to the public and customers." ¶¶61, 81. Defendants do not deny this and feign confusion as to "who was allegedly mis-counting error rates" or how Defendants' manipulated error rates "rendered any specific statement false." Mot. at 18. Plaintiff plainly pleaded the answers to those questions in the Complaint. ¶¶61–62, 69, 72, 163(b).

Specifically, Plaintiff alleges that "when Twist told the public that, for example, its genes had an 'error rate of 1:3000 base pairs,'" this was false because "the other 2,999 included base pairs that also had errors" and Twist's true error rate "was about 1 in 10 base pairs, or 1 in 10 nucleotides for oligo pools." ¶61. This is corroborated by independent personal knowledge of multiple FEs covering the entire Class Period. *See, e.g.*, ¶¶69, 72 (product line specialist observed "10% of products that suffered from production errors," and that Leproust admitted the Company's "10% error rate" in internal "Monthly Performance Meetings"); ¶¶80–83 (Leproust pressured employees to conceal product failures and make "misrepresentations to customers"); ¶84 (manufacturing team lead observed numerous production errors and quality deficiencies). Defendants' reliance on *Curry v. Yelp Inc.*, 2015 WL 1849037 (N.D. Cal. Apr. 21, 2015) and *In re Netflix, Inc. Sec. Litig.*, 2005 WL 1562858 (N.D. Cal. June 28, 2005) is misplaced. In both cases, plaintiffs lacked FEs and relied only on the mere existence of customer complaints to allege that the company's class period statements were false. *Netflix*, 2005 WL 1562858, at *7; *Yelp*, 2015 WL 1849037, at *6–8.

**Slow and Unpredictable Turn-around Times**. Twist created artificial turnaround times to make misrepresentations to the public "by filtering its data to exclude batches or types of products . . . that Twist knew suffered . . . slower turnaround times" and also "report[ing] the turnaround time on the first batch as the delivery time for the whole order," which "concealed that these orders were still incomplete, and it took Twist much longer to complete production and shipment of the full customer orders." ¶¶61(b), (c). Twist's manipulation was independently confirmed by the leader of Twist's manufacturing team, who explained that Twist broke orders into batches and only counted the first batch as "the turnaround time for the whole order … even though 'the whole order had not been completed'" ¶92, and Twist's sales specialist who was trained to tell customers "four to six weeks" even though the actual turnaround time was "12 or 16 weeks" ¶87.

Thus, contrary to Defendants' unsupported assertion that their statements are not "promises

19

or guarantees of turnaround times," the statements are false and therefore actionable. Mot. at 18. Indeed, as the engineer leading Twist's QC team and personally overseeing production at both Twist production labs, FE-1 "saw the raw numbers" for Twist's "turnaround times" to complete customer orders and explained that Twist "definitely underreported" the true turnaround times by using "very cherry-picked" data. ¶61.

**Contamination Events**. Defendants confirm that their Class Period statements were misleading by admitting they never disclosed "contamination events" except for a single disclosure in November 2021 that Twist had "shutdown production" during Q3 2021. Mot. at 5, 19–20. As Plaintiff alleges, Twist had contamination shutdowns in late 2020 or early 2021 and Spring 2022 that Defendants failed to disclose. ¶¶71, 75.

Moreover, by describing the comparatively modest Q3 2021 shutdown as an "extraordinary event," reassuring investors that "[n]one] of the [contaminated] genes were shipped to customers," and that this merely caused "a delay in *some* gene orders," Mot. at 5, Twist further misled investors. In truth, (i) contamination shutdowns were not extraordinary—they were common, and an inherent feature of the way "Twist's lab was designed and used"; (ii) contamination shutdowns lasted "three or four weeks," caused "significant delays," completely upended Twist's business because "[d]uring such shutdowns, *no* orders were shipped, *no* product went out, there was *no* progress on orders that were in production, and *no* production started on new or existing orders"; and (iii) contaminations sucked enormous resources from the Company because resolving the shutdown immediately became "top priority and there was nothing more important" and "significant amount of manpower dedicated to trying to discern the source of the contamination." ¶¶71, 75, 90. Given the substantial costs and harms, Defendants' omission of these facts is independently actionable as they would have significantly altered the "total mix" of information made available to investors. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38–39 (2011); *see also In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 705 (9th Cir. 2021) ("[I]nvestors would likely find omissions regarding significant cybersecurity incidents material to their decisionmaking.").

Defendants rely on *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022). But this case supports Plaintiff's position. *Id*. at 620 ("A company must disclose a negative internal

20

development [] *if its omission would make other statements materially misleading*."). Here, Twist's contamination shutdowns made the challenged Class Period statements materially misleading.

**Customer Dissatisfaction**.  Contrary to Defendants' assertion, Twist purportedly stated it "cannot guarantee" customer satisfaction, and that it did not say "Twist does not receive customer complaints," is not a basis for this Court to dismiss all Class Period misstatements that reference Twist customers.  Mot. at 19.  For example, Leproust stated that Twist's NGS "product launches … were very well received" and that customers say these products "are great" and "lower [] sequencing costs," and asserted that "why [Twist] win[s] is because of [the Company's] quality," according to "report[s]" from "[Twist's] customers," ¶¶159, 160.  In truth, "[m]ore than half" of the thousands of customers to whom Twist sold NGS products complained that Twist's NGS tools did not work.  ¶80.  Further, at the same time she made these statements, Leproust instructed employees to conceal the widespread defects and failures of Twist's products telling them to blame the customers for the faults.  ¶¶82, 83.

## C. Plaintiff Alleges Scienter

The standard for scienter is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007).  The inference "need not be irrefutable[,] . . . even the most plausible," or require a "smoking-gun." *Id*. at 324–26.  The inference is "strong" when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference" of non-fraudulent intent—*i.e.*, a tie goes to Plaintiff.  *Id*. at 310.  The allegations in the Complaint establish a strong inference of scienter.

### 1. Plaintiff Alleges a Strong Inference of Scienter
#### a. Twist's Scienter

As an initial matter, Defendants do not challenge Defendant Twist's scienter.  Nor could they.  Twist's COO and a VP of Business Technologies pressured and directed employees to improperly categorize production costs as R&D expenses as part of a long-standing internal policy.

21

¶¶58, 58(a)(iii)-(iv).  Likewise, numerous executives were aware of Twist's product quality issues, error rates, turnaround times, and customer complaints, including the CEO, CFO, Senior Director of Quality Assurance, numerous co-founders, CTO, Senior Director of R&D, and Director of NGS Research.  ¶¶63(b), 79(a), 79(b), 82, 84.  The knowledge of these senior executives, as reflected in their direct interactions with FE-1 and FE-4, is imputed to Defendant Twist.  *See Kyung Cho v. UCBH Holdings, Inc*., 890 F. Supp. 2d 1190, 1204 (N.D. Cal. 2012) (imputing the knowledge of a non-defendant vice president to the company in finding scienter).

### b.    Leproust's and Thorburn's Scienter as to Production Costs and R&D

To begin, similar to *Glazer*, the pressure campaign concerning production costs and R&D is sufficient on its own to create a strong inference of scienter.  63 F.4th at 772.  There, non-defendant senior executives, including the CRO, SVP for Sales and VP for the Americas, instructed employees to misclassify certain deals to influence revenue numbers.  *Id.*  The Ninth Circuit concluded that this was sufficient to establish scienter with respect to the individual defendants, particularly when combined with allegations about who specifically was pressured and who did the pressuring.  *Id*. at 772–73.  That is precisely the information that FE-1 provided.  *See supra* **III B. 1**.

Defendants Leproust and Thorburn's access to and use of internal data further establishes their scienter.  Twist maintained an internal system that tracked and made available real-time data from each stage of the production process.  ¶65, FE-2.  Leproust and Thorburn had access to this data and, every month during the Class Period, made presentations during Monthly Performance Meetings and executive meetings about revenues, gross margins, error rates, and turnaround times. ¶¶62(a), FE-1; 67(a), FE-2.  These presentations contradicted Defendants' public statements regarding these issues.  ¶62(a), FE-1.  Moreover, Leproust and Thorburn admitted that they were "focus[ed] on improving . . . gross margins," which they said was a "key metric" and "very important for us." ¶26.

These allegations alone—which were corroborated by multiple FEs—create a strong inference of scienter.  *See NVIDIA*, 81 F.4th at 940 ("Access and review of contemporaneous

22

reports are the most direct way to prove scienter."); *Glazer*, 63 F.4th at 773 ("Individual Defendants' access to internal reports . . . support the inference of scienter."); *Quality Sys.*, 865 F.3d at 1145 ("[S]ales reports were 'automatically delivered to the management team;'" and "'funnel reports' . . . were available to executives"); *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1026 (N.D. Cal. 2020) (strong inference where defendants "received regular reports on the company's financial information").

Defendants rely on *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016) in claiming that Plaintiff failed to "allege facts demonstrating that defendants knowingly and recklessly engaged in an improper accounting practice." Mot. at 27 (citing *id.*). But they ignore that Plaintiff alleges just that. Specifically, that senior executives directed employees to misclassify costs in a deliberate effort to inflate gross margins, ¶58, and that Leproust and Thorburn had access to and made use of data contradicting their statements, ¶¶26, 62(a), 65, 67(a). This establishes a strong inference of scienter in the Ninth Circuit, as noted above in *NVIDIA*, *Glazer*, *Quality Sys.*, and *Mulderrig*.

### c.    Leproust's and Thorburn's Scienter as to Twist's Products

**<u>Lack of Automation</u>**. During Monthly Performance Meetings, Leproust discussed a strategy to sacrifice automation in favor of marketing "beta" versions of Twist's products to generate revenue. ¶59(b), FE-1. Leproust did not want to invest in the software development needed to automate production until they knew the products would sell. *Id.*[9] Leproust told employees that the Company's lack of automation "was fine." ¶79, FE-3.

---

[9] Defendants rely on *In re Verifone Sec. Litig.*, 2016 WL 1213666, at *9 (N.D. Cal. Mar. 29, 2016) to say that this is inadequate because it lacks specific details. But *Verifone* had no allegation concerning the time, place, or manner of defendants' conduct. Here, FE-1, FE-2, and FE-3 all state that Leproust addressed these automation issues regularly in Monthly Performance Meetings. ¶¶59, 62, 66, 67, 69, 76.

23

**High Turnaround Times**. Leproust had access to real-time data from Twist's internal tracking system regarding turnaround times, error rates, and other production data. ¶65, FE-2. Based on this real-time data, Leproust made presentations to the employees on error rates, turnaround times, number of genes shipped, and gross margins. ¶¶66, 67, 67(a), FE-2.

**Contamination**. Contamination issues were "company-wide events" and Leproust and Thorburn were personally involved in responding to such events. ¶58(d), FE-1. Leproust was provided with updates based on reports prepared by FE-2 concerning a significant lab contamination issue in Spring 2022. ¶¶71, 71(a), FE-2. Leproust and other senior executives also addressed contamination issues extensively in meetings. ¶¶76 FE-3; 90(b), FE-6.[10]

**Product Quality and Error Rates**. At executive meetings, Leproust presented slides with information about technology and production problems contradicting the information Twist was conveying publicly. ¶62(a), FE-1. Leproust urged employees (including FE-1) to sacrifice quality and instead focus on shipping more product. ¶62(b), FE-1. Several times, she dismissed specific employee concerns regarding product quality, insisting that "good enough was good enough." ¶63(b), FE-1. Leproust reported during monthly meetings that the true error rate was 10% (versus Defendants' public statements that error rates were in the 0.033-0.013% range). ¶69, FE-2.

Defendants rely solely on *Zucco* to argue that the error rate evidence is not sufficient. But their cited language involved FEs who were not even employees during the time in question. 552 F.3d at 997. That contrasts with the evidence of FE-2, who specifically interacted with Leproust as she acknowledged the true error rate of 10%. ¶69.

**Customer Complaints**. Leproust had hundreds of conversations with FE-4 about product failures, quality control errors, and customer complaints in development meetings and via email. At meetings including Leproust and Thorburn, Leproust spoke about how to manage problems with

---

[10] Defendants argue that these allegations do not create an inference of scienter because "none of the allege misstatements refers to or even broaches the topic of contamination." Mot. at 22. But Defendants ignore that Plaintiff alleges an omissions theory. *Supra* **III B. 2. c**.

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION                    5:22-cv-08168-EJD
TO DEFENDANTS' MOTION TO DISMISS

product failures and customer complaints.  ¶82, FE-4.  Employees repeatedly confronted Leproust about product failures and customer complaints.  In response, she instructed employees to never admit that Twist did anything wrong but instead blame the customers.  ¶83, FE-4.

Defendants argue that "none of the six FEs offers any facts to establish their personal knowledge of any Individual Defendant's state of mind at the time any alleged misstatement was made."  Mot. at 20 (relying on *In re SolarCity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 1009 (N.D. Cal. 2017)).[11]  But Plaintiff alleges substantial personal interaction between the FEs and individual defendants that obviate the Court's concerns in *SolarCity*.  *Cf* 274 F. Supp. 3d at 1001 (rejecting FEs because what FEs knew "d[id] not come from [the FEs'] personal knowledge," but from third parties).  As Defendants concede, FE-1 interacted directly with Leproust, including raising concerns about product quality issues, and FE-4 had hundreds of conversations, meetings, and emails with Leproust. Mot. at 21.  Further, FE-2 attended meetings where Defendants demonstrated their knowledge, ¶¶66, 67, 67(a), 69, and Leproust received reports that FE-2 prepared, ¶¶71, 71(a)).  Moreover, FE-3 similarly attended meetings with Leproust, including meetings specifically for Company leadership, and interacted directly with her, ¶¶76, 77, 79. Finally, FE-6 attended meetings with Leproust where contamination issues were discussed, ¶90(b)).

Defendants claim that "[m]erely being present at [Company] meetings does not demonstrate the requisite personal knowledge to establish scienter with respect to the individual defendants." Mot. at 21 (quoting *Scheller v. Nutanix*, 450 F. Supp. 3d 1024, 1042 (N.D. Cal. 2020)).  But *Nutanix* merely required that an FE "had personal knowledge with respect to falsity of the specific statements at issue." *Scheller*, 450 F. Supp. 3d at 1042.  Plaintiff adequately alleges both that the FEs had personal interactions with Defendants and had personal knowledge of the falsity of Defendants' actionable misstatements and omissions.  ¶¶56–94.  Further, *Nathanson v. Polycom,*

---

[11] Defendants again say that FE-1 is an unreliable witness because FE-1 "lacks personal knowledge of Twist's actual accounting practices."  Mot. at 21.  But for the reasons set forth above, FE-1's basis for personal knowledge of Twist's misconduct is well-established.  *Supra* **III B. 1**.

25

*Inc.*, 87 F. Supp. 3d 966, 980 (N.D. Cal. 2015), which Defendants cite in arguing that FE-1's allegations amount to "generalized claims about corporate knowledge that offer no reliable personal knowledge," Mot. at 21 (quoting *id*.), is easily distinguished.  FE-1 does not rely on generalized corporate knowledge; instead, FE-1 was specifically instructed to misclassify costs as part of a scheme by Defendants to inflate gross margins.  Accordingly, this argument fails.

## 2.    Core Operations Create a Strong Inference of Scienter

Scienter is also established under the core operations doctrine.  Twist's synthetic DNA products and NGS tools made up 80 to 100 percent of its revenues during the Class Period and was repeatedly touted in Twist's SEC filings as the "core" of the Company's business model.  ¶¶24, 193.  Further, the Individual Defendants repeatedly told investors that gross margins was a key metric that would be a specific "focus" for management.  ¶26.  And the FEs specifically noted that Defendants had access to data contradicting their public statements and also prepared and delivered presentations to employees based on such data.  ¶171.  These allegations are sufficient on their own to establish Defendants' scienter.  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785–86 (9th Cir. 2008) (core operations allegations are sufficient "where they are particular and suggest that defendants had actual access to the disputed information" and "where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter"); *see also Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*, 2012 WL 3835078, at *3 (N.D. Cal. Sept. 4, 2012) (Davila, J.) ("It is unlikely that the fact that Celera's single largest source of cash income stopped sending payments altogether could have gone unnoticed by the CFO and CEO.").

The cases Defendants cite in a lengthy single-spaced footnote are inapposite.  Neither *Metzler*, 540 F.3d at 1068, nor *Zucco*, 552 F.3d at 992, involved core operations allegations, rendering them irrelevant.  And neither *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 817 (N.D. Cal. 2019), nor *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062–63 (9th Cir. 2014), involved any specific allegations, like those here, linking defendants to contradictory data or to the key products and financial metrics at issue.

26

### 3. Defendants' Stock Sales Create a Strong Inference of Scienter

The Individual Defendants' stock sales are also indicative of scienter. Defendants argue that Plaintiff fails to provide meaningful trading history for purposes of comparison to the stock sales within the Class Period. Mot. at 26. Not so. Plaintiff alleges that Leproust and Thorburn's class period stock sales were unusual in nature, in part, because neither Leproust nor Thorburn had "any open market sales before, or as of September 28, 2023, after the Class Period." ¶¶181, 183. These are sufficiently meaningful trading histories—or lack thereof—to demonstrate that Leproust's sale of over 638,000 shares in 161 separate transactions, ¶180, and Thorburn's sale of over 237,000 shares in 62 separate transactions, ¶182, *during* the Class Period were suspicious and indicative of scienter. *See Lamartina v. VMware, Inc.*, 2021 WL 4133851, at *3 (N.D. Cal. Sept. 10, 2021) (Davila, J.) (finding inference of scienter where an individual defendant had no pre-class period sales and 17 during the class period, and two others had pre-class period sales and 12 during the class period).

Defendants argue that any inference of scienter is rebutted by the fact that many of these Class Period transactions were executed pursuant to Rule 10b5-1 trading plans. Mot. at 26. But such plans provide relief only if the insider adopted the plan "[b]efore becoming aware of the [material nonpublic] information." *VMware*, 2021 WL 4133851, at *12 (*quoting* 17 C.F.R. § 240.10b5-1(c)(1)(i)). Here, the trading plans were not adopted before the fraud, but were rather amended several times during the Class Period, ¶184, and thus the existence of the plans does not negate the inference of scienter. *Id*.; *see also In re Intuitive Surgical Sec. Litig.*, 2017 WL 4355072, at *4 (N.D. Cal. Sept. 29, 2017) (Davila, J.) (stock sales supported scienter where "individual Defendants . . . manipulated their 10b-5 plans during the Class Period").[12]

Defendants also argue that that the stock sales are not suspicious because "Defendants both

_____

[12] Defendants contend that this fact is "of little consequence where, as here, the Class Period begins only a mere seven weeks after Twist's initial public offering." Mot. at 27. But they provide no explanation for this conclusory assertion and cite no supporting authority.

27

retained substantial shares of Twist stock after their alleged trades." Mot. at 26.  But that is misleading at best.  As Plaintiff alleges, Defendants Leproust and Thorburn sold 76% and 85% of their holdings, respectively, during the Class Period.  ¶¶181, 183.  This is indicative of scienter. *Intuitive*, 2017 WL 4355072, at *4 (stock sales support scienter where defendants sold 40% and 30% of their respective holdings).

### 4.  Holistically, Lead Plaintiff's Allegations Create a Strong Inference of Scienter

Defendants attempt to defeat the robust allegations of scienter in the Complaint by deploying a "divide and conquer" approach—attacking each element of scienter individually instead of addressing them "collectively." Although each category above is sufficient standing alone to create a strong inference of scienter, taken together the inference is overwhelming. *Tellabs*, 551 U.S. at 322–23 (mandating this approach).

Together with Plaintiff's other allegations, Leproust's statement in April 2022 adds to her scienter.  Defendants try to dismiss it as an "anodyne" statement, but its import is clear: Leproust admitted that she withheld information from investors.  While Defendants argue that Leproust did not specifically admit to withholding the material information relevant to the challenged statements here, Mot. at 25, she nevertheless admits that she deliberately withheld from investors negative information that was so serious that it kept her awake "laying in bed at four in the morning saying 'what did I do; how can I get myself out of this.'"  ¶185.  This is probative of scienter and adds to the substantial allegations discussed above.

Defendants offer ***no competing inference***.  Instead, they contend that there can be no scienter regarding their financial misstatements because Twist's auditors did not catch Defendants' misconduct, there was no financial restatement, and there was no government investigation.  Mot. at 27–28.  As discussed above, this is neither dispositive nor factually accurate.  *See supra* **III B. 1**; *see also Alaska Elec. Pension Fund v. Adecco S.A.*, 371 F. Supp. 2d 1203, 1220 n.4 (S.D. Cal. 2005) ("The lack of a restatement is not dispositive when a plaintiff has otherwise met the PSLRA's pleading requirements.").

Citing two out-of-circuit cases, Defendants claim that the lack of an investigation defeats

28

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION          5:22-cv-08168-EJD
TO DEFENDANTS' MOTION TO DISMISS

scienter for the financial misstatements.  But neither case is helpful.  *In re 2007 Novastar Fin. Inc., Sec. Litig.*, 2008 WL 2354367 (W.D. Mo. June 4, 2008), *aff'd*, 579 F.3d 878 (8th Cir. 2009) did not deal with allegations that Defendants falsified any accounting, and is not on point. And although the court in *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307 (S.D. Fla. 2004) noted that there was no restatement or auditor resignation, its findings were based on a lack of suspicious stock sales and that Defendants were not confronted with the fraudulent misstatements.

Defendants also contend that the fact that Twist's revenues have increased in FY 2023, and that 98% of their revenues were from repeat customers "demolishes Plaintiff's premise" concerning the state of Twist's products and the flood of customer complaints.  Mot. at 28.  These purported facts, external to the Complaint and after the Class Period, are irrelevant to whether Defendants knew their statements were false and misleading when made and Defendants fail to explain the relevance.  They are also misleading because Twist defines "repeat customer" as a customer who purchased "more than once in the current fiscal year," it does not mean customers in the Class Period who have returned to purchase more in 2023.  Mot., Ex. 29 at 50.

## IV.     PLAINTIFF STATES SECURITIES ACT CLAIMS

Defendants attack Plaintiff's claims under the Securities Act on the grounds of falsity and standing.  Both arguments fail.  For the same reasons discussed above, Plaintiff has adequately pleaded the falsity of the misstatements at issue in the Securities Act claims.  *Supra* **III B**.[13]  With respect to the statement in Twist's 2019 Form 10-K that it does not offer retrospective discounts or rebates, ¶121, Defendants argue that this statement is not false because they also disclose that they "reduce revenue by the amount of expected returns, which have been insignificant" and because the Complaint has no allegations showing the statement is false.  Mot. at 29.  Defendants are wrong on both counts.  The disclosure of possible returns does not disclose rebates or discounts. And the Complaint includes specific allegations that Defendants instructed Twist employees to give "serious discounts" and provide replacement products for free, ¶82, FE-4, and executives

---

[13] Because Plaintiff's allegations satisfy Rule 9(b), the issue of whether Rule 9(b) applies to Plaintiff's Securities Act claims is irrelevant.

29

authorized, the Company to give discounts to every customer, ¶88, FE-5.  As such, Plaintiff has pleaded falsity with respect to the claims under the Securities Act.

Defendants do not challenge Plaintiff's Article III standing, but instead argue that Plaintiff lacks Section 11 standing for Twist's February 2022 Offering.  This argument is foreclosed by *Melendres*, 784 F.3d at 1262.  Under *Melendres*, courts are merely required to determine whether the Plaintiff has Article III standing (which is uncontested here), and then defer until the class certification stage the question of whether the Plaintiff has the representative capacity to assert the rights of others who have similar, but not identical, interests.  *Id.*  Defendants' Motion fails to acknowledge *Melendres*, and instead cites cases predating it.  *See Welgus v. TriNet Grp., Inc.*, 2017 WL 6466264, at \*25 (N.D. Cal. Dec. 18, 2017), *aff'd*, 765 F. App'x 239 (9th Cir. 2019) (adopting this approach); *see also In re Volkswagon "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2017 WL 3058563, at \*4 (N.D. Cal. July 19, 2017) (*Melendres* "clearly forecloses" class standing arguments until the class certification stage of the litigation).[14]

## V.    PLAINTIFF STATES 20(a) CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS

Defendants do not dispute that Leproust and Thorburn are controlling persons and thus subject to liability under Section 20(a) of the Exchange Act and Section 15 of the Securities Act.

## VI.    CONCLUSION

Defendants' motion to dismiss should be denied.  Should the Court grant dismissal, Plaintiff respectfully requests leave to amend, as such amendment would not be futile.

---

[14] Even at the class certification stage, Lead Plaintiff would be an adequate representative for absent class members who purchased in the February 2022 offering.  The offerings at issue shared misstatements and implicated the same concerns.

30

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS                                                5:22-cv-08168-EJD

Dated: January 26, 2024

Respectfully submitted,

By: */s/ Joseph A. Fonti*
**BLEICHMAR FONTI & AULD LLP**
Joseph A. Fonti (*pro hac vice*)
jfonti@bfalaw.com
George N. Bauer (*pro hac vice*)
gbauer@bfalaw.com
Nancy A. Kulesa (*pro hac vice*)
nkulesa@bfalaw.com
Benjamin Burry (*pro hac vice*)
bburry@bfalaw.com
Joseph W. Baier (*pro hac vice*)
jbaier@bfalaw.com
7 Times Square, 27th Floor
New York, New York 10036
Tel: (212) 789-1340
Fax: (212) 205-3960

– and –

Lesley E. Weaver (Bar No. 191305)
lweaver@bfalaw.com
1330 Broadway, Suite 630
Oakland, California 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020

*Counsel for Lead Plaintiff Policemen's Annuity
and Benefit Fund of Chicago and Lead Counsel
for the Putative Class*

John A. Kehoe (*pro hac vice*)
**KEHOE LAW FIRM, P.C.**
41 Madison Avenue, 31st Floor
New York, NY 10010
Telephone: (215) 792-6676
jkehoe@kehoelawfirm.com

*Additional Counsel for Lead Plaintiff
Policemen's Annuity and Benefit
Fund of Chicago*

31

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION          5:22-cv-08168-EJD
TO DEFENDANTS' MOTION TO DISMISS

## CERTIFICATE OF SERVICE

I hereby certify that on January 26, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 26, 2024.

*/s/ Joseph A. Fonti*
Joseph A. Fonti

32

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION                5:22-cv-08168-EJD
TO DEFENDANTS' MOTION TO DISMISS