JAMES N. KRAMER (SBN 154709)
jkramer@orrick.com
ALEXANDER K. TALARIDES (SBN 268068)
atalarides@orrick.com
M. TODD SCOTT (SBN 226885)
tscott@orrick.com
ARIEL B. WINAWER (SBN 317821)
awinawer@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

Attorneys for Defendants
TWIST BIOSCIENCE CORPORATION, EMILY M.
LEPROUST, and JAMES M. THORBURN

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| ANTHONY JOSEPH PETERS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TWIST BIOSCIENCE CORPORATION, EMILY M. LEPROUST, and JAMES M. THORBURN,<br><br>Defendants. | Case No. 5:22-cv-08168-EJD<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**<br><br>Date:     April 18, 2024<br>Time:     9:00 a.m.<br>Judge:    Honorable Edward J. Davila<br>Dept:     4, 5th Floor |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   ARGUMENT ..................................................................................................... 1

    A.   Plaintiff Fails To Plead Loss Causation ................................................. 1

    B.   Plaintiff Fails To Plead Falsity ............................................................... 4

        1.   The Challenged Statements Regarding Financial Metrics .............................. 4

        2.   The Challenged Statements Regarding Twist's Products ............................... 7

        3.   The Single Statement Challenged Only Under Section 11 ............................ 10

    C.   Plaintiff Fails To Plead Facts Creating A "Strong Inference" Of Scienter ............ 11

        1.   Plaintiff Does Not Allege Twist's Corporate Scienter ................................. 11

        2.   The FEs Do Not Create A Strong Inference of Scienter ............................... 12

        3.   Defendants' Stock Sales Do Not Create An Inference of Scienter ............... 15

        4.   Plaintiff's Other Scienter Arguments Are Unavailing ................................. 16

    D.   Plaintiff Cannot Challenge The February 2022 Offering Under Section 11 ......... 17

    E.   Plaintiff's Request To Strike Portions Of The Motion Is Unwarranted ............... 18

III.  CONCLUSION .................................................................................................. 18

DEFENDANTS' REPLY IN SUPPORT OF
MOTION TO DISMISS, 5:22-CV-08168-EJD

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) ...................................................................................... 10

*Barbera v. WMC Mortgage Corp.*,
  2006 WL 167632 (N.D. Cal. Jan. 19, 2006) ............................................................. 6

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020) ............................................................................. 1, 2, 4

*In re CBT Grp. PLC Sec. Grp. Litig.*,
  2001 WL 1822729 (N.D. Cal. Dec. 28, 2001) ...................................................... 6, 7

*In re Century Aluminum Co. Sec. Litig.*,
  729 F.3d 1104 (9th Cir. 2013) ................................................................................. 18

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
  2019 WL 6877195 (N.D. Cal. Dec. 17, 2019) .................................................... 6, 11

*In re eHealth, Inc. Sec. Litig.*,
  2023 WL 6390593 (N.D. Cal. Sept. 28, 2023) .......................................................... 2

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023) .................................................................................... 13

*Glazer Cap. Mgmt., LP v. Magistri*,
  549 F.3d 736 (9th Cir. 2008) ............................................................................. 12, 13

*Kampe v. Volta Inc.*,
  2024 WL 308262 (N.D. Cal. Jan. 26, 2024) ....................................................... 5, 10

*Lamartina v. VMware, Inc.*,
  2021 WL 4133851 (N.D. Cal. Sept. 10, 2021) ........................................................ 15

*Leacock v. IonQ, Inc.*,
  2023 WL 6308045 (D. Md. Aug. 28, 2023) .......................................................... 2, 3

*In re LeapFrog Enters., Inc. Sec. Litig.*,
  527 F. Supp. 2d 1033 (N.D. Cal. 2007) ................................................................... 15

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ................................................................................. 12

*Lomingkit v. Apollo Educ. Grp. Inc.*,
  2017 WL 633148 (N.D. Cal. Feb. 16, 2017) ............................................................. 7

# TABLE OF AUTHORITIES (CONTINUED)

**Cases**                                                                                          **Page(s)**

*Lozada v. TaskUs, Inc.*,
   2024 WL 68571 (S.D.N.Y. Jan. 5, 2024) ................................................................. 2

*Lu v. Align Tech., Inc.*,
   417 F. Supp. 3d 1266 (N.D. Cal. 2019) ................................................................ 7

*Melendres v. Arpaio*,
   784 F.3d 1254 (9th Cir 2015) ........................................................................... 17

*In re Mullen Auto. Sec. Litig.*,
   2023 WL 8125447 (C.D. Cal. Sept. 28, 2023) ..................................................... 2

*In re Nektar Therapeutics Sec. Litig.*,
   34 F.4th 828 (9th Cir. 2022) .................................................................... 1, 2, 3, 4

*Ng v. Berkeley Lights, Inc.*,
   2024 WL 695699 (N.D. Cal. Feb. 20, 2024) ............................................ 1, 2, 3, 4

*Oh v. Hanmi Fin. Corp.*,
   621 F. Supp. 3d 1075 (C.D. Cal. 2022) ................................................................ 7

*Or. Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*,
   774 F.3d 598 (9th Cir. 2014) ............................................................................. 11

*Orshan v. Apple Inc.*,
   2023 WL 3568079 (N.D. Cal. Mar. 31, 2023) (Davila, J.) .................................. 18

*In re Plug Power, Inc. Sec. Litig.*,
   2023 WL 5577276 (S.D.N.Y. Aug. 29, 2023) ...................................................... 6

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*,
   2020 WL 2559939 (N.D. Cal. May 20, 2020) ...................................................... 6

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) .............................................................. 13, 16, 17

*Prodanova v. H.C. Wainwright & Co., LLC*,
   993 F.3d 1097 (9th Cir. 2021) ........................................................................... 11

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ............................................................................. 8

*In re QuantumScape Sec. Litig.*,
   580 F. Supp. 3d 714 (N.D. Cal. 2022) ................................................................. 2

DEFENDANTS' REPLY IN SUPPORT OF
MOTION TO DISMISS, 5:22-CV-08168-EJD

# TABLE OF AUTHORITIES (CONTINUED)

**Cases**                                                                                 **Page(s)**

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012).............................................................................................. 4

*Rubke v. Capitol Bancorp Ltd.*,
    551 F.3d 1156 (9th Cir. 2009)........................................................................................... 4

*Scheller v. Nutanix, Inc.*
    450 F. Supp. 3d 1024 (N.D. Cal. 2020) ........................................................................ 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S 308 (2007) ....................................................................................................... 17

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002).......................................................................................... 15

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) ..................................................................... 12, 16

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022)............................................................................................ 10

*Wozniak v. Align Tech., Inc.*,
    850 F. Supp. 2d 1029 (N.D. Cal. 2012) ......................................................................... 12

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009)....................................................................................*passim*

**Statutes and Rules**

15 U.S.C.
    § 77k, Securities Act Section 11 ..............................................................................*passim*
    § 78j(b), Exchange Act Section 10(b) ......................................................................*passim*
    § 78u-4, PSLRA.................................................................................... 4, 6, 13, 15

17 C.F.R.
    § 240.105-1, SEC Rule 10b5-1 ...................................................................................... 16

Fed. R. Civ. R.
    Rule 9(b)....................................................................................................................... 4, 11

N.D. Cal.
    L.R. 3-4 .......................................................................................................................... 18

DEFENDANTS' REPLY IN SUPPORT OF
MOTION TO DISMISS, 5:22-cv-08168-EJD

## I.    **INTRODUCTION**

Defendants' Motion to Dismiss ("Motion" or "Mot.") demonstrates that Plaintiff's allegations fail to state a claim under either Section 10(b) of the Exchange Act or Section 11 of the Securities Act. And because Plaintiff's Sections 10(b) and 11 claims fail, its control person claims under Sections 15 and 20(a) likewise fail. As detailed below, Plaintiff's opposition ("Opp.") fails to overcome the Motion's demonstration and confirms that the AC should be dismissed.

## II.    **ARGUMENT**

### A.    **Plaintiff Fails To Plead Loss Causation**

As the Motion explains, Plaintiff's Section 10(b) claim fails as a matter law because Plaintiff attempts to plead loss causation based solely on the Scorpion Report, which, under controlling Ninth Circuit precedent, cannot serve as a corrective disclosure. *See* Mot. at 9. Plaintiff's arguments in opposition are all unavailing and were recently rejected by Judge Gilliam in dismissing another Section 10(b) claim that, like the one here, relied on a short-seller report by Scorpion to plead loss causation. *See Ng v. Berkeley Lights, Inc.*, 2024 WL 695699, at *16-17 (N.D. Cal. Feb. 20, 2024).

First, citing *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781 (9th Cir. 2020), Plaintiff argues that the Ninth Circuit rejects "bright line" rules for pleading loss causation. *See* Opp. at 6. But *BofI* **confirms** Plaintiff's failure to plead loss causation, as it held that reports "by anonymous short-sellers who had a financial incentive to convince others to sell," and that "included disclaimers from the authors stating that they ma[k]e 'no representation as to the accuracy or completeness of the information [provided],'" cannot serve as corrective disclosures. 977 F.3d at 797. In *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828 (9th Cir. 2022), the Ninth Circuit held that such reports cannot serve as corrective disclosures even if they "provide[d] new information to the market" and "related directly to the alleged false statements." *Id.* at 840. Judge Gilliam recently applied *BofI* and *Nektar* to hold that another short-seller report by Scorpion could not be used to plead loss causation:

> [T]he Court finds that the Scorpion Report was not a corrective disclosure. Importantly, the report contains a multitude of disclaimers as to its completeness and accuracy …. Because Scorpion Capital is an admitted short-seller with an admitted financial incentive to convince others to sell, the nature of the Scorpion Report would invariably cause investors to take its "contents with a healthy grain of salt." *BofI*, 977 F.3d at 797; *accord Nektar*, 34 F.4th at 840. This is still so even if the Scorpion Report "provide[d] new information to the market" by providing analysis that "pulled

DEFENDANTS' REPLY IN SUPPORT OF
MOTION TO DISMISS, 5:22-CV-08168-EJD

together disparate sources and connected data in ways that were not plainly obvious." *Nektar*, 34 F.4th at 840. As in *BofI* and *Nektar*, the "character" of the Scorpion Report—produced by a "self-interested" short-seller "who disavowed any accuracy"—renders it inadequate to amount to a corrective disclosure. *Id.*; *see also BofI*, 977 F.3d at 797[.]

*Berkeley Lights*, 2024 WL 695699, at *16-17. Plaintiff's cited cases to the contrary are unavailing. Judge Orrick's decision in *In re QuantumScape Sec. Litig.,* 580 F. Supp. 3d 714 (N.D. Cal. 2022), **pre-dates** *Nektar*, and while it cited *BofI*'s holding that the allegations of a lawsuit by a former employee can constitute a corrective disclosure, it did not acknowledge or address *BofI*'s separate holding regarding the inadequacy of relying on a short-seller report to plead loss causation. *Id.* at 731-32. Similarly, *In re Mullen Auto. Sec. Litig.*, 2023 WL 8125447 (C.D. Cal. Sept. 28, 2023), did not even **mention** *Nektar*, or acknowledge or address *BofI*'s admonishment against relying on short-seller reports for pleading loss causation. *Id.* at *10-11. And *Lozada v. TaskUs, Inc.*, 2024 WL 68571 (S.D.N.Y. Jan. 5, 2024) is an out-of-circuit decision by a district court that, unlike this Court, was not bound by *Nektar* and *BofI* (which the court in *Lozada* did not even cite or consider).

Second, Plaintiff argues that *BofI* and *Nektar* are not controlling here because the Scorpion Report "is not anonymous," but was instead published by "Scorpion Capital LLC," a purportedly well-known entity. *See* Opp. at 7. The plaintiffs in *Berkeley Lights* made the exact same argument and Judge Gilliam readily rejected it because "the identity of the entity that sponsored the report (as opposed to the identity of any actual person who wrote the representations in it) does not change the 'character' of the report itself—namely, that it was based on secondhand information gathered by a self-interested short-seller." 2024 WL 695699, at *16 n.7 (citing *Nektar*, 34 F.4th at 833-34). In any event, under *Nektar*, the Scorpion Report **was** functionally anonymous given that it does not identify any individual author. *See Nektar*, 34 F.4th at 840 (holding that short-seller report published by **Plainview LLC** was an "**anonymous**" short-seller report that disclaimed accuracy and thus could not serve as a corrective disclosure (emphasis added)); *In re eHealth, Inc. Sec. Litig.*, 2023 WL 6390593, at *2, *7-8 (N.D. Cal. Sept. 28, 2023) (holding that, under *Nektar* and *BofI*, a short-seller report published by "research firm **Muddy Waters Capital**" could not serve as a corrective disclosure because it "**has no identified [individual] author**" and disclaimed any accuracy (emphases added)). Consistent with *Nektar*, the court in *Leacock v. IonQ, Inc.*, 2023 WL 6308045 (D. Md. Aug. 28,

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS, 5:22-cv-08168-EJD

2023) found that another short-seller report by Scorpion (which also did not identify any individual author) was "an ***anonymous*** short-seller report," and relying on *Nektar*, held that the report could not serve as a corrective disclosure. *Id.* at \*23 (emphasis added).

Third, Plaintiff argues that the Scorpion Report did not "disclaim" any accuracy. *See* Opp. at 7-8. But as Judge Gilliam found when confronted with another report by Scorpion that included the same disclaimer language included in the Report here, the Scorpion Report "contains a multitude of disclaimers as to its completeness and accuracy." *Berkeley Lights*, 2024 WL 695699, at \*16. Similarly, in *Leacock*, which also involved another report by Scorpion that included the same disclaimer language included in the Report here, the court held that, "[a]s in *In re Nektar*," "the nature" of Scorpion's "anonymous short-seller report"—"in particular, its disclaimers as to the accuracy of the information it purports to 'reveal'"—disqualified it from serving as a corrective disclosure. 2023 WL 6308045, at \*4, \*23. Indeed, the Scorpion Report's disclaimer language is materially indistinguishable from that used in the short-seller report in *Nektar*. *Compare Nektar*, 34 F.4d at 834 ("The Plainview Report [] contained a disclaimer that its authors 'make no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information' in the report."), *with* ECF No. 87-1 at 2 ("Scorpion Capital LLC cannot and does not provide any representations or warranties with respect to the accuracy of [its source] materials…. [W]e cannot and do not provide any representations or warranties with respect to the accuracy of the information [any experts] have provided to us. The quotations of experts used in this article do not reflect all information they have shared with us …. In addition, the experts have typically received compensation for their conversations with us and may have conflicts of interest or other biases … which may give them an incentive to provide us with inaccurate, incomplete or otherwise prejudiced information. The former employees … we spoke with are by definition separated from the company and thus the information they have provided may be outdated.… We have not conducted any diligence or other verification with respect to any social media posts … [and] we cannot and do not provide any representations or warranties with respect to the[ir] accuracy ….").

Finally, Plaintiff suggests that the Scorpion Report can serve as a corrective disclosure because it was not based solely on public information. *See* Opp. at 5-7. But Ninth Circuit law is clear

that it is the "character" of the Report—produced by a "self-interested" short-seller "who disavowed any accuracy"—that "render[s] it inadequate." *Nektar*, 34 F.4th at 840. This is true even if the Report purports to provide new, previously undisclosed, information. *Id.* (short-seller report could not serve as a corrective disclosure even if it "provide[d] new information to the market"); *see also Berkeley Lights*, 2024 WL 695699, at *17 (holding that, under *BofI* and *Nektar*, "even if the Scorpion Report 'provide[d] new information to the market' …, the 'character' of the Scorpion Report—produced by a 'self-interested' short-seller 'who disavowed any accuracy'—renders it inadequate to amount to a corrective disclosure"). In short, the Ninth Circuit's controlling decisions in *Nektar* and *BofI* compel the finding that the Scorpion Report cannot serve as a corrective disclosure, and thus Plaintiff's Section 10(b) claim should be dismissed for failure to adequately plead loss causation.

### B.    Plaintiff Fails To Plead Falsity

Plaintiff does not dispute that, with one exception, its Section 11 claim is based on the same alleged misstatements underlying its Section 10(b) claim, or that its Section 11 claim is governed by Rule 9(b). *See* Mot. at 29; Opp. at 29-30. The standard for pleading Section 11 falsity under Rule 9(b) is the same as that for pleading Section 10(b) falsity under the PSLRA. *See Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1165 (9th Cir. 2009); *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012). As the Motion demonstrates, the AC fails to plead in accordance with the PSLRA and Rule 9(b) that any of the challenged statements was actionably false or misleading.

#### 1.    The Challenged Statements Regarding Financial Metrics

As the Motion details, Plaintiff's allegations regarding purported GAAP violations fail to plead falsity for multiple reasons. *See* Mot. at 10-13. First, putting aside the fact that applying GAAP involves an ***exercise of judgment***, Plaintiff's claim that Twist improperly accounted for R&D expenses is based ***solely*** on the assertions of FE-1, a lab employee who never worked in Twist's accounting department and is not alleged to have personal knowledge of Twist's accounting decisions. Plaintiff says that it is enough to allege that "FE-1 personally billed production costs to the R&D department," Opp. at 8-9, but allegations that FE-1 entered contracts "into [Twist's] expense and purchase order approval system," or "designated the R&D department as the appropriate department to bill the cost to in Twist's system that tracked such information," AC ¶ 58,

says nothing about how Twist actually accounted for the expenses, or whether such accounting violated GAAP. Put simply, because FE-1 did not perform an accounting function and did not have personal knowledge of Twist's accounting decisions, FE-1's assertions are insufficient to establish the falsity of Twist's accounting. *See* Mot. at 10 (citing cases); *Kampe v. Volta Inc.*, 2024 WL 308262, *13 (N.D. Cal. Jan. 26, 2024) ("Plaintiffs do not allege that CW1 performed an accounting function or aver any facts that would permit the Court to reasonably infer that CW1 was in a position to have reliable information about Volta's accounting practices").

Second, Plaintiff is wrong about the GAAP rule governing accounting for R&D expenses. *See* Mot. at 10-11. ASC 730 does not draw a strict binary distinction between work performed on existing products and R&D, but recognizes a sliding scale where the "improvement," "testing," "evaluation," "modification" and "advancement" of existing products can be recognized as an R&D expense. *Id.* at 11. Plaintiff argues that some unspecified amount of costs here were categorically "not incurred to 'improve,' 'modify,' or 'advance the design of existing products,'" Opp. at 9, but the AC acknowledges that costs were "shared resource[s]" used by production *and* R&D, AC ¶ 58. As the Motion shows, shared resources are "within the scope of ASC 730 and classified as research and development costs." ECF No. 87-3 at 3-4. Plaintiff further argues that Twist "specifically told investors ... that R&D costs included 'costs incurred for the *development* of [Twist's] products,' not the production of those products," Opp. at 9, but Plaintiff misrepresents Twist's disclosures, which actually stated that Twist's R&D expenses "consist *primarily* of costs incurred for the development of [Twist's] products," AC ¶¶ 52-53 (emphasis added), and thus included other related costs, too.

At bottom, FE-1's conclusory allegations fail to raise a plausible inference of any GAAP violation, particularly given that Twist has not restated its Class Period financial statements, and its auditors have maintained their opinions over those financial statements. *See* Mot. at 11 (citing cases). Plaintiff argues that Twist's audits were conducted on a "test basis," Opp. at 9, but cannot cite any authority to show how that affects the analysis. Plaintiff also notes that Twist's auditors "identif[ied] three material weaknesses" at the Company, *id.* at 10, but as the audit opinions themselves show, none of those weaknesses related to accounting for R&D expenses or other financial metrics, *see* ECF No. 87-8 at 65-66. And while Plaintiff cites Twist's financial statements *after* the AC was filed

DEFENDANTS' REPLY IN SUPPORT OF
MOTION TO DISMISS, 5:22-cv-08168-EJD

to argue falsity, Opp. at 9, those post-Class Period financial statements do not in any way show that Twist's financial statements during the Class Period were in any way false (and, in any event, "[i]t is axiomatic that the complaint may not be amended by briefs in opposition to a motion to dismiss," *Barbera v. WMC Mortgage Corp.*, 2006 WL 167632, at *2 n.4 (N.D. Cal. Jan. 19, 2006)).

Third, the challenged disclosures regarding R&D expenses were statements of opinion and are not alleged to have been both subjectively and objectively false when made, such that they could be actionable. *See* Mot. at 12. Indeed, none of the FEs offers **any** insight as to the sincerity of Defendants' beliefs about Twist's accounting decisions. Given that fatal fact, Plaintiff cites two cases to argue that "accounting for revenues and costs ... are not opinions." Opp. at 11. But one of Plaintiff's cited cases does not address falsity or opinion statements at all, *see In re Plug Power, Inc. Sec. Litig.*, 2023 WL 5577276, at *23 (S.D.N.Y. Aug. 29, 2023) ("the Court need not reach the issue of a misstatement or omission"), and the other recognizes that where a plaintiff alleges particularized facts to establish "basic details as the approximate amount by which revenues and earnings were overstated," and "the dates of any of the [improperly recognized] transactions," a court can reasonably infer that defendants misstated "existing things in the realm of 'fact.'" *Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, 2020 WL 2559939, at *4-5 (N.D. Cal. May 20, 2020). Here, by sharp contrast, Plaintiff does not aver any particularized facts to show that any specific expense was improperly accounted as an R&D expense, let alone by how much, and instead quarrels with Twist's application of ASC 730, an exercise that necessarily requires an exercise of judgment as to what, for example, constitutes the "improvement," "testing," and "modification" of products, *see* ECF No. 87-2 at 8, 10, and thus necessarily yields statements of opinion.

Plaintiff also argues that because FE-1 was at Twist for the majority of the Class Period, the falsity of Twist's concurrent financial statements can be assumed. *See* Opp. at 12. But "[g]enerally alleging wrongdoing during [a] CW's employment at the Company does not provide the particularity required under PSLRA. In short, CW reports must be specific in their time references to support that each alleged misstatement was false when made." *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *14 (N.D. Cal. Dec. 17, 2019) (emphasis omitted). The cases Plaintiff cites, *see* Opp. at 12, either buttress that holding, *see In re CBT Grp. PLC Sec. Grp. Litig.*,

2001 WL 1822729, at *6 (N.D. Cal. Dec. 28, 2001) (falsity alleged where the complaint specifically alleged "numerous instances of improper revenue recognition"), or do not address confidential witness allegations at all, *see Oh v. Hanmi Fin. Corp.*, 621 F. Supp. 3d 1075, 1085 (C.D. Cal. 2022); *see also Lomingkit v. Apollo Educ. Grp. Inc.*, 2017 WL 633148, *21 (N.D. Cal. Feb. 16, 2017) (discussing *In re CBT*, noting that "[w]ithout the 'who, what, when, where, and how' … the court cannot meaningfully evaluate the plausibility of [plaintiff's] claims").

Finally, Plaintiff argues that the "internal Twist policy" to allocate "shared resources" to R&D "subsume[s] the entire Class Period," and thus is sufficient to establish the falsity of the challenged financial metrics. *See* Opp. at 12 (citing AC ¶ 58). But that purported "policy": (i) is not alleged to have been known by any Defendant, (ii) in fact ***aligns*** with ASC 730, because it recognizes that resources shared between production and R&D can be allocated to R&D, *see* Mot. at 11, and (iii) is not specifically alleged with supporting facts to have ever been employed improperly, such that any particular expense was misallocated in Twist's financial statements.

### 2. The Challenged Statements Regarding Twist's Products

Plaintiff's arguments regarding the challenged product-related statements are equally unavailing. As the Motion shows, the product-related statements are puzzle-pled, with all nineteen statements alleged to be misleading for the same six reasons, even where those reasons have no factual connection to the statements themselves. *See* Mot. at 13-14 & n. 9. Plaintiff argues that the AC is not puzzle-pled because Defendants were able to "parse out with relative ease the statements at issue and the reasons as to why they are alleged to be false and misleading," Opp. at 13, but at the same time argues that the Motion should be denied because Defendants "defend against only one reason for falsity" and "fail[ed] to address the other" factually unrelated "reasons for falsity for each challenged statement," *id.* at 17. Plaintiff cannot have it both ways. Similarly, the AC fails to identify which specific portions of the block-quoted statements are alleged to be false, *see* Mot. at 14, yet Plaintiff criticizes Defendants for supposedly "cherry-picking," Opp. at 14, "ignoring," *id.* at 15, or "omitt[ing] from their Motion" certain portions of the block-quoted statements, *id.* at 16, as if it was Defendants' burden to "discern which specific statements Plaintiff contends to be false or misleading," *Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1274 (N.D. Cal. 2019).

Many of the challenged product-related statements are also inactionable puffery. *See* Mot. at 14-15 & n.10. Plaintiff does not address any of the case law the Motion cites in support, and instead argues that the challenged statements are actionable because they "are capable of objective verification." *See* Opp. at 14. But Plaintiff does not cite any authority to show how generalized, vague and mildly optimistic statements like "our product launches . . . were very well received," AC ¶ 159, or "we are very flexible," *id.* ¶ 162, for example, can be objectively verified. Plaintiff further argues that "[w]hether the Company indeed shipped perfect DNA, had higher uniformity than competitors, and whether its production process worked 100% of the time [are] objectively verifiable," Opp. at 15, but Plaintiff does not allege any specific facts to show that those statements were false when made, *see* Mot. at 16. And Plaintiff is correct that it is "irrelevant" whether Dr. Leproust said that Twist "see[s] perfect DNA" or "ship[s] perfect DNA," Opp. at 15 n.6 (emphasis omitted)—in either case her use of "perfect" was inactionable puffery, *see* Mot. at 15 & n.11.

Plaintiff also argues that statements like Twist "achieve[d] high levels of quality, precision, automation," *id.* ¶149, "automated [its] entire workflow," *id.* ¶153, and allowed "customers to quickly deploy [its] technologies," *id.* ¶152, are actionable because they "address specific aspects of a company's operation that the speaker knows to be performing poorly," Opp. at 14 (citing *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017)). But that rule applies only where, unlike here, the statements go "beyond [the] 'feel good' optimis[m]" displayed here and offer a "concrete description" that "affirmatively create[s] an impression of a state of affairs that differ[s] in a material way from the one that actually exist[ed]," *Quality*, 865 F. 3d at 1144 (citation omitted). Nor are there any particularized allegations to show that any Defendant knew these areas of the Company to be "performing poorly," and the Company's business in fact grew throughout the Class Period, with 98% of revenues from repeat customers in 2022 and 2023. *See* Mot. at 2-3.

Several of the product-related statements are also statements of opinion. *See* Mot. at 15. Plaintiff argues that the opinions are nevertheless actionable because "the speaker did not [honestly] hold the belief she professed" or there are "facts going to the basis for the issuer's opinion ... whose omission makes the opinion statement … misleading." Opp. at 16 (citation omitted). But the AC does not allege any facts at all regarding Defendants' beliefs or the basis of their opinions. *See* Mot.

at 15-16.  Plaintiff further argues that certain of the opinions are actionable because they contain misleading embedded facts about error rates and their production capabilities, Opp. at 16, but as the Motion demonstrates, the AC does not allege any particularized facts to establish those "embedded facts" were false at the time the statements were made, *see* Mot. at 17-18.

At bottom, none of the product-related statements are adequately alleged to be false or misleading. Mot. at 16-20. As for the **statements regarding production automation**, the Motion demonstrates that Twist's claims to have "automated its entire workflow," AC ¶ 151, are not inconsistent with Twist utilizing employee labor, or experiencing problems with its production line, or not being fully "scalable," *id.* ¶ 163.  Plaintiff cannot dispute that fatal flaw, and instead insists that Twist's production line was in fact "***never*** automated" ***at all***, and that "Defendants ***never*** developed an automated production process," period. Opp. at 18. But the AC does not allege that Twist's production line was "never automated"—to the contrary, the FEs repeatedly concede that Twist's production line was automated, just not to the FEs' satisfaction. *See, e.g.*, AC ¶ 60 (Twist would not "create automation around" a product for "one or two years"), ¶ 79 ("some steps in production . . . had to be done manually," and Twist needed "more automation"). Plaintiff also now insists that "Twist ***never*** scaled production for existing products," Opp. at 18, but the AC does not allege that either—indeed, FE-1 admits that certain of Twist's "contracts ***scaled with production***, so that Twist had to pay more . . . ***as it produced more products***," AC ¶ 58 (emphases added).

The Motion likewise shows that the challenged **statements about product quality and error rates** are not inconsistent with the existence of certain product errors or customer complaints. Mot. at 17. Plaintiff argues that the error rate statements were misleading because Defendants used "falsified data" to "generate false error rates," Opp. at 18, but as the Motion details, the allegations Plaintiff cites in support of that claim are conclusory, and lacking in any specific facts that would show any specific challenged statement was false when made. As the Motion further shows, and Plaintiff does not dispute, the types of error rates discussed by the FEs, *see* AC ¶ 69 ("first task yield"), are different from the error rates referenced in the challenged disclosures, *id.* ¶¶ 150, 156 ("customizable set of oligo pools"), *id.* ¶ 157 ("non-clonal genes"). *See* Mot. at 18.

Plaintiff's challenge to the **statements about turn-around times** fails because (i) the

DEFENDANTS' REPLY IN SUPPORT OF
MOTION TO DISMISS, 5:22-CV-08168-EJD

statements are not promises or guarantees of specific turnaround times, such that exceptions would render the statements misleading; (ii) the FE's testimony concerns turn-around times for different products than those referenced by the challenged statements; and, in any event, (iii) none of the FEs provides any specific details to show that any specific challenged statement was false when made. *Id.*; *see also Kampe*, 2024 WL 308262 at *8 ("The complaint must specify such facts as the times, dates, places, benefits received, and other details of the alleged fraudulent activity."). Likewise, the challenged **statements about customer satisfaction** are not promises of absolute customer satisfaction, and Twist repeatedly disclosed that it "cannot guarantee" its products would consistently satisfy its customers. Mot. at 19. In any event, the FEs' claim that Twist generally misrepresented turn-around times to customers, *see* Opp. at 19, is not supported by specific factual allegations, and is rebutted by Twist's strong repeat business, *see* Mot. at 2-3.

Lastly, Plaintiff alleges that Defendants failed to disclose **lab contaminations**, but the Motion shows that (i) none of the challenged statements refers to lab contaminations, and so Twist had no duty to disclose lab contaminations, and (ii) Twist did, in fact, disclose a lab contamination event. *See* Mot. 19-20. In response, Plaintiff asserts that Twist misrepresented the ***scope*** of the lab contamination event that it disclosed, Opp. at 20, but that is not alleged in the AC, and is unsupported by specific facts in any event. Plaintiff also argues that the contamination events were so disruptive to Twist's business that failing to disclose them "is independently actionable," *id.*, but the case that Plaintiff cites for support addressed the inapposite situation where the defendants' statements referenced the subject matter of undisclosed problems, such that the "omission of any mention of the" problems "made the statements ... materially misleading," *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 702 (9th Cir. 2021). None of the challenged statements here refers to contamination events, so Twist had no independent duty to disclose any such event. *See Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 620 (9th Cir. 2022) ("A company must disclose a negative internal development only if its omission would make other statements materially misleading.").

### 3.    The Single Statement Challenged Only Under Section 11

Regarding the lone statement that Plaintiff challenges solely under Section 11—"[w]e do not offer retrospective discounts or rebates," AC ¶ 121—Plaintiff argues that paragraphs 82 and 88

of the AC include "specific allegations [by FE-4 and FE-5] that Defendants instructed Twist employees to give 'serious discounts'" and that "executives authorized" Twist "to give discounts to every customer." Opp. at 29-30 (citing AC ¶¶ 82, 88). But even crediting this conclusory assertion as true, it would not render the challenged statement false, given that Twist disclosed that its customer contracts may "contain prospective discounts," AC ¶ 121, and that it "reduced revenue by the amount of expected returns," Mot. at 5 (citations omitted). Nothing asserted by FE-4 or FE-5 in paragraphs 82 and 88 of the AC establishes that Twist provided *retrospective* discounts, as opposed prospective discounts. Nor do paragraphs 82 and 88 allege that any Twist employee *in fact* gave any retrospective discount to any customer, let alone specify *when* any purported retrospective discount was given, such that it would have rendered the challenged statement to have been false *when made*. *See City of Sunrise*, 2019 WL 6877195, at *14 ("CW reports must be specific in their time references to support that each alleged misstatement was false when made."); *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1106 (9th Cir. 2021) (to satisfy Rule 9(b), a complaint must plead "the who, what, when, where, and how" of the misconduct charged).

### C.    Plaintiff Fails To Plead Facts Creating A "Strong Inference" Of Scienter

Plaintiff's Section 10(b) claim also fails because, as the Motion details, the AC fails to plead specific facts creating a strong inference that Defendants acted with scienter. *See* Mot. at 20-28.

#### 1.    Plaintiff Does Not Allege Twist's Corporate Scienter

As an initial matter, Plaintiff argues that the Motion "do[es] not challenge Defendant Twist's [corporate] scienter" and thus concedes it. Opp. at 21. But as the Motion notes, where, as here, the plaintiff seeks to hold individuals and a company liable on a securities fraud theory, the Ninth Circuit requires that the plaintiff allege scienter with respect to each of the individual defendants. *See* Mot. at 20; *Or. Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 607 (9th Cir. 2014). Indeed, Plaintiff's only basis for pleading Twist's scienter is the allegation that "Defendants Leproust and Thorburn, both of whom acted with scienter, had actual and apparent authority over Twist and acted within the scope of their apparent authority in making the [alleged] misstatements at issue" and thus "*[t]heir scienter is imputed to the Company*." AC ¶ 194 (emphasis added). Because Plaintiff has not adequately pled the scienter of the Individual Defendants

"responsible for actually making the [allegedly misleading] statements[,]" there can be no finding of corporate scienter. *See Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008).

### 2. The FEs Do Not Create A Strong Inference of Scienter

As the Motion shows, Plaintiff's FE allegations do create a strong inference of scienter because none of the FEs "identify any specific information that was either received or communicated by any Individual Defendant that would contradict any public statement at the time it was made." *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 814 (N.D. Cal. 2019); *see* Mot. at 20-25.

***Financial Metrics***. Plaintiff fails to plead any Defendant's scienter as to statements about Twist's financial metrics, because no FE is alleged to have worked in Twist's accounting or finance group, or to have had any involvement with Twist's accounting decisions, and thus no FE can speak to any Defendant's state of mind regarding Twist's accounting and any purported GAAP violation. *See* Mot. at 21. Plaintiff argues that "senior executives directed employees to misclassify costs in a deliberate effort to inflate gross margins, [], and that Leproust and Thorburn had access to and made use of data contradicting their statements." Opp. at 23. But as the Motion shows, *see* Mot. at 21, such vague, conclusory allegations do nothing to show that any specific costs were purportedly misallocated on any specific dates, *see, e.g.*, *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1042 (N.D. Cal. 2012) (allegations "fail" "in that they include no 'hard numbers' or other specifics"), or that any FE has ***personal knowledge*** of—and thus would be able to speak to—any Defendant's state of mind regarding Twist's accounting practices, *see, e.g.*, *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009) (dismissing CW allegations where CWs were "simply not positioned to know the information alleged"). In *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200 (9th Cir. 2016), the Ninth Circuit dismissed scienter allegations where the complaint failed to "allege the role of the Individual Defendants in preparing the company's accounting statements or what knowledge they had of GAAP principles." *Id.* at 1207. That is precisely the case here.

Plaintiff cites a series of cases for the proposition that "access to and use of internal data" establishes the Individual Defendants' scienter. *See* Opp. at 22-23. Far from establishing a bright-line rule, those cases demonstrate that an inference of scienter may be shown where a plaintiff can specifically allege how a defendant's knowledge of or access to ***specific*** information ***contradicted*** a

challenged statement made by the defendant. Here, the AC alleges only that unspecified "internal information" to which the Individual Defendants allegedly had access "contradicted Defendants' public statements," AC ¶ 67(a); *see also id.* ¶¶ 62(a), 169, 171, 175, but under the PSLRA, such allegations are meaningless without **specifics** detailing "the **actual contents** of the reports the executives purportedly … had access to" and **how** they contradicted any particular public statement at the time it was made, *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (emphasis added); *see also* Mot. at 23 (citing additional cases). Moreover, only one FE—FE-2—offers any allegation regarding the Individual Defendants' access to information regarding gross margins for Twist products, claiming that Dr. Leproust reported on gross margins at monthly meetings using information gathered from a company database. AC ¶ 67(a). But FE-2 does not provide any details whatsoever, as the PSLRA requires, to support the assertion that Dr. Leproust's reporting contradicted Defendants' public statements at the time they were made.

Plaintiff cites *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 772 (9th Cir. 2023) to argue that alleging a "pressure campaign concerning production costs and R&D is sufficient on its own to create a strong inference of scienter." Opp. at 22. In *Glazer*, however, the plaintiffs alleged that the defendants must have known that certain illusory deals were being miscategorized because the individual defendants **themselves participated** in the widespread pressure campaign to do so. *See* 63 F.4th at 772 (listing allegation from CW that pressure campaign came directly from defendant CEO). By contrast, the only allegation here regarding a supposed "pressure campaign" to purportedly misallocate costs comes from FE-1, an **engineer**, who states that Twist had a "known, understood policy ... [to] expense production costs to R&D," and that Twist COO Patrick Weiss, who is **not** a defendant, "instructed employees to expense costs to R&D as much as possible." AC ¶ 58. As the Motion explains, conclusory allegations concerning a "known, understood Company policy" are not indicative of any Individual Defendant's scienter. *See* Mot. at 21 (citing cases); *Zucco*, 552 F.3d at 998 ("generalized claims about corporate knowledge are not sufficient"). Conclusory allegations that Defendants were "focused on improving ... gross margins," or that margins were a "key metric" and "very important for [them]," Opp. at 22, are simply not factual bases from which to infer a company-wide pressure campaign.

***Twist's Products***. Plaintiff does not credibly dispute that none of the six FEs had personal knowledge of any Individual Defendant's state of mind regarding any challenged statement about Twist' products. *See Zucco*, 552 F.3d at 998 (FEs must have "reliable personal knowledge of the defendants' mental state"). Plaintiff concedes that only FE-1 and FE-4 are alleged to have had any direct contact with either Individual Defendant, Opp. at 25, yet fails to demonstrate how either FE had personal knowledge of any Individual Defendant's mental state with respect to the challenged statements. At most, as the Motion details, FE-1 is alleged to have raised unspecified "concerns" to Dr. Leproust in Monthly Performance Meetings that "senior executives rejected," AC ¶ 63(b), and FE-4 is alleged to have had "'hundreds' of conversations and meetings with Dr. Leproust" about product issues that Leproust discussed how to "manage," *id.* ¶ 82. But neither speaks to the falsity of any specific statements at issue. FE-2[1], FE-3, and FE-6[2] had only indirect contact with the Individual Defendants at monthly Company meetings, Opp. at 25, which is what cases like *Scheller v. Nutanix, Inc.* 450 F. Supp. 3d 1024, 1041 (N.D. Cal. 2020) and others have held to be insufficient. FE-5 is not alleged to have had any contact with either Individual Defendant.

Plaintiff also fails to address, and thus concedes, several key points in the Motion that show why the FEs' allegations regarding Twist's products do not create a strong inference of scienter. For example, with respect to FEs' allegations regarding contamination issues, Plaintiff fails to grapple with binding Ninth Circuit law which states that vague, conclusory, or generalized claims about general corporate knowledge are insufficient to show scienter. *See* Mot. at 22 (citing cases). Plaintiff likewise fails to address the fact that a defendant's general awareness of customer complaints is not indicative of scienter. *Id.* at 23 (citing cases). Finally, Plaintiff ignores that vague references to what "senior management" supposedly knew or did cannot be probative of scienter, as well as the fact

---

[1] Plaintiff claims that Dr. Leproust received reports that FE-2 prepared, Opp. at 25, but the AC does not allege that. Instead, it alleges that unnamed "managers and directors [purportedly] used the information from FE-2's reports to provide updates to Leproust on the status of [a cross contamination] issue [in 2022]." AC ¶ 71(a).

[2] Plaintiff alleges that Dr. Leproust "discussed the contamination issues at meetings," but does not allege that FE-6 attended any meeting where contamination was discussed. AC ¶ 90(b).

DEFENDANTS' REPLY IN SUPPORT OF
MOTION TO DISMISS, 5:22-CV-08168-EJD

that the Individual Defendants' use of various refrains or "tag lines" at unspecified times does nothing for the scienter analysis. *Id.* at 24 (citing cases).

### 3. Defendants' Stock Sales Do Not Create An Inference of Scienter

Plaintiff does not address or dispute the Motion's showing that the AC's motive allegations based on routine corporate objectives add nothing to the scienter analysis. *See* Mot. at 27. Nevertheless, Plaintiff argues that the Individual Defendants' scienter can be inferred from their purportedly "unusual" stock sales during the Class Period. *See* Opp. at 27-28. But that argument fails because Plaintiff fails to provide a meaningful trading history for purposes of comparison to the stock sales within the Class Period. *See* Mot. at 26. The Class Period spans nearly ***four years***. Plaintiff attempts to compare the Individual Defendants' trading history over those four years to a mere ***seven weeks before*** and ***ten months*** after the Class Period. This lopsided comparison does not constitute a "meaningful trading history" under Ninth Circuit precedent, and the single case Plaintiff cites in opposition does not dictate otherwise. *See* Opp. at 27 (citing *Lamartina v. VMware, Inc.*, 2021 WL 4133851 (N.D. Cal. Sept. 10, 2021)). In *Lamartina*, the plaintiff alleged an 18-month class period and contrasted the defendants' trading during those 18-months with their trading during the ***18-months directly preceding*** the class period. 2021 WL 4133851, at *13. Here, no comparable apples-to-apples trading history is alleged. *See Zucco*, 552 F.3d at 1006 ("Even if the defendant's trading history is simply not available, for reasons beyond a plaintiff's control, the plaintiff is not excused."). Moreover, Plaintiff has made "no attempt to plead how the timing of any specific sale by any specific defendant is linked to intentional misrepresentations or omissions or gives rise to an inference of scienter as to specific misstatements or omissions." *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1052 (N.D. Cal. 2007). As the Ninth Circuit has explained, when no temporal link between the alleged misstatements and any specific stock sale is pled and the class period is exceedingly long, it "becomes difficult to see how particular stock sales would strengthen allegations that particular statements were uttered with [scienter] at the times they were made." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093 (9th Cir. 2002). Plaintiff's failure to plead any such link here "operates to the detriment of [Plaintiff], because it is [Plaintiff's] burden under the PSLRA to provide a clear context from which [the Court] can find a strong inference of fraud." *Id.*

Stock sales support an inference of scienter *only* when they are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Zucco*, 552 F.3d at 1005. With no meaningful trading history or any temporal link between the alleged misstatements and the stock sales pled, combined with the fact that most of the stock sales were executed pursuant to Rule 10b5-1 trading plans, *see* Mot. at 26-27, Plaintiff's stock sale allegations cannot create any inference of scienter, let alone a strong one.

### 4.    Plaintiff's Other Scienter Arguments Are Unavailing

Plaintiff also argues that Dr. Leproust's statement in April 2022 establishes her scienter, *see* Opp. at 28, but as the Motion shows, her statement is not an admission to withholding any specific material information from investors (much less any information that contradicted any public statement), and is consistent with the federal securities laws in any event, *see* Mot. at 25-26.

Plaintiff further argues that the "core operations" doctrine applies here, because the Individual Defendants told investors that gross margins was a "key metric" while having access to data purportedly "contradicting their public statements," and because Twist's "synthetic DNA products and NGS tools" were represented in SEC filings as the "core" of Twist's business model. *See* Opp. at 26. But while Twist's gross margins or DNA synthesis technology may be important to its success, "that fact does not make every piece of information within the Company that relates to [its accounting or technology] critical to the business's core operations." *Veal*, 423 F. Supp. 3d at 817. Moreover, "[a] plaintiff [seeking to invoke the core operations doctrine] must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations ... or witness accounts demonstrating that executives had actual involvement in creating false reports." *Intuitive Surgical*, 759 F.3d at 1062. Here, Plaintiff utterly fails to meet either of those requirements. Nowhere does Plaintiff allege that the Individual Defendants were involved in accounting decisions with respect to any particular classification of expense, or that either of them received any reports regarding any purportedly improper classification of R&D expenses or calculation of gross margins. And just as in *Intuitive Surgical*, the AC relies heavily on FEs who lack personal knowledge of the Individual Defendants' states of mind and who only allege that the Individual Defendants "were familiar with the contents of . . . [data] because the substance

of the [data] was discussed in meetings." *Id.* Thus, the AC's allegations do not present the "rare circumstance" in which the core operations inference may be invoked because it would be "'absurd' to suggest that management was without knowledge" of the allegedly undisclosed facts. *Id.* at 1063.

Finally, Plaintiff argues that it has adequately pled scienter because "Defendants offer no competing inference." Opp. at 28 (emphasis omitted). But it is **Plaintiff's burden** to plead specific facts creating an inference of scienter that is "more than merely plausible or reasonable," and that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S 308, 314 (2007). Plaintiff has not done so, and the more compelling inference here is that Defendants did **not** act with scienter. This conclusion is buttressed by the indisputable fact that (i) Twist has never restated its financial statements; (ii) its auditors have not withdrawn their opinions of Twist's financial statements; (iii) despite the Scorpion Report's scurrilous accusations, no agency has initiated an investigation or other action against Twist; and (iv) Twist's business has continued to thrive, contrary to Plaintiff's premise that Twist is a company in shambles with customer complaints flooding in. *See* Mot. at 2-3. While Plaintiff is correct that these facts are not dispositive, *see* Opp. at 28-29, courts have repeatedly recognized that such facts are nevertheless "highly probative" of an absence of scienter, *see* Mot. at 27-28 (citing cases).

### D.    Plaintiff Cannot Challenge The February 2022 Offering Under Section 11

Plaintiff does not dispute that it does not, and cannot, plead facts to plausibly show that any of its Twist shares are traceable to the shares sold in the February 2022 Offering, which represented only approximately 11% of Twist's outstanding shares. *See* Mot. at 30 & n.17. Under controlling Supreme Court and Ninth Circuit precedent, this means that Plaintiff cannot state a Section 11 claim based on the February 2022 Offering. *Id.* at 30. In response, Plaintiff argues that Defendants' tracing argument is foreclosed by *Melendres v. Arpaio*, 784 F.3d 1254, 1262-63 (9th Cir 2015), which held that a named plaintiff with Article III standing can adequately represent a class of individuals who have similar, but not identical, interests. *See* Opp. at 30. Plaintiff's response is a *non sequitur*. Defendants' argument is **not** that Plaintiff is an inadequate class representative—it is that Plaintiff **cannot state a claim** based on the February 2022 Offering. As the Ninth Circuit has held, a plaintiff's "failure to plead the traceability of their shares means they lack **statutory** standing under § 11," and

the "***failure to allege statutory standing results in failure to state a claim on which relief can be granted***." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1109 (9th Cir. 2013) (emphases added). Accordingly, Plaintiff's failure (and inability) to plead the traceability of its shares to the February 2022 Offering results in a failure to state a Section 11 claim based on that Offering. *Id.*

### E.   Plaintiff's Request To Strike Portions Of The Motion Is Unwarranted

As Plaintiff points out, *see* Opp. at 4, Defendants' Motion incorrectly used single-spaced footnotes. Defendants' counsel relied on L.R. 3-4, which permits single-spaced footnotes, and inadvertently overlooked the Court's individual Standing Order, which departs from L.R. 3-4 and requires double-spaced footnotes. If the Motion's footnotes had been double-spaced it would have been a little more than two pages over the stipulated 30-page limit. Counsel's error was unintentional, not an attempt to "circumvent" the stipulated page limit, as Plaintiff contends. To remedy counsel's error, Defendants have limited the length of this reply brief to well below the stipulated 20-page limit. Alternatively, if the Court desires, Defendants are prepared to submit a revised version of their Motion that makes the same arguments within 30 pages even with the use of double-spaced footnotes. But Plaintiff's request to strike portions of the Motion is unwarranted given that counsel's error was unintentional, will not be repeated, and Plaintiff suffered no prejudice. *See Orshan v. Apple Inc.*, 2023 WL 3568079, at *1 n.2 (N.D. Cal. Mar. 31, 2023) (Davila, J.) (where defendant's brief opposing class certification used single-spaced footnotes and would have exceeded the page limits if footnotes had been double-spaced, the Court admonished defendant not to repeat the mistake and proceeded to consider defendant's brief in full and deny certification).

### III.   CONCLUSION

For these reasons, and those set forth in Defendants' Motion, the AC should be dismissed.

DEFENDANTS' REPLY IN SUPPORT OF
MOTION TO DISMISS, 5:22-CV-08168-EJD

Dated:  February 23, 2024

JAMES N. KRAMER
ALEXANDER K. TALARIDES
M. TODD SCOTT
ARIEL B. WINAWER
Orrick, Herrington & Sutcliffe LLP


By*: /s/ James N. Kramer*
JAMES N. KRAMER
Attorneys for Defendants

DEFENDANTS' REPLY IN SUPPORT OF
MOTION TO DISMISS, 5:22-CV-08168-EJD