# EXHIBIT 2

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Steve W. Berman (*pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Attorneys for Lead Plaintiff*
*Michael Damelio*

**ROBBINS GELLER RUDMAN**
  **& DOWD LLP**
Jessica T. Shinnefield (234432)
Lonnie A. Browne (293171)
John M. Kelley (339965)
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone:  (619) 231-1058
Facsimile:  (619)231-7423
jshinnefield@rgrdlaw.com
lbrowne@rgrdalw.com
jkelley@rgrdlaw.com

*Attorneys for Plaintiff*
*Pompano Beach Police & Firefighters' Retirement System*

[Additional counsel appear on signature page.]

**IN THE UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| VICTOR J. NG, Individually and on Behalf of All Others Similarly Situated, | Case No. 4:21-cv-09497-HSG |
| Plaintiff, | <u>CLASS ACTION</u> |
| vs. | AMENDED COMPLAINT |
| BERKELEY LIGHTS, INC., et al., | |
| Defendants. | |

**TABLE OF CONTENTS**

Page

SUMMARY OF THE ACTION ..................................................................................................... 1

JURISDICTION AND VENUE ..................................................................................................... 7

EXCHANGE ACT CLAIMS ......................................................................................................... 8

I. PARTIES ............................................................................................................................ 8

  A. Plaintiffs ............................................................................................................... 8

  B. Berkeley Lights Defendants ............................................................................... 8

  C. Control Defendants ............................................................................................. 9

  D. Relevant Non-Party ........................................................................................... 11

II. FACTUAL BACKGROUND ........................................................................................... 11

  A. The Company Depended on the Beacon and Placement of Beacons with Customers ...................................................................................................... 17

  B. The Control Defendants Maintained Significant Control Over Berkeley Lights ............................................................................................................... 18

  C. Events at the Beginning of the Class Period .................................................... 24

III. DEFENDANTS' FALSE AND MISLEADING STATEMENTS  AND OMISSIONS DURING THE CLASS PERIOD ................................................................ 28

IV. DISCLOSURE OF DEFENDANTS' SCHEME TO DEFRAUD ................................... 45

  A. Defendants Reaffirm 2021 Targets in 1Q21 in the Face of Revenue and Sales Headwinds, including Placing Fewer Units than Previous Quarters ............ 45

  B. Defendants Released Poor Results for a Second Consecutive Quarter in 2Q21, with Fewer Units Placed than in any Quarter from the Prior Year ............ 47

  C. Scorpion Capital Issued a Scathing Investigative Report Uncovering the Breadth of the Issues with Berkeley Lights's Platform and the Company's Many Efforts to Conceal Those Issues ................................................................... 50

  D. Defendant Hobbs Replaced as CEO as the Company Falls Well Short of Projections for Full-Year 2021 ......................................................................... 55

V. ADDITIONAL SCIENTER ALLEGATIONS ................................................................ 56

  A. Defendants' Misrepresentations Were Necessary to Go Public ........................... 56

  B. Berkeley Lights's Senior Executives' Insider Sales Were Unusual and Suspicious ........................................................................................................ 58

  C. The Control Defendants' Sales Were Also Unusual and Suspicious ................... 62

D.  Defendants Actively Disregarded Contradicting Data Regarding Marketability and customers' dwindling payments ...............................................64

E.  Defendants Were Informed of Their Products' Shortcomings by Their Pre-Class Period Trials with Academic Research Customers ....................................66

F.  Defendants' Decision to Introduce Subscription Models Demonstrates Their Knowledge of the Significant Challenges of Selling Their Products Beyond the Company's Saturated Customer Base ..................................................67

G.  Oversight and Due Diligence Supports a Strong Inference of Scienter as to the Control Defendants ........................................................................................68

H.  Defendants' Direct and Extensive Involvement in Developing and Marketing Berkeley Lights's Products ...........................................................69

I.  Defendants' Deceptive Pattern of Disclosures Concerning Market Demand Support a Strong Inference of Scienter ..................................................69

J.  Suspicious Employee Resignations ......................................................................72

K.  Defendants' Imputed Knowledge of Facts Critical to BLI's Core Operations ...........................................................................................................73

VI.   LOSS CAUSATION AND ECONOMIC LOSS ................................................................76

A.  May 11, 2021 Disclosure ......................................................................................77

B.  August 11, 2021 Disclosure ..................................................................................78

C.  September 15, 2021 Disclosure .............................................................................79

D.  January 5, 2022 Disclosure ...................................................................................81

VII.  PRESUMPTION OF RELIANCE ....................................................................................83

VIII.  NO SAFE HARBOR .........................................................................................................84

COUNT I FOR VIOLATION OF §10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5 AGAINST BERKELEY LIGHTS AND THE INDIVIDUAL DEFENDANTS ..............................................................................................................85

COUNT II FOR VIOLATION OF §20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS AND THE CONTROL DEFENDANTS ......................86

NON-FRAUD SECURITIES ACT CLAIMS ...........................................................................87

IX.   BACKGROUND TO THE SECURITIES ACT CLAIMS ...............................................88

X.   SECURITIES ACT DEFENDANTS ..................................................................................88

XI.   THE IPO MATERIALS WERE FALSE AND MISLEADING .......................................90

XII.  THE IPO MATERIALS VIOLATED ITEM 303 AND ITEM 505 ................................92

AMENDED COMPLAINT                     - ii -
Case No. 4:21-cv-09497-HSG

COUNT III  FOR VIOLATION OF § 11 OF THE SECURITIES ACT AGAINST
    BERKELEY LIGHTS, HOBBS, HOLT, THE DIRECTOR DEFENDANTS,
    AND THE UNDERWRITER DEFENDANTS ................................................................. 94

COUNT IV  VIOLATION OF § 12(A)(2) OF THE SECURITIES ACT AGAINST
    BERKELEY LIGHTS, HOBBS, HOLT, THE DIRECTOR DEFENDANTS,
    AND THE UNDERWRITER DEFENDANTS ................................................................. 96

COUNT V  VIOLATIONS OF § 15 OF THE SECURITIES ACT AGAINST HOBBS,
    HOLT, KHANDROS, WRVI, SEQUOIA, AND NIKON ................................................. 98

XIII.    CLASS ACTION ALLEGATIONS ........................................................................ 99

PRAYER FOR RELIEF ................................................................................................... 100

DEMAND FOR TRIAL BY JURY ................................................................................. 101

AMENDED COMPLAINT          - iii -
Case No. 4:21-cv-09497-HSG

Lead Plaintiff Michael Damelio ("Lead Plaintiff"), together with Plaintiff Pompano Beach Police & Firefighters' Retirement System (the "Retirement System") (together, "Plaintiffs"), bring this consolidated action pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, against Berkeley Lights, Inc. ("Berkeley Lights," "BLI," or the "Company"), certain current and former senior Company executives and directors, the underwriter firms that sponsored the Company's July 17, 2020 Initial Public Offering ("IPO" or "Offering"), and the outside firms that controlled the Company. Plaintiffs bring this action on behalf of themselves and all other persons similarly situated, who purchased or otherwise acquired: (a) Berkeley Lights common stock pursuant and/or traceable to the IPO Materials (defined below) issued in connection with the Company's initial public offering on or about July 17, 2020; and/or (b) securities of Berkeley Lights during the period from July 17, 2020 and January 5, 2022, inclusive ("Class Period") and were damaged thereby ("Class").

Plaintiffs allege the following based upon their personal knowledge, upon their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the ongoing investigation of their attorneys, including, among other things: a review of the Company's publicly available SEC filings; media reports about the Company; the Company's website and marketing materials; price and volume data for Company securities; consultation with investigators; and additional materials and data concerning the Company and industry, as identified herein.

## SUMMARY OF THE ACTION

1. This is a federal securities class action that arises from Defendants' false and misleading statements and omissions regarding the functionality of digital cell biology company Berkeley Lights's flagship product, the Beacon: a laboratory instrument used for screening cells sold to drug development and large pharmaceutical/biotech companies. In its IPO Registration Statement and throughout the Class Period, Defendants repeatedly emphasized the purported superiority of the Beacon compared to existing cell analyzing instruments. Defendants claimed the

AMENDED COMPLAINT                  - 1 -
Case No. 4:21-cv-09497-HSG

Beacon's "unprecedented speed" and revolutionary technology had already garnered positive customer validation from leading biopharmaceutical companies like Amgen, Bayer, and others, was driving sustainable revenue growth, and afforded the Company an enormous market opportunity with a total addressable market ("TAM") of $23 billion.

2.      In reality, however, the Beacon suffered from numerous design and manufacturing defects rendering the $2 million instrument unreliable and eliciting a myriad of customer complaints. In addition, given the Beacon's extraordinarily prohibitive cost, severe performance issues, lack of customer validation, and saturated potential-customer base, Defendants had also misrepresented the Company's TAM and growth prospects.  Defendants' misrepresentations about the Beacon's functionality and marketability artificially inflated the price of Berkeley Lights's securities, until respected activist and short seller Scorpion Capital released a scathing and detailed investigatory report, based in part on 24 damning research interviews, including with 14 of Berkeley Lights's largest customers, all of whom described a "trail of customers who allege they were 'tricked,' misled, or over-promised into buying a $2 million lemon."[1] Though Defendants tersely characterized the Scorpion Capital Report as containing "highly misleading statements, groundless claims and a clear lack of industry understanding," in the coming months, Berkeley Lights would go on to report deteriorating revenue, waning demand for the Beacon, a dismal financial outlook, and the demotion of the Company's CEO—almost precisely the same fate Scorpion Capital had earlier predicted.  These events caused the price of Berkeley Lights's securities to plummet, significantly injuring investors.

3.      Founded in 2011 and based in Emeryville, California, Berkeley Lights is a venture-capital-backed biotechnology company that sells primarily one product, the Beacon—a high-end flow cytometry and cell sorting machine launched in 2016 under the direction of Defendant Eric Hobbs. In simple terms, the Beacon uses light and semiconductor technology to move individual cells so they can be isolated, cultured, assayed, and exported.  Or as Defendant Hobbs has

---

[1] *See* Scorpion Capital Report, attached hereto as Exhibit A. This Amended Complaint incorporates the allegations in the Scorpion Capital Report, including the many confidential witness interviews summarized therein, by reference.

AMENDED COMPLAINT                          - 2 -
Case No. 4:21-cv-09497-HSG

explained, Berkeley Lights's "technology captures data from thousands of single cells, over time, allowing biologists to gain deeper information about populations and sub populations than any other method can provide."

4.    Flow cytometer technology, which was first developed in the 1950's and underlays Berkeley Lights's product, has been a standard commodity tool in labs for half a century.  Scores of vendors, including well-established, multi-billion-dollar market cap companies such as Sony, Becton Dickinson, and Thermo Fisher sell cytometers at retail prices between $75,000 to $100,000.  By contrast, Berkeley Lights reportedly charges customers $2 million for each Beacon instrument, more than 20 times the price charged by competitor firms.  Although the use cases for flow cytometers and the Beacon are substantially identical, Berkeley Lights's value proposition is that the Beacon's advanced functionality allows for faster screens.

**The Beacon**
*as advertised on Berkeley Lights website*



5.    In the Company's early stages, Berkeley Lights received hundreds of millions of dollars in private equity financing from several Menlo Park, California-based venture capital firms, including Sequoia Capital and WRVI, as well as Japanese imaging-technology provider Nikon

AMENDED COMPLAINT                              - 3 -
Case No. 4:21-cv-09497-HSG

Corp.  In Summer 2020, in the wake of several notable tech stock debuts, the Company announced its intent to go public through an IPO valuing the Company at more than $1 billion, thereby putting the Company's venture capital investors in a prime spot to exit their position in Berkeley Lights while raking in enormous returns.

6.    In its July 17, 2020 IPO offering documents ("IPO Materials"), Defendants hyped the functionality of Berkeley Lights's product platform, claiming it provides "the most advanced environment for rapid functional characterization of single cells at scale."  Defendants also stated that the Berkeley Lights platform delivers "the best cells" and "provides the deepest information, with linked phenotypic and genotypic data, on tens of thousands of live single cells relevant to the customers' end product specifications."  Further, Defendants claimed that "this level of scale and precision is not attainable with other approaches."

7.    Defendants also highlighted in the IPO Materials Berkeley Lights's purported operational and financial growth, stating that the Company's direct platform sales had increased 84% year-over-year to $39.1 million for its fiscal 2019.  Therein, Defendants stated that Berkeley Lights had placed 26 machines in 2019, a 117% increase over the prior year, and six machines in the first quarter of 2020, a 20% increase over the first quarter of 2019.  Defendants further enticed investors by representing that the "total addressable market" for the Company's products and services was an astounding "$23 billion." On an individual level, Defendant Hobbs also met personally with potential investors, holding over 180 Zoom calls in the three days preceding the IPO to help take the Company public.

8.    Propelled by the IPO Materials' glowing statements concerning the Company's flagship product's superior functionality and Berkeley Lights's growth potential, the IPO, which closed on July 21, 2020, was a rousing success.  Altogether, the Company sold approximately 9.315 million shares of common stock to the public at the IPO price of $22 per share, for approximate proceeds to the Company of $204.9 million before deducting underwriting discounts, commissions, and other offering expenses payable by Berkeley Lights.  Prominent investment banks J.P. Morgan, Morgan Stanley, and Cowen acted as lead book-running managers for the offering, with William Blair acting as a co-manager.

AMENDED COMPLAINT                        - 4 -
Case No. 4:21-cv-09497-HSG

9.      Thereafter, throughout the Class Period, Defendants continued to emphasize the purported capabilities and effectiveness of the Berkeley Lights platform (*i.e.*, the Beacon), stating, for example, that the platform "captures and delivers rich single-cell data to find the best cells" and "allows for a high level of control over live single cells or other micro-objects throughout the functional characterization process." Defendants also represented that Berkeley Lights was experiencing numerous tailwinds driving sales growth.

10.      Unbeknownst to investors, the IPO Materials were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.  Additionally, throughout the Class Period, Defendants made materially false and misleading statements and omissions concerning the effectiveness of the Company's platform, the platform's value to Berkeley Lights's potential and existing customers, and size of the biotechnology market for the platform.  Specifically, the IPO Materials and Defendants' Class Period statements misled investors by concealing that the Beacon suffered from numerous design and manufacturing defects including breakdowns, high error rates, data integrity issues and other problems, limiting the ability of biotechnology companies and research institutions to consistently use the machines at scale.  Defendants failed to disclose that Berkeley Lights had received numerous customer complaints regarding the durability and effectiveness of its automation systems, including complaints related to the design and manufacturing.  Moreover, the IPO Materials and Defendants' Class Period statements overstated the actual market for Berkeley Lights's products and services, which was merely a fraction of the $23 billion represented to investors due to the relatively high cost of the Company's instruments and consumables and inability to provide the sustained performance necessary to justify these high costs.

11.      Defendants profited greatly from their misstatements and omissions at the expense of unsuspecting investors.  After Defendants converted their initial ownership interests in the Company into common stock via the IPO, Defendants cashed in on those holdings in the Company's November 2020 Secondary Public Offering ("SPO," and, together with "IPO," the "Offerings").  Thereafter, Defendants continued to derive substantial benefit, to the detriment of

the Class, from their pervasive and significant insider sales, until the truth about the Berkeley Lights platform was slowly, but eventually, revealed to the market.

12.    The truth about Berkeley Lights's failed platform first began to emerge slowly as the Company returned repeatedly dismal results at the start of 2021 and introduced various mechanisms to prop up sales and placements of its platform.  Then, on September 17, 2021, Scorpion Capital, an activist short seller firm focused on exposing frauds and stock promotions in the life science industry, issued a short seller report (the "Scorpion Capital Report") outlining the many failures of Berkeley Lights.  As detailed herein, the Scorpion Capital Report was based on 24 research interviews, including interviews with 14 of Berkeley Lights's largest customers, that described a "trail of customers who allege they were 'tricked,' misled, or over-promised into buying a $2 million lemon."

13.    As the repeated failures of Berkeley Lights's platform were documented, Defendants attempted to keep their finger in the dam for months, denying the accuracy of the Scorpion Capital Report and attempting to minimize the financial damage.  Finally, in January 2022, the dam could no longer hold, as Berkeley Lights demoted the Company's CEO and announced a significant revenue shortfall for 2021.  Over the course of the Class Period, Berkeley



Lights had fallen from an $80+ per share rising venture capital-backed IPO star (when Defendants offloaded their shares) to a $10 per share company with a broken platform in search of a market.

14.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class Member have suffered significant losses and damages.

**<u>JURISDICTION AND VENUE</u>**

15.    The claims asserted herein arise under §§ 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

16.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1337, § 22 of the Securities Act (codified at 15 U.S.C. §77v), and § 27 of the Exchange Act (codified at 15 U.S.C. § 78aa).

17.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c), § 22 of the Securities Act (15 U.S.C. § 77v), and § 27 of the Exchange Act, because the Company conducts business in this District and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements.  Defendant Berkeley Lights maintains its corporate headquarters in this District.

18.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**EXCHANGE ACT CLAIMS**

**I.      PARTIES**

**A.      Plaintiffs**

19.      Lead Plaintiff Michael Damelio purchased shares of Berkeley Lights common stock during the Class Period and was damaged thereby, as set forth in the Certification, previously filed in this action.  *See* ECF Nos. 25-2, 60-2.

20.      Named Plaintiff Pompano Beach Police & Firefighters' Retirement System  is an institutional investor that provides retirement benefits to police officers and firefighters in Pompano Beach, Florida.  Established in 1972, the Retirement System has hundreds of members and maintains assets of more than $250 million.  The Retirement System purchased shares of Berkeley Lights common stock during the Class Period and was thereby damaged, as set forth in the attached Certification, which is incorporated by reference herein.  As further reflected in the attached Certification, the Retirement System purchased shares of Berkeley Lights common stock in the Company's July 2020 IPO.  *See* Exhibit B.

**B.      Berkeley Lights Defendants**

21.      Defendant Berkeley Lights is a biotechnology company headquartered in Emeryville, California.  The Company's common stock is listed on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "BLI."

22.      Defendant Eric D. Hobbs ("Hobbs") served as the Chief Executive Officer ("CEO") of Berkeley Lights and a member of the Company's Board of Directors (the "Board") at all relevant times, until his unexpected transition, effective March 9, 2022, to president of the Company's Antibody Therapeutics business line.

23.      Defendant Shaun M. Holt ("Holt") served as the Chief Financial Officer ("CFO") of Berkeley Lights at all relevant times until his unexpected transition, effective March 15, 2021, to an advisory role and subsequent departure from the Company on April 30, 2021.

24.      Defendant Kurt Wood ("Wood") served as the CFO of Berkeley Lights from March 15, 2021 until his unexpected departure from the Company, effective April 1, 2022.  He remained with the Company through April 30, 2022 in an advisory position to help with the transition to a

AMENDED COMPLAINT                                - 8 -
Case No. 4:21-cv-09497-HSG

new CFO.  Prior to serving as CFO, Defendant Wood served as the Company's Vice President of Business Development.

25.    Defendants referenced above in ¶¶ 22-24 are referred to herein as the "Individual Defendants."  During the Class Period, the Individual Defendants ran the Company as hands-on managers, overseeing Berkeley Lights's operations, business practices, and finances, and made the materially false and misleading statements described herein.  The Individual Defendants had intimate knowledge about core aspects of Berkeley Lights's financial and business operations, including the Company's proprietary technologies and business relationships.  They were also intimately involved in deciding which disclosures would be made by the Company.

**C.    Control Defendants**

26.    Defendant WRVI Capital ("WRVI") is a venture capital fund focused on the technology industry and includes any subsidiaries or affiliates that directly held shares of or otherwise had voting and dispositive power over Berkeley Lights stock, including, but not limited to, the following: Walden Riverwood GP, LLC, Walden Riverwood Ventures, L.P., WIIG Communications Management LLC, WRV-BLI LLC, WRV-BLI II, LLC, WRV-BLI III LLC, WRV-BLI IV, LLC., WRV GP II, LLC, and WRV II, L.P.  Defendant WRVI was an early backer of Berkeley Lights and at the time of the IPO owned 25.5% of the Company.  As a result of its economic interest in the Company, WRVI appointed several members to the Board of Directors. WRVI's founding managing partner, Michael Marks ("Marks," named defendant for the Securities Act Claims, *see infra*), served on the Berkeley Lights's Board of Directors from April 2014 until his retirement in May 2021, at which time he was serving as the Board's chairperson.

27.    Defendant Sequoia Capital ("Sequoia") is a venture capital fund focused on the technology industry and includes any subsidiaries or affiliates that directly held shares of or otherwise had voting and dispositive power over Berkeley Lights stock, including, but not limited to, the following: SC US (TTGP), Ltd, SC U.S. Venture XV Management, L.P., SC U.S. Growth VI Management, L.P., Sequoia Capital U.S. Venture Fund XV, L.P., Sequoia Capital U.S. Venture Partners Fund XV, L.P., Sequoia Capital U.S. Venture Partners Fund XV (Q), L.P., Sequoia Capital U.S. Venture XV Principals Fund, L.P., Sequoia Capital U.S. Growth Fund VI, L.P., and

AMENDED COMPLAINT                           - 9 -
Case No. 4:21-cv-09497-HSG

Sequoia Capital U.S. Growth VI Principals Fund, L.P.  Defendant Sequoia was an early backer of Berkeley Lights and at the time of the IPO owned 15% of the Company.  As a result of its economic interest in the Company, Sequoia appointed several members to the Board of Directors, including its managing partner Michael Moritz ("Moritz," named defendant for the Securities Act Claims).  Moritz has served on Berkeley Lights's Board of Directors from April 2015 through the present, including on various standing committees of the Board.

28.     Defendant Nikon Corporation is a Japanese publicly traded corporation specializing in optics and imaging products.  Nikon Corporation entered into a distribution agreement with Berkeley Lights in January 2018, and pursuant to that agreement, from March 2019 through at least March 2022, served as the Company's exclusive distributor of products in Japan, Singapore, Thailand, and South Korea and non-exclusive distributor in China.  Additionally, Nikon had a significant financial interest in the Company prior to the IPO, owning 8.1% of the Company, and Mr. Makoto Shintani, Nikon's Corporate Vice President and Deputy General Manager from April 2015 until March 2019 and later a Senior Fellow of the Healthcare Business Unit of Nikon, served on the Berkeley Lights's Board of Directors from May 2018 through July 2020.

29.     Defendant Igor Khandros is the founder and former CEO of Berkeley Lights.  He served as CEO from 2011 to March 2017.  At the time of the IPO, Khandros owned 22.3% of the Company and appointed multiple members to the Board of Directors, including himself.  Khandros has served on the Berkeley Lights's Board of Directors from 2011 through the present.  Khandros continues to own a significant portion of the Company, being the largest single shareholder in the Company with beneficial ownership of 13% of the Company's shares.

30.     Defendants WRVI, Sequoia, Nikon, and Khandros are collectively referred to herein as the "Control Defendants."  Through their significant ownership interest in the Company, appointment of directors, and managing personnel's seats (or, in the case of Khandros, his own seat) on the Board, the Control Defendants had the power to influence and exerted this power over Berkeley Lights during the Class Period.  In addition, the Control Defendants had unique insight

AMENDED COMPLAINT                           - 10 -
Case No. 4:21-cv-09497-HSG

into the Company's operations through their business relationships with Berkeley Lights and/or information rights gained as a part of their investments in the Company.

### D.    Relevant Non-Party

31.    Scorpion Capital is an American activist short seller firm that specializes in publishing intensive, differentiated research reports on publicly traded companies the firm believes to be engaged in securities fraud and/or stock promotion.  Over the past four years, Scorpion Capital has released investigative reports on at least seven publicly traded companies.  At least one court in this District has credited Scorpion Capital's research in a securities fraud case.[2]

32.    Scorpion Capital is led by Kir Kahlon ("Kahlon"), the firm's founder and Chief Investment Officer.  Mr. Kahlon has frequently appeared on business news and financial news media outlets including CNBC and Zer0es TV to address and defend Scorpion Capital's reports. Prior to establishing Scorpion Capital, Kahlon worked for Seligman Investments, a firm based in Silicon Valley and New York with approximately $15 billion under management.  Prior to Seligman, Kahlon worked with Tiger Global, a pre-eminent hedge fund, focusing exclusively on deep-dive investigative shorts.  Kahlon began his career at the global management consulting firm Bain & Company, upon graduation from college, and entered the investment business in 2004 when he was hired by activist investor Carl Icahn.  Kahlon graduated from UC Berkeley (BA) with Highest Honors in 1992 and Harvard Business School (MBA) in 1998.

## II.    FACTUAL BACKGROUND

33.    Berkeley Lights is a biotechnology company headquartered in Emeryville, California.  The Company was founded in 2011 by Ming Wu, William Davidow, and Defendant Khandros.  Berkeley Lights owns and operates a proprietary platform for analyzing and processing cell data for use in the development and commercialization of biotherapeutics and other cell-based products, focusing on the markets of antibody therapeutics, cell therapy and synthetic biology.

---

[2] *See In re QuantumScape Sec. Class Action Litig.*, No. 3:21-CV-00058-WHO, 2022 WL 137729 (N.D. Cal. Jan. 14, 2022) (Orrick, J.) (finding Scorpion Capital short report based on unnamed employees and experts reliable).

AMENDED COMPLAINT                    - 11 -
Case No. 4:21-cv-09497-HSG

34.     Berkeley Lights claims that its proprietary platform provides the most advanced technology available for the rapid functional characterization of single cells at scale.  This technology purportedly enables the end user, such as a biotechnology company or research institution, to characterize the performance of cells relevant to the desired cell-based product early in the research and development process and then connect this phenotypic data to the genetic code to each cell.  The Company claims that the level of scale and precision offered by its platform "is not attainable with other approaches," allowing vast amounts of cell data to be analyzed much quicker and with more control than in traditional processes.

35.     The centerpiece of the Berkeley Lights platform is the Company's advanced automation system, the Beacon.  The Beacon is a fully automated, high throughput system designed to allow detailed cell analysis at scale.  The Beacon is used by Berkeley Lights's customers for tasks such as antibody discovery and cell line development and uses a proprietary light imaging technology known as OptoElectro Positioning.  The Company reportedly charges $2 million for each Beacon instrument—far above the industry standard for other cell screening machines—and justifies this high cost by pointing to the purported improvement in speed, scale and precision offered by the instrument.

**Berkeley Lights's Graphic Regarding Beacon's Screening Times**
*as advertised on Berkeley Lights website*



36.     Berkeley Lights also offers a pared down automation system known as the Lightning at a lower price point, as well as an instrument for use in workflows requiring an extended cell culture period known as the Berkeley Lights Culture Station.

**The Lightning**
*as advertised on Berkeley Lights website*



37.     In addition to its automation systems, Berkeley Lights manufactures proprietary consumables such as its OptoSelect chips and reagent kits for use with the automation systems as a part of its overall platform.  The Company's proprietary OptoSelect chips are used to house and manipulate cells and cell environments using the Company's NanoPen technology.  Berkeley Lights OptoSelect chips are commercially available in five different sizes, with the largest housing 14,000 pens.  The OptoSelect chips are single-use consumables and must be replaced after each workflow.  Similarly, the Company offers reagent kits to support on-chip analysis with a variety of capabilities, such as sample preparation, enhancement of culture cells, assays, and other tasks. These workflow consumables can significantly increase the costs of using the Berkeley Lights platform.  For example, the Beacon is estimated to cost $15,000 per full run based on the four OptoSelect chips that would be used.

38.     The Berkeley Lights platform is further supported by the Company's proprietary automation and analysis software, including the Company's Cell Analysis Suite software.  The Cell Analysis Suite forms the foundation for all workflows run on the Beacon and Lightning.  The software controls the systems, acquires, and analyzes data, and directs all operations included in each automated workflow, including cell and NanoPen selection, on-chip immunoassay analysis,

AMENDED COMPLAINT                              - 14 -
Case No. 4:21-cv-09497-HSG

single-cell imaging, automatic clone selection, and removal from the NanoPens and exporting living cells.

39. Berkeley Lights generates both product revenue and service revenue. The Company defines sales of advanced automation systems, recurring revenue from consumables, workflow subscription agreements and workflow licenses as "product revenue," and revenue from joint development agreements and partnerships, service and warranty contracts, feasibility studies and platform support as "service revenue." These revenues are derived through three revenue streams: (i) direct platform sales, comprised of the sale of advanced automation systems and, in certain instances, fully paid workflow licenses and platform support services; (ii) recurring revenue, comprised of the sale of consumables such as the Company's OptoSelect chips and reagent kits, as well as extended warranty and service programs and, in certain instances, renewable workflow licenses; and (iii) revenue from joint development agreements and partnerships whereby the Company provides services for the development of new workflows, cell or organism types, or delivers specific biological assets to meet specific customers' needs, often in connection with specified development milestones. Direct platform sales account for the majority of Company revenues. For example, during its fiscal 2019, direct platform sales accounted for 69% of total Berkeley Lights revenue, compared to 14% attributable to recurring revenue and 17% attributable to milestone revenue.

40. In July 2020, Berkeley Lights conducted its initial public offering, which generated over $200 million in offering proceeds, including the full exercise of the underwriters' over-allotment option. In the days leading up to the IPO, Defendant Hobbs went on a media blitz to sell the IPO and made himself available to meet with prospective investors in a marathon virtual roadshow. As reported by Defendant Hobbs in an August 2020 interview with CNN, most of these Zoom calls were one-on-one. In total, Hobbs reported having over 180 Zoom meetings regarding Berkeley Lights, its platform, and/or the representations made in the Company's IPO Materials, as previewed by the article's headline:

AMENDED COMPLAINT                              - 15 -
Case No. 4:21-cv-09497-HSG

**Excerpt from CNN Business Article:**



## Health care CEO does 180 Zoom calls in three days to help take company public

By Paul R. La Monica, CNN Business
Updated 1:46 PM ET, Wed August 12, 2020

Dr. Eric Hobbs, CEO of Berkeley Lights.

**New York (CNN Business)** — Being in charge of a health care company during a pandemic is a ton of work — just ask Eric Hobbs, CEO of Berkeley Lights, who met with 180 investors over Zoom over three and a half days — and lost 10 pounds over the process.

41.    At the time of the IPO, the Control Defendants, as described in more detail below, collectively owned a majority of the outstanding shares of the Company.

42.    Then, less than four months after the IPO, on November 16, 2020, Berkeley Lights announced it would be conducting a secondary offering of stock to allow certain insiders to sell their personal Berkeley Lights shareholdings (the "SPO").  In the SPO, several Berkeley Lights insiders, including Control Defendants WRVI, Nikon, and Khandros and WRVI's founding managing partner and director of Berkeley Lights, Michael Marks (named defendant for the Securities Act Claims), sold 3.45 million Berkeley Lights shares to investors at $86 per share, generating nearly $300 million in gross offering proceeds for the selling insiders.  The SPO was unusual not only because of its close proximity to the IPO but also because the underwriters for the IPO agreed to allow the selling stockholders to exit their IPO lockup agreements early.

AMENDED COMPLAINT                    - 16 -
Case No. 4:21-cv-09497-HSG

**A.      The Company Depended on the Beacon and Placement of Beacons with Customers**

43.      As discussed above, the Beacon serves as the centerpiece of the Berkeley Lights platform and the Company's flagship product.  As such, the success of the Beacon—that is, the machine's ability to meet the Company's promises in terms of providing "the most advanced environment for rapid functional characterization of single cells at scale" and the Company's ability to place significant numbers of Beacon machines with customers—is vital to the Company.

44.      As explained above, direct platform sales are the most important revenue stream for Berkeley Lights, and direct platform sales are, in turn, largely driven by sales of the Beacon.  Or, in the words used by the Company itself in its IPO Prospectus: "our revenue has been primarily generated from direct platform sales, largely driven by Beacon."  The Company made the same disclosure throughout the Class Period, including in its SPO Prospectus and 2020 Form 10-K, and even after the Class Period, in its 2021 Form 10-K.

45.      Recurring revenue, a separate revenue stream from direct platform sales and one that was growing over the course of the Class Period, was also dependent on placing platforms with customers.  For example, the Company explained in its IPO Prospectus, "[e]ach platform placement, depending on the chosen access model, drives various streams of recurring revenue."

46.      Likewise, the Company introduced subscription models in an effort to drive greater platform placements.  For example, as Defendant Wood explained during the Q1 2021 Earnings Call: "What we believe is the new subscription model, increases the SAM and increases the unit placements. So we would expect that to drive incremental unit placements." Similarly, Defendant Wood explained during the Q2 2021 Earnings Call: "Our TechAccess subscription offering is designed to increase our served available market opportunity and drive incremental platform placements."

47.      Everything was aimed at getting Beacons into customers' hands and then trying to ensure they used them, including developing workflows for the platform.  Essentially use cases, the Company developed workflows understanding their use in driving customer adoption of Beacons.  As Defendant Hobbs explained during the Q4 2020 Earnings Call: "[a]nd so what

AMENDED COMPLAINT                              - 17 -
Case No. 4:21-cv-09497-HSG

happens is the workflow goes out of the market, [] and then it becomes a revenue stream for us. And that revenue stream can come in multiple ways.  It can be tool placements via CapEx sales, it can be subscriptions as we've discussed previously."

48.    Partnerships went hand in hand with developing workflows, and while generating moderate revenue for the Company in the short term, ultimately were aimed at developing use cases for and placements of the Beacon platform.  *Id.*

**B.    The Control Defendants Maintained Significant Control Over Berkeley Lights**

49.    The Control Defendants—WRVI, Sequoia, Nikon, and Khandros—maintained and exerted significant control over Berkeley Lights at all times leading up to and through the IPO and SPO when they began to liquidate their holdings in the Company, reaping significant financial gains for themselves, and to the detriment of Plaintiffs and the Class.

50.    Each of the Control Defendants owned a significant direct interest in Berkeley Lights, allowing them to appoint and control the Company's Board of Directors.

51.    Prior to the IPO, Defendant Khandros, the founder and former CEO of the Company, held the vast majority (~81-83%) of the outstanding shares of the Company's Series A, A-1, and A-2 preferred stock (Series A: 3,000,000/3,660,000; Series A-1: 1,250,001/1,500,000; and Series A-2: 5,707,762/7,024,937), and as a result, had the ability to, and did in fact, designate two members of the Board of Directors.  He designated himself to one of these Board seats—a position he still holds today.

52.    Prior to the IPO, WRVI held the vast majority (62%) of the outstanding shares of the Company's Series B preferred stock (8,406,337/13,592,338), and as a result, had the ability to, and did, designate one member of the Board of Directors.

53.    Prior to the IPO, Sequoia held the vast majority (71%) of the outstanding shares of the Company's Series C preferred stock (6,825,937/9,637,965), and as a result, had the ability to (and did) designate two members of the Board of Directors.  WRVI designated its managing partner Moritz, along with the founding managing partner of WRVI, Marks.

AMENDED COMPLAINT                              - 18 -
Case No. 4:21-cv-09497-HSG

54.    Lastly, prior to the IPO, Nikon was the largest single holder (32%) of the Company's Series E preferred stock (2,874,829/9,103,617), with other Defendants (specifically, WRVI (8%), Sequoia (5%), and Marks (4%)) holding significant shares as well.  Series E stockholders, voting as a separate class, designated one member of the Board of Directors.  As the single largest holder of Series E preferred stock, Nikon had significant influence over the appointment of this director.  The Series E stockholders designated Nikon's corporate vice president, Makoto Shintani, to this seat on the Board, a position in which he served from May 2018 through July 2020.

55.    Khandros, WRVI, Sequoia, and Nikon, combined, beneficially owned 62.8% (22.3%, 25.5%, 15.0%, and 8.1%, respectively) of all outstanding shares of Berkeley Lights stock (common and preferred) prior to the IPO, and as such, collectively had the ability to (and did) designate at least two additional members of the Board of Directors.[3]  This was separate and apart from their ability to designate the Board members indicated above as a result of their individual holdings of the various series of preferred stock.

56.    In total, between them, the Control Defendants designated at least seven (and quite possibly eight) of the ten members of Berkeley Lights's Board of Directors prior to the IPO, and this does not include the seat held by Defendant Shintani, Nikon's corporate vice president.  After two members of the Board resigned or retired in connection with the IPO, the Control Defendants' combined designees made up at least six of the eight sitting Board members when the Company went public in July 2020 and included Defendants Khandros, Marks, and Moritz.

---

[3] It's quite likely that the Control Defendants designated a third additional Board member as majority holders of the outstanding "voting stock" in the Company, which, voting together as a single class, designated one of the directors.  It is not entirely clear, however, how "voting stock" was defined and thus whether the Control Defendants held a majority of all outstanding voting stock and designated a director in this capacity as well.

AMENDED COMPLAINT                           - 19 -
Case No. 4:21-cv-09497-HSG

**CONTROL DEFENDANTS' CONTROL OVER BLI'S BOARD MEMBERS**

  

*controlled*      *controlled*      *controlled*      *controlled*

*controlled*      *controlled*

57.    In addition, prior to the IPO, Marks, WRVI's founding managing partner, controlled a significant number of shares in his own right, upwards of 3.3% of all outstanding stock in the company (separate and apart from any interest or control in stock owned by WRVI).

58.    The Control Defendants continued to exercise significant control over Berkeley Lights after the IPO.  As summarized in the chart below, even after the IPO, the Control Defendants owned the vast majority of the outstanding shares of Berkeley Lights stock.



Beneficial Ownership of Berkeley Lights After the IPO

[1] – Does not include any separate beneficial ownership of Berkeley Lights by WRVI's founding managing partner and Berkeley Lights' director Michael Marks through the Marks Family Trust or Paxion Capital, L.P. Marks served as a founding partner of Paxion Capital, a private partnership, from March 2015 until March 2020, and as indicated in Berkeley Lights' S-1 filed with the SEC on June 26, 2020, Marks was then a member of the investment committee of Paxion Partners, the general partner of Paxion Capital, L.P., and shared voting and dispositive power over the shares held by Paxion Capital, L.P.  The June 2020 S-1 indicates Marks held beneficial ownership of: (i) 1,485,884 shares of common stock issuable upon the conversion of Series D Preferred Stock held by Paxion; (ii) 574,965 shares of common stock issuable upon the conversion of Series E Preferred Stock held by Paxion; and (iii) 38,460 shares of common stock issuable upon the conversion of Series E convertible preferred stock directly held by the Marks Family Trust.

59.    As explained in more detail below, the Control Defendants began to exit the company as soon as they could, starting with their sale of significant numbers of Berkeley Lights shares in the November 2020 SPO, but even after the SPO, they still maintained a controlling interest of outstanding shares in the Company, as illustrated in the following chart.



60.     The Control Defendants thus continued to exert a significant amount of power over the Company after the SPO, including through their ability to control the appointment of new board members.  In addition, throughout much, if not all, of the Class Period the Control Defendants maintained their direct presence on the Board through the seats held by their managing partners (or, in the case of Defendant Khandros, Khandros himself).  Defendants Khandros and Moritz continue to serve on the Board to this day, and Defendant Marks maintained his Board seat until his retirement in May 2021, serving as the Board's chairperson at the time of his retirement.  Indeed, despite stepping down as CEO in 2017, Khandros, in his own words, has "maintain[ed] a very active presence in the company" as he "directs his energies to creating and building strategic partnerships."  Furthermore, as directors at the time of the IPO and SPO, Khandros, Marks, and Moritz signed the offering materials for each, and thus were responsible for the content and dissemination of these materials, including the false and misleading statements therein.  Likewise, Nikon's Shintani served as a director at the time of the IPO and signed the IPO Materials.  In their roles as directors, Khandros, Marks, and Moritz also signed Berkeley Lights 10-Ks issued during the Class Period (Marks had departed from the Board by the time of the 2021 10-K and so was not a signatory for this one), and as such, were responsible for the content and dissemination of these materials as well.

AMENDED COMPLAINT                              - 21 -
Case No. 4:21-cv-09497-HSG

61.     The Control Defendants further exercised control over the Company through the Board's various standing committees.  Throughout the relevant time period, Berkeley Lights's Board maintained three standing committees, the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee.  Each of the standing committees following the IPO was composed entirely of directors appointed by Control Defendants.  Further, Marks, WRVI's founding managing partner, served on the Audit Committee; Moritz, Sequoia's managing partner, served on the Compensation Committee and Nominating and Corporate Governance Committee; and Defendant Khandros served on the Nominating and Corporate Governance Committee.  The Control Defendants' pre-IPO Board designees continue to hold a majority of the seats on these three standing committees, and Defendants Khandros and Moritz still serve on the Nominating and Corporate Governance Committee.  The committees have significant responsibilities, including retaining and overseeing auditors, reviewing and approving internal control procedures, developing and recommending to the Board corporate governance principles, and reviewing and approving incentive compensation and equity plans.

62.     The Control Defendants also had unique insight into the Company's operations through information rights that they gained as a part of their early investments in the Company, including the right to visit and inspect the Company's properties and to examine its books of accounts and records.  These were provided for in an Investors' Rights Agreement that the Control Defendants entered into with Berkeley Lights, which agreement also provided that the Company would provide monthly, quarterly, and annual unaudited financial statements to the Control Defendants.  In combination with their participation on the Board of Directors, this provided the Control Defendants with insight about the Company not available to the rest of the investing public.

63.     Similarly, beginning in January 2018, Berkeley Lights entered into a distribution agreement with Nikon, which, as restated in March 2019, provided that Nikon was the exclusive distributor of Berkeley Lights products in Japan, Singapore, Thailand and South Korea and a non-exclusive distributor in China.  As the exclusive distributor in Japan, Singapore, Thailand and South Korea, Nikon was required to purchase a minimum quantity of Berkeley Lights products

AMENDED COMPLAINT                                - 22 -
Case No. 4:21-cv-09497-HSG

every six months throughout the term of the distribution agreement. The agreement, which was set to expire in March 2022, provided Nikon with important insight into Berkeley Lights's placement of products in Asia, including trends in accounts receivable. Berkeley Lights considered the Asia Pacific region vital for expanding product growth, and throughout the Class Period, this geographical market was a growing source of revenue for Berkeley Lights, both in terms of absolute numbers as well as a percentage of total revenue.

64. So, for example, revenues recognized by Berkeley Lights from sales to Nikon pursuant to its distribution agreement accounted for over 25% of all Berkeley Lights's revenue in the Asia Pacific market during 2018 and 2019. And revenues recognized from the distribution agreement with Nikon constituted a growing percentage of the total of all Asia Pacific sales, making up nearly 40% of the sales in 1Q 2020.

65. The Company itself acknowledged the substantial power Defendants WRVI, Sequoia, Nikon, and Khandros had to direct the affairs of the Company, explaining in the IPO Prospectus: "Our directors, officers and principal stockholders have significant voting power and may take actions that may not be in the best interests of our other stockholders."

66. The IPO Prospectus continued, providing still more detail about the scope and nature of the Control Defendants' hold on the Company:

> After this offering, our executive officers, directors and principal stockholders each holding more than 5% of our common stock will collectively control approximately 64% of our outstanding common stock. As a result, these stockholders [essentially the Control Defendants], if they act together, will be able to control the management and affairs of our company and most matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions. . . . This concentration of ownership may not be in the best interests of our other stockholders.

67. Berkeley Lights made substantially the same disclosures throughout the Class Period, including in the SPO Prospectus, which explained that the Company's directors, officers and principal stockholders' continued to own a significant majority (61.13%) of Berkeley Lights outstanding stock, and as such, were "able to control the management and affairs of our company and most matters requiring stockholder approval."

AMENDED COMPLAINT                                    - 23 -
Case No. 4:21-cv-09497-HSG

**C.     Events at the Beginning of the Class Period**

68.     As discussed, Berkeley's Lights growth and value was dependent on the capabilities and reliability of its platform, and in particular, its flagship instrument Beacon, and placing significant numbers of its platform with customers.  But as the Company itself disclosed, prior to the IPO the Company was "still in the very early stages of platform adoption," with an installed base of only 54 units as of March 31, 2020.  The Company had even fewer customers, 49, as of March 31, 2020, with a few customers having multiple systems.

69.     But the Control Defendants had potentially billions of dollars' worth of illiquid ownership interest that could effectively only be sold on a public market, and in order to liquidate those holdings, the Company needed to go public.  Thus, Defendants took the Company public via the IPO and pursuant to a registration statement filed with the SEC on an Amended Form S-1 on July 15, 2020 ("IPO Registration Statement").  The IPO Registration Statement confirmed "[t]he principal purpose of this offering is to create a public market for our common stock and enable access to the public equity markets for us and our stockholders," namely, the Control Defendants, which as explained above held the vast majority of the Company's outstanding stock at the time of the IPO.  Granted, the Control Defendants' stock holdings were subject to various restrictions, so they could not be sold immediately after the IPO, but the IPO started the clock on these sale restrictions' expiration.  And, as explained in more detail below, the Control Defendants did not waste any time in beginning to offload vast quantities of their stock holdings as soon as they could after the IPO, even receiving an early release from lockup provisions that should have lasted 180 days to dispose of shares in the SPO that followed four shorts months after the IPO.

70.     Accordingly, to attract investors to purchase Berkeley Lights's stock, and permit the Control Defendants to sell their ownership interests, Berkeley Lights and the Individual Defendants had to play up the purportedly groundbreaking nature of the Company's platform, the growth in product placements to date, and prospects for placing still greater numbers of units with customers in the future.  For example, financial analysts from J.P. Morgan initiating coverage of Berkeley Lights shortly after the IPO provided an "Overweight" rating for the Company and a price target of $75 (with the stock closing the day before at $58.15), which assumed "a unique

AMENDED COMPLAINT                    - 24 -
Case No. 4:21-cv-09497-HSG

technology platform that enables significantly accelerated development and commercialization of biologic drugs and other cell-based products." The platform was so "disruptive" that J.P. Morgan did "not see meaningful competitive threat from existing players." J.P. Morgan analysts further highlighted the Company's "large TAM with long runway for market penetration." Similarly, analysts from Cowen initiated coverage at the same time with an "Outperform" rating, which was based on the Company's "unique and proprietary technology platform that allows users to optimize cell-based products and manufacturing processes — cutting costs, reducing timelines, improving 'hit rates,' and allowing for more robust/optimal outcomes," and "already demonstrated robust growth in its installed base."

71.    Thus, despite the relatively small number of the Company's platforms placed prior to the IPO, in the IPO Registration Statement, the Company highlighted its "new" platform as being "the most advanced environment for rapid functional characterization of single cells at scale" and providing a "level of scale and precision [that] is not attainable with other approaches." Similarly, the Company claimed an enormous market opportunity with a total addressable market of $23 billion.

72.    Further, in the lead up to the IPO, Berkeley Lights claimed to be experiencing revenue growth, in particular in connection with its direct platform sales. IPO Materials stated that, during fiscal 2019, Berkeley Lights's direct platform sales had increased 84% year-over-year to $39.1 million in sales. Similarly, IPO Materials stated that, during the first quarter of 2020, Berkeley Lights's direct platform sales had increased 5% year-over-year to $9.4 million in sales. As a result, as the Company explained, "[w]e believe we have established a solid foundation, from which to drive adoption of our platform across multiple markets."

73.    The Company further acknowledged in connection with the IPO that its ability to drive further adoption of its platform, and in particular, its Beacon instrument, was key: "Our ability to execute our growth strategy depends upon our ability to increase the adoption of the Berkeley Lights Platform." As the company further disclosed: "[a]ny failure to increase penetration in our existing markets would adversely affect our ability to improve our operating results." And, of course, customer adoption was, in turn, dependent on "the relative reliability and

AMENDED COMPLAINT                - 25 -
Case No. 4:21-cv-09497-HSG

robustness of our platform as a whole and the components of our platform," Beacon being foremost among these platforms as the principal revenue driver of the Company leading up to the IPO.

74.     A similar series of events and disclosures played out in the immediate aftermath of the IPO as the Company positioned itself for the SPO and the Control Defendants began to liquidate their ownership interest in the Company.

75.     For example, the Company's revenue trends purportedly continued after the IPO, as Berkeley Lights stated that it continued to experience year-over-year increases in its direct platform sales revenue.  On August 25, 2020, Berkeley Lights released its financial results for the second quarter of 2020, stating that during the quarter the Company had achieved $7.5 million in direct platform revenue, a 9% year-over-year increase.  And, on November 12, 2020, Berkeley Lights released its financial results for the third quarter of 2020, stating that during the quarter the Company had achieved $12.4 million in direct platform revenue, a 65% sequential increase.  During this time, the price of Berkeley Lights common stock quadrupled from the IPO price, reaching over $90 per share on November 12, 2020.

76.     Then, on November 16, 2020, Berkeley Lights announced it would be conducting a secondary offering of stock to allow certain insiders to sell their personal Berkeley Lights shareholdings.  In the SPO, several Berkeley Lights insiders, including Control Defendants WRVI, Nikon, and Khandros and WRVI's founding managing partner and director of Berkeley Lights, Michael Marks, sold 3.45 million Berkeley Lights shares to investors at $86 per share, generating nearly $300 million in gross offering proceeds for the selling insiders.  The SPO was unusual not only because of its close proximity to the IPO—which had been conducted less than four months previously—but also because the underwriters for the IPO had agreed to allow the selling stockholders to exit their IPO lockup agreements early.  Additionally, the selling stockholders, not Berkeley Lights, would receive all of the proceeds from this offering.

AMENDED COMPLAINT                            - 26 -
Case No. 4:21-cv-09497-HSG

**Global Newswire Posting of Berkeley Lights's SPO Announcement**
*highlighted emphasis added*



# Berkeley Lights Announces Pricing of Public Offering by Selling Stockholders

November 18, 2020 23:25 ET | Source: Berkeley Lights, Inc

EMERYVILLE, Calif., Nov. 18, 2020 (GLOBE NEWSWIRE) -- Berkeley Lights, Inc., a leader in Digital Cell Biology, today announced the pricing of its previously announced public offering of 3,000,000 shares of common stock to be sold by certain selling stockholders of Berkeley Lights at a public offering price of $86.00 per share. In addition, the selling stockholders have granted the underwriters a 30-day option to purchase up to an additional 450,000 shares of common stock. The offering is expected to close on or about November 23, 2020, subject to the satisfaction of customary closing conditions. The selling stockholders will receive all of the net proceeds from the offering. Berkeley Lights will not receive any proceeds from the offering.

J.P. Morgan, Morgan Stanley and Cowen are acting as lead book-running managers for the offering.

A registration statement relating to the shares being sold in this offering by the selling stockholders has been filed with the Securities and Exchange Commission and was declared effective on November 18, 2020. The offering is being made only by means of a prospectus, copies of which may be obtained, when available, from: J.P. Morgan Securities LLC, c/o Broadridge Financial Solutions, 1155

77.    The SPO Materials, like with those for the IPO before it, touted the supposed groundbreaking nature of the Berkeley Lights platform, stating, for example, that the platform provides "the most advanced environment for rapid functional characterization of single cells at scale." The SPO Registration Statement similarly stated that the Berkeley Lights platform delivered "the best cells" and "provides the deepest information, with linked phenotypic and genotypic data, on tens of thousands of live single cells relevant to the customers' end product specifications." The SPO Registration Statement also claimed that "this level of scale and precision is not attainable with other approaches." The SPO Registration Statement described the Berkeley Lights platform as enabling the Company's customers "to find the best cells" by offering advanced capabilities.

78.    The SPO Registration Statement repeated the Company's financial and operational results provided in Berkeley Lights's 2Q20 Form 10-Q and 3Q20 Form 10-Q. The SPO Registration Statement also continued to represent that the "total addressable market" for the Company's products and services was "$23 billion."

AMENDED COMPLAINT                          - 27 -
Case No. 4:21-cv-09497-HSG

79.    Unbeknownst to the investing public, however, at the time of the IPO and SPO, the Berkeley Lights platform had significant reliability issues and its capabilities fell well short of the groundbreaking technology that the Company had represented to the market.  The truth about Berkeley Lights's platform would be revealed in significant part as a result of an investigative analyst report issued by Scorpion Capital in September 2021.  As detailed more thoroughly below, the Scorpion Capital Report was based on 24 damning research interviews, including interviews with 14 of Berkeley Lights's largest customers, that described a "trail of customers who allege they were 'tricked,' misled, or over-promised into buying a $2 million lemon."

### III.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

80.    The Class Period begins on July 17, 2020.  On that date, Berkeley Lights filed with the SEC a prospectus on Form 424B4, which incorporated and formed part of the registration statement for the IPO and was signed by Defendants Hobbs and Holt (the "IPO Registration Statement").  The IPO Registration Statement highlighted the purported superiority of the Berkeley Lights platform compared to existing cell analyzing instruments, stating, for example, that the platform provides "the most advanced environment for rapid functional characterization of single cells at scale."  The IPO Registration Statement also stated that the Berkeley Lights platform delivered "the best cells" and "provides the deepest information, with linked phenotypic and genotypic data, on tens of thousands of live single cells relevant to the customers' end product specifications."  The IPO Registration Statement also claimed that "this level of scale and precision is not attainable with other approaches."  The IPO Registration Statement described the Berkeley Lights platform as enabling the Company's customers "to find the best cells" by offering advanced capabilities, including as follows:

- Performing rapid functional characterization of tens of thousands of single cells in parallel;

- Precisely controlling the environment around each cell, and maintaining cells in a healthy state for further use;

- Accessing a high degree of cell biodiversity;

AMENDED COMPLAINT                                    - 28 -
Case No. 4:21-cv-09497-HSG

- Deep Opto Profiling of the relevant phenotypic characteristics, at single-cell resolution over time and connecting this to the genotypic information for each cell;

- Performing a broad range of workflows, including single-cell assays, on an integrated platform; and

- Digitally aggregating, accessing, and analyzing a rich data library for each single cell.

81.    The IPO Registration Statement also highlighted Berkeley Lights's purported operational and financial growth, stating that the Company's direct platform sales had increased 84% year-over-year to $39.1 million for its fiscal 2019.  The IPO Registration Statement stated that this segment growth had continued in the first quarter of 2020, as the Company generated $9.4 million in direct platform sales during the quarter, an increase over the first quarter of 2020. Similarly, the IPO Registration Statement stated that Berkeley Lights had placed 26 machines in 2019, a 117% increase over the prior year, and six machines in the first quarter of 2020, a 20% increase over the first quarter of 2019.  The IPO Registration Statement represented that the "total addressable market" for the Company's products and services was "$23 billion."

82.    Finally, the IPO Registration Statement included the following statement as one of its "Risk Factors":

> The Berkeley Lights Platform is comprised of OptoSelect chips and reagent kits, advanced automation systems and advanced application and workflow software, which may contain undetected errors or defects and may not meet the expectations of our customers, which means our business, financial condition, results of operations and prospects could suffer.

83.    At the time they were made, the statements in ¶¶ 80-82 were materially false or misleading because they failed to disclose the adverse facts pertaining to Berkeley Lights's business, operations, and financial condition, which were known to or deliberately disregarded by Defendants:

(a)     that Berkeley Lights's flagship instrument, the Beacon, suffered from numerous design and manufacturing defects including breakdowns, high error rates, data integrity issues and other problems, limiting the ability of biotechnology companies and research institutions to consistently use the machines at scale;

AMENDED COMPLAINT                                    - 29 -
Case No. 4:21-cv-09497-HSG

(b)     that Berkeley Lights had received numerous customer complaints regarding the durability and effectiveness of the Company's automation systems, including complaints related to the design and manufacturing detailed in (a), above, and described herein;

(c)     that the actual market for Berkeley Lights's products and services was a fraction of the $23 billion represented to investors because of, inter alia, the relatively high cost of the Company's instruments and consumables and inability to provide the sustained performance necessary to justify these high costs;

(d)     as a result of (a)-(c), above, Defendants' statements to investors during the Class Period regarding Berkeley Lights's business, operations and financial results were materially false and misleading.

84.     On August 25, 2020, Berkeley Lights issued a release providing the Company's financial and operational results for the quarter ended June 30, 2020 ("2Q20").  The release stated that Berkeley Lights had achieved total revenue of $10.6 million during the quarter and made four platform placements.  The release also stated that Berkeley Lights had generated $7.5 million in direct platform revenue for the quarter, compared to $6.9 million for the comparable period in 2019.

85.     Also on August 25, 2020, Berkeley Lights filed with the SEC its quarterly results for 2Q20 on Form 10-Q, which was signed by Defendants Hobbs and Holt, who also filed certifications attesting to the Form 10-Q's accuracy and completeness.  The 2Q20 Form 10-Q contained the financial and operational information contained in the 2Q20 Berkeley Lights release. The 2Q20 Form 10-Q highlighted the purported capabilities and effectiveness of the Berkeley Lights platform, stating that the platform "captures and delivers rich single-cell data to find the best cells" and "allows for a high level of control over live single cells or other micro-objects throughout the functional characterization process."  In addition, the 2Q20 Form 10-Q stated that the Company had experienced an increase in product revenues during the quarter, stating in pertinent part as follows:

> Product revenue increased by $1.3 million, or 17%, for the three months ended June 30, 2020, compared to the three months ended June 30, 2019.  The increase was primarily driven by an increase of $0.8 million in consumables sales driven by

AMENDED COMPLAINT                              - 30 -
Case No. 4:21-cv-09497-HSG

additional demand from our customers due to the increase in our installed base as well as increased activity by our customers related to the COVID-19 pandemic, an increase of $0.4 million in revenue from direct platform and system sales driven by regional mix of the platform placements during the three months ended June 30, 2020, including license arrangements related to our workflows, and an increase of $0.1 million in workflow subscription revenue.

86.    At the time they were made, the statements in ¶¶ 84-85 were materially false or misleading because they failed to disclose the adverse facts pertaining to Berkeley Lights's business, operations, and financial condition, which were known to or deliberately disregarded by Defendants:

(a)    that Berkeley Lights's flagship instrument, the Beacon, suffered from numerous design and manufacturing defects including breakdowns, high error rates, data integrity issues and other problems, limiting the ability of biotechnology companies and research institutions to consistently use the machines at scale;

(b)    that Berkeley Lights had received numerous customer complaints regarding the durability and effectiveness of the Company's automation systems, including complaints related to the design and manufacturing detailed in (a), above, and described herein;

(c)    that the actual market for Berkeley Lights's products and services was a fraction of the $23 billion represented to investors because of, inter alia, the relatively high cost of the Company's instruments and consumables and inability to provide the sustained performance necessary to justify these high costs; and

(d)    as a result of (a)-(c), above, Defendants' statements to investors during the Class Period regarding Berkeley Lights's business, operations and financial results were materially false and misleading.

87.    On November 12, 2020, Berkeley Lights issued a release providing the Company's financial and operational results for the quarter ended September 30, 2020 ("3Q20").  The release stated that Berkeley Lights had achieved total revenue of $18.2 million during the quarter.  The release also stated that Berkeley Lights had generated $12.4 million in direct platform revenue for the quarter, an increase over the comparable period in 2019.

AMENDED COMPLAINT                      - 31 -
Case No. 4:21-cv-09497-HSG

88.     That same day, Berkeley Lights held an earnings call to discuss the Company's 3Q20 results hosted by Defendants Hobbs and Holt.  During his prepared remarks, Defendant Hobbs claimed that Berkeley Lights offered "the most advanced environment for functional testing of live single cells."  Defendant Hobbs similarly stated that the Berkeley Lights "platform enables customers to perform standardized and automated workflows, with precise control over the environment, which enables functional testing of 10s of thousands of live single cells in parallel."  Defendant Hobbs represented that the Company's machines created "the largest data cube for single cells in the industry" and that Berkeley Lights was "the only Company commercializing a platform that can do this in a scalable way."  Defendant Hobbs further stated that during "the third quarter, [the Company] placed 8 platforms of customers, which was up from 4 platforms placed in the second quarter."  Defendant Hobbs also represented that Berkeley Lights was experiencing numerous tailwinds driving sales growth, stating in pertinent part as follows:

> We saw an increase in the current revenues, which were up 26% from last quarter and up 92% year-over-year.  Growth over the prior quarter, was seen across all geographical regions, with Asia leading new platform placements, followed by Europe and the United States.  Revenue was driven by strong demand for the discovery and development of cell-based products, especially for antibody therapeutic workflows.  We continue to see capacity expansion in the industry led by strong investment activity in the CRO, CDMO space.  In addition, the trend of increasing functional single-cell characterization continues to gain momentum, which is a key driver in our long-term growth strategy and core to our mission at Berkeley Lights.

89.     Also on November 12, 2020, Berkeley Lights filed with the SEC its quarterly results for 3Q20 on Form 10-Q, which was signed by Defendants Hobbs and Holt, who also filed certifications attesting to the Form 10-Q's accuracy and completeness.  The 3Q20 Form 10-Q contained the financial and operational information contained in the 3Q20 Berkeley Lights release and earnings call.  The 3Q20 Form 10-Q highlighted the purported capabilities and effectiveness of the Berkeley Lights platform, stating that the platform "captures and delivers rich single-cell data to find the best cells" and "allows for a high level of control over live single cells or other microobjects throughout the functional characterization process."  In addition, the 3Q20 Form 10-Q stated that the Company had experienced an increase in product revenues during the quarter, stating in pertinent part as follows:

AMENDED COMPLAINT                              - 32 -
Case No. 4:21-cv-09497-HSG

Product revenue increased by $0.9 million, or 7%, for the three months ended September 30, 2020, compared to the three months ended September 30, 2019. The increase was primarily driven by an increase of $1.0 million in consumables sales driven by additional demand from our customers due to the increase in our installed base, as well as workflow subscription revenue of $0.2 million. This increase was offset by a decrease in platform sales of $0.4 million resulting from the mix of system type placed as well as the regional mix of placements. During both of the three months ended September 30, 2020 and 2019, we sold 8 platforms.

90.     At the time they were made, the statements in ¶¶ 87-89 were materially false or misleading because they failed to disclose the adverse facts pertaining to Berkeley Lights's business, operations, and financial condition, which were known to or deliberately disregarded by Defendants:

(a)     that Berkeley Lights's flagship instrument, the Beacon, suffered from numerous design and manufacturing defects including breakdowns, high error rates, data integrity issues and other problems, limiting the ability of biotechnology companies and research institutions to consistently use the machines at scale;

(b)     that Berkeley Lights had received numerous customer complaints regarding the durability and effectiveness of the Company's automation systems, including complaints related to the design and manufacturing detailed in (a), above, and described herein;

(c)     that the actual market for Berkeley Lights's products and services was a fraction of the $23 billion represented to investors because of, inter alia, the relatively high cost of the Company's instruments and consumables and inability to provide the sustained performance necessary to justify these high costs; and

(d)     as a result of (a)-(c), above, Defendants' statements to investors during the Class Period regarding Berkeley Lights's business, operations and financial results were materially false and misleading.

91.     On November 19, 2020, Berkeley Lights filed with the SEC a prospectus on Form 424B4, which incorporated and formed part of the registration statement for the SPO and was signed by Defendants Hobbs and Holt (the "SPO Registration Statement"). The SPO Registration Statement highlighted the purported superiority of the Berkeley Lights platform compared to existing cell analyzing instruments, stating, for example, that the platform provides "the most

AMENDED COMPLAINT                         - 33 -
Case No. 4:21-cv-09497-HSG

advanced environment for rapid functional characterization of single cells at scale." The SPO Registration Statement similarly stated that the Berkeley Lights platform delivered "the best cells" and "provides the deepest information, with linked phenotypic and genotypic data, on tens of thousands of live single cells relevant to the customers' end product specifications." The SPO Registration Statement also claimed that "this level of scale and precision is not attainable with other approaches." The SPO Registration Statement described the Berkeley Lights platform as enabling the Company's customers "to find the best cells" by offering advanced capabilities, including the following:

- Performing rapid functional characterization of tens of thousands of single cells in parallel;

- Precisely controlling the environment around each cell, and maintaining cells in a healthy state for further use;

- Accessing a high degree of cell biodiversity;

- Deep Opto Profiling of the relevant phenotypic characteristics, at single-cell resolution over time and connecting this to the genotypic information for each cell;

- Performing a broad range of workflows, including single-cell assays, on an integrated platform; and

- Digitally aggregating, accessing, and analyzing a rich data library for each single cell.

92. The SPO Registration Statement repeated the Company's financial and operational results provided in Berkeley Lights's 2Q20 Form 10-Q and 3Q20 Form 10-Q, as detailed above. The SPO Registration Statement also represented that the "total addressable market" for the Company's products and services was "$23 billion."

93. Finally, the SPO Registration Statement included the following statement as one of its "Risk Factors":

The Berkeley Lights Platform is comprised of OptoSelect chips and reagent kits, advanced automation systems and advanced application and workflow software, which may contain undetected errors or defects and may not meet the expectations of our customers, which means our business, financial condition, results of operations and prospects could suffer.

AMENDED COMPLAINT                    - 34 -
Case No. 4:21-cv-09497-HSG

94. At the time they were made, the statements in ¶¶ 91-93 were materially false or misleading because they failed to disclose the adverse facts pertaining to Berkeley Lights's business, operations, and financial condition, which were known to or deliberately disregarded by Defendants:

(a) that Berkeley Lights's flagship instrument, the Beacon, suffered from numerous design and manufacturing defects including breakdowns, high error rates, data integrity issues and other problems, limiting the ability of biotechnology companies and research institutions to consistently use the machines at scale;

(b) that Berkeley Lights had received numerous customer complaints regarding the durability and effectiveness of the Company's automation systems, including complaints related to the design and manufacturing detailed in (a), above, and described herein;

(c) that the actual market for Berkeley Lights's products and services was a fraction of the $23 billion represented to investors because of, inter alia, the relatively high cost of the Company's instruments and consumables and inability to provide the sustained performance necessary to justify these high costs; and

(d) as a result of (a)-(c), above, Defendants' statements to investors during the Class Period regarding Berkeley Lights's business, operations and financial results were materially false and misleading.

95. On February 25, 2021, Berkeley Lights issued a release providing the Company's financial and operational results for the quarter and fiscal year ended December 31, 2020 ("FY20"). The release stated that Berkeley Lights had achieved total revenue of $21.7 million during the quarter and total revenue of $64.3 million during FY20. The release also stated that Berkeley Lights had placed nine platforms during the fourth quarter.

96. That same day, Berkeley Lights held an earnings call to discuss the Company's FY20 results hosted by Defendants Hobbs, Wood, and Holt. During the FY20 earnings call, Defendant Wood stated that Berkeley Lights was experiencing robust direct platform sales growth, stating "direct platform sales totaled $44.7 million in 2020 and $15.3 million in the fourth quarter of 2020, increasing by 14% and 39% respectively over the prior year periods." In addition,

AMENDED COMPLAINT                     - 35 -
Case No. 4:21-cv-09497-HSG

Defendant Wood stated: "We continue to expand our customer base, with 18 placements coming from new customers and nine being repeat orders.  This brought our install base to 75 systems at year end, a 56% increase over 2019."

97.    At the time they were made, the statements in ¶¶ 95-96 were materially false or misleading because they failed to disclose the adverse facts pertaining to Berkeley Lights's business, operations, and financial condition, which were known to or deliberately disregarded by Defendants:

(a)    that Berkeley Lights's flagship instrument, the Beacon, suffered from numerous design and manufacturing defects including breakdowns, high error rates, data integrity issues and other problems, limiting the ability of biotechnology companies and research institutions to consistently use the machines at scale;

(b)    that Berkeley Lights had received numerous customer complaints regarding the durability and effectiveness of the Company's automation systems, including complaints related to the design and manufacturing detailed in (a), above, and described herein;

(c)    that the actual market for Berkeley Lights's products and services was a fraction of the $23 billion represented to investors because of, inter alia, the relatively high cost of the Company's instruments and consumables and inability to provide the sustained performance necessary to justify these high costs; and

(d)    as a result of (a)-(c), above, Defendants' statements to investors during the Class Period regarding Berkeley Lights's business, operations and financial results were materially false and misleading.

98.    On March 12, 2021, Berkeley Lights filed with the SEC its annual report for FY20 on Form 10-K, which was signed by Defendants Hobbs and Holt, who also filed certifications attesting to the Form 10-K's accuracy and completeness.  The FY20 Form 10-K contained the financial and operational information contained in the FY20 Berkeley Lights release and earnings call. The FY20 Form 10-K highlighted the purported capabilities and effectiveness of the Berkeley Lights platform, stating that the platform "captures and delivers rich single-cell data to find the best cells" and "allows for a high level of control over live single cells or other micro-objects

AMENDED COMPLAINT                        - 36 -
Case No. 4:21-cv-09497-HSG

throughout the functional characterization process." In addition, the FY20 Form 10-K stated that the Company had experienced an increase in product revenues during the quarter, stating in pertinent part as follows:

> Product revenue increased by $8.1 million, or 19% for the year ended December 31, 2020, compared to the year ended December 31, 2019. The increase during the year ended December 31, 2020 compared to December 31, 2019, was primarily driven by an increase of $3.8 million in consumables sales driven by additional demand from our customers due to the increase in our installed base, an increase of $3.3 million from platform and system sales, including sales-type lease arrangements and license arrangements related to our workflows, and an increase of $1.0 million in subscription arrangement and related revenue driven by the launch of our subscription access program in February 2020. During the year ended December 31, 2020 we sold 27 platforms compared to 26 platforms during the year ended December 31, 2019. Revenue from platform and system sales in the year ended December 31, 2020 as compared to the prior year was impacted by the regional mix of the platform placements as well as the mix of system type placed.

99.    Finally, the FY20 Form 10-K included the following statement as one of its "Risk Factors":

> The Berkeley Lights Platform is comprised of OptoSelect chips and reagent kits, advanced automation systems and advanced application and workflow software, which may contain undetected errors or defects and may not meet the expectations of our customers, which means our business, financial condition, results of operations and prospects could suffer.

100.    At the time they were made, the statements in ¶¶ 98-99 were materially false or misleading because they failed to disclose the adverse facts pertaining to Berkeley Lights's business, operations, and financial condition, which were known to or deliberately disregarded by Defendants:

(a)    that Berkeley Lights's flagship instrument, the Beacon, suffered from numerous design and manufacturing defects including breakdowns, high error rates, data integrity issues and other problems, limiting the ability of biotechnology companies and research institutions to consistently use the machines at scale;

(b)    that Berkeley Lights had received numerous customer complaints regarding the durability and effectiveness of the Company's automation systems, including complaints related to the design and manufacturing detailed in (a), above, and described herein;

(c)    that the actual market for Berkeley Lights's products and services was a fraction of the $23 billion represented to investors because of, inter alia, the relatively high cost of

AMENDED COMPLAINT                                  - 37 -
Case No. 4:21-cv-09497-HSG

the Company's instruments and consumables and inability to provide the sustained performance necessary to justify these high costs; and

(d)    as a result of (a)-(c), above, Defendants' statements to investors during the Class Period regarding Berkeley Lights's business, operations and financial results were materially false and misleading.

101.    On May 11, 2021, Berkeley Lights issued a release providing the Company's financial and operational results for the quarter ended March 31, 2021 ("1Q21").  The release stated that Berkeley Lights had achieved total revenue of $18.6 million for the first quarter of 2021, representing 35% growth year over year.

102.    On the same day, Berkeley Lights filed with the SEC its quarterly results for 1Q21 on Form 10-Q, which was signed by Defendants Hobbs and Wood, who also filed certifications attesting to the Form 10-Q's accuracy and completeness.  The 1Q21 Form 10-Q contained the financial and operational information contained in the 1Q21 Berkeley Lights release and earnings call.  The 1Q21 Form 10-Q highlighted the purported capabilities and effectiveness of the Berkeley Lights platform, stating that the platform "captures and delivers rich single-cell data to find the best cells" and "allows for a high level of control over live single cells or other micro-objects throughout the functional characterization process."  In addition, the 1Q21 Form 10-Q stated that the Company had experienced an increase in product revenues during the quarter, stating in pertinent part as follows:

> Product revenue increased by $2.9 million, or 27%, for the three months ended March 31, 2021, compared to the three months ended March 31, 2020.  The increase was primarily driven by strong demand from the Antibody Therapeutics market, resulting in an increase of $1.4 million from platform and system sales, including sales-type lease arrangements and license arrangements related to our workflows, an increase of $1.1 million in consumables sales driven by additional demand from our customers due to the increase in our installed base, and an increase of $0.4 million in subscription arrangement and related revenue driven by the launch of our subscription access program in 2020. During the three months ended March 31, 2021, we sold eight platforms, including placements associated with subscription arrangements, as compared to the three months ended March 31, 2020 in which we sold six platforms.

103.    That same day, Berkeley Lights held an earnings call to discuss the Company's 1Q21 results hosted by Defendants Hobbs and Wood.  During the 1Q21 earnings call, Defendant

AMENDED COMPLAINT                                    - 38 -
Case No. 4:21-cv-09497-HSG

Hobbs stated that Berkeley Lights was experiencing "strong" demand "for both new and existing customers. Such demand was in part driven "by offering alternative access models to accommodate customers through a subscription-based approach." Hobbs also stated that Berkeley Lights intended to introduce a second subscription model "to better meet their specific capacity needs. In this model, customers will subscribe to a given capacity inclusive of all consumables, software, service and support for their Cell Line Development or antibody discovery campaigns." The purpose of each of these subscription models, Hobbs told investors, was to "increase [their] served available market, broaden [their] customer base and drive incremental demand."

104.    On the same conference call, Defendant Wood stated, "We continue to expect revenue to be in the range of $90 to $100 million . . . . [W]e expect revenues to be more heavily weighted to the back half of the year, as more business development collaborations and partnerships come online and as a result of the seasonality we typically experience in the fourth quarter." He continued, regarding the new subscription model:

> This offering will recognize revenue over the subscription term compared to the upfront recognition of a typical equipment sale. As we ramp this offering, it is possible that some previously anticipated CapEx sales may transition to a subscription offering. This could impact quarterly revenues in the near-term, but in turn would provide upside to recurring and overall revenues in future periods.

105.    At the time they were made, the statements in ¶¶ 101-04 were materially false or misleading because they failed to disclose the adverse facts pertaining to Berkeley Lights's business, operations, and financial condition, which were known to or deliberately disregarded by Defendants:

(a)    that Berkeley Lights's flagship instrument, the Beacon, suffered from numerous design and manufacturing defects including breakdowns, high error rates, data integrity issues and other problems, limiting the ability of biotechnology companies and research institutions to consistently use the machines at scale;

(b)    that Berkeley Lights had received numerous customer complaints regarding the durability and effectiveness of the Company's automation systems, including complaints related to the design and manufacturing detailed in (a), above, and described herein;

AMENDED COMPLAINT                    - 39 -
Case No. 4:21-cv-09497-HSG

(c)     that the actual market for Berkeley Lights's products and services was a fraction of the $23 billion represented to investors because of, inter alia, the relatively high cost of the Company's instruments and consumables and inability to provide the sustained performance necessary to justify these high costs;

(d)     Berkeley Lights's new subscription models were exposing the Beacon's weaknesses to new customers, and, because of the Beacon's repeated material failures, those customers were unlikely to become long term subscription or platform customers of Berkeley Lights;

(e)     Berkeley Lights's subscription customers were coming at the expense of platform customers because smaller customers were choosing the subscription model over the Beacon's $2m platform price tag, thus subscription offerings were not "increasing the available market" or "broadening the customer base;" and

(f)     as a result of (a)-(e), above, Defendants' statements to investors during the Class Period regarding Berkeley Lights's business, operations and financial results were materially false and misleading.

106.     On August 11, 2021, Berkeley Lights issued a release providing the Company's financial and operational results for the quarter ended June 30, 2021 ("2Q21").  The release stated that Berkeley Lights had achieved total revenue of $19.3 million for the second quarter of 2021, representing 82% growth year over year.

107.     On the same day, Berkeley Lights filed with the SEC its quarterly results for 2Q21 on Form 10-Q which was signed by Defendants Hobbs and Wood, who also filed certifications attesting to the Form 10-Q's accuracy and completeness.  The 2Q21 Form 10-Q contained the financial and operational information contained in the 2Q21 Berkeley Lights release and earnings call.  The 2Q21 Form 10-Q highlighted the purported capabilities and effectiveness of the Berkeley Lights platform, stating that the platform "is a fully integrated, end-to-end solution, comprised of proprietary consumables, including our OptoSelect chips and reagent kits, advanced automation systems and advanced application and workflow software."  In addition, the 2Q21 Form 10-Q

AMENDED COMPLAINT                          - 40 -
Case No. 4:21-cv-09497-HSG

stated that the Company had experienced an increase in product revenues during the quarter, stating in pertinent part as follows:

> Product revenue increased by $3.9 million, or 43%, for the three months ended June 30, 2021, compared to the three months ended June 30, 2020.  The increase was primarily driven by strong demand across our markets, especially from the Antibody Therapeutics, Gene and Cell Therapy market, resulting in an increase of $3.4 million from platform and system sales, including sales-type lease arrangements and license arrangements related to our workflows, an increase of $0.2 million in consumables sales driven by additional demand from our customers due to the increase in our installed base, and an increase of $0.3 million in subscription arrangement and related revenue driven by the launch of our subscription access program in 2020. During the three months ended June 30, 2021, we placed seven platforms as compared to the three months ended June 30, 2020 in which we placed in total four platforms.

108.    That same day, Berkeley Lights held an earnings call to discuss the Company's 2Q21 results hosted by Defendants Hobbs and Wood.  During the 2Q21 earnings call, Defendant Hobbs, in response to a question about "new units coming offline at customer locations, stated "We're seeing customers are utilizing the tools and they have not decommissioned them."

109.    On the same conference call, Defendant Wood stated, regarding the genesis of the subscription platform:

> So, we tailored this to folks that need to run between 5 and 10 campaigns a year, which obviously is significantly less than what the Beacon is capable of.  And the intent there was to attract that customer to the Berkeley Lights Platform that otherwise would have -- went to an alternative solution, whether that's been a CRO or to build out the lab space that they needed to do it manually and house with that. So, the design here was to price an all-in package that included the tool, the software, the service and the consumables and a very simple price per campaign, easy to sell, goes through an OpEx budget versus the CapEx budget type of a model.

110.    Also on the August 11 conference call, one analyst asked, "[J]ust on the guidance here, 90 to 100 [million in total revenue for the year].  So you did roughly $38 million, I think, in the first half.  So, to the midpoint of the guidance, it is a decent step up in the second half.  And you've got this changing model a little bit going on here.  So, can you just give us some thoughts on the confidence in your ability to hit that guidance . . . ?"

111.    In response, Defendant Wood continued to paint a rosy picture of the Company and reiterated the revenue guidance for the year of $90 to 100 million.  Wood explained that the second half of the year would see an uptick in revenue as a result of usual seasonality further augmented by a couple of factors:

AMENDED COMPLAINT                              - 41 -
Case No. 4:21-cv-09497-HSG

"[O]n the first half versus second half split that you talked about, if you were to look historically over the last couple of years, it's been relatively that same profile, first half and second half. I will say that this year, we expect Q4 to be a slightly higher percentage than what it may have been. And that's primarily a function as you ramp up on some of these business development deals like the Bayer that we talked about as well as getting the TechAccess [subscription model] more rolled out and we get more kind of on that recurring revenue base on there."

Wood continued, emphasizing the early success of the Company's new TechAccess subscription model: "And that program is off to a good start with getting three contracts signed in the first few months of that being launched."

112.    At the time they were made, the statements in ¶¶ 106-11 were materially false or misleading because they failed to disclose the adverse facts pertaining to Berkeley Lights's business, operations, and financial condition, which were known to or deliberately disregarded by Defendants:

(a)    that Berkeley Lights's flagship instrument, the Beacon, suffered from numerous design and manufacturing defects including breakdowns, high error rates, data integrity issues and other problems, limiting the ability of biotechnology companies and research institutions to consistently use the machines at scale;

(b)    that Berkeley Lights had received numerous customer complaints regarding the durability and effectiveness of the Company's automation systems, including complaints related to the design and manufacturing detailed in (a), above, and described herein;

(c)    that the actual market for Berkeley Lights's products and services was a fraction of the $23 billion represented to investors because of, inter alia, the relatively high cost of the Company's instruments and consumables and inability to provide the sustained performance necessary to justify these high costs;

(d)    Berkeley Lights's new subscription models were exposing the Beacon's weaknesses to new customers, and, because of the Beacon's repeated material failures, those customers were unlikely to become long term subscription or platform customers of Berkeley Lights;

(e)    Berkeley Lights's subscription customers were coming at the expense of platform customers because smaller customers were choosing the subscription model over the

AMENDED COMPLAINT                            - 42 -
Case No. 4:21-cv-09497-HSG

Beacon's $2m platform price tag, thus subscription offerings were not "increasing the available market" or "broadening the customer base;"

      (f)      Berkeley Lights's year end revenue guidance was unachievable as it would require all-time record revenue in Q3 and Q4 just to hit the low-end of guidance, a minimum of $26 million per quarter, or an almost 40% increase over its revenue reported for the first two quarters of the year, and the Company itself acknowledged subscription placements would put downward pressure on revenue in the second half;

      (g)      Berkeley Lights' partnership agreements were a stop gap necessitated by the Beacon's weaknesses and shifted the burden of using the cumbersome and error-prone machine to Berkeley Lights, as opposed to its customers; and

      (h)      as a result of (a)-(f), above, Defendants' statements to investors during the Class Period regarding Berkeley Lights's business, operations and financial results were materially false and misleading.

113.    On November 4, 2021, Berkeley Lights issued a release providing the Company's financial and operational results for the quarter ended September 30, 2021 ("3Q21"). The release stated that Berkeley Lights had achieved total revenue of $24.3 million for the third quarter of 2021, representing 34% growth year over year.

114.    On the same day, Berkeley Lights filed with the SEC its quarterly results for 3Q21 on Form 10-Q which was signed by Defendants Hobbs and Wood, who also filed certifications attesting to the Form 10-Q's accuracy and completeness. The 3Q21 Form 10-Q contained the financial and operational information contained in the 3Q21 Berkeley Lights release and earnings call. The 3Q21 Form 10-Q highlighted the purported capabilities and effectiveness of the Berkeley Lights platform, stating that the platform "is a fully integrated, end-to-end solution, comprised of proprietary consumables, including our OptoSelect chips and reagent kits, advanced automation systems and advanced application and workflow software." Regarding the Scorpion Capital Report, in Item 1A the 10-Q added a risk factor relating to the business and strategy that "changes in financial estimates or recommendations by securities analysts, as well as publications from

AMENDED COMPLAINT                                - 43 -
Case No. 4:21-cv-09497-HSG

research analysts associated with short selling, such as was published about us in Q3 2021" could harm Berkeley Lights's share price.

115.   That same day, Berkeley Lights held an earnings call to discuss the Company's 3Q21 results hosted by Defendants Hobbs and Wood.  During the 3Q21 earnings call, Defendant Hobbs stated regarding the Scorpion Capital Report:

> [W]e had multiple repeat purchases in the quarter post the short report being published.  But on the bright side, the report has further cemented the strong relationships we have with our customers.  Many have offered to continue to provide broad support towards Berkeley Lights.  So in general, the customer response has been very positive as we move forward. So I think, in general, we have not seen a dramatic impact from the Scorpion short report."

116.   On the same conference call, in response to a question regarding Berkeley Lights iterating financial guidance at the lower end of the previously stated range, despite an ostensibly "strong" quarter, Defendant Wood stated, "[W]e expect it to be a little bit at the lower end of that range as we were successful with what we're doing on the business.  So nothing really there."  He continued, "[E]ach tool, you're selling $1.5 million to $2 million.  So one timing moving in and out of a quarter can have a material impact.  So that's more what we're saying in that narrow range there."

117.   At the time they were made, the statements in ¶¶ 113-16 were materially false or misleading because they failed to disclose the adverse facts pertaining to Berkeley Lights's business, operations, and financial condition, which were known to or deliberately disregarded by Defendants:

(a)   that Berkeley Lights's flagship instrument, the Beacon, suffered from numerous design and manufacturing defects including breakdowns, high error rates, data integrity issues and other problems, limiting the ability of biotechnology companies and research institutions to consistently use the machines at scale;

(b)   that Berkeley Lights had received numerous customer complaints regarding the durability and effectiveness of the Company's automation systems, including complaints related to the design and manufacturing detailed in (a), above, and described herein;

AMENDED COMPLAINT                              - 44 -
Case No. 4:21-cv-09497-HSG

(c)    that the actual market for Berkeley Lights's products and services was a fraction of the $23 billion represented to investors because of, inter alia, the relatively high cost of the Company's instruments and consumables and inability to provide the sustained performance necessary to justify these high costs;

(d)    that the high error rates, repeated equipment malfunctions, and dissatisfied customers documented in the Scorpion Capital Report were true, and had a material effect on the successful growth of Berkeley Lights, and

(e)    as a result of (a)-(d), above, Defendants' statements to investors during the Class Period regarding Berkeley Lights's business, operations and financial results were materially false and misleading.

118.    As a result of Defendants' wrongful acts and omissions, and the decline in the price of Berkeley Lights common shares detailed herein, Plaintiffs and other members of the Class have suffered significant losses and damages.

## IV.    DISCLOSURE OF DEFENDANTS' SCHEME TO DEFRAUD

119.    The Company revealed the truth of the underlying and long-standing issues with the Berkeley Lights platform through the series of partial corrective disclosures identified below, beginning at the start of 2021 as product placements and revenue slumped and the Company attempted to prop up its unit placements through the introduction of another subscription model:

**A.    Defendants Reaffirm 2021 Targets in 1Q21 in the Face of Revenue and Sales Headwinds, including Placing Fewer Units than Previous Quarters**

120.    The truth began to emerge nearly six months after the November 2020 SPO.  On May 11, 2021, Berkeley Lights issued an earnings release announcing its 1Q 2021 results, filed its Form 10-Q, and held an earnings call.  While the Company reaffirmed its prior guidance for expected total revenues between $90 to 100 million for the full year 2021, signs of poor product placement and limited adoption of expanded use cases for the Beacon began to show—tell-tale indicators that the Beacon could not meet the lofty promises made by the Company.

AMENDED COMPLAINT                                   - 45 -
Case No. 4:21-cv-09497-HSG

121.    To begin with, Berkeley Lights only sold eight platforms during the quarter, down from the prior quarter (9 placed in 4Q 2020) and equal to the number sold in 3Q 2020.  With "at a minimum" 45 total placements promised for 2021, Berkeley Lights had to average over twelve units sold in each of the remaining three quarters to reach its target, more units sold per-quarter in three consecutive quarters than in any other single quarter in the history of the Company.  Further, while the Company highlighted $18.6 million in revenue for the quarter, representing 35% growth year over year, this was a 14% drop in revenue compared to the prior quarter.

122.    Also, the Company introduced a new subscription model for its products that was intended to bolster its stagnant direct sales.  The new subscription model was notable for a few reasons.

123.    First, Berkeley Lights introduced the new model right on the heels of the introduction of another subscription model.  The Company introduced the prior model a little over a year earlier in February 2020 with similar promises that it would "enable broader customer access," particularly among potential customers "with lower capacity requirements."  Yet, by May 2021, the prior model had floundered, with a single subscription placement in each of the prior two quarters, and the Company pivoted to offer yet another subscription model.

124.    But what was true of the new subscription model was also true of the former, and as one analyst from Morgan Stanley questioned the Company during the earnings call, the likelihood of a customer willing to pay $1.5 to $2 million for a Beacon switching to the subscription model seemed unlikely.  During the earnings call, Berkeley Lights tried to allay these fears, explaining that the subscription program would drive new adoption as it was focused on customers with fewer campaign runs and pricing based on campaign capacity.  Essentially, Berkeley Lights was slashing prices, a troubling sign for a product that the Company had sold investors on as providing "the most advanced environment for rapid functional characterization of single cells at scale"—or as Defendant Hobbs explained during the May 11 earnings call, "Berkeley Lights does functional validation or test better than anybody else."

125.    The new subscription model was unlikely to drive incremental sales, and instead, as the Company itself acknowledged, would only lead to cannibalization of placements, as

AMENDED COMPLAINT                             - 46 -
Case No. 4:21-cv-09497-HSG

potential customers chose the cheaper and less risky option with the Berkeley Lights platform. This possibility was all but confirmed by Berkeley Lights's maintaining its guidance on total expected revenue for 2021 despite the introduction of the new subscription model.

126.    The announcement of the new subscription model also begged the question of why these new, low-capacity customers were included among the potential 1,600 customers and $23 billion TAM that Berkeley Lights announced in connection with the IPO and SPO.  These companies, with small operating budgets, were never going to be able to afford a $2 million Beacon.  Yet, as Berkeley Lights described, they were now part of the Company's "served [or serviceable] available market" with the introduction of the new subscription model.

127.    In response to the May 11, 2021 news, the Company's stock price fell from a closing price of $45.54 per share on May 10, 2021 to a closing price of $43.13 on May 11, 2021 on trading volume of more than 2.5 million shares.  The May 11 share price drop reflected a market capitalization loss of over $140 million, and a 5.3% decline from Berkeley Lights's closing price on May 10, 2021.

128.    As the market continued to digest the news, Berkeley Lights's share price continued to fall over the next two days, closing at $39.53 per share on May 12, 2021 and $36.40 on May 13, 2021.  This was an additional 8.3% decline on May 12 and 7.9% decline on May 13.  Berkeley Lights lost another $449 million in market capitalization over the two days.

**B.    Defendants Released Poor Results for a Second Consecutive Quarter in 2Q21, with Fewer Units Placed than in any Quarter from the Prior Year**

129.    The truth about the Berkeley Lights platform continued to leak to the market when, just a few months later, the Company disclosed poor financial results for 2Q21.  On August 11, 2021, Berkeley Lights issued an earnings release announcing its 2Q21 results, filed its Form 10-Q, and held an earnings call, again posting disappointing results and missing revenue marks for the quarter.  Revenue for the quarter fell slightly below projections and the Company placed a dismal seven units for the quarter.  The units placed declined from the prior quarter (8), which already was the low mark over the preceding three quarters (8, 9, and 8 units placed in 1Q21, 4Q20, and 3Q20, respectively).  With only fifteen units placed through the first half of the year,

the Company needed to sell 30 units (or two-thirds of all units) over the second half of the year to meet its expected ("at a minimum") 45 units sold in 2021.  Further, the revenue for the quarter ($19.3 million) was essentially flat with 1Q21 revenue, signaling the Company's growth prospects were deteriorating.

130.    The quarter's shortcomings were not lost on analysts that questioned Berkeley Lights's ability to meet projections for the second half of the year.  As one analyst asked during the earnings call, "just on the guidance here, 90 to 100 [million in total revenue for the year].  So you did roughly $38 million, I think, in the first half.  So, to the midpoint of the guidance, it is a decent step up in the second half.  And you've got this changing model a little bit going on here.  So, can you just give us some thoughts on the confidence in your ability to hit that guidance . . . ?"  To meet the year-end revenue guidance, Berkeley Lights needed two unprecedented quarters in a row just to hit the low-end of guidance, a minimum of $26 million per quarter, or an almost 40% increase over its revenue reported for the first two quarters of the year.  This was especially problematic given that Defendant Wood noted in response to the above question that subscription placements in the second half would put downward pressure on revenue: "the more subscription we do, as we talked about in the last call, the closer to the lower end of the range will be."  The below chart from the Scorpion Capital Report illustrates well the dire situation facing Berkeley Lights in August 2021.

**Excerpt From Scorpion Capital Report (p. 28) regarding BLI's 2021 Guidance**



131.    On this news, the Company's stock price fell over 9.5% from $43.79 per share at close on August 10, 2021 to $39.65 per share at close on August 11, 2021.  There was heavy Berkeley Lights trading volume during the day, with over 2 million shares changing hands.  The August 11 share price decline resulted in a loss of $261.3 million in market capitalization for the Company.

132.    Berkeley Lights worked hard to downplay any concerns, however, and as explained above in ¶¶ 106-12, Defendant Wood kicked the revenue can down the road.  The Company again reiterated its revenue guidance for the year, explaining that it believed an uptick was coming partly as a result of the new subscription offering and the ramp up in partnership agreements, including a recently announced partnership agreement with Bayer, as well as usual seasonal differences with more heavily weighted past fourth quarters.

133.    The Company really emphasized the new Bayer deal, for which Berkeley Lights issued a separate press release on the same day.  As Defendant Hobbs explained during the analyst call, "[t]he Bayer deal is another step into offering high-throughput functional screening services at Berkeley Lights."  Curiously, the Bayer deal was not with the German pharmaceutical giant for use in developing a drug or other therapeutic for use in humans, but a small, U.S. based agricultural division of Bayer.

134.    Of course, the Company did not let on about the consistent failures of its platform and customer dissatisfaction with its capabilities, or otherwise explain why, despite the Company's dependence on unit placement, it was touting new service business through partnerships like that with Bayer that involved no product placements.  Nor did the Company explain how Defendant Wood could say in the same breath that revenue would tick up in the second half of 2021 due in part to the ramp up of its subscription offering, while also noting that subscription placements would put downward pressure on revenue in the second half.

135.    These efforts to downplay any concerns partially succeeded in maintaining the artificial inflation in the price of Berkeley Lights's securities, as analysts generally issued positive reports following the call and emphasized the prospects of the Company's new strategic partnerships.

AMENDED COMPLAINT                        - 49 -
Case No. 4:21-cv-09497-HSG

**C.     Scorpion Capital Issued a Scathing Investigative Report Uncovering the Breadth of the Issues with Berkeley Lights's Platform and the Company's Many Efforts to Conceal Those Issues**

136.     On September 15, 2021, research analyst firm Scorpion Capital issued a scathing investigative report, titled "Fleecing Customers And IPO Bagholders With A $2 Million Black Box That's A Clunker, While Insiders and Silicon Valley Bigwigs Race To Dump Stock.  Just Another VC Pump at 27X Sales.  Target Price: $0," which criticized Berkeley Lights's technology and questioned the sustainability of the Company's most important business relationships and its business growth plan (the "Scorpion Capital Report").  Although Scorpion Capital stated it was short Berkeley Lights, the information contained in the Scorpion Capital Report was purportedly based on extensive proprietary research and analysis, including 24 research interviews with former Berkeley Lights employees, industry scientists and end users across 14 of the Company's largest customers.  The Scorpion Capital Report detailed a "trail of customers who allege they were 'tricked,' misled, or over-promised into buying a $2 million lemon" and concluded that the "reality is so far from BLI's grandiose hype that we believe its product claims and practices may constitute outright fraud."

137.     Examples from witness interviews detailed in the Scorpion Capital Report include, inter alia: (i) an Amgen employee who stated that Berkeley Lights machines had an error rate 50% higher than standard lab equipment; (ii) a Bristol Myers Squibb employee who described the machines as onerous and unusable and a waste of money; (iii) a Pfizer senior scientist who implied that the Company's key product claims and capabilities are false; (iv) a Novartis ex-manager who described the products as a farce that do not work; and (v) an AbbVie scientist who stated that in their experience 40% to 50% of all cells were ruined during runs on the Berkeley Lights machines.  In total, the Scorpion Capital Report claimed to have interviewed customers representing 30% to 50% of Berkeley Lights's entire installed base and that "[a]ll 14 customers indicated that BLI's machine is a flop" and that the authors could not "recall hearing feedback as scathing and universal during customer checks."  Problems cited in the Scorpion Capital Report included the fact that the Company's instruments were not robust enough for commercial use and frequently broke down,

AMENDED COMPLAINT                                       - 50 -
Case No. 4:21-cv-09497-HSG

were prone to contamination, suffered from throughput limitations, were plagued by data integrity issues, and experienced repeated software problems.

138.    In addition, the Scorpion Capital Report found "virtually every" ex-employee interviewed had described Berkeley Lights's total addressable market as "negligible," with one describing the addressable market claimed by the Company in its communications to investors as "'ridiculous.'"  The Scorpion Capital Report concluded that only a relatively small number of biotech companies could afford the relatively expensive machines produced by Berkeley Lights and that most of these had already made a purchase.  In addition, the Scorpion Capital Report found that negative customer experiences had further crimped the Company's growth potential. According to the Scorpion Capital Report, the availability of cheaper and better alternatives compounded the problem.  The Scorpion Capital Report stated that Berkeley Lights was experiencing anemic or even declining product sales and growth and had been forced to move into bespoke projects and subscription-based offerings in order to "scrape together enough shards of revenue to try and keep the story going while insiders dump stock."  The Scorpion Capital Report estimated the Company's actual total addressable market based on interviews with former Berkeley Lights employees to be only $400 million to $600 million.

139.    The price of Berkeley Lights common stock plummeted on the information revealed in the Scorpion Capital Report, falling nearly 30% over two trading days to close at $23.53 on September 16, 2021, on trading volume of over 22 million shares.  The Company lost $619.3 million in market capitalization as a result of the two-day share price decline.

AMENDED COMPLAINT                              - 51 -
Case No. 4:21-cv-09497-HSG



**BLI Stock Price After Scorpion Capital Report Publication**

140. The scope and specificity of the Scorpion Capital Report bolstered its credibility, with the report describing itself as the "most in-depth due diligence to date" on the Company. Certain aspects of the Scorpion Capital Report were also generally corroborated by available public information, including the Company's relatively flat sales of its flagship Beacon instruments, alarming increase in accounts receivables, and move into more subscription-based and bespoke product offerings. Moreover, the fact that the price of Berkeley Lights common stock plummeted on the publication of the Scorpion Capital Report and failed to recover even after Berkeley Lights responded to the report indicates that the market found the Scorpion Capital Report's allegations credible and directly contrary to Defendants' prior representations to investors.

141. More specifically, Berkeley Lights issued its response to the Scorpion Capital Report the day after the report was issued, making a statement on the September 16, 2021 airing of CNBC's Fast Money. The statement was read by the host of the program as a part of a segment focusing on Berkeley Lights and featuring an extended interview of Scorpion Capital's founder, Kir Khalon, about the report issued the day prior. During the interview, Mr. Khalon reiterated all

the major points of the Scorpion Capital Report and addressed questions about the credibility of the report, including its reliance on former employees of Berkeley Lights, who as the host of the show pointed out may have an axe to grind or may only have outdated information about the Company.

**Screenshot from CNBC Interview with Scorpion Capital Founder Khalon**



142.    Mr. Khalon explained, "The heart of the report [] is that we talked to fourteen of Berkeley Lights largest customers. . . . the most important thing to verify as part of the research is what do customers think about the product.  So, we talked to seven ex-employees, we talked to fourteen large customers.  These are not rinky-dink customers.  . . . and the feedback from all fourteen customers was extremely negative.  They told us that the product, which is overpriced to begin with, at a shocking $2 million—that the product basically doesn't work.  It doesn't do what it purports to do, and in many cases, they just mothball it. . . .  And that was actually confirmed by the former employees we talked to."

143.    And with regard to Scorpion's interviews with former employees, Khalon explained, "we're very careful to screen for the former employees that we speak with. Occasionally, you can have employees that are disgruntled, but we talked to former executives. You know, these are extremely credible people.  We verify that information by talking to many

different ex-employees." Khalon continued, "And in this case the information was very consistent from employee to employee, from customer to customer, so we're very confident that the findings are correct." In short, he concluded: "they [the customers] did get fleeced."

144.    In contrast, Berkeley Lights's response was tepid—it did not address any of the facts of the Scorpion Capital Report or offer any specifics in response. Rather, it read, in its entirety:

> We have strong and continued confidence in our business, technology, customer relationships, and the value we deliver. The Berkeley Lights technology enables our customers to find the biology that cures disease.
>
> The report from Scorpion, a self-proclaimed short seller, contains highly misleading statements, groundless claims and a clear lack of industry understanding. It's important to note that Scorpion never reached out to us prior to the publication of their report. We believe the sole purpose of the report was to serve the short seller's interests at the expense of Berkeley Lights shareholders.
>
> Berkeley Lights is well positioned to continue to drive customer success and execute our business strategy.

145.    Given the Scorpion Capital Report, the ensuing interview on September 16 with the founder of Scorpion Capital, and the Company's response to the report issued during the same interview and also made available in an 8-K filing the following day on September 17, the investing public had a choice to make. Investors credited the well-sourced and researched short report, with Berkeley Lights's share price continuing its fall the following week as the market continued to digest the news. Ultimately, by the end of the following week, on September 23, 2021, Berkeley Lights's share price had fallen below its IPO-offering price (to $21.95) for the first time since the Company went public.

146.    Berkeley Lights tried to minimize the damage, continuing to issue false statements, as described above in ¶¶ 106-11, 113-17, in an effort to convince the market of the falsity of the Scorpion Capital Report. The efforts worked, at least partially, and the entire artificial inflation in the price of Berkeley Lights stock did not immediately dissipate.

147.    Contemporaneous analyst reports confirm the effectiveness of Berkeley Lights's PR strategy. J.P. Morgan's September 16, 2021, analyst report read, "Overall, we see little merit in most of the accusations made in the short report, and we believe the underlying value proposition

AMENDED COMPLAINT                    - 54 -
Case No. 4:21-cv-09497-HSG

of BLI's Beacon platform stays intact.  In fact, BLI had customers on site yesterday who expressed no concern in reaction to the Scorpion Capital Report.  Management remains confident in the path forward and will continue to focus on execution."  Similarly, William Blair's October 12, 2021, report read:

> In our view, the reason for the prerelease is part of a broader effort from the company to show the strength of the business and chip away at the recent commentary that has questioned the company's value proposition and near-term results.  While this will not put those concerns to bed completely, we see this as a step in the right direction as the team is demonstrating not only financial results but ongoing utilization from existing customers, which would seem to validate the company's use-cases to some degree.

**D.      Defendant Hobbs Replaced as CEO as the Company Falls Well Short of Projections for Full-Year 2021**

148.    The truth about the actual  capabilities of Berkeley Lights's platform (or lack thereof) was fully revealed on January 5, 2022, when the Company issued a press release announcing that Defendant Hobbs was demoted from his position as CEO.  The demotion was characterized as a transition, with Hobbs remaining with the Company in a new position as president of the Antibody Therapeutics business line.  But whatever spin the Company tried to put on the demotion, its purpose was clear as the Company simultaneously announced a significant shortfall in its total revenue for 2021.

149.    As announced by the Company on January 5, total revenue for 2021 was expected to be between $84 and $84.5 million, well short of the projected $90 to 100 million, a figure the Company continually reaffirmed throughout 2021, including on May 11 and August 11.  The end of year revenue miss implied a significant shortcoming for the fourth quarter 2021: $22 million in revenue for the quarter, a 10% sequential decrease, when the Company had continually assured investors that product placements and revenue would tick up in the fourth quarter 2021 as a result of, among other reasons, usual seasonality.  The press release also indicated that product placements continued (and would continue) to take a hit, corroborating the Scorpion Capital Report in this important respect.

150.    The Company indicated that the decision to replace Hobbs with a new CEO resulted from Hobbs' lack of experience necessary for scaling up commercialization of Berkeley Lights's

AMENDED COMPLAINT                              - 55 -
Case No. 4:21-cv-09497-HSG

platform.  This is a peculiar explanation for the CEO transition given that the Company had long described Hobbs as necessary to the success of the Company and included risk disclosures in its SEC filings indicating that the loss of Hobbs could adversely impact the business.  Additionally, scaling up commercialization was already a priority for Berkeley Lights, as should be obvious for a company with a supposed $23 billion TAM that to date had yet to top $85 million in annual revenue.

151.    The Company was toeing a precarious line, otherwise indicating to investors that it was not changing its fundamental strategy.

152.    In response to the January 5, 2021 news, the Berkeley Lights share price plunged on the following day, falling from a closing price of $16.27 on January 5, 2022 to a closing price of $9.88 per share on January 6, 2022, or a 39.3% drop, on volume in excess of 11.8 million shares. The Company lost $431.2 million in market capitalization as a result.

### V.    ADDITIONAL SCIENTER ALLEGATIONS

153.    The allegations in this Section allege scienter as to each Defendant.  The inference and conclusion that Defendants acted with scienter, that is, that they intended to mislead the investing public or were reckless as to the possibility of misleading the investing public, is supported by the following facts.  While organized into sub-Sections for readability, the following allegations of scienter are mutually corroborating.  Here, numerous well-pled facts demonstrate a "strong inference" of each Defendant's scienter.

**A.    Defendants' Misrepresentations Were Necessary to Go Public**

154.    As discussed above, Defendants made many of their misrepresentations and omissions while soliciting funds from investors in their initial public offering, with their misstatements allowing the Company to complete the IPO.  With the Company having a small installed base and acknowledging that it was "still in the very early stages of platform adoption," the Company had to justify its value proposition as a growth company.  Without the misrepresentations and omissions about the groundbreaking capabilities of Berkeley Lights's platform, and in particular, its flagship Beacon instrument, the Company's growth leading up to

the IPO, and its prospects for future growth with a $23 billion TAM, Defendants would have had difficulty convincing the investing public to buy shares in the IPO.

155.    Notably, the need to raise capital was a going concern for the Company to continue operations, given its poor direct revenues.  In the Company's IPO Risk Disclosures, Defendants reported that the Company "need[ed] to raise additional capital to fund [its] existing operations" in addition to expanding operations.  The Company also noted that, based on its then-current business plan, the net proceeds from the offering, together with its current cash, would cover approximately the Company's next 12 months or more.

156.    And Defendants' false and misleading representations had their intended effect: On July 17, 2020, Berkeley Lights's stock opened for trading at $51.05 after pricing 8,100,000 shares of common stock at a $22.00 per share public offering price.  The Company also granted the Underwriter Defendants a 30-day option to purchase up to an additional 1,215,000 shares of common stock at the IPO price.  The gross proceeds from this offering (excluding adjustments) earned Berkeley Lights approximately $178.2 million in funds.

157.    Additionally, Defendants were able to use the Company's public status for lucrative self-enrichment.  In the wake of the Company's Offerings, Berkeley Lights's compensation committee granted equity awards for its named officers in the form of stock options and restricted stock options ("RSUs").  Between January 10, 2021 and March 15, 2021, in the wake of the IPO and SPO, the Company awarded "incentive-based" equity, unrelated to performance, to its executives in the following amounts:

| Name | Options | | RSUs | |
| --- | --- | --- | --- | --- |
| | ($) | (# shares) | ($) | (# shares) |
| Defendant Hobbs (CEO) | 2,281,314 | 85,600 | 768,196 | 14,300 |
| Defendant Wood (CFO) | 813,655 | 30,000 | 3,330,200 | 55,000 |
| Keith Breinlinger | 826,592 | 31,000 | 268,600 | 5,000 |
| Stuart Merkadeau | 533,531 | 20,000 | 268,600 | 5,000 |
| Matthew Rosinack | 480,179 | 18,000 | 268,600 | 5,000 |

158.    Further, once public, Berkeley Lights executives and insiders, including Defendants Hobbs and Holt and Control Defendants WRVI, Sequoia, Nikon, and Khandros,

AMENDED COMPLAINT                                    - 57 -
Case No. 4:21-cv-09497-HSG

became able to sell substantial amounts of BLI stock, which they otherwise could not have accomplished without the Company going public.  These sales are described in detail below.

### B.    Berkeley Lights's Senior Executives' Insider Sales Were Unusual and Suspicious

159.    After the IPO, Defendants continued to act with scienter insofar that they knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of federal securities laws.

160.    Defendants engaged in this scheme to further inflate the price of Berkeley Lights common stock, enhance the value of their holdings of Berkeley Lights common stock and other securities (including the options and RSUs granted through the executive compensation programs described above), and to allow for massive insider sales.  To that end, in November 2020, Berkeley Lights conducted a Secondary Offering of common stock that allowed certain insiders, including Control Defendants WRVI, Nikon, and Khandros and WRVI's founding managing partner and director of Berkeley Lights, Michael Marks (named defendant for the Securities Act Claims), to sell 3.45 million shares of their Berkeley Lights common stock at $86 per share, generating nearly $300 million in offering proceeds for the selling insiders.  These SPO sales included an additional 450,000 shares of Berkeley Lights common stock, which the selling stockholders granted the underwriters through options exercisable within 30 days.

161.    The SPO was unusual not only because of its close proximity to the IPO—which had been conducted less than four months previously—but also because the underwriters for the IPO had agreed to allow the selling stockholders to exit their 180-day IPO lockup agreements early (with respect to the SPO stocks sold).  Such early releases from lockups are not only aggressive but relatively rare.  The purpose of a 180-day (6 month) lockup is to help stabilize the stock price by preventing pre-IPO shareholders from dumping their stock as soon as the company goes public.  Early releases, on the other hand, reward early investors for taking bets on the company by

AMENDED COMPLAINT                          - 58 -
Case No. 4:21-cv-09497-HSG

allowing them to benefit from IPO success and by giving them a "safe window" within which to sell their shares.

162.    Additionally, the SPO was notable because it allowed insiders to sell their Berkeley Lights common stock at an offering price more than 8.5 times higher than the market price to which Berkeley Lights stock fell following the revelation of the true facts concealed by Defendants, discussed above.  The sell-off was not limited to the SPO, however, as numerous Company insiders sold tens of millions of dollars' worth of additional Berkeley Lights stock in the secondary market, including Defendants Hobbs and Holt who collectively sold over $34 million worth of their personal Berkeley Lights stock at prices as high as $62 per share.  These sales were suspicious in both timing and amount.

163.    For example, during the Class Period, Defendant Hobbs made more than $25 million from insider sales of more than 442,800 shares of Berkeley Lights stock.  The first significant sale occurred on March 1, 2021.  This date was notable for Hobbs and other Individual Defendants for several reasons.

164.    First, just one week prior to March 1, Defendants had issued a press release and held a corresponding earnings call concerning the Company's financial and operational results for the quarter and fiscal year ended December 31, 2020 ("FY20").  In the release, Defendants proclaimed that Berkeley Lights had achieved total revenue of $21.7 million during the quarter, earned total revenue of $64.3 million during FY20, and had placed nine platforms during the fourth quarter.  Meanwhile, on the earnings call, Defendants Hobbs, Holt, and Wood told investors that Berkeley Lights was experiencing three growth tailwinds that created direct platform sales growth for the Company.  Defendants made these statements despite knowing that (a) Berkeley Lights's flagship instrument, the Beacon, suffered from numerous design and manufacturing defects, (b) Berkeley Lights had received numerous customer complaints regarding the durability and effectiveness of the Company's automation systems, and (c) the actual market for Berkeley Lights's products and services was a fraction of the $23 billion represented to investors because of, inter alia, the relatively high cost of the Company's instruments and consumables and inability to provide the sustained performance necessary to justify these high costs.

AMENDED COMPLAINT                              - 59 -
Case No. 4:21-cv-09497-HSG

165.    Second, March 1 was the end date for Berkeley Lights's 2020 Employee Stock Purchase Plan, under which all participants were deemed to have exercised their options in full. Upon exercise, each plan participant would purchase the number of whole shares that their accumulated payroll deductions would have purchased at the list option price.  In other words, beginning on March 1, Defendant Hobbs and other Berkeley Lights employees gained access to all the Berkeley Lights common stock they had built up from FY2020 relating to their Berkeley Lights employment, and thus gained access to a new swath of Berkeley Lights common stock that they could immediately unload.

166.    Finally, as of March 1, the Company had yet to file with the SEC its annual report for FY2020 on Form 10-K, which had been previewed in the February press release and earnings call.   As discussed above, the Annual Report contained the full financial and operational information for FY20 that had been previewed in the Company's late-February press release and earnings call.  Additionally, Defendants made new representations in the Form 10-K concerning the purported capabilities and effectiveness of the Berkeley Lights platform.  Notably, the Form 10-K disclosed information that would later be recognized as warning lights for investors in the aftermath of the Scorpion Capital Report, including the fact that the Company had sold virtually the same number of lab instruments in 2020 as it did the year prior.

167.    For his March 1 transaction, Defendant Hobbs sold more than 200,000 shares of Berkeley Lights common stock and earned more than $12 million.

168.    Less than two weeks later, on March 11, 2021, Defendant Hobbs completed his second significant Class Period stock transaction—selling nearly 81,000 shares in a single day. The very next day, Berkeley Lights filed with the SEC its annual report for FY20.  For his sale of nearly 81,000 shares, Defendant Hobbs earned more than $4.5 million.

169.    Like Defendant Hobbs, Defendant Holt made similarly timed trades on March 1, 2021 and March 12, 2021, earning him more than $9.3 million from the sale of nearly 183,000 shares, as Holt prepared to leave the Company.

170.    In the ensuing months, as the truth of Defendants' fraud began to slowly emerge but before the other shoe dropped and Defendants' fraudulent conduct became fully known to the

AMENDED COMPLAINT                              - 60 -
Case No. 4:21-cv-09497-HSG

market, Defendant Hobbs continued to make significant sales of Berkeley Lights stock, selling 157,500 shares for proceeds of over $7 million between March 25 and August 18, 2021. These sales are further suspicious in terms of amount and timing when compared with Defendants Hobbs' subsequent sales. Indeed, after his August 18, 2021 sales, Defendant Hobbs did not sell any other shares in the Company through the end of the Class Period.

171. While these in-Class-Period sales were made pursuant to 10b5-1 plans, Defendants entered into those plans during the Class Period while they were in possession of material non-public information. All of the foregoing sales were made by Defendants Hobbs and Holt without disclosing the materially adverse facts about Berkeley Lights that they were privy to.

172. In addition to Defendants Hobbs and Holt, other corporate insiders opened a flurry of Rule 10b5-1 Plans[4] that envisioned these insiders selling their shares of common stock at approximately $60 per share. Nevertheless, throughout the Class Period, insiders sold their shares at progressively lower prices, dropping down to between $30 to $40 per share, prices more than 40% below their 10b5-1 Plans' inception prices.

173. Between March 1, 2021 and May 11, 2021, when the first partial corrective disclosure was made, the following additional insider sales occurred:

| Officer or Director | Total Shares Sold | Total Proceeds Received |
|---|---|---|
| Director Sarah Boyce | 10,000 shares | $611,340 |
| CTO Keith Breinlinger | 50,550 shares | Over $2.6 million |
| General Counsel Stuart Merkadeau | 24,005 shares | Over $1.3 million |
| CAO Matthew Rosinack | 21,000 shares | Over $1.3 million |
| Director James Rothman | 236,155 shares | Over $13 million |

[4] Rule 10b5-1 allows company insiders to make predetermined trades while following insider trading laws and avoiding insider trading accusations. The price, amount, and sales dates must be specified in advance and determined by a formula or metrics. Rule 10b5-1 also stops any insiders from changing or adopting a plan if they are in possession of material nonpublic information (MNPI).

AMENDED COMPLAINT                    - 61 -
Case No. 4:21-cv-09497-HSG

Merkadeau and Breinlinger continued to unload their stock in the months that followed, selling 46,172 and 65,750 shares for proceeds of over $2 and $2.8 million, respectively, before the Scorpion Capital Report was issued on September 15, 2021.

174.    These insider sales are probative of Defendants' scienter and are part of Defendants' scheme, artifice to defraud, or acts, practices, or course of business in violation of §10(b) and Rule 10b-5.  While Defendants were issuing materially false and misleading statements about Berkeley Lights's business and concealing material adverse information about its operations and business dealings, Defendants Hobbs and Holt, who had access to confidential information and were aware of the truth about the Company and its business by virtue of their association with and control over the Company, reaped massive financial benefits from this illegal scheme and course of conduct by selling roughly $34 million of Berkeley Lights common stock at artificially inflated prices.

**C.    The Control Defendants' Sales Were Also Unusual and Suspicious**

175.    Defendants Hobbs and Holt and the other Berkeley Lights corporate insiders described above were not alone in making unusually large and suspiciously timed stock trades. Indeed, Berkeley Lights's largest shareholders at the time of the IPO, Control Defendants WRVI, Nikon, Sequoia, and Khandros —each of which presumably had visibility into Berkeley Lights's sales pipeline—all liquidated or otherwise disposed of significant numbers of their shares prior to the filing of Berkeley Lights's FY 2020 annual report—in total, more than 19 million shares of Berkeley Lights common stock.

176.    These Defendants began their first tranche of stock dumps during the suspiciously timed SPO, which to stress again, resulted in no additional revenues for Berkeley Lights.  More specifically, through the SPO, after deducting for underwriter discounts or commissions, Defendant WRVI sold 1,386,047 shares for total proceeds of over $114 million, Defendant Khandros sold 1,209,388 shares for total proceeds of over $99 million, and Defendant Nikon sold 436,000 shares for total proceeds of over $35 million.

177.    WRVI's founding managing partner and director of Berkeley Lights Michael Marks (again, a named defendant in the Securities Act Claims) also stood to profit handsomely

AMENDED COMPLAINT                          - 62 -
Case No. 4:21-cv-09497-HSG

from the SPO.  In connection with the SPO, Marks reported a sale 362,600 shares of Berkeley Lights common stock at an average share price of $82.56, totaling nearly $30 million in value, attributed to his beneficial interest in the shares held and sold by WRVI.  Two weeks later, on December 10, 2020, Marks reported the sale of an additional 55,162 shares at an average share price of $82.56, totaling more than $4.55 million in net proceeds.

178.    The Control Defendants' Class Period sales did not stop with the SPO, however, as they continued to unload their stock in the following months.  The first to go was WRVI.  On January 12, 2021—the first day after the lock-up period for Berkeley Lights stock expired—WRVI distributed each and every BLI share remaining among its holdings—12,276,309 shares worth approximately $1.1 billion—to its limited partners and members.

179.    WRVI's founding managing partner Marks was one of the beneficiaries of these distributions.  For example, in January 2021, the Marks Family Trust—for which Marks was a trustee—received nearly 1.27 million of the 12.28 million shares of Berkeley Lights common stock distributed by WRVI.  In the two-week period between March 1, 2021—after Berkeley Lights's FY20 press release—and March 11, 2021—the day before Berkeley Lights published its 2020 Annual Report, the Marks Family Trust unloaded, in total, 200,000 shares of its Berkeley Lights common stock, reaping more than $11 million in gains.

180.    WRVI was not alone in its corporate exit.  As explained above, Nikon sold 436,000 shares during the SPO for total proceeds of over $35 million.  Then, on March 1, 2021, Nikon liquidated every one of the 3,976,734 shares that it continued to own after the SPO.  Put differently, as reflected in the Form 13G filed by Nikon on March 9, 2021, Nikon completely exited its Berkeley Lights's position, going from a 6.1% ownership interest to retaining zero shares and zero percent interest in the Company.  Assuming Nikon sold these shares at the lowest share price recorded for March 1, 2021, Nikon would have earned proceeds of over $226 million.  If Nikon received more realistic returns, selling these shares at the average share price this day, it would have earned proceeds of over $247 million.

181.    Sequoia too began to jump ship in the immediate aftermath of the SPO.  As reflected in the Berkeley Lights's proxy filed in connection with the 2021 annual shareholder meeting, as

AMENDED COMPLAINT                    - 63 -
Case No. 4:21-cv-09497-HSG

of March 23, 2021, Sequoia continued to hold 4,828,808 shares of Berkeley Lights stock, making it beneficial owner of 7.3% of the Company.  With 8,048,013 shares beneficially owned as of the SPO (12.5% of all outstanding shares), this meant that Sequoia had disposed of 3,219,205 shares in the ensuing four months.  As reflected in a Form 4 filed by Sequoia on March 16, 2021, Sequoia disposed of 1,609,603 of these shares on March 12, 2021 by distributing them to its partners and managers.  Priced at Berkeley Lights's closing share price of $54.24 on March 12, 2021, the distributions to Sequoia's partners and managers would have had a value of over $87 million.  As further disclosed by Sequoia in the Form 4, as a result of the distributions, Sequoia no longer held over 10% of the outstanding stock of Berkeley Lights and thus no longer needed to report its changes in ownership of the stock.  Nevertheless, there are indications that Sequoia continued its fire sale.  By the following year when the Company filed its annual proxy for the 2022 shareholder meeting, Sequoia was no longer identified as a 5% stockholder, meaning it had disposed of at least an additional 1,437,799 shares.

182.    Already making over $90 million in connection with the SPO, Defendant Khandros also continued to sell his shares in the Company, when over the course of less than a month between August 12, 2021 and September 9, 2021, less than a week before the Scorpion Capital Report was issued and Berkeley Lights's stock price lost 30% of its value in two days, Khandros sold another 300,000 shares for over $10 million.

**D.      Defendants Actively Disregarded Contradicting Data Regarding Marketability and customers' dwindling payments**

183.    Defendants were alerted to problems with the Berkeley Lights platform through the rapid shift in the quality and source of the Company's revenue during the Class Period.  As discussed above, during this nearly two-year period, Berkeley Lights experienced relatively flat growth in its product revenues.  Meanwhile, the Company's revenue from service-side sources including customer training and support spiked and accelerated from a high of approximately 22% in quarters prior to the IPO to up to 32% of the Company's total revenue by the end of June 2021.  Further, revenue attributable to "joint development agreements"—another way of framing the time and materials expended to assist current customers—grew from just 12% of total sales in 3Q20 up

to 20% by the end of 2Q21.  These sudden increases in service-based revenue as opposed to product-sales-based revenue strongly signaled the declining demand for Berkeley Lights's product.  Indeed, the Company hinted at waning demand, introducing a subscription pricing model for its platform shortly before the IPO.  Additionally, in connection with the IPO and SPO, the Company admitted that it needed to expand customer adoption "through alternative non-direct capital sales channels, including our subscription, partnering and services offerings."  It may be strongly inferred that Defendants, by virtue of their positions, were aware of the magnitude and significance of these revenue numbers.  Additionally, it may be inferred that Defendants knowingly relied on service revenue to plug revenue holes.

184.    The Company's declining recurring revenue streams also undercut any argument that Defendants may raise that they were unaware of their alleged fraud.  As alleged in the Scorpion Capital Report, recurring revenues are the consumables used for each run/assay, namely disposable chips, and reagents, run by Berkeley Lights's customers.  Throughout the Class Period, consumable revenues significantly worsened, decreasing downward 18%, despite the purported installed base for Berkeley Lights's instruments increasing from 75 to 82.  The decrease in recurring consumables revenue in the face of an increased user base strongly suggested to Defendants that Berkeley Lights's customers were decreasingly utilizing Berkeley Lights's platform.  Individual Defendants, as a result of their positions in the Company, would have had direct access to this sales and revenue information.

185.    As further evidence that customers were becoming dissatisfied with the Beacon's product defects and breakdowns, Berkeley Lights was seeing its accounts receivable spike tremendously while its product sales remained relatively flat or even decreased in certain quarters.  For example, in 1Q21, product sales decreased 24% compared to the prior quarter, yet accounts receivable increased by 27%.  Similarly, in 2Q21, product sales decreased 4% compared to the prior quarter, yet accounts receivable increased by 20%.  For all of FY21, product sales increased only 10%, while at the same time accounts receivable increased a resounding 100%.  This concerning trend, further reflected in the below graph, was surely known to Defendants, and

AMENDED COMPLAINT                     - 65 -
Case No. 4:21-cv-09497-HSG

supports the fact that they were aware that customers were not paying for the Beacon product on a timely basis due to its poor performance.



**E.   Defendants Were Informed of Their Products' Shortcomings by Their Pre-Class Period Trials with Academic Research Customers**

186.   Given their dual executive and science backgrounds, Individual Defendants also knew, or should have been aware that, the absence of academic papers or other life science publications regarding the Berkeley Lights platform's use cases doomed the platform's commercial potential.

187.   To break through in these areas, the Company offered free six-month trials to several academic research customers in the hopes of producing publishable data that would ease the perception of Berkeley Lights's platform in the eyes of scientists and the FDA (which might use data obtained from Berkeley Lights devices in authorizing pharmaceutical therapies). For example, Berkeley Lights sent one such academic research customer, UCSF, its Lighting product—a product specifically designed for academic labs—for free on a trial basis, in an arrangement by which UCSF would be allowed to use the product for six months to perform a number of projects with the hope that they would purchase the product thereafter. When UCSF

failed to produce an amount of data sufficient for publication, Berkeley Lights extended the free trial from six to nine months; however, no publishable data ever came from the trial.

188.    Likewise, in the second half of 2019, Berkeley Lights also sent NIH a Lightning for free on a trial basis, again in the hope that NIH would run several experiments and produce publishable data.  NIH, however, returned the platform after six months and informed Berkeley Lights that it had decided to instead purchase a different system from a competing device manufacturer with superior throughput that could meet NIH's needs.

189.    By virtue of its importance to the Company, it can be strongly inferred that Defendants knew or were aware of these academic research customers' disastrous experiences with Berkeley Lights's Products.  The lack of published data validating both the Lightning and Beacon led to a vicious circle with a lack of customers, which led to a further lack of published data and so on, creating further known obstacles to product marketability.

**F.    Defendants' Decision to Introduce Subscription Models Demonstrates Their Knowledge of the Significant Challenges of Selling Their Products Beyond the Company's Saturated Customer Base**

190.    As discussed above, at the start of 2021, as product placements and revenue slumped, the Company made a deliberate shift in its business model by introducing a new subscription model in an effort to drive greater platform placements.  Defendants claimed in press releases and in calls to investors that a subscription model would increase SAM and incremental unit placements.  In truth, the subscription model was also designed to prop up the Company's unit placements and get more products out the door to customers disinterested in paying the full $2 million price tag for the Beacon in a lump sum payment or incremental installment plans.

191.    Because of the Beacon's repeated material failures, which were known to Defendants, Defendants likely knew or should have been aware that subscription customers exposed to the Beacon's weaknesses were unlikely to become long term subscription or platform customers of Berkeley Lights.  Defendants also knew, or should have been aware, that Berkeley Lights subscription customers were coming at the expense of platform customers because smaller customers were choosing the subscription model over the Beacon's $2 million platform price tag. Indeed, during a 1Q21 earnings call, Defendant Wood conceded as much, telling investors that, as

AMENDED COMPLAINT                    - 67 -
Case No. 4:21-cv-09497-HSG

the Company ramped up new subscription offerings, "it is possible that some previously anticipated CapEx sales may transition to a subscription offering," thus impacting revenues.

192.    Problems with the subscription model (and the revenue recognition slumps the model intended to hide) were readily apparent to Defendants.  First, Berkeley Lights introduced the new model right on the heels of the introduction of another subscription model just one year earlier, in February 2020, which had floundered despite similar promises that it would enable broader customer access.  Second, despite touting the subscription model's possibilities throughout 2021, the Company maintained its original guidance on total expected revenue for the year.  As such, it can be strongly inferred that Defendants knew or were aware of the functionality and demand problems with Berkeley Lights's platform when making the false statements identified above to investors, further evidencing Defendants' scienter.

### G.    Oversight and Due Diligence Supports a Strong Inference of Scienter as to the Control Defendants

193.    Through their significant ownership interest in the Company, appointment of directors, and managing personnel's seats (or, in the case of Khandros, his own seat) on the Board, the Control Defendants had the power to influence and exerted this power over Berkeley Lights during the Class Period.

194.    In addition, the Control Defendants had unique insight into the Company's operations through their business relationships with Berkeley Lights and/or information rights gained as a part of their early investments in the Company, including the right to visit and inspect the Company's properties and to examine its books of accounts and records.  These were provided for in an Investors' Rights Agreement that the Control Defendants entered into with Berkeley Lights, which agreement also provided that the Company would provide monthly, quarterly, and annual unaudited financial statements to the Control Defendants.  In combination with their participation on the Board of Directors, this provided the Control Defendants with insight about the Company not available to the rest of the investing public.

195.    Additionally, with respect to Nikon, its agreement with Berkeley Lights, under which Nikon would act as the Company's exclusive product distributor in Japan, Singapore,

AMENDED COMPLAINT                          - 68 -
Case No. 4:21-cv-09497-HSG

Thailand, and South Korea (and non-exclusive distributor in China), provided Nikon with important insight into Berkeley Lights's placement of products in Asia, including trends in accounts receivable. Berkeley Lights considered the Asia Pacific region vital for expanding product growth, and throughout the Class Period, this geographical market was a growing source of revenue for Berkeley Lights, accounting for over 30% and 41% of its revenues, respectively in 2020 and 2021. Accordingly, Nikon had direct insight into the Company's sales and revenue in this large and growing geographical product market.

**H.     Defendants' Direct and Extensive Involvement in Developing and Marketing Berkeley Lights's Products**

196.    Defendant Hobbs joined the Company in 2013 to lead the commercial development of Berkeley Lights's opto-fluidic technology, which resulted in the Beacon system—one of the primary subjects of this lawsuit. Throughout the Class Period, Hobbs and other Defendants routinely touted at investor events how much the Company's largest purchasers valued the Berkeley Lights platform. For example, during a January 12, 2021 conference hosted by JP Morgan, Defendant Hobbs proudly claimed that Amgen had "converted wholly to Berkeley Lights" given the "superiority" of the platform's workflows. Defendant Hobbs made similar public representations at conferences hosted by Cowen and KeyBanc in March 2021. He also routinely commented on the drivers of the Company's purported sales growth during the Class Period in investor calls and other public events. As such, he is intimately familiar with the Company's products and customer experiences, further evidencing his scienter when making the false statements identified above.

**I.     Defendants' Deceptive Pattern of Disclosures Concerning Market Demand Support a Strong Inference of Scienter**

197.    As detailed above, Defendants issued a series of partial disclosures and half-admissions concerning poor product placement and limited adoption of expanded use cases for the Beacon, but those statements showed a consistent pattern of (a) failing to acknowledge the severity, scope and longstanding duration of the Company's direct sales problems; (b) failing to acknowledge the underlying cost, error rate, limited use case, and customer utilization issues

AMENDED COMPLAINT                              - 69 -
Case No. 4:21-cv-09497-HSG

resulting in poor sales, or the need for adopting a subscription model; (c) attempting to deflect blame for poor financial reports due to lags created from its sales-to-subscriptions strategy shift, even though the Company still faced mounting barriers to new unit placement , (d) understating the persistence of the problems, and (e) overstating Berkeley Lights's capacity to mitigate or resolve the problems. *See supra* at ¶¶ 80-116. All of these statements, by their very nature, served to mislead and are in themselves suggestive of deceptive intent.

198. One indicator of the severity and the persistence of the sales problem was Berkeley Lights's inability to meet its product placement projections, even after shifting to a subscription model. For 2021, the Company represented that it expected total revenues between $90 to 100 million for the full year 2021 with "at a minimum" 45 total placements—approximately 11-12 placements per quarter. In its 1Q21 Report, released on May 11, 2021, the Company revealed that it had only sold eight platforms during the quarter, down from the prior quarter (9 placed in 4Q 2020) and equal to the number sold in 3Q 2020. It was at this time that the Company introduced its new subscription model to bolster stagnant sales. *See also supra* ¶¶ 101-04 (discussing why it was clear to Defendants at the time why this strategy was doomed from the start). On this news, the Company reaffirmed its 2021 guidance. Nevertheless, the downward trend in revenue and product placement persisted throughout the year. For 2Q21, the Company reported that revenues had again came under projections and that it had placed even fewer units—a dismal seven units for the quarter. With only fifteen units placed through the first half of the year, the Company needed to sell 30 units (or two-thirds of all units) over the second half of the year to meet its expected ("at a minimum") 45 units sold in 2021.

199. The Company attempted to downplay external concerns by blaming the disappointing results (which had been trending downward for two successive quarters) on the new subscription model. The Company further represented that it believed an uptick was coming partly as a result of (i) the new subscription offering, (ii) the ramp up in partnership agreements, and (iii) usual seasonal differences with more heavily weighted past fourth quarters. As such, the Company again reiterated its revenue guidance for the year, but to meet the year-end revenue guidance, Berkeley Lights needed two unprecedented quarters in a row just to hit the low-end of guidance, a

minimum of $26 million per quarter, or an almost 40% increase over its revenue reported for the first two quarters of the year.

200.    The Scorpion Capital Report and Defendants' September 16, 2021 response thereafter demonstrates the bad faith of Defendants' partial disclosures and half-admissions, including those identified above.  As discussed above, Defendants issued a meek, three-paragraph response affirming its confidence in its technology's potential and attacking the short-seller motives.  As such, Defendants' response was more notable for what it did not say.  First, with more than two-thirds of the 3Q21 completed and nearly two-thirds of year 2021 complete, Defendants no longer towed the line of expressing confidence in their 2021 revenue and product placement targets.  Further, they failed to recognize or address *any* of the Report's 158 pages of findings, opinions, or the myriad of customer and former-employee interviews.  For example, even though Scorpion Capital reported that "virtually every" ex-employee interviewed had described Berkeley Lights's TAM as "negligible," Berkeley Lights refused to give any information on how its TAM was actually calculated or how its estimates were more reasonable.  Additionally, Defendants did not dispute the reported account that at least 14 Berkeley Lights's customers, which represented 30% to 50% of entire installed base, thought the Beacon was a "flop."

201.    The reasons for Defendant's implicit concessions are obvious: Defendants already knew, or must have known by September 2021, that their subscription gambit had failed to save the Company from its product placement slump due to problems inherent with the Beacon.  This is confirmed by the Company's poor sales and revenue numbers as reported in its 3Q21 Report, published on November 4, 2021, and the corresponding earnings call.  In the 3Q21 Report, the Company added a risk factor relating to the business and strategy that "changes in financial estimates or recommendations by securities analysts, as well as publications from research analysts associated with short selling, such as was published about us in Q3 2021" could harm Berkeley Lights's share price.  And on the earnings call, in response to a question regarding Berkeley Lights iterating financial guidance at the lower end of the previously stated range, despite an ostensibly "strong" quarter, Defendant Wood confirmed that the Company expected to fall short on revenue

AMENDED COMPLAINT                          - 71 -
Case No. 4:21-cv-09497-HSG

and product placements yet again.  In the face of these headwinds, however, Defendant Hobbs represented that the Company "ha[d] not seen a dramatic impact from the Scorpion short report."

202.    Taken together, and in combination with the information revealed by Scorpion Capital, Defendants' disclosures regarding poor product placement, limited adoption of expanded use cases, and other factors affecting the Beacon's marketability demonstrate a consistent pattern of bad faith and deception.

### J.    Suspicious Employee Resignations

203.    The unexpected departure of key executives, namely, the Company's former CFO Defendant Holt, its former Chief Accounting Officer Matthew W. Rosinack, and its former director Michael Marks, so soon after the IPO bolster an already compelling inference of scienter.

204.    As alleged throughout the Complaint, Defendant Holt was personally involved in the fraud alleged herein and revealed in large part by the Scorpion Capital Report.  He knew, or was aware, of the myriad complaints customers had regarding the Beacon and had access to the financial information pertinent to Berkeley Lights's problems deploying its product to new and existing customers.

205.    As such, Defendant Holt's departure, first announced on February 25, 2021, on the same day that Berkeley Lights previewed its lackluster FY20 annual results, is strongly indicative of his and Berkeley Lights's scienter.

206.    Rosinack, as CAO, and Marks, as Berkeley Lights director and founding managing partner at Control Defendant WRVI, had significant roles in the Company and the fraud alleged herein, each signing (and thus responsible for the content and dissemination of) some of the Berkley Lights filings containing false and misleading statements.

207.    As such, Rosinack's resignation filed with the Company on May 24, 2021, less than two weeks after the first corrective disclosure alleged—the May 11, 2021 announcement of Berkeley Light 1Q21 results, *see supra* ¶¶ 101-04, 120-28, revealing that the Beacon could not meet the lofty promises made by the Company—supports a strong inference of scienter by Berkeley Lights and the Individual Defendants.

AMENDED COMPLAINT                           - 72 -
Case No. 4:21-cv-09497-HSG

208.   Similarly, on May 7, 2021, Marks notified the Company of his intention to retire from the Board effective May 14, 2021, shortly after he cashed out significant stock holdings in the Company, *see supra* ¶ 179, further supporting a strong inference of scienter by Berkeley Lights and the Individual Defendants.

209.   Defendant Hobbs's "transition" from the central role of CEO to president of Berkeley Lights's Antibody Therapeutics Line in January 2022 further supports a compelling inference of his and the Company's scienter, given his knowledge of, and participation in, the fraud scheme alleged herein.  As detailed above, Hobbs was demoted the same day the Company announced that its total revenues for FY21 would fall well short of its projections, and that product placements continued (and would continue) to take a hit.  The Company attempted to justify this role change by claiming Hobbs lacked the experience necessary for scaling up commercialization of Berkeley Lights's platform, despite long describing Hobbs as necessary to the success of the Company and indicating in its SEC risk disclosures that the loss of Hobbs could adversely impact the business.  Nevertheless, the Company did not announce that a specific successor was under consideration.  The timing of Hobbs's resignation is also notable as it occurred just one month after the filing of the first class-action complaint.  These facts are highly indicative of Hobbs and the Company's scienter.

210.   Further, on March 7, 2022, Defendant Wood provided notice that he would be leaving the Company effective April 1, 2022.  With Wood's resignation, the Company has seen two CFOs depart within a year's time.  At the time of this filing, over four and half months after Wood announced his departure, the CFO position at Berkeley Lights remains unfilled.  Given Wood's knowledge of, and participation in, the fraud scheme alleged herein, these facts are highly indicative of his and the Company's scienter

**K.   Defendants' Imputed Knowledge of Facts Critical to BLI's Core Operations**

211.   At all relevant times during the Class Period, Berkeley Lights was a small-to-medium sized company with less than 200 employees, with an even smaller, tight-knit upper management team.  Additionally, Berkeley Lights was a one-product company, the revenue for which, the Company conceded in its IPO prospectus, was primarily generated from its direct

AMENDED COMPLAINT                                    - 73 -
Case No. 4:21-cv-09497-HSG

platform sales—largely driven by Beacon. As indicated in the Company's IPO filings, in FY19, direct sales totaled $39.1 million and contributed to 69% of the Company's revenues (the remainder sourced from services, *i.e.*, installations/repairs, (12%) and "strategic partnerships" (17%)). And as discussed above, the Company sold, on average, less than 30 direct platform products per year.

212.    Given the Company's size, small (in magnitude) sales, and that its lab instrument sales are purported to be the major focus of Berkeley Lights's business operations, it may be strongly inferred that Defendant Hobbs (the Company's 5+-year CEO and, previously, VP of Commercial Development), Defendant Holt (the Company's CFO for more than five years), and Defendant Wood (Holt's successor as CFO and prior to becoming CFO, Vice President of Business Development) were fully aware of the status of all material matters involving Berkeley Lights's core business operations throughout the Class Period, including the truth as to the matters alleged herein to have been materially misrepresented to and/or concealed from Plaintiffs and the members of the Class.

213.    Because committed orders and customer base for Berkeley Lights's lab instruments were core to the Company's success, the materially false statements and omissions detailed herein could not have occurred without the Individual Defendants' knowledge and approval. Indeed, as discussed above, and as reported in the Scorpion Capital Report, Berkeley Lights customers routinely complained to Berkeley Lights employees and executives regarding the platform's Reliability. These problems included:

(a)    Numerous hardware and software issues; software was constantly updated, confusing and throwing off customers.

(b)    The instrument was highly prone to contamination—a concern that the Company continues to struggle with, and took multiple steps to mitigate.

(c)    Data integrity problems with the Berkeley Lights platform, affecting the platform's marketability both directly and indirectly, by making the platform unable for use for FDA-related submissions.

214.    Moreover, the Individual Defendants were highly sophisticated and in positions to know that their statements concerning the superiority of the Berkeley Lights platform compared to existing cell instruments, as well as its financial performance, were false and misleading.  For example, Defendant Hobbs—Berkeley Lights's former CEO and a named inventor on more than 80 of the Company's patents—joined the Company in 2013 to lead the commercial development of its opto-fluidic technology, resulting in the Berkeley Lights platform.  Indeed, in commenting on Hobbs's transition to CEO, Company founder Igor Khandros noted that Hobbs had "played a critical role in managing Berkeley Lights's business operations, including the recent introduction of our Beacon platform."  Hobbs served as CEO beginning in 2017 and, in that role, made or endorsed many of the false statements alleged herein, including those in Berkeley Lights's IPO Registration Statement, press releases, and other SEC filings.  As CEO, Hobbs was at all relevant times intimately involved in Berkeley Lights's activities, including the decision to hold an IPO and the decision to shift to a subscription model.

215.    Defendant Holt served as Berkeley Lights's CFO at all relevant times up until his unexpected transition, effective March 15, 2021, to an advisory role and subsequent departure from the Company on April 30, 2021.  Like Hobbs, Holt served in his executive capacity for several years preceding the Class Period.  Holt similarly made or endorsed the Company's false statements, including those in its IPO Registration Statement, press releases, and other SEC filings. Defendant Wood—Defendant Holt's successor and now, also, former CFO with over 25 years of finance experience—served as CFO beginning March 15, 2021 and, before that, served as the Company's Vice President of Business Development.  As such, he too has made or endorsed several of the Company's false statements, including in his role as CFO.

216.    Likewise, Control Defendant Khandros—the founder of Berkeley Lights and the CEO preceding Hobbs—was both sufficiently sophisticated and knowledgeable to know that the Company's statements, as identified above, were false and misleading.  Despite stepping down as CEO, Khandros, in his own words, has "maintain[ed] a very active presence in the company" as he "directs his energies to creating and building strategic partnerships."  Moreover, after his transition away from CEO, Khandros remained on the Berkeley Lights board and thus has access

AMENDED COMPLAINT                                    - 75 -
Case No. 4:21-cv-09497-HSG

to information, in addition to his personal and business contacts, concerning the Company's current operations.

217.    The sophistication of the Individual Defendants, as well as that of Control Defendant Khandros, strengthens the allegations of scienter, by undermining an exculpating explanation for the fraud.

218.    Additionally, the scienter of the Individual Defendants is imputable to the Company, as the misrepresentations and omissions of Berkeley Lights, as alleged herein, were of such a nature that they would have been approved by corporate officials sufficiently knowledgeable about the Company to know that those statements and omissions were misleading.

## VI.    LOSS CAUSATION AND ECONOMIC LOSS

219.    Because loss causation is not an element of Plaintiffs' Securities Act Claims, the allegations set forth in this section pertain only to Plaintiffs' Exchange Act Claims.

220.    During the Class Period, as detailed herein, Berkeley Lights and the Individual Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Berkeley Lights common stock.  The Company's conduct operated as a fraud or deceit on Class Period purchasers of Berkeley Lights common stock by failing to disclose and misrepresenting the adverse facts relating to the Company's business and growth prospects that are detailed herein.  By presenting a misleading picture of Berkeley Lights's business and prospects, Berkeley Lights and the Individual Defendants' false and misleading statements had the intended effect of causing Berkeley Lights common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $106.00 per share on December 22, 2020.

221.    The price of Berkeley Lights common stock fell precipitously, as the prior artificial inflation dissipated each time Berkeley Lights and the Individual Defendants' prior misrepresentations and material facts were at least partially disclosed or became apparent to the market, and/or the risks concealed by their misconduct at least partially materialized.  As a result of their purchases of Berkeley Lights common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

AMENDED COMPLAINT                          - 76 -
Case No. 4:21-cv-09497-HSG

222.    Defendants' false and misleading statement and omissions, identified herein at ¶¶ 80-118, had the intended effect and caused Berkeley Lights's stock to trade at artificially inflated levels during the Class Period.

**A.    May 11, 2021 Disclosure**

223.    On May 11, 2021, just a few short months after Control Defendants WRVI, Nikon, and Khandros, along with WRVI's founding managing partner and Berkeley Lights's director, Michael Marks, made $248 million through the sale of their shares in the SPO, and as they, the Individual Defendants, and other Company insiders continued to unload their stock in the Company following the SPO, Berkeley Lights issued a press release and filed its Form 10-Q announcing its 1Q 2021 financial results.  These documents indicated serious issues with Berkeley Lights's flagship Beacon instrument, as the Company experienced poor product placement for the quarter, with only eight platforms placed.  In addition, the Company held an Earnings Call on the same day, during which, it introduced a new subscription model intended to prop up product placements.

224.    In direct response to these disclosures, as further detailed in ¶¶ 101-04, 120-28, Berkeley Lights's stock price suffered a significant decline.  The Company's stock price fell from a closing price of $45.54 per share on May 10, 2021 to a closing price of $43.13 on May 11, 2021 on trading volume of more than 2.5 million shares.  The May 11 share price drop reflected a market capitalization loss of over $140 million, and a 5.3% decline from Berkeley Lights's closing price on May 10, 2021.  On the same day, the Nasdaq Composite Index ("Nasdaq") was nearly flat at minus 0.1%, and a comparable industry index, the Nasdaq Biotechnology Index ("NGI"), rose 0.50%.

225.    The Company's stock price continued to decline on the following two trading days, as the market further absorbed the adverse news, closing at $39.53 per share on May 12, 2021 and $36.40 on May 13, 2021.  This was an additional 8.3% decline on May 12 and 7.9% decline on May 13.  The Nasdaq lost only 2.7% on May 12 and increased by 0.7% on May 13.  Meanwhile, the NGI remained relatively flat for the two days (minus 0.9% for May 12 and flat at 0.0% for May 13).  Berkeley Lights lost another $449 million in market capitalization over the two days.

Altogether, the Company's common stock price fell by an approximate aggregate 20.1% in value over the three days.

226. As further illustrated by the below chart, the timing and magnitude of the decline in the price of Berkeley Lights common stock when compared to the price movements in the Nasdaq and NGI on the same days negates any inference that losses suffered by Plaintiffs and other Class members were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Berkeley Lights and the Individual Defendants' fraudulent conduct.



**B.    August 11, 2021 Disclosure**

227. On August 11, 2021, Berkeley Lights issued a press release and filed its Form 10-Q announcing its 2Q21 financial results, posting disappointing results for two consecutive quarters. The Company missed earnings marks and placed the fewest number of platforms since a year prior in 2Q20. With only seven platforms placed for the quarter and not a single product placement via subscription, there were again troubling signs of fundamental flaws with the Company's platform.

228. The disclosures and leakage of information on August 11, 2021, as further detailed in ¶¶ 106-11, 129-35, also had a direct impact on Berkeley Lights common stock price. The

AMENDED COMPLAINT                    - 78 -
Case No. 4:21-cv-09497-HSG

Company's stock price fell over 9.5% from $43.79 per share at close on August 10, 2021 to $39.65 per share at close on August 11, 2021.  In comparison, on the same day the Nasdaq was relatively flat at minus 0.2%, while the NGI lost 3.0%.  There was heavy Berkeley Lights trading volume during the day, with over 2 million shares changing hands.  The August 11 share price decline resulted in a loss of $261.3 million in market capitalization for the Company.

229.    As further illustrated by the below chart, the timing and magnitude of the decline in the price of Berkeley Lights common stock when compared to the price movements in the Nasdaq and NGI on the same days negates any inference that losses suffered by Plaintiffs and other Class members were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Berkeley Lights and the Individual Defendants' fraudulent conduct.

Berkeley Lights vs. Nasdaq and Nasdaq Biotechnology Index
August 10, 2021 - August 11, 2021

## C.    September 15, 2021 Disclosure

230.    On September 15, 2021, Scorpion Capital issued a report condemning Berkeley Lights for "Fleecing Customers" and describing the Company's flagship Beacon platform as a "Black Box That's a Clunker."  The report laid bare the Company's prior false and misleading statements and omissions about its platform, revealing that far from being the groundbreaking technology represented to investors in the IPO and leading up to and in connection with the SPO,

AMENDED COMPLAINT                    - 79 -
Case No. 4:21-cv-09497-HSG

the Beacon was a flop that, among other issues, experienced extremely high error rates compared to similar machines and was prone to contamination. The platform was universally derided by the Company's customers interviewed for the report. And all of this was corroborated by numerous interviews with former employees or executives at Berkeley Lights.

231.    In addition, the report revealed the Company's previously reported TAM was significantly overinflated and that the Company's true TAM was at most $600 million.

232.    In direct response to the Scorpion Capital Report disclosing the truth of the Berkeley Lights platform's capabilities and reliability, as further detailed in ¶¶ 129-35, the Company's common stock price plummeted. On September 15, 2021, the share price dropped from a closing price of $32.76 the day prior to a closing price of $26.62, an 18.7% decline, on trading volume of over 7.4 million shares. As the market continued to digest the disclosures from the Scorpion Capital Report on September 16, the share price dropped another 11.6% to a closing price of $23.53 for the day. There was heavy trading volume on the day, with over 15.4 million shares trading hands, or nearly 18 times the average daily trading volume in the stock since the closing of the IPO. In comparison, on September 15, 2021 the Nasdaq and NBI were both up, respectively, 0.8% and 1.0%. Similarly, on September 16, 2021, the Nasdaq experienced gains of 0.1% and the NBI of 0.5%. As a result of this drop, the Company's market capitalization shrunk by $619.3 million.

233.    As further illustrated by the below chart, the timing and magnitude of the decline in the price of Berkeley Lights common stock when compared to the price movements in the Nasdaq and NGI on the same days negates any inference that losses suffered by Plaintiffs and other Class members were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Berkeley Lights and the Individual Defendants' fraudulent conduct.

AMENDED COMPLAINT                              - 80 -
Case No. 4:21-cv-09497-HSG



### D.      January 5, 2022 Disclosure

234.      On January 5, 2022, Berkeley Lights issued a press release disclosing that it was replacing its CEO, Defendant Hobbs, and that the Company fell well short of projected earnings marks for the prior year.  The press release added further credence to the Scorpion Capital Report and drove home the underlying, persistent issues with the Company's platform.

235.      The disclosures and leakage of information on January 5, 2022, as further detailed in ¶¶ 148-52, also directly impacted Berkeley Lights common stock price.  Made at the close of the markets on January 5, 2022, the share price plunged on the following day, falling from a closing price of $16.27 on January 5, 2022 to a closing price of $9.88 per share on January 6, 2022, or a 39.3% drop, on volume in excess of 11.8 million shares.  The Nasdaq and NBI were relatively flat for the day, respectively, at minus 0.1% and 0.0%.  As a result, Berkeley Lights lost $431.2 million in market capitalization on the day.

236.      As further illustrated by the below chart, the timing and magnitude of the decline in the price of Berkeley Lights common stock when compared to the price movements in the Nasdaq and NGI on the same days negates any inference that losses suffered by Plaintiffs and other Class members were caused by changed market conditions, macroeconomic factors, or

Company-specific facts unrelated to Berkeley Lights and the Individual Defendants' fraudulent conduct.



237.    The precipitous declines in the price of Berkeley Lights common stock set forth above were a direct result of the nature and extent of the Individual Defendants' fraud being partially and then finally revealed to investors and the market, and/or the materialization of the risk that they concealed by their misconduct.  The timing and magnitude of the decline in the price of Berkeley Lights common stock, particularly when compared to the movements of a general stock index and an appropriate industry index, as reflected in the above charts, negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.

238.    The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of the Defendants' fraudulent scheme to artificially inflate the price of Berkeley Lights common stock and the subsequent significant decline in the value of Berkeley Lights common stock when the Defendants' prior misrepresentations and other fraudulent conduct were revealed and/or the risks that they concealed by such misconduct materialized.

## VII.    PRESUMPTION OF RELIANCE

239.    At all relevant times, the market for Berkeley Lights common stock was an efficient market for the following reasons, among others:

(a)    Berkeley Lights stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient and automated market;

(b)    according to the Company's Form 10-Q filed November 4, 2021, Berkeley Lights had more than 67 million shares of common stock outstanding as of October 29, 2021;

(c)    as a regulated issuer, Berkeley Lights filed periodic public reports with the SEC;

(d)    Berkeley Lights regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e)    unexpected material news about Berkeley Lights was rapidly reflected in and incorporated into the price of Berkeley Lights common stock during the Class Period.

240.    As a result of the foregoing, the market for Berkeley Lights common stock promptly digested current information regarding Berkeley Lights from publicly available sources and reflected such information in the price of Berkeley Lights common stock.  Under these circumstances, all purchasers of Berkeley Lights common stock during the Class Period suffered similar injury through their purchases of Berkeley Lights common stock at artificially inflated prices, and a presumption of reliance applies.

241.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiffs' claims are based, in significant part, on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Berkeley Lights's business, operations and risks, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have

AMENDED COMPLAINT                    - 83 -
Case No. 4:21-cv-09497-HSG

considered them important in making investment decisions.  Given the importance of Defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## VIII.   NO SAFE HARBOR

242.    The false and misleading statements alleged herein were not forward-looking.  To the extent any of the alleged false and misleading statements were forward-looking, the federal statutory safe harbor for forward-looking statements under certain circumstances does not apply. Many of the specific statements alleged were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements accompanying them.  To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Such cautions were absent from Berkeley Lights's Class Period filings and oral disclaimers.  And any generalized risk disclosures made by Berkeley Lights were not sufficient to insulate the Defendants from liability for their materially false and misleading statements, given the then-existing facts contradicting the statements by the Defendants.

243.    Further, to the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory safe harbor.  15 U.S.C. §78u-5(b)(2)(A).

244.    Defendants are also liable for any false or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Berkeley Lights who knew that the forward-looking statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the

AMENDED COMPLAINT                                  - 84 -
Case No. 4:21-cv-09497-HSG

projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## COUNT I

### FOR VIOLATION OF §10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5 AGAINST BERKELEY LIGHTS AND THE INDIVIDUAL DEFENDANTS

245.    Plaintiffs repeat and reallege every allegation contained above as if set forth herein.

246.    This Count is brought against Defendants Berkeley Lights, Hobbs, Holt, and Wood. During the Class Period, the Defendants named in this Count disseminated or approved the false statements specified above in ¶¶ 80-118, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

247.    Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Berkeley Lights common stock during the Class Period.

248.    Defendants, individually and together, directly and indirectly, by use, means and instrumentalities of interstate commerce and/or the mail, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about Berkeley Lights's business, operations and financial condition as specified herein.

249.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them.

AMENDED COMPLAINT                - 85 -
Case No. 4:21-cv-09497-HSG

250.    As a direct and proximate result of Berkeley Lights and the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their respective purchases of Berkeley Lights common stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for Berkeley Lights common stock and experienced losses when the artificial inflation was released from Berkeley Lights common stock as a result of the leakage and disclosure of information and price declines detailed herein.  Plaintiffs and the Class would not have purchased Berkeley Lights common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

251.    By reason of the foregoing, the Defendants named in this Count have violated §10(b) of the 1934 Act and SEC Rule 10b-5.

## COUNT II

### FOR VIOLATION OF §20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS AND THE CONTROL DEFENDANTS

252.    Plaintiffs repeat and reallege every allegation contained above as if set forth herein.

253.    This Count is brought against Defendants Hobbs, Holt, Wood, Khandros, WRVI, Sequoia and Nikon.

254.    Individual Defendants Hobbs (the Company's CEO and a director), Holt (the Company's CFO), and Wood (the Company's Vice President of Business Development and CFO after the resignation of Holt) acted as controlling persons of Berkeley Lights within the meaning of §20(a) of the Exchange Act by virtue of their positions as senior officers and/or directors at Berkeley Lights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the Company's disclosures, practices, and business model.  By reason of the foregoing, Hobbs, Holt, and Wood had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.  Hobbs, Holt, and Wood were provided with, or had unlimited access to copies of, the Company's public

AMENDED COMPLAINT                          - 86 -
Case No. 4:21-cv-09497-HSG

filings and other statements alleged by Plaintiffs to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

255.    Defendants Khandros, WRVI, Sequoia, and Nikon acted as controlling persons of Berkeley Lights within the meaning of §20(a) of the Exchange Act by virtue of their share of ownership, power to appoint directors, including through the appointment and service of themselves (Khandros) or their managing personnel (Marks, Moritz, and Shintani from, respectively, WRVI, Sequoia, and Nikon) as directors, and/or agreements with the Company. By reason of the foregoing, Khandros, WRVI, Sequoia, and Nikon had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of various statements that Plaintiffs contend are false and misleading. Khandros, WRVI, Sequoia, and Nikon were provided with, or had unlimited access to copies of, some or all of the Company's public filings and other statements alleged by Plaintiffs to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

256.    As set forth above, Berkeley Lights violated §10(b) and Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, and as a result of their aforementioned conduct, the Individual Defendants and Control Defendants are liable pursuant to §20(a) of the Exchange Act for the §10(b) violations. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from the Company's stock.

AMENDED COMPLAINT                          - 87 -
Case No. 4:21-cv-09497-HSG

**NON-FRAUD SECURITIES ACT CLAIMS**

257.    The claims set forth below in Counts III-V allege violations of §§11, 12(a)(2) and 15 of the Securities Act ("Securities Act Claims").  These Securities Act Claims are based solely on strict liability and negligence—*i.e.*, not intentional or reckless conduct.   This section incorporates solely ¶¶ 1-30, 305-10, and expressly disclaims any allegations of fraud, scienter, or recklessness pled herein in connection with the Exchange Act Claims.  As such, these Securities Act claims are presented separate and apart from Counts I and II.

## IX.    BACKGROUND TO THE SECURITIES ACT CLAIMS

258.    During the Class Period, Berkeley Lights issued prospectuses and registration statements (collectively, "IPO Materials") in connection with the Company's July 2020 IPO. Under the Securities Act, Berkeley Lights, the individuals who signed the IPO Materials, and the underwriters to the IPO, are liable jointly and severally for materially false or misleading statements or omissions in the IPO Materials.

259.    The IPO Materials issued in connection with the July 2020 IPO contained false and misleading statements, which misrepresented the business and value of Berkley Lights. Defendants priced the July 2020 IPO at $22 per share.  At the filing date of this complaint, with the true facts about Berkley Lights having been revealed, the Company's stock is trading at less than $4.35 per share, resulting in millions of dollars of investor losses.

260.    The Securities Act Claims seek to recover such losses suffered by Class members who purchased shares of Berkeley Lights common stock pursuant and traceable to the false and misleading IPO Materials.

## X.    SECURITIES ACT DEFENDANTS

261.    Defendants Berkeley Lights, Eric Hobbs, Shaun Holt, Igor Khandros, WRVI, Sequoia, and Nikon, *see supra* ¶¶ 21-23, 26-30, are realleged as Defendants for the Securities Act Claims.  Defendant Berkeley Lights is the registrant of the securities sold in the July 2020 IPO. Defendants Hobbs, Holt, and Khandros signed the IPO Materials.   In addition, Defendant

Khandros, along with Defendants WRVI, Sequoia, and Nikon, were controlling persons of Berkeley Lights throughout the Class Period, including in connection with the IPO, as alleged above, ¶¶ 49-67, 252-56.

262.    The Securities Act Claims are also brought against current and former Berkeley Lights Board of Directors members identified below, who each signed the IPO Materials at issue, and/or were named as directors in the registration statements for the IPO (collectively, "Director Defendants"):

(a)    Defendant Igor Khandros was a director on Berkeley Lights during the Class Period.  Defendant Khandros signed the IPO Materials for the July 2020 IPO.

(b)    Defendant Michael Marks was a director on Berkeley Lights during the Class Period.  Defendant Marks signed the IPO Materials for the July 2020 IPO.

(c)    Defendant Sarah Boyce was a director on Berkeley Lights during the Class Period.  Defendant Boyce signed the IPO Materials for the July 2020 IPO.

(d)    Defendant Gregory Lucier was a director on Berkeley Lights during the Class Period.  Defendant Lucier signed the IPO Materials for the July 2020 IPO.

(e)    Defendant Michael Moritz was a director on Berkeley Lights during the Class Period.  Defendant Moritz signed the IPO Materials for the July 2020 IPO.

(f)    Defendant Elizabeth Nelson was a director on Berkeley Lights during the Class Period.  Defendant Nelson signed the IPO Materials for the July 2020 IPO.

(g)    Defendant James Rothman was a director on Berkeley Lights during the Class Period.  Defendant Rothman signed the IPO Materials for the July 2020 IPO.

(h)    Defendant Ming Wu was a director on Berkeley Lights during the Class Period.  Defendant Wu signed the IPO Materials for the July 2020 IPO.

(i)    Defendant Makoto Shintani was a director on Berkeley Lights during the Class Period.  Defendant signed the IPO Materials for the July 2020 IPO.

263.    The Securities Act Claims are also brought against the below underwriters for the IPO (collectively, "Underwriter Defendants"):

AMENDED COMPLAINT                              - 89 -
Case No. 4:21-cv-09497-HSG

(j)    Defendant JP Morgan Securities LLC ("J.P. Morgan") served as an underwriter for the July 2020 IPO.

(k)    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter for the July 2020 IPO.

(l)    Defendant Cowen and Company LLC ("Cowen") served as an underwriter for the July 2020 IPO.

(m)    Defendant William Blair and Company LLC ("William Blair") served as an underwriter for the July 2020 IPO.

264.    The Defendants identified in ¶¶ 261-63 are referred to collectively as the "Securities Act Defendants."

## XI.    THE IPO MATERIALS WERE FALSE AND MISLEADING

265.    In July 2020, Berkeley Lights was taken public through an IPO of its common stock at $22 per share.  The IPO was sold pursuant to a prospectus for an offering of Berkeley Lights stock filed with the SEC on Form 424B4 on July 17, 2020, which incorporated a registration statement for the offering filed on Form S-1 on July 16, 2020.  These IPO Materials were signed by Defendants Hobbs, Holt, Boyce, Khandros, Lucier, Marks, Moritz, Nelson, Rothman, Wu, and Shintani.  Defendants J.P. Morgan, Morgan Stanley, Cowen, and William Blair acted as underwriters for the July 2020 IPO.

266.    The IPO Registration Statement and Prospectus contained untrue statements of material facts, and omitted to state other facts necessary to make the statements made not misleading, including the below false and misleading statements:

(a)    The IPO Registration Statement highlighted the purported superiority of the Berkeley Lights platform compared to existing cell analyzing instruments, stating, for example, that the platform provides "the most advanced environment for rapid functional characterization of single cells at scale."  The IPO Registration Statement also stated that the Berkeley Lights platform delivered "the best cells" and "provides the deepest information, with linked phenotypic and genotypic data, on tens of thousands of live single cells relevant to the customers' end product

AMENDED COMPLAINT                        - 90 -
Case No. 4:21-cv-09497-HSG

specifications." The IPO Registration Statement also claimed that "this level of scale and precision is not attainable with other approaches."

(b) The IPO Registration Statement described the Berkeley Lights platform as enabling the Company's customers "to find the best cells" by offering advanced capabilities, including as follows:

- Performing rapid functional characterization of tens of thousands of single cells in parallel;

- Precisely controlling the environment around each cell, and maintaining cells in a healthy state for further use;

- Accessing a high degree of cell biodiversity;

- Deep Opto Profiling of the relevant phenotypic characteristics, at single-cell resolution over time and connecting this to the genotypic information for each cell;

- Performing a broad range of workflows, including single-cell assays, on an integrated platform; and

- Digitally aggregating, accessing, and analyzing a rich data library for each single cell.

(c) The IPO Registration Statement also highlighted Berkeley Lights's purported operational and financial growth, stating that the Company's direct platform sales had increased 84% year-over-year to $39.1 million for its fiscal 2019. The IPO Registration Statement stated that this segment growth had continued in the first quarter of 2020, as the Company generated $9.4 million in direct platform sales during the quarter, an increase over the first quarter of 2020. Similarly, the IPO Registration Statement stated that Berkeley Lights had placed 26 machines in 2019, a 117% increase over the prior year, and six machines in the first quarter of 2020, a 20% increase over the first quarter of 2019. The IPO Registration Statement represented that the "total addressable market" for the Company's products and services was "$23 billion."

267. Finally, the IPO Registration Statement included the following statement as one of its "Risk Factors":

The Berkeley Lights Platform is comprised of OptoSelect chips and reagent kits, advanced automation systems and advanced application and workflow software, which may contain undetected errors or defects and may not meet the expectations

AMENDED COMPLAINT - 91 -
Case No. 4:21-cv-09497-HSG

of our customers, which means our business, financial condition, results of operations and prospects could suffer.

268.    At the time they were made, the statements in ¶¶ 266-67 were materially false or misleading because they failed to disclose the adverse facts pertaining to Berkeley Lights's business, operations, and financial condition, including:

(a)    that Berkeley Lights's flagship instrument, the Beacon, suffered from numerous design and manufacturing defects including breakdowns, high error rates, data integrity issues and other problems, limiting the ability of biotechnology companies and research institutions to consistently use the machines at scale;

(b)    that Berkeley Lights had received numerous customer complaints regarding the durability and effectiveness of the Company's automation systems, including complaints related to the design and manufacturing detailed in (a), above, and described herein;

(c)    that the actual market for Berkeley Lights's products and services was a fraction of the $23 billion represented to investors because of, inter alia, the relatively high cost of the Company's instruments and consumables and inability to provide the sustained performance necessary to justify these high costs;

(d)    As a result of (a)-(c), above, Defendants' statements in the July 2020 IPO regarding Berkeley Lights's business, operations and financial results were materially false and misleading.

269.    While the July 2020 IPO Materials enumerated certain generic "risk factors," these risk factors did not disclose the specific risks associated with the capabilities and reliability of the Berkeley Lights platform and their impact on Berkeley Lights's business, operations, and financial condition.

## XII.    THE IPO MATERIALS VIOLATED ITEM 303 AND ITEM 505

270.    In addition to the misstatements and omissions set forth above, the IPO Materials were false and misleading because they failed to disclose material information that was required to be disclosed pursuant to the regulations governing their preparation.

271.    Specifically, Item 303 required the IPO Materials to "[d]escribe any known trends or uncertainties that have had or that [the Company reasonably expects are] likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," 17 C.F.R. §229.303(b)(2)(ii), and Item 105 required the IPO Materials to provide "a discussion of the material factors that make an investment in the registrant or offering speculative or risky," 17 C.F.R. §229.105.

272.    In negligent violation of Item 303 and Item 105, the IPO Materials failed to disclose the significant problems with the reliability and capabilities of the Company's platform, specifically, that: (1) Berkeley Lights's flagship instrument, the Beacon, suffered from numerous design and manufacturing defects including breakdowns, high error rates, data integrity issues and other problems, limiting the ability of biotechnology companies and research institutions to consistently use the machines at scale; and (2) Berkeley Lights had received numerous customer complaints regarding the durability and effectiveness of the Company's automation systems, including complaints related to the design and manufacturing detailed in (1), above. Further, the IPO Materials failed to disclose the true size of the Company's total addressable market. The severe problems being experienced by Berkeley Lights' customers when using the Company's platform and the true size of the Company's total addressable market were known to management, presented a significant uncertainty, and made investment in Berkeley Lights risky given that the Company is essentially a one product company and the reliability and capability of, and market size for, its platform, and in particular, the Beacon, were vital to the Company's success and created a known uncertainty and risk that the Company would be unable to place significant additional numbers of its platform with customers and/or expand its service offerings to new or repeat customers, thus compromising all of Berkeley Lights's revenue.

273.    As set forth in ¶¶ 119-52 above, subsequent disclosures have confirmed that the IPO Materials contained materially false and misleading statements and failed to disclose required information, in that they omitted to disclose, for example, the significant problems with the reliability and capabilities of the Company's platform, specifically, that: (1) Berkeley Lights's flagship instrument, the Beacon, suffered from numerous design and manufacturing defects

AMENDED COMPLAINT                              - 93 -
Case No. 4:21-cv-09497-HSG

including breakdowns, high error rates, data integrity issues and other problems, limiting the ability of biotechnology companies and research institutions to consistently use the machines at scale; and (2) Berkeley Lights had received numerous customer complaints regarding the durability and effectiveness of the Company's automation systems, including complaints related to the design and manufacturing detailed in (1), above. Since the July 2020 IPO, the price of Berkeley Lights common stock has declined by approximately 80% as of this filing.

**COUNT III**

**FOR VIOLATION OF § 11 OF THE SECURITIES ACT AGAINST BERKELEY LIGHTS, HOBBS, HOLT, THE DIRECTOR DEFENDANTS, AND THE UNDERWRITER DEFENDANTS**

274.    Plaintiff incorporates ¶¶ 21-23, 26-30, 49-67, 261-73 by reference.

275.    This Count is brought under § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendants Berkeley Lights, Hobbs, Holt, the Director Defendants, and the Underwriter Defendants.

276.    This Count does not sound in fraud. With respect to this Count, Plaintiffs do not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent. This claim is based solely on strict liability and negligence.

277.    The IPO Materials for the July 2020 IPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

278.    Berkeley Lights is the registrant for the shares of Berkeley Lights stock, and as such is strictly liable for the false and misleading statements in the IPO Materials. The Underwriter Defendants were responsible for the contents and dissemination of the IPO Materials used in the offerings for which they served as underwriters. *See supra* ¶¶ 263. Defendants Hobbs and Holt, as well as the Director Defendants, were responsible for the contents and dissemination of the IPO Materials they signed. *Id.* ¶¶ 261-62.

AMENDED COMPLAINT                          - 94 -
Case No. 4:21-cv-09497-HSG

279.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds to believe that the statements contained in the IPO Materials were true and without omissions of material facts and were not misleading. By virtue of each of the Defendants' failure to exercise reasonable care, the IPO Materials contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading.

280.    None of the untrue statements or omissions of material fact in the IPO Materials alleged herein were forward-looking statements. Rather, each statement or omission concerned existing facts. Moreover, the IPO Materials did not properly identify any of the alleged false or misleading statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

281.    The Retirement System and/or members of the Class acquired Berkeley Lights stock in the IPO in which shares were offered and/or sold pursuant to the above-described IPO Materials.

282.    At the times of their purchases, Plaintiffs and other members of the Class were without knowledge of the facts concerning the misstatements and omissions alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiffs discovered or could have reasonably discovered the facts upon which this complaint is based to the time that Plaintiffs commenced this action. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs commenced this action.

283.    The Retirement System, and members of the Class have sustained damages, as the value of Berkeley Lights's stock purchased or otherwise acquired pursuant or traceable to the materially false and misleading IPO Materials has declined substantially from the date of the offering to the date of this filing.

284.    By reason of the conduct herein, Berkeley Lights, Hobbs, Holt, the Director Defendants, and the Underwriter Defendant have each violated § 11 of the Securities Act.

AMENDED COMPLAINT                    - 95 -
Case No. 4:21-cv-09497-HSG

## COUNT IV

### VIOLATION OF § 12(A)(2) OF THE SECURITIES ACT AGAINST BERKELEY LIGHTS, HOBBS, HOLT, THE DIRECTOR DEFENDANTS, AND THE UNDERWRITER DEFENDANTS

285.    Plaintiffs incorporate ¶¶ 21-23, 26-30, 49-67, 261-73 by reference.

286.    This Count is brought under § 12(a)(2) of the Securities Act, 15 U.S.C. §771(a)(2), on behalf of the Class, against Defendants Berkeley Lights, Hobbs, Holt, the Director Defendants, and the Underwriter Defendants.  With respect to this Count, Plaintiffs do not claim that any of the Defendants committed intentional acts or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent.  This claim is based on strict liability and negligence.

287.    Section 12(a)(2) grants a private right of action against any person who offers or sells a security "by means of a prospectus . . .which includes an untrue statement of material fact or omits to state a fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.  15 U.S.C. §771(a)(2).

288.    The IPO Materials were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

289.    Berkeley Lights was a seller, offeror, and/or solicitor of purchases of its common stock pursuant to the defective IPO Materials and directly solicited the purchase of its common stock though means of the IPO Materials.

290.    The Director Defendants (for the IPO Materials they signed, ¶ 262), the Underwriter Defendants (for the IPO Materials used in the offerings for which they served as Underwriters, ¶ 263), and Defendants Hobbs and Holt (for the IPO Materials they signed, *see* ¶ 261) were sellers, offerors and/or solicitors of purchasers of Berkeley Lights common stock pursuant to the defective IPO Materials, and directly solicited the purchase of Berkeley Lights common stock through means of the IPO Materials.  Acts of solicitation included participating in the preparation of, or signing, the false and misleading IPO Materials, and/or selling shares of stock pursuant to the false and misleading IPO Materials.

AMENDED COMPLAINT                          - 96 -
Case No. 4:21-cv-09497-HSG

291.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO Materials were true and without omissions of material facts and were not misleading.

292.    By virtue of each of the Defendants' failure to exercise reasonable care, the IPO Materials contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein misleading.

293.    None of the untrue statements or omissions of material fact in the IPO Materials alleged herein were forward-looking statements.  Rather, each statement or omission concerned existing facts.  Moreover, the IPO Materials did not properly identify any of the alleged false or misleading statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

294.    The Retirement System and/or members of the Class acquired Berkeley Lights stock in the July 2020 IPO in which shares were offered and/or sold pursuant to the above-described IPO Materials.

295.    At the times of their purchases, named Plaintiffs and other members of the Class were without knowledge of the facts concerning the misstatements and omissions alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time that Plaintiffs discovered or could have reasonably discovered the facts upon which this complaint is based to the time that Plaintiffs commenced this action. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs commenced this action.

296.    The Plaintiffs and other members of the Class have sustained damages, as the value of Berkeley Lights's stock purchased or otherwise acquired pursuant or traceable to the materially false and misleading IPO Materials has declined substantially from the dates of the offerings to the date of this filing.

297.    By reason of the conduct herein alleged, Berkeley Lights, Hobbs, Holt, the Director Defendants, and the Underwriter Defendants violated §12(a)(2) of the Securities Act.

AMENDED COMPLAINT                    - 97 -
Case No. 4:21-cv-09497-HSG

298.    Accordingly, members of the Class who hold the common stock issued pursuant to the defective IPO Materials have the right to rescind and recover the consideration paid for their shares and hereby tender their common stock to Defendants sued herein, and Class members who have sold their common stock that was issued pursuant to the defective IPO Materials seek damages to the extent permitted by law.

## COUNT V

### VIOLATIONS OF § 15 OF THE SECURITIES ACT AGAINST HOBBS, HOLT, KHANDROS, WRVI, SEQUOIA, AND NIKON

299.    Plaintiffs incorporate ¶¶ 21-23, 26-30, 49-67, 261-73 by reference.

300.    This Count is brought under § 15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against Defendants Hobbs, Holt, Khandros, WRVI, Sequoia, and Nikon. This Count does not sound in fraud. With respect to this Count, Plaintiffs do not claim that any of the Defendants committed intentional acts or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent. This claim is based on strict liability and negligence.

301.    Defendants Hobbs (the Company's CEO and a director) and Holt (the Company's CFO) acted as controlling persons of Berkeley Lights within the meaning of § 15 of the Securities Act by virtue of their positions as senior officers and/or directors at Berkeley Lights. By reason of their positions at the Company, Hobbs, and Holt, individually and acting pursuant to a common plan, had the power to influence and exercised such power to cause Berkeley Lights to engage in the conduct alleged herein.

302.    Defendants Khandros, WRVI, Sequoia, and Nikon acted as controlling persons of Berkeley Lights within the meaning of § 15 of the Securities Act by virtue of their share of ownership, power to appoint directors, including through the appointment and service of themselves (Khandros) or their managing personnel (Defendant Marks, Moritz, and Shintani from, respectively, WRVI, Sequoia, and Nikon) as directors, and/or agreements with the Company. By reason of these relationships with the Company, as further detailed above in ¶¶ 26-30, 49-67, which are incorporated by reference herein, Khandros, WRVI, Sequoia, and Nikon individually

AMENDED COMPLAINT                    - 98 -
Case No. 4:21-cv-09497-HSG

and acting pursuant to a common plan, had the power to influence and exercised such power to cause Berkeley Lights to engage in the conduct alleged herein.

303.    Defendants Hobbs, Holt, Khandros, WRVI, Sequoia, and Nikon either signed the IPO Materials and/or otherwise participated in the process which allowed the sale of the shares of Berkeley Lights common stock to be successfully completed.

304.    As set forth above, Berkeley Lights violated §§ 11 and 12(a)(2) of the Securities Act in connection with the July 2020 IPO.  By virtue of their positions as controlling persons, and as a result of their aforementioned conduct, Defendants Hobbs, Holt, Khandros, WRVI, Sequoia, and Nikon are liable pursuant to § 15 of the Securities Act for the §§ 11 and 12 violations.

## XIII.    CLASS ACTION ALLEGATIONS

305.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of Berkeley Lights during the Class Period, including those who purchased shares of Berkeley Lights common stock pursuant or traceable to the IPO Materials issued in connection with Berkeley Lights's July 2020 IPO, and were damaged thereby (the "Class").  Excluded from the Class are Defendants and members of their immediate families, the officers and directors of the Company, at all relevant times, and members of their immediate families, the legal representatives, heirs, successors or assigns of any of the foregoing, and any entity in which Defendants have or had a controlling interest.

306.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Berkeley Lights common stock was actively traded on the Nasdaq.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Berkeley Lights or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

AMENDED COMPLAINT                                           - 99 -
Case No. 4:21-cv-09497-HSG

307.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws that are complained of herein.

308.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

309.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   whether the Securities Act and Exchange Act were violated by Defendants as alleged herein;

(b)   whether statements made by Defendants misrepresented material facts about the business, operations, and management of Berkeley Lights; and

(c)   to what extent the members of the Class have sustained damages and the proper measure of damages.

310.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A.      Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and b(3) of the Federal Rules of Civil Procedure and certifying Plaintiffs as Class Representatives and Hagens Berman and Robbins Geller Rudman & Dowd LLP as Class Counsel;

B.      Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs reasonable costs and expenses incurred in this action, including attorneys' fees, experts' fees, and other costs and disbursements; and

D.      Awarding such further relief, including any equitable/injunctive relief, as the Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

DATED:  July 25, 2022                    Respectfully submitted,

                                         HAGENS BERMAN SOBOL SHAPIRO LLP

                                         By:   _/s/ Lucas E. Gilmore_____
                                           LUCAS E. GILMORE
                                         Reed R. Kathrein
                                         715 Hearst Avenue, Suite 202
                                         Berkeley, CA 94710
                                         Telephone: (510) 725-3000
                                         Facsimile: (510) 725-3001
                                         reed@hbsslaw.com
                                         lucasg@hbsslaw.com

                                         Steve W. Berman (*pro hac vice*)
                                         **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                         1301 Second Avenue, Suite 2000
                                         Seattle, WA 98101
                                         Telephone: (206) 623-7292
                                         Facsimile: (206) 623-0594
                                         steve@hbsslaw.com

AMENDED COMPLAINT                        - 101 -
Case No. 4:21-cv-09497-HSG

Raffi Melanson (*pro hac vice* pending)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
55 Cambridge Pkwy, Suite 300
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
raffim@hbsslaw.com

*Attorneys for Lead Plaintiff*

JESSICA T. SHINNEFIELD (234432)
LONNIE A. BROWNE (293171)
JOHN M. KELLEY (339965)
**ROBBINS GELLER RUDMAN & DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
jshinnefield@rgrdlaw.com
lbrowne@rgrdalw.com
jkelley@rgrdlaw.com

*Counsel for Pompano Beach Police and Firefighters
Retirement System*

ROBERT A. SUGARMAN
PEDRO A. HERRERA
**SUGARMAN SUSSKIND BRASWELL &
HERRERA**
100 Miracle Mile, Suite 300
Coral Gables, FL 33134
Telephone:  305/529-2801
305/447-8115
sugarman@sugarmansusskind.com
pherrera@sugarmansusskind.com

*Additional Counsel for Pompano Beach Police and
Firefighters Retirement System*

AMENDED COMPLAINT                    - 102 -
Case No. 4:21-cv-09497-HSG