IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


PETERS,                                 )   CV-22-8168-EKL
                                        )
                    PLAINTIFF,          )   SAN JOSE, CALIFORNIA
                                        )
            VS.                         )   NOVEMBER 13, 2024
                                        )
TWIST BIOSCIENCE CORPORATION,           )   PAGES 1-44
ET AL,                                  )
                                        )
                    DEFENDANTS.         )
                                        )

_____

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE EUMI K. LEE
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:        **BY:  GEORGE N. BAUER**
                          BLEICHMAR FONTI AULD LLP
                          75 VIRGINIA ROAD
                          WHITE PLAINS, NY 10603


FOR THE PLAINTIFF:        **BY:  JOSEPH A. FONTI**
                          BLEICHMAR FONTI & AULD LLP
                          300 PARK AVENUE, SUITE 1301
                          NEW YORK, NY 10022



APPEARANCES CONTINUED ON THE NEXT PAGE


OFFICIAL COURT REPORTER:      SUMMER FISHER, CSR, CRR
                              CERTIFICATE NUMBER 13185


PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

UNITED STATES COURT REPORTERS

APPEARANCES CONTINUED:

FOR THE PLAINTIFF:        **BY:  JOSHUA SAMRA**
                          BLEICHMAR FONTI & AULD LLP
                          1330 BROADWAY, STE 630
                          OAKLAND, CA 94612


FOR THE DEFENDANT:        **BY:  JAMES NEIL KRAMER**
                          ORRICK, HERRINGTON & SUTCLIFFE LLP
                          THE ORRICK BUILDING
                          405 HOWARD STREET
                          SAN FRANCISCO, CA 94105

SAN JOSE, CALIFORNIA                    NOVEMBER 13, 2024

P R O C E E D I N G S

(COURT CONVENED AT 11:24 A.M.)

THE COURT:  ALL RIGHT.  LET'S GO AHEAD AND HAVE COUNSEL FOR PETERS VERSUS TWIST BIOSCIENCE COME AND SETTLE IN.

THANK YOU FOR YOUR PATIENCE, WE HAD A LONGER MORNING THAN WE HAD EXPECTED.

MR. BAUER:  GOOD MORNING, YOUR HONOR.

GEORGE BAUER, BLEICHMAR FONTI AULD, FOR THE PLAINTIFFS.

I'M JOINED BY JOSEPH FONTI AND JOSH SAMRA, ALSO OF BLEICHMAR FONTI AULD.

THE COURT:  COULD YOU REPEAT THEIR NAMES ONE MORE TIME.

MR. BAUER:  YES.  JOSEPH FONTE AND JOSH SAMRA.

THE COURT:  ALL RIGHT.  GOOD MORNING EVERYBODY.

MR. KRAMER:  GOOD MORNING, YOUR HONOR.

JAMES KRAMER FROM ORRICK HERRINGTON SUTCLIFFE ON BEHALF OF DEFENDANTS.  AND WITH ME IS DENNIS CHO, HE IS THE CHIEF LEGAL OFFICER AND CORPORATE SECRETARY FOR TWIST.

THE COURT:  THANK YOU.  AND WELCOME.

ALL RIGHT, COUNSEL, I'M LOOKING VERY MUCH -- I HAD SENT PARTIES A TENTATIVE IN THIS MATTER, BUT EVEN AS OF LAST NIGHT MY THINKING CONTINUES TO CHANGE, SO I'M VERY MUCH LOOKING FORWARD TO ARGUMENT IN THIS CASE WHICH IS ONE OF THE REASONS YOU ENDED UP LAST.

SO -- BUT WITH THAT, I HAVE SOME SPECIFIC QUESTIONS THAT I RAISED, I HAVE SOME ADDITIONAL ONES WHICH HAVE COME UP IN THE LAST 24 HOURS WHICH I WILL RAISE AS WELL, BUT I'M GOING TO BEGIN WITH THE MOVING PARTY.

MR. KRAMER:  THANK YOU, YOUR HONOR.

AND JUST TO GIVE YOU KIND OF AN OVERVIEW OF WHAT I WAS GOING TO DO, I WAS GOING TO TRACK THE COURT'S TENTATIVE, WHICH WE APPRECIATE.  I WAS GOING TO START WITH LOSS CAUSATION THEN MOVE TO THE -- SOME OF THE FALSITY ISSUES YOU IDENTIFIED, SPECIFICALLY ABOUT SOME OF THE ACCOUNTING ISSUES AND ERROR RATES, AND I WAS GOING TO TALK ABOUT SCIENTER.

AND WHAT I WILL DO IS I WILL PAUSE ALONG THE WAY BUT PLEASE INTERRUPT ME, YOUR HONOR, BECAUSE THE HOPE HERE IS TO BE HELPFUL TO THE COURT.

THE COURT:  YES.  I WILL NOT BE SHY.

MR. KRAMER:  GOOD.  I APPRECIATE THAT, YOUR HONOR.

YOUR HONOR, WE SAT THROUGH A COUPLE OF THE ARGUMENTS, AS THE COURT NOTED, THE FIRST ONE WAS ARGUING PLAUSIBILITY AND THAT STANDARD.

AS THE COURT KNOWS, SECURITY CASES ARE SUBJECT TO A COMPLETELY DIFFERENT STANDARD.  IN 1995 CONGRESS PASSED THE PSLRA STAYING ALL DISCOVERY PENDING THE MOTIONS TO DISMISS, AND IN THE LAST 29 YEARS, A BODY OF LAW HAS DEVELOPED ABOUT WHAT NEEDS TO BE ALLEGED TO SHOW FALSITY SCIENTER AND LOST CAUSATION.

LOSS CAUSATION, INTERESTINGLY, HAS ONLY BEEN SUBJECT TO DEVELOPMENT IN THE LAW IN THE LAST FIVE OR SIX YEARS.  AS THE COURT KNOWS, LOSS CAUSATION REQUIRES PLAINTIFF ALLEGE THAT THERE WAS A CORRECTIVE DISCLOSURE TO THE MARKET AND THAT CORRECTIVE DISCLOSURE CAUSED THE STOCK PRICES TO DECLINE.

HISTORICALLY, CORRECTIVE DISCLOSURES WERE BASED ON COMPANY'S STATEMENTS.  COMPANY SAYS, WITH THIS GUIDANCE, OUR PRODUCT IS LATE, AND THEN OF COURSE, PLAINTIFFS BACK CASH ON THAT TO ESTABLISH A CLAIM.  BUT IN THE LAST FIVE YEARS WE HAVE COME INTO A REALM OF SHORT SALE REPORTS.

THE COURT:  YES.

MR. KRAMER:  YES, THE SHORT SALE REPORT.  THE SCORPIONS, THE FUZZY PANDAS, THE HINDENBURGS.

THE COURT:  I'M HALFWAY THROUGH THESE CASES.

MR. KRAMER:  THAT'S TERRIFIC.

SO STARTING IN 2020 AND THEN AGAIN IN 2022, THE NINTH CIRCUIT HAS ADDRESSED, DOES A SHORT SALE REPORT ESTABLISH LOSS CAUSATION?  AND THE COURTS, TO BE CLEAR, HAVE NOT ADOPTED A BRIGHT LINE RULE.  THEY SAID IT TURNS ON THE CHARACTER OF THE REPORT.  AND IT REALLY IS A SITUATION WHERE DOES THE REPORT PROVIDE NEW INFORMATION THAT SHOWS THAT A PRIOR STATEMENT WAS FALSE.

AND WE HAVE THE BENEFIT HERE OF JUDGE GILLIAM, EARLIER THIS YEAR, APPLYING THE NINTH CIRCUIT DECISION IN NEKTAR, IN THE BERKELEY LIGHTS CASE, AND JUDGE GILLIAM WAS APPLYING NEKTAR

TO A SCORPION, REPORT, THE SAME REPORT.

AND SO YOUR HONOR, OFTEN DEFENSE LAWYERS SAY THERE IS A CASE THAT'S ON ALL FOURS, IT'S ON ALL FOURS, THIS CASE REALLY IS ON ALL FOURS.

THE COURT:  I THINK ALL COUNSEL SAYS THAT.

MR. KRAMER:  THEY DO SAY THAT.  AND I SAY IT CAREFULLY, YOUR HONOR.  BUT JUDGE GILLIAM WAS APPLYING NEKTAR TO A SCORPION REPORT, AND WE HAVE THE SCORPION REPORT, AND WHAT JUDGE GILLIAM DID WAS GO THROUGH THE VARIOUS FACTORS FROM THE NINTH CIRCUIT IN NEKTAR AND SAY, IS THIS REPORT ONE THAT PROVIDED NEW INFORMATION TO THE MARKET.  AND WE PROVIDED THE COURT WITH THE SCORPION REPORT, OF COURSE, IT'S REQUEST FOR JUDICIAL NOTICE NUMBER 1.  AND IF YOU LOOK AT THE SECOND PAGE, WE HAVE DISCLAIMERS, SO IT'S PAGE 2 OF THE REPORT.

THE COURT:  I READ THOSE YESTERDAY.

MR. KRAMER:  WELL, VERY GOOD, YOUR HONOR.  YOU GOT THIS.

AND THESE ARE EXACTLY THE SAME DISCLAIMERS THAT JUDGE GILLIAM LOOKED AT IN RULING THAT THE SCORPION REPORT DOES NOT ESTABLISH LOSS CAUSATION.

AND JUST TO HIGHLIGHT A COUPLE, THE FIRST, "SCORPION STANDS TO REALIZE SIGNIFICANT GAINS IN THE EVENT THE STOCK PRICE DECLINES."  THAT SCORPION "DOES NOT PROVIDE ANY REPRESENTATIONS FOR WARRANTIES WITH REPORT TO THE ACCURACY OF THE MATERIALS."  THAT SCORPION "HAS NOT CONDUCTED ANY DILIGENCE

OR OTHER VERIFICATION AS TO ITS INFORMATION."  AND OF COURSE THAT PEOPLE POSTING THIS INFORMATION HAVE CONFLICTS OF INTEREST WHICH THEY SAY -- WHICH MAY GIVE THEM "INCENTIVE TO POST INACCURATE, INCOMPLETE OR OTHERWISE PREJUDICIAL INFORMATION."

YOUR HONOR, THE NINTH CIRCUIT HAS MADE CLEAR THAT IN A SITUATION WHERE YOU'VE GOT A SHORT SALE REPORT, THAT DISCLAIMS ANY ACCURACY, DISCLAIMS ANY WORK TO TEST THE VORACITY OF THE INFORMATION AND IN FACT SPECIFICALLY SAYS HEY, THIS COULD BE A BUNCH OF LIES, THAT DOES NOT ESTABLISH LOSS CAUSATION.

AND TO BE CLEAR HERE, YOUR HONOR, THE PLAINTIFFS ARE RELYING SOLELY ON THIS REPORT TO ESTABLISH LOSS CAUSATION. PARAGRAPHS 197 TO 199.  IN THE HEADING, THE TRUTH IS REVEALED.

THE COURT:  SO YOU READ THEIR ARGUMENT IN THE SUR-REPLY WHICH BASICALLY WAS, OKAY BUT THIS IS DIFFERENT AND THIS IS DISTINGUISHABLE BECAUSE WE HAVE A INVESTORS WHO SAY THEY RELIED ON THIS REPORT.

TALK ME THROUGH THAT AND WHY THAT SHOULD BE COMPELLING TO DISTINGUISH IT FROM THE BERKELEY CASE.

MR. KRAMER:  I DON'T THINK IT SHOULD BECAUSE THOSE WERE THE SAME ARGUMENTS MADE IN FRONT OF JUDGE GILLIAM IN THE BERKELEY LIGHTS.  THE TEST IS WHETHER THE MARKET WHEN SEEING THE SCORPION REPORT HAD AH HA MOMENT, AND SAID, WE WERE LIED TO, AND THAT CAUSED THE STOCK PRICE TO DECLINE.

AS JUDGE GILLIAM SAID AND AS NEKTAR SAID, IT'S THE QUALITY OF THE SOURCE.  AND WHEN YOU HAVE DISCLAIMERS AND YOU HAVE

SOMEONE SAYING, I COULD PROFIT, I'VE DONE NO WORK TO VERIFY.

THE COURT:  WELL HERE'S THE RUB, THEN WHAT HAPPENS WHEN THE MARKET HAS THE AH HA MOMENT, BUT THEY ALSO RELIED ON A REPORT THAT WAS UNRELIABLE?

MR. KRAMER:  WELL, SO THAT WOULD BE CONTRARY TO THE NINTH CIRCUIT AND CONTRARY TO JUDGE GILLIAM'S DECISION.  THE PLAINTIFFS CAN PLEAD LOSS CAUSATION ANOTHER WAY, RIGHT.  AND YOU KNOW -- AND OF COURSE YOU COULD CERTAINLY, AS OFTEN HAPPENS IN THESE CASES, DISMISS THE CASE WITH LEAVE TO AMEND AND THEY CAN TRY TO CORRECT IT.

BUT AS CURRENTLY PLED, RELYING ON THE SCORPION REPORT SOLELY, DOES NOT ESTABLISH LOSS CAUSATION, RIGHT.  THEY HAVE GOT TO SHOW THE MARKET SAW THAT REPORT, THOUGHT IT WAS ACCURATE, OFFERED NEW INFORMATION TO THE MARKET AND THAT NEW INFORMATION CAUSED THE STOCK PRICES TO DECLINE.

AND YOUR HONOR, WE DID PUT IN THE REQUEST FOR JUDICIAL NOTICE, ALL THE COMPANY'S 10-K FILINGS THROUGHOUT THE CLASS PERIOD.  YOU KNOW, ESSENTIALLY BERKELEY LIGHTS, I'M SURE YOU SAW THE HEADLINE FROM THAT REPORT WHICH WAS QUITE ASTONISHING, BANKRUPTCY, SWINDLE, YOU KNOW, THE ACCOUNTING IS ALL FRAUD.

YOUR HONOR, THE COURT CAN TAKE JUDICIAL NOTICE OF THE FACT THAT THE COMPANY HAS NEVER RESTATED ITS FINANCIALS.  WE HAVE A FOUR-YEAR CLASS PERIOD, YOU HAVE A SCORPION REPORT ISSUING A HIGHLY PUBLICIZED, HUNDRED-PAGE REPORT SAYING IT'S ALL A HOUSE OF CARDS.

AND YOUR HONOR, IN THAT SITUATION, YOU WOULD THINK THAT IF THERE WAS SOME TRUTH TO IT, THERE WOULD BE A RESTATEMENT.  BUT INSTEAD WHAT WE HAVE, AND AGAIN THE COURT CAN TAKE JUDICIAL NOTICE OF THIS, WE HAVE NO RESTATEMENT, WE HAVE CLEAN AUDIT OPINIONS FOR EVERY YEAR.

SO AGAIN, IF THERE HAD BEEN A RESTATEMENT, OR IF THE COMPANY HAD ISSUED AN AK SAYING, SOMETHING WE SAID WAS INCORRECT, THAT'S FINE.  BUT THE PLAINTIFFS, 197 TO 199, ARE RELYING SOLELY ON SCORPION, THE NINTH CIRCUIT HAS SPOKEN, JUDGE GILLIAM APPLIED THE STANDARDS OF SCORPION, THEY CAN'T RELY ON THAT FOR LOSS CAUSATION.

THE COURT:  I AM NOT BOUND BY JUDGE GILLIAM, EVEN THOUGH I HAVE THE MOST RESPECT FOR HIM.

MR. KRAMER:  AND I DO TOO, YOUR HONOR.

BUT HE DID APPLY THE NINTH CIRCUIT.  AND REMEMBER IN NEKTAR AND IN BOFI THERE WERE SIMILAR REPORTS, RIGHT.  THE REPORTS THERE WAS ALSO, WE DISCLAIM ANY -- WE DISCLAIM THE VORACITY, WE HAVEN'T DONE ANY WORK TO TEST IT.

AND WHAT BOFI AND NEKTAR SAID WAS AN INVESTOR WOULD TAKE THAT WITH A GRAIN OF SALT, RIGHT, THEY WOULD KNOW WHAT WHEN SOMEONE SAYS, I'M GOING TO MAKE A LOT OF MONEY IF THE STOCK PRICE GOES DOWN, I THINK --

THE COURT:  RIGHT.  LET'S GO BACK TO MY HYPOTHETICAL. LET'S SAY THERE WAS RELIANCE, SO WHAT DOES THE COURT DO WITH THAT?

MR. KRAMER:  SO RELIANCE, IF IT'S --

THE COURT:  I'M NOT ARGUING THIS ONE WAY OR THE OTHER, I'M JUST ASKING.

MR. KRAMER:  IT'S A GREAT QUESTION.  THE HYPOTHETICAL IS QUITE INTERESTING AS A THEORETICAL PERSPECTIVE.

THEY HAVE GOT TO SHOW THE MARKET RESPONDING, NOT ANY STOCKHOLDER.  IF IT'S AN INDIVIDUAL STOCKHOLDER, THEN IT'S AN INDIVIDUAL CLAIM.  THIS IS A CLASS ACTION, THEY ARE RELYING ON THE FRAUD ON THE MARKET DOCTRINE.

THE COURT:  THEY WOULD SAY THE MARKET REFLECTS IT BY THE 20 PERCENT DROP IN STOCK PRICE, OR WHATEVER PERCENTAGE, I COULD BE WRONG.

MR. KRAMER:  YEAH.

SO IF THAT'S TRUE, YOUR HONOR, THEN ANY PLAINTIFF CAN GET PAST THE LOSS CAUSATION BY SIMPLY ISSUING A BS REPORT WHERE THEY SAY THIS ISN'T TRUE, OR I DIDN'T DO ANY WORK TO CHECK BUT I THINK IT'S A HOUSE OF CARDS, AND THEN THEY GET PAST LOSS CAUSATION, THAT WOULD GO DIRECTLY INTO THE TEETH OF THE NINTH CIRCUIT, YOUR HONOR.

THE COURT:  OKAY.

MR. KRAMER:  SO LET ME MOVE TO THE FALSITY PIECE, AND I WANT TO TALK ABOUT THE TWO POINTS YOUR HONOR RAISED IN THE TENTATIVE, THE ACCOUNTING ISSUE AND THEN ALSO THE ERROR RATE ISSUE.

SO AS THE COURT KNOWS, OVER THE LAST 29 YEARS THERE'S BEEN

A DEVELOPMENT OF LAW ON WHAT PLAINTIFFS NEED TO ALLEGE WHEN TRYING TO ESTABLISH FALSITY THROUGH A FORMER EMPLOYEE.  AND THE ALLEGATIONS MUST ESTABLISH THAT THE WITNESS WAS IN A POSITION TO KNOW THE INFORMATION AND HAS PERSONAL KNOWLEDGE OF THE INFORMATION.  AND THAT'S THE ZUCCO CASE, WHICH IS 552, F.3D AT 996.  AND THEN OF COURSE ASSERTED WRONGDOING DURING THE FORMER EMPLOYEE'S EMPLOYMENT DOES NOT PROVIDE THE PARTICULARITY REQUIREMENT UNDER THE PSLRA.  THE CONFIDENTIAL WITNESS REPORTS OR THE FORMER EMPLOYEE REPORTS MUST BE CONTEMPORANEOUS WITH THE ALLEGED STATEMENT.

SO IN OTHER WORDS, THEY DON'T GET TO SAY, I WAS EMPLOYED FOUR YEARS, BAD STUFF HAPPENED, THAT STATEMENT WAS FALSE.  AND THAT'S THE CITY OF SUNRISE V. ORACLE CASE, AND IT'S ALSO A CASE FROM JUDGE KOH, WHICH I THINK WAS IN THIS COURTROOM -- NO, WAS SHE NEXT DOOR?  I ALWAYS GET THAT CONFUSED.  THAT WAS ALIGN TECH, WHICH IS 417 F.SUPP.3D AT 1274.  THE PLAINTIFFS DON'T GET TO JUST SAY, BAD STUFF HAPPENED WHILE I WAS EMPLOYED AND THEREFORE EVERY STATEMENT WAS FALSE.

SO STARTING WITH -- AND WE HAVE A CHALLENGE HERE BECAUSE THAT'S REALLY WHAT'S HAPPENING.  WE HAVE GOT, FOR THE ACCOUNTING -- ALLEGED ACCOUNTING MISSTATEMENT, AND THE ALLEGATION IS THAT WELL, THE COMPANY RECORDED THINGS AS R&D AS OPPOSED TO COST OF GOODS SOLD, AND IT DID THAT TO BEEF UP ITS MARGINS.

SO I SHOULD PAUSE HERE AND LET'S DOUBLE CLICK ON WHAT THE

COMPANY DOES, BECAUSE YOUR HONOR THIS COMPANY DOES NOT MAKE WIDGETS RIGHT, THIS COMPANY IS A RESEARCH COMPANY, THEY MANUFACTURE A BROAD RANGE OF SYNTHETIC DNA THAT GOES ON CHIPS WHICH ARE CUSTOMIZED TO A PARTICULAR CUSTOMER'S NEEDS.  SO THEY CAN DO RESEARCH.

SO WE ARE NOT MAKING WIDGETS, WE ARE MAKING VERY CUSTOMIZABLE PRODUCTS.  AND IF I REFER THE COURT TO EXHIBIT 50 RJN, WHICH IS OUR 10-K THAT STARTS AT THE CLASS PERIOD, THIS IS ALL FULLY DISCLOSED.  VIRTUALLY ALL RESEARCH AND DEVELOPMENT REQUIRES TRIAL AND ERRORS AND "OUR CUSTOMERS REQUIRE MANY VARIATIONS OF GENES TO FIND THE DNA SEQUENCE THAT ACHIEVES THEIR OBJECTIVES."  THAT'S EXHIBIT 5 AT PAGE 5 OF THE COMPANY'S 10-K.

AND THEN THE COMPANY GOES ON TO DISCLOSE AT PAGE 12 OF THAT SAME 10-K, RESEARCH AND DEVELOPMENT ACTIVITIES ARE CONDUCTED "IN COLLABORATION WITH MANUFACTURING ACTIVITIES."

WHAT'S HAPPENING, YOUR HONOR, IS TWIST GETS AN ORDER FROM A CUSTOMER, THEY SAY THEY NEED DNA ON A SILICON CHIP BUT IT HAS TO BE SPECIFICALLY BUILT TO THEIR NEEDS IN ORDER FOR A CUSTOMER TO DO TESTING.

SO THEY ARE MAKING WIDGETS, AND THAT'S REALLY IMPORTANT BECAUSE YOUR HONOR, THE ONE THING WE AGREED ON WITH PLAINTIFFS, AND I ALWAYS LIKE TO HIGHLIGHT WHERE WE AGREE, IS THE ACCOUNTING STANDARD THAT APPLIES.  SO WE GOT ASC 730 AND ASC 730 IS WHAT GOVERNS HOW YOU ALLOCATE COSTS BETWEEN R&D AND

COSTS OF GOODS SOLD.

AND THE PLAINTIFFS CITE TO THIS --

THE COURT:  BETWEEN THE R&D AND --

MR. KRAMER:  AND COST OF GOODS SOLD.

SO IF YOU ARE MAKING A WIDGET, THAT'S COST OF GOODS SOLD AND THAT IMPACTS YOUR MARGINS.  R&D, IT GETS CAPITALIZED, FOR RESEARCH AND DEVELOPMENT TO BUILD SOMETHING NEW, IT GETS CAPITALIZED AND SPREAD OUT OVER THE LIFE OF PRODUCT.  THIS IS A DIFFERENT ACCOUNTING ISSUE.  SO ASC 730 IS THE ACCOUNTING THAT APPLIES.

AND I SHOULD POINT OUT BEFORE I GET THERE, YOU HAD ASKED ABOUT HOW MUCH DISCRETION THERE IS IN THESE ACCOUNTING RULES, THE SUPREME COURT IN THE THOR POWER TOOL CASE WHICH IS 439 U.S. 522 AT 544, MADE CLEAR THAT THERE'S DISCRETION IN APPLYING ACCOUNTING STANDARDS, AND THERE IS A LONG LINE OF CASES WE CITED FROM THE NINTH CIRCUIT WHICH SAYS THAT ACCOUNTING DECISIONS OFTEN INVOLVE JUDGMENTS AND OPINIONS.

BUT HERE, THE COURT NEEDS TO LOOK NO FURTHER THAN THE ACCOUNTING STANDARD THAT APPLIES.  THE PLAINTIFFS CITE TO ASC 730 WHICH IS THE ACCOUNTING STANDARD IN PARAGRAPHS 49 AND 56 OF THEIR COMPLAINT, AND IN FACT THEY GO FURTHER YOUR HONOR AND THEY REFERENCE THE PRICEWATERHOUSECOOPERS GUIDANCE ON HOW TO APPLY THIS IN THEIR COMPLAINT.

AND THAT GUIDANCE IS ATTACHED AS RJN NUMBER 3.  SO THIS IS PRICEWATERHOUSECOOPERS MEMO ON HOW DO YOU APPLY THE APPLICABLE

ACCOUNTING STANDARDS FOR DECIDING IS SOMETHING COST OF GOODS SOLD OR IS SOMETHING R&D.

AND REMEMBER, THE CLAIM IS WELL YOU SHOULD HAVE MADE THIS COSTS OF GOOD SOLD BUT YOU MADE IT R&D.  AND IF YOU LOOK AT THE GUIDANCE FROM PRICEWATERHOUSECOOPERS, IT SAYS "RESEARCH AND DEVELOPMENT COSTS NEED TO BE CONSIDERED TO DETERMINE WHETHER THEY SHOULD BE CAPITALIZED OR EXPENSED AS INCURRED.  WHETHER THEY ARE TREATED AS R&D OR WHETHER THEY ARE TREATED AS COST OF GOODS SOLD."

"JUDGMENT IS REQUIRED TO DETERMINE THE APPROPRIATE ACCOUNTING TREATMENT."

YOUR HONOR, IT IS -- IT IS A MIXED QUESTION OF WHAT'S HAPPENING ON AN APPLICATION OF THE ACCOUNTING STANDARD.  AND SO AGAINST THAT BACKDROP, WE DON'T MAKE WIDGETS, WE HAVE AN ACCOUNTING STANDARD THAT HAS LOTS OF DISCRETION AND LOTS OF FACTS AND CIRCUMSTANCES.

LET'S LOOK AT WHAT'S HAPPENING IN THE COMPLAINT.  THEY HAVE ONE CONFIDENTIAL WITNESS, FE1, THAT PROVIDES THE ALLEGATION THAT SUPPORTS THIS CLAIM.  AND FE1 WHO IS A -- IS NOT AN ACCOUNTANT, IS NOT ALLEGED --

THE COURT:  HE'S NOT REQUIRED TO BE.

MR. KRAMER:  WHAT'S THAT?

THE COURT:  HE'S NOT REQUIRED TO BE AN ACCOUNTANT.

MR. KRAMER:  NO, I UNDERSTAND YOUR HONOR, BUT HE'S NOT.  AND THERE IS NO ALLEGATION THAT HE OR SHE KNOWS ANYTHING

ABOUT THE CATEGORIES. THERE IS NO ALLEGATION THAT HE OR SHE UNDERSTOOD THE ACCOUNTING RULES, APPLIED THEM, EVEN KNEW THAT ASC 730 APPLIED.

BUT PUTTING THAT ASIDE, THE ALLEGATION, TO ITS ESSENCE IS, I WAS TOLD BY A NON DEFENDANT, THE COO, TO ENTER INTO THE DATABASE, COSTS AS R&D THAT I BELIEVED SHOULD HAVE BEEN COST OF GOODS SOLD. THAT'S ALLEGATION.

AND YOUR HONOR, JUST AS A LEGAL MATTER, IF YOU ARE GOING TO RELY ON A CONFIDENTIALS WITNESS ON AN ACCOUNTING ISSUE, THE PLAINTIFFS ARE REQUIRED TO ALLEGE THE FORMER EMPLOYEE'S ROLE IN ACCOUNTING PROCESS AND PERSONAL KNOWLEDGE OF THE ACCOUNTING DECISION. SO THEY HAVE TO BE INVOLVED IN THE ACTUAL ACCOUNTING DECISION AND HAVE PERSONAL KNOWLEDGE.

AND THAT'S THE BRODSKY V. YAHOO! CASE WHICH IS 630 F.SUPP AT 1114. WE CITED THAT IN OUR MOTION TO DISMISS. SO BRODSKY SAYS IF A FORMER EMPLOYEE IS GOING TO TRY TO CLAIM THE ACCOUNTING IS WRONG, THEY HAVE TO BE IN THE ROOM, THEY HAVE TO KNOW HOW THE DECISION WAS MADE.

ALL WE HAVE HERE IS AN APPLICATION ENGINEER WHO ENTERED DATA INTO A DATABASE. WE DON'T KNOW WHAT HAPPENED AFTERWARDS, HE OR SHE DOESN'T SAY THAT THEY WERE IN THE ROOM WHEN THAT GOT SPIT OUT OF A REPORT AND ANY ACCOUNTING DECISION WAS MADE. WE DON'T KNOW WHAT OTHER INFORMATION HAPPENED. WE DON'T KNOW IF PRICEWATERHOUSECOOPERS OR OTHER PEOPLE IN THE ACCOUNTING DEPARTMENT LOOKED AT THAT DATA AND SAID, YOU KNOW WHAT, WE

SHOULD ACCOUNT FOR THIS AS R&D OR COST OF GOODS SOLD.  IT MAY HAVE CHANGED, WE DON'T KNOW.

WE ALSO DON'T KNOW WHAT SPECIFIC PROJECT HE OR SHE WAS WORKING ON.  WAS IT A PROJECT UNIQUE TO A CUSTOMER'S NEEDS OR WAS IT A RUN OF THE MILL PROJECT THAT, YOU KNOW, MORE SQUARELY FIT INTO COST OF GOODS SOLD?

BUT AT THE END OF THE DAY, YOUR HONOR, THE PLAINTIFFS ARE TRYING TO PIVOT FROM SOMEONE THAT ENTERED SOMETHING INTO A DATABASE, AND AGAIN NOT AT THE DIRECTION OF EITHER OF THE DEFENDANTS, AND CLAIMED THAT EVERY ACCOUNTING STATEMENT MADE DURING A FOUR-YEAR CLASS PERIOD WAS FALSE, EVERY STATEMENT MADE DURING A FOUR-YEAR CLASS PERIOD.

PUTTING ASIDE THE FACT THAT FE1 DOESN'T SUPPORT THAT ANY STATEMENT WAS FALSE, THE PLAINTIFFS ARE REQUIRED TO IDENTIFY WHEN THE DATA WAS ENTERED AND WHAT STATEMENTS WERE RENDERED FALSE.

AGAIN, CITING JUDGE KOH AND SOME OF THE OTHER CASES I CITED, THEY DON'T GET TO SAY, WELL, MISCONDUCT HAPPENED ON MY WATCH SO EVERY STATEMENT OVER FOUR YEARS IS FALSE.

AND THAT'S WHAT WE HAVE HERE, YOUR HONOR.  AND SO WHAT WE --

THE COURT:  SO YOUR POINT BEING THE LACK OF SPECIFICITY, IN TERMS OF THOSE DETAILS, SORT OF HIS -- THAT HE MAY NEED TO SAY A DATE.

MR. KRAMER:  SO FIRST, THEY NEED TO SAY WHY HE HAS

PERSONAL KNOWLEDGE OF THE ACCOUNTING DECISION.  THEY ARE TRYING TO COLLAPSE WHAT GOT ENTERED INTO A MANUFACTURING SYSTEM AS WHAT GOT SPIT OUT ON THE BACK END AS AN ACCOUNTING DECISION.

THERE IS A HUGE GAP THERE.  THEY HAVE TO BRIDGE THAT GAP.  IF THEY CAN ALLEGE WHAT I PUT IN THE ACCOUNTING SYSTEM, I LEARNED LATER IS HOW WE ACCOUNTED FOR IT, GREAT, THEY SHOULD BRIDGE THAT GAP.  BUT THAT IS A GAPING GAP IN THE LOGIC OF THEIR CLAIM, RIGHT, WHAT YOU PUT IN AN ACCOUNTING SYSTEM -- I'M SORRY, IN A MANUFACTURING SYSTEM, DOESN'T SAY ANYTHING ABOUT THE ACCOUNTING TREATMENT.

AGAIN, YOU KNOW, IT MAY HAVE BEEN A SITUATION WHERE THE PROJECT THE PERSON WAS WORKING ON AT THE TIME WASN'T ONE OF THESE ONES THAT REQUIRED GREAT DISCRETION UNDER ASC 730, WE DON'T KNOW.

AND AS WE SAW IN THE YAHOO CASE I JUST CITED, THEY HAVE TO HAVE THE CONFIDENTIAL WITNESS, THE FORMER EMPLOYEE HAS TO HAVE A ROLE AND PERSONAL KNOWLEDGE OF THE ACCOUNTING DECISION. AGAIN, THEY DON'T GET TO JUST SAY, YOU ENTERED SOMETHING IN A MANUFACTURING DATABASE AND THEREFORE EVERYTHING WAS FALSE.

BUT AT A MINIMUM, YOUR HONOR, ON THE SPECIFICITY POINT, THAT'S ALSO TRUE.  THEY DON'T GET TO SAY, WELL I ENTERED SOMETHING IN A DATABASE SO WE HAVE A 47-MONTH CLASS PERIOD, EVERY ACCOUNTING STATEMENT WAS FALSE.  THAT'S NOT HOW THE LAW HAS DEVELOPED, YOUR HONOR, RIGHT, NOT HOW THE LAW HAS DEVELOPED.

SO YOU KNOW, IF THEY CAN AMEND TO FILL THAT GAP, THEY CERTAINLY CAN, THEY CAN TRY TO DO THAT.

NOW LET'S TALK ABOUT ERROR RATES.

SO ONE OF THE THINGS WE SEE IN THE COMPLAINT IS THE ALLEGATION THAT FIRST TEST YIELD RATES WERE MISTAKEN, RIGHT. AND THEY CITE TO PARAGRAPH 69 OF THE COMPLAINT. AND AT PARAGRAPH 69, THE PLAINTIFFS SAY, ESSENTIALLY THAT FIRST TEST YIELD, THE TRUE ERROR RATE WAS TEN PERCENT ON OUR FIRST TEST YIELD AND THAT WAS MISREPRESENTED. THAT'S THE ALLEGATION OF PARAGRAPH 69.

HERE'S THE PROBLEM, YOUR HONOR, THE DEFENDANTS NEVER DISCLOSED THE FIRST TEST YIELD RATE TO THE MARKET. THAT WAS NOT AN ERROR RATE THAT WAS SHARED. INSTEAD, THE ERROR RATES THAT WERE SHARED RELATED TO SPECIFIC PRODUCTS. WE SHARED ERROR RATES THAT RELATE TO OUR NUCLEOTIDES, WHICH WAS ONE IN 2,000. WE SHARED ERROR RATES THAT WERE BASED ON OLIGO POOLS WHICH ARE ALSO 1 OF 2,000, AND WE SHARE ERROR RATES ON NON-CLONAL GENES THAT HAD AN ERROR RATE OF ONE IN 7,500.

THERE IS NOWHERE THE PLAINTIFFS HAVE IDENTIFIED, BECAUSE IT DIDN'T HAPPEN, WHERE DEFENDANTS SAID OUR FIRST TEST YIELD RATES WERE X. IT'S AN APPLES AND ORANGE COMPARISON OF WHAT WAS REALLY SAID.

SO THERE'S AN -- AND REMEMBER, SECURITIES FRAUD IS ABOUT A MISSTATEMENT TO THE MARKET, A MISSTATEMENT TO THE MARKET. AND IF WE DIDN'T REPRESENT TO THE MARKET WHAT OUR FIRST TEST YIELD

RATES WERE, HOW COULD THERE BE A MISSTATEMENT TO THE MARKET?

AND OF COURSE THERE'S NO ALLEGATION THAT ANY OF THESE OTHER ERROR RATES I JUST DESCRIBED WERE FALSE AT THE TIME THEY WERE MADE.  SO THEY CAN'T BRIDGE THAT GAP EITHER, YOUR HONOR, IT'S AN APPLES TO ORANGES COMPARISON.  MAYBE IF THEY AMEND THEY CAN CLARIFY THAT, THEY CAN IDENTIFY WHERE WE SUPPOSEDLY MISREPRESENTED ERROR RATES, BUT THEY HAVEN'T DONE THAT.

I WAS GOING TO MOVE TO SCIENTER, YOUR HONOR.

THE COURT:  YES.

MR. KRAMER:  GREAT.  APPRECIATE IT.

SO AS THE COURT KNOWS, SCIENTER REQUIRES, IN THE NINTH CIRCUIT, ACTUAL INTENT TO DEFRAUD OR CONSCIOUS DISREGARD OF THE TRUTH, IT'S BASICALLY YOU HAVE TO KNOWINGLY LIE TO THE MARKET.

PIVOTING BACK TO THE ALLEGED ACCOUNTING DISCLOSURES, FE1 OFFERS NOTHING ABOUT HIS DISCUSSION WITH MR. LEPROUST OR MR. THORBURN AT ALL.  THERE ARE NO FACTS THAT HE HAD A DISCUSSION WITH EITHER THE CEO OR CFO ABOUT THE ACCOUNTING. AND WHAT THEY NEED TO ESTABLISH SCIENTER IS FOR MR. LEPROUST OR MR. THORBURN TO SAY, I KNOW THE ACCOUNTING IS WRONG, I DON'T DARE, OR DISREGARD FACTS, RIGHT, I'M NOT GOING TO CONSIDER THESE FACTS.  BUT THERE IS NOTHING.  FE1 OFFERS NO ACCOUNTING-RELATED ALLEGATIONS ABOUT ANY DEFENDANT'S STATE OF MIND WHATSOEVER.  FULL STOP.  IT'S JUST NOT IN THERE.

AND I WENT BACK THROUGHOUT COMPLAINT EARLIER THIS MORNING,

YOU KNOW, THE COMPLAINT HAS A GREAT TABLE OF CONTENTS IN THE FRONT, WE GOT FE1, I LOOKED AT IT, IT WAS REALLY GREAT, THERE'S NOTHING.  THERE'S NOTHING.

AND THE SAME IS TRUE AS TO THE OTHER ALLEGED MISSTATEMENTS.  THERE IS NOTHING THAT GOES TO ALIGNING ANY OF THE DEFENDANT'S STATE OF MIND WITH ANY ALLEGEDLY FALSE STATEMENT, IT JUST DOESN'T EXIST.  IT'S ALL THROWN OUT THERE, DISCONNECTED FROM STATEMENTS.

AND REMEMBER, JUST LIKE ON FALSITY, YOUR HONOR, THE NINTH CIRCUIT REQUIRES THAT THEY SHOW WHEN YOU'VE GOT A FALSE STATEMENT, WHAT WAS THE INFORMATION THAT SHOWED THE STATEMENT WAS FALSE AT THE TIME, AND AT THAT TIME YOU ACTED WITH INTENT TO DEFRAUD.

AND INSTEAD WHAT WE HAVE IS THERE IS A BUNCH OF PARAGRAPHS ABOUT ALL THE BAD THINGS HAPPENING AT THE COMPANY AND THEN THEY LIST ALL OF THE STATEMENTS THAT WERE FALSE, WITHOUT THAT SPECIFICITY.

AGAIN, CONTRARY TO NINTH CIRCUIT.  MAYBE IF THEY AMEND, THEY CAN TRY TO FIX IT, BUT YOUR HONOR, THEY HAVEN'T SATISFIED THAT EITHER ON SCIENTER.

AND THE FINAL POINT, YOUR HONOR, I WILL MAKE IS ON TRADING.  THE COURTS ARE CLEAR THAT WHEN YOU'VE GOT A VERY, VERY BROAD CLASS PERIOD, TRADING IS NOT NECESSARILY INDICATIVE OF SCIENTER AT ALL; IN FACT, THE BURDEN IS ON THE PLAINTIFF TO SHOW PRE-CLASS PERIOD TRADES AND COMPARE THEM AND SHOW THAT THE

TRADING DURING THE CLASS PERIOD WAS DRAMATICALLY OUT OF LINE OR SUSPICIOUS OR UNUSUAL IN TIMING OR AMOUNT.  THERE'S BEEN NO EFFORT HERE WHATSOEVER.

AND IN FACT, YOUR HONOR, I CAN REPRESENT TO THE COURT THAT OVER TWO-THIRDS OF THE CLASS PERIOD SALES WERE DOWN PURSUANT TO A 10B5-1 PLAN OR WERE DONE TO SATISFY -- THEY WEREN'T OPEN MARKET PURCHASES, THEY WERE EXERCISES TO SATISFY TAXES.

AND I KNOW THE PLAINTIFFS CLAIM WELL, YOU KNOW, THEY ENTERED A 10B5-1 PLAN DURING THE CLASS PERIOD, WELL THAT DOESN'T GET YOU THERE, THEY HAVE TO ALLEGE THAT WHEN ENTERING THE PLAN, THE DEFENDANTS KNEW FACTS THAT SUGGESTED THAT THERE WAS FALSE INFORMATION IN THE MARKET, AND THEY HAVEN'T DONE THAT, THEY DON'T GET A PASS, OTHERWISE EVERY PLAINTIFF'S LAWYER WOULD COME IN AND SAY, WELL I WANT BROADEN THE CLASS PERIOD AND THE 10B5-1 PLAN IS INEFFECTIVE.

SO I DON'T THINK THEY GET THERE ON SCIENTER EITHER, YOUR HONOR.

THE COURT:  ANYTHING FURTHER?

MR. KRAMER:  NOT UNLESS YOU HAVE QUESTIONS, YOUR HONOR, I APPRECIATE YOUR INDULGENCE ON THE TIME.

I WAS GOING TO RESERVE A COUPLE MINUTES FOR REBUTTAL, BUT I DON'T KNOW HOW I DID ON TIMING THOUGH.

THE COURT:  YOU ARE AT 22 MINUTES AND 54 SECONDS.

MR. KRAMER:  WOW.  I WAS HOPING TO DO IT SHORTER, YOUR HONOR, I APOLOGIZE, YOUR HONOR, BUT I'M HERE FOR

QUESTIONS.

THE COURT:  ALL RIGHT.  I'M GOING TO SAVE SOMETHING FOR REBUTTAL, BUT LET ME --

MR. KRAMER:  THANK YOU, YOUR HONOR, I APPRECIATE THAT.

MR. BAUER:  THANK YOU, YOUR HONOR.

FIRST, I WANT TO ADDRESS YOUR HONOR'S TENTATIVE RULING.  I THINK YOU KNOW WE UNDERSTAND THE FIRST PART OF YOUR TENTATIVE RULING.  WE UNDERSTAND THE COURT'S REASONING WITH RESPECT TO SUSTAINING THE STATEMENTS WITH FINANCIAL METRICS AND THE ERROR RATES.  WE AGREE WITH THAT, WE THINK THOSE ARE SUFFICIENTLY PLED, THOSE ARE AT PARAGRAPHS 132 TO 148 OF THE COMPLAINT.  113, 114 ARE THE SECURITIES ACT ALLEGATIONS FOR THOSE SAME STATEMENTS.  AND WITH RESPECT TO THE ERROR RATES, IT'S PARAGRAPHS 150, 156, 157 AND 117.

WE WOULD NOTE FOR THE RECORD, THE OTHER ALLEGATIONS WE DO BELIEVE ARE STILL RELEVANT TO TELL A FULL STORY ABOUT TWIST MANUFACTURING WOES, THE IMPACT IT HAD ON CUSTOMERS AND THE DEFENDANT'S STATE OF MIND, BUT WE UNDERSTAND YOUR HONOR'S REASONING AND WE WOULD NOTE THAT THE TENTATIVE RULING WOULD NOT IMPACT THE OVERALL PATH OF THE LITIGATION, THE SAME CLASS MEMBERS, SAME CLASS PERIOD, SAME DAMAGES.

THE COURT:  I WILL WARN YOU THAT I WAS WAVERING IN TERMS OF WHETHER OR NOT THE FINANCIAL -- YOU SHOULD STILL ADDRESS EVERYTHING, BECAUSE I HAVE BEEN GOING BACK AND FORTH ON

THIS TENTATIVE, AS I SAY, EVEN AS OF THIS MORNING.

MR. BAUER:  UNDERSTOOD, YOUR HONOR.

SO WITH THAT, LET ME TURN TO SOME OF THE MOST SUBSTANTIVE POINTS THAT COUNSEL RAISED, STARTING WITH THE LOSS CAUSATION POINT.

THE COURT:  BEFORE WE GO INTO LOSS CAUSATION, LET ME ASK ABOUT PUZZLE PLEADING.

SO -- AND IT'S BEEN A WHILE, BUT DIGGING INTO THE CASE LAW, IT APPEARS THAT IN A LOT OF CASES WHAT HAPPENS IS THE COMPLAINTS ARE HIGHLIGHTED OR BOLDED, IN TERMS OF EXACTLY WHICH ALLEGATIONS.  SO IN THE 150-SERIES OF THE COMPLAINT THERE WERE PARAGRAPHS, AND THAT'S FINE, A LOT OF IT IS HELPFUL IN TERMS OF CONTEXT, BUT THERE WERE PARAGRAPHS, BUT NOTHING WAS HIGHLIGHTED, NOTHING WAS BOLDED AND THERE WAS NO BRIEF EXPLANATION AFTERWARDS, WHICH OFTEN HAPPENS IN CASES.

WHY WASN'T THAT INCLUDED AND DOES THAT LEAD TO THE POINT THAT I NEED TO CONSIDER WHETHER OR NOT SOME OF THIS WAS PUZZLE PLED?

MR. BAUER:  WELL I THINK THE FULL PARAGRAPHS THAT YOU IDENTIFY, THOSE ARE PROVIDED TO PROVIDE THE FULL CONTEXT OF --

THE COURT:  THAT'S FINE.  CONTEXT IS GREAT.  BUT NOT HIGHLIGHTING IT, NOT HIGHLIGHTING THE EXACT EXCERPTS THAT ARE THE ALLEGED MISREPRESENTATIONS.

MR. BAUER:  WELL I THINK THE ENTIRE EXCERPT IS THE FALSE STATEMENT.  AND YOU KNOW, WHEN IT COMES TO PUZZLE

PLEADING, THE TEST IS WHETHER IT'S DIFFICULT FOR OR IMPOSSIBLE FOR THE COURT, FOR THE PARTIES, TO PARSE OUT THE ALLEGATIONS AND UNDERSTAND WHAT WAS BEING ALLEGED AS FALSE AND THE REASONS FOR WHY THOSE STATEMENTS WERE FALSE.

I MEAN, I WOULD RESPECTFULLY SUBMIT, YOUR HONOR, COUNSEL DIDN'T HAVE ANY TROUBLE IDENTIFYING WHAT THE FALSE STATEMENTS ARE AND WHAT THE REASONS FOR THOSE FALSE STATEMENTS ARE, THEY HAD A VERY WELL ORGANIZED, COGENT BRIEF, COUNSEL OFFERED A VERY WELL COGENT, ORGANIZED ARGUMENT.  THEY UNDERSTAND THE STATEMENTS, THEY UNDERSTAND WHY THE STATEMENTS WERE FALSE, AS DO WE, SO WE DON'T THINK THERE IS A PUZZLE PLEADING ISSUE AT ALL HERE, YOUR HONOR.

THE COURT:  OKAY.

MR. BAUER:  SO TURNING BACK TO LOSS CAUSATION, YOU KNOW, COUNSEL MADE THE POINT THAT THEY ARE NOT SEEKING TO APPLY A BRIGHT LINE RULE HERE.  I WOULD RESPECTFULLY DISAGREE WITH THAT.  I THINK DEFENDANTS'S ARGUMENT IS ESSENTIALLY IN DEFIANCE OF THE NINTH CIRCUIT'S BAN ON BRIGHT LINE RULES.

THEIR ARGUMENT IS ESSENTIALLY YOU HAVE A SHORT SELLER REPORT, THEREFORE IT CANNOT BE A LOSS CAUSATION EVENT, DISREGARDING ALL THE FACTS AND CIRCUMSTANCES SURROUNDING THIS CIRCUMSTANCE SCORPION REPORT.

THE COURT:  SO I MEAN, I DON'T THINK THAT'S REALLY WHAT THE CRUX OF THE ISSUE IS AS TO THAT.  I MEAN, I THINK IT'S -- DEFENDANTS ARE SAYING, OKAY NO, YOU WILL GET THE

DISCLAIMERS, YOU LOOK AT THIS, YOU LOOK AT THAT, THESE ARE THE THREE OR FOUR THINGS WHICH JUDGE GILLIAM IN BERKELEY --

MR. KRAMER:  BERKELEY LIGHTS.

THE COURT:  THANK YOU.  BERKELEY LIGHTS RELIED ON.

I THINK ON THE OTHER HAND, THIS IS HOW I'M SEEING IT IN TERMS OF THE CASE LAW.  ON THE OTHER HAND, PLAINTIFFS ARE SAYING LOOK, INVESTORS SAID THAT THIS WAS ACTUALLY RELIED ON, THAT THIS IS WHAT CAUSED -- I MEAN, THE DROP IN THE STOCK PRICE HAPPENED ON THE SAME DAY, THAT THIS WAS ACTUALLY RELIED ON BY THE MARKET, THAT SHOULD BE SUFFICIENT.

AND YOU KNOW, YOU HEARD THE CONCERN FROM DEFENSE COUNSEL SAYING, WELL THE CONCERN HERE THEN WILL BE, OKAY ANYONE CAN SAY, OKAY THIS IS WHAT CAUSED THE DROP, THIS IS WHAT CAUSED THIS AND SO THEN LITIGATION ABOUNDS.

SO WALK ME THROUGH THAT, WALK ME THROUGH WHY THIS IS DIFFERENT ENOUGH FROM BERKELEY LIGHTS OR APPLYING THE STANDARDS FROM NEKTAR AND SUCH, BECAUSE -- AND SHOULD THE COURT GO AS FOR AS SAYING, OKAY WELL INVESTORS SAY THEY ACTUALLY RELIED ON IT, THAT'S SUFFICIENT UNDER EXISTING NINTH CIRCUIT CASE LAW.

MR. BAUER:  WELL I THINK WE SHOULD START WITH BOFI, THE BOFI CASE, BECAUSE WHAT BOFI REALLY SAYS IS THAT CERTAIN TYPES OF PURPORTED LOSS CAUSATION EVENTS CAN BE UNRELIABLE AND THAT A REASONABLE INVESTOR READING THOSE POSTS WOULD LIKELY TAKE THEM WITH A GRAIN OF SALT, WOULD LIKELY TAKE THEM WITH A GRAIN OF SALT.

HERE WE DON'T HAVE TO SPECULATE ABOUT WHAT AN INVESTOR WOULD LIKELY HAVE DONE.  TO BE CLEAR, PLAINTIFFS ARE NOT TELLING THE COURT THAT THIS STATEMENT WAS RELIABLE AND CAUSED THE LOSS, THE ANALYSTS AT THE TIME ARE TELLING THE COURT THAT THE INVESTORS TOOK THIS -- DID NOT TAKE THIS WITH A GRAIN OF SALT AND THAT IT CAUSED THE LOSS.

THE COURT:  SO IS THERE A COMPARABLE CASE?

MR. BAUER:  A COMPARABLE -- YES.  SO WE HAVE THEM CITED IN OUR BRIEF, YOUR HONOR.  YOU HAVE THE QUANTUMSCAPE CASE FROM THE NORTHERN DISTRICT OF CALIFORNIA, 2022, WHICH ACTUALLY INVOLVED THE SCORPION CAPITAL REPORT EXACTLY LIKE THIS ONE, LOSS CAUSATION WAS UPHELD.

YOU HAVE THE MULLEN CASE OUT OF THE CENTRAL DISTRICT OF CALIFORNIA IN 2023.  SAME SITUATION, SHORT SELLER REPORT, LOSS CAUSATION WAS UPHELD.

VERY RECENTLY, YOUR HONOR, IN THE NINTH CIRCUIT, THE IN RE GENIUS BRANDS CASE, THAT'S 97 F.4TH, 1171, INVOLVED A REPORT BY HINDENBURG WHICH THE COURT ACTUALLY REFERRED TO THERE AS "AN ACT OF A SHORT SELLER."  LIKEWISE, COURT UPHELD LOSS CAUSATION OF THAT.

SO THIS WOULD BE NOT BE THE FIRST CASE POST- BOFI, POST- NEKTAR WHERE A SHORT SELLER REPORT SATISFIED THE LOSS CAUSATION REQUIREMENTS.  AS YOUR HONOR NOTED, HERE SPECIFICALLY YOU HAVE ANALYSTS SAYING THE STOCK OF THE COMPANY REACTED TO THE NEWS AND IT TUMBLED.  THE COMPANY WAS -- THERE WAS A SHORT REPORT

THAT IMPACTED SHARES, THAT'S FROM THE SVP SECURITIES SHORT SELLER REPORT.

NO SIMILAR ALLEGATIONS, YOUR HONOR, IN BERKELEY LIGHTS, NO SIMILAR ALLEGATIONS IN BOFI, NEKTAR, EHEALTH, ANY OF THE OTHER CASES CITED BY THE DEFENDANTS.  AND WHEN YOU HAVE A CIRCUMSTANCE WHERE THE INVESTORS AND THE ANALYSTS ARE TELLING YOU OR TELLING US THAT WE DID NOT TAKE IT WITH A GRAIN OF SALT, IT CAUSED THE LOSS HERE, WE CAN'T SUBSTITUTE OUR OWN JUDGMENT.

AND IN FACT, I WOULD POINT YOUR HONOR TO THE LEACOCK CASE WHICH IS CITED IN THE DEFENDANT'S BRIEF, THEY PROVIDE A HYPOTHETICAL THAT ALMOST NEARLY MATCHES THE SITUATION WE ARE DEALING WITH HERE.  IT SAYS, IF IN THE WAKE OF A SHORT SELLER REPORT, AN INVESTMENT ANALYST -- IN THAT CASE THEY HYPOTHESIZED DOWNGRADING THE STOCK FROM A BUY TO A SELL -- THEY SAY AN ALLEGATION LIKE THAT WOULD MAKE IT MORE PLAUSIBLE THAT INVESTORS PERCEIVE THE SHORT SELLER REPORT AS A REASON TO SELL BY ILLUMINATING WHAT INVESTORS BELIEVED ABOUT THE REPORT.

THAT'S THE SITUATION WE HAVE HERE AND THAT WAS THE SITUATION THAT WAS LACKING IN THAT CASE, LEACOCK, AND THE REST OF THE CASES CITED BY THE DEFENDANTS.

WHAT'S MORE, YOUR HONOR, IT'S NOT JUST THE INVESTORS AND ANALYSTS SAYING IT DID IMPACT, IT DID IMPACT.  THE DAY OF THE REPORT THE STOCK DROPPED 20 PERCENT IN ONE DAY ON UNUSUALLY HIGH TRADING VOLUME, WHICH IS ANOTHER VERY SIGNIFICANT POINT MENTIONED IN BOFI.  IT WAS A 442 PERCENT INCREASE IN ONE DAY ON

THE TRADING VOLUME.

SO FOR ALL THOSE REASONS, YOUR HONOR, AGAIN, WE WOULD RESPECTFULLY SUBMIT THAT LOSS CAUSATION IS MORE THAN ESTABLISHED.

AND WITH RESPECT TO THE DISCLAIMERS THAT COUNSEL SPENT TIME ON, I WOULD NOTE THOSE DISCLAIMERS WERE IN THE REPORT, INVESTORS REVIEWED THEM, THE ANALYSTS REVIEWED THEM AND THEY STILL NOTED THAT THE STOCK -- THE SHORT SELLER REPORT IMPACTED THE STOCK.

I WILL TURN NOW TO THE FALSITY POINTS, YOUR HONOR, UNLESS YOUR HONOR HAS ANY FURTHER QUESTIONS ON LOSS CAUSATION.

THE COURT:  NO.

MR. BAUER:  OKAY.  SO COUNSEL SPENT A LOT OF TIME DISCUSSING FE1 AND FE1'S POSITION AT THE COMPANY AND FE1'S INABILITY TO SPEAK TO THE FINANCIAL METRIC STATEMENTS.

WHAT WE HAVE HERE, YOUR HONOR, IS SOMEONE WHO ACTUALLY ENTERED THESE COSTS INTO THE SYSTEM.  AND THE DEFENDANT'S SPECULATION THAT THERE IS SOMEONE ELSE THAT COULD HAVE CHANGED THAT ENTRY, SOMEONE ELSE THAT COULD HAVE TAKEN WHAT WAS ENTERED INTO THE SYSTEM AND CHANGED IT BEFORE THE FINANCIAL METRICS CAME OUT, IS JUST THAT, IT'S SPECULATION.

WHAT WE HAVE HERE, BASED ON THE WELL PLED ALLEGATIONS IN THE COMPLAINT, IS MORE THAN ENOUGH FOR A REASONABLE INFERENCE THAT THESE NUMBERS WERE PUT IN THE SYSTEM IN THIS WAY INCONSISTENT WITH REALITY.

AND YOU KNOW, I WILL POINT YOU TO PARAGRAPH 58 OF THE COMPLAINT, YOUR HONOR, WHERE FE1 SAYS HE WAS PERSONALLY INSTRUCTED TO BUILD THESE PRODUCTION COSTS, THAT'S 58 A.3 WHERE HE PERSONALLY INPUT THIS DATA INTO THE SYSTEM.  HE PERSONALLY SAW THESE CONTRACTS AND THESE COSTS BEING PROCESSED IN THIS MANNER, THAT'S AT 58 A.4.

AND I WOULD ALSO NOTE HE WAS PERSONALLY RESPONSIBLE FOR MANUFACTURING QC, QUALITY CONTROL.  HE WAS THE ONE WHO KNOWS WHAT WAS INCURRED FOR PRODUCTION, WHAT WAS INCURRED FOR R&D, MORE SO THAN A PERSON IN FINANCE.

AND THE NINTH CIRCUIT IS CLEAR THAT -- AND THIS IS THE GLAZER CASE THAT'S CITED IN OUR PAPERS, IF THE FORMER EMPLOYEE PROVIDES A BASIS FOR HIS KNOWLEDGE, THEN THAT'S SUFFICIENT. AND THAT'S WHAT HE DOES HERE.  HE WAS PERSONALLY INSTRUCTED TO BOOK THESE COSTS AND HE DID BOOK THESE COSTS.  WHAT MAY HAVE HAPPENED AFTERWARDS IS SPECULATION, IT'S A QUESTION OF FACT. AND WE WOULD BE MORE THAN HAPPY TO GO INTO DISCOVERY AND ASSESS WHAT ACTUALLY HAPPENED NEXT.

AND I WOULD NOTE, YOUR HONOR, COUNSEL IDENTIFIED THE BRODSKY CASE, NONE OF THE CW'S THERE COULD PROVIDE ANY FIRSTHAND EVIDENCE, LIKE FE1 DOES, ABOUT HOW THE COSTS WERE ACTUALLY BOOKED.  FE1 PROVIDES THAT INFORMATION.

TO THE POINT ABOUT ASC 730 AND THIS QUESTION OF JUDGMENT, DEFENDANTS DON'T CITE A SINGLE CASE THAT SAYS R&D COSTS LIKE THIS ARE SUBJECT TO JUDGMENT.  COUNSEL IDENTIFIED A CASE

TALKING GENERALLY ABOUT ACCOUNTING STANDARDS BEING DISCRETIONARY, BUT ASC 730 IS NOT THAT, ASC 730, IN FACT AS HIGHLIGHTED IN OUR BRIEFS WAS SPECIFICALLY PUT IN PLACE TO AVOID THOSE TYPES OF JUDGEMENT QUESTIONS, IT WAS SPECIFICALLY PUT IN PLACE TO MAKE A CONCRETE RUBRIC TO DETERMINE WHETHER SOMETHING WAS R&D OR WHETHER SOMETHING IS COST OF REVENUE.

AND IT'S NOT GENERAL, IT'S NOT VAGUE, IT'S QUITE SPECIFIC. IT SAYS THINGS SUCH AS, AND THIS IS IN THE COMPLAINT YOUR HONOR, R&D WOULD NOT INCLUDE QUALITY CONTROL DURING COMMERCIAL PRODUCTION.  YOU COULD SEE THAT ACTUALLY AT -- IN THE ATTACHMENTS TO DEFENDANT'S REQUESTS FOR JUDICIAL NOTICE AT DOCKET 87-2.  "R&D WOULD NOT INCLUDE QUALITY CONTROL DURING COMMERCIAL PRODUCTION."

WELL FE1 AT PARAGRAPHS 58(A) AND (C) SPECIFICALLY SAYS "QC COSTS WERE BOOKED TO R&D."  THESE WERE COMPUTATION COSTS, THEY WERE TROUBLESHOOTING COSTS, WHEN THERE WERE CONTAMINATION EVENTS, THEY NEEDED TO BRING IN R&D PERSONNEL TO CORRECT THAT. THOSE WERE ALL BOOKED TO R&D WHEN THEY WERE ACTUALLY USED FOR QUALITY CONTROL FOR COMMERCIAL PRODUCTION.

LIKEWISE, ASC 730 SAYS R&D WOULD NOT INCLUDE TROUBLESHOOTING, WHICH WE JUST MENTIONED.  AND AT PARAGRAPH 58(D) YOU HAVE CONTAMINATIONS COSTS, THE COSTS INCURRED TO RECTIFY CONTAMINATION ISSUES WERE BOOKED TO R&D.

AND IN FACT, THE COMPLAINT GOES ON, YOUR HONOR, TO IDENTIFY ALL THE SPECIFIC COSTS THAT WERE INCURRED IN

PRODUCTION THAT WERE BOOKED TO R&D. AND THAT'S AT PARAGRAPH 58(A), YOUR HONOR. AGAIN, QC COSTS, 58(A)(1). THIRD PARTY -- SPECIFIC THIRD PARTY WEB PLATFORMS THAT WERE USED, 58(A)(2). PRODUCTION SOFTWARE TO COMPLETE ORDERS, 58(B). QC FOR PRODUCTS THAT DIDN'T PASS INSPECTION AND HAD TO BE RERUN, 58(C).

SO THIS WAS NOT GENERALIZED ALLEGATIONS, YOUR HONOR, THESE ARE VERY SPECIFIC ALLEGATIONS OF THE TYPES OF COSTS AND WHY THOSE COSTS WERE IMPROPERLY BOOKED.

COUNSEL MADE REFERENCE ALSO TO THE FACT THAT THERE WAS NO FINANCIAL RESTATEMENT AND THAT THERE WERE CLEAN AUDIT OPINIONS.

JUST BRIEFLY, YOUR HONOR, THE FACT THAT THE COMPANY HASN'T CONFESSED TO THE FRAUD DOES NOT MEAN THAT THERE WAS NO FRAUD.

AND IN FACT, YOU KNOW, YOU COULD SEE IN OUR BRIEFS, AFTER THE COMPLAINT WAS FILED IN THIS CASE, THE DEFENDANTS ACTUALLY WENT AHEAD AND MADE THEIR BIGGEST YEAR OVER YEAR INCREASE IN REVENUE EVER, AND THEIR FIRST EVER REDUCTION IN R&D COSTS AND GROSS MARGINS AFTER THIS COMPLAINT WAS FILED; WHICH IS EXACTLY WHAT WE ALLEGE HERE, RIGHT, THAT THE R&D COSTS WERE INFLATED, THAT THE COSTS OF REVENUE WAS DEFLATED AND THAT THE GROSS MARGINS WERE INFLATED.

SO IMMEDIATELY AFTER THIS COMPLAINT WAS FILED THEY WENT AHEAD AND CORRECTED THAT. AND IN FACT THAT TREND CONTINUED, YOUR HONOR, IN SUBSEQUENT FILING. SO THEY DID THAT IN THEIR 2023 10-K IN DECEMBER OF 2023, AND THEY CONTINUED THAT TREND IN

THEIR QUARTERLY RESULTS IN MAY OF 2024.

WITH RESPECT TO SPECIFICITY, YOUR HONOR, YOU KNOW, THE DEFENDANTS ARGUE THAT THE ALLEGATIONS HERE ARE TOO GENERAL.  I WOULD NOTE 9(B), THE STATUTE THAT THEY ARE REFERRING TO THAT REQUIRES THIS LEVEL OF SPECIFICITY, REALLY ONLY REQUIRES THAT DEFENDANTS ARE GIVEN NOTICE OF THE PARTICULAR MISCONDUCT SO THAT THEY CAN DEFEND AGAINST THE FRAUD.  THAT'S THE NEUBRONNER CASE FROM THE NINTH CIRCUIT, YOUR HONOR.

DEFENDANTS SEEK TO IMPOSE AN IMPOSSIBLE BURDEN ON THE PLAINTIFFS TO SAY THAT WE NEED TO CITE EVERY SINGLE FACT, CHAPTER AND VERSE OF HOW THIS FRAUD PLAYED OUT.  THAT'S SIMPLY NOT THE LAW.  IT'S PRACTICALLY IMPOSSIBLE BUT IT'S NOT THE LAW.

YOU CAN LOOK AT THE OH V. HANMI CASE WHICH IS FROM THE CENTRAL OF CALIFORNIA 2022, CITED IN OUR BRIEFS.  THE PLAINTIFFS DON'T NEED TO ALLEGE EACH PARTICULAR DETAIL, THEY HAVE TO ALLEGE ENOUGH INFORMATION SO THAT THE COURT CAN DISCERN WHETHER THE ALLEGED GAAP VIOLATIONS WERE MINOR OR TECHNICAL OR WHETHER THEY CONSTITUTED WIDESPREAD AND SIGNIFICANT INFLATION OF REVENUE.

HERE WE HAVE AN FE, YOUR HONOR, WHO WAS TOLD THROUGHOUT HIS TIME AT THE COMPANY, WHICH SPANS ALMOST THE ENTIRETY OF THE CLASS PERIOD, BY MULTIPLE COO'S THAT THIS IS A STANDARD POLICY, WE ARE GOING TO TAKE ALL COSTS THAT WERE USED FOR PRODUCTION THAT COULD BE ASSIGNED TO R&D, RIGHT, BECAUSE THEY WERE DONE BY R&D PERSONNEL EVEN THOUGH THEY WERE INCURRED FOR PRODUCTION AND

WE ARE GOING TO ASSIGN ALL OF THAT TO R&D.  THIS WAS A CALCULATED DECISION TO MISCHARACTERIZE THESE COSTS.  AND DEFENDANT'S CASES DON'T SAY OTHERWISE.

AND I WOULD NOTE, YOUR HONOR, THAT THEY ARE NOT VAGUE OR GENERAL, THEY ARE VERY CLEAR THAT THESE ARE WIDESPREAD ISSUES.  FE1 SAYS THAT THESE PRODUCTIONS, THE MISCHARACTERIZATION OF PRODUCT COSTS WAS DONE AS MUCH AS POSSIBLE.  PARAGRAPH 58.

HE SAYS THEY WERE INCURRED FOR EVERY PRODUCT THAT TWIST PRODUCED, THAT'S 58(A).  HE SAYS THAT ALL OF THE SOFTWARE ENGINEERING WORK THAT HE DID AT TWIST WAS BILLED TO R&D.  AND REMEMBER, HE WAS A MANUFACTURING SUPERVISOR AND MANAGER FOR ALL OF THOSE YEARS.  THAT'S PARAGRAPH 58(B).

HE SAYS THAT R&D PERSONNEL WERE USED TO TROUBLE SHOOT FOR EACH PRODUCT THAT TWIST SOLD TO CUSTOMERS.

THIS WAS NOT AN ISOLATED INCIDENT, THIS WAS A WIDESPREAD SCHEME THROUGHOUT THE COMPANY.

THE COURT:  TALK TO ME ABOUT THE ERROR RATES.

MR. BAUER:  YES.  TURNING TO THE ERROR RATES NEXT, YOUR HONOR.

I WOULD POINT YOUR HONOR THERE TO PARAGRAPH 69 WHICH COUNSEL REFERENCED.  THAT PARAGRAPH DOES REFER TO FIRST TEST YIELD, IT DOES REFER TO ERROR RATES, BUT IF YOU LOOK AT THE LAST SENTENCE, IT SAYS LEPROUST, WHO IS THE DEFENDANT CEO, REPORTED THE COMPANY'S TEN PERCENT ERROR RATE AT MONTHLY PERFORMANCE MEETINGS.

PUBLICLY THEY WERE SAYING ERROR RATES WERE 1 IN 2,000 OR 1 IN 3,000 OR EVEN BETTER.  INTERNALLY, THEY HAD ACCESS TO DATA AND USED DATA THAT CONTRADICTED THAT.  AND SHE SPECIFICALLY, FE2 SPECIFICALLY REFERS TO THE ERROR RATE, NOT THE FIRST TEST YIELD RATE, THE ERROR RATE THAT WAS REPORTED AT TEN PERCENT. AND THAT'S BACKED UP BY FE1, YOUR HONOR, WHO ALSO SAYS THAT INTERNAL REPORTING ON ERROR RATES AND OTHER PRODUCTION MEASURES CONTRADICTED THE DEFENDANT'S PUBLIC STATEMENTS.

THE COURT:  OKAY.

MR. KRAMER:  I'M READY WHEN YOU ARE, YOUR HONOR.

OH, I'M SORRY, I APOLOGIZE.

MR. BAUER:  BRIEFLY ON SCIENTER, YOUR HONOR.

I THINK THE COMPLAINT GOES INTO VERY STRONG DETAIL ON HOW THE DEFENDANTS WERE AWARE THAT THE FINANCIAL METRICS WERE FALSE, HOW THE DEFENDANTS WERE AWARE THAT THE ERROR RATES WERE FALSE.

I THINK THE EVIDENCE IS SUFFICIENT FOR SOME OF THE OTHER STATEMENTS AS WELL.  FOR INSTANCE, THEY SAY THAT THEY AUTOMATED THEIR ENTIRE WORK FLOW.  YOU KNOW, THE EVIDENCE ALLEGED IN THE COMPLAINT IS CLEAR THAT THAT WAS NOT TRUE, THAT IT WAS A HIGHLY MANUAL PROCESS THAT RESULTED IN ERRORS, THAT RESULTED IN LONG TURNAROUND TIMES, THAT RESULTED IN PRODUCTS GOING TO CUSTOMERS THAT WERE NOT TO THEIR SATISFACTION.  AND THE DEFENDANTS WERE AWARE OF THESE FACTS.

YOU KNOW, ON THE GROSS MARGINS COST OF REVENUE POINT, THE

DEFENDANTS EMPHASIZE THAT THIS WAS A KEY METRIC THAT THEY WERE FOCUSED ON.

THEY WERE AT MONTHLY PERFORMANCE MEETINGS WHERE THEY CONVEYED INTERNAL-ONLY SLIDES WITH PRODUCTION PROBLEMS THAT CONTRADICTED WHAT THEY SAID PUBLICLY. THAT'S AT PARAGRAPH 62.

PARAGRAPH 65 AND 66, THEY HAD ACCESS TO THE MES DATABASE THAT TRACKED REALTIME DATA ABOUT PRODUCTION PROCESS AND THAT WAS USED TO PREPARE INTERNAL REPORTING.

AND PARAGRAPH 67(A), THEY MADE PRESENTATIONS ON GROSS MARGINS THAT CONTRADICTED TWIST'S PUBLIC STATEMENTS.

THE COURT: TALK TO ME ABOUT SCIENTER AND THORBURN.

MR. BAUER: YES.

SO THE CLAIMS AGAINST THORBURN, YOUR HONOR, WE CAN POINT TO A NUMBER OF INSTANCES WHERE HE WAS INVOLVED IN DISCUSSIONS, HAD ACCESS TO DATA, THAT CONTRADICTED THE COMPANY'S PUBLIC STATEMENTS.

IF YOU LOOK AT PARAGRAPH 62(A) AND 67(A), HE WAS INVOLVED IN THOSE VERY SAME MONTHLY MEETINGS WHERE KEY METRICS WERE BEING DISCUSSED IN WHICH THEY CONTRADICTED PUBLIC STATEMENTS. THAT'S DIRECT KNOWLEDGE, AND IT'S -- AT MINIMUM, IT'S DELIBERATE RECKLESSNESS BY AVOIDING THE INFORMATION HE WAS LEARNING IN THOSE MEETINGS.

FE5, YOUR HONOR, HE SAID HE WAS KICKED OUT OF MEETINGS WITH LEPROUST AND THORBURN BECAUSE HE OR SHE WOULD RAISE CONCERNS ABOUT PRODUCTION ISSUES. THAT'S AT PARAGRAPH 85.

PARAGRAPH 62(D), FE1 REPORTS THAT THORBURN SHOWED CHARTS INDICATING THAT TWIST WAS NOT PROFITABLE AND INSTEAD INSISTED ON CONCEALING THE TRUTH ABOUT INVESTORS, SAYING INVESTORS SEEMED TO LIKE WHAT WE WERE DOING, SO LET'S JUST KEEP DOING IT.

FINALLY 62(A), THORBURN PRESENTED AT MONTHLY PERFORMANCE MEETINGS -- I'M SORRY, HE WAS PRESENT AT MONTHLY PERFORMANCE MEETINGS WHERE LEPROUST REPORTED INTERNAL-ONLY SET OF SLIDES THAT CONTRADICTED THE COMPANY'S PUBLIC SALES.

AND I THINK THE FINAL PIECE, YOUR HONOR, SPECIFIC TO THORBURN ARE HIS STOCK SALES.  DEFENDANT SPENT SOME TIME ON THE STOCK SALES, AND I WOULD NOTE AS WE ALLEGED IN THE COMPLAINT, HE SOLD 237,000 SHARES IN 62 SEPARATE TRANSACTIONS FOR OVER $18 MILLION DURING THE CLASS PERIOD.  HE SOLD OVER 85 PERCENT OF HIS HOLDINGS IN THAT CLASS PERIOD.  HE HAD ZERO SALES PRIOR TO THE CLASS PERIOD.

NOW DEFENDANTS ARGUE THAT THE STOCK SALES NEED TO COINCIDE WITH THE FALSE STATEMENTS, THEY DO.  WE SHOW THAT THESE STATEMENTS HAPPENED ALL THROUGHOUT THE CLASS PERIOD, AT THE TIME THAT THESE STATEMENTS WERE BEING MADE.  AND FINALLY, YOUR HONOR, THAT THESE SALES WERE PURSUANT TO A 10B5 PLAN AND THOSE PLANS WERE MODIFIED AND ADOPTED DURING THE CLASS PERIOD.

AND IF YOU LOOK AT JUDGE DAVILA'S RULING IN IN RE INTUITIVE, STOCK SALES REPORTED SCIENTER THERE, THE INDIVIDUAL DEFENDANTS MANIPULATED THEIR 10B5 PLANS DURING THE CLASS PERIOD.

NOW DEFENDANTS SAY WITHOUT CITING ANYTHING IN THEIR BRIEFS THAT THIS IS IRRELEVANT BECAUSE THE CLASS PERIOD BEGINS SEVEN WEEKS AFTER THE IPO.  I DON'T REALLY KNOW THE RELEVANCE OF THAT.  THE PLANS WERE AMENDED THROUGHOUT THE CLASS PERIOD.  AND FOR DEFENDANT THORBURN, THEY WERE SPECIFICALLY AMENDED ON DECEMBER 16, 2020 AND AUGUST 24, 2021.

SO TAKE ALL OF THAT TOGETHER, YOUR HONOR, WE THINK THAT ESTABLISHES SCIENTER FOR MR. THORBURN.  AND AGAIN, I WOULD NOTE FOR SCIENTER, THE STANDARD IS NOT ANY ONE SPECIFIC PIECE NEEDS TO ESTABLISH SCIENTER, IT'S A WHOLISTIC ANALYSIS THAT REALLY ASKS THE QUESTION WHETHER THE INFERENCE OF SCIENTER IS AS PLAUSIBLE AS ANY OTHER INFERENCE, RIGHT.  THE INFERENCE HAS TO BE AS COMPELLING AS ANY ALTERNATIVE INFERENCE, IT'S A 50/50 SHOT, IT HAS TO BE AS COMPELLING AS ANY OTHER, AND THE TIE GOES TO THE PLAINTIFF.  AND WE THINK WE MORE THAN SATISFY THAT STANDARD FOR MR. THORBURN, MS. LEPROUST AND THE COMPANY AS WELL.

THE COURT:  THANK YOU.

ANYTHING FURTHER?

MR. BAUER:  NOTHING FURTHER, YOUR HONOR.

THE COURT:  ALL RIGHT.  THANK YOU.

MR. KRAMER:  THANK YOU, YOUR HONOR.

THE COURT:  VERY SHORT.

MR. KRAMER:  YEAH, I WILL.

IF THERE EVER WAS A CASE WHERE WE NEEDED -- SO SOME JUDGES

REQUIRE A CHART.  THE STATEMENT THAT WAS MADE, THE SPECIFIC STATEMENT, WHY IT WAS FALSE AT THE TIME, WHY THE STATEMENT WAS MADE WITH SCIENTER.  A LOT OF JUDGES REQUIRE THAT TO DEAL WITH THIS ISSUE WHERE YOU'VE JUST GOT A BOATLOAD OF VAGUE, UNTETHERED FACTS AND THEN SAY EVERY STATEMENT FOR FOUR YEARS WAS FALSE.

I THINK, RESPECTFULLY YOUR HONOR, IT'S A BIG DEAL, THE MOTION TO DISMISS IN THESE CASES IS A BIG DEAL BECAUSE IF WE MOVE INTO DISCOVERY ON A FOUR-YEAR CLASS PERIOD, IT'S UNBELIEVABLY EXPENSIVE AND DISRUPTIVE.

THE PLAINTIFFS NEED TO DO MORE.  THEY ARGUE FOR AN 8(A) STANDARD, PUT US ON NOTICE.  YOUR HONOR, YOU KNOW THAT'S NOT THE STANDARD, RIGHT, IT'S 9(B).  THE PSLRA REQUIRES SPECIFICITY.  WE CITED MANY CASES THAT SAY YOU HAVE TO IDENTIFY WITH SPECIFICITY, THE STATEMENT, WHY IT WAS FALSE AT THE TIME AND WHY IT WAS MADE WITH SCIENTER.

BUT JUST A COUPLE QUICK THINGS.  COUNSEL SAID THE COO INSTRUCTED FE1, "TAKE ALL COSTS USED FOR PRODUCTION AND ASSIGNED TO R&D."  THAT'S NOT IN THE COMPLAINT, THAT'S NOWHERE IN THE COMPLAINT, YOUR HONOR.

HE ARGUES THAT THE 10B5-1 PLANS WERE MANIPULATED.  THAT'S NOT IN THE COMPLAINT.  IF THEY WERE MANIPULATED, THERE SHOULD BE FACTS.  PLANS CAN BE AMENDED.  THAT'S NOT ILLEGAL.  IT'S DISCLOSED WHEN THEY ARE AMENDED.  IF THEY WERE "MANIPULATED" THEY SHOULD BE IN THERE.

AND ON LOSS CAUSATION, YOUR HONOR, LOSS CAUSATION IS NOT PROXIMATE CAUSE, IT'S NOT THE STOCK PRICE DECLINED WHEN THE SHORT SALE REPORT CAME OUT.  IT'S INSTEAD THAT WHETHER THE TRUTH CAUSED THE PLAINTIFF'S LOSS.  YOU NEED TO HAVE THE TRUTH.

SIMPLY BECAUSE THE STOCK PRICE WENT DOWN, THAT DOESN'T MEAN THAT LOSS CAUSATION IS MET.  THE TRUE FACTS HAVE TO HAVE CAUSED THE LOSS.  IT'S NOT CALLED APPROXIMATE CAUSE, IT'S CALLED LOSS CAUSATION.

AND FIRST SOLAR, A NINTH CIRCUIT DECISION, SPECIFICALLY ADDRESSED THAT.  IT'S FIRST SOLAR AT 753, IT'S A NINTH CIRCUIT DECISION OF 2019, WE CITED IT IN OUR PAPERS.

AND YOUR HONOR, THE CASES THEY CITE ON REASONS WHY LOSS CAUSATION HAS APPLIED, QUANTUMSCOPE, THAT PREDATED NEKTAR, RIGHT.  MULLEN AUTO DIDN'T ADDRESS NEKTAR AT ALL OR TALK ABOUT BOFI, AND THEY CITE A BUNCH OF OUT-OF-CIRCUIT DECISIONS.

AND YEAH, AS I SAID, AND THE COURT HEARD ME, HE DIDN'T, I'M NOT ADVOCATING FOR A BRIGHT LINE RULE, THE NINTH CIRCUIT DID.  AND THE FACT THAT A HINDENBURG REPORT BY AN ACTIVIST STOCKHOLDER, NOT A SHORT SELLER, GOT PAST THE MOTION TO DISMISS DOESN'T BEAR ON ANYTHING, IT'S ABOUT THE CHARACTER AND QUALITY OF SCORPION.  THE SPECIFIC DISCLAIMERS.

AND YOU DON'T HAVE BEFORE YOU, YOUR HONOR, THE DISCLAIMERS THAT WERE IN HINDENBURG, I WORKED ON THE HINDENBURG, I HAVE A COUPLE OF CASES, DIFFERENT --

THE COURT:  NOT BEFORE THE COURT.

MR. KRAMER:  NOT BEFORE THE COURT.

SO MY POINT IS WHAT IS BEFORE THE COURT ARE THE EXACT SAME DISCLAIMERS THAT THE NINTH CIRCUIT SAID ARE INDICATIVE OF NOT SHOWING LOSS CAUSATION, THAT JUDGE GILLIAM APPLIED, AND I KNOW YOU ARE NOT BOUND, BUT THEY ARE EXACTLY THE SAME AS THE NINTH CIRCUIT SAID DON'T GIVE RISE TO LOSS CAUSATION.

THE COURT:  YOU MADE YOUR POINT.

MR. KRAMER:  OKAY.  I APPRECIATE THAT.

AND I GUESS THE FINAL POINT I WOULD MAKE, HE RAISED -- THERE WAS A POINT MADE ON ACCOUNTING STATEMENTS, I JUST WANT TO POINT THE COURT TO A LINE OF CASES OUT OF THE NORTHERN DISTRICT, IT'S THE SUPERMICRO COMPUTING CASE, 2017 WESTLAW 4355128 AT STAR TWO.  IT SAYS, "ALTHOUGH A LACK OF RESTATEMENT OR AN UNQUALIFIED INDEPENDENT AUDITOR'S OPINION DOES NOT ABSOLVE OR SHIELD A DEFENDANT FROM LIABILITY, THE FAILURE TO PLEAD FACTS SUGGESTING IMPROPER ACCOUNTING, OTHER THAN THE VIEWS EXPRESSED BY ONE FORMER EMPLOYEE, FAILS TO RAISE A PLAUSIBLE INFERENCE THAT THE FINANCIAL STATEMENTS WERE MISSTATED."

AND THAT CASE WAS ALSO CITED BY THE CITY OF ROSEVILLE WHICH IS 963 F.SUPP.2D, AT 1113.

THE COURT:  MR. KRAMER, WAS THAT INCLUDED?

MR. KRAMER:  YES, YOUR HONOR, IT WAS.

THE COURT:  OKAY.

MR. KRAMER:  IT WAS.

AND SO THE POINT IS THE COURT CAN TAKE JUDICIAL NOTICE OF ALL OF THESE THINGS, IN TERMS OF ASSESSING WHETHER OR NOT THERE WAS A FALSE STATEMENT, YOUR HONOR.

THE COURT:  OKAY.  SUBMITTED?

MR. KRAMER:  SUBMITTED, YOUR HONOR.

THE COURT:  ALL RIGHT.

MR. BAUER:  IF I COULD MAKE ONE BRIEF RESPONSE, YOUR HONOR?

THE COURT:  I WILL PERMIT IT JUST BECAUSE THE DISPARITY, BUT I AM GOING TO LET MY STAFF GET LUNCH SHORTLY BECAUSE WE HAVE AN AFTERNOON CALENDAR.

MR. BAUER:  I WOULD NOTE JUST VERY BRIEFLY, YOUR HONOR, ON THE QUESTION OF WHETHER PRODUCTION COSTS VERSUS R&D COSTS, HOW THEY GET BOOKED, WHETHER THAT'S A QUESTION OF JUDGMENT.

FIRST OF ALL, IT'S NOT, AGAIN FOR THE POINTS I MENTIONED EARLIER, BUT EVEN IF IT WAS, IN THIS PARTICULAR CASE WHERE YOU HAVE A DELIBERATE CAMPAIGN, A DELIBERATE INSTRUCTION THAT YOU ARE GOING TO TAKE AS MUCH OF THE PRODUCTION COSTS AS POSSIBLE AND BOOK THEM TO R&D, THEN THAT OPINION, THAT JUDGMENT IS NOT HONESTLY HELD.  AND IT DOES NOT -- THE STATEMENTS REMAIN ACTIONABLE.  THAT'S FROM THE OMNICARE CASE, YOUR HONOR, SO I WOULD JUST ADD THAT TO THE RECORD.

THE COURT:  OKAY.  SUBMITTED?

MR. BAUER:  SUBMITTED, YOUR HONOR.

MR. KRAMER:  YOUR HONOR, THE ONLY THING I WOULD ADD, IF SOME ADDITIONAL BRIEFING WOULD BE HELPFUL TO THE COURT, WE WOULD BE HAPPY TO PROVIDE IT.  WE KNOW YOU INHERITED THIS CASE FROM JUDGE DAVILA.  IF ANYTHING WE CAN DO WOULD BE HELPFUL, WE ARE PREPARED TO DO IT, SO I WOULD JUST THROW THAT OUT AS AN OFFER.

THE COURT:  I AM PONDERING WHETHER OR NOT IT DOES MAKE SENSE BECAUSE THE CHART IS SOMETHING WE JUST RECEIVED IN A DIFFERENT CASE WHICH WE WERE THINKING, WOW, IT WOULD HAVE BEEN HELPFUL IN THIS CASE.

MR. KRAMER:  RIGHT.

I HAVE A BIG CASE IN FRONT OF JUDGE DONATO AND HE REQUIRES THE CHART, AND IT WAS VERY HELPFUL, YOUR HONOR.

MR. BAUER:  WE DON'T THINK IT'S NECESSARY HERE, YOUR HONOR, FOR THE REASONS STATED, WE THINK IT'S ADEQUATELY ALLEGED, BUT WHATEVER WOULD HELP YOUR HONOR, WE ARE HAPPY TO DO.

THE COURT:  ALL RIGHT.

WELL WE HAVE THE HOLIDAYS TO WORK ON ALL OF THESE SO WE WILL BE IN TOUCH IF WE NEED ANYTHING FURTHER, BUT I APPRECIATE THE OFFER FROM BOTH AND YOUR PATIENCE IN WAITING UNTIL THE END OF THE MORNING.

BUT WITH THAT, THANK YOU BOTH.  THAT CONCLUDES THIS MATTER.

MR. KRAMER:  THANK YOU.

HAPPY HOLIDAYS, YOUR HONOR.

THE COURT:  HAPPY HOLIDAYS.

MR. BAUER:  THANK YOU, YOUR HONOR.

(THE PROCEEDINGS WERE CONCLUDED AT 12:19 P.M.)

**CERTIFICATE OF REPORTER**

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____
SUMMER A. FISHER, CSR, CRR
CERTIFICATE NUMBER 13185

DATE:  11/22/24