1

2

3

4                          UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7    ANTHONY JOSEPH PETERS,              Case No.  22-cv-08168-EKL

8                Plaintiff,              **ORDER GRANTING IN PART AND**
                                         **DENYING IN PART DEFENDANTS'**
9         v.                             **MOTION TO DISMISS**

10   TWIST BIOSCIENCE CORPORATION, et    Re: Dkt. No. 86
     al.,
11
                Defendants.
12

13          Lead Plaintiff Policemen's Annuity and Benefit Fund of Chicago ("PABF") brings this

14   securities class action against Defendant Twist Bioscience Corporation ("Twist") and two of

15   Twist's top executives, Emily Leproust and James Thorburn ("Individual Defendants").  Plaintiff

16   alleges that Twist and the Individual Defendants (collectively "Defendants") misled investors by

17   stating that Twist had automated its entire workflow, enabling it to manufacture its products

18   consistently and efficiently, when in reality Twist faced tremendous production challenges and

19   received rampant customer complaints.  First Am. Compl. ¶¶ 5, 7-8, ECF No. 83 ("FAC").

20   Plaintiff also alleges that Defendants failed to disclose that Twist improperly allocated certain

21   expenses to inflate Twist's gross margins.  *Id.* ¶¶ 132-148.  Defendants move to dismiss the first

22   amended complaint for failure to state a claim.  Mot. to Dismiss, ECF No. 86 ("Mot.").

23          After reviewing the parties' briefs and hearing argument, Defendants' motion to dismiss is

24   GRANTED IN PART and DENIED IN PART as to the Sections 11 and 15 Securities Act claims;

25   GRANTED as to the Section 10(b) Exchange Act claim against Thorburn and DENIED as to

26   Twist and Leproust; and DENIED as to the Section 20(a) Exchange Act claim.

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

# I.    BACKGROUND[1]

## A.    Company Background

Founded in 2013, Twist is a biotechnology company that manufactures synthetic DNA products for a variety of purposes ranging from academic and medical research to applications for more sustainable crop production.  ECF No. 87-9.  What purportedly sets Twist apart from its competitors is Twist's "new method of manufacturing synthetic DNA" combined with its "proprietary software, scalable commercial infrastructure, and e-commerce platform."  *Id.*  These capabilities "enable [Twist] to achieve high levels of quality, precision, automation, and manufacturing throughput at a significantly lower cost than [its] competitors."  *Id.*

Five years after its founding, Twist held its initial public offering ("IPO") in October 2018.  FAC ¶ 33.  Between October 2018 and November 2022, Twist allegedly raised over $1 billion in public offerings,[2] with Twist's share price exceeding $207 during this period.  *Id.* ¶ 10.  On November 15, 2022, Scorpion Capital published an "investigative report" ("Report") sharply criticizing Twist's business practices and revealing supposed accounting improprieties.  FAC Ex. 1.  The Report claimed that Twist was inflating its gross margins, covering up manual manufacturing processes and quality control issues, and misrepresenting its error rates, turnaround times, and customer satisfaction.  FAC ¶ 199.  The Report also disclosed that Scorpion Capital was a "short-seller" of Twist stock, meaning that it stood "to realize significant gains in the event that the price of [Twist's] stock . . . decline[d]."  FAC Ex. 1 at 1.

The day the Report was published, Twist's stock allegedly "lost over 20% of its value."  FAC ¶¶ 205.  In the three days following, Twist's stock "continued to plummet, closing at a two-year loss of $24.81 per share[,]" which "represented a loss in value of almost 35%[.]"  *Id.*  Within days of the Report, three analysts – Evercore ISI, J.P. Morgan, and SVB Securities – attributed the

---

[1] The facts are assumed to be true for purposes of this motion.

[2] Twist's IPO, completed on November 2, 2018, allegedly raised $80.5 million; the January 27, 2020 offering raised $49.98 million; the February 19, 2020 offering raised nearly $150 million; the June 3, 2020 offering raised nearly $115 million; the December 2, 2020 offering raised nearly $350 million; and the February 10, 2022 offering raised nearly $287.5 million.  FAC ¶¶ 33-39.

drop in value to the publication of the Report. *See* FAC ¶¶ 201-203. A few weeks later a fourth analyst attributed the decline in Twist's stock value to the Report. *Id.* ¶ 204. The Report allegedly served as a corrective disclosure, alerting investors to the false and misleading statements made by Twist's chief executive officer Emily Leproust and chief financial officer James Thorburn.

### B.    Allegedly False and Misleading Statements

Plaintiff alleges Defendants misled investors by making false and misleading statements about Twist's production, manufacturing, and product capabilities ("Product Statements") and Twist's financials ("Financial Metrics Statements"). *Id.* ¶¶ 5, 7-8.

As to the Product Statements, Defendants allegedly misrepresented to investors that Twist had "automated" and "scalable" production processes, the "lowest industry error rate[s]," high customer satisfaction, and fast turnaround times. *Id.* ¶ 5. Plaintiff asserts that "[i]n reality, Twist did not, and could not, produce its products profitably" because "Twist relied heavily on its technical staff to constantly intervene manually in the manufacturing process." *Id.* ¶ 6. Plaintiff argues that "[t]hese manual processes generated inconsistent, error-prone products with slow delivery times" and "rampant customer complaints." *Id.* ¶¶ 6, 8.

As to the Financial Metrics Statements, Twist allegedly made false statements regarding its research and development ("R&D") expenses, cost of revenue, and gross margins.[3] *Id.* ¶¶ 132-148. Twist had a "standing policy" of improperly allocating certain expenses to R&D in violation of the applicable Generally Accepted Accounting Principles ("GAAP"). *Id.* ¶¶ 7, 115. This in turn understated Twist's cost of revenue and materially inflated Twist's gross margins.[4] *Id.* ¶ 148.

---

[3] The allegedly false Financial Metrics Statements were made in Twist's Form 10-K filings for 2018 through 2021, Twist's Form 10-Q filings for 4Q 2018 through 3Q 2022, Twist's quarterly and year-end earnings calls in 2019 through 2022, and in statements made by Thorburn during earnings calls. FAC ¶¶ 132-147; *see, e.g.*, *id.* ¶ 135 ("Our gross margin was 13% positive for the quarter, and we're now positive gross margin year-to-date."), ¶ 136 ("Our gross margin for the third quarter is positive 16%."), ¶ 137 ("As we continue to grow our revenue and leverage our fixed costs, our gross margins improved, and the margin for the year was $7 million positive compared to a negative gross margin of $6.8 million in the previous fiscal year 2018.").

[4] A company's gross margin is the net amount of revenue earned after subtracting necessary production costs, known as the cost of revenue. FAC ¶ 44. Because R&D expenses are excluded from the cost of revenue, inflating R&D expenses would potentially inflate gross margins. *Id.*

United States District Court
Northern District of California

3

Thus, Defendants allegedly materially overstated Twist's gross margins by misallocating certain production costs as R&D. *Id.* ¶ 148.

### C.    Procedural History

On December 12, 2022, Anthony Joseph Peters filed the original complaint in this action. ECF No. 1.  On July 28, 2023, the Court appointed PABF as Lead Plaintiff.  ECF No. 70.  On October 11, 2023, Lead Plaintiff filed the operative complaint.  FAC, ECF No. 83.  Defendants timely filed a motion to dismiss on December 6, 2023.  ECF No. 86.  On August 20, 2024, the action was reassigned to this Court.  ECF No. 101.  This Court heard argument on November 13, 2024,  and the motion was taken under submission, with a written order to issue.  ECF No. 105.

Plaintiff alleges that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5, promulgated by the United States Securities and Exchange Commission ("SEC"), as well as Section 11 of the Securities Act of 1933 ("Securities Act").  FAC ¶¶ 208-216, 224-227.  Plaintiff also alleges that the Individual Defendants were controlling persons of Twist and, thus, violated Section 20(a) of the Exchange Act and Section 15 of the Securities Act.  *Id.* ¶¶ 217-223, 228-229.  Plaintiff seeks to recover damages on behalf of all persons and entities who purchased or otherwise acquired Twist common stock between December 13, 2019, and November 14, 2022 ("Class Period").  *Id.* ¶ 52.  The putative class for the Exchange Act claim consists of "all persons and entities who purchased or otherwise acquired Twist's common stock between December 20, 2018 and November 15, 2022."  *Id.* ¶ 52.  The putative class for the Securities Act claim consists of "all persons and entities who purchased or otherwise acquired Twist common stock in the December 2020 and February 2022 Offerings pursuant and/or traceable to the 2020 Registration Statement."  *Id.* ¶ 99.

Defendants move to dismiss for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6) and 9(b), and the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Mot. at 1.  Defendants contend that Plaintiff has not plausibly alleged false or misleading statements, scienter, or loss causation.  *See id.* at 10-20.

## II.      LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  To avoid dismissal, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the pleaded facts allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  For purposes of a Rule 12(b)(6) motion, the court generally "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  However, the court need not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)).

Rule 9(b) requires plaintiffs alleging fraud to "state with particularity the circumstances constituting fraud or mistake," meaning that plaintiffs must allege the "'who, what, when, where, and how' of the misconduct charged[.]" *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009).  The PSLRA further requires the complaint to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading[.]" *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1133 (N.D. Cal. 2017) (quoting 15 U.S.C. § 78u-4(b)(2)(A)).  "[T]o comply with the PSLRA's particularity requirement, plaintiffs must 'reveal with particularity the sources of their information.'" *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005)).  "If the complaint does not satisfy the PSLRA's pleading requirements, the Court must grant a motion to dismiss the complaint." *Shenwick*, 282 F. Supp. 3d at 1133 (citing 15 U.S.C. § 78u-4(b)(3)(A)).

## III.      REQUEST FOR JUDICIAL NOTICE

Defendants ask the Court to consider twenty-nine exhibits in their request for judicial notice.  Defs.' Req. for Jud. Notice, ECF No. 87 ("RJN").  Plaintiff opposes Defendants' request as to Exhibits 4, 28, and 29.  Pl.'s Opp. to RJN at 2-4, ECF No. 91 ("RJN Opp.").  The Court

United States District Court
Northern District of California

GRANTS the request, with the exception of Exhibit 4, pursuant to the limitations discussed below.

In ruling on a Rule 12(b)(6) motion, courts generally do not consider material outside the pleadings. *United States v. Corinthian Colls.*, 655 F.3d 984, 998 (9th Cir. 2011). However, courts may consider "matters of public record." Fed. R. Evid. 201(b). Defendants request that the Court take judicial notice of Exhibits 28 and 29, consisting of two post-Class Period SEC filings. RJN at 4. The Court grants the requests for judicial notice as to Exhibits 28 and 29 because they are publicly available documents whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b); *see also In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1066-67 (N.D. Cal. 2010) ("The court is . . . permitted to take judicial notice of the content of relevant public disclosure documents required to be filed with the SEC."). However, the Court considers SEC filings "only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents." *Troy Grp., Inc. v. Tilson*, 364 F. Supp. 2d 1149, 1152 (C.D. Cal. 2005).

In addition, courts may consider "documents incorporated in the complaint by reference[.]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). "[A] defendant may seek to incorporate a document into the complaint 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.'" *Id.* (quoting *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)). Because Exhibits 1 through 3 and 5 through 27 are cited to and relied on throughout the complaint, the Court finds that they are incorporated by reference. However, for purposes of the motion to dismiss, the Court will not assume the truth of their contents "if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018).

Exhibit 4 is not incorporated by reference because it is not referenced or relied on in the complaint and Defendants use it to "disput[e] the factual allegations in the complaint[.]" *Id.* at 1002-03; *see also* Mot. at 15 (citing to Exhibit 4 to dispute that Leproust made a particular statement). In addition, Plaintiff explains that Defendants' Exhibit 4 is an entirely different transcript than the one cited to and relied upon in the complaint. RJN Opp. at 4. Plaintiff submitted a copy of the correct transcript including Leproust's statement. *See* Bauer Decl., Ex. 4,

1   ECF No. 92-4.  Because it is not referenced in the complaint, the Court DENIES the request to

2   incorporate Defendants' Exhibit 4.  *See Khoja*, 899 F.3d at 1002-03.

3   **IV.    DISCUSSION**

4         Defendants move to dismiss both the Exchange Act and Securities Act claims, arguing that

5   many of the identified statements are not actionable and that none of the statements were false.[5]

6   The Court first addresses claims under Section 10(b) and Rule 10b-5 of the Exchange Act, then

7   turns to claims under Section 11 of the Securities Act, and concludes with the control person

8   analysis under Section 15 of the Securities Act and Section 20(a) of the Exchange Act.

9         **A.    Section 10(b) and Rule 10b-5 Claim**

10        To state a claim for damages under Section 10(b) and Rule 10b-5 of the Exchange Act,

11  Plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter;

12  (3) a connection between the misrepresentation or omission and the purchase or sale of a security;

13  (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *In*

14  *re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017) (quoting *Halliburton Co. v.*

15  *Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).  A complaint alleging a Section 10(b)

16  violation "must meet both the heightened pleading requirements for fraud" under Federal Rule of

17  Civil Procedure 9(b) and the "exacting pleading requirements" of the PSLRA.  *Id.* (quoting

18  *Tellabs*, 551 U.S. at 313).

19        Because the complaint alleges two distinct types of false statements, the Court addresses

20  actionability, falsity, and scienter first for the Product Statements then for the Financial Metrics

21  Statements.  The Court then analyzes whether Plaintiff has plausibly alleged loss causation.

22

23

24  _____

    [5] Plaintiff also asks the Court to disregard portions of Defendants' briefing that exceeds the 30-
25  page limit set by the Court.  Opp. at 4.  Judge Edward J. Davila previously granted the parties'
    request to exceed the page limits by filing a 30-page opening brief, a 30-page opposition, and a
26  20-page reply.  ECF No. 85.  Defendants' opening brief was 30 pages, but included 17 single-
    spaced footnotes in violation of Judge Davila's standing order, which requires footnotes to be
27  double-spaced.  Defendants explained that they limited their reply brief to 18 pages to address the
    noncompliance issue, and offered to submit a revised version of the brief.  Reply at 18, ECF No.
28  93.  The Court finds no prejudice and denies Plaintiff's request.

### 1.    Product Statements

The complaint identifies nineteen Product Statements followed by five reasons the statements are allegedly false or misleading.[6]  FAC ¶¶ 149-163.  Defendants raise several arguments in favor of dismissal including:  (1) the complaint is puzzle-pleaded, (2) three statements are non-actionable opinion statements, (3) ten statements include non-actionable puffery, and (4) none of the Product Statements are false or misleading.  Mot. at 13-20.

### a.    Puzzle-Pleading

As an initial matter, Defendants argue that the complaint is puzzle pleaded as to the Product Statements.  Mot. at 13-14.  A puzzle pleading is a pleading that puts undue burden on defendants and the court to identify the statements at issue and to match them up with reasons why the statements are false or misleading.  *See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1554 (9th Cir. 1994) (en banc); *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 842 (N.D. Cal. 2000).  A court may dismiss a complaint as puzzle pleaded when the complaint is so confusing or disorganized that the court is unable to identify the statements at issue and the corresponding reasons for falsity.  *See Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1274 (N.D. Cal. 2019) (dismissing complaint for lack of clarity between allegations and contextual statements); *In re Aqua Metals, Inc. Sec. Litig.*, No. 17-cv-07142-HSG, 2019 WL 3817849, at *8 (N.D. Cal. Aug. 14, 2019) (dismissing the complaint because matching hundreds of inter-referenced statements with corresponding reasons for falsity is unduly burdensome).

Here, the complaint is not puzzle pleaded as to the Product Statements.  The complaint identifies nineteen relatively short Product Statements in a clearly designated section of the complaint titled "False and Misleading Statements Regarding Twist's Products."  *See, e.g.*, FAC ¶¶ 149-163.  In the last paragraph of the section, Plaintiff identifies five categories of falsity, each containing a brief explanation articulating why the statements in each category are false.  *Id.* ¶ 163.  Although Plaintiff does not match each statement to a category of falsity, the reader can

---

[6] In total, Plaintiff identifies twenty-one Product Statements, but two statements, *see* FAC ¶ 121, are alleged only as to the Securities Act violation.  This section of the Order focuses on the nineteen Product Statements relevant to the Exchange Act claim.

United States District Court
Northern District of California

1    "parse out with relative ease the statements at issue and the reasons as to why they are alleged to

2    be false and misleading."  *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal.

3    2014).  Thus, the Product Statements are not puzzle pleaded.

4         Although not puzzle pleaded, the complaint leaves much to be desired in terms of clarity.

5    Most notably, Plaintiff fails to highlight or identify specific portions of the statements that are

6    allegedly false.  This created more work for opposing counsel and the Court alike, and, at times,

7    made it difficult to discern whether Plaintiff had met its pleading requirements under Rule 9(b)

8    and the PSLRA.  *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069,

9    1075-76 (N.D. Cal. 2005) (explaining that plaintiff must specify "the reason or reasons why the

10    statement is misleading . . . [and] state with particularity all facts on which that belief is formed").

11    The Court further addresses this concern in Section V *infra* of this Order.

### b.    Actionability

13         Defendants argue that many of the statements are not actionable, either as opinion

14    statements or statements of corporate optimism or puffery.  The Court addresses each of these

15    arguments, finding that the following statements, in their entirety, are not actionable:  FAC ¶¶ 161,

16    149, 152, and 155.  The Court further concludes that the remaining Product Statements are either

17    entirely actionable or are mixed statements containing both actionable and non-actionable

18    portions.

### i.    Opinion statements

20    Defendants argue that the following statements are non-actionable opinion statements:

21    - "[W]ith what we believe is the lowest industry error rate[.]"  *Id.* ¶ 150.
22    - "[O]ur view so far is that we still have the fastest turnaround time and the best price for custom panel."  *Id.* ¶ 161.
23    - "[W]e have built a highly scalable gene production process with what we believe is industry leading capacity of approximately 45,000 genes per month[.]"  *Id.* ¶ 153.

25    *See* Mot. at 15.  In general, there are three theories under which opinion statements can be

26    actionable.  *See City of Dearborn Heights Act 345 Police & Fire Retirement Sys. v. Align Tech.,*

27    *Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2016).  An opinion statement is actionable if:  (1) "the speaker

28    did not hold the belief she professed" and that belief is objectively untrue; (2) there are "facts

United States District Court
Northern District of California

1    going to the basis for the [speaker's] opinion . . . whose omission makes the opinion statement at

2    issue misleading to a reasonable person reading the statement fairly and in context"; and (3) the

3    statements have "embedded statements of fact" that, if untrue, are actionable.  *Id.* at 194.

4        Two of the statements, when read in full as stated in the complaint, have embedded

5    statements of fact.  For example, the first statement reads in full: "We offer turnaround times of

6    six to nine business days for non-clonal genes with what we believe is the lowest industry error

7    rate of 1:3000 base pairs."  FAC ¶ 150.  "[T]urnaround times of six to nine business days" and

8    "error rate[s] of 1:3000 base pairs" are objectively verifiable facts that if untrue may be actionable.

9    Likewise, the statement that Twist has a production process with a capacity of "approximately

10   45,000 genes per month" is a provable fact that if untrue may be actionable.  *Id.* ¶ 153.

11       As to the portions of the above statements that reflect only the speaker's opinion without

12   an embedded fact, including the entire statement at paragraph 161, Plaintiff has not met its

13   pleading burden.  To plead an actionable opinion statement, Plaintiff must still comply with the

14   PSLRA's pleading requirements by specifying "each statement alleged to have been misleading"

15   and stating "the reason or reasons why the statement is misleading[.]"  *Dearborn Heights*, 856

16   F.3d at 614.  As discussed above, the Product Statements are followed by five reasons the

17   statements are allegedly false, but none of the stated reasons address the subjective requirement

18   that "the speaker did not hold the belief she professed" nor do they "identify particular (and

19   material) facts" whose omission makes the opinion statement at issue misleading.  *See Omnicare,*

20   *Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183, 194 (2015).

21   Plaintiff attempts to cure this deficiency by explaining the reason each statement is misleading in

22   its opposition brief.  Opp. to Defs.' Mot. at 16, ECF No. 90 ("Opp.").  But the Court must make its

23   determination based on the pleadings, not on arguments raised in briefing.  Therefore, Plaintiff has

24   not met its pleading burden as to the opinions expressed in the above statements.

25                    **ii.    Corporate optimism and puffery**

26       Defendants next argue that many of the Product Statements contain non-actionable

27   corporate puffing or optimism.  Mot. at 14-15.  These statements fall into three categories:

28   statements that are entirely non-actionable puffery or optimism; mixed statements that are partially

United States District Court
Northern District of California

non-actionable; or statements that are entirely actionable.

"'[V]ague, generalized, and unspecific assertions' of corporate optimism or statements of 'mere puffing' cannot state actionable material misstatements of fact under federal securities laws." *In re Cornerstone*, 355 F. Supp. 2d at 1087 (quoting *Glen Holly Ent., Inc. v. Tektronix. Inc.*, 352 F.3d 367, 379 (9th Cir.2003)). These types of statements are often forward-looking, not measurable, and not "tethered to facts that a reasonable person would deem important to a securities investment decision." *Id.*; *see also In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("When valuing corporations,[ ] investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers."). By contrast, "[s]tatements by a company that are capable of objective verification are not 'puffery[.]'" *Or. Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 606 (9th Cir. 2014). In addition, statements of corporate optimism may be actionable "when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *Quality Sys.*, 865 F.3d at 1143-44 (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)).

The Court finds that the Product Statements at paragraphs 149, 152, and 155 of the complaint constitute non-actionable corporate puffing because they employ terms that are "not capable of objective verification and lack a standard against which a reasonable investor could expect them to be pegged." *In re Mellanox Techs. Ltd. Sec. Litig.*, No. 13-cv-04909-JST, 2014 WL 12650991, at *7 (N.D. Cal. Mar. 31, 2014) (citation omitted). Specifically, the terms "high levels," "dramatically increased" and "dramatically expanded" are not quantifiable or verifiable and are classic examples of corporate puffing. FAC ¶¶ 149, 152; *see Stickrath v. Globalstar, Inc.*, 527 F. Supp. 2d 992, 998 (N.D. Cal. 2007) ("terms such as 'high quality,' 'reliable,' 'high performance,' and 'latest technology' are non-actionable puffery"). Likewise, the statement – "We literally take more shots on goals than everyone else. So 100% of the time it works." – is non-actionable puffing. FAC ¶ 155. Although "100%" sounds quantifiable, it is unclear from the statement and context what works "100% of the time." This statement is puffing because it is not "tethered to facts that a reasonable person would deem important to a securities investment decision." *In re Cornerstone*, 355 F. Supp. 2d at 1087.

United States District Court
Northern District of California

The Court finds that the Product Statements at paragraphs 153, 159, and 160 are mixed statements containing both non-actionable puffery as well as actionable statements of fact. Specifically, in paragraph 153, the terms "highly scalable" and "highly flexible" are not quantifiable or verifiable and amount to non-actionable puffery. *See Stickrath*, 527 F. Supp. 2d at 998. By contrast, "capacity of approximately 45,000 genes per month" and "[w]e have automated everything" are verifiable and, thus, actionable statements of fact. Paragraph 160 also contains both non-actionable puffery ("why we win is because of our quality") and an actionable statement of fact ("our customers report that they need to sequence half as much with Twist"). FAC ¶ 160. "Why we win" is not actionable because it is "the type of hopeful, nebulous statement[] that reasonable investors have come to expect from high-ranking company executives." *In re Mellanox Techs.*, 2014 WL 12650991 at *10 (citation omitted). The remainder of the statement is actionable because it is measurable and objectively verifiable.

Finally, paragraph 159 contains an actionable statement of fact ("customers are saying [we'll lower your sequencing costs]") and non-actionable puffing (product launches were "very well received"). FAC ¶ 159; *see also Cutera*, 610 F.3d at 1111 ("well-regarded" is puffery). Plaintiff argues that the statement – product launches were "very well received" – is actionable because it "address[es] specific aspects of a company's operation that the speaker knows to be performing poorly." Opp. at 14 (quoting *Quality Sys.*, 865 F.3d at 1143). Plaintiff cites to the fact that Twist "received significant customer complaints." FAC ¶ 163(e); *see also* Opp. at 14. However, Twist receiving customer complaints does not directly contradict Defendants' statement that some product launches were "well-received." Thus, Plaintiff has not adequately alleged that the statement was false, much less particularized facts demonstrating that Defendants knew it was false when stated. As alleged, the Court finds that this statement is non-actionable puffing.

The Court finds the statements in paragraphs 154 and 158 entirely actionable. First, paragraph 154 states that Twist has "automated everything." FAC ¶ 154. In context, this statement is specific and measurable. Twist either has or has not automated its entire production process. *Apollo*, 774 F.3d at 606 ("Statements by a company that are capable of objective verification are not 'puffery[.]'"). Likewise, the statement in paragraph 158 – *i.e.*, "we have

12

actually perfect quality, we ship perfect [synthetic] DNA [products]" – is actionable.  FAC ¶ 158.

Due to the nature of Twist's products, it is "objectively verifiable" whether Twist does in fact ship

"perfect DNA."  *Id.*  The Court finds that the other statement in paragraph 158 – *i.e.*, "[t]he

customer experience is excellent" – is likewise actionable as a statement "address[ing] [a] specific

aspect[] of the company's operation that [one or more Defendants] knows to be performing

poorly."  *Quality Sys.*, 865 F.3d at 1143 (quoting *Warshaw*, 74 F.3d at 959).  Although in

isolation, describing the customer experience as "excellent" is non-actionable puffery, here,

Plaintiff plausibility alleges that Leproust knew that this was not true.  FAC ¶ 82 (alleging that

FE-4[7] had "hundreds" of conversations with Leproust regarding product failures, quality issues,

and customer complaints).  Accordingly, this statement is actionable.

In sum, the Court finds that all or portions of the following paragraphs are actionable:

FAC ¶¶ 150, 151, 153, 154, 156, 157, 158, 160, 161, and 162.

### c.      Falsity

Having found the above statements actionable, the Court now turns to whether Plaintiff has

plausibly alleged falsity as to these statements.  To be false or misleading, a statement "must

affirmatively create an impression of a state of affairs that differs in a material way from the one

that actually exists."  *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see

also Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) (holding that statements were not

misleading where allegedly true "circumstances are not inconsistent with the statements").

As discussed, the complaint does not specify which of the five reasons for falsity apply to

each statement, leaving Defendants and the Court to infer which reason applies to each of the

Product Statements.  The Court adopts a modified version of Defendants' classification of the

Product Statements for the purposes of this Order.  *See* Mot. at 13 (classifying the Product

Statements).[8]

---

[7] The complaint relies on statements from six former employees, referred to by "FE" pseudonyms
in numbered order.  *See* FAC ¶¶ 57-94.

[8] Plaintiff appears to endorse Defendants' classification of the Product Statements.  *See* Opp. at 13
("In fact, Defendants themselves identified the categories of false statements alleged in the
Complaint, the statements which correspond to those categories, and the reasons for the

United States District Court
Northern District of California

The actionable Product Statements are categorized as follows:

> Category 1 – Lack of automation: FAC ¶ 151 (Twist "automated [its] entire workflow"), ¶ 153 ("The manufacturing process for our NGS . . . requires minimal . . . direct labor given the efficiency of our production capability. We have automated the entire workflow[.]"), ¶ 154 ("[W]e have automated everything.").

> Category 2 – Product quality: *Id.* ¶ 158 ("We have actually perfect quality, we ship perfect DNA.").

> Category 3 – Error rates: *Id.* ¶ 150 ("We sell a diverse, customizable set of oligo pools" and "oligonucleotides . . . with an error rate of 1:2000 nucleotides"), ¶ 156 (Twist produced synthetic DNA with an "error rate of 1:3000 base pairs" and "customizable set of oligo pools . . . with an error rate of 1:2000 nucleotides"), ¶ 157 ("non-clonal genes with an error rate of 1:7500 base pairs").

> Category 4 – Turnaround times: *Id.* ¶ 150 ("We offer turnaround times of approximately 11 to 17 business days for clonal genes," "six to nine business days for non-clonal genes," and "beginning at five days" for oligo pools), ¶ 161 (You get a new panel "[w]ith Twist, [in] 2 to 3 weeks," and Twist "swiftly [ph] combined a million probe panels for just 100 samples, probably for $20,000 and you get it in two weeks").

> Category 5 – Customer dissatisfaction: *Id.* ¶ 158 ("The customer experience is excellent."), ¶ 159 ("we don't have to [say we are great] because . . . customers are saying it for us"), ¶ 160 ("our customers report that they need to sequence half as much with Twist as with the competition"), ¶ 162 ("We're not going to do a deal that's not a gross margin positive.").[9]

The Court finds that Plaintiff plausibly alleges falsity as to the first category of statements, *i.e.*, lack of automation. *See* FAC ¶¶ 151, 153, 154. Four former Twist employees state that Twist's production process was not fully automated, resulting in human errors, increased costs, and longer turnaround times. *See id.* ¶¶ 59, 60, 63 (FE-1 discussing lack of automation), ¶ 72 (FE-2 same), ¶ 79(b) (FE-3 same), ¶ 94(a) (FE-6 same). For example, FE-1 explained that there were "many human touchpoints in the production processes[,]" *id.* ¶ 159(a), and that it would often take

---

statements' falsity."). To the extent Plaintiff alleges more than one category of falsity applies to a single statement, Plaintiff must specify as such in its second amended complaint.

[9] Although the complaint alleges that Twist experienced disruptive contamination events and identified "contamination events" as a category of falsity, none of the Product Statements relate to contamination events. Thus, the category of "contamination events" is not addressed in this Order.

1  "one to two years," *id.* ¶ 60, before Twist was willing to "invest in the software development

2  needed for automated production" of new products, *id.* ¶ 59(b).  FE-1 explained that during this

3  time, Twist was "just throwing more bodies at the problem," rather than "doing the automation

4  work."  *Id.* ¶ 60.  One of FE-1's biggest concerns was that Twist "had a lot of manual

5  processes[.]"  *Id.* ¶ 63(a).  FE-2 and FE-3 echoed these concerns.  *Id.* ¶¶ 72, 79(b) (explaining that

6  automation "was not the priority").  According to FE-3, Leproust told employees, "If you have to

7  do it manually, it is okay. We just want [the product] out."  *Id.* ¶ 79.

8       Defendants argue that the automation statements are not false because "Twist repeatedly

9  disclosed that while its technology platform allows it to achieve high levels of automation, it still

10  'requires minimal . . . ***direct labor***.'"  Mot. at 16 (quoting FAC ¶ 120 (emphasis added by

11  Defendants)).  This single statement does not shield Defendants from liability because Twist's

12  former employees state that the lack of automation extends *well beyond* "minimal . . . direct

13  labor."  *See* FAC ¶ 59(a) (explaining there are "many human touch points in the production

14  processes"), ¶ 72 (FE-2 explaining there are "various human touchpoints and manual steps to

15  manufacture the [c]ompany's products").  In sum, the statements portraying Twist's workflow as

16  entirely automated "create an impression of a state of affairs that differs in a material way from the

17  one that actually exists."  *Brody*, 280 F.3d at 1006.  The Court finds that Plaintiff has plausibly

18  alleged falsity as to the first category.

19       Plaintiff likewise plausibly alleges falsity as to paragraph 158, which both encompasses the

20  second category (product quality) and the fifth category (customer dissatisfaction).  *See* FAC

21  ¶ 158 ("We have actually perfect quality, we ship perfect DNA.  The customer experience is

22  excellent.").  Three former Twist employees detail significant customer complaints regarding the

23  quality of products received, including complaints about imperfect DNA.  *Id.* ¶ 70 (FE-2

24  explaining that Twist shipped "containers that did not have the product," genes where the "DNA

25  was the wrong sequence," and products infected with cross contamination); *see also id.* ¶ 60 (FE-1

26  explaining that "[d]ue to serious complaints about quality, Twist had to re-make products for

27  customers multiple times because of the errors.  This reproduction affected all Twist products"),

28  ¶ 82 (FE-4 discussing product failures and quality issues).  These allegations directly contradict

United States District Court
Northern District of California

assertions of shipping "perfect DNA" and the customer experience being "excellent." Accordingly, Plaintiff plausibly alleges falsity as to paragraph 158.

However, Plaintiff does not plausibly allege that the remaining statements in the third, fourth, and fifth categories were false.[10]

> Category 3 – Error rates:  *Id.* ¶ 150 ("We sell a diverse, customizable set of oligo pools" and "oligonucleotides . . . with an error rate of 1:2000 nucleotides"), ¶ 156 (Twist produced synthetic DNA with an "error rate of 1:3000 base pairs" and "customizable set of oligo pools . . . with an error rate of 1:2000 nucleotides"), ¶ 157 ("non-clonal genes with an error rate of 1:7500 base pairs").

> Category 4 – Turnaround times:  *Id.* ¶ 150 ("We offer turnaround times of approximately 11 to 17 business days for clonal genes," "six to nine business days for non-clonal genes," and "beginning at five days" for oligo pools), ¶ 161 (You get a new panel "[w]ith Twist, [in] 2 to 3 weeks," and Twist  "swiftly [ph] combined a million probe panels for just 100 samples, probably for $20,000 and you get it in two weeks").

> Category 5 – Customer dissatisfaction:  *Id.* ¶ 159 ("we don't have to [say we are great] because . . . customers are saying it for us"), ¶ 160 ("our customers report that they need to sequence half as much with Twist as with the competition").

Plaintiff's allegations as to the remaining actionable statements are not specific enough to necessarily render them false.  For example, Plaintiff argues that Defendants' statement about the error rates of base pairs and nucleotides were false because Twist's true error rate was otherwise. *See* Opp. at 19 (quoting FAC ¶ 61) ("Twist's true error rate 'was about 1 in 10 base pairs, or 1 in 10 nucleotides for oligo pools.'")  However, because Plaintiff's allegations do not specify *when* the error rate was calculated, the Court cannot find that the allegations contradict Defendants' statement.  Plaintiff has the burden of showing that Defendants materially misrepresented or omitted information that directly contradicts their statements.  Without more information, it is not clear that the statements relating to error rates were false.

Similarly, Plaintiff has not alleged particularized facts demonstrating that statements regarding turnaround times were false.  The allegedly false turnaround time statements identify

---

[10] The Product Statement in paragraph 162 does not clearly fit into any of the five reasons for falsity.  Therefore, Plaintiff has not satisfied the PSLRA pleading standard as to this statement.

United States District Court
Northern District of California

timelines for specific products – clonal and non-clonal genes, oligo pools, and probe panels.  *See* FAC ¶¶ 150, 156, 157.  Most of the allegations in the complaint are too general to address the falsity of these product-specific statements.  For example, FE-1 states that Twist's turnaround times for unidentified products were "definitely underreported."  FAC ¶ 61.  Without more information, the Court cannot plausibly infer that general delays relating to unspecified products at an unspecified time speak to the falsity of the identified statements.  Likewise, the allegation that the turnaround times for "synthetic probes" ended up being "more like 12 or 16 weeks" does not directly contradict any of the Product Statements.[11]

Finally, Plaintiff likewise fails to plead facts that would render the customer dissatisfaction statements in paragraphs 159 and 160 false.  First, the customer satisfaction statement at paragraph 159 reads in full:  "In the past it used to be me or people from Twist saying we are great and we'll lower your sequencing costs.  And now we don't have to do that because the Broad Institute and other customers are saying it for us."  FAC ¶ 159.  There are no allegations in the complaint that suggest the Broad Institute or other customers were not saying Twist is "great" and will "lower sequencing costs."  Therefore, Plaintiff has not adequately pleaded that this statement was false.  The same is true for the statement "our customers report that they need to sequence half as much with Twist as with the competition."  *Id.* ¶ 160.  There are simply no allegations addressing customers comparing Twist with its competitors.  Thus, the reasons Plaintiff offers as to why these statements were false "bear no connection to the substance of the statements."  *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 807 (N.D. Cal. 2019).

### d.    Scienter

Plaintiff adequately alleges falsity as to the Product Statements regarding lack of automation, "perfect quality" DNA, and the customer experience being "excellent."  *See supra* Section IV.A.1.c.  The Court now evaluates whether Plaintiff has alleged scienter as to these

---

[11] Based on the glossary of terms in the complaint, the Court understands "panels" and "probes" to be two separate products such that a turnaround time of 12 to 16 weeks for panels does not directly contradict the statement that customers can receive "probe panels for just 100 samples . . . in two weeks."  *See* FAC ¶ 161.  In any event, if these two statements are in fact contradictory, Plaintiff has not met the PSLRA pleading burden requiring Plaintiff to identify "the reason or reasons why [each] statement is misleading."  *In re Cornerstone*, 355 F. Supp. 2d at 1075-76.

Product Statements.

To adequately allege scienter, "Plaintiff[] must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Quality Sys.*, 865 F.3d at 1144 (quoting 15 U.S.C. § 78u-4(b)(2)(A)). "In this circuit, the 'required state of mind' is a mental state that not only covers 'intent to deceive, manipulate, or defraud,' but also 'deliberate recklessness.'" *Id.* (quoting *Schueneman v. Arena Pharm.*, 840 F.3d 698, 705 (9th Cir. 2016)). "In determining whether Plaintiff's allegations give rise to a 'strong inference' of scienter, the Court must look at all the facts alleged and consider 'plausible opposing inferences.'" *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 979 (N.D. Cal. 2015) (citing *Tellabs*, 551 U.S. at 322-23). The Court "conducts a dual inquiry when assessing whether the strong inference standard is met: first, it determines whether any one of the plaintiff's allegations is alone sufficient to give rise to a strong inference of scienter; second, if no individual allegations are sufficient, it conducts a 'holistic' review to determine whether the allegations combine to give rise to a strong inference of scienter." *Glazer*, 63 F.4th at 766 (citing *Zucco*, 552 F.3d at 992).

As an initial matter, Plaintiff's argument that the Individual Defendants' "unusual" stock sales create an inference of scienter fails.[12] Opp. at 27-28. "Unusual" or "suspicious" stock sales by corporate executives "may constitute circumstantial evidence of scienter," when it is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Zucco*, 552 F.3d at 1005 (9th Cir. 2009) (citation omitted). "For individual defendants' stock sales to raise an inference of scienter, plainitffs must provide a 'meaningful trading history' for purposes of comparison to the stock sales within the class period." *Id.* at 1006. Plaintiff is not excused from pleading the relevant trading history, "[e]ven if the defendant's trading history is simply not available, for reasons beyond a plaintiff's control[.]" *Id.* Here, Plaintiff cannot plead scienter based on Defendants' stock sales because

---

[12] During the Class Period, Leproust allegedly liquidated over 76% of her Twist holdings, but did not have any open market sales before or after the Class Period. *Id.* ¶ 181. Thorburn likewise liquidated over 85% of his Twist holdings, but did not have any open market sales before or after the Class Period. *Id.* ¶ 183.

United States District Court
Northern District of California

there simply is no "meaningful trading history."  Twist "only became a publicly traded company

less than two months before the start of the almost four-year Class Period."  Mot. at 26; *see also*

FAC ¶¶ 33, 123.  Thus, the stock sales do not create an inference of scienter.

As to Leproust, Plaintiff plausibly alleges facts giving rise to a strong inference of scienter

based on facts provided by FE-1, FE-2, FE-3, and FE-4.  Specifically, the complaint alleges that

FE-4 had "hundreds" of conversations and meetings with Leproust regarding product failures,

quality control errors, and customer complaints.[13]  FAC ¶ 82.  FE-4 explains that these concerns

were raised in formal "Development Meetings" with Leproust and other company executives,

including Thorburn, until FE-4 was "frozen out[.]"  *Id.* ¶¶ 82, 85.  The complaint alleges that FE-4

was specifically asked "not to attend" the meetings because FE-4 was "the one to bring up the

problems and no one wanted to hear the problems."  *Id.* ¶ 85.  In addition, FE-1 alleges that they

raised concerns about manual production processes impacting quality directly with Leproust more

than "two or three times" and that Leproust responded with her tagline: "good enough is good

enough."  *Id.* ¶ 63; *see also id.* ¶ 79 (FE-3 same).  FE-1 further alleges that Leproust was "called

out" in front of the whole company with questions relating to profitability and product quality

during Monthly Performance Meetings.  *Id.* ¶ 63(b).  These allegations are sufficient to allege a

strong inference that Leproust was at least reckless as to the allegedly false Product Statements.

In contrast, Plaintiff has not adequately alleged scienter as to Thorburn.  The

overwhelming majority of allegations in the complaint address Leproust's knowledge and actions,

but do not address Thorburn's state of mind with a similar level of detail.  Instead, Plaintiff only

alleges generally that Thorburn attended the meetings where concerns were raised.  *Id.* ¶¶ 67(a),

82.  Plaintiff does not otherwise discuss Thorburn's specific involvement in those meetings or

knowledge about product quality and customer concerns.  *Cf. id.* ¶ 82 ("Leproust discussed . . .

how to 'manage' Twist's customers who were frustrated by the fact that Twist's NGS products did

not work.").  The Court concludes that the allegations are insufficient to support a strong inference

---

[13] FE-4 served as a senior application scientist working on Twist's NGS products from November 2017 to December 2020.  FAC ¶ 80.

of scienter as to Thorburn.  Likewise, a "holistic" review of the complaint does not support a strong inference of scienter as to Thorburn.

As Twist's chief executive officer, Leproust's scienter is imputed to Twist.  *See Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1204 (N.D. Cal. 2012) (imputing the knowledge of a vice president to the company in finding scienter).

\* \* \*

In sum, Plaintiff plausibly alleges that the actionable statements in the first and second categories were false.  In addition, Plaintiff plausibly alleges falsity as to the statement in paragraph 158, which falls under the second and fifth categories.  The remaining statements are either not actionable or not adequately pleaded.  Plaintiff adequately alleges scienter as to Twist and Leproust, but not as to Thorburn.

### 2.    Financial Metrics Statements

Plaintiff alleges that the Financial Metrics Statements in Twist's public filings and earnings calls were false and misleading because Twist had a standing policy of misallocating production costs as R&D, which in turn perpetually understated the cost of revenue and inflated gross margins.  Defendants raise several arguments in favor of dismissing Plaintiff's claims as to the Financial Metric Statements.  The Court addresses these arguments in turn.

### a.    Actionability

Financial misstatements are at the heart of securities law, and improper reporting of revenues, including allegations based on GAAP violations, are generally actionable so long as they meet the PSLRA pleading requirements.  *See Daou*, 411 F.3d at 1015 ("If properly pled, overstating of revenues may state a claim for securities fraud, as under GAAP, revenue must be earned before it can be recognized." (citation modified)).  In certain circumstances, financial misstatements may amount to nonactionable opinion statements, if the statements are inherently subjective or involve forward-looking estimates or predictions.  *See Dearborn Heights*, 856 F.3d at 610 (holding that goodwill valuations were "opinion statements" because such statements "are inherently subjective and involve management's opinion regarding fair value"); *see also Hunt v. Bloom Energy Corp.*, No. 19-cv-02935-HSG, 2021 WL 4461171, at \*4 (N.D. Cal. Sept. 29, 2021)

(holding that the challenged statements were "opinion statements" because the applicable accounting rules require companies to estimate *future* costs for existing contracts, and therefore involve the "exercise of judgment"). Defendants contend that the Financial Metrics Statements here amount to opinion statements under *Dearborn Heights* and *Hunt* because they are "forward-looking opinions," requiring the exercise of judgment. *See* Mot. at 12. The Court disagrees.

The Financial Metrics Statements involve facts known at the time rather than "forward-looking opinions" or predictions. *See Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, No. 19-cv-04744-WHA, 2020 WL 2559939, at *1 (N.D. Cal. May 20, 2020). That is, the Financial Metrics Statements involve reporting of R&D expenses that existed at the time, not projections of future R&D expenses. *See id.* (holding that plaintiffs plausibly alleged false financial statements by Granite based on accounting misconduct comprised of "then-presently known facts" rather than "forward-looking opinions"). That Twist executives may have had to exercise some judgment in deciding how to allocate certain expenses does not equate to making future projections or estimates, as was the case in *Dearborn Heights* and *Hunt*. Accordingly, the Court finds that the Financial Metrics Statements are not opinion statements.

### b.    Falsity

#### i.    GAAP Violations

At issue is Twist's allocation of R&D expenses under GAAP. FAC ¶ 51; Mot. at 11. The parties agree that the relevant accounting rule pertaining to R&D expenses is ASC 730.[14] *See* FAC ¶ 51; Mot. at 11. Under ASC 730, certain costs "typically would not be considered [R&D expenses]," including costs related to "quality control during commercial production," "trouble-shooting . . . during commercial production," and "adaptation of an existing capability to a particular requirement or customer's need as part of a continuing commercial activity[.]" RJN Ex. 2 at 11. According to Plaintiff, Twist routinely and improperly classified these costs as R&D expenses. *See* FAC ¶ 58. Defendants' position is that Twist's classification was proper under

---

[14] ASC 730 refers to Financial Accounting Standard Board's Accounting Standards Codification Topic 730 ("ASC 730").

United States District Court
Northern District of California

United States District Court
Northern District of California

1  ASC 730 because these costs related to the "improvement" or "modification" of existing products

2  or processes, which may be classified as R&D expenses under ASC 730.  Mot. at 11 (citing RJN,

3  Ex. 2 at 9, 11).  Defendants further argue that Twist's Financial Metrics Statements were not

4  misleading because Twist "repeatedly disclosed that its '[r]esearch and development activities are

5  conducted in collaboration with manufacturing activities.'"  *Id.* (citation modified).

6      The parties' arguments demonstrate that determining whether the Financial Metrics

7  Statements were false or misleading relies on a factual question of whether Twist's activities fell

8  within, or outside of, the parameters of ASC 730.  RJN Ex. 3 at 3-4; *id*. Ex. 5.  The Court does not

9  resolve factual disputes on a motion to dismiss.

10              ### ii.    Reliance on FE-1

11      Finally, Defendants argue that Plaintiff cannot rely on FE-1's statements to state a

12  plausible claim as to the Financial Metrics Statements because (1) FE-1 is not an accountant, and

13  therefore lacks the necessary personal knowledge to support an inference of falsity, and (2) the

14  statement of a single witness is insufficient to establish falsity.[15]  *See* Mot. at 10-11.  Neither of

15  these arguments is persuasive.

16      The fact that FE-1 is not an accountant is not dispositive in determining whether they have

17  personal knowledge of the allegations made.[16]  "Plaintiff[] need only provide a basis for each

18  [FE's] knowledge about the specific statements he made."  *Glazer*, 63 F.4th at 771.  Here, FE-1's

19  statements establish his personal knowledge of Twist's policy of allegedly allocating production

20  costs to R&D.  FE-1 worked for Twist as a bioinformatics engineer from July 2019 to April 2022.

21  FAC ¶ 57.  During that time, FE-1 was responsible for quality control in both of Twist's South

22  San Francisco labs, and reported to executives who instructed FE-1 and other employees to

23

24  [15] Defendants also contend that FE-1's observations lack specific facts regarding "when or how
    Twist allegedly improperly classified R&D expenses, or which public disclosure was purportedly

25  false as a result."  Mot. at 12; Hr'g Tr. at 16-17.  This argument is not materially different from
    Defendants' argument that FE-1 lacked personal knowledge of Twist's accounting practices,

26  which the Court addresses and resolves in this section.  Plaintiff alleges Twist's accounting
    practices during the Class Period with sufficient particularity.  *See* FAC ¶ 58(a)-(e).

27  [16] Defendants rely on *Brodsky v. Yahoo!*, 630 F. Supp. 2d 1104, 1114 (N.D. Cal. 2009), and
    *Dearborn Heights*, 856 F.3d at 610, but neither of these cases hold that a confidential witness must

28  be an accountant to establish false financial information.

1    categorize costs incurred to produce and sell its commercial products as R&D rather than cost of

2    revenue.  *Id.* ¶¶ 57-58.  This was a "standing policy."  *Id.* ¶ 58.  FE-1 states that "[i]n adhering to

3    this policy, Twist billed many direct product costs, as well as those incurred in connection with the

4    production process, to R&D."  *Id.* ¶ 58.  These allegations establish FE-1's personal knowledge of

5    Twist's accounting policy.

6    Next, Defendants argue that Plaintiff cannot establish falsity of the Financial Metrics

7    Statements based solely on the "views expressed by [one] former employee[.]"  Mot. at 11 (citing

8    *In re Levi Strauss & Co. Secs. Litig.*, 527 F. Supp. 2d 965, 987-88 (N.D. Cal. 2007)).  Defendants

9    misconstrue *Levi Strauss*, which held that "the complaint, *taken as a whole*, [did] not give rise to a

10   plausible inference that any particular statement [was] materially false or misleading on the

11   asserted bases."  *Levi Strauss*, 527 F. Supp. 2d at 984 (emphasis added).[17]  Defendants' argument

12   also fails because the Court's conclusion does not rest on FE-1's personal view that Twist's

13   accounting practices violate ASC 730.  Instead, FE-1 provides the factual basis for the Court to

14   conclude that this accounting principle was plausibly violated.  Therefore, unlike in *Levi Strauss*,

15   FE-1's statements are sufficient to support Plaintiff's allegations of falsity.[18]

16   The Court finds that the complaint as a whole plausibly alleges with sufficient particularity

17   that the Financial Metrics Statements were false or misleading.

### c.    Scienter

19   Plaintiff argues that two theories support a strong inference of scienter regarding the

20   Financial Metrics Statements:  (1) the Individual Defendants had access to data related to

21   production costs; and (2) the core operations doctrine.  Opp. at 22-23, 26-29.

22   _____

23   [17] Defendants' other authorities are inapposite because neither case held that the statements of a single confidential witness are categorically insufficient to plausibly allege falsity, but rather

24   involved the respective plaintiffs failing to plead with particularity.  *See* Mot. at 11.  Here, by contrast, Plaintiff has alleged the Financial Metrics Statements and inaccuracies with sufficient

25   detail and particularity to satisfy the PSLRA and Rule 9.

26   [18] Defendants argue that this case shares other material considerations with *Levi Strauss*, including that Twist did not restate its financials, no regulatory action was taken against Twist, and Twist's

27   auditors did not withdraw or amend their clean audit opinions.  Mot. at 3, 11.  But neither the absence of restated financials nor the presence of a clean audit opinion is sufficient to challenge a well-pleaded fraud claim, as these factors do not "absolve or shield a defendant from liability."

28   *Levi Strauss*, 527 F. Supp. 2d at 987.

First, Plaintiff argues that Leproust and Thorburn were aware of the allegedly improper accounting practices because they had access to the accounting data.  Opp. at 22-23.  "[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter."  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016).  Instead, "[t]o raise a strong inference of scienter, the [complaint] must allege facts demonstrating that [the] defendants knowingly and recklessly engaged in an improper accounting practice[.]"  *Id.* (citation modified).  Here, the complaint does not allege "the role of the [I]ndividual [D]efendants in preparing the company's accounting statements or what knowledge they had of GAAP principles." *Id.*  Thus, without more, the Individual Defendants' access to production data does not create strong inference of scienter as to the Financial Metrics Statements.

Second, Plaintiff contends that scienter exists because the financial metric at issue – inflated gross margins – concerned the core operations central to Twist's business.  FAC ¶ 193. "The core operations theory of scienter relies on the principle that 'corporate officers have knowledge of the critical core operation of their companies.'"  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014).  Allegations about management's role in a company may "help to satisfy the PSLRA scienter requirement in three circumstances." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008).  First, the allegations may be used along with other allegations "that, when read together, raise an inference of scienter that is 'cogent and compelling, thus strong in light of other explanations.'"  *Id.* (quoting *Tellabs*, 551 U.S. at 323.).  Second, the allegations may satisfy the PSLRA independently "where they are particular and suggest that defendants had actual access to the disputed information."  *Id.* at 786. Third, such allegations, standing alone, may satisfy the PSLRA standard "in rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter."  *Id.*

Plaintiff alleges that Leproust and Thorburn "repeatedly touted Gross Margins to investors as a key metric for assessing the [c]ompany's financial well-being," and "[i]t would be absurd therefore to suggest that Defendants were without knowledge of . . . the true costs and revenues associated with these products that impacted the 'key metric' of Gross Margins."  FAC ¶ 193; *see*

*also* FAC ¶ 26.  However, these allegations are insufficient to establish scienter based on a core operations theory because "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter" absent allegations of specific information related to the fraud being conveyed to or known by management.  *Ferry*, 542 F.3d at 784-85 (quoting *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1068 (9th Cir.2008)). Plaintiff also relies on allegations that the Individual Defendants had access to production data that contradicted their public statements.  *See* Opp. at 26 (citing FAC ¶ 171).  However, as discussed above, Plaintiff does not allege that the production data included specific accounting information, or that the Individual Defendants were aware of or directed the allegedly improper accounting practices.  Therefore, Plaintiff's allegations fall short of establishing an inference of scienter.

In addition, the Court must inquire "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 551 U.S. at 322-23.  The Court finds that the allegations discussed above, taken together, do not create a strong inference of scienter as to inflated gross margins.

\* \* \*

In sum, Plaintiff has alleged that the Financial Metrics Statements are actionable and plausibly false.  However, Plaintiff has not alleged scienter as to any of the Defendants.

### 3.    Loss Causation

Defendants argue that Plaintiff has failed to plead loss causation because, "as a matter of law, the Scorpion Report cannot serve as a corrective disclosure[.]"  Mot. at 9.  The Court disagrees and finds that Plaintiff has plausibly pleaded loss causation.

"To establish loss causation in a fraud-on-the-market case, the plaintiff must show that after purchasing her shares and before selling, the following occurred: (1) 'the truth became known,' and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated.  *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020) (citation omitted).  The Ninth Circuit has explained that loss causation is "simply a variant of proximate cause."  *Espy v. J2 Global, Inc.*, 99 F.4th 527, 540 (9th Cir. 2024) (citation omitted).  The ultimate

1    question is "whether the defendant's misstatement[s], as opposed to some other fact, foreseeably

2    caused the plaintiff's loss." *Lloyd*, 811 F.3d at 1210.

3         The most common way to prove loss causation in a "fraud-on-the-market" case is to

4    identify one or more corrective disclosures. A corrective disclosure occurs when information

5    correcting the misstatement or omission that is the basis for the action is disseminated to the

6    market." *BofI*, 977 F.3d at 790. Under the Ninth Circuit's "flexible approach," a corrective

7    disclosure can "come from any source, including . . . whistleblowers, analysts, or investigative

8    reporters." *Id.* Regardless of the source, Plaintiff must allege facts "plausibly suggesting" that "a

9    corrective disclosure revealed . . . the truth concealed by the defendant's misstatement," and that

10   disclosure "caused the company's stock price to decline." *Espy*, 99 F.4th at 540 (quoting *BofI*,

11   977 F.3d at 790). Whether a short-seller report can serve as a corrective disclosure is a context-

12   dependent analysis. *See BofI*, 977 F.3d at 790 (rejecting application of a bright-line rule in

13   evaluating corrective disclosures). The relevant inquiry is "whether the market reasonably

14   *perceived* [the Report's] allegations as true and acted upon them accordingly," resulting in a drop

15   in stock value. *Id.*

16        Although reasonable investors may often disregard or take short-seller reports "with a

17   healthy grain of salt," *see id.* at 797, Plaintiff has alleged facts suggesting that the market

18   reasonably believed the Report's allegations despite Scorpion's short position. First, the Report

19   was followed by a near-simultaneous drop in Twist's stock value. On the day the Report was

20   published, Twist's stock allegedly "lost over 20% of its value." FAC ¶¶ 197, 205. In the three

21   days after, the stock "continued to plummet, closing at a two-year loss of $24.81 per share," which

22   "represented a loss in value of almost 35%[.]" *Id.* The immediate and drastic drop in value

23   "bolsters the inference that the market regarded [the] allegations as true[.]" *BofI*, 977 F.3d at 792

24   (explaining that a price drop of more than 30% supports the inference that the market regarded the

25   disclosure's allegations as true). Second, following the Report's release, three reputable analysts –

26   Evercore ISI, J.P. Morgan, and SVB Securities – attributed the drop in value to the publication of

27   the Report. *See id.* ¶¶ 201-203. This was followed by a fourth analyst a few weeks later. *Id.*

28   ¶ 204; *see also Uniformed Sanitationmen's Ass'n Comp. Accrual Fund v. Equinix, Inc.*, No. 24-cv-

United States District Court
Northern District of California

1    02656-VC, 2025 WL 39936, at *6 (N.D. Cal. Jan. 6, 2025) (concluding that a short-seller report

2    was a corrective disclosure, noting that analyst reports "suggest[ed] that the market was taking

3    [the disclosure's] allegations seriously").  Finally, the fact that the drop is "not readily attributable

4    to non-fraud-related factors that might have moved [Twist's] stock price" further supports the

5    finding that the Report served as a corrective disclosure.  *BofI*, 977 F.3d at 792.

6    　　　　Accordingly, the Court finds that Plaintiff has plausibly alleged loss causation based on the

7    Report.

8    　　　　　　　　　　　　　　　　　　* * *

9    　　　　In summary, the motion to dismiss the Section 10(b) and Rule 10b-5 claim as to Leproust

10    and Twist is DENIED.  The motion to dismiss the Section 10(b) and Rule 10b-5 claim against

11    Thorburn is GRANTED.

12    　　　　**B.    Section 11 of the Securities Act**

13    　　　　"Section 11 of the Securities Act contains a private right of action for purchasers of a

14    security if the issuer publishes a registration statement in connection with that security that

15    'contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be

16    stated therein or necessary to make the statements therein not misleading.'"  *Rubke v. Capitol*

17    *Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009) (citing 15 U.S.C. § 77k(a)).  "To prevail in such

18    an action, a plaintiff must prove '(1) that the registration statement contained an omission or

19    misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would

20    have misled a reasonable investor about the nature of his or her investment.'"  *Id*. (quoting *Daou*,

21    411 F.3d at 1027).  "No scienter is required for liability under [Section] 11; defendants will be

22    liable for innocent or negligent material misstatements or omissions."  *Daou*, 411 F.3d at 1027

23    (quoting *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404 (9th Cir. 1996)).

24    　　　　Plaintiff asserts a Section 11 claim on behalf of individuals and entities who acquired

25    Twist common stock in the December 2020 and February 2022 Offerings pursuant and/or

26    traceable to the 2020 Registration Statement.  FAC ¶ 99.  Plaintiff's Section 11 claim relies on the

27    same factual allegations and misstatements alleged as to the Section 10(b) claim.  The alleged

28    misstatements regarding Twist's costs of revenue, R&D expenses, and gross margins are found in

United States District Court
Northern District of California

27

Twist's 2020 Registration Statement.[19]  In addition, Plaintiff alleges that ten Product Statements incorporated by reference into the 2020 Registration Statement were false and misleading.  *Id.* ¶¶ 116-122.

### 1.    Product Statements

Plaintiff alleges that ten Product Statements incorporated by reference into the 2020 Registration Statement were false or misleading.  *Id.* ¶¶ 116-122.  Eight of the Product Statements are identical to Product Statements alleged under Section 10(b) of the Exchange Act.  *Compare id.* ¶¶ 116-122, *with id.* ¶¶ 149-153.  Because the same pleading standard applies to Plaintiff's Section 11 claim,[20] the Court adopts its Exchange Act analysis as to the eight identical statements.  That is, the Court finds that Plaintiff has identified actionable statements and plausibly alleged falsity as to the automation representations in paragraphs 118 and 120.[21]  The Court finds that the other statements, *see id.* ¶¶ 116, 117, 119, 120, are either not actionable or not adequately pleaded.  *See supra* Section IV.A.1.

Plaintiff identifies two additional allegedly false Product Statements, *see* FAC ¶ 121, that are specific to Plaintiff's Section 11 claim only.  Paragraph 121 states that Twist "do[es] not offer retrospective discounts or rebates" and that Twist "reduce[s] revenue by the amount of expected returns which has been insignificant[.]"  *Id.* ¶ 121.  The Court finds that Plaintiff has adequately alleged falsity as to the retrospective discount statement.  As detailed by former Twist employees, Twist did offer retrospective discounts when customers complained about product quality issues.  *See id.* ¶ 82 (FE-2 explaining that Twist employees were instructed to give "serious discounts," to "comp" products, or to send replacement products for free to pacify customers who received failed

---

[19] Plaintiff alleges that the 2020 Registration Statement incorporates the following documents: Twist's Forms 10-K for the years 2019, 2020, and 2021; Twist's Forms 10-Q for the fourth quarter of 2019 through the fourth quarter of 2021; and Twist's quarterly press releases, filed on Forms 8-K, for the fourth quarters of 2019, 2020, and 2021, respectively.  FAC ¶¶ 113-114.

[20] Where the complaint relies on the same allegations to allege violations of Section 10(b) and Section 11, the court assumes that the complaint sounds in fraud and applies the heightened pleading standard to the Section 11 claims.  *Rubke*, 551 F.3d at 1161.

[21] The Product Statements in paragraphs 118 and 120 are identical to the Product Statements in paragraphs 151 and 153, which the Court analyzed as to the Exchange Act claim.  *See supra* Section IV.A.1.

United States District Court
Northern District of California

United States District Court
Northern District of California

or defective products), ¶ 88 (explaining that Twist gave FE-5 authority to give discounts to every customer and that it was not uncommon for FE-5 to give customers a 25% to 50% discount). However, the complaint does not provide sufficient detail for the Court to conclude that "the amount of expected returns . . . has been insignificant" was false when stated. Indeed, the complaint does not provide any tangible information about the amount of returns. Accordingly, Plaintiff has plausibly alleged falsity as to the retrospective discount statement, but not as to the amount of returns.

### 2.    Financial Metrics Statements

Because Plaintiff's Section 11 claim relies on a subset of the same allegations that formed the basis for Plaintiff's Section 10(b) claim, the Court applies the heightened pleading standard to the Section 11 claim. *Rubke*, 551 F.3d at 1161; *see also* Opp. at 29 n.13 ("Because Plaintiff's allegations satisfy Rule 9(b), the issue of whether Rule 9(b) applies to Plaintiff's Securities Act claims is irrelevant."). For the reasons stated above, the Court likewise finds that Plaintiff alleges false Financial Metrics Statements with sufficient particularity to state a plausible claim under Section 11. *See supra* Section IV.A.2.

### 3.    Standing as to the February 2022 Offering

"To bring a claim under [Section] 11, the securities held by the plaintiff must be traceable to the particular registration statement alleged to be false or misleading." *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 768 (2023). Defendants argue that Plaintiff lacks statutory standing to assert a Section 11 claim based on the February 2022 offering because Plaintiff does not allege that it purchased shares during the February 2022 offering, or purchased shares that can be traced to the February 2022 offering.

To prevail on this claim, Plaintiff must show that the relevant shares either came from the February 2022 offering, or are traceable to the February 2022 offering. *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013). The "level of factual specificity needed to satisfy this pleading requirement will vary depending on the context." *Id*. at 1107. In circumstances where the relevant shares were issued in a single offering, an allegation that plaintiff's shares were "directly traceable" to that offering "might well suffice," because in that

29

United States District Court
Northern District of California

situation, "by definition all of the company's shares will be directly traceable to the offering in question." *Id.* But when, as occurred here, "a company has issued shares in multiple offerings under more than one registration statement, . . . a greater level of factual specificity will be needed before a court can reasonably infer that shares purchased in the aftermarket are traceable to a particular offering." *Id.*

Plaintiff does not plausibly allege that it acquired shares during the February 2022 offering, or shares traceable to the February 2022 offering. Schedule A, which is attached to the amended complaint and lists the shares acquired by Plaintiff, does not reflect that Plaintiff purchased shares at the $55 per share price of the February 2022 offering. Mot. at 30 (citing FAC ¶ 39 & Schedule A). The amended complaint does not allege any other facts indicating that Plaintiff's shares were "part of the 5.2 million shares sold in that Offering[.]" *Id.* "Accepting the allegations as true, [Plaintiff's] shares could have come from the [February 2022] offering, but the 'obvious alternative explanation' is that they could instead have come from the pool of previously issued shares," *i.e.*, the December 2020 offering. *Century Aluminum*, 729 F.3d at 1108. Because Plaintiff's Section 11 claim is based in part on acquiring stock during the February 2022 offering, Plaintiff must plead facts "tending to exclude the possibility that the alternative explanation is true[.]" *Id.* Plaintiff fails to do so.

Plaintiff relies on *Melendres v. Arpaio* to argue that the Court does not have to determine the issue of statutory standing at the pleading stage. 784 F.3d 1254, 1262-63 (9th Cir. 2015). However, *Melendres* is not applicable. In *Melendres*, the defendants sought to partially decertify the class on the ground that the named plaintiffs lacked standing to represent the class, but they did *not* dispute the plaintiffs' standing to assert their individual *claims*. *Id.* at 1261-62. Here, Defendants contend that Plaintiff lacks statutory standing to assert a Section 11 claim. The issue of statutory standing is properly addressed on a Rule 12(b)(6) motion. *See Century Aluminum*, 729 F.3d at 1109 (finding that district court should have addressed the motion to dismiss based on lack of statutory standing under Section 11 pursuant to Rule 12(b)(6), not Rule 12(b)(1)).

Because Plaintiff fails to plausibly allege statutory standing under Section 11, the Court grants the motion in part, with leave to amend the Section 11 claim to the extent it is based on the

February 2022 offering.

**C.**    **Section 20(a) of the Exchange Act and Section 15 of the Securities Act**

Section 20(a) of the Exchange Act and Section 15 of the Securities Act make certain "controlling" individuals jointly and severally liable to plaintiff "as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.'" *Zucco*, 552 F.3d at 990 (quoting *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003) ("*America West*")); *see also* 15 U.S.C. §§ 77o, 78t(a).  Where the plaintiff adequately pleads a primary securities violation, dismissal at the pleading stage is rarely appropriate because the question of whether an individual defendant is a "controlling person" is an "intensely factual question." *America West*, 320 F.3d at 945.  However, Section 20(a) and Section 15 claims may be summarily dismissed if the plaintiff fails to adequately plead a primary securities violation.  *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012).

Here, Plaintiff alleges that Leproust and Thorburn are "control persons" within the meaning of Section 20(a) and Section 15 by virtue of their executive positions and management roles, their preparation and signing of Twist's SEC filings, and their direct involvement in Twist's daily operations.  FAC ¶¶ 95-98.  The Individual Defendants move to dismiss Plaintiff's control persons claims solely on the basis that "Plaintiff has failed to plead a primary violation of either Section 10(b) or Section 11[.]"  Mot. at 30.  However, as discussed *supra* in Section IV.A and B, the Court finds that Plaintiff has adequately pleaded primary violations of both Section 10(b) and Section 11 by Defendant Twist.  Given the fact-intensive nature of the control person analysis and given that Thorburn and Leproust plausibly "exercise[] actual power or control" over Twist, it would be premature for the Court to dismiss the Section 20(a) and Section 15 claims.  Thus, Court DENIES IN PART Defendants' motion to dismiss the Section 20(a) and Section 15 claims as to both Leproust and Thorburn.  However, the motion is GRANTED to the extent the Section 15 claim is based on the February 2022 offering.

## V.    CONCLUSION

Based on the foregoing reasons, the Court rules as follows:

1.    With respect to Section 10(b) of the Exchange Act, the motion is DENIED as to Twist and Leproust, and GRANTED WITH LEAVE TO AMEND as to Thorburn.

2.    With respect to Section 11 of the Securities Act, the motion is DENIED IN PART and GRANTED IN PART WITH LEAVE TO AMEND to the extent the Section 11 claim is based on the February 2022 offering.

3.    With respect to Section 20(a) of the Exchange Act and Section 15 of the Securities Act, the motion is DENIED IN PART and GRANTED IN PART WITH LEAVE TO AMEND to the extent the Section 15 claim is based on the February 2022 offering.

The Court grants Plaintiff leave to amend because this is the Court's first ruling on the legal sufficiency of Plaintiff's allegations.  *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (holding that the "court should grant leave to amend . . . unless it determines that the pleading could not possibly be cured by the allegation of other facts" (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995))).  Failure to cure the deficiencies identified in this Order may result in dismissal of Plaintiff's deficient claims with prejudice.  *Zucco*, 552 F.3d at 1007 (holding that failure to correct pleading deficiencies after dismissal is a "strong indication" that further amendment would be futile); *see also Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) ("A district court's discretion to deny leave to amend is 'particularly broad' where the plaintiff has previously amended." (quoting *Sisseton-Wahpeton Sioux Tribe v. United States*, 90 F.3d 351, 355 (9th Cir. 1996))).

Plaintiff shall file its Second Amended Complaint within 21 days of this Order.  Where Plaintiff relies on Product Statements comprised of multiple sentences or more than one proposition, Plaintiff is ORDERED to bold or highlight the portions of the Product Statement Plaintiff alleges are false.  Plaintiff is instructed to comply with the redline requirements for amended complaints found in the Court's Standing Order for Civil Cases.

The Court also strongly encourages Plaintiff to submit a chart containing their amended

United States District Court
Northern District of California

allegations which satisfies the dictates of the PSLRA, specifying (1) each statement alleged to have been misleading, (2) the reason or reasons why the statement is misleading, and (3) if an allegation regarding the statement or omission is made on information and belief, stating with particularity all facts on which that belief is formed.  *See* 15 U.S.C. § 78u-4(b)(1).  To the extent Plaintiff alleges more than one category of falsity applies to a single statement, Plaintiff shall specify which categories apply to each statement in its second amended complaint.  Plaintiff may include in the chart particularized allegations as to what the Individual Defendant(s) knew and when they knew it.  *See* 15 U.S.C. § 78u-4(b)(2).

**IT IS SO ORDERED.**

Dated:  September 3, 2025

_____
Eumi K. Lee
United States District Judge