# EXHIBIT 1

JAMES N. KRAMER (SBN 154709)
jkramer@orrick.com
ALEXANDER K. TALARIDES (SBN 268068)
atalarides@orrick.com
M. TODD SCOTT (SBN 226885)
tscott@orrick.com
ARIEL B. WINAWER (SBN 317821)
awinawer@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

Attorneys for Defendants
TWIST BIOSCIENCE CORPORATION, EMILY M.
LEPROUST, and JAMES M. THORBURN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| ANTHONY JOSEPH PETERS, Individually and on Behalf of All Others Similarly Situated, | Case No. 5:22-cv-08168-EKL |
|---|---|
| Plaintiff, | **DECLARATION OF FARIS ABDELAZIZ** |
| v. | Judge:    Honorable Eumi K. Lee |
| TWIST   BIOSCIENCE   CORPORATION, EMILY  M.  LEPROUST,  and  JAMES  M. THORBURN, | Dept:    7, 4th Floor |
| Defendants. | |

## DECLARATION OF FARIS ABDELAZIZ

I, Faris Abdelaziz, declare as follows,

1.    I have personal knowledge of the facts stated in this declaration, and competently could testify to them if called upon to do so.

2.    I understand that I am the individual identified as "Former Employee 2" or "FE-2" in the Amended Class Action Complaint in the above-captioned action.

3.    I was employed at Twist Bioscience Corporation ("Twist") from August 2017 to June 2023. From August 2017 to March 2019, I held the position of Manufacturing Associate, and from March 2019 to March 2021, I held the position of Manufacturing Supervisor. Thereafter, from March 2021 to June 2023, I served as a Product Line Specialist.

4.    A few months after I left Twist, in August or September 2023, I received a phone call from an individual who identified herself as Desiree Torres from the law firm Bleichmar, Fonti & Auld LLP ("Bleichmar"). Ms. Torres explained that she had some questions for me about my time working at Twist in connection to a lawsuit.

5.    I agreed to answer her questions. After that call, I did not hear from Ms. Torres or anyone at Bleichmar until in or around September 2025, when she contacted me again to tell me that the case was moving forward.

6.    I never received a copy of any complaint from Ms. Torres or anyone at Bleichmar and was never asked to review the accuracy of any statements attributed to me. Until recently, I did not know that statements attributed to me had been included in any lawsuit against Twist.

7.    Having now reviewed the Amended Class Action Complaint, certain of the allegations attributed to me are incorrect, mischaracterized, or taken out of context. I summarize the most egregious of these inaccuracies below.

8.    Paragraph 67(a) states that, according to FE-2, *"[d]uring each Monthly Performance Meeting, Leproust utilized PowerPoint to present Twist executives and employees with a detailed analysis of the Company's metrics for the month or the quarter. . . . At the meetings, Leproust discussed and compared Twist's monthly and quarterly results to her goals. CFO Thorburn was at the monthly meetings as well and discussed the Company's revenues. This internal*

ABDELAZIZ DECLARATION
CASE NO.: 5:22-CV-08168-EKL

*information contradicted Defendants' public statements."*

9.      I never stated, and do not believe, that Dr. Leproust or Mr. Thorburn presented any information at Twist's internal meetings that "contradicted Defendants' public statements." In my understanding, the information that Twist leadership presented at internal meetings was consistent with its public statements. I was not on Twist's finance team and had no insight into how Twist calculated its financial results.

10.     Paragraph 69 states that, according to FE-2, *"Twist's True Error Rate Was 10%: One metric that Leproust tracked closely and discussed in Monthly Performance Meetings was 'first task yield.' First task yield represented how often Twist's production was 'right the first time,' or 'how much of the order was correct the first time without anything having to be redone.' Twist's internal goal was to get around 90 percent first task yield, meaning that 90 percent of the time, the gene production was done correctly and did not require 'anything to be redone.' This translated to a ten percent error rate, meaning that one in ten of Twist's products failed quality control."* Paragraph 69(a) further alleges that *"FE-2 explained that there were a series of steps that were followed in the ten percent of instances where Twist's manufacturing process did not result in an acceptable product."*

11.     I never stated that "Twist's true error rate was 10%" or that "one in ten of Twist's products failed quality control" such that "Twist's manufacturing process did not result in an acceptable product." These statements are incorrect. The first *pass* yield metric (not first *task* yield) is a performance indicator. No product that failed any part of the quality control process, including first pass yield, would be sent to a customer. The fact that Twist's quality control process caught any errors before the products were shipped to customers indicates that Twist's process worked, not that it was flawed.

12.     Paragraph 70(b) states that *"Twist established a protocol for responding to customers' complaints about missing, defective, or contaminated products. . . . As a product specialist, FE-2 was personally involved in investigating these types of customer complaints. FE-2 worked with quality control personnel as part of these investigations. . . . FE-2 communicated FE-2's findings to the quality control personnel and prepared 'incident reports' to memorialize the*

ABDELAZIZ DECLARATION
CASE NO.: 5:22-CV-08168-EKL

*errors that generated customer complaints."*

13.    It was extremely uncommon for me to prepare an incident report and open an investigation based on a customer complaint. Incident reports were created when there was an event affecting the product or equipment in the lab. Customer complaints were the most uncommon reason for me to open an investigation. I understand that is because Twist only shipped products to customers that had passed its rigorous quality control processes.

14.    Paragraph 70 also alleges that *"[t]here were several different complaints and defects, including Twist shipping: (i) empty 'containers that did not have the product,' meaning that the product was entirely missing; (ii) genes where 'the DNA was the wrong sequence'; and (iii) products infected with cross-contamination."*

15.    It was extremely rare in my experience for any complaints and defects identified in Paragraph 70 to occur.

16.    I believe in Twist's leadership and the legitimacy and integrity of Twist's products. I am disappointed that my words have been fabricated or mischaracterized to unfairly accuse Twist, Dr. Leproust, and Mr. Thorburn of wrongdoing.

I declare under penalty of perjury that the foregoing is true and correct. Executed in South San Francisco, California this 8th day of December, 2025.

By: _____

Faris Abdelaziz

ABDELAZIZ DECLARATION
CASE NO.: 5:22-CV-08168-EKL