# Exhibit 1

# EXHIBIT 1

**Unredacted Memorandum**

**(Filed Under Seal)**

**BLEICHMAR FONTI & AULD LLP**
Adam C. McCall (Bar No. 302130)
1330 Broadway, Suite 630
Oakland, California 94612
Telephone: (415) 445-4003
Facsimile: (415) 445-4020
amccall@bfalaw.com

Joseph A. Fonti (*pro hac vice*)
Nancy A. Kulesa (*pro hac vice*)
George N. Bauer (*pro hac vice*)
Benjamin Burry (*pro hac vice*)
Thayne Stoddard (*pro hac vice*)
300 Park Avenue, Suite 1301
New York, New York 10022
Tel: (212) 789-1340
Fax: (212) 205-3960
jfonti@bfalaw.com
nkulesa@bfalaw.com
gbauer@bfalaw.com
bburry@bfalaw.com
tstoddard@bfalaw.com

*Counsel for Lead Plaintiff Policemen's*
*Annuity and Benefit Fund of Chicago and*
*Lead Counsel for the Putative Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

ANTHONY JOSEPH PETERS, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

TWIST BIOSCIENCE CORPORATION, EMILY M. LEPROUST, and JAMES M. THORBURN,

Defendants.

Case No. 5:22-cv-08168-EKL

CLASS ACTION

**MOTION FOR CLASS CERTIFICATION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

**FILED UNDER SEAL**

Date: July 29, 2026
Time: 9:00am
Courtroom: 7, 4th Floor
Judge: Honorable Eumi K. Lee

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ...................................................................................1

STATEMENT OF THE ISSUES TO BE DECIDED.............................................................1

I.     PRELIMINARY STATEMENT .................................................................................2

II.    STATEMENT OF FACTS .........................................................................................4

III.   ARGUMENT ..............................................................................................................5

    A.   Class Certification Standards. ...........................................................................5

    B.   Rule 23(a) Is Satisfied for the Exchange Act Claims. .....................................6

        1.   Numerosity Is Established. ......................................................................6

        2.   Commonality Is Established by Questions of Law and Fact Common to Class Members.................................................................7

        3.   Typicality Is Established Because Lead Plaintiff's Claims Arise from the Same Facts and Conduct that Give Rise to Class Members' Claims.....................................................................8

        4.   Adequacy Is Established Because Lead Plaintiff Has Vigorously Prosecuted This Action and Class Counsel Is Adequate. ...........................9

    C.   Rule 23(b)(3) Is Satisfied for the Exchange Act Claims. .......................................11

        1.   Predominance Is Established by Common Questions Subject to Class-Wide Proof. ........................................................................11

        2.   Damages for the Exchange Act Claims Can Be Calculated on a Class-Wide Basis by Common Methodology...............................................19

        3.   Superiority Is Established Because This Federal Securities Class Action Raises No Unusual Manageability Issues. ...................................21

    D.   Rule 23(a) Is Satisfied for the Securities Act Claims. .......................................21

        1.   Numerosity Is Established Because Twist Sold More Than 3.2 Million Shares In the December 2020 Offering. ....................................22

        2.   Commonality Is Established by Questions of Law and Fact Common to Class Members.................................................................22

        3.   Typicality is Established Because Lead Plaintiff's Claims Arise from the Same Facts and Conduct that Give Rise to Class Members' Claims.....................................................................23

        4.   Adequacy Is Established Because Lead Plaintiff Has Vigorously Prosecuted This Action and Class Counsel Is Adequate. ...........................23

    E.   Rule 23(b)(3) Is Satisfied for the Securities Act Claims. .......................................23

        1.   Common Issues Predominate for the Securities Act Claims. ...................23

        2.   Damages for the Securities Act Claims Can Be Calculated on a Class-Wide Basis by Statutory Formula. .....................................................24

        3.   Superiority Is Established Because This Federal Securities Class Action Raises No Unusual Manageability Issues. ...................................25

IV.    CONCLUSION.............................................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997).................................................................................................11

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    568 U.S. 455 (2013)..............................................................................................6, 12

*Baker v. SeaWorld Ent., Inc.*,
    No. 14 Civ. 2129, 2017 WL 5885542 (S.D. Cal. Nov. 29, 2017) ............................21

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)...........................................................................................3, 9, 13

*Blackie v. Barrack*,
    524 F.2d 891, 903 (9th Cir. 1975) .........................................................................5, 7

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) ..................................................................... *passim*

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
    348 F.R.D. 372 (S.D. Cal. 2024) .............................................................................20

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
    No. 17 Civ. 554, 2018 WL 4931543 (N.D. Cal. Oct. 11, 2018)................................12

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
    2022 WL 1459567 (N.D. Cal. May 9, 2022).............................................................6

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005).................................................................................................12

*Epstein v. MCA, Inc.*,
    50 F.3d 644 (9th Cir. 1995) .......................................................................................2

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011).....................................................................................12, 13, 17

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
    594 U.S. 113 (2021).............................................................................................13, 14

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014).............................................................................................13, 17

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ..............................................................................8, 10

ii

*Hatamian v. Advanced Micro Devices, Inc.*,
No. 14 Civ. 226, 2016 WL 1042502 (N.D. Cal. Mar. 16, 2016)................................................20

*Hayes v. MagnaChip Semiconductor Corp.*,
No. 14 Civ. 1160, 2016 WL 7406418 (N.D. Cal. Dec. 22, 2016) ......................................15, 19

*Hefler v. Wells Fargo & Co.*,
No. 16-CV-05479-JST, 2018 WL 4207245 (N.D. Cal. Sept. 4, 2018). ...................................12

*Hildes v. Arthur Andersen LLP*,
734 F.3d 854 (9th Cir. 2013) ...........................................................................................14, 22

*Hodges v. Akeena Solar, Inc.*,
274 F.R.D. 259 (N.D. Cal. 2011)...............................................................................................11

*Homyk v. ChemoCentryx*, Inc.,
No. 4:21 Civ. 3343, 2024 WL 1141699 (N.D. Cal. Mar. 6, 2024)
(*leave to appeal denied*) No. 24-1720, 2024 WL 2745788 (9th Cir. May 23, 2024).................7

*Huberman v. Tag-It Pac. Inc.*,
314 F. App'x 59 (9th Cir. 2009) .......................................................................................8, 9, 18

*In re Alco Int'l Grp., Inc. Sec. Litig.*,
158 F.R.D. 152 (S.D. Cal. 1994) .................................................................................................2

*In re Apple Inc. Sec. Litig.*,
No. 4:19 Civ. 2033, 2022 WL 354785 (N.D. Cal. Feb. 4, 2022) .............................................10

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) ..........................................................................................22, 24

*In re Cooper Cos. Inc. Sec. Litig.*,
254 F.R.D. 628 (C.D. Cal. 2009)..........................................................................................2, 12

*In re Diamond Foods, Inc., Securities Litig.*,
295 F.R.D. 240 (N.D. Cal. 2013)................................................................................... *passim*

*In re Facebook, Inc.*,
312 F.R.D. 332 (S.D.N.Y. 2015) ...............................................................................................25

*In re Intuitive Surgical Sec. Litig.*,
2016 WL 7425926 (N.D. Cal. Dec. 22, 2016)..................................................................7, 8, 19

*In re LDK Solar Sec. Litig.*,
255 F.R.D. 519 (N.D. Cal. 2009)........................................................................................13, 14

*In re LendingClub Sec. Litig.*,
282 F. Supp. 3d 1171 (N.D. Cal. 2017) ...............................................................................7, 10

*In re Lyft Inc. Sec. Litig.*,

iii

2021 WL 3711470 (N.D. Cal. Aug. 20, 2021) ................................................................21

*In re NetSol Techs., Inc. Sec. Litig.*,
    2016 WL 7496724 (C.D. Cal. July 1, 2016)..................................................................2

*In re SanDisk LLC Sec. Litig.*,
    No. 15 Civ. 01455, 2018 WL 4293336 (N.D. Cal. Sept. 4, 2018) ...........................21

*In re Snap Inc. Sec. Litig.*,
    334 F.R.D. 209 (C.D. Cal. 2019).................................................................................23

*In re Talis Biomedical Corp. Sec. Litig.*,
    No. 22 Civ. 105, 2024 WL 536303 (N.D. Cal. Feb. 9, 2024)...................................22

*In re Twitter Inc. Sec. Litig.*,
    326 F.R.D. 619 (N.D. Cal. 2018).............................................................................11, 21

*In re VeriSign, Inc. Sec. Litig.*,
    2005 WL 7877645 (N.D. Cal. Jan. 13, 2005)...........................................................6, 21

*Katz v. China Century Dragon Media, Inc.*,
    287 F.R.D. 575 (C.D. Cal. 2012)................................................................................22

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ....................................................................14, 17, 18

*Lamartina v. VMware, Inc.*,
    No. 5:20 Civ. 2182, 2024 WL 3286059 (N.D. Cal. July 2, 2024)..............................6

*McFarland v. Memorex Corp.*,
    96 F.R.D. 357 (N.D. Cal. 1982)...................................................................................22

*McMahan & Co. v. Wherehouse Entm't*,
    65 F.3d 1044 (2d Cir. 1995) ........................................................................................24

*Miller v. Thane Int'l, Inc.*,
    615 F.3d 1095 (9th Cir. 2010) .....................................................................................14

*Montage Tech. Grp. Ltd. Sec. Litig.*,
    No. 14 Civ. 722, 2016 WL 1598666 (N.D. Cal. Apr. 21, 2016) ...............................16

*Nacif v. Athira Pharma, Inc.*,
    No. 21 Civ. 861, 2024 WL 643513 (W.D. Wash. Feb. 15, 2024) ..............................24

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 424 (2022)............................6

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) .........................................................................................7

LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF – CASE NO. 5:22-cv-08168-EKL

*Petrie v. Elec. Game Card, Inc.*,
  308 F.R.D. 336 (C.D. Cal. 2015) ................................................................................16, 18, 19

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*,
  No. 19 Civ. 4744, 2021 WL 229310 (N.D. Cal. Jan. 21, 2021) ....................................18, 19, 21

*Pulaski & Middleman, LLC v. Google, Inc.*,
  802 F.3d 979 (9th Cir. 2015) ..........................................................................................19

*Rannis v. Recchia*,
  380 Fed. App'x 646 (9th Cir. 2010) ..................................................................................6

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
  335 F.R.D. 276 (N.D. Cal. 2020)................................................................................ *passim*

*SEB Inv. Mgmt. AB v. Wells Fargo & Co.*,
  No. 22 Civ. 3811, 2025 WL 1243818 (N.D. Cal. Apr. 25, 2025) ...................................9, 14, 17

*Sidibe v. Sutter Health*,
  333 F.R.D. 463 (N.D. Cal. 2019)......................................................................................10

*Siemers v. Wells Fargo & Co.*,
  243 F.R.D. 369 (2007) .....................................................................................................9

*Sudunagunta v. NantKwest, Inc.*,
  2018 WL 3917865 (C.D. Cal. Aug. 13, 2018)....................................................................24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..........................................................................................................5

**Statutes**

15 U.S.C. § 77k(a) ...............................................................................................................14, 22

15 U.S.C. § 77k(e) ...............................................................................................................24, 25

17 C.F.R. § 229.404 ...................................................................................................................2

**Other Authorities**

H.R. Rep. No. 104- 369 (1995)..................................................................................................10

SEC Securities Act Release No. 6331 (Aug. 13, 1981)................................................................16

**Rules**

Fed. R. Civ. P. 23 ........................................................................................................... *passim*

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT on July 29, 2026, at 9:00 a.m., or as soon thereafter as this matter may be heard, before The Honorable Eumi K. Lee, United States District Court for the Northern District of California, San Jose Division, Courtroom 7, 4th Floor, 280 South 1st Street, San Jose, Court-appointed Lead Plaintiff Policemen's Annuity and Benefit Fund of Chicago ("Lead Plaintiff" or "PABF") will, and hereby does, respectfully move this Court for entry of an Order, pursuant to Federal Rule of Civil Procedure 23, in the above-captioned action (the "Action"): (1) certifying the Class (defined below); (2) appointing Lead Plaintiff as Class Representative; and (3) appointing Bleichmar Fonti & Auld LLP ("BFA") as Class Counsel (the "Motion").[1]

Pursuant to Section VIII.A of the Court's Civil Standing Order, the undersigned hereby certifies that the parties met and conferred by videoconference on March 10, 2026 for approximately 10 minutes. Lead Plaintiff disclosed the basis for its Motion and the parties were unable to narrow any disputed issues.

This Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the Declaration of George N. Bauer in Support of Lead Plaintiff's Motion for Class Certification (the "Bauer Decl.") and the exhibits thereto, including the Expert Report of Chad Coffman (Bauer Decl. Ex. A (hereafter, the "Coffman Report")) and the Declaration of Kevin Reichart in Support of Lead Plaintiff's Motion for Class Certification (Bauer Decl. Ex. B (hereafter, the "Reichart Decl.")), the papers and pleadings filed in this action, and such further argument and matters as may be offered at the Court's request.

## STATEMENT OF THE ISSUES TO BE DECIDED

The issues to be decided on this Motion are:

1. Whether to certify the Class (defined below);

2. Whether to appoint Lead Plaintiff as Class Representative; and

3. Whether to appoint BFA as Class Counsel pursuant to Rule 23(g).

---

[1] Capitalized terms not defined herein have the meanings stated in the Glossary of Terms for the Amended Complaint (ECF 83, "Amended Complaint" or "AC" at iii-vi). Unless otherwise noted, all emphases are added and all internal citations and quotation marks are omitted.

1

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    PRELIMINARY STATEMENT

The Ninth Circuit recognizes that securities cases fit Rule 23 "like a glove." *Epstein v. MCA, Inc.*, 50 F.3d 644, 668 (9th Cir. 1995).  Indeed, courts in this Circuit and elsewhere have long recognized that securities class actions such as this one "are particularly effective in serving as private policing weapons against corporate wrongdoing." *In re Cooper Cos. Inc. Sec. Litig.*, 254 F.R.D. 628, 642 (C.D. Cal. 2009).  As such, these actions are routinely certified as "the Ninth Circuit liberally construe[s] the Rule 23 criteria in favor of plaintiffs," and "has repeatedly endorsed class actions for securities actions." *In re Alco Int'l Grp., Inc. Sec. Litig.*, 158 F.R.D. 152, 155 (S.D. Cal. 1994); *In re NetSol Techs., Inc. Sec. Litig.*, 2016 WL 7496724, at *3 (C.D. Cal. July 1, 2016).

Lead Plaintiff advances claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of the proposed Class.  The putative Class consists of:

> As to claims under the Securities Act, all persons that purchased or otherwise acquired Twist's common stock in the December 2020 Offering pursuant to the 2020 Registration Statement, and were damaged thereby; and

> As to claims under the Exchange Act, all persons and entities who purchased or otherwise acquired Twist's common stock between December 20, 2018 and November 15, 2022, both inclusive, and were damaged thereby.[2]

Both sets of claims rest upon the central tenet that Defendants' materially false and misleading public statements about Twist's business misled investors, who were damaged as a result.  Rule 23's requirements are amply met under circumstances like these, where damaged

---

[2] Excluded from the Class are: (i) Defendants and any affiliates or subsidiaries thereof; (ii) present and former officers and directors of Twist and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iii) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any Defendant had or has had a controlling interest; (v) Twist's employee retirement and benefit plan(s); and (vi) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding six categories.

2

investors seek to recover under the Exchange Act and Securities Act for losses that were caused by a common course of misconduct.

*First*, Rule 23(a)'s prerequisites of numerosity, commonality, typicality, and adequacy are satisfied.  Numerosity and commonality plainly exist here.  Joinder of the many thousands of members of the proposed Class would be wholly impracticable, and this securities class action raises several common questions of law and fact, including as to falsity, materiality, scienter, and damages.  Typicality and adequacy are also easily satisfied:  the Policemen's Annuity and Benefit Fund of Chicago is the paradigmatic institutional investor lead plaintiff contemplated by the PSLRA and has successfully served as a Court-appointed class representative in the past.  As just two examples: (i) PABF previously served as Lead Plaintiff in *In re DaimlerChrysler, et al.*, 1:00-cv-00993 (D. Del.), and secured a $300 million recovery for the class; (ii) PABF also served as Lead Plaintiff in *In re Apollo Group Inc. Sec. Litig.*, 2:04-cv-02147 (D. Ariz.) and successfully recovered $145 million for investors.  (*See* ECF 43 at 8.)

Proposed Class Counsel, whom the Court appointed as Lead Counsel, are highly experienced, have vigorously pursued Class members' claims, and are fully committed to maximizing Class members' recovery.

*Second*, Rule 23(b)(3)'s predominance and superiority requirements are readily satisfied. Questions common to all Class members predominate over any questions affecting only individual Class members.  With respect to the Exchange Act claims, the predominance requirement is satisfied where, as here, securities trade in an efficient market such that the fraud-on-the-market presumption establishes class-wide reliance. *See Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  As explained below and as summarized in the accompanying Coffman Report, Twist common stock traded in an efficient market throughout the Class Period; millions of shares of Twist common stock were actively traded on NASDAQ, a paradigmatic and presumptively efficient market.  (*See* Coffman Report ¶ 29 (average weekly trading volume of 3.06 million shares).)  Predominance is similarly met for the Securities Act claims because common issues concerning material falsity prevail over any individualized inquiries.  Proceeding as a class action is also superior to other available methods for fairly and efficiently adjudicating Class members' claims.

## II.    STATEMENT OF FACTS

As alleged in detail in the Amended Complaint, Defendants Twist, Leproust and Thorburn misled the market in various public statements throughout the December 20, 2018 to November 15, 2022 Class Period when they: (i) touted the full automation of Twist's manufacturing workflow despite the need for substantial manual intervention; (ii) embellished the quality of the products Twist offered to its customers despite objective indications that the products were of inconsistent quality, often subpar, and subject to massive contamination events; and (iii) flaunted Twist's customers' purported satisfaction in the face of repeated complaints from those very customers.

Defendants also misled investors in the December 2020 Offering, through which Twist sold nearly $350 million of stock, (AC ¶ 38), by making similar misstatements about Twist's purported automation, misstating key financial metrics—including Cost of Revenue, R&D Expense and Gross Revenue—and concealing customer rebates.

This house of cards collapsed upon the release of an investigative report into Twist published on November 15, 2022 (the "Scorpion Report"), which precipitated Twist's stock price plummeting nearly 35%, from $38.00 on November 14, 2022 to a two-year low of $24.81 just three days later.

Lead Plaintiff purchased $1,793,008.38 of Twist common stock at artificially inflated prices attributable to Defendants' fraud during the Class Period. (ECF 132-1.) Lead Plaintiff purchased $451,440 of this Twist common stock directly in the December 2020 Offering from an underwriter at the offering price of $110.00. (*Id.*; *see also* AC ¶16.) Since appointment, Lead Plaintiff and Lead Counsel have vigorously prosecuted this action, filing a detailed complaint and extensive briefing in opposition to Defendants' motion to dismiss. Once the Court substantially denied Defendants' motion to dismiss on September 3, 2025, discovery commenced. Since then, Lead Counsel's efforts have included:

- Propounding Requests for Production, Interrogatories, and Requests to Admit on Defendants;
- Negotiating a Protective Order with Defendants' counsel (ECF 135);

4

- Negotiating ESI custodians and search terms with Defendants' counsel;

- Procuring and analyzing Defendants' documents produced thus far;

- Serving targeted subpoenas on key third parties;

- Raising key deficiencies in Defendants' discovery responses and conferring multiple times in an effort to resolve them; and

- Answering Defendants' discovery requests, including responding and objecting to document requests, interrogatories, and requests for admission, and reviewing and producing more than 60,000 pages of documents.

Though discovery is ongoing, evidence has already begun to emerge in support of the Amended Complaint's allegations. *See, e.g.*, Ex. C (TWIST_00004863), █████████████████████ █████████████████████████████████████████████████████████████████ ████████████; Ex. D (TWIST_00005385), █████████████████████████ ████████████████████████████████████████████████████████████; Ex. E (TWIST_00133977) (May 3, 2021 email to Leproust stating that *"panels contamination has been reported from various customers"*).

## III.    ARGUMENT

### A.    Class Certification Standards.

The Supreme Court has recognized "that meritorious private [securities] actions" are "an essential supplement to [government] enforcement actions . . . ." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). The Ninth Circuit has "consistently upheld" class certification under Rule 23 in securities actions. *Blackie v. Barrack*, 524 F.2d 891, 903 (9th Cir. 1975).

Class certification is warranted when a movant satisfies Rule 23(a) and one of Rule 23(b)'s subdivisions—here, Rule 23(b)(3). Rule 23(a) is satisfied when a movant shows that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 282 (N.D. Cal.

2020) ("*SEB I*").  Rule 23(b)(3) requires showing:  (1) "that the questions of law or fact common to class members predominate over any questions affecting only individual members;" and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.*

Rule 23's standards must be satisfied "by a preponderance of the evidence."  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 424 (2022).  But, as the Supreme Court cautioned, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

Here, Rule 23(a)'s four prerequisites and the requirements of Rule 23(b)(3) are satisfied, warranting class certification.

**B.      Rule 23(a) Is Satisfied for the Exchange Act Claims.**

**1.  Numerosity Is Established.**

Rule 23(a)'s "numerosity" requirement is met if "the class is so numerous that joinder of all members is impracticable . . . ."  Fed. R. Civ. P. 23(a)(1).  Courts in this District find that "[n]umerosity is presumed where the plaintiff class contains forty or more members." *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2022 WL 1459567, at *3 (N.D. Cal. May 9, 2022); *see also Rannis v. Recchia*, 380 Fed. App'x 646, 650-51 (9th Cir. 2010) (affirming certification of 20-member class).  "In cases involving securities traded on national stock exchanges, numerosity is practically a given." *In re VeriSign, Inc. Sec. Litig.*, 2005 WL 7877645, at *4 (N.D. Cal. Jan. 13, 2005); *Lamartina v. VMware, Inc.*, 2024 WL 3286059, at *3 (N.D. Cal. July 2, 2024) ("Given that more than forty individuals purchased stock annually, the Court finds that the class is so numerous that joinder of all members is impracticable.")

The proposed Class here is numerous and likely consists of thousands of members since Twist common stock was actively traded on a national securities exchange (NASDAQ) during the entirety of the Class Period, with an average weekly trading volume of 6.54% and a minimum of 27.9 million shares outstanding throughout the Class Period.  Coffman Report ¶¶ 29, 70.  Joinder of this necessarily vast number of investors would be impractical.  *See, e.g., SEB I*, 335 F.R.D. at

6

282–83 (numerosity satisfied where defendant corporation had "over six-hundred thousand outstanding shares" of stock during class period). The numerosity requirement of Rule 23(a)(1) is thus met for the Exchange Act claims.

### 2. Commonality Is Established by Questions of Law and Fact Common to Class Members.

Rule 23(a)'s "commonality" requirement is met if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A lead plaintiff "need not show . . . that every question in the case, or even a preponderance of questions, is capable of class wide resolution. So long as there is even a single common question, a would-be class can satisfy the commonality requirement of Rule 23(a)(2).'" *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014). Indeed, "[i]n securities fraud cases, commonality is often satisfied as a result of the inherent nature of such cases." *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *4 (N.D. Cal. Dec. 22, 2016); *see also Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975) ("Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest . . . .").

Here, common issues of law and fact predominate. Commonality is often established for Section 10(b) claims when—as here—a lead plaintiff "alleg[es] that investors were defrauded by the same misleading [statements] over the same period of time, and suffered similar losses as a result." *In re LendingClub Sec. Litig.*, 282 F. Supp. 3d 1171, 1179 (N.D. Cal. 2017).[3] Indeed, "[s]imilarly to other securities fraud class actions, here, Plaintiff[] contend[s] that all class members were harmed as a result of a common course of conduct arising from material misrepresentations

---

[3] In addition, Lead Plaintiff's "control person" claim under Section 20(a) of the Exchange Act requires proof that Leproust and Thorburn controlled Twist, another common issue subject to Class-wide proof. *See, e.g.*, *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 245-51 (N.D. Cal. 2013) (Section 20(a) "extends liability for violations of other provisions of the Act, including Section 10(b), to certain 'controlling persons'"); *Homyk v. ChemoCentryx, Inc.*, 2024 WL 1141699, at *7 (N.D. Cal. Mar. 6, 2024) ("The Court has found certification of the predicate Section 10(b) claim appropriate, and . . . therefore finds certification of the Section 20A violation . . . appropriate."), *leave to appeal denied*, No. 24-1720, 2024 WL 2745788 (9th Cir. May 23, 2024).

and omissions Defendants made to the investing public." *Intuitive Surgical*, 2016 WL 7425926, at *5.

The Amended Complaint alleges that Defendants engaged in a common course of misconduct stemming from their untrue statements of material fact concerning: (i) Twist's purported automation of its workflow (AC ¶¶ 151, 153-54); (ii) Twist's purported product quality (*id.* ¶ 158); and (iii) Twist's purported customer satisfaction (*id.*). The Amended Complaint alleges further that Defendants made these misstatements with the requisite level of scienter (*id.* ¶¶ 164-70), that such misstatements caused the price of Twist common stock to be artificially inflated or maintained (*id.* ¶ 195, 207), that investors relied on these misstatements to their detriment by way of the fraud-on-the-market presumption (*id.* ¶¶ 206-07), and that this fraud was revealed by the Scorpion Report's publication on November 15, 2022, causing a decline in Twist's common stock price (*id.* ¶¶ 200-05), that investors were damaged thereby (*id.* ¶ 227), and that Leproust and Thorburn were control persons of Twist (*id.* ¶¶ 228-29). None of these allegations comprising the elements of the Exchange Act claims requires resolution of issues individual to Lead Plaintiff or any Class member. Rather, each can and will be resolved by common proof and common questions of law. The commonality requirement of Rule 23(a)(2) is thus met for the Exchange Act claims.

**3. Typicality Is Established Because Lead Plaintiff's Claims Arise from the Same Facts and Conduct that Give Rise to Class Members' Claims.**

Rule 23(a)'s "typicality" requirement is met when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Under [Rule 23(a)'s] permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members." *Huberman v. Tag-It Pac. Inc.*, 314 F. App'x 59, 63 (9th Cir. 2009). To establish typicality, the class representatives' claims "need not be substantially identical" to those of other putative class members. *SEB I*, 335 F.R.D. at 283 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). Instead, "[u]nder the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive

8

LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF – CASE NO. 5:22-cv-08168-EKL

with those of absent class members . . . ." *Id.* The claims and defenses at issue for the Lead Plaintiff run in lockstep with those of the Class.

When a lead plaintiff's Exchange Act claims "ar[i]se from the same set of events and course of conduct that gave rise to the claims of other class members," typicality is satisfied. *Id.* at 284; *see also Siemers v. Wells Fargo & Co.*, 243 F.R.D. 369, 375 (N.D. Cal. 2007) ("the claim of lead plaintiff . . . is typical of those by other members of the class . . . for they were all victims to greater or lesser degree of the same undisclosed (alleged) scheme"). Here, Lead Plaintiff and Class members all purchased Twist common stock and assert the same Section 10(b) claims, based on the same misstatements by Defendants, and the same Section 20(a) claim of "control person" liability. *See supra*, § II.

Further, Lead Plaintiff is not subject to any "unique defense[s]," much less any that threaten to become the focus of the litigation, with respect to the Exchange Act claims.[4] *See Huberman*, 314 F. App'x at 62 (deeming the factual basis for alleged unique defense insufficient and "hold[ing] that the district court abused its discretion in denying class certification on atypicality grounds."). The typicality requirement of Rule 23(a)(3) is thus met for the Exchange Act claims.

### 4. Adequacy Is Established Because Lead Plaintiff Has Vigorously Prosecuted This Action and Class Counsel Is Adequate.

#### a. Lead Plaintiff Is Adequate.

Rule 23(a)(4)'s "adequacy" prong requires that the proposed class representatives "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Court's inquiry focuses on two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members[,] and (2) will the named plaintiffs and their counsel prosecute

---

[4] In its interrogatory responses, Lead Plaintiff has disclosed that "it relied on BMO Global Asset Management and William Blair & Company in connection with Lead Plaintiff's transactions and holdings of Twist common stock." Such delegation to investment managers, however, is commonplace for lead plaintiffs in securities class actions and has no bearing on reliance. *See SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 2025 WL 1243818, at *5 (N.D. Cal. Apr. 25, 2025 ("*SEB II*") ("the Class is entitled to *Basic*'s presumption of reliance . . . [t]hus, [plaintiff] . . . is presumed to have relied on the misrepresentation by virtue of [its investment manager's] reliance on a market that fully digests all available material information about a security and incorporates it into the security's price.").

the action vigorously on behalf of the class?" *SEB I*, 335 F.R.D. at 284-285 (quoting *Hanlon*, 150 F.3d at 1020). Alleged conflicts only defeat adequacy where they are "fundamental to the suit" and "go to the heart of the litigation." *Sidibe v. Sutter Health*, 333 F.R.D. 463, 488 (N.D. Cal. 2019).

The Court previously determined that PABF and BFA are qualified and appropriate to act as Lead Plaintiff and Lead Counsel, respectively. (*See* ECF 70.) Lead Plaintiff continues to demonstrate that it is adequate, having vigorously pursued the proposed Class's claims since the inception of the case, including conducting a rigorous investigation to advance the robust and detailed allegations of the Amended Complaint, successfully opposing Defendants' motion to dismiss, propounding numerous discovery requests on Defendants and non-parties, and responding to the numerous discovery requests served by Defendants, including through the production of more than 60,000 pages of documents. (Bauer Decl. ¶ 2.) Lead Plaintiff continues to be fully committed to actively prosecuting the action in the best interest of the Class. (Reichart Decl. ¶ 7.) *See In re LendingClub*, 282 F. Supp. 3d at 1182 ("To establish adequacy lead plaintiffs need only be familiar with the basis for the suit and their responsibilities as lead plaintiffs."). PABF undertook a fulsome and fair due diligence process to select Lead Counsel, further supporting that it will fairly and adequately represent the Class. (Reichart Decl. ¶ 6.) Finally, PABF timely and accurately amended its PSLRA Certification when it became aware that additional transactions existed that were required to be disclosed. *See In re Apple Inc. Sec. Litig.*, 2022 WL 354785, at *5 (N.D. Cal. Feb. 4, 2022) (finding that correction of claimed losses did not indicate lack of diligence by lead plaintiff and holding that "[a]n error in claimed losses may [only] render a movant inadequate if there is evidence of bad faith or intent to deceive the court or the parties . . . defendants do not make such a showing [and] Plaintiff already corrected its inadvertent errors on the certification . . . ."). Lead Plaintiff is also not subject to any unique defenses, *see supra*, III.B.3, and its interests are aligned with the other Class members' interests.

Moreover, the PSLRA was intended to "increase the likelihood that institutional investors will serve as lead plaintiffs," such as Lead Plaintiff here. *See* H.R. Rep. No. 104-369, at 34 (1995) (Conf. Rep.). Lead Plaintiff, which manages more than $3.8 billion for over 27,000 participants (Reichart Decl. ¶ 2), is the paradigmatic institutional investor that the PSLRA envisioned as a

10

class representative. *In re Twitter Inc. Sec. Litig.*, 326 F.R.D. 619, 627 (N.D. Cal. 2018) ("the lead plaintiff provisions were designed to encourage greater institutional investor participation in class action litigation"). PABF is an adequate class representative.

**b. Class Counsel Is Adequate.**

Lead Plaintiff has also protected the interests of the Class by retaining and overseeing BFA as Lead Counsel. BFA is highly experienced in litigating securities class actions, has vigorously prosecuted the claims of the proposed Class, and will continue to do so. *See, e.g.*, *Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 267-68 (N.D. Cal. 2011) (adequacy satisfied where class counsel "has sufficient experience in complex class actions such that they are capable of adequately and vigorously prosecuting this litigation"). Lead Counsel has a proven track record in successfully prosecuting complex securities class actions like this one. (*See* Bauer Decl. Ex. F (BFA resume).) Lead Counsel's adequacy also is demonstrated by its substantial work in investigating and prosecuting this action thus far. *See, e.g.*, *Twitter*, 326 F.R.D. at 628. Indeed, Lead Counsel, under Lead Plaintiff's supervision, developed and filed the detailed Amended Complaint (ECF 83), succeeded in opposing Defendants' motion to dismiss, and has navigated a complex discovery landscape. Accordingly, Lead Plaintiff respectfully submits that proposed Class Counsel satisfies the adequacy requirement of Rule 23(a)(4) and the requirements of Rule 23(g).

**C.    Rule 23(b)(3) Is Satisfied for the Exchange Act Claims.**

Lead Plaintiff seeks class certification pursuant to Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Both requirements are met here.

**1. Predominance Is Established by Common Questions Subject to Class-Wide Proof.**

The Supreme Court has held that "[p]redominance is a test readily met in certain cases alleging . . . securities fraud." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "Considering whether questions of law or fact common to class members predominate begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*,

11

563 U.S. 804, 809 (2011) ("*Halliburton I*").  "Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered on the merits, in favor of the class."  *SEB I*, 335 F.R.D. at 286.

"Considering whether 'questions of law or fact common to the class members predominate' begins, of course, with the elements of the underlying cause of action."  *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, No. 17 Civ. 554, 2018 WL 4931543, at *2 (N.D. Cal. Oct. 11, 2018).  However, a plaintiff seeking class certification does not need to prove that "each elemen[t] of [its] claim [is] susceptible to classwide proof."  *Amgen*, 568 U.S. at 469.  Rather, when "common questions represent a significant portion of the case and can be resolved for all members of the class in a single adjudication," class certification is appropriate.  *SEB I*, 335 F.R.D. at 286.

### i.   Twist Common Stock Trades in an Efficient Market and the Fraud-On-The-Market Presumption Therefore Applies.

Common issues plainly predominate here.  To prevail under Section 10(b) of the Exchange Act and Rule 10b-5, Lead Plaintiff must prove: (1) a material omission or misrepresentation; (2) scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.[5]  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  Significantly, the Supreme Court has held that because materiality and loss causation are common merits issues in a securities fraud class action, proof of those elements is not a prerequisite to class certification.  *See Amgen*, 568 U.S. at 467 (materiality); *Halliburton I*, 563 U.S. at 812-13 (loss causation).  Falsity and scienter are also common issues.  *See, e.g.*, *Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018 WL 4207245 at *4 (N.D. Cal. Sep. 4, 2018) ("Whether Defendants' statements were false, material, made with the requisite scienter, and caused the class members' losses are significant aspects of the case and susceptible to common proof."); *Cooper*, 254 F.R.D. at 640 ("The same evidence applies equally to each class member;

---

[5] Lead Plaintiff's "control person" claims under Section 20(a) of the Exchange Act also depend upon resolution of common questions of fact and law.  *See supra*, n. 3.

LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF – CASE NO. 5:22-cv-08168-EKL

proving or disproving scienter does not hinge on any individual plaintiff's actions, but on Defendants' actions."). Thus, whether common questions predominate for Lead Plaintiff's Section 10(b) claim "turns on the element of reliance." *Halliburton I*, 563 U.S. at 810.

Under *Basic* and *Halliburton II*, Lead Plaintiff may "satisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of a stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-284 (2014) ("*Halliburton II*"); *see also In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 526 (N.D. Cal. 2009) ("reliance may be presumed in securities cases under the fraud-on-the-market doctrine"). To invoke the fraud-on-the-market presumption, Lead Plaintiff need only show that Defendants' statements were publicly made and that Twist common stock traded in an efficient market during the Class Period. *Halliburton II*, 573 U.S. at 277-78. Lead Plaintiff amply demonstrates these requirements. All of the alleged misstatements were publicly available; indeed, many were made in Twist's SEC filings. (*See* AC ¶¶ 151, 153-54, 158.) Additionally, Twist common stock traded in an efficient market, as explained below. There is also no question that Lead Plaintiff, and other Class members, purchased Twist common stock at market prices after the misstatements were made and before the truth was fully revealed. (*See, e.g.*, ECF 132-1.) As a result, the fraud-on-the-market presumption applies.

Importantly, the Supreme Court has confirmed that the fraud-on-the-market presumption "does not rest on a 'binary' view of market efficiency," but instead is based on the "fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'" *Halliburton II*, 573 U.S. at 272 (quoting *Basic*, 485 U.S. at 247 n.24). Lead Plaintiff need only show that the stock traded in a "generally efficient market" at the class certification stage. *Halliburton II*, 573 U.S. at 279.[6]

---

[6] Importantly, *Halliburton II* also held that "plaintiffs need not directly prove price impact to invoke the *Basic* presumption," 573 U.S. at 279; rather, "the defendant bears the burden of persuasion to prove a lack of price impact," *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 126 (2021). Defendants will be unable to do so here. As a threshold matter, "price impact" has no bearing on certifying Plaintiff's Securities Act claims, where reliance and loss causation are not

13

Although the Ninth Circuit has not articulated a specific test for market efficiency, the courts in this Circuit regularly consider the exchange listing and the five factors first set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989) ("*Cammer*").  *See Miller v. Thane Int'l, Inc.*, 615 F.3d 1095, 1102-03 (9th Cir. 2010); *In re LDK Solar*, 255 F.R.D. at 562.  The five *Cammer* factors are: (1) the weekly trading volume; (2) the amount of securities analyst coverage, (3) the existence of market makers and arbitrageurs; (4) the eligibility of the company to file a Form S-3 registration statement, and (5) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the security's prices.  *Cammer*, 711 F. Supp. at 1286-87; *see, e.g.*, *Diamond Foods*, 295 F.R.D. at 247-51.  Courts in this Circuit also consider the three factors noted in *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001) ("*Krogman*"): (1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders (the "float").  *See, e.g.*, *SEB II*, 2025 WL 1243818, at *6.

Mr. Coffman establishes that ***all five*** *Cammer* factors, and all three factors from *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ("*Krogman*"), demonstrate that Twist common stock traded in an efficient market during the Class Period.  (*See* Coffman Report ¶¶ 27-68.) Lead Plaintiff is thus entitled to invoke the fraud-on-the-market presumption.

### 1. *Cammer* 1: Twist Common Stock Traded at a Large Average Weekly Volume.

*Cammer* noted that an average weekly turnover "of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one" and "one percent would justify a substantial presumption." *Cammer*, 711 F. Supp. at 1286.  Twist's

___

required elements. *See* 15 U.S.C. § 77k(a); *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013).  As to the Exchange Act claims, any "price impact" argument will fail, since (among other reasons): (i) the issuance of the Scorpion Report resulted in a substantial price decline; (ii) the Court already rejected Defendants' loss causation arguments, finding an "immediate and drastic drop in value" of Twist common stock after the release of the Scorpion Report, that "three reputable analysts . . . attributed the drop in value to [its] publication," and that "the drop is not readily attributable to non-fraud-related factors"  (ECF 117 at 26-27); and (3) there is no "mismatch between the contents of the misrepresentation and the corrective disclosure," *Goldman*, 594 U.S. at 123, because the Scorpion Report—like the Exchange Act misstatements it revealed to be false—expressly relates to the automation of Twist's workflow, Twist's customer experience, and the quality of Twist's products.

14

common stock easily meets this standard, as its average weekly trading volume during the Class Period was 6.54%—more than 3 times higher than *Cammer*'s 1% to 2% threshold, indicating an efficient market. (Coffman Report ¶ 29.) *See, e.g.*, *Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *5 (N.D. Cal. Dec. 22, 2016) (noting an average weekly trading volume of 4.2% of shares outstanding "favor[ed] a finding of market efficiency").

### 2. *Cammer* 2: A Significant Number of Analysts Followed and Reported on Twist Common Stock.

Twist common stock was the subject of broad analyst and news coverage during the Class Period. At least 20 separate firms had equity analysts issue over 293 reports regarding Twist during the Class Period. (Coffman Report ¶ 35 & Ex. 4.) This factor strongly supports market efficiency. *See, e.g.*, *Hayes*, 2016 WL 7406418, at *5 & n.2 (analyst coverage weighs in favor of market efficiency even though there was coverage by "only seven analysts," and explaining that "courts have weighed this factor in favor of market efficiency when only four or six analysts published reports during the class period").

### 3. *Cammer* 3: Existence of Market Makers, Institutional Investors, and Arbitrageurs.

*Cammer* noted that the "existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87. This factor also strongly supports market efficiency.

As stated above, Twist common stock traded on NASDAQ, which is widely regarded as among the most open, developed, and efficient exchanges in the world. Rather than rely on market makers to provide liquidity for trading, these large, modern exchanges "rely on a computerized system to match orders and provide quotes" and the "minimum requirements to be listed on the NYSE or NASDAQ and remain in good standing virtually guarantee a liquid market for that security." (Coffman Report ¶ 42.)

Additionally, institutional investors (defined as all SEC Form 13-F filers) held significant positions in Twist common stock during the Class Period. Institutions held an average of 87.5% of

15

the Twist's common stock public float during the Class Period, which supports hundreds of institutions owning Twist common stock.  (Coffman Report ¶ 75 & Ex. 12.)  This supports a finding of market efficiency because the participation of sophisticated investors facilitates the incorporation of material information into securities prices.  *See, e.g.*, *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 356-57 (C.D. Cal. 2015) (explaining that "[s]ome courts have found that a large number of institutional investors holding a company's stock suggests that a market is efficient," and summarizing that courts have found as few as 70 institutional owners holding as little as 11% of total outstanding common stock weighs in favor of market efficiency).

### 4.  *Cammer* 4: Eligibility to File SEC Form S-3.

Twist met the eligibility requirements to issue a Form S-3 throughout the Class Period. (Coffman Report ¶ 46.)   This factor supports market efficiency because companies are only permitted to make such simplified filings if the SEC believes "that the market operates efficiently for these companies."   *Cammer*, 711 F. Supp. at 1284 (quoting SEC Securities Act Release No. 6331 (Aug. 13, 1981)); *see e.g.*, *In re Diamond Foods, Inc.*, 295 F.R.D. at 248 ("[t]hat a company's public offerings met the threshold requirements for filing a Form S–3 tends to support a finding of efficiency . . . .").

### 5.  *Cammer* 5: The Relationship Between News Events and Security Price Changes.

*Cammer* noted that "one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause-and-effect relationship between the company disclosures and resulting movements in stock price."   *Cammer*, 711 F. Supp. at 1291.   While courts have rejected the idea that the fifth *Cammer* factor is necessary to establish market efficiency, *see, e.g.*, *In re Montage Tech. Grp. Ltd. Sec. Litig.*, No. 14 Civ. 722, 2016 WL 1598666 at *8 (N.D. Cal. Apr. 21, 2016), there is more than enough support to illustrate this cause-and-effect relationship here.

Specifically, to further substantiate market efficiency, Mr. Coffman's event study establishes the cause-and-effect relationship between Twist's disclosures and resulting movements in its stock price, satisfying *Cammer* 5.  Event studies seek "to show that the market price of the

16

defendant's stock tends to respond to pertinent publicly reported events." *Halliburton II*, 573 U.S. at 280.  An event study "is a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price." *In re Diamond Foods, Inc.*, 295 F.R.D. at 247.  An event study is "[t]he most common empirical test for a causal connection" and widely accepted by courts to prove the cause-and-effect relationship contemplated by *Cammer*. *Id.* at 248; *see also SEB II*, 2025 WL 1243818, at *7 (finding market efficiency where "statistically significant price movements occurred 20 times more frequently on financial information release days than on non-release days.")

Mr. Coffman, an experienced expert on the subject, conducted an event study using a widely accepted methodology and concluded that the price of Twist common stock reflected the information disclosed to the market, and promptly responded to the disclosure of new, material, unexpected information.  (Coffman Report ¶¶ 53-68.)  Specifically, Mr. Coffman's event study compared dates during the Class Period on which Twist released earnings announcements and preannouncements, against days without such events.  (*Id.*)

This event study revealed that Twist common stock reacted with statistical significance at the 5% significance level (sometimes called the 95% confidence level) on seven of the sixteen earnings days, or 43.75%.  (Coffman Report ¶ 63 & Ex. 7.)  By comparison, statistically significant price reactions (at the same 95% confidence level) occurred on just 2.6% of non-earnings days. (*Id.* ¶ 64.)  In other words, there were more likely to be big price movements on days when "unexpected . . . events or financial releases" occurred, demonstrating a prompt response in the price of Twist common stock.  *Cammer*, 711 F. Supp. at 1287.

### 6. Additional *Krogman* Factors Further Establish Market Efficiency.

Each of the three *Krogman* factors also strongly supports efficiency.  *First*, "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman*, 202 F.R.D. at 478.  During the Class Period, the average market capitalization of Twist common stock was $2.93 billion.  (Coffman Report

17

¶ 70.) This means that, throughout the vast majority of the Class Period, Twist's market capitalization was in the top half of the firms listed on the combined NYSE and NASDAQ exchanges. (*Id.*) Numerous courts have found similar or even far lower market capitalization levels to support market efficiency. *See, e.g.*, *Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, 2021 WL 229310, at *6 (N.D. Cal. Jan. 21, 2021) (finding market efficiency where defendant corporation had an average market capitalization of $2.09 billion during the class period).

*Second*, the narrow bid-ask spreads for Twist common stock also support efficiency. "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Krogman*, 202 F.R.D. at 478. During the Class Period, the average bid-ask spread on Twist common stock was between 0.067% and 1.141%, which was generally below the average and median bid-ask spread of a random sample of 100 other common stocks trading on the NYSE and NASDAQ. (Coffman Report ¶ 73.) These narrow bid-ask spreads compare favorably to the spreads in other cases finding market efficiency. *See, e.g.*, *Petrie*, 308 F.R.D. at 356 (finding that even an average bid-ask of 2.91% during the Class Period supports market efficiency).

*Third*, when evaluating efficiency, "courts also consider the percentage of shares held by the public, rather than insiders," known as the float. *Krogman*, 202 F.R.D. at 478. A larger float may be an indicator of market efficiency. (Coffman Report ¶ 74.) During the Class Period, the float for Twist common stock was 89.3% of the shares outstanding. (*Id.*) The large percentage of Twist common stock in the float supports market efficiency. *See, e.g.*, *Petrie*, 308 F.R.D. at 357 (float of 87.4% of shares weighed in favor of market efficiency).

### 7. Twist's Listing on NASDAQ Further Supports Market Efficiency.

At all relevant times, Twist common stock was listed and actively traded on NASDAQ. (Coffman Report ¶ 41.) The listing of a security on a major exchange such as NASDAQ weighs in favor of a finding of market efficiency and supports invoking the presumption of reliance. *See Huberman*, 314 F. App'x at 63 (where defendant company's stock "was traded on a national exchange and the stock prices reflected public information an efficient market is present"); *see also In re Diamond Foods, Inc.*, 295 F.R.D. at 250 (finding market efficiency and noting that defendant

18

has not "identified any authority, binding or otherwise, that has held that common shares traded on the NASDAQ are not traded in an efficient market"); *Hayes*, 2016 WL 7406418, at *7 (the fact that defendant's stock traded on the NYSE, "though not dispositive of market efficiency, certainly helps to confirm that conclusion").

        **8. A Lack of Consistent Autocorrelation Also Demonstrates Efficiency as to Twist Common Stock.**

One additional factor, autocorrelation, considers whether changes in a security's prices can be statistically predicted based on past price movements. (Coffman Report ¶ 76.) Courts have recognized that an absence of autocorrelation weighs in favor of market efficiency because "an efficient market incorporates information quickly into the first day's price, whereas an inefficient market would not fully digest the information until later." *Petrie*, 308 F.R.D. at 356. Persistent autocorrelation would indicate that past price movements are not fully reflected in the current price. (Coffman Report ¶ 77.)

Here, Mr. Coffman found that "[t]he [autocorrelation] coefficient is not statistically different than zero, meaning there is no evidence of statistically significant autocorrelation" in Twist ordinary share prices during the Class Period, again supporting a finding of market efficiency. (*Id.* ¶ 79 & Ex. 13.); *see Petrie*, 308 F.R.D. at 356 (finding that "this factor weighs in Plaintiffs' favor" where "Plaintiffs' expert's autocorrelation study found no significant autocorrelation for [defendant's common stock's] raw or excess returns over the Class Period"); *Granite*, 2021 WL 229310, at *6 (finding plaintiff entitled to fraud-on-market presumption where plaintiff's expert found no autocorrelation of defendant's common stock during the class period).

        **2. Damages for the Exchange Act Claims Can Be Calculated on a Class-Wide Basis by Common Methodology.**

The law in the Ninth Circuit is that "differences in damage calculations" cannot defeat class certification. *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 986-88 (9th Cir. 2015) (holding that district court erred in denying class certification, and confirming that "even after *Comcast*," individualized "damage calculations alone cannot defeat class certification."); *see also*

19

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 348 F.R.D. 372, 395 (S.D. Cal. 2024) (rejecting defendants' *Comcast* argument because "[a]t this stage in the proceedings, [p]laintiffs need only show that damages could feasibly and efficiently be calculated once the common liability questions are adjudicated . . . [and their] proposed damages model meets this burden"). Such is plainly the case here.

While Rule 23 does ***not*** require that "proponents of class certification must rely upon a classwide damages model to demonstrate predominance," *Intuitive Surgical*, 2016 WL 7425926, at *17, Lead Plaintiff has shown here that damages can be determined on a class-wide basis using an event study to measure the amount of artificial inflation in Twist stock on each day of the Class Period. This standard and well-accepted method for calculating class-wide damages in cases under Section 10(b) of the Exchange Act is referred to as the "out-of-pocket" method, which states that damages are equal to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the PSLRA's "90-day lookback" provision (a formulaic limit on damages that also can be applied class-wide)). *See Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *8 (N.D. Cal. Mar. 16, 2016) ("the 'out-of-pocket' or 'event study' method" routinely satisfies the "class-wide damages" requirement.)

Mr. Coffman demonstrates that, although 'such calculations would likely depend, in part, on the completion of discovery and full development of the case record," per-share damages can be determined on a Class-wide basis with a proposed model that would (1) use an event study to isolate the price movements specific to Twist common stock when Defendants' alleged fraud was revealed; (2) determine the amount of "artificial inflation per share" in the price of Twist common stock for each day during the Class Period; and (3) mechanically calculate each Class member's individual damages by analyzing their actual transactions as part of the claims process. (Coffman Report ¶¶ 81-86.) This is more than sufficient at this stage. *See SEB I*, 335 F.R.D. at 288 ("Plaintiff's proposed 'out of pocket' damages methodology, which uses an event study to determine the price inflation attributable to the alleged fraud, is widely accepted for calculating damages of a class of stockholders" and "does not involve any individualized issues."). Courts in

20

this Circuit have repeatedly accepted Mr. Coffman's proposed class-wide damages methodology in Exchange Act class actions. *See, e.g.*, *Granite*, 2021 WL 229310; *In re SanDisk LLC Sec. Litig.*, 2018 WL 4293336 (N.D. Cal. Sept. 4, 2018); *Baker v. SeaWorld Ent., Inc.*, 2017 WL 5885542 (S.D. Cal. Nov. 29, 2017).

### 3. Superiority Is Established Because This Federal Securities Class Action Raises No Unusual Manageability Issues.

Finally, Rule 23's "superiority" requirement is met when a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) provides four factors to guide the analysis: (a) the class members' interests in individually controlling the prosecution of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in managing a class action.

Each factor demonstrates the superiority of a class action here. The Class consists of a large number of investors who are geographically dispersed and whose individual damages are likely small enough to render individual litigation prohibitively expensive. "Class actions are particularly well-suited in the context of securities litigation, wherein geographically dispersed shareholders with relatively small holdings would otherwise have difficulty in challenging wealthy corporate defendants." *In re VeriSign*, 2005 WL 7877645, at *9. Concentrating the litigation in this Court has a number of benefits, including eliminating the risk of inconsistent adjudication. Indeed, there is no other pending litigation advancing these claims. Federal securities class actions are routinely certified and raise no unusual manageability issues; this case is no different. *See, e.g.*, *Twitter Inc.*, 326 F.R.D. at 631 ("Courts in this district have recognized the utility of the class action device in securities cases.").

### D. Rule 23(a) Is Satisfied for the Securities Act Claims.

The Securities Act claims also readily satisfy Rule 23(a)'s requirements.

21

**1.  Numerosity Is Established Because Twist Sold More Than 3.2 Million Shares In the December 2020 Offering.**

Twist sold more than 3.2 million shares of its common stock in the December 2020 Offering, raising nearly $350 million in proceeds.  (AC ¶ 38.)  The presumption that, "[i]n cases involving securities traded on national stock exchanges, numerosity is practically a given" applies with respect to Securities Act claims.  *In re Talis Biomedical Corp. Sec. Litig.*, 2024 WL 536303, at *3 (N.D. Cal. Feb. 9, 2024) (certifying Securities Act class); *see also Katz v. China Century Dragon Media, Inc.*, 287 F.R.D. 575, 584 (C.D. Cal. 2012) ("That there were thousands of transactions lead[s] to the reasonable inference that there were hundreds, if not thousands of individuals who made these trades and by whom claims can be made under Section 11.")  The numerosity requirement of Rule 23(a)(1) is thus met for the Securities Act claims.

**2.  Commonality Is Established by Questions of Law and Fact Common to Class Members.**

Commonality is often established for Section 11 claims—and corresponding control person claims under Section 15—when a lead plaintiff alleges that offering documents "contained untrue statements of material fact or omitted to disclose material facts . . . ."  *In re Lyft Inc. Sec. Litig.*, 2021 WL 3711470, at *3 (N.D. Cal. Aug. 20, 2021); *see also e.g.*, *McFarland v. Memorex Corp.*, 96 F.R.D. 357, 365 (N.D. Cal. 1982) ("The requirement of commonality in Rule 23(a)(2) is met because under Section[] 11 . . . there is a common question of fact as to the presence of any misstatements or omissions in the registration statement.").  Moreover, Section 11 does not require reliance, 15 U.S.C. § 77k(a), and therefore, "a § 11 case will never demand individualized proof as to an investor's reliance or knowledge . . . ."  *Hildes*, 734 F.3d at 859.

The Amended Complaint alleges with respect to the Securities Act claims that the 2020 Registration Statement for the December 2020 Offering and documents incorporated therein contained untrue statements of material fact concerning Twist's:  (i) automation of its workflow or lack thereof (AC ¶¶ 118, 120); offering of retrospective discounts or rebates (*id.* ¶ 121); and (iii) Twist's financial metrics, including Cost of Revenue, R&D Expense and Gross Revenue (*id.* ¶¶ 113-14).  The Amended Complaint further alleges that investors in the December 2020 Offering

22

were damaged by way of these misstatements (*id.* ¶ 223) and that Leproust and Thorburn were control persons of Twist with respect to the content and issuance of the 2020 Registration Statement (*id.* ¶¶ 219-22). All of these issues involve common questions that can be resolved by common proof and common questions of law. The commonality requirement of Rule 23(a)(2) is thus met for the Securities Act claims.

### 3. Typicality is Established Because Lead Plaintiff's Claims Arise from the Same Facts and Conduct that Give Rise to Class Members' Claims.

Because Lead Plaintiffs' Securities Act claims, like its Exchange Act claims, "ar[i]se from the same set of events and course of conduct that gave rise to the claims of other class members," typicality is satisfied. *SEB I*, 335 F.R.D. at 284. Lead Plaintiff and other Class members asserting Securities Act claims purchased Twist common stock in the December 2020 Offering, assert the same Section 11 claims based on the same misstatements in the 2020 Registration Statement, and assert the same Section 15 claims of "control person" liability. *See supra*, § II. Moreover, Lead Plaintiff is not subject to any unique defense under the Securities Act. The typicality requirement of Rule 23(a)(3) is thus met for the Securities Act claims.

### 4. Adequacy Is Established Because Lead Plaintiff Has Vigorously Prosecuted This Action and Class Counsel Is Adequate.

Lead Plaintiff and Lead Counsel are adequate for the same reasons set forth above with respect to the Exchange Act claims. *See supra*, III.B.4; *see also In re Snap Inc. Sec. Litig.*, 334 F.R.D. 209, 224 (C.D. Cal. 2019) (certifying class and noting that the Court's adequacy "analysis with regard to the Securities Act claims d[id] not differ materially from those regarding the Exchange Act claims . . . .")

### E.    Rule 23(b)(3) Is Satisfied for the Securities Act Claims.

#### 1.    Common Issues Predominate for the Securities Act Claims.

Common issues plainly predominate because the Securities Act claims can be proven by class-wide proof and their resolution will depend upon common issues of fact and law. *See supra*,

23

§ III.D.2.  There are no individualized issues that will predominate over the plethora of common ones.

Moreover, inquiries into Class members' Section 11 standing do not defeat predominance. For one thing, such narrow inquiries cannot predominate over common issues, such as material falsity.  And in all events, such an inquiry is unnecessary because the Class definition itself ensures that all Securities Act class members have standing.  *See Sudunagunta v. NantKwest, Inc.*, 2018 WL 3917865, at *9 (C.D. Cal. Aug. 13, 2018) ("[t]he definition of the proposed class already addresses" standing).  Specifically, only direct purchasers—*i.e.*, all persons and entities who purchased or acquired Twist common stock in the December 2020 Offering, *see supra*, § I—are included in the Securities Act Class.  This Class definition avoids the need for tracing inquiries and ensures that all Securities Act Class members "purchased [their] shares directly in the secondary offering itself," *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013), and therefore undoubtedly have standing.[7]  The legion of issues common to the Securities Act claims, *see supra*, § III.D.2, prevail over any individual ones.

### 2.  Damages for the Securities Act Claims Can Be Calculated on a Class-Wide Basis by Statutory Formula.

"The plain language of section 11(e) prescribes the method of calculating damages, *see* 15 U.S.C. § 77k(e), and the court must apply that method in every case."  *McMahan & Co. v. Wherehouse Ent., Inc.*, 65 F.3d 1044, 1048 (2d Cir. 1995).  Mr. Coffman explains that he can readily calculate damages for the Securities Act claims on a Class-wide basis using Section 11's statutory

---

[7] Purchases and acquisitions of Twist common stock will be considered to have been made in the December 2020 Offering only if they occurred between December 2, 2020 and December 7, 2020 (both dates inclusive), and were made (i) at the December 2020 Offering price of $110.00 and/or (ii) directly from an underwriter for the December 2020 Offering (J.P. Morgan Securities LLC, Goldman Sachs & Co. LLC, Cowen and Company, LLC, Evercore Group L.L.C., and Robert W. Baird & Co. Incorporated).  These criteria are routinely applied at the claims administration stage.  *See, e.g.*, *Nacif v. Athira Pharma, Inc.*, 2024 WL 643513, at *3 (W.D. Wash. Feb. 15, 2024) (approving settlement of Securities Act claims for claimants with "shares acquired during the SPO directly from one of the Underwriters [at] the purchase price [of] $22.50.")

24

formula.[8]  (Coffman Report ¶¶ 87-90.)  Section 11's statutory damages formula confirms that predominance is satisfied.  *See In re Facebook, Inc.*, 312 F.R.D. 332, 350 (S.D.N.Y. 2015) ("Because the statutory formula applies, the individual damages questions are sufficiently reduced such that predominance of the common questions, answers, and facts remains.").

### 3. Superiority Is Established Because This Federal Securities Class Action Raises No Unusual Manageability Issues.

Lead Plaintiff respectfully submits that a class action is a superior method for adjudicating the Securities Act claims for the same reasons set forth with respect to the Exchange Act claims. *See supra*, III.C.3.

## IV.    CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court grant this motion and: (1) certify this Action as a class action pursuant to Rule 23(a) and (b)(3); (2) appoint Lead Plaintiff as Class Representative pursuant to Rule 23(a) and (b)(3); and (3) appoint BFA as Class Counsel pursuant to Rule 23(g).

Dated: March 13, 2026

By: */s/ Joseph A. Fonti*
**BLEICHMAR FONTI & AULD LLP**
Joseph A. Fonti (*pro hac vice*)
jfonti@bfalaw.com
Nancy A. Kulesa (*pro hac vice*)
nkulesa@bfalaw.com
George N. Bauer (*pro hac vice*)
gbauer@bfalaw.com
Benjamin Burry (*pro hac vice*)
bburry@bfalaw.com
Thayne Stoddard (*pro hac vice*)
tstoddard@bfalaw.com
300 Park Avenue, Suite 1301
New York, New York 10022

---

[8] Section 11 damages are "the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought . . . ."  15 U.S.C. § 77k(e).

Tel: (212) 789-1340
Fax: (212) 205-3960

– and –

Adam C. McCall (Bar No. 302130)
1330 Broadway, Suite 630
Oakland, California 94612
Telephone: (415) 445-4003
Facsimile: (415) 445-4020
amccall@bfalaw.com

*Counsel for Lead Plaintiff Policemen's
Annuity and Benefit Fund of Chicago and
Lead Counsel for the Putative Class*

John A. Kehoe (*pro hac vice*)
**KEHOE LAW FIRM, P.C.**
41 Madison Avenue, 31st Floor
New York, NY 10010
Telephone: (215) 792-6676
jkehoe@kehoelawfirm.com

*Additional Counsel for Lead Plaintiff
Policemen's Annuity and Benefit Fund of
Chicago*

26